# EXHIBIT B

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

PACTOOL INTERNATIONAL LTD.,

Plaintiff,

v.

KETT TOOL COMPANY, INC., et al.,

Defendants.

CASE NO. C06-5367BHS

ORDER

This matter comes before the Court on Plaintiff PacTool International Ltd.'s ("PacTool") motion to exclude the report and testimony of Richard A. Killworth ("Killworth") (Dkt. 255), motion to exclude the opening expert report and related testimony of Keith A. Hock ("Hock") (Dkts. 257 & 258), motion to exclude portions of the opening report and related testimony of Nicholas C. Tarkany ("Tarkany") (Dkt. 259), and motion to bifurcate trial (Dkt. 278). The Court has reviewed the briefs filed in support of and in opposition to the motions and the remainder of the file.

## I.  PROCEDURAL HISTORY

On June 29, 2006,  PacTool filed a complaint against Kett Tool Company, Inc. ("Kett") alleging patent infringement. Dkt. 1. On April 8, 2010, PacTool filed a First Amended Complaint against Kett and Defendant H. Rowe Hoffman alleging patent infringement. Dkt. 63.  On July 14, 2010, Kett answered the complaint and asserted numerous affirmative defenses, including certain equitable defenses. *See* Dkt. 95.  On December 6, 2010, Elizabeth Tu Hoffman, executor for H. Rowe Hoffman, (the "Estate"; collectively with Kett "Defendants") was substituted for H. Rowe Hoffman.  Dkt. 121.

On October 20, 2011, PacTool filed a motion to exclude the report and testimony of Killworth (Dkt. 255), a motion to exclude the opening expert report and related testimony of Hock (Dkts. 257 & 258), and a motion to exclude the portions of the opening report and related testimony of Tarkany (Dkt. 259). On October 31, 2011, Defendants responded. Dkts. 267, 268, & 269. On November 4, 2011, PacTool replied. Dkts. 273, 274, & 275.

On November 7, 2011, PacTool filed a motion to bifurcate trial. Dkt. 278. On December 5, 2011, Defendants responded. Dkt. 299. On December 16, 2011, PacTool replied. Dkt. 303.

## II. DISCUSSION

### A. Motion to Bifurcate

A court "may order a separate trial of one or more separate issues, claims, cross claims, counterclaims, or third-party claims." Fed. R. Civ. P. 42(b). Such bifurcation is warranted "for convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). Bifurcation is within the sound discretion of the trial court. *Hirst v. Gertzen*, 676 F.2d 1252, 1261 (9th Cir. 1982).

In this case, PacTool requests that the Court bifurcate trial on the equitable issues from the legal issues. Dkt. 278 at 11. PacTool, however, has failed to persuade the Court that bifurcation of the issues is either necessary or more convenient. The factual issues of invalidity and inequitable conduct are intertwined because the issues are based on whether there was prior sales of the patentable device. With regard to the defenses of laches, waiver, equitable estoppel, implied license and unclean hands, PacTool has failed to persuade the Court that the evidence is so prejudicial that it requires a separate trial. Based on the parties' briefs and evidence in the record, the case can be managed by a single trial and it is unlikely that the jury will be confused or make a mistake if the

evidence on equitable issues is presented.  Therefore, PacTool's motion to bifurcate is denied.

**B.     Motions to Exclude**

Federal Rule of Evidence 702 governs the admission of expert testimony and provides in part as follows:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993), and Rule 702, courts are charged with a "gatekeeping role," the objective of which is to ensure that expert testimony admitted into evidence is both reliable and relevant.  Courts do not permit expert testimony that "invades the province of the jury to find facts and that of the court to make ultimate legal conclusions." *Sundance, Inc. v. Demonte Fabricating Ltd.*, 550 F.3d 1356, 1364 (Fed. Cir. 2009).  "Admission of expert testimony is within the discretion of the trial court*." Acoustical Design, Inc. v. Control Elecs. Co.*, 932 F.2d 939, 942 (Fed. Cir. 1991) (citing *Salem v. U.S. Lines Co.*, 370 U.S. 31, 35 (1962)).

In this case, PacTool moves to exclude the report and related testimony of three experts: Killworth, Hock and Tarkany.  The Court will address each motion separately.

**1.     Killworth**

The Estate has retained Killworth, who is a registered and practicing patent attorney.  Dkt. 255-2 at 23.  Killworth provides as follows:

> If called upon to testify at the trial of this case, I expect to testify regarding Patent Office practice and procedure, and that at least one person with the duty of disclosure violated that duty during the original prosecution of the '303 and '998 patents, and at least one person with the duty of disclosure violated that duty during the reexamination of those same patents.

*Id.* at 13.  Killworth may testify regarding Patent Office practice and procedure.  *See Sundance*, 550 F.3d at 1363 n. 5.  The remainder of Killworth's proffered testimony, however, is clearly legal conclusions that persons violated the duty of disclosure.  Therefore, the Court grants PacTool's motion as to all testimony except the practices and procedures of the Patent Office.  The Court may exclude this testimony as well because it has not been shown that specialized knowledge of these procedures will assist a jury as to any evidence in this particular case.

### 2. Hock

Kett has retained Hock to provide an opinion on (1) whether Kett made a sale to PacTool before March 6, 1997 and (2) PacTool's damages.  Dkt. 257-1 at 7.  PacTool moves to exclude the opening report of Hock and related testimony regarding when and if sales were made because it is not credible, it is outside of Hock's expertise, and it would be confusing to the jury.  Dkt. 257 at 7-11.  The Court agrees with PacTool and finds that Hock's opening report improperly invades the province of the jury to find facts that are at issue.  Hock relies on sales documents and inventory documents to conclude that Kett sold the thin blades to PacTool prior to March 6, 1997.  That specific conclusion is a question of fact for the jury to determine.  If the Court allowed this testimony, Hock would not be assisting the trier of fact to understand or determine a fact at issue; Hock would be providing testimony that there actually was at least one sale made.  This is improper.  Therefore, the Court grants PacTool's motion to exclude the opening report and related testimony of Hock.

### 3. Tarkany

Defendants have retained Tarkany as a "technical expert consultant."  Dkt. 259-2 at 2.  Tarkany provides as follows:

> If called upon to testify at trial of this case, I expect to testify about the invalidity of asserted claims of U.S. Patent No. 5,993,303 ("the '303 patent") and U.S. Patent No. 6,250,998 ("the '998 patent") (including their respective reexamination

certificates) (collectively "the patents-in-suit") and/or the unenforceability of those patents.

*Id*. at 4. An expert qualified in the pertinent art may testify on issues

> such as the nature of the claimed invention, the scope and content of prior art, the differences between the claimed invention and the prior art, or the motivation of one of ordinary skill in the art to combine these references to achieve the claimed invention.

*Sundance*, 550 F.3d at 1364.

In this case, Tarkany is a machinist and PacTool does not challenge his qualifications as an expert. Thus, under applicable case law, Tarkany may testify on certain aspects of the prior art and its relevance in this case. Tarkany, however, may not testify regarding pure issues of law, such as obviousness, inventorship, and derivation. These issues are best left to trial and the Court will not enter a blanket order limiting Tarkany's specific testimony. On the other hand, the Court will consider entering a blanket order with regard to Defendants' failure to comply with the rules of discovery.

Fed. R. Civ. P. 26(a)(2) requires that an expert report must be "detailed and complete." Specifically, expert reports

> shall contain a complete statement of all opinions to be expressed and the basis and reasons therefore; the data or other information considered by the witness in forming the opinions; [and] any exhibits to be used as a summary of or support for the opinions . . . .

Fed. R. Civ. P. 26(a)(2)(B). The consequences of an expert's failure to meet those requirements are also set out in the Federal Rules:

> [a] party that without substantial justification fails to disclose information required by Rule 26(a) . . . is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

Fed. R. Civ. P. 37(c)(1).

In this case, PacTool argues (1) that Tarkany failed to disclose specific combinations of prior art that would render the patents invalid and (2) that the two Japanese patents that Tarkany relied upon should be excluded because Defendant failed to

comply with the rules of evidence and rules of civil procedure.  With regard to the former issue, the Court agrees with PacTool that Tarkany has failed to disclose the basis and reasons for his opinion that there are "dozens" of obviousness combinations that render the patents invalid.  Defendants content that they "will only seek to make invalidity arguments disclosed in the Invalidity Contentions and will ensure that the scope of Mr. Tarkany's testimony is congruent with the scope of his report."  Dkt. 269 at 4.  Therefore, the Court grants PacTool's motion, at least to this extent.  The Court will also place the burden upon Defendants at trial to show that an obviousness combination was actually disclosed in Tarkany's report and is not based on speculation because it was unduly burdensome to disclose during discovery.

With regard to the Japanese patents, Defendants have clearly failed to comply with Federal Rule of Evidence 902(3) and Federal Rule of Civil Procedure 44(a)(2).  Defendants have also failed to offer any substantial justification for this failure.  Morever, providing full, certified copies of the translations now would require additional discovery and expert analysis.  Therefore, the Court grants PacTool's motion on this issue and any evidence based on these patents will be excluded from trial.

### III.  ORDER

Therefore, it is hereby **ORDERED** that PacTool's motion to exclude the Killworth report and related testimony (Dkt. 255) is **GRANTED in part** and **DENIED in part** as stated herein; PacTool's motion to exclude the opening expert report and related testimony of Hock (Dkts. 257 & 258) is **GRANTED**; PacTool's motion to exclude the portions of the opening report and related testimony of Tarkany (Dkt. 259) is **GRANTED**

**in part** and **DENIED in part** as stated herein; and PacTool's motion to bifurcate trial (Dkt. 278) is **DENIED**.

DATED this 4th day of January, 2012.

BENJAMIN H. SETTLE
United States District Judge

Downloaded from vLex by Rene Vazquez

Page 1039

**87 F.3d 1039**

**96 Cal. Daily Op. Serv. 4264, 96 Daily Journal**

**D.A.R. 6885**

**The CROW TRIBE OF INDIANS; Crow Tribal Gaming Commission; Absaloka Casino Enterprise, Inc.; Clara Nomee; Gavin Jefferson; Henrietta Pretty On Top; Leon Pretty Weasel; Tyrone Ten Bear; and Steven Stevens, Plaintiffs-Appellants, v. Marc RACICOT, individually and as Governor of the State of Montana; Janet Jessup, individually and in her capacity as Administrator of the Montana Gambling Control Division; Joseph Mazurek, individually and in his capacity as Attorney General for the State of Montana; Deanne Sandholm, individually and in her capacity as Assistant Attorney General for the State of Montana; Montana Gambling Control Division; and the State of Montana, Defendants-Appellees.**

No. 95-35407.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted May 7, 1996.

Decided June 14, 1996.

**[*1041]** John Fredericks, III, Fredericks, Pelcyger, Hester & White, Boulder, Colorado, for plaintiffs-appellants.

Clay R. Smith, Solicitor, Attorney General of Montana, Helena, Montana, for defendants-appellees.

Appeal from the United States District Court for the District of Montana.

Before LAY, * CHOY, and LEAVY, Circuit Judges.

CHOY, Circuit Judge:

This appeal presents a dispute between the Crow Tribe and the State of Montana over the use of mechanical slot machines on the Crow Indian Reservation. The district court granted summary judgment against the Crow Tribe's claim that the Tribe may operate mechanical slot machines on their Reservation. We affirm.

Statement of the Case

The Indian Gaming Regulatory Act of 1988 ("IGRA"), 25 U.S.C. §§ 2701-2721, provides a comprehensive framework for regulating gaming on Indian land. The IGRA divides Indian gaming into three classes, each subject to varying degrees of tribal, state and federal regulation. Class I gaming is defined as social games for prizes of minimal value, and traditional forms of Indian gaming conducted as part of tribal ceremonies and celebrations. § 2703(6). Class I gaming is within the exclusive jurisdiction of Indian tribes and is not subject to state or federal regulation

§ 2710(a)(1). Class II gaming includes bingo and related games. § 2703(7). Class II gaming is within the exclusive jurisdiction of Indian tribes subject only to federal oversight. § 2710(a)(2). Class III gaming, the type of gaming at issue in this appeal, "means all forms of gaming that are not class I gaming or class II gaming." § 2703(8).

Class III gaming activities may be conducted on Indian lands only if (1) authorized [*1042] by a tribal ordinance, (2) located in a state that permits such gaming for any purpose by any person, organization, or entity, and (3) is conducted in conformance with a Tribal-State compact. § 2710(d)(1). The IGRA provides a framework for the negotiation of a compact. If a state fails to enter into negotiations or fails to negotiate in good faith, the IGRA permits a tribe to bring an action in federal court to compel a state to negotiate in good faith. § 2710(d)(7)(A). 1

In March 1993, the Crow Tribe ("Crow") and the State of Montana ("State") executed a Tribal-State compact authorizing Class III gaming on the Crow Reservation. The Tribal-State compact was approved by the Secretary of the Interior as required by § 2710(d)(8). On January 8, 1994, the Crow Tribal Council adopted the Crow Tribal Gaming Ordinance. Section 10 of the Gaming Ordinance establishes the Crow Tribal Gaming Commission ("Commission") and delegates to the Commission the authority to regulate Class III gaming and to issue regulations implementing that authority. On March 3, 1994, the Commission promulgated regulations governing administrative proceedings relating to Class III gaming. Final decisions of the Commission are appealable to the Crow Tribal Court.

Appellant Absaloka Casino Enterprise, Inc. ("ACE") is a tribally-chartered corporation wholly owned by the Crow. ACE owns and operates the Little Bighorn Casino located within the Crow Indian Reservation.

On April 23, 1994, ACE filed a declaratory judgment action with the Commission. ACE requested that the Commission determine whether mechanical slot machines are authorized under Appendix F of the compact. The Commission set a hearing date for April 29, 1994 and notified the State. The State, through Governor Racicot, chose not to appear at the hearing. Instead, Governor Racicot sent a letter to the Commission stating that the Commission's interpretation of the compact would not be binding on the State.

Downloaded from vLex by Rene Vazquez



The Commission held a hearing on ACE's petition on April 29, 1994. On the basis of the evidence presented by ACE, the Commission issued an order declaring that ACE could lawfully operate mechanical slot machines consistent with the IGRA and Appendix F of the compact. Thereafter, Governor Racicot sent a letter dated May 20, 1994, to the Commission stating that the Commission's order was not binding on the State; that the compact does not authorize the use of slot machines; and that the use of slot machines would be a substantial failure by the tribe in its performance under the compact. The State did not seek relief from the Commission's order in the Crow Tribal Court.

ACE began operating mechanical slot machines on June 17, 1994. On the following day, state and federal agents entered the Little Bighorn Casino with a search warrant and seized the slot machines. The search warrant was supported by an affidavit from FBI agent Steven Santala. Santala's affidavit was based on information provided by Janet Jessup, the Administrator of the Montana Gambling Control Division.

The Crow filed suit in district court seeking declaratory, injunctive, and monetary relief under 42 U.S.C. § 1983. The Crow's first, fifth, and sixth causes of action alleged that the State violated the Crow's right to regulate Class III gaming and operate mechanical slot machines. The Crow's second, third, and fourth causes of action alleged that the State violated their Equal Protection, Due Process, and Fourth Amendment rights. The district court granted summary judgment against all of the Crow's claims.

On appeal, the Crow present two bases in favor of the use of mechanical slot machines. First, the Crow argue that the Commission's order collaterally estops the State from maintaining that slot machine use is not permitted. The Crow contend that the order became final when the State failed to appeal to the Tribal Court and respect for tribal self-government prevents relitigation of this **[*1043]** issue in federal court. Second, the Crow argue that even if this issue may be relitigated, slot machines are permitted under the compact. The Crow also appeal the district court's grant of summary judgment against their Fourth Amendment and Due Process claims. The Crow do not appeal the district court's grant of summary judgment against their Equal Protection claim.

We review a grant of summary judgment de novo. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir.1995), cert. denied, --- U.S. ----, 116 S.Ct. 1261, 134 L.Ed.2d 209 (1996). We must determine, viewing the evidence in the light most favorable to the nonmoving

party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law. Id. Discussion A. The State is not estopped from arguing that the compact does not permit the use of mechanical slot machines because the Commission lacks jurisdiction to interpret the Tribal-State compact.

If the Commission lacked jurisdiction to interpret the compact to include the use of mechanical slot machines, then its determination cannot have preclusive effect. See In re Jenson, 980 F.2d 1254, 1256 (9th Cir.1992).

The compact itself provides little insight into the scope of the Commission's power. Article II of the compact provides:

The purpose of this Agreement is to provide for the operation of and to define the respective authority of the Tribe and the State for regulation of Class III gaming as defined by the IGRA on the Crow Reservation.

The Commission is defined as the agency "responsible for regulatory oversight of gaming under this Agreement," Article III.H, and "regulate" means "the power to control through statute, ordinance, resolution, administrative rule, guideline or administrative procedure and to impose taxes, fees, assessments and penalties insofar as is consistent with the IGRA." Article III.C. Finally, Article IX provides: "The primary responsibility for the on-site regulation, control and security of the gaming operation authorized by this Agreement and for the enforcement of this Agreement shall be that of the [Commission]." While these provisions illustrate that the Commission does have some regulatory power, they do not indicate that such power extends to interpreting the types of gaming permitted under the compact.

The Tribal Gaming Ordinance provides a better understanding of the scope of the Commission's regulatory power. The Gaming Ordinance provides:

The Crow Tribe is authorized to operate, license and regulate Class III gaming on Indian Lands, as defined at 25 U.S.C. § 2703(4)(b) within the State of Montana, provided it has entered into, and operates Class III gaming consistent with, a compact entered into between the Tribe and the State of Montana.

The Ordinance creates the Commission and grants the Commission various powers including the power to: promulgate rules and regulations; identify and define rules of play for each Class III game permitted; license, supervise, inspect, and oversee all gaming activities; conduct background investigations of employees; carry on a continuous study of Class III gaming; report to the Tribal Council on emergencies; and take any action deemed necessary and appropriate to enforce the Ordinance. Notably absent from the powers of the Commission is the authority to determine the types of games the compact permits.

Downloaded from vLex by Rene Vazquez

vLex

A holding that the Commission has jurisdiction to interpret the compact would undermine the express grant of jurisdiction to the United States District Courts to enjoin gaming on Indian lands not permitted under a compact. § 2710(d)(7)(A)(ii) provides: "The United States district courts shall have jurisdiction over ... any cause of action initiated by a State or Indian tribe to enjoin a class III gaming activity located on Indian lands and conducted in violation of any Tribal-State compact." If the Commission could interpret the compact, then once such an interpretation was made and became final after appeal to the Tribal Court, it would not be reviewable in federal court. "Unless a [*1044] federal court determines that the Tribal Court lacked jurisdiction, however, proper deference to the tribal court system precludes relitigation of issues raised ... and resolved in the Tribal Courts." Iowa Mutual Ins. Co. v. LaPlante, 480 U.S. 9, 19, 107 S.Ct. 971, 978, 94 L.Ed.2d 10 (1987). Thus, in a case where a tribe's administrative and judicial bodies have interpreted a compact in a manner contrary to a state's position, a state would have no remedy in federal court. This would render the express grant of jurisdiction in § 2710(d)(7) useless.

Article X of the compact also counsels against a holding that the Commission has jurisdiction to interpret the types of permissible gaming. Article X permits termination of the compact in the "event of substantial and continuing failure" by either the State or the Crow in the performance of the obligations under the compact. We agree with the State that allowing the Crow, through the Commission, to have the final word on the interpretation of the compact would render this provision difficult to enforce against the Crow. The parties could not have intended this result.

We are not persuaded by the Crow's argument that the exhaustion cases require a holding that the Commission has jurisdiction to interpret the compact. The exhaustion cases express the principle that a "tribal court presumptively has jurisdiction over activities that take place on tribal land." United States v. Plainbull, 957 F.2d 724, 727 (9th Cir.1992); see also Iowa Mutual, 480 U.S. at 18, 107 S.Ct. at 977-78. Yet, here the issue is not the jurisdiction of a tribal court but rather the authority of a tribal agency. Agencies do not have presumptive

jurisdiction like a tribal or state court, but rather have limited jurisdiction. See Lyng v. Payne, 476 U.S. 926, 937, 106 S.Ct. 2333, 2340-41, 90 L.Ed.2d 921 (1986) (agency power no greater than that delegated by legislature). Thus, we need not presume that the Commission has jurisdiction to interpret the compact.

In conclusion, we hold that the Commission lacks authority to interpret the compact and thus its order does not estop the State from arguing that the compact does not permit the use of mechanical slot machines.

B. The Tribal-State compact does not permit the use of mechanical slot machines.

The IGRA sets forth three requirements that must be established before Class III gaming activities are lawful on Indian lands. The gaming activities must be: (1) authorized by a tribal gaming ordinance, (2) located in a state "that permits such gaming for any purpose by any person, organization, or entity," and (3) conducted in conformance with a Tribal-State compact. § 2710(d)(1). We address only the third requirement and hold that the compact does not permit the use of mechanical slot machines.

Appendix F, the provision authorizing lotteries, provides:

I. DEFINITIONS

"LOTTERY GAMES." The term "LOTTERY GAMES" means any procedure, including any on-line or other procedure using a machine or electronic device, by which one or more prizes are randomly distributed among persons who have paid for a chance to win a prize but does not include any game in which a player completes [sic] against or plays with any other person.

II. CONDITIONS

Lottery games may be conducted on the Reservation if such games are conducted and operated by the Tribe in a manner which provides security at least as stringent as the Montana Lottery.

The Crow argue that the language of this provision permits the operation of mechanical slot machines. The Crow rely on the expert testimony of James Maida who testified that a lottery encompasses any game with the elements of prize, consideration, and chance. The Crow also rely on several state court cases holding that the term "lottery" includes slot machines. The State responds that throughout the compact negotiations the State repeatedly objected to the use of slot machines; that the Crow agreed to drop slot machines from their compact proposals; and that the term "lottery games" relates only to those forms of gaming allowed under the Montana Lottery. [*1045]

Downloaded from vLex by Rene Vazquez

The State's argument premised on the negotiation of the compact is persuasive. Prior to the execution of the compact, the Crow tendered proposed compacts authorizing a broad range of Class III gaming. The Crow's second proposed compact explicitly authorized the use of mechanical slot machines. "The Tribe may conduct ... slot machines." Joint Exhibit Appendix to Affidavits of Robert J. Robinson and Janet Jessup, Ex. 5, p. 4. Similarly, the Crow's third proposed compact explicitly authorized mechanical slot machines. Id., Ex. 8, p. 5. The State, through its negotiator Robert J. Robinson, objected to both of these compacts. The State asserted that the Crow could only operate those forms of gaming permitted under Montana law and that slot machines were not permitted. Id., Ex. 6, pp. 20, 23; Id., Ex. 7, pp. 3-4; Id., Ex. 10, p. 6. In response to the State's objections, the Crow apparently agreed to exclude mechanical slot machine use from the compact. Tom Fredericks, representing the Crow, stated: "Well, I think that we'd be willing to say okay, we won't have any of the one-armed mechanical bandits in there, the antique kinds of things. We'll just leave it to video machines." Id., Ex. 10, p. 6.

As adopted, the March 1993 compact makes no reference to the use of mechanical slot machines. The only reference to slot machines is in Appendix A which specifically excludes slot machines from the scope of permissible video gambling machines. We agree with the State that it makes no sense to conclude that the parties intended the ambiguous language in Appendix F to authorize mechanical slot machine use when the State and the Crow earlier disputed an explicit authorization.

The State's explanation of the lottery games provision is also persuasive. The State explains that as originally drafted, part II of Appendix F, provided:

II. CONDITIONS

Lottery games may be conducted on the Reservation under the following conditions:

A. such games are authorized by the Montana Lottery subject to the provisions of sections 23-7-101 through 23-7-412, MCA;

B. such games are conducted and operated by the Tribe in a manner which provides security at least as stringent as the Montana Lottery.

The State claims that as originally drafted the compact allowed the State to operate the Montana Lottery on the Reservation under section II.A and granted a reciprocal right to the Crow to operate its own lottery under section II.B. The State argues that while the compact as executed omitted the State's right to operate the Montana Lottery on the Reservation under section II.A, the language in section II.B, which is included in the executed compact, was intended to authorize only those forms of gaming permitted under the Montana Lottery.

The State's argument is persuasive considering that Appendix F of the executed compact references the security provisions of the Montana Lottery. The Montana Lottery has no security provisions for the use of mechanical slot machines because slot machines are excluded from the scope of the Montana Lottery. "The state lottery may not ... operate a slot machine." MCA 23-7-102(3)(a). The lack of security provisions for slot machines implies that the compact was not intended to allow their use.

The Crow argue that we should accept the expert testimony that lotteries include all games with the elements of prize, consideration, and chance. We disagree. The interpretation of a contract is an issue of law which this court reviews de novo. Stoumbos v. Kilimnik, 988 F.2d 949, 954 (9th Cir.), cert. denied, 510 U.S. 867, 114 S.Ct. 190, 126 L.Ed.2d 148 (1993). Expert testimony is not proper for issues of law. "Experts 'interpret and analyze factual evidence. They do not testify about the law....'" United States v. Brodie, 858 F.2d 492, 496 (9th Cir.1988) (quoting United States v. Curtis, 782 F.2d 593, 599 (6th Cir.1986)).

The Crow also argue that case law strongly supports their position that lotteries include slot machines. See Harris v. Missouri Gaming Comm'n, 869 S.W.2d 58, 64 (Mo.1994) ("Almost all other state courts have held slot machines to be lotteries."). The Crow present a good argument that lotteries generally include slot machines. Yet, the issue here is not whether lotteries generally include slot machines, but rather whether the parties intended the term "lottery games" in the compact to authorize slot machines. The State persuasively argues that this result was not intended. In conclusion, we hold that the compact does not permit the use of mechanical slot machines. 2

C. The district court properly granted summary judgment against the Crow's Fourth Amendment claim.

The Crow explain that their Fourth Amendment claim has two components: (1) that no substantial basis for probable cause could exist to search the casino and seize the slot machines because the use of the slot machines was lawful under the IGRA and the compact, and (2) that the magistrate who issued the search warrant was misled by Janet Jessup's misrepresentations and omissions of fact. Appellant's Opening Brief at 27-28.

Downloaded from vLex by Rene Vazquez



We affirm the grant of summary judgment against the Crow's Fourth Amendment claim. A substantial basis for probable cause did exist. As explained above, the Crow have neither the right to interpret the compact nor to operate mechanical slot machines. Under these circumstances, the Johnson Act is applicable and the use of slot machines is illegal. See § 2710(d)(6); 15 U.S.C. § 1175. Moreover, we are not persuaded that Janet Jessup omitted or misrepresented any facts. Her conduct was objectively reasonable and she is entitled to qualified immunity. See Malley v. Briggs, 475 U.S. 335, 341, 106 S.Ct. 1092, 1096, 89 L.Ed.2d 271 (1986).

D. The district court properly granted summary judgment against the Crow's Due Process claim.

The district court wrote:

Because the compact and the State of Montana do not create an interest in the operation of mechanical slot machines, plaintiffs do not have a property interest in owning or operating slot machines. Accordingly, they have not suffered a deprivation of that interest at the hands of defendants.

District Court Judgment at 18. We agree with the district court. As discussed above, the Crow have neither the right to interpret the compact nor the right to operate slot machines. Thus, the Crow have failed to establish the necessary predicate for

a Due Process claim--the existence of a property or liberty interest.

Conclusion

We hold that the Commission lacks jurisdiction to interpret the compact and thus its order does not estop the State from maintaining that the compact does not permit the use of mechanical slot machines. We further hold that the Tribal-State compact does not permit the use of mechanical slot machines. Finally, summary judgment was properly granted against the Crow's Fourth Amendment and Due Process claims.

AFFIRMED.

* Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

1 The Supreme Court recently held that this grant of federal court jurisdiction violates the Eleventh Amendment. Seminole Tribe of Florida v. Florida, --- U.S. ----, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Because the State and the Crow have already adopted a Tribal-State compact, the specific remedy invalidated by Seminole Tribe is not at issue here.

2 Because we hold that the Commission lacks jurisdiction to interpret the compact and that the compact does not permit the use of mechanical slot machines, we need not decide whether (1) the IGRA creates enforceable rights for purposes of § 1983, (2) the IGRA forecloses § 1983 enforcement, (3) the compact is a "law" of the United States for purposes of § 1983, and (4) the Crow Tribe is a "person" who may sue under § 1983.

Downloaded from vLex by Rene Vazquez

561 F.3d 1319

**CORDIS CORPORATION, Plaintiff-Appellant, v. BOSTON SCIENTIFIC CORPORATION and Scimed Life Systems, Inc., Defendants-Cross Appellants.**

No. 2008-1003.

No. 2008-1072.

**United States Court of Appeals, Federal Circuit.**

**March 31, 2009.**

[*1322] Gregory L. Diskant, Patterson, Belknap Webb & Tyler LLP, of New York, NY,

[*1323] argued for plaintiff-appellant. With him on the brief were Eugene M. Gelernter, Thomas W. Pippert, Kathleen M. Crotty, Scott W. Parker and Scott B. Howard. Of counsel was Michael J. Timmons. Of counsel on the brief was Constantine L. Trela, Jr., Sidley Austin LLP, of Chicago, IL.

John M. Desmarais, Kirkland & Ellis LLP, of New York, NY, argued for defendants-cross appellants. With him on the brief were Peter J. Armenio, Young J. Park and Timothy K. Gilman.

Before MAYER and DYK, Circuit Judges, and HUFF, District Judge.[*]

DYK, Circuit Judge.

Cordis Corporation ("Cordis") appeals, and Boston Scientific Corporation and Scimed Life Systems, Inc. ("Boston Scientific") cross-appeal, from a final judgment of the United States District Court for the District of Delaware. The judgment was based on two separate jury verdicts of infringement: (1) infringement by Boston Scientific of claims 1 and 23 of U.S. Patent No. 4,739,762 ("the '762 patent") and claim 2 of U.S. Patent No. 5,895,406 ("the '406 patent"), and (2) infringement by Cordis of claim 36 of U.S. Patent No. 5,922,021 ("the '021 patent"). The judgment also determined that those claims were not invalid. *Cordis Corp. v. Boston Scientific Corp.,* Civ. No. 03-027-SLR, 2007 WL 2775087 (D.Del. Sept. 24, 2007) (judgment). With one minor exception, we affirm.

BACKGROUND

Cordis and Boston Scientific own patents relating to intravascular stents, which are cylindrical lattice-like scaffolds inserted into a blood vessel and then expanded, often by using a balloon catheter, in order to hold the vessel open. Cordis owns the '762 patent and the '406 patent, and Boston Scientific owns the '021 patent.

In January 2003, Cordis filed suit against Boston Scientific, alleging that several of Boston Scientific's stents infringe various claims of the '762 patent and the '406 patent. Boston Scientific counterclaimed, alleging that several of Cordis's stents infringe various claims of the '021 patent. The district court denied Cordis

s motion for a preliminary injunction against sales of one of Boston Scientific's stents, and we affirmed. *Cordis Corp. v. Boston Scientific Corp.,* 99 Fed.Appx. 928 (Fed. Cir.2004).

We treat the Cordis claims and the Boston Scientific claims separately. Since Cordis is the appellant, we first discuss Boston Scientific's claims against Cordis that are the subject of the Cordis appeal.

*The Boston Scientific claims:* The jury returned a verdict in July 2005 that (a) Cordis's Cypher, BX Velocity, BX Sonic, and Genesis stents do not literally infringe claim 36 of the '021 patent; (b) "the Cypher, BX Velocity, BX Sonic and Genesis stents infringe the `corners' limitation of claim 36 of the '021 patent under the doctrine of equivalents"; and (c) claim 36 of the '021 patent is not invalid for obviousness. *Cordis Corp. v. Boston Scientific Corp.,* Civ. No. 03-027-SLR, 2006 WL 1305227, at *1 (D.Del. May 11, 2006) (*"Memorandum Opinion"*). The district court denied Cordis's motion for judgment as a matter of law or, in the alternative, a new trial.

*The Cordis claims:* On summary judgment, the district court determined that claims 1 and 23 of the '762 patent were not invalid. A separate jury returned a verdict [*1324] in favor of Cordis in June 2005 that (a) Boston Scientific's Express, Taxus Express, Express Biliary, and Libert é stents literally infringe claim 23 of the '762 patent; (b) Boston Scientific induced literal infringement of claim 1 of the '762 patent with respect to these stents; (c) the Libert é stent literally infringes claim 2 of the '406 patent; and (d) claim 2 of the '406 patent is neither anticipated nor rendered obvious by the prior art. The district court denied Boston Scientific's motion for judgment as a matter of law or, in the alternative, a new trial.

After the district court entered judgment, Cordis and Boston Scientific both timely appealed. We have jurisdiction under 28 U.S.C. §§ 1291, 1292(c)(2), and 1295(a)(1).

DISCUSSION

We review the denial of a motion for judgment as a matter of law without deference, and we review the denial of a motion for a new trial for abuse of discretion. *Hewlett-Packard Co. v. Mustek Sys., Inc.,* 340 F.3d 1314, 1318 (Fed.Cir. 2003). Each party raises issues that have little merit. We dispose of those arguments summarily, reserving more extended discussion for the few issues that merit attention.

I

We first address Cordis's appeal.

A. *"Wherein" clause construction*

Cordis challenges the judgment that its BX Velocity stent infringes claim 36 of the '021 patent. Claim 36 depends from claim 24, which in turn depends from claim 23. '021 patent col.22 l.42, col.21 l.16.

Downloaded from vLex by Rene Vazquez

vLex

The procedural posture of this issue is unclear. The jury found that the accused Cordis stents do not literally infringe claim 36 of the '021 patent. Instead of addressing whether Cordis's stents infringed claim 36 under the doctrine of equivalents, the jury was asked only to determine whether Cordis's stents "infringe the `corners' limitation of claim 36 of the '021 patent under the doctrine of equivalents." J.A. at 11,238. The jury found that the "corners" limitation was infringed under the doctrine of equivalents. Apparently the parties agreed that the BX Velocity stent infringes all limitations of claim 36 (if properly construed by the district court) except the "corners" limitation, but the parties provided no reference in the record reflecting this agreement. However, the district court entered judgment of infringement of claim 36, and we assume that the judgment rests upon such an agreement.

Cordis first argues that the district court erred in construing the "wherein" clause of claim 23, and that under a proper construction of this clause Cordis's BX Velocity stent does not infringe claim 36.[1] The "wherein" clause of claim 23 describes how the struts within one expansion column or ring of a stent are connected to the struts of another column or ring,

*wherein* the first expansion strut of the first expansion strut pair in the first expansion column has a longitudinal axis offset from a longitudinal axis of the first expansion strut of the second expansion strut pair in the second expansion column.

'021 patent col.21 ll.11-15 (emphasis added). The district court construed this "wherein" clause to mean "the first expansion strut in the first column does not share a longitudinal axis with the second expansion strut in the second column." *Cordis Corp. v. Boston Scientific Corp.*, Civ. No. 03-027-SLR, 2005 WL 1322966, at *2 (D.Del. June 3, 2005) (*"Claim Construction"*). The district [*1325] court refused to construe the "wherein" clause in claim 23 to exclude so-called "180 degrees out of phase" stent designs.

Claim construction is an issue of law, *Markman v. Westview Instruments, Inc.,* 52 F.3d 967, 970-71 (Fed.Cir.1995) (en banc), *aff'd,* 517 U.S. 370, 116 S.Ct. 1384, 134 L.Ed.2d 577 (1996), that we review without deference, *Cybor Corp. v. FAS Technologies Inc.,* 138 F.3d 1448, 1456 (Fed.Cir.1998) (en banc).

Cordis urges that the district court's construction improperly failed to exclude

stents whose strut pairs are arranged "180 degrees out of phase," a phrase that both parties agree is in common usage in stent design. In such a 180-degree out-of-phase arrangement, the struts within each expansion column or ring are connected to form pairs, and the connected ends of the pairs in one ring face the connected ends of the pairs in the next ring, forming a mirror-image pattern. Cordis argues that if claim 23 excludes such 180-degree out-of-phase designs, then Cordis's BX Velocity stent (which uses a 180-degree out-of-phase design) would not infringe claim 36. Cordis illustrated the 180-degree out-of-phase design with a diagram:

NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE

Br. for Pl.-Appellant Cordis Corp. 3.

Cordis argues that the same "wherein" clause appears in both claim 1 and claim 23; that the clauses must have the same meaning; and that the prosecution history shows that the "wherein" clause excludes 180-degree out-of-phase designs. Cordis's argument is a bit confusing. The issue is not the meaning of the "wherein" clause. Rather, the problem stems from the fact that claim 23 and claim 1 use different numbering systems, so that, for example, the "first expansion strut of the second expansion strut pair in the second expansion column" is not the same strut in claim 23 as in claim 1.

Under the numbering system of claim 1, each strut in a column or ring is either the "first" or "second" strut of a pair, each pair in the first ring is a "first ... pair," and each pair in the second ring is a "second ... pair."[2] Thus in claim 1, the [*1326] "wherein" clause requires the first strut of every strut pair in the first ring to be offset from the first strut of every strut pair in the second ring, which would not be possible in a 180-degree out-of-phase design. However, under the numbering system of claim 23, each strut in a ring is individually numbered "first ... second ... third ... fourth ...," each pair in the first ring is individually numbered "first ... second ... third ... fourth ...," and each pair in the second ring is individually numbered "first ... second ... third ... fourth ...."[3] Thus in claim 23, the [*1327] "wherein" clause requires only one specific strut (the first strut of the first pair in the first ring) to be offset from one other specific strut (the "first expansion strut of the second expansion strut pair in the second ring). Cordis numbered a figure from the '021 patent (also known as the Jang patent) to illustrate these different numbering systems: [*1328]

NOTE: OPINION CONTAINING TABLE OR OTHER DATA THAT IS NOT VIEWABLE

Downloaded from vLex by Rene Vazquez



Br. for Pl.-Appellant Cordis Corp. 40. Because these two specific struts could be offset from each other but yet aligned with other struts to form a 180-degree out-of-phase pattern, the language of claim 23 includes 180-degree out-of-phase designs. Indeed, the parties appear to agree that on their face claim 1 and claim 23 each use a different numbering system to describe the relative arrangement of a stent's struts, with the result that the claim 23 "wherein" clause does not exclude 180-degree out-of-phase designs. The question is whether the prosecution history requires that, despite its plain language, the "wherein" clause of claim 23 be construed to use the same numbering system as claim 1. Cordis argues that the prosecution history reflects such a "clear and unmistakable" disclaimer. *Free Motion Fitness, Inc. v. Cybex Int'l, Inc.,* 423 F.3d 1343, 1353 (Fed.Cir.2005); *see also Omega Eng'g, Inc., v. Raytek Corp.,* 334 F.3d 1314, 1325-26 (Fed.Cir.2003). We cannot agree.

The "wherein" clause was added to claims 1 and 23 during the prosecution of the '021 patent after the examiner rejected [*1329] both claims as anticipated by European Patent Application No. 95307687.4, Pub. No. 0 709 067 A2 ("Pinchasik"). Pinchasik discloses a stent whose struts are arranged in a 180-degree out-of-phase design but whose struts are not numbered. During the first office action, the examiner rejected claims 1 and 23 as anticipated by Pinchasik, coloring one of Pinchasik's stent design figures and numbering parts of the figure (labeled "Figure 2") according to the numbering system of claim 1 of the '021 patent.4 The examiner's numbering system is, however, different than claim 23's numbering system. The examiner's rejection in light of Pinchasik made no reference to 180-degree out-of-phase designs, but simply stated that claim 1, claim 23, and other claims "are rejected under 35 U.S.C. § 102(b) as being anticipated by Pinchasik" and that "[w]ith respect to [these claims] ... refer to the modified Figure 2 attached to this office action." J.A. at 1705. After the "wherein" clause was added to claims 1 and 23, the examiner allowed both claims. Cordis argues that the examiner used only the numbering system of claim 1 when allowing both claim 1 and claim 23, and that the examiner necessarily assumed that claim 23 used the same numbering system as claim 1. However, the examiner did not say so, and we cannot simply suppose that the claims were allowed based on an assumed identity of numbering systems. We note that Cordis does not argue that Pinchasik anticipates claim 23 of the '021 patent under the district court's claim construction, which suggests that the examiner could have allowed the claim on other grounds. Cordis

also argues that both the applicant and the examiner referred to stent pairs as "longitudinally offset," but these references simply repeat the "wherein" clause and say nothing about different numbering systems. Finally, on the disclaimer issue, Cordis argues that the '021 patent's provisional application described the invention as consisting of stents whose flexibility depended on connections between "split level" (and thus offset) strut pairs, but again this language in the provisional application did not discuss the system for numbering these connected strut pairs. A disclaimer must be "clear and unmistakable," and unclear prosecution history cannot be used to limit claims. *Free Motion Fitness,* 423 F.3d at 1352-53; *see also Inverness Med. Switz. GmbH v. Warner Lambert Co.,* 309 F.3d 1373, 1381-82 (Fed. Cir.2002). The plain language of claim 23 cannot be overcome by such unclear prosecution history. Although Cordis urges that no figure in the '021 patent uses a 180-degree out-of-phase design, a patent is not confined to its disclosed embodiments. *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1323 (Fed.Cir.2005) (en banc).

We affirm the district court's construction of the "wherein" clause in claim 23 of the '021 patent.

### B. Corners limitation

Alternatively, Cordis argues that the judgment of infringement of claim 36 of the '021 patent by the BX Velocity stent should be set aside, because the jury erred in concluding that the "corners" limitation of claim 36 was satisfied under the doctrine of equivalents, and because the district court erred in denying judgment as a matter of law on this ground. The "corners" limitation appears both in the language of claim 36 itself and in claim 23, on which claim 36 depends.5 Cordis does not dispute the district court's construction of [*1330] "corners" as "a place where two surfaces meet to form an angle." *Claim Construction,* 2005 WL 1322966, at *1.

First, Cordis argues that the evidence did not support the jury's verdict of infringement of this limitation under the doctrine of equivalents. A jury's determination of infringement is a question of fact that we review to consider whether it is supported by substantial evidence. *B. Braun Med., Inc. v. Abbott Labs.,* 124 F.3d 1419, 1423 (Fed.Cir.1997).

Downloaded from vLex by Rene Vazquez

The district court properly found that Boston Scientific presented sufficient expert testimony that Cordis's BX Velocity stent meets the "corners" limitation of claim 36 under the doctrine of equivalents under the function-way-result test of *Graver Tank & Manufacturing Co. v. Linde Air Products Co.,* 339 U.S. 605, 608, 70 S.Ct. 854, 94 L.Ed. 1097 (1950), a test that is still useful under *Warner-Jenkinson Co. v. Hilton-Davis Chemical Co.,* 520 U.S. 17, 39-40, 117 S.Ct. 1040, 137 L.Ed.2d 146 (1997), particularly for mechanical inventions. Boston Scientific's expert Dr. Moore testified that the "corners" in claim 36 and the circular arcs or rounded corners of the BX Velocity stent both function as actual and potential reference points for joining adjacent stent rings, fulfill this function through their similar locations, and can or do result in offset connections between stent rings. Such testimony fulfills Boston Scientific's obligation to "provide particularized testimony and linking argument ... with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents." *Tex. Instruments Inc. v. Cypress Semiconductor Corp.,* 90 F.3d 1558, 1567 (Fed.Cir. 1996).

Cordis next argues that the doctrine of equivalents should not be applied in this case because the jury's finding of infringement vitiated the "corners" limitation.[6] Cordis asserts that the circular arcs of the BX Velocity stent cannot "form an angle" as required by the district court's claim construction. Whether the doctrine of equivalents vitiated a patent claim is a question of law we review de novo. *Pfizer, Inc. v. Teva Pharms. USA, Inc.,* 429 F.3d 1364, 1379 (Fed.Cir.2005).

The district court properly found that vitiation did not bar a doctrine of equivalents analysis here. Although we have "refused to apply the doctrine [of equivalents] ... where the accused device contained the antithesis of the claimed structure," *Planet Bingo, LLC v. GameTech International, Inc.,* 472 F.3d 1338, 1345 (Fed.Cir.2006), the circular arcs of the BX Velocity are not antithetical to the "corners" limitation in claim 36 of the '021 patent. Boston Scientific's theory that the circular arcs of the BX Velocity stent are equivalent to the "corners" in claim 36 does not vitiate the "corners" limitation, because it does not "render[ ] the pertinent limitation meaningless," *Freedman Seating Co. v. Am. Seating Co.,* 420 F.3d 1350, 1359

Fed.Cir.2005), or "effectively eliminate that element in its entirety," *Warner-Jenkinson,* 520 U.S. at 29, 117 S.Ct. 1040. *See Primos, Inc. v. Hunter's Specialties, Inc.,* 451 F.3d 841, 850 (Fed.Cir.2006). [*1331]

We affirm the district court's denial of Cordis's motions for judgment as a matter of law or, in the alternative, a new trial on infringement of the '021 patent.

C. *New claim construction arguments*

Cordis argues that the district court improperly declined after trial to adopt a new construction of "expansion columns" and "connecting strut columns" in the claims of the '021 patent. In a motion for judgment as a matter of law on infringement of the '021 patent, Cordis raised for the first time the argument that the district court should adopt the construction of these terms that Boston Scientific had advocated in a different case relating to the '021 patent.[7] The district court declined to do so. *Cordis Corp. v. Boston Scientific Corp.,* Civ. Nos. 03-027-SLR, 03-283-SLR, 2007 WL 2775087, at *1 (D.Del. Sept. 24, 2007).

Raising this argument for the first time in a motion for judgment as a matter of law more than a year after the jury's infringement verdict was too late. "[L]itigants waive their right to present new claim construction disputes if they are raised for the first time after trial." *Conoco, Inc. v. Energy & Envtl. Int'l, L.C.,* 460 F.3d 1349, 1359 (Fed.Cir.2006); *see also Abbott Labs. v. Syntron Bioresearch, Inc.* 334 F.3d 1343, 1357 (Fed.Cir.2003). The district court properly declined to revise its claim construction in response to Cordis's argument.

D. *Indefiniteness*

Cordis asserts that the district court erred in finding that claim 23 of the '021 patent is not indefinite. Cordis argues that claim 36, and claim 23 on which it depends, are invalid unless claim 23's "wherein" clause is construed to exclude 180-degree out-of-phase designs. Indefiniteness under 35 U.S.C. § 112 ¶ 2 is an issue of claim construction and a question of law that we review de novo. *Praxair, Inc. v. ATMI, Inc.,* 543 F.3d 1306, 1319 (Fed.Cir.2008). We see no basis for Cordis's argument. Claim 23 as construed by the district court is not indefinite.

E. *Obviousness*

Cordis argues that the jury erred in finding that claim 36 of the '021 patent was not invalid for obviousness, and that the district court erred in denying Cordis's motion for judgment as a matter of law of obviousness.

Downloaded from vLex by Rene Vazquez

The '021 patent claims priority to its provisional application. '021 patent col.1 ll.6-8. Cordis first argues that the district court should have ruled as a matter of law that the '021 patent was not entitled to a priority date of April 26, 1996 (when the '021 patent's provisional application was filed), and that the correct priority date is April 25, 1997 (when the '021 patent's non-provisional application was filed). Cordis asserts that the priority date is important because after April 26, 1996, and before April 25, 1997, inventors had created stents that demonstrated that claim 36 of the '021 patent was invalid as obvious under 35 U.S.C. § 103. Cordis's basis for challenging the priority date is its theory that the '021 patent's April 1996 provisional application did not provide a sufficient written description of the patent's limitations, namely the limitation of claim 36 requiring connecting struts to be attached on one end at a "second" or bottom corner of a strut pair and on the other end at a "first" or top corner.

The written description requirement of 35 U.S.C. § 112 ¶ 1 is a [*1332] question of fact, and we review a jury's findings of fact relating to the written description requirement for substantial evidence. *PIN/NIP, Inc. v. Platte Chem. Co.,* 304 F.3d 1235, 1243 (Fed.Cir.2002). To comply with the written description requirement, an applicant must "convey with reasonable clarity to those skilled in the art that, as of the filing date sought, he or she was in possession of the invention," *New Railhead Mfg., L.L.C. v. Vermeer Mfg. Co.,* 298 F.3d 1290, 1295 (Fed.Cir. 2002) (quoting *Vas-Cath Inc. v. Mahurkar,* 935 F.2d 1555, 1563-64 (Fed.Cir.1991)* (emphasis omitted), namely that he or she "had invented each feature that is included as a claim limitation," *New Railhead,* 298 F.3d at 1295. The district court cited uncontradicted testimony from Boston Scientific's expert Dr. Moore that the '021 patent's provisional application provided a sufficient written description of the limitations of claim 36. We conclude that the jury could properly find that the '021 patent was entitled to an April 1996 priority date.

Cordis alternatively argues

that regardless of whether the '021 patent has a priority date of April 1996 or April 1997, several earlier patents[8] were prior art rendering claim 36 obvious. Cordis asserts that it would have been obvious to one of ordinary skill in the art to combine features of these patents to create stents with the bottom-corner-to-top-corner connecting struts disclosed in claim 36 of the '021 patent.

"We review `[the] jury's conclusions on obviousness, a question of law, without deference, and the underlying findings of fact ... for substantial evidence.'" *Johns Hopkins Univ. v. Datascope Corp.,* 543 F.3d 1342, 1345 (Fed.Cir. 2008) (quoting *LNP Eng'g Plastics, Inc. v. Miller Waste Mills, Inc.,* 275 F.3d 1347, 1353 (Fed.Cir.2001)). The district court cited uncontradicted testimony from Boston Scientific's expert Dr. Moore that the prior art patents cited by Cordis would be unlikely to be combined to create the connectors of claim 36 of the '021 patent, and that these prior art patents taught away from the bottom-to-top connectors described in claim 36 by describing features of such connectors as potentially harmful. The district court properly concluded there was substantial evidence that these prior art patents did not render claim 36 obvious.

We affirm the district court's denial of Cordis's motion for judgment as a matter of law or, in the alternative, a new trial on invalidity of the '021 patent.

II

We next address Boston Scientific's cross-appeal.

A. *Monographs*

Boston Scientific argues that the district court erred in holding that two monographs prepared by the inventor of the '762 patent are not prior art, and erred in granting Cordis's motion for summary judgment that the asserted claims of the '762 patent are not invalid "as to the asserted claims being invalidated by the Palmaz Monographs." *Cordis Corp. v. Boston Scientific Corp.,* Civ. No. 03-027-SLR (D. Del. June 3, 2005) (summary judgment order).

If there are no facts in dispute, whether a reference is a prior art "printed publication" within the meaning of 35 U.S.C. § 102(b) is a question of law.[9] In [*1333] *re Klopfenstein,* 380 F.3d 1345, 1347 (Fed. Cir.2004). Because the facts of the distribution of Dr. Palmaz's monographs are not in dispute, we review de novo the issue of whether the monographs are prior art printed publications.

Downloaded from vLex by Rene Vazquez



In 1980 the inventor of the '762 patent, Dr. Palmaz, prepared a ten-page paper describing his work on stents. This paper is the "1980 monograph." At that time he was a resident at a hospital in California. His name was not on the paper. He gave copies of the paper to approximately six of his teachers at an oral presentation of his work to these physicians and several other colleagues. Pursuant to agreements, Palmaz later gave copies of the monograph to two companies (Vascor, Inc., and Shiley, Inc.) while attempting to commercialize his stent technology.10 Neither agreement required confidentiality, and the Shiley agreement specifically stated that Shiley "shall not be committed to keep secret any idea or material submitted." J.A. at 19,473. In 1983 Dr. Palmaz revised the paper; the revised paper became the "1983 monograph." In 1983 he also gave a copy of both monographs to Werner Schultz, a technician from whom Dr. Palmaz was seeking fabrication assistance. When Dr. Palmaz joined the faculty in 1983 at the University of Texas, San Antonio, he gave a copy of the 1983 monograph to a doctor there (who then gave it to the technician setting up Dr. Palmaz's laboratory) and to the university as part of a research proposal. Dr. Palmaz applied for the patent that became the '762 patent in 1985.

A document is publicly accessible if it "has been disseminated or otherwise made available to the extent that persons interested and ordinarily skilled in the subject matter or art, exercising reasonable diligence, can locate it and recognize and comprehend therefrom the essentials of the claimed invention without need of further research or experimentation." *In re Wyer*, 655 F.2d 221, 226 (CCPA 1981) (quoting *I.C.E. Corp. v. Armco Steel Corp.*, 250 F.Supp. 738, 743 (S.D.N.Y.1966)). In general, "[a]ccessibility goes to the issue of whether interested members of the relevant public could obtain the information if they wanted to." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1569 (Fed.Cir.1988). Many of our cases in this area have concerned publications available in libraries, and the question has been whether the publication has been sufficiently indexed to be publicly accessible. *See, e.g., In re Cronyn*, 890 F.2d 1158, 1161 (Fed.Cir.1989); *In re Hall*, 781 F.2d 897, 899 (Fed.Cir.1986); *In re Wyer*, 655 F.2d at 226. Other cases have involved widespread distribution so that the public could easily obtain copies of the publication. *See, e.g., Kyocera Wireless Corp. v. Int'l Trade Comm'n*, 545 F.3d 1340, 1350-51 (Fed.Cir.2008).

Here we have a somewhat different question: whether the distribution to a limited number

of entities without a legal obligation of confidentiality renders the monographs printed publications under § 102(b). We have held that where a distribution is made to a limited number of entities, a binding agreement of confidentiality may defeat a finding of public accessibility. But we have also held that such a binding legal obligation is not essential. *Klopfenstein*, 380 F.3d at 1351. We have noted that "[w]here professional and behavioral norms entitle a party to a reasonable expectation" that information will not be copied or further distributed, "we are [*1334] more reluctant to find something a `printed publication.'"11 *Id.* at 1350-51.

We first discuss Dr. Palmaz's distribution of copies of his monographs to his university and hospital colleagues. We have recognized the importance of "preserv[ing] the incentive for inventors to participate in academic presentations or discussions" by noting that professional norms may support expectations of confidentiality. *Id.* at 1351. The record here contains clear evidence that such academic norms gave rise to an expectation that disclosures will remain confidential.12 Cordis's expert Dr. Buller testified that the "code of practice which occurs worldwide in academic circles, in departments, in medicine" includes treating a document describing scientific research in the "same confidential manner as you would if you had been given it directly by the author." J.A. at 8540-41. The district court properly concluded that Dr. Palmaz's distribution of the monographs to his academic and research colleagues did not render the monographs prior art printed publications.

However, Boston Scientific urges that, even if the academic and hospital distributions did not create public accessibility, the distribution of monographs to two commercial entities did so. These distributions occurred during attempts to interest the two companies in development of Dr. Palmaz's stent designs. There is no claim here that the two commercial entities provided any express agreement to keep the document confidential; indeed, one entity's disclosure agreement did not discuss the entity's confidentiality obligations, and the other entity's disclosure agreement specifically disclaimed such obligations (most likely to avoid a lawsuit resulting from inadvertent disclosure). Boston Scientific argues that under the decision of our predecessor court, the Court of Claims, in *Garrett Corp. v. United States*, "[w]hile distribution [of a government report] to government agencies and personnel alone may not constitute publication, distribution to commercial companies without restriction on use clearly does." 190 Ct.Cl. 858, 422 F.2d 874, 878 (1970) (citation omitted).

Downloaded from vLex by Rene Vazquez

However, the evidence here was sufficient to support a conclusion that there was an expectation of confidentiality between Dr. Palmaz and each of the two commercial entities. While the Shiley legal agreement executed before development discussions disclaimed a confidentiality requirement, Dr. Palmaz testified that he requested confidentiality during subsequent discussions and was "surprise[d]" when he was shown the language of the Shiley agreement. J.A. at 8517; *id.* at 19,354. There is no suggestion that the request for confidentiality was not, in fact, honored. Dr. Palmaz confirmed that the entities kept their copies of the monograph confidential, whether or not they were legally obligated to do so. J.A. at 8502. The district court noted that "there is no [**1335**] evidence that [the commercial entities] would have distributed, or in fact did distribute, the 1980 Monograph outside of the company." *Cordis Corp. v. Boston Scientific Corp.*, Civ. No. 03-027-SLR, 2005 WL 1331172, at *4 (D.Del. June 3, 2005). There was no showing that similar documents in the past became available to the public as a result of disclosure by these or similar commercial entities, that these or similar commercial entities typically would make the existence of such documents known and would honor requests for public access, or that these or similar commercial entities had an incentive to make the document available, etc. The mere fact that there was no legal obligation of confidentiality—all that was shown here—is not in and of itself sufficient to show that Dr. Palmaz's expectation of confidentiality was not reasonable.[13]

We affirm the district court's holding that Dr. Palmaz's 1980 and 1983 monographs were not prior art printed publications under § 102(b), and we affirm the district court's grant of Cordis's summary judgment motion that the claims of the '762 patent are not invalidated by the Palmaz monographs.

### B. *Anticipation*

Boston Scientific argues that the jury erred in finding that claim 2 of the '406 patent is not invalid, and that the district court erred in not granting judgment as a matter of law on grounds of anticipation. Anticipation is a question of fact; we review the jury's verdict for substantial evidence. *Voda v. Cordis Corp.*, 536 F.3d 1311, 1321 (Fed.Cir.2008).

Boston Scientific's theory is that Cordis's '762 patent anticipates claim 2 of Cordis's '406 patent. The parties agree that the '762 patent includes all elements of claim 2 of the '406 patent, save for the functional language in claim 1 of the '406 patent (on which claim 2 of the '406 patent depends). This functional language

states, "such that the links and bands define an expandable structure having *axial flexibility* in an unexpanded configuration." '406 patent col.5 ll.35-39 (emphases added).[14]

Boston Scientific argues that this "such that" claim language cannot operate as a claim limitation to distinguish the '406 patent over the prior art. Contrary to Boston Scientific's argument, we have held that functional language can be a claim limitation. *See Microprocessor Enhancement Corp. v. Tex. Instruments Inc.*, 520 F.3d 1367, 1375 (Fed.Cir.2008). We conclude that the jury could properly find that the "such that" claim language is a limitation of claim 1 of the '406 patent that barred a finding of anticipation. [**1336**]

Boston Scientific alternatively argues that even if the "such that" functional language limits claim 2 to stents "having axial flexibility," the evidence demonstrated that the '762 patent disclosed such axial flexibility. The district court, citing both the testimony of Boston Scientific's expert Dr. Moore and the presumption of a patent's validity, held that the evidence presented was sufficient for the jury to find that the '762 patent did not anticipate claim 2 of the '406 patent. The district court properly concluded that substantial evidence supported the jury's verdict that claim 2 of Cordis's '406 patent was not invalid.

We affirm the district court's denial of Boston Scientific's motion for judgment as a matter of law that claim 2 of the '406 patent is anticipated and invalid.

### C. *"Thin-walled"*

Boston Scientific argues that the jury erred in finding that Boston Scientific's Express and Taxus Express stents literally infringe claim 23 of the '762 patent, and in finding that Boston Scientific induced literal infringement of claim 1 of the '762 patent with respect to these stents.[15] Claim 23 of the '762 patent depends from claim 13. '762 patent col.12 ll.55-60. Boston Scientific also argues that the district court erred in denying its motion for judgment as a matter of law of noninfringement under the "thin-walled" limitation of claim 1 and claim 13.

First, Boston Scientific argues that the district court construed the term "thin-walled" improperly. The district court construed "thin-walled" in claim 1 and claim 13 of the '762 patent as "the wall of the tubular member must have little extent from one surface to its opposite at both its first and second diameters." *Claim Construction*, 2005 WL 1322966, at *2. The district court's claim construction was proper, and the district court was not obligated, as Boston Scientific urges, to construe [**1337**] "thin-walled" to exclude stent walls whose struts are thicker than they are wide.

Downloaded from vLex by Rene Vazquez

vLex

Second, Boston Scientific complains that the district court refused to allow Boston Scientific to argue the prosecution history of the '762 patent to the jury, and that the district court's exclusion of this argument prejudiced Boston Scientific's noninfringement case. Boston Scientific had sought to use the prosecution history of the '762 patent to show that Cordis had admitted that stents whose thicknesses were within a particular numerical range were not "thin-walled."[16] In effect, Boston Scientific sought to argue claim construction to the jury. We have held that it is improper to argue claim construction to the jury because the "risk of confusing the jury is high when experts opine on claim construction." *CytoLogix Corp. v. Ventana Med. Sys., Inc.,* 424 F.3d 1168, 1172-73 (Fed.Cir.2005); *see Sundance, Inc. v. DeMonte Fabricating Ltd.,* 550 F.3d 1356, 1364 n. 6 (Fed.Cir.2008). The district court thus properly excluded Boston Scientific's claim construction argument before the jury, and properly held that its exclusion of this argument did not entitle Boston Scientific to a new trial.

Third, Boston Scientific argues that even under the district court's claim construction, Cordis did not present sufficient evidence that the Express and Taxus Express stents meet the "thin-walled" limitations of claim 1 and claim 13 (on which claim 23 depends). The district court cited testimony by Cordis's expert Dr. Buller describing how the Express and Taxus Express stents meet the "thin-walled" limitation of claims 1 and 23 under the district court's construction of this limitation. *Memorandum Opinion,* 2006 WL 1305227, at *12. We conclude that the district court properly found that Cordis presented substantial evidence to support the jury's infringement verdict.

We affirm the district court's denial of Boston Scientific's motion for judgment as a matter of law that the Express and Taxus Express stents do not infringe claims 1 and 23 of the '762 patent under the "thin-walled" limitation of these claims.

### D. *"Substantially parallel"*

Boston Scientific argues that the jury erred in finding that Boston Scientific's Liberté stent infringes claims 1 and 23 of the '762 patent, and that the district court erred in denying Boston Scientific's motion for judgment as a matter of law of noninfringement under the "substantially parallel" limitations of claim 1 and claim 13 (on which claim 23 depends). Both claim 1 and claim 13 describe stents whose slots (spaces or openings within a stent's lattice design) are "disposed *substantially parallel* to the longitudinal axis" of the stent. '762 patent col. 10 l.61-col.11 l.9; col. 11 l.62-col. 12 l.15 (emphasis added).

Boston Scientific first contends that the district court erred by not construing the term "parallel" in claim 1 and claim 13 of the '762 patent. This argument was not timely raised before the district court and has been waived. *Conoco,* 460 F.3d at 1359.

Next, Boston Scientific argues that Cordis did not present substantial evidence that the Liberté stent meets the "substantially parallel" limitation in claims 1 and 23. Boston Scientific asserts that the Liberté stent's banana-shaped slots are not substantially parallel to the **[*1338]** stent's longitudinal axis. The district court cited testimony of both parties' experts to support its finding that Cordis provided sufficient evidence to support the jury's infringement verdict under the "substantially parallel" limitation. *Memorandum Opinion,* 2006 WL 1305227, at *10. We conclude that substantial evidence supported the jury's verdict.

Boston Scientific further asserts that the district court's exclusion of the deposition testimony about the Liberté stent by Dr. Palmaz, the inventor of the '762 patent, warrants a new trial. Dr. Palmaz testified during a deposition that the slots of the Liberté stent "deviate from the longitudinal axis" of the stent. J.A. at 11,520. The district court excluded this testimony, finding that Dr. Palmaz was not an expert on the Liberté stent and that his testimony did not provide relevant evidence of infringement and created a risk of prejudice. *Memorandum Opinion,* 2006 WL 1305227, at *14. Boston Scientific argues that this testimony of Dr. Palmaz was important in defining the meaning of the claim term "substantially parallel" and in rebutting Cordis's evidence that the Liberté stent infringed claims 1 and 23 of the '762 patent. As noted earlier, claim construction cannot be argued to the jury. *CytoLogix Corp.,* 424 F.3d at 1172-73; *see also Sundance,* 550 F.3d at 1364 n. 6. "[I]nventor testimony as to the inventor's subjective intent is irrelevant to the issue of claim construction," and as the inventor of the '762 patent, Dr. Palmaz had no special expertise regarding the alleged infringement of the patent by the Liberté stent. *Howmedica Osteonics Corp. v. Wright Med. Tech., Inc.,* 540 F.3d 1337, 1346-47 (Fed.Cir. 2008); *see also Air Turbine Tech., Inc. v. Atlas Copco AB,* 410 F.3d 701, 714 (Fed. Cir.2005). The district court's exclusion of the Liberté stent portion of Dr. Palmaz's deposition testimony was within its discretion.

We affirm the district court's denial of Boston Scientific's motion for judgment as a matter of law or a new trial that the Liberté stent does not infringe claims 1 and 23 of the '762 patent under the "substantially parallel" limitation of these claims.

### E. *"Wave"*

Downloaded from vLex by Rene Vazquez



Boston Scientific contends that the jury erred in finding that the Libert é stent infringes claim 2 of the '406 patent, and that the district court erred in denying Boston Scientific's motion for judgment as a matter of law of noninfringement. Claim 2 of the '406 patent depends from claim 1. '406 patent col.5 ll.39-41. The parties agree that the Libert é stent infringes all limitations of claim 2, except the limitation in claim 1 (on which claim 2 depends) describing "a plurality of longitudinally disposed bands, wherein each band defines a generally continuous *wave* having a spatial frequency along a line segment parallel to the longitudinal axis." '406 patent col.5 ll.29-32 (emphasis added).

First, Boston Scientific argues that the district court improperly refused to construe the term "wave" in claim 1. In fact, the district court did construe the claim language "longitudinally disposed bands, wherein each band defines a generally continuous wave having a spatial frequency along a line segment parallel to the longitudinal axis" as "the stent has multiple elongated surfaces that run parallel to the stent's long axis, each of these surfaces having the undulating appearance of a continuous wave," though it did not separately construe the term "wave." *Construction,* 2005 WL 1322966, at *1.

As the district court pointed out, Boston Scientific did not suggest until after the close of the trial that the district court was required to construe the term "wave" in any other respect. *Memorandum Opinion,* **[*1339]** 2006 WL 1305227, at *6. Under *Conoco,* this argument thus was not timely raised before the district court and has been waived. 460 F.3d at 1359.

Alternatively, Boston Scientific argues that even under the district court's claim construction, the evidence did not sufficiently support the jury's infringement verdict. This contention is without merit. The district court cited testimony by Cordis's expert Dr. Buller applying the court's claim construction and describing how the Libert é stent meets the limitations of claim 2 of the '406 patent. *Memorandum Opinion,* 2006 WL 1305227, at *4. We conclude that Cordis presented substantial evidence to support the jury's infringement verdict.

We affirm the district court's denial of Boston Scientific's motion for judgment as a matter of law that the Libert é stent does not infringe claim 2 of the '406 patent.

*F. Dismissal without prejudice*

The district court granted Boston Scientific's motion for judgment as a matter of law that its Taxus Libert

é stent (not to be confused with its Libert é stent or its Taxus Express stent) did not infringe the asserted claims of Cordis's '762 and '406 patents. The district court held that it did not have jurisdiction to consider infringement claims relating to the Taxus Libert é stent because that stent had "no nexus to the United States." *Memorandum Opinion,* 2006 WL 1305227, at *24.

However, Boston Scientific argues that the district court erred in dismissing Cordis's infringement claims against the Taxus Libert é stent without prejudice, rather than with prejudice, and asserts that Cordis failed to prove that the Taxus Libert é stent infringed the asserted claims of the '762 and '406 patents. Cordis asserts that it did not present evidence at trial that the Taxus Libert é stent infringed the asserted claims of the '762 and '406 patents under 35 U.S.C. § 271(f) because it believed such evidence related only to damages rather than to infringement liability.17

"Congress has not clearly stated in 35 U.S.C. § 271 or in any other statute that § 271's requirement that the infringing act happen within the United States is a threshold jurisdictional requirement as opposed to an element of the claim." *Litecubes, LLC v. N. Light Prods., Inc.,* 523 F.3d 1353, 1363 (Fed.Cir.2008), *cert. denied* sub nom. *GlowProducts.com v. Litecubes, LLC,* ___ U.S. ___, 129 S.Ct. 578, ___ L.Ed.2d ___ (2008). Thus, the question of whether the Taxus Libert é stent had a nexus to the United States was an element of Cordis's liability claims, rather than a jurisdictional requirement. Because "a failure to prove the allegations alleged in a complaint requires a decision on the merits, not a dismissal for lack of subject matter jurisdiction," *id.* at 1361, the district court's dismissal of Cordis's infringement claims regarding the Taxus Libert é stent should have been with prejudice.

We reverse the district court's dismissal without prejudice of Cordis's claims that the Taxus Libert é stent infringed the asserted claims of the '762 and '406 patents, and remand with instructions to dismiss the claims with prejudice.

III

We affirm the district court's judgment in all respects save one. We reverse the district court's dismissal without prejudice **[*1340]** of Cordis's claims that the Taxus Libert é stent infringed the asserted claims of the '762 and '406 patents, and remand with instructions to dismiss the claims with prejudice.

AFFIRMED-IN-PART, REVERSED-IN-PART, REMANDED

COSTS

No costs.

* Honorable Marilyn L. Huff, District Judge, United States District Court for the Southern District of California, sitting by designation.

1. This argument does not apply to Cordis's Cypher, BX Sonic, and Genesis stents.

2. Claim 1 of the '021 patent states:

1. A stent in a non-expanded state, comprising:

Downloaded from vLex by Rene Vazquez

a *first expansion strut pair* including a *first expansion strut* positioned adjacent to a *second expansion strut* and a joining strut of the first expansion strut pair that couples the first and second expansion struts at a distal end of the first expansion strut pair, a *plurality of the first expansion strut pair forming a first expansion column;*

a *second expansion strut pair* including a *first expansion strut* positioned adjacent to a *second expansion strut* and a joining strut of the second expansion strut pair that couples the first and second expansion struts of the second expansion strut pair at a proximal end of the second expansion strut pair, a *plurality of the second expansion strut pair forming a second expansion column;*

a first connecting strut including a first connecting strut proximal section, a first connecting strut distal section and a first connecting strut intermediate section, the first connecting strut proximal section being coupled to the distal end of the first expansion strut pair in the first expansion column and the first connecting strut distal section being coupled to the proximal end of the second expansion strut pair of the second expansion column, a plurality of the first connecting strut forming a first connecting strut column that couples the first expansion column to the second expansion column, the first connecting strut intermediate section being non-parallel to the first connecting strut proximal and distal sections, *wherein the first expansion strut of the first expansion strut pair in the first expansion column has a longitudinal axis offset from a longitudinal axis of the first expansion strut of the second expansion strut pair in the second expansion column.*

'021 patent col. 18 ll.9-41 (emphases added).

3. Claim 23 of the '021 patent states:

23. A stent in a non-expanded state, comprising:

a first

expansion column formed of a plurality of first expansion column strut pairs, a *first expansion strut pair* including a first *expansion strut* adjacent to a *second expansion strut* and a first joining strut that couples the first and second expansion struts at a proximal end of the first expansion strut pair, a *second expansion strut pair* including a *third expansion strut* adjacent to the second expansion strut and a second joining strut that couples the second and third expansion struts at a distal end of the second expansion strut pair, a *third expansion strut pair* including a *fourth expansion strut* adjacent to the third expansion strut and a third joining strut that couples the third and fourth expansion struts at a proximal end of the third expansion strut pair, a *fourth expansion strut pair* including a *fifth expansion strut* adjacent to the fourth expansion strut and a fourth joining strut that couples the fourth and fifth expansion struts at a distal end of the fourth expansion strut pair, a first expansion strut pair *first corner* formed where the first joining strut is coupled to the first expansion strut, and a first expansion strut pair *second corner* formed where the first joining strut is coupled to the second expansion strut, and a second expansion strut pair *first corner* formed where the second joining strut is coupled to the second expansion strut, and a second expansion strut pair *second corner* formed where the second joining strut is coupled to the third expansion strut, and a third expansion strut pair *first corner* formed where the third joining strut is coupled to the third expansion strut, and a third expansion strut pair *second* corner formed where the third joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair first corner formed where the fourth joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair *second* corner formed where the fourth joining strut is coupled to the fifth expansion strut;

Downloaded from vLex by Rene Vazquez



a second expansion column formed of a plurality of second expansion column strut pairs, a *first expansion strut pair* including a *first expansion strut* adjacent to a *second expansion* strut and a first joining strut that couples the first and second expansion struts at a proximal end of the first expansion strut pair, a *second expansion strut pair* including a *third expansion* strut adjacent to the second expansion strut and a second joining strut that couples the second and third expansion struts at a distal end of the second expansion strut pair, a *third expansion strut pair* including a *fourth expansion strut* adjacent to the third expansion strut and a third joining strut that couples the third and fourth expansion struts at a proximal end of the third expansion strut pair, a *fourth expansion strut pair* including a *fifth expansion strut* adjacent to the fourth expansion strut and a fourth joining strut that couples the fourth and fifth expansion struts at a distal end of the fourth expansion strut pair, a first expansion strut pair *first corner* formed where the first joining strut is coupled to the first expansion strut, and a first expansion strut pair *second corner* formed where the first joining strut is coupled to the second expansion strut, and a second expansion strut pair *first corner* formed where the second joining strut is coupled to the second expansion strut, and a second expansion strut pair *second corner* formed where the second joining strut is coupled to the third expansion strut, and a third expansion strut pair *first corner* formed where the third joining strut is coupled to the third expansion strut, and a third expansion strut pair *second corner* formed where the third joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair *first corner* formed where the third joining strut is coupled to the fourth expansion strut, and a fourth expansion strut pair *second corner* formed where the fourth joining strut is coupled to the fifth expansion strut; and

a first connecting strut column formed of a plurality of first connecting struts, each connecting strut of the first connecting strut column including a connecting strut proximal section, a connecting strut distal section and a connecting strut intermediate section, a first connecting strut proximal section is coupled to the joining strut of the second expansion strut pair of the first expansion strut column, and a first connecting strut distal section is coupled to the joining strut of the first expansion strut pair of the second expansion strut column, and a second connecting strut proximal

section is coupled to the joining strut of the fourth expansion strut pair of the first expansion strut column, and a second connecting strut distal section is coupled to the joining strut of the third expansion strut pair of the second expansion strut column, the first connecting strut intermediate section being non-parallel to the first connecting strut proximal and distal sections *wherein the first expansion strut of the first expansion strut pair in the first expansion column has a longitudinal axis offset from a longitudinal axis of the first expansion strut of the second expansion strut pair in the second expansion column.*

'021 patent col. 19 l.53—col.21 l.15 (emphases added).

4. The exhibit included at page 7994 of the Joint Appendix shows that the examiner colored in and labeled the figure from Pinchasik, but does not disclose numbering of the figure by the examiner. The parties appear not to dispute that the examiner did number the figure according to the numbering system of claim 1 of the '021 patent.

5. Claim 36 of the '021 patent states:

36. The stent of claim 24, wherein the first connecting strut proximal section is coupled to the *second corner* of the second expansion strut pair of the first expansion strut column, and the first connecting strut distal section is coupled to the *first corner* of the first expansion strut pair of the second expansion strut column, and the second connecting strut proximal section is coupled to the *second corner* of the fourth expansion strut pair of the first expansion strut column, and the second connecting strut distal section is coupled to the *first corner* of the third expansion strut pair of the second expansion strut column.

'021 patent col.22 ll.42-52 (emphases added).

6. Cordis also argues that circular arcs were disclaimed. We find no basis for this in the prosecution history of the '021 patent.

7. The claim construction Cordis urged the district court to adopt was appealed to this court and has since been vacated and remanded. *Jang v. Boston Scientific Corp.,* 532 F.3d 1330, 1331 (Fed.Cir.2008).

8. U.S. Patent Nos. 5,102,417; 5,449,373; 5,643,312; 5,733,303; and 6,348,065.

9. Under 35 U.S.C. § 102, "[a] person shall be entitled to a patent unless ... (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

10. The parties here agree that there is no evidence that copies of the monographs were given to a third commercial entity, Cook Inc., before the critical date of the '021 patent.

Downloaded from vLex by Rene Vazquez

11. In the public use context of § 102(b), we have similarly noted that a lack of an express promise of confidentiality is not determinative of public use, but is instead "one factor to be considered in assessing all the evidence." *Bernhardt, L.L.C. v. Collezione Europa USA, Inc.,* 386 F.3d 1371, 1379 (Fed.Cir.2004) (quoting *Moleculon Research Corp. v. CBS, Inc.,* 793 F.2d 1261, 1266 (Fed.Cir. 1986)), *abrogated on other grounds by Egyptian Goddess, Inc. v. Swisa, Inc.,* 543 F.3d 665 (Fed. Cir.2008) (en banc); *see also Invitrogen Corp. v. Biocrest Mfg., L.P.,* 424 F.3d 1374, 1382 (Fed.Cir.2005).

12. The only potentially contrary testimony is a statement in a report by Boston Scientific's expert that a "colleague, faculty member or other recipient [of the monographs] ... would be under no obligation to maintain the disclosure in confidence." J.A. at 19,386. As we have discussed, whether or not recipients have a legal obligation to maintain confidentiality is not determinative.

13. Boston Scientific asserted that the district court improperly did not allow it to argue that the monographs were prior art in light of the result of a different litigation involving the '762 patent. We do not need to reach the question of whether the earlier determination that the '762 patent was "valid" precluded further litigation of the validity determination in this case.

14. Claims 1 and 2 of the '406 patent state:

1. A stent having first and second ends with an intermediate section there-between, and a longitudinal axis, comprising:

a plurality of longitudinally disposed bands, wherein each band defines a generally continuous *wave* having a spatial frequency along a line segment parallel to the longitudinal axis; and

a plurality of links for maintaining the bands in a tubular structure, wherein the links are so disposed that any single circumferential path formed by the links is discontinuous; *such that* the links and bands define an expandable structure having *axial flexibility* in an unexpanded configuration.

2. A stent according to claim 1, wherein each link is axially displaced from any circumferentially adjacent link.

'406 patent col.5 ll.26-41 (emphases added).

15. Claims 1, 13, and 23 of the '762 patent state:

1. A method for implanting a prosthesis within a body passageway comprising the steps of:

utilizing a *thin-walled,* tubular member as the prosthesis, the tubular member having a plurality of slots formed therein, the slots being disposed *substantially parallel* to the longitudinal axis of the tubular member;

disposing the prosthesis upon a catheter;

inserting the prosthesis and catheter within the body passageway by catheterization of said body passageway; and

expanding and deforming the prosthesis at a desired location within the body passageway by expanding a portion of the catheter associated with the prosthesis to force the prosthesis radially outwardly into contact with the body passageway, the prosthesis being deformed beyond its elastic limit.

13. An expandable intraluminal vascular graft, comprising:

a *thin-walled* tubular member having first and second ends and a wall surface disposed between the first and second ends, the wall surface having a substantially uniform thickness and a plurality of slots formed therein, the slots being disposed *substantially parallel* to the longitudinal axis of the tubular member;

the tubular member having a first diameter which permits intraluminal delivery of the tubular member into a body passageway having a lumen; and

the tubular member having a second, expanded and deformed diameter, upon the application from the interior of the tubular member of a radially, outwardly extending force, which second diameter is variable and dependent upon the amount of force applied to the tubular member, whereby the tubular member may be expanded and deformed to expand the lumen of the body passageway.

23. The expandable intraluminal vascular graft of claim 13, wherein the outside of the wall surface of the tubular member is a smooth surface, when the tubular member has the first diameter.

'762 patent col. 10 l.6-col. 11 l.9; col. 11 l.62-col. 12 l.15; col. 12 ll.55-60 (emphases added).

16. When affirming the district court's denial of Cordis's preliminary injunction motion in this case, we found no error in the district court's conclusion that the prosecution history did not limit "thin-walled" to "thicknesses no greater than 0.0045 inches." *Cordis Corp.,* 99 Fed.Appx. at 933.

17. Cordis argues that the Taxus Libert é stent has the same structure as the Libert é stent. We see no error in the district court's determination that the Taxus Liberté stent and the Libert é stent are different products.

Downloaded from vLex by Rene Vazquez

vLex

550 F.3d 1356

**SUNDANCE, INC. and Merlot Tarpaulin and Sidekit Manufacturing Company, Inc., Plaintiffs-Cross Appellants, v. DEMONTE FABRICATING LTD. and Quickdraw Tarpaulin Systems, Inc., Defendants-Appellants.**

No. 2008-1068.

No. 2008-1115.

**United States Court of Appeals, Federal Circuit.**

December 24, 2008.

Rehearing Denied January 22, 2009.

[*1358] Thomas C. Wettach, Cohen & Grigsby, P.C., of Pittsburgh, PA, argued for plaintiffs-cross-appellants. Of counsel on the brief were Kevin J. Heinl and Robert C. Brandenburg, Brooks Kushman P.C., of Southfield, MI.

Richard L. Rainey, Covington & Burling LLP, of Washington, DC, argued for defendants-appellants. With him on the brief were Roderick R. McKelvie, Scott C. Weidenfeller, and Roger A. Ford.

Before DYK, PROST, and MOORE, Circuit Judges.

MOORE, Circuit Judge.

Plaintiffs-Cross Appellants Sundance, Inc. and Sidekit Manufacturing Co., Inc. (collectively, Sundance) sued Defendants-Appellants DeMonte Fabricating Ltd. and Quick Draw Tarpaulin Systems, Inc. (collectively, DeMonte) in the United States District Court for the Eastern District of Michigan for infringement of claim 1 of U.S. Patent No. 5,026,109 (the '109 patent). A jury concluded that claim 1 was infringed but invalid for obviousness under 35 U.S.C. § 103.

Following the jury verdict, Sundance moved for judgment as a matter of law (JMOL) that the '109 patent was not invalid. The court granted Sundance's motion, and denied DeMonte's motion asking for reconsideration in light of KSR International Co. v. Teleflex Inc., 550 U.S. 398, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007). DeMonte also moved for JMOL of noninfringement, which the court denied. DeMonte appeals both rulings. Sundance cross-appeals the district court's denial of prejudgment interest for infringing sales made prior to the date it filed suit. For the reasons set forth below, we reverse the district court's judgment that the asserted claims are nonobvious as a matter of law, thereby resolving all issues between the parties.

BACKGROUND

The '109

patent is directed to retractable segmented covering systems for "almost any structure or container," such as truck trailers, swimming pools, porches, and patios. '109 patent col.2 ll.35-43. Independent claim 1, the only asserted claim in this suit, reads as follows:

A retractable segmented cover system used with a truck trailer comprising a plurality of flexible cover sections with a plurality of substantially parallel supporting bows spaced there between and a drive assembly, wherein each cover [*1359] section is detachably connected between substantially parallel supporting bows, the bows are slideably supported on the truck trailer and at least one bow is fixedly connected to the drive assembly such that the cover system can be extended or retracted by the drive assembly and wherein *a cover section can be removed from the cover system independent of the other cover sections.*

At trial, relevant to this appeal, DeMonte presented two prior art references to the jury as a basis for a determination of obviousness —U.S. Patent Nos. 4,189,178 (Cramaro) and 3,415,260 (Hall). Cramaro discloses a retractable tarpaulin cover system for use in trucks. The parties agree that the difference between the cover system disclosed in claim 1 of the '109 patent and the Cramaro cover system is that Cramaro does not include "segmented tarps." Sundance's Br. at 26. The parties further agree that Hall discloses a cover system divided into a number of "flexible screen members." *Id.* at 27. Hall indicates that its system "may be used as a truck cover." Hall col.6 l.48. Demonte's patent law expert, Daniel Bliss, opined that one of ordinary skill in the art would be motivated to combine Cramaro and Hall.[1] The jury determined that claim 1 of the '109 patent was obvious.

In a decision rendered before the Supreme Court's holding in *KSR*, the district court granted Sundance's motion for JMOL, ruling that "there was not sufficient evidence for the jury to conclude that one skilled in the art would have combined Hall and Cramaro so as to arrive at the invention—a segmented tarp used for truck covers." *Sundance, Inc. v. DeMonte Fabricating Ltd.,* No. 02-73543, 2006 WL 2708541, at *5 (E.D.Mich. Sept. 20, 2006). In particular, the district court concluded that Hall was "prior art outside of the truck environment which used segmented tarps," "a segmented pool cover," and "a segmented non truck cover." *Id.* at *3-4.

Downloaded from vLex by Rene Vazquez

vLex

In its ruling, the court also noted that Mr. Bliss "did not cite any references in either [Hall or Cramaro] to support his conclusion" that a person of ordinary skill in the art would have a motivation to combine the references. *Id.* at *5. Nor did the court find any "suggestion in the art to combine" Cramaro—which the court characterized as a truck cover—with Hall— which the court characterized as a non truck cover. *Id.* The court reasoned that its conclusion—that DeMonte failed to adduce sufficient evidence for the jury to conclude that one skilled in the art would have combined Hall and Cramaro—was "especially true in light of the fact that the level of skill in the art is low and focuses on tarps used for *truck covers.*" *Id.* (emphasis added). The district court further stated that "secondary considerations ... support[] a finding of nonobviousness," including "long-felt but unresolved need" and "copying." *Id.* After the Supreme Court decided *KSR,* DeMonte moved for reconsideration, which the district court denied, stating that it had not rigidly applied the teaching, suggestion, and motivation test in its original analysis.

DeMonte has timely appealed, and Sundance has timely cross-appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

DISCUSSION I.

We first consider the district court's admission of testimony from DeMonte's **[*1360]** patent law expert, Mr. Bliss. Federal Rule of Evidence 702 provides that:

[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts.

Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and Rule 702, courts are charged with a "gatekeeping role," the objective of which is to ensure that expert testimony admitted into evidence is both reliable and relevant. *See also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 149, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (holding that Rule 702 applies not only to "scientific" testimony, but to all expert testimony). Patent cases, like all other cases, are governed by Rule 702. There is, of course, no basis for carving out a special rule as to experts in patent cases.

We note that

"[a]dmission of expert testimony is within the discretion of the trial court." *Acoustical Design, Inc. v. Control Elecs. Co.,* 932 F.2d 939, 942 (Fed. Cir.1991) (citing *Salem v. U.S. Lines Co.,* 370 U.S. 31, 35, 82 S.Ct. 1119, 8 L.Ed.2d 313 (1962)). We review the admission of expert testimony for an abuse of discretion. *Id.* (citing *Seattle Box Co. v. Indus. Crating & Packing, Inc.,* 731 F.2d 818, 826 (Fed.Cir.1984)); *see also Kumho Tire Co.,* 526 U.S. at 152, 119 S.Ct. 1167 ("[A] court of appeals is to apply an abuse-of-discretion standard when it reviews a trial court's decision to admit or exclude expert testimony.").

DeMonte submitted the expert report of Mr. Bliss to the district court, indicating that Mr. Bliss would opine on: USPTO practices and procedures (eight pages explaining prosecution and reexamination); claim construction (four pages interpreting the claim construction ruling); noninfringement (seven pages concluding that the claims of the '109 patent are not infringed); invalidity, including anticipation and obviousness (thirteen pages concluding that the claims of the '109 patent are invalid); and inequitable conduct (six pages concluding that the '109 patent is unenforceable due to inequitable conduct). Expert Report of Daniel H. Bliss (Docket No. 99-4, Mar. 28, 2006) (Report). Sundance objected, filing a motion in limine to preclude Mr. Bliss from testifying at trial. Sundance argued that Mr. Bliss "lacks appropriate technical background in the field of the invention." Sundance also argued that Mr. Bliss was not qualified to testify about "his interpretation of the law governing invalidity, infringement," or ultimate legal conclusions.

Opposing the motion, DeMonte argued that Mr. Bliss was qualified because he "is a patent attorney with extensive experience in patent law and procedure," and that his testimony was admissible because courts may allow patent law experts to testify on "general procedures involved in the patent application process," citing *Bausch & Lomb, Inc. v. Alcon Laboratories, Inc.,* 79 F.Supp.2d 252, 254-55 (W.D.N.Y.2000). DeMonte further argued that Mr. Bliss's testimony should be admitted even though "Mr. Bliss may not have experience specifically with segmented tarpaulin systems" because his qualifications are "an appropriate subject for cross examination, but would go more to the weight to be given his testimony," citing **[*1361]** *Cameco Industries, Inc. v. Louisiana Cane Manufacturing, Inc.,* No. 92-3158, 1995 WL 468234, *3-4, 1995 U.S. Dist. LEXIS 11294, at * 10-11 (E.D.La. July 27, 1995). The district court denied the motion in limine without comment, thereby permitting Mr. Bliss to testify before the jury on all of the issues submitted in his expert report.

Downloaded from vLex by Rene Vazquez



Although the motion in limine was denied in its entirety, Mr. Bliss did not actually testify as to all of the matters contained in his report. Mr. Bliss "was not asked to testify in general on patent office practice and procedure." Oral Arg. 1:23-1:27, available at http://oralarguments.cafc.uscourts.gov/mp3/2008-1068.mp3.2 Rather, his testimony focused on the issues of noninfringement and invalidity, including the factual predicates underlying obviousness as well as his conclusion that claim 1 of the '109 patent would have been obvious.

In their appellate briefs and during oral argument, the parties disputed whether the district court properly admitted the testimony of Mr. Bliss on the issues of noninfringement and invalidity. Sundance argues that "[a]lthough DeMonte refers to Mr. Bliss as a technical expert, he has no technical experience in the field of truck[s] or tarps and practiced as an engineer for but a year and a half in unrelated areas. He was not qualified at trial as a technical expert." Sundance's Br. at 14 n. 4. DeMonte responded that "reliance on a `patent expert' for `an opinion on the ultimate question,' such as infringement or invalidity, is entirely appropriate." DeMonte's Reply Br. at 5 n. 1 (citing *Snellman v. Ricoh Co.,* 862 F.2d 283, 287 (Fed.Cir. 1988)).

We conclude that the district court abused its discretion in denying Sundance's motion in limine; Mr. Bliss is not qualified to testify as an expert witness on the issues of infringement or validity. These issues are analyzed in great part from the perspective of a person of ordinary skill in the art, and testimony explaining the technical evidence from that perspective may be of great utility to the factfinder.3

Despite the absence of any suggestion of relevant technical expertise, Mr. Bliss offered expert testimony on several issues which are exclusively determined from the perspective of ordinary skill in the art. In elaborate technical detail, Mr. Bliss opined [*1362] on how the disclosed invention, accused system, and prior art operate, including his opinions as to the noninfringement and invalidity of claim 1 of the '109 patent.

DeMonte failed to explain how Mr. Bliss possesses the relevant expertise in the pertinent art.4 Mr. Bliss has no experience whatsoever in "the field of tarps or covers." Nor does DeMonte purport that Mr. Bliss's experience with engines and the like is sufficiently related to covers. *See Cameco Indus.,* 1995 WL 468234, **3-4, 1995 U.S. Dist. LEXIS 11294, at *10-11 (finding that expert's education and experience were "sufficiently related to the subject matter of plaintiff's patent to allow him to speak with authority on the issues of validity and infringement"). Mr. Bliss is not "qualified as an expert by knowledge, skill, experience, training, or education" in the pertinent art

we therefore fail to see how he could "assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

Admitting testimony from a person such as Mr. Bliss, with no skill in the pertinent art, serves only to cause mischief and confuse the factfinder. Unless a patent lawyer is also a qualified technical expert, his testimony on these kinds of technical issues is improper and thus inadmissible. Because Mr. Bliss was never offered as a technical expert, and in fact was not qualified as a technical expert, it was an abuse of discretion for the district court to permit him to testify as an expert on the issues of noninfringement or invalidity.

DeMonte relies on *Snellman,* 862 F.2d at 287, for the proposition that we previously allowed patent law experts to testify on the meaning of technical terms in claims and to give opinions on ultimate questions of infringement and invalidity. DeMonte mischaracterizes our holding in *Snellman*. In *Snellman,* we acknowledged that there was substantial evidence to uphold the jury verdict which included testimony from a patent law expert. Neither party raised the admissibility of the patent lawyer's testimony nor did we address this issue. The opinion mentions the [*1363] patent lawyer's testimony in just two sentences without any analysis of the propriety of such testimony. *See United States v. L.A. Tucker Truck Lines, Inc.,* 344 U.S. 33, 38, 73 S.Ct. 67, 97 L.Ed. 54 (1952) (holding that an issue neither "raised in briefs or argument nor discussed in the opinion of the Court" cannot be taken as "a binding precedent on this point").

We have on several occasions upheld a district court's exclusion of testimony by a patent law expert. *See, e.g., Medtronic Inc. v. Intermedics, Inc.,* 799 F.2d 734, 741 (Fed.Cir.1986) (determining no abuse of discretion where trial court excluded patent law expert's testimony relating to the infringement of the asserted claims); *see also Union Carbide Corp. v. Am. Can Co.,* 724 F.2d 1567, 1572 (Fed.Cir.1984) (agreeing with a district court that gave little weight to the opinion of a former patent attorney with no "expertise as to the scope of the field of endeavor of the inventions of the patents in suit or as to what other fields are analogous art"); *Endress + Hauser, Inc. v. Hawk Measurement Sys. Pty. Ltd.,* 122 F.3d 1040, 1042 (Fed.Cir.1997) ("Indeed, this court has on numerous occasions noted the impropriety of patent lawyers testifying as expert witnesses and giving their opinion regarding the proper interpretation of a claim as a matter of law, the ultimate issue for the court to decide."). In light of all the contrary precedent and the non-existent analysis in *Snellman,* we conclude that *Snellman* does not control the disposition in this case.

Downloaded from vLex by Rene Vazquez

vLex

We hold that it is an abuse of discretion to permit a witness to testify as an expert on the issues of noninfringement or invalidity unless that witness is qualified as an expert in the pertinent art. Testimony proffered by a witness lacking the relevant technical expertise fails the standard of admissibility under Fed.R.Evid. 702. Indeed, where an issue calls for consideration of evidence from the perspective of one of ordinary skill in the art, it is contradictory to Rule 702 to allow a witness to testify on the issue who is not qualified as a technical expert in that art. We understand that patent lawyers are often qualified to testify as technical experts, but such a qualification must derive from a lawyer's technical qualifications in the pertinent art.

We do not, of course, suggest that being a person of ordinary skill in the art automatically entitles a witness to testify as an expert on these or other matters. On the other hand, our opinion should not be read as suggesting that Rule 702 requires a witness to possess something more than ordinary skill in the art to testify as an expert. A witness possessing merely ordinary skill will often be qualified to present expert testimony both in patent trials and more generally. *See* Fed.R.Evid. 702; *see also United States v. Wilson,* 484 F.3d 267, 275-77 (4th Cir.2007) (district court did not abuse discretion under Rule 702 by permitting police officer to testify as to the meaning of coded drug language); *United States v. Marler,* 614 F.2d 47, 49-50 (5th Cir.1980) (district court did not err by permitting deputy fire marshal to offer expert testimony on cause of fire). Admission of expert testimony remains subject to the Rules of Evidence and is committed to the discretion of the district court. Fed.R.Evid. 702; *Acoustical Design,* 932 F.2d at 942.5 **[*1364]**

With regard to invalidity, for example, a witness not qualified in the pertinent art may not testify as an expert as to anticipation, or any of the underlying questions, such as the nature of the claimed invention, what a prior art references discloses, or whether the asserted claims read on the prior art reference. *See Acoustical Design,* 932 F.2d at 942 (sustaining trial court's preclusion of patent expert from testifying about the drafting of claims to avoid prior art and that the claims in suit read on the prior art, as

it would not have been of any benefit to the jury).

Nor may a witness not qualified in the pertinent art testify as an expert on obviousness,6 or any of the underlying technical questions, such as the nature of the claimed invention, the scope and content of prior art, the differences between the claimed invention and the prior art, or the motivation of one of ordinary skill in the art to combine these references to achieve the claimed invention. *See Medtronic,* 799 F.2d at 741; *In re Deters,* 515 F.2d 1152, 1155 (CCPA 1975) (rejecting patent expert testimony on nonobviousness where patent expert was not a person ordinarily skilled in the art and thus his opinion was "not evidence entitled to any weight in resolving the issue").

DeMonte has failed to demonstrate any possible relevancy or reliability of Mr. Bliss's testimony as to technical matters in light of his lack of relevant technical expertise.7 Mr. Bliss lacks the necessary expertise to be of assistance to the court or the jury on the technical aspects of this case. The court, in its role as gatekeeper, must exclude expert testimony that is not reliable and not specialized, and which invades the province of the jury to find facts and that of the court to make ultimate legal conclusions. Allowing a patent law expert without any technical expertise to testify on the issues of infringement and validity amounts to nothing **[*1365]** more than advocacy from the witness stand.8 The district court's denial of the motion in limine to exclude the testimony of Mr. Bliss, a person not skilled in the pertinent art, was an abuse of discretion.

II.

We now consider the district court's entry of JMOL overturning the jury verdict of obviousness. Under Sixth Circuit law, we review a grant of a motion for JMOL *de novo,* using the same standard of review required of the district court. *Johnson Controls, Inc. v. Jay Indus. Inc.,* 459 F.3d 717, 722 (6th Cir.2006). JMOL is appropriate when viewing the evidence in a light most favorable to the non-moving party—giving that party the benefit of all reasonable inferences—there is no genuine issue of material fact for the jury, and reasonable minds could come to but one conclusion in favor of the moving party. *Barnes v. City of Cincinnati,* 401 F.3d 729, 736 (6th Cir.2005) (citations omitted).

Downloaded from vLex by Rene Vazquez

The consequence of our holding that the testimony of Mr. Bliss should have been excluded is that there was no expert testimony supporting a holding of obviousness; we conclude, however, that no such testimony was required because there are no underlying factual issues in dispute as to obviousness. The technology is simple and neither party claims that expert testimony is required to support such a holding. *See Union Carbide,* 724 F.2d at 1573 ("[T]he references and appellant's invention are easily understandable without the need for expert explanatory testimony."); *see also Centricut, LLC v. Esab Group, Inc.,* 390 F.3d 1361, 1369-70 (Fed.Cir.2004); *Iron Grip Barbell Co., v. USA Sports, Inc.,* 392 F.3d 1317, 1323 n. 3 (Fed.Cir.2004). We reverse the district court's grant of JMOL and conclude as a matter of law that claim 1 of the '109 patent would have been obvious and is therefore invalid. *See KSR,* 127 S.Ct. at 1745-46 ("The ultimate judgment of obviousness is a legal determination."). The factual inquiries underlying our determination of obviousness are not in material dispute regardless of the admissibility of the testimony of Mr. Bliss. *See id.* ("Where, as here, the content of the prior art, the scope of the patent claim, and the level of ordinary skill in the art are not in material dispute, and the obviousness of the claim is apparent in light of these factors, summary judgment is appropriate.").

A.

On appeal, Sundance argues that the combination of Cramaro and Hall does not disclose every limitation of claim 1 of the '109 patent. There is no dispute that Cramaro discloses a truck cover including every limitation of claim 1 except "a cover section [that] can be removed from the cover system independent of the other cover sections." The district court construed the word "independent" to mean that "any one cover section can be removed from the [*1366] cover system without removing any other cover section," a definition that neither party challenges. The parties do not dispute that Hall discloses a cover made up of a number of cover sections. Rather, Sundance argues that any particular cover section of Hall cannot be removed "without removing any other cover section." Sundance contends that, in order to remove one of the cover sections in Hall, a face plate must be completely removed such that the adjoining edge of adjacent sections will drape and that they will no longer be part of the cover. In other words, the process of removing one cover section of the Hall invention requires releasing one edge of the adjacent cover sections, and these adjacent cover sections are then left hanging from the cover frame. Oral Arg. at 22:10-23:15. According to Sundance, these hanging cover sections are no longer part of the cover, and thus the section that had been between the two hanging sections could not have been removed "without removing any other cover section."

Even accepting Sundance's explanation of how the cover in Hall operates, there is no serious dispute that in Hall, a cover section can be removed independent of the other cover sections. The question is not whether the hanging sections are *part of the cover*; the question is whether the hanging sections have been *removed*. After a first section is removed, the two cover sections adjacent to the first section are still attached to the cover—they have not been removed. Thus, a combination of Hall and Cramaro satisfies every limitation of claim 1 of the '109 patent. We next turn to whether the combination would have been obvious at the time of the invention.

B.

The district court's decision to overturn the jury verdict was based upon its misunderstanding of Hall as "prior art outside of the truck environment which used segmented tarps." *Sundance,* 2006 WL 2708541 at *3-4 (describing Hall as "a segmented pool cover" and "a segmented non truck cover"). Sundance does not dispute that this determination was an error, doubtless because Hall *explicitly* and repeatedly suggests that its cover system may be used as a truck covering. In the "field of the invention" section of the specification, the patent states that a "field of art to which this invention might pertain is the general class of land vehicles, bodies and tops and in particular to the general subclass of tops and more particularly to load covers and collapsible standing tops." Hall col.1 ll.29-34. The specification also describes one preferred embodiment of the Hall invention as being "used as a truck cover which may be moved to the cab or toward the end of the truck as desired." *Id.* at col.6 ll.48-50. The specification further notes that "[i]t is, of course, realized that this type of structure may be used to provide an expandable cover for trucks." *Id.* at col.6 ll.66-67.[9] The district court based its grant of JMOL on a lack of motivation to combine Cramaro and Hall, a conclusion which itself was based on the district court's misunderstanding of Hall as not within the scope of the relevant art.

"[I]n many cases a person of ordinary skill will be able to fit the teachings of multiple patents together like pieces of a puzzle." *KSR,* 127 S.Ct. at 1742. Such a combination is more likely to be obvious [*1367] where it " 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement." *Id.* at 1740 (quoting *Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 282, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976)). The truck cover of claim 1 of the '109 patent is the result of precisely such an obvious combination.

Downloaded from vLex by Rene Vazquez

vLex

In combination with each other, the cover system of Cramaro performs exactly the function that it performs independent of Hall, and the removable cover sections of Hall perform exactly the function that they perform independent of Cramaro. The elements of the cover system of Cramaro perform several functions, including protection of the cargo, containment of the cargo, and retraction of the cover. None of these functions changes upon the simple act of replacing the one-piece cover of Cramaro with the segmented cover of Hall. The segmented cover of Hall performs the function of allowing individual replacement of the cover sections. This function does not change upon incorporation into the Cramaro cover system. The combination simply mechanizes Hall's segmented cover or segments Cramaro's mechanized cover.

In *KSR,* the Court considered the obviousness of a claim directed to an adjustable automobile throttle pedal combined with an electronic sensor. The relevant prior art included a patent that disclosed an adjustable pedal and another that disclosed an electronic sensor. The Court held that it saw "little difference between the teachings of [the relevant prior art] and the adjustable electronic pedal disclosed in [the claim]. A person having ordinary skill in the art could have combined [the adjustable pedal] with a pedal position sensor in a fashion encompassed by [the claim], and would have seen the benefits of doing so." *KSR,* 127 S.Ct. at 1743.

Just as with the claim at issue in *KSR,* the segmented truck cover claimed in the `109 patent represents the "mere application of a known technique to a piece of prior art ready for the improvement." *Id.* at 1740. It would have been obvious to replace the one-piece cover in Cramaro with the segmented cover of Hall. Indeed, the benefits of combining Hall and Cramaro would have been inescapably obvious to a person of ordinary skill in the art at the time of the invention of the truck cover claimed in the `109 patent. Adding the removable cover sections of Hall to Cramaro would give the resulting design *exactly* the same benefit as Hall—individually replaceable cover sections. Neither party has suggested that the combination of the removable cover sections of Hall with the cover system of Cramaro yields anything "more than one would expect from such an arrangement," nor is any such result apparent. *Sakraida,* 425 U.S. at 282, 96 S.Ct. 1532.

The `109 patent explains that "it would be desirable to have a retractable cover system wherein only the damaged portion could easily be removed and replaced without replacing or disassembling the entire cover system.'" `109 patent

col.2 ll.12-17. Hall explained that its segmented cover "can be prefabricated for ready assembly and that replacement and repair is easily provided for." Hall col.6 ll.28-32. The remaining work to incorporate the replaceable cover sections of Hall into the design of Cramaro is "the work of the skillful mechanic, not that of the inventor." *Sakraida,* 425 U.S. at 282, 96 S.Ct. 1532 (quoting *Hotchkiss v. Greenwood,* 52 U.S. (11 How.) 248, 267, 13 L.Ed. 683 (1851)). We conclude that a cover designer of ordinary skill, at the time of the invention, would have found it obvious to incorporate the [*1368] removable cover sections of Hall into the cover system of Cramaro.

Secondary considerations of nonobviousness—considered here by the district court—simply cannot overcome this strong prima facie case of obviousness. *Agrizap, Inc. v. Woodstream Corp.,* 520 F.3d 1337, 1344 (Fed.Cir.2008); *see also Anderson's-Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57, 61, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969) (considering argument of secondary considerations but holding that "those matters without invention will not make patentability"); *Leapfrog Enters., Inc. v. Fisher-Price, Inc.,* 485 F.3d 1157, 1162 (Fed.Cir.2007) (holding that the objective considerations of nonobviousness presented, including substantial evidence of commercial success, praise, and long-felt need, were inadequate to overcome a strong showing of primary considerations that rendered the claims at issue invalid); *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.,* 464 F.3d 1356, 1371 (Fed.Cir.2006) ("The presence of certain secondary considerations of nonobviousness are insufficient as a matter of law to overcome our conclusion that the evidence only supports a legal conclusion that claim 1 would have been obvious."). Based on the foregoing, we reverse the district court's holding that the asserted claims are nonobvious as a matter of law.

CONCLUSION

Because we hold as a matter of law that claim 1 of the '109 patent is invalid for obviousness, we need not address the issues of infringement or prejudgment interest. The judgment below is

*REVERSED.*

1. Sundance objected to the admission of the testimony of Mr. Bliss on the issues of invalidity and noninfringement, arguing that Mr. Bliss was not qualified as a technical expert, but merely a patent law expert. As explained below, the district court erroneously admitted the testimony over Sundance's objection.

2. We have no reason to doubt that Mr. Bliss— an experienced patent attorney—is qualified to testify as to patent office procedure generally. *See Bausch & Lomb, Inc.,* 79 F.Supp.2d at 254-55 (allowing testimony directed to general procedures involved in the patent application process).

Downloaded from vLex by Rene Vazquez



3. Patent claims are construed from the perspective of one of ordinary skill in the art. *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1313 (Fed.Cir.2005). For the purposes of the doctrine of equivalents, identification of the claim elements as well as the determination of infringement itself are done from the perspective of one of ordinary skill in the art. *See AquaTex Indus., Inc. v. Techniche Solutions,* 479 F.3d 1320, 1329 (Fed.Cir.2007) (citing *Graver Tank & Mfg. Co. v. Linde Air Prods. Co.,* 339 U.S. 605, 609, 70 S.Ct. 854, 94 L.Ed. 1097 (1950)). What a prior art reference discloses or teaches is determined from the perspective of one of ordinary skill in the art. *Scripps Clinic & Research Found. v. Genentech, Inc.,* 927 F.2d 1565, 1576 (Fed.Cir.1991) ("There must be no difference between the claimed invention and the reference disclosure, as viewed by a person of ordinary skill in the field of the invention."). Whether a patent claim would have been obvious in light of prior art references is determined from the perspective of one of ordinary skill in the art. *See KSR,* 127 S.Ct. at 1742 (2007) (emphasizing that, in determining whether a patent combining known elements would have been obvious, the focal question is whether the combination was obvious to a person with ordinary skill in the art).

4. In its opening brief, DeMonte described Mr. Bliss as its "technical expert." DeMonte's Br. at 24. Nonetheless, the record clearly indicates that DeMonte at all times proffered Mr. Bliss as a patent law expert, and not as a technical expert. In response to Sundance's interrogatories, DeMonte stated: "As to Daniel H. Bliss, the witness *will be called to testify as a patent expert."* Def.'s Fourth Supp. Resp. to Pls.' First Set of Interrogs. to Defs. at 3 (emphasis added). DeMonte's response to Sundance's motion in limine presents Mr. Bliss as "a patent attorney with extensive experience in patent law and procedure," without any reference to his technical background. DeMonte did not suggest that Mr. Bliss was one of ordinary skill in the art or a technical expert. Rather it relied upon examples where patent law experts have been permitted in district courts to offer testimony on claim construction, infringement and validity, citing *Bausch & Lomb* and *Cameco.*

Mr. Bliss's pre-trial expert

report details his years of experience as a patent attorney, including preparation of opinions on invalidity and knowledge of USPTO practice and procedure. Report at 3. The report does not present Mr. Bliss as having any personal technical experience, or skills in the field of mechanics, much less covers. Although Mr. Bliss also stated in his report that he has experience in "the vehicle field," support for this statement was only in the context of preparing and prosecuting patent applications for inventions in the vehicle field and in testifying "as an expert on patent law and patent office procedure" in connection with a separate suit also related to the vehicle field. *Id.* at 3. Nor does his appended curriculum vitae reveal any relevant technical experience with vehicle or other cover systems. *Id.* at 50. Indeed, his report opines that the level of ordinary skill in the art "would be someone with a high school education and one or more years of experience in the field of tarps or covers"—experience that he himself lacks. *Id.* at 40.

5. Those of ordinary skill (or those of extraordinary skill) in the particular art are not, of course, the only witnesses who may testify as experts in a patent trial. For example, patent lawyers might offer testimony in contexts other than noninfringement and invalidity, such as patent office practice and procedure; a chemist not skilled in the particular art at issue might nevertheless appropriately testify as an expert as to the consequences of reacting two chemicals in a particular environment.

6. Our holding that it was an abuse of discretion to allow Mr. Bliss to testify on several issues including his opinion on the legal question of obviousness is not a general proclamation as to the admissibility of expert testimony on legal questions. The error here arises from Mr. Bliss's lack of appropriate technical qualifications. Whether a *qualified* technical expert can testify as to the ultimate question of obviousness is of course left to the discretion of the district court. We note, however, that our court has held that allowing a witness to testify *before the jury* on claim construction would be improper. *See CytoLogix Corp. v. Ventana Med. Sys., Inc.,* 424 F.3d 1168, 1172 (Fed.Cir.2005) (noting that "[t]he risk of confusing the jury is high when experts opine on claim construction" before the jury); *see also Endress + Hauser,* 122 F.3d at 1042.

Downloaded from vLex by Rene Vazquez



7. Notably, the District of Delaware has issued guidelines restricting the scope of patent law expert testimony to practice and procedure in the Patent and Trademark Office rather than legal issues and conclusions in an effort to prevent overly expansive expert testimony that may usurp the jury and judge's roles. *See Guidelines: Legal Expert Testimony in Patent Cases,* http://www.ded.uscourts.gov/SLR/ Misc/Guidelines.pdf (last visited Dec. 9, 2008); John E. Kidd & Keeto H. Sabharwal, *The District of Delaware: An Ideal Venue for Patent Litigators,* 18 Del. Law. 16, 17 (Winter 2000); *see also Nisus Corp. v. Perma-Chink Sys, Inc.,* No. 3:03-CV-120, 2005 WL 6112992, *3, 2005 U.S. Dist. LEXIS 41068, at *10 (E.D.Tenn. May 27, 2005) (limiting patent expert's testimony just to USPTO practice and procedures); *Minn. Mining & Mfg. Co. v. Appleton Papers, Inc.,* No. 4-95-786, 1998 U.S. Dist. LEXIS 22597, at *4-5 (D.Minn. June 25, 2008) (allowing a former patent examiner with a degree in electrical engineering to testify as to USPTO procedure, but not as to claim construction, infringement, or validity, because he had "not shown that he [wa]s qualified to offer opinions from the perspective of a person of ordinary skill in the relevant art").

8. "Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it." *Daubert,* 509 U.S. at 595, 113 S.Ct. 2786. This concern is further compounded where the purported witness is an attorney. It is already difficult enough for courts to separate intricate questions of fact in patent cases from equally intricate questions of law. A technically unqualified patent attorney can do much mischief by leading the jury to seemingly sound conclusions without ever providing a well-grounded factual basis in the pertinent art. *See Bausch & Lomb, Inc.,* 79 F.Supp.2d at 255 ("Simply put, testimony that is designed to instruct the jury on the applicable law is not admissible because, by purporting to do what lies with the exclusive province of the court, it cannot be helpful to the jury.").

9. In addition, the '109 patent itself clearly discloses that its invention is not limited for use in truck environments and can be used with swimming pools, just like the Hall invention. *See* '109 patent col.2 ll.29-40 ("For example, the present cover system could be used as an awning over a porch or patio, or as a cover for a swimming pool.").

Downloaded from vLex by Rene Vazquez

vLex

Page 1285

**926 F.2d 1285**

**59 USLW 2427, Fed. Sec. L. Rep. P 95,701,**

**31 Fed. R. Evid. Serv. 1185**

**UNITED STATES of America, Appellee, v. Paul A. BILZERIAN, Defendant-Appellant.**

**No. 787, Docket 89-1502.**

**United States Court of Appeals, Second Circuit.**

**Argued Feb. 13, 1990.**

**Decided Jan. 3, 1991.**

[*1289] Charles Fried, Cambridge, Mass. (Langdell Hall, Cambridge, Mass. of counsel; Arthur F. Mathews, Stephen H. Sachs, Stephen F. Black, Joseph K. Brenner, Lee T. Lauridsen, W. Hardy Callcott, Mark J. Leimkuhler, Wilmer, Cutler & Pickering, Washington, D.C., also of counsel), for defendant-appellant.

David E. Brodsky, Asst. U.S. Atty., S.D.N.Y. (Roger S. Hayes, Acting U.S. Atty., John F. Auchincloss II, Asst. U.S. Atty., S.D.N.Y., New York City, of counsel), for appellee.

Samuel J. Buffone, Washington, D.C. (Asbill, Junkin, Myers & Buffone, Chartered, Washington, D.C., of counsel), filed a brief for amicus curiae National Ass'n of Criminal Defense Lawyers.

Before LUMBARD, CARDAMONE, and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

One of the principal questions posed by this appeal is whether the availability of civil proceedings--often used to enforce the securities laws--forecloses the government from instituting criminal prosecution for the violation of these same laws. The complex contrivances revealed in the present record, such as "parking" stock at a brokerage firm in order to create the impression that the stock has been sold, or having a broker "acculmulate" stock on an investor's behalf in order to delay disclosure of the purchase, carry home the meaning of Scott's "O, what a tangled web we weave, When first we practice to deceive!" 2 Sir Walter Scott, Marmion, Canto VI, XVII (Little Brown & Co. 1857). Although these schemes are not specifically dealt with in the securities laws, the Securities Exchange Act nonetheless contains a general antifraud provision and other federal laws prohibit conspiracy, fraud, and making false statements to United States agencies. This appeal addresses the propriety of enforcing the complained of trading methods through these general fraud and false statement provisions.

Appellant Paul A. Bilzerian (hereafter referred to as Bilzerian or defendant) was convicted on nine counts of an indictment charging violations of securities fraud, making false statements to the Securities and Exchange Commission (SEC), and conspiracy to commit specific offenses, and to defraud the SEC and the Internal Revenue Service (IRS). The charges relate to transactions defendant made between May 1985 and October 1986 in the common stock of four companies: Cluett, Peabody and Company, Inc. (Cluett), Hammermill Paper Company (Hammermill), H.H. Robertson Company (Robertson) and Armco Steel (Armco). On September 29, 1989, the United States District Court for the Southern District of New York (Ward, J.), entered a judgment of conviction and sentenced Bilzerian to four years in prison and a $1.5 million fine.

FACTS A. The Underlying Transactions 1. The Cluett Transactions

The indictment charged three fraudulent schemes relating to trades in Cluett. These involved misrepresenting the source of funds used to purchase stock, secretly accumulating stock through nominee, and misrepresenting an "open market" purchase. By agreeing to share any profits and by guaranteeing against any loss, Bilzerian in April and May of 1985 raised $9 million to buy Cluett stock from various individual investors. The funds were transferred to him through a series of trusts set up for that purpose. Defendant was required to disclose purchase of this large block of stock on a form filed with the SEC known as a Schedule 13D. On the 13D, and its amendment, respecting the Cluett purchase, defendant stated that the stock was purchased with "personal funds," and did not disclose that they were [*1290] raised from other investors with whom he had a profit-sharing and guarantee-against-loss agreement.

Bilzerian also engaged an employee of Jeffries & Company, Inc. (Jeffries), a registered broker-dealer, to accumulate stock on his behalf. Under stock accumulation, a broker-dealer purchases stock in its own account with the understanding that the customer will buy it at a later date at the broker's cost plus interest and commissions. In such a transaction the prearranged sale involves no risk of loss to the broker-dealer, who acts as a nominee for the true purchaser. On May 28, 1985 defendant purchased the accumulated stock without revealing the accumulation arrangement to the SEC. The indictment charged that the agreement was fraudulently designed to delay the reporting requirements of the securities laws.

Downloaded from vLex by Rene Vazquez



Bilzerian also agreed to purchase 347,567 shares of Cluett common stock from a group of shareholders in contemplation of making a tender offer for that company, offering between $38 and $40 per share depending on the price of his tender offer. This proposed purchase was made with the understanding that the trade would not settle for 45 days and that defendant would cancel the purchase proposal if a third party offered more for the shares. Although he learned that 66,667 of the shares included in this block were already under his control, defendant advised the shareholder group to proceed with the sale. The offering statement claimed that 347,567 shares were purchased "in an open market transaction." The existence and terms of the privately-negotiated transaction were not disclosed.

The indictment alleged that the Cluett transactions violated Secs. 10(b) and 32 of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. Secs. 78j(b) and 78ff (Count One), and the federal false statements statute, 18 U.S.C. Sec. 1001 (Counts Two, Three, and Four). Defendant was also charged with conspiring to defraud the SEC and to commit specific offenses in violation of 18 U.S.C. Sec. 371 (Count Eight).

2. The Hammermill Transactions

In June 1986 defendant raised $8 million from an individual investor for the purpose of purchasing Hammermill stock. These funds were made available to him through a trust upon his agreeing to share any profits from the eventual sale of the stock. Bilzerian turned the funds over to a limited partnership--of which he was the general partner--and the partnership made the tender offer for Hammermill. The disclosure relating to the stock purchase and tender offer stated that defendant's contribution to the partnership was from "personal funds."

Once again, defendant arranged to have an employee of Jeffries accumulate Hammermill stock on his behalf. On July 21, 1986 he purchased 551,000 accumulated shares of Hammermill. Although he was required to disclose the acquisition as of July 7, he failed to file until July 25, and at that time did not disclose the accumulation agreement. The Hammermill transactions were alleged to violate 15 U.S.C. Secs. 78j(b) and 78ff (Count Five), 18 U.S.C. Sec. 1001 (Counts Six and Seven) and 18 U.S.C. Sec. 371 (Count Eight).

3. The Robertson and Armco Transactions

Defendant also engaged in "stock parking" transactions in shares of Robertson and Armco. "Parking" refers to a transaction in which a broker-dealer buys stock from a customer with the understanding that the customer will buy the stock back at a later

date for the purchase price plus interest and commissions. As with "accumulation" there is no market risk to the broker-dealer who is the owner of the shares in name only.

Bilzerian arranged to park 58,000 shares of Robertson with Jeffries for 30 days. Although he assured Jeffries he would repurchase the stock, the stock price fell substantially in the interim and he refused to honor his commitment. As a result, Jeffries incurred a $250,000 loss. Defendant compensated Jeffries in part for this loss by generating approximately $125,000 in commissions for the broker. He paid the **[*1291]** remaining $125,000 with the understanding that it would be refunded when an additional $125,000 of commissions was generated. Jeffries sent Bilzerian a false invoice in the amount of $125,000 for "financial services" that were never performed, and the latter deducted the payment on a 1985 tax return. When additional commissions were generated in 1986 he sent Jeffries fictitious invoices for "consulting services" seeking a refund of the $125,000.

Defendant also arranged to park 306,600 shares of Armco with Jeffries for a 30-day period beginning September 2, 1986. In addition, Jeffries agreed to accumulate Armco stock in its own account on defendant's behalf and then sell him the accumulated stock when he repurchased the 306,600 shares. On October 2 defendant purchased 818,900 shares of Armco from Jeffries at the prevailing market price of $8 per share. Although the broker realized a $575,000 gain on the sale, the profits belonged to defendant by virtue of the stock parking and accumulation agreements. Defendant sent his broker an invoice for fictitious "consulting services" in order to account for the profits he realized on the trade.

For his part in the Robertson and Armco trades, Bilzerian was charged with conspiring to defraud the SEC and the IRS and to commit specific offenses including violations of 15 U.S.C. Secs. 78g, 78q, and 78ff (1988) and 18 U.S.C. Sec. 1001, in violation of 18 U.S.C. Sec. 371 (Count Nine).

B. The Trial

At trial defendant argued that he did not intend to violate the securities laws, but believed the financing structure of the transactions, utilizing trusts to borrow funds, would allow him legally to avoid disclosure regarding other investors, and that describing the source of his funds as "personal" was lawful. A motion was made in limine seeking a ruling permitting him to testify regarding his belief in the lawfulness of describing the source of his funds as "personal" without being subjected to cross-examination on communications he had with his attorney on this subject, discussions ordinarily protected by the attorney-client privilege.

Downloaded from vLex by Rene Vazquez



Declining to rule on the issue in the abstract, Judge Ward stated that if defendant testified regarding his good faith regarding the legality of the disclosure, it would open the door to cross-examination with respect to the basis for his belief, and that such cross-examination would allow inquiry into communications with his attorney. Thus, defendant did not testify regarding his good faith, and now claims the trial court's ruling prejudiced his defense and infringed his constitutional right to deny each element of the charge against him. Error is also claimed in several evidentiary rulings made at trial, including the district court's decision to admit expert testimony by a government witness on the legal requirements of the federal securities laws, while excluding similar expert testimony offered by the defense. Additionally, defendant challenges the admission into evidence of a $4 million tax return error on an unrelated personal tax return.

Beyond the challenge that his right to a fair trial was prejudiced, Bilzerian asserts fundamental errors in the prosecution of this case. Specifically, he contends that prosecution under the general false statements statute was improper in light of the existence of more specific securities laws covering the same conduct, that any misstatements or omissions made on securities filings were immaterial, and that he was improperly charged under the "defraud" clause of the federal conspiracy statute rather than the more specific "offense" clause.

## DISCUSSION I. CHALLENGES TO THE CONDUCT OF THE TRIAL A. Attorney-Client Privilege

Defendant contends the testimony he sought to introduce regarding his good faith attempt to comply with the securities laws would not have disclosed the content or even the existence of any privileged communications or asserted a reliance on counsel defense. As such, he continues, [*1292] the attorney-client privilege would not be waived by his testimony and, therefore, the trial court committed reversible error when it denied his motion in limine seeking to protect the privilege. He alleges that this ruling, together with similar rulings made during the course of the trial, prevented him from refuting the charge that he acted with criminal intent--a central element of the government's case--and that his constitutional right to "the fullest opportunity to meet the accusation against

him.... [and] to deny all the elements of the case against him," Walder v. United States, 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503 (1954), was thereby encroached upon.

Professor Wigmore tells us that the attorney-client privilege, dating back to the 1600s, is the most ancient of the confidential communication privileges. Originally, it was the attorney's privilege; today, it is recognized as the client's. See 8 J. Wigmore, Evidence Sec. 2290, at 542-44 (McNaughton rev.1961). It may have arisen--with the advent of testimonial compulsion in Elizabethan England--as a judicial extension of the right of individuals to avoid self-incrimination. Id. at 543-44; Note, Developments in the Law: Privileged Communications, 98 Harv.L.Rev. 1450, 1502 (1985).

The purposes for the privilege are twofold: first, it assures that a person seeking legal advice may do so safely. Its existence therefore encourages the full and truthful revelation by the client of all the facts in his possession. Second, no attorney can represent a client effectively unless the client discloses fully all the facts in his possession. Thus, the privilege "recognizes that sound legal advice or advocacy serves public ends and that such advice or advocacy depends upon the lawyer's being fully informed by the client." Upjohn Co. v. United States, 449 U.S. 383, 389, 101 S.Ct. 677, 682, 66 L.Ed.2d 584 (1981). The fundamental purpose of the privilege is to " 'encourage full and frank communication between attorneys and their clients.' " United States v. Zolin, 491 U.S. 554, 109 S.Ct. 2619, 2626, 105 L.Ed.2d 469 (1989) (quoting Upjohn, 449 U.S. at 389, 101 S.Ct. at 682).

Although the underlying rationale for the privilege has changed over time, it has retained its importance in the common law tradition. Id. 109 S.Ct. at 2625-26; see United States v. Schwimmer, 892 F.2d 237, 243 (2d Cir.1989). The potential societal benefit may be great in cases like the one at bar, where defendant seeks legal advice in order to act within the confines of highly complex federal securities laws. Often the importance of the interests promoted by the privilege justify the exclusion of otherwise relevant evidence. See McCormick on Evidence Sec. 72 at 152 (E. Cleary 2d ed. 1972).

Downloaded from vLex by Rene Vazquez

vLex

However, the attorney-client privilege cannot at once be used as a shield and a sword. See In re von Bulow, 828 F.2d 94, 103 (2d Cir.1987); see also Clark v. United States, 289 U.S. 1, 15, 53 S.Ct. 465, 469, 77 L.Ed. 993 (1933) ("The privilege takes flight if the relation is abused."). A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes. See von Bulow, 828 F.2d at 101-02. Thus, the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications. See United States v. Exxon Corp., 94 F.R.D. 246, 249 (D.D.C.1981) (claim of good faith reliance on governmental representations waived attorney-client privilege); Hearn v. Rhay, 68 F.R.D. 574, 581 (E.D.Wash.1975) (assertion of qualified immunity defense waived attorney-client privilege). This waiver principle is applicable here for Bilzerian's testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue. His conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and, as a result, his intent.

In support of his argument that asserting a good faith defense does not waive the attorney-client privilege, Bilzerian points to United States v. White, 887 F.2d 267 (D.C.Cir.1989). **[*1293]** In that case attorney-client communications were admitted at trial over defense counsel's objection, in part because defendant's assertion of lack of intent was deemed to have waived the privilege. In reversing White's conviction the court stated: "[a] rule thus forfeiting the privilege upon denial of mens rea would deter individuals from consulting with their lawyers to ascertain the legality of contemplated actions...." 887 F.2d at 270. Because intent is an element of the case that the government must prove, the court continued, waiver of the attorney-client privilege based in denial of intent "would cut short both the privilege and the right." Id.

Denial of an essential element of the crime charged--here criminal intent--is a constitutional right to be carefully safeguarded. But White is distinguishable because the district court's ruling in the instant case did not prevent defendant from denying criminal intent; the district judge merely said that Bilzerian's own testimony as to his good faith would open the door to cross-examination, possibly including inquiry into otherwise privileged communications with his attorney. Defendant was free to deny criminal intent either without asserting good faith or to argue his good faith defense by means of defense counsel's opening and closing statements and by his examination of witnesses.

Another important distinction between White and the case at bar is that in the former the privileged communications were actually admitted at trial, allowing the appellate court an opportunity to examine whether defendant's case was or was not prejudiced. See White, 887 F.2d at 272. Because defendant did not testify as to his good faith, the privileged communications were not introduced at trial. Hence, the trial court's ruling and our review of defendant's claims lack a specific factual context within which to determine if the defense was actually prejudiced. See Luce v. United States, 469 U.S. 38, 41, 105 S.Ct. 460, 463, 83 L.Ed.2d 443 (1984) ("A reviewing court is handicapped in any effort to rule on subtle evidentiary questions outside a factual context."). The district court took great pains to point out that application of the privilege would hinge on the testimony elicited on direct examination. In response to defense counsel's statement that "[t]he government presumably then would be able to call the attorney because the privilege is gone," the court stated:

I am not going to go to that point. It may be that the government would be bound by the answer of the witness but I am not going to get to that point because I don't think I have to at this juncture. I don't know how this is going to play out. Until I do, I think it is inappropriate for me to give any advisory opinion.

In effect, defendant was seeking an advisory ruling in advance, assuring that the attorney-client privilege would not be waived regardless of what developed in his direct testimony. In order for the privilege to operate effectively defendants must be able to rely on its protection, see In re von Bulow, 828 F.2d at 100 ("An uncertain privilege--or one which purports to be certain, but results in widely varying applications by the courts--is little better than no privilege."), but courts cannot sanction the use of the privilege to prevent effective cross-examination on matters reasonably related to those introduced in direct examination. Cf. McGautha v. California, 402 U.S. 183, 215-17, 91 S.Ct. 1454, 1471-72, 28 L.Ed.2d 711 (1971) (defendant testifying on punishment issue in a bifurcated proceeding could not assert privilege against self-incrimination on issue of guilt); Walder, 347 U.S. at 63-65, 74 S.Ct. at 355-56 (defendant who lied on witness stand not permitted to use exclusionary rule as shield against impeachment).

A district court's finding that a defendant has waived the attorney-client privilege is reviewed under the abuse of discretion standard. See In re von Bulow, 828 F.2d at 101. Here the district court's ruling did not prevent the defense from urging lack of intent. Accordingly, the refusal to grant Bilzerian blanket protection from an implied waiver of the attorney-client privilege was not an abuse of discretion.

Downloaded from vLex by Rene Vazquez

Bilzerian asserts the court ruled that even his own testimony regarding the steps **[*1294]** he took to change the structure of his financing arrangements would waive the privilege. He argues that testimony about underlying facts cannot waive the privilege, because the attorney-client privilege does not extend to underlying facts. See Upjohn, 449 U.S. at 395-96, 101 S.Ct. at 685-86. To the contrary, the trial court held only that Bilzerian's testimony about the changes would open the door on cross-examination to inquiry into Bilzerian's reasons for making the changes, because the topic would necessarily involve Bilzerian's state of mind. Even defendant's trial counsel knew the testimony about the changes would be inextricably intertwined with Bilzerian's assertion of good faith. Counsel said: "Mr. Bilzerian's response would be in substance that he directed these changes to be made so that--in order to enable himself to be able to report as personal funds on the 13D the funds that he received from the trust that he would not have to disclose any of the investors' names and that he thought that doing that, that he believed that was appropriate and proper". The trial court's ruling left defendant free to testify without getting into his state of mind, but correctly held that if he asserted his good faith, the jury would be entitled to know the basis of his understanding that his actions were legal.

### B. Expert Testimony

Defendant next contends that his ability to defend himself was unfairly prejudiced by the trial court's rulings on the admissability of expert testimony. The court erred, he says in allowing Professor John C. Coffee, a government expert witness, to testify regarding the requirements of Schedule 13D concerning disclosure of the source of funds and arrangements and understandings with others.

Particularly in complex cases involving the securities industry, expert testimony may help a jury understand unfamiliar terms and concepts. Its use must be carefully circumscribed to assure that the expert does not usurp either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it. See United States v. Scop, 846 F.2d 135, 139-40, modified, 856 F.2d 5 (2d Cir.1988); Marx & Co., Inc. v. Diners' Club, Inc., 550 F.2d 505, 510-11 (2d Cir.), cert. denied, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977).

As a general rule an expert's testimony on issues of law is inadmissible. See generally, Note, Expert Legal Testimony, 97 Harv.L.Rev. 797 (1984

. The Marx and Scop cases distinguish between factual conclusions that may be included in an expert's testimony--though they embrace an ultimate issue to be decided by the jury--and opinions embodying legal conclusions that encroach upon the court's duty to instruct on the law. See Scop, 846 F.2d at 142; Marx, 550 F.2d at 512. In Marx, it was held that an expert's legal opinion on the meaning of certain contract terms was outside the witness' area of expertise and was also an invasion of the court's authority to instruct the jury on the applicable law. 550 F.2d at 509-510. In Scop, an expert's repeated statements that defendants' conduct established a manipulative and fraudulent scheme within the meaning of the securities laws exceeded the permissible scope of opinion testimony. 846 F.2d at 139. These cases establish that although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts.

Unlike Scop and Marx, the government's expert in the present case did not give his opinion as to whether Bilzerian's actions violated the securities laws. As the government's first witness, much of Professor Coffee's testimony was general background on federal securities regulation and the filing requirements of Schedule 13D, which he presented by referring to a blank form. Although Professor Coffee did answer a few questions based on hypothetical facts, the use of hypotheticals was first introduced by the defense on cross examination. The mere use of hypotheticals does not usurp the jury's function of applying the law to the facts of the case. See Scop, 846 F.2d at 143. Further, since **[*1295]** the expert's general testimony was not objected to at trial, the issue was waived. See United States v. Heinemann, 801 F.2d 86, 96 (2d Cir.1986), cert. denied, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987).

Following a specific objection that Professor Coffee's testimony constituted an impermissible legal instruction, Judge Ward limited his testimony regarding 13D's requirements by asking the jury to read specified instructions on the blank Schedule 13D and to ask Professor Coffee to clarify any ambiguity in the instructions. In addition, the trial judge gave a limiting instruction indicating that the expert's testimony was simply background information:

Professor Coffee is here to furnish you with background concerning the meaning of terms, the procedures which are followed and his opinion as to the reason for these procedures. He is not here to give his opinion as to what the law requires. That is a matter which must be presented to you by the court.

Downloaded from vLex by Rene Vazquez

vLex

With respect to the admission or exclusion of expert evidence, we defer to the trial judge's broad discretion unless his decision is clearly wrong. See Salem v. United States Lines, 370 U.S. 31, 35, 82 S.Ct. 1119, 1122, 8 L.Ed.2d 313 (1962); United States v. Daly, 842 F.2d 1380, 1387 (2d Cir.), cert. denied, 488 U.S. 821, 109 S.Ct. 66, 102 L.Ed.2d 43 (1988). In view of the general background nature of the unobjected to testimony and the court's limiting instruction to defense counsel, we see no abuse of discretion in admitting the expert testimony.

Bilzerian argues further that the trial court erred in limiting the testimony of his expert witness, Lee B. Spencer, Jr., former director of the SEC's Division of Corporate Finance. The defense sought to elicit that the phrase "personal funds," as generally understood in the securities industry, includes funds derived from loans of the type received by defendant. It hoped to demonstrate with this evidence defendant's good faith in completing the disclosure form. Judge Ward excluded this proof because it related directly to the issue of whether Bilzerian's actual 13D disclosures complied with the legal requirements. Thus, the expert testimony would have constituted an impermissible instruction on governing law. Defense counsel was informed that it would have an opportunity to submit proposed jury instructions regarding the scope of "personal funds."

Although testimony concerning the ordinary practices in the securities industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice, Marx, 550 F.2d at 509, testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admissable, and may not be made so simply because it is presented in terms of industry practice. Several hypothetical questions posed to Mr. Spencer include the particular facts alleged in the indictment, blurring the line between testimony regarding industry practice and an opinion on the legality of defendant's conduct. It does not appear that the trial court's ruling was clearly wrong or that the limits placed on Spencer's earlier testimony prejudiced the defense.

C. Admission of Evidence Regarding Bilzerian's 1986 Personal Tax Return

Defendant next alleges that the district court abused its discretion in admitting evidence of a $4 million error made on his 1986 personal income tax return. The evidence was part of the testimony given by Brian Murphy, a former senior tax manager with the accounting firm of Peat Marwick Main & Co. who had done accounting work for some partnerships in which defendant participated. On direct examination

the government elicited testimony that during Murphy's preparation of tax returns for Bilzerian's Hammermill-related partnerships, Bilzerian stated that the source of his contribution to the partnership was personal funds. The trial evidence indicated to the contrary that the money was borrowed.

On cross-examination, the defense sought to establish that the source of funds was irrelevant for tax purposes and [*1296] that the tax returns filed on behalf of the partnerships, including the Bilzerian contribution, were correct. On redirect the government elicited the fact that defendant had underreported income from the Hammermill transaction on his personal tax return for 1986 by approximately $4 million.

The trial court stated since a partnership pays no income taxes, the testimony given on cross-examination regarding the accuracy of partnership returns created the impression that defendant had accurately reported his income from the Hammermill transaction. As such, the door had been opened to correct the false impression, including inquiry into defendant's personal tax returns.

Bilzerian asserts the evidence was inadmissable pursuant to Rules 403 and 404(b) of the Federal Rules of Evidence. Rule 404(b) prohibits the introduction of "other crimes, wrongs, or acts" for the purpose of demonstrating defendant's propensity to commit the charged crime. Fed.R.Evid. 404(b). The district court noted the evidence was not admitted for that improper purpose, but in order to rebut a false impression that had been created. Redirect may of course be used to rebut false impressions arising from cross-examination, and the scope of such redirect is within the trial court's broad discretion. United States v. Mang Sun Wong, 884 F.2d 1537, 1544 (2d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1140, 107 L.Ed.2d 1045 (1990).

Rule 403 permits the court to exclude evidence if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. The weighing of relevance under Rule 403 may be altered when a false impression is created by earlier testimony. That is, evidence whose probative value might not ordinarily outweigh its prejudicial effect if offered on direct examination is admissable to rebut testimony elicited on cross examination that created a false impression. United States v. Martinez, 775 F.2d 31, 37 (2d Cir.1985). Balancing relevance against prejudice under Rule 403 is in the hands of the trial court and will not be overturned unless its ruling is arbitrary or irrational. See United States v. Esdaille, 769 F.2d 104, 108 (2d Cir.), cert. denied, 474 U.S. 923, 106 S.Ct. 258, 88 L.Ed.2d 264 (1985).

Downloaded from vLex by Rene Vazquez

The deficiency in Bilzerian's personal tax return was not relevant to the charge of conspiracy to defraud the IRS or to any other charge in the indictment. In addition, the testimony on cross examination related only to defendant's partnership tax return. His personal return at most had a tenuous connection to the issues at trial. Yet, the fact of his tax error was introduced without objection when he was cross-examined. In such context the evidence was admissible under Fed.R.Evid. 611(b) as probative of his veracity. The trial court was in the best position to judge whether a false impression was created by Murphy's cross-examination, and the decision to admit this evidence was within the trial court's discretion. Here, Judge Ward gave a limiting instruction stating that the contested evidence was to be considered only in evaluating Murphy's testimony regarding his preparation of the partnership returns. Thus, the rulings on the admissibility of the tax error were proper.

## II. ALLEGED PROSECUTORIAL FAILURES A. Liability Under Sec. 10(b) and Rule 10b-5

Again, Bilzerian contends the securities fraud convictions cannot be sustained because any misstatements or omissions made, including the delays in disclosing his stockholdings, were not material. The securities fraud counts charged that in connection with the Cluett and Hammermill transactions defendant violated Sec. 10(b) of the Exchange Act, 15 U.S.C. Sec. 78j(b) (1988), [1] and Rule 10b-5 of the regulations [*1297] promulgated thereunder, 17 C.F.R. Sec. 240.10b-5 (1990) [2]. Section 10(b) and Rule 10b-5 prohibit fraudulent practices in connection with the purchase or sale of a security, including the knowing misrepresentation or omission of material facts.

Section 10(b) was designed to protect investors engaged in the purchase and sale of securities by implementing a policy of full disclosure. Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 477-78, 97 S.Ct. 1292, 1303-04, 51 L.Ed.2d 480 (1977). The Sec. 10(b) convictions were largely based on misrepresentations made on Schedules 13D and 14D-1 concerning the source of the funds used for the transactions and on the untimely filing of the forms. Some background on the filing requirements relating to Schedule 13D and Schedule 14D-1 is helpful to understanding this portion of the case. Both forms are reports filed with the SEC and made available to the public. They disclose the acquisition of a significant amount of stock in a publicly traded company. Schedule 14D-1, 17 C.F.R. 240.14d-100 (1990), discloses the commencement of a tender offer for the stock of a public company. See Finnegan v. Campeau Corp., 915 F.2d 824 (2d Cir.1990). Schedule 13D, 17 C.F.R. Sec. 240.13d-101 (1990), the focus of this prosecution, discloses that an investor has acquired beneficial ownership of five percent or more of the stock of a public

company.

Pursuant to Sec. 13(d)(1) of the Exchange Act, 15 U.S.C. Sec. 78m(d)(1) (1988), [3] defendant was required to file a Schedule 13D within ten days after he became the beneficial owner of five percent of the stock of Cluett and Hammermill. Section 13(d)'s purpose is to "alert investors to potential changes in corporate control so that they [can] properly evaluate the company in which they had invested or were investing." GAF Corp. v. Milstein, 453 F.2d 709, 720 (2d Cir.1971), cert. denied, 406 U.S. 910, 92 S.Ct. 1610, 31 L.Ed.2d 821 (1972); see also Mayer v. Chesapeake Ins. Co., 877 F.2d 1154, 1162 (2d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 722, 107 L.Ed.2d 741 (1990) (purpose of Sec. 13(d) is to alert marketplace and permit investors to assess potential for change in corporate control). In addition to background information about the persons purchasing the stock, Sec. 13(d) specifically requires disclosure of:

(B) the source and amount of the funds or other consideration used or to be used in making the purchases, and if any part of the purchase price is represented or is to be represented by funds [*1298] or other consideration borrowed or otherwise obtained for the purpose of acquiring, holding, or trading such security, a description of the transaction and the names of the parties thereto ...

. . . . .

(E) information as to any contracts, arrangements, or understandings with any person with respect to any securities of the issuer, including but not limited to transfer of any of the securities, joint ventures, loan or option arrangements, puts or calls, guaranties of loans, guaranties against loss or guaranties of profits, division of losses or profits, or the giving or withholding of proxies, naming the persons with whom such contracts, arrangements, or understandings have been entered into, and giving the details thereof.

15 U.S.C. Sec. 78m(d)(1).

A duty to file under Sec. 13(d) creates the duty to file truthfully and completely. SEC v. Savoy Industries, 587 F.2d 1149, 1165 (D.C.Cir.1978), cert. denied, 440 U.S. 913, 99 S.Ct. 1227, 59 L.Ed.2d 462 (1979); GAF, 453 F.2d at 720. Although Sec. 13(d) is a reporting requirement rather than an antifraud provision, criminal penalties are available against one who knowingly makes a false and misleading statement of material fact on a document required to be filed by the securities laws. 15 U.S.C. Sec. 78ff. In addition, a false or misleading statement made on a Schedule 13D may be actionable under the antifraud provision of Sec. 10(b). GAF, 453 F.2d at 720; see also Kamerman v. Steinberg, 891 F.2d 424, 431 (2d Cir.1989). In either case, materiality of the misstatement or omission is a prerequisite to liability.

Downloaded from vLex by Rene Vazquez



Contending there were no material misstatements or omissions to support his Sec. 10(b) convictions, defendant argues first that the absence of any market fluctuation in Cluett stock immediately after his 13D was filed demonstrates that the information was not important to investors. Second, he asserts, the source of the funds he used was not material because he could have lawfully avoided disclosing his investors' identities by channeling the money through limited partnerships rather than trusts. From this premise he reasons that because the investors' identities could have been concealed, the fact that an unnamed other person was investing with him was not a material fact.

The standard of materiality under the securities laws was set forth by the Supreme Court in TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976). An omitted fact is material if there is a substantial likelihood that a reasonable shareholder would consider it important in making an investment decision. Id. at 449, 96 S.Ct. at 2132; Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988). Determination of materiality is a mixed question of law and fact that the Supreme Court has stated is especially well suited for jury determination. TSC, 426 U.S. at 450, 96 S.Ct. at 2133 ("The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts ... and these assessments are peculiarly ones for the trier of fact.")

Turning to defendant's first point, whether a public company's stock price moves up or down or stays the same after the filing of a Schedule 13D does not establish the materiality of the statements made, though stock movement is a factor the jury may consider relevant. See Akerman v. Oryx Communications, Inc., 609 F.Supp. 363, 368 (S.D.N.Y.1984), aff'd, 810 F.2d 336 (2d Cir.1987); SEC v. Bausch & Lomb, Inc., 565 F.2d 8, 15-16 (2d Cir.1977). With respect to the second point, we decline to hold that the materiality of information to be disclosed in 13D is material per se for purposes of Sec. 10(b) simply because such disclosure is required under the securities laws. But the fact that the information is required to be revealed under Sec. 13(d) is evidence of its materiality. SEC v. Levy, 706 F.Supp. 61, 72 (D.D.C.1989).

After hearing the evidence in this case the jury concluded that the misstatements and omissions

were material. Defendant faces a heavy burden when challenging the [*1299] sufficiency of the evidence leading to his conviction. See United States v. Zabare, 871 F.2d 282, 286 (2d Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 161, 107 L.Ed.2d 119 (1989). If any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt, the conviction must be affirmed. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979).

It was not unreasonable for the jury to conclude that erroneously describing the source of funds as "personal" was material, for it indicated the honesty and feasibility of Bilzerian's plans for the investment. See Savoy, 587 F.2d at 1166-67 (failure to disclose participation of a certain investor violated Sec. 13(d) and was material under Sec. 10(b)); Levy, 706 F.Supp. at 73 (failure to reveal on 13D that stock purchase was funded with borrowed money was material under Sec. 10(b)). It was also reasonable for the jury to find that defendant engaged in a fraudulent scheme to avoid the disclosure requirements of Sec. 13(d). See SEC v. First City Financial Corp., Ltd., 688 F.Supp. 705, 724 (D.D.C.1988), aff'd, 890 F.2d 1215, 1228 (D.C.Cir.1989) (stock parking arrangement used to delay filing Schedule 13D violated Sec. 13(d)). Since the question of materiality is especially well suited for jury determination, and defendant has not demonstrated a lack of sufficient evidence to support that body's conclusion, there is no basis to set aside the securities fraud convictions.

B. Liability Under 18 U.S.C. Sec. 1001

For making false statements on the Forms 13D and 14D-1 filed with the SEC, Bilzerian was charged with violating the general false statements statute, 18 U.S.C. Sec. 1001, rather than the more specific securities law provisions. He contends that the government's prosecution under Sec. 1001 was an unprecedented attempt to impose criminal penalties without complying with the specific requirements for criminal prosecution under the 1934 Act.

Section 1001 provides:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or representations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Downloaded from vLex by Rene Vazquez

18 U.S.C. Sec. 1001 (1988). The statute was designed "to protect the authorized functions of governmental departments and agencies from the perversion which might result from the deceptive practices described." United States v. Gilliland, 312 U.S. 86, 93, 61 S.Ct. 518, 522, 85 L.Ed. 598 (1941); see also United States v. Fitzgibbon, 619 F.2d 874, 877-78 (10th Cir.1980) (describing legislative history). To support a conviction under Sec. 1001, the government must establish that the defendant (1) knowingly and willfully (2) made a statement (3) in relation to a matter within the jurisdiction of a department or agency of the United States, (4) with knowledge that it was false or fictitious and fraudulent. See United States v. Silva, 715 F.2d 43, 49 (2d Cir.1983). Under our decisions, materiality of the statement is not an element of the offense. See United States v. Elkin, 731 F.2d 1005, 1009 (2d Cir.), cert. denied, 469 U.S. 822, 105 S.Ct. 97, 83 L.Ed.2d 43 (1984); United States v. Silver, 235 F.2d 375, 377 (2d Cir.), cert. denied, 352 U.S. 880, 77 S.Ct. 102, 1 L.Ed.2d 80 (1956).

Defendant asserts that it was Congress' purpose to have criminal prosecutions, for misstatements in informational reports filed with the SEC, brought under Sec. 32(a) of the Exchange Act, 15 U.S.C. Sec. 78ff, a specific enforcement provision setting forth criminal penalties for willful violations of the securities laws and the applicable rules and regulations. Unlike the false statements statute, Sec. 32(a) requires proof of materiality and contains a provision that imprisonment will not be imposed on a defendant who was ignorant of the substance of the rule. In pertinent part it provides: [*1300]

Any person who willfully violates any provision of this chapter ... or any rule or regulation thereunder the violation of which is made unlawful or the observance of which is required ... or any person who willfully and knowingly makes, or causes to be made, any statement in any application, report, or document required to be filed ... which statement was false or misleading with respect to any material fact, shall upon conviction be fined not more than $1,000,000, or imprisoned not more than 10 years, or both ...; but no person shall be subject to imprisonment under this section for the violation of any rule or regulation if he proves that he had no knowledge of such rule or regulation.

15 U.S.C. Sec. 78ff (1988).

It is settled

law that "when an act violates more than one criminal statute, the Government may prosecute under either so long as it does not discriminate against any class of defendants." United States v. Batchelder, 442 U.S. 114, 123-24, 99 S.Ct. 2198, 2204, 60 L.Ed.2d 755 (1979). Prosecution has additionally been permitted under Sec. 1001 despite the existence of other overlapping and more specific false statement statutes. United States v. Gordon, 548 F.2d 743, 744 (8th Cir.1977); see also, e.g., United States v. Grotke, 702 F.2d 49, 54 (2d Cir.1983) (Sec. 1001 applicable despite more specific currency reporting statute.).

Defendant argues that in the case of alleged misstatements or omissions in informational reports filed under the Exchange Act, Congress planned that Sec. 32(a) and not Sec. 1001 control. At the time Sec. 1001 was enacted--only 12 days after the Exchange Act was passed--it provided harsher penalties than Sec. 32(a), though the requirements for conviction under Sec. 1001 were less stringent. Nonetheless, proximity of the enactments without more does not suggest that the application of the false statements statute was to be limited by the just-enacted securities laws. Absent more explicit indicia of Congressional purpose to foreclose the use of Sec. 1001, the general rule that criminal statutes may overlap controls. The fact that less proof is required for conviction under Sec. 1001 does not amount--as defendant alleges--to overriding the requirements of Sec. 32(a).

Defendant also asserts that statements made on Schedules 13D and 14D-1 are not matters "within the jurisdiction of" the SEC because with respect to these statements the SEC is merely a repository of information and does not act upon the statements. It is his view that Sec. 1001 is appropriate only for misstatements or omissions (1) made during an active governmental inquiry or (2) that formed the basis for some sort of governmental action.

The Supreme Court has stressed that the term "jurisdiction" in Sec. 1001 should be broadly construed. An agency has jurisdiction within the meaning of the statute when it has authority to act upon the information. See United States v. Rodgers, 466 U.S. 475, 479-80, 104 S.Ct. 1942, 1946, 80 L.Ed.2d 492 (1984); United States v. Adler, 380 F.2d 917, 922 (2d Cir.), cert. denied, 389 U.S. 1006, 88 S.Ct. 561, 19 L.Ed.2d 602 (1967). "A statutory basis for an agency's request for information provides jurisdiction enough to punish fraudulent statements under Sec. 1001." Bryson v. United States, 396 U.S. 64, 71, 90 S.Ct. 355, 359, 24 L.Ed.2d 264 (1969).

Downloaded from vLex by Rene Vazquez

A statutory basis for the SEC's request for information exists because the Exchange Act requires the documents at issue to be filed with it. 15 U.S.C. Secs. 78m(d), 78n(d) (1988). This executive agency is authorized to regulate the content of the documents and to investigate and prosecute violations of law based on the filings. 15 U.S.C. Secs. 78m(d), 78u (1988); see United States v. Fields, 592 F.2d 638, 649 (2d Cir.1978) (filing prospectus which concealed material facts with SEC stated a claim under Sec. 1001), cert. denied, 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); United States v. Kuna, 760 F.2d 813, 820 (7th Cir.1985) (sustaining conviction under Sec. 1001 for false statement on broker-dealer registration); United States v. Di Fonzo, 603 F.2d 1260, 1263-64 (7th Cir.1979) (documents submitted to SEC in course of investigation within its jurisdiction), cert. denied, 444 U.S. 1018, 100 S.Ct. 672, 62 [*1301] L.Ed.2d 648 (1980); see also United States v. Hansen, 772 F.2d 940, 943-44 (D.C.Cir.1985) (the term "jurisdiction" in Sec. 1001 embraces the authority to conduct an official inquiry), cert. denied, 475 U.S. 1045, 106 S.Ct. 1262, 89 L.Ed.2d 571 (1986); United States v. Diaz, 690 F.2d 1352, 1357 (11th Cir.1982) (grant of authority rather than its exercise determines jurisdiction).

Although the SEC may not act on every Schedule 13D, the filing of a false statement may interfere with its investigatory and enforcement function, including its determination whether or not to investigate a transaction. The securities laws are designed to make accurate information available to the investing public; the SEC's authority to regulate disclosure required under those laws brings the securities filings at issue within its jurisdiction for purposes of Sec. 1001.

Further, defendant makes a venue objection, stating the alleged violation occurred in Washington D.C., where the document was filed, and that the drafting of the document was mere preparation for the offense, not part of it. See United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1190 (2d Cir.), cert. denied, --- U.S. ----, 110 S.Ct. 324, 107 L.Ed.2d 314 (1989). We disagree. The documents were prepared and signed--i.e. "made"--within the Southern District of New York, and thus venue was properly laid there. See United States v. Mendel, 746 F.2d 155, 165 (2d Cir.1984) (venue under Sec. 1001 lies either where documents were prepared or filed), cert. denied, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985).

C. Conspiracy

Bilzerian was convicted on two conspiracy counts alleging that he participated in two multi

object conspiracies intended to defraud the United States and to commit specific offenses. The first conspiracy involved an agreement to park Robertson & Armco stock to generate tax losses without complying with disclosure required by Sec. 13(d); the second was a scheme to accumulate Cluett and Hammermill shares, also without providing disclosure under Sec. 13(d). These agreements were found to violate the federal conspiracy statute, 18 U.S.C. Sec. 371 (1988), which provides in pertinent part:

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Section 371 prohibits two distinct types of conspiracies; conspiracies to defraud the United States and conspiracies to commit an offense against the United States. While the offense clause governs a conspiracy to commit a specific offense, defined elsewhere in the federal criminal code, the defraud clause is broader and covers agreements to interfere with or to obstruct government's lawful functions. See United States v. Nersesian, 824 F.2d 1294, 1313 (2d Cir.), cert. denied, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987).

Bilzerian would have us rule that when conduct is chargeable under the specific offense clause, the government is precluded from prosecuting under the defraud clause. See United States v. Minarik, 875 F.2d 1186, 1193-94 (6th Cir.1989). Thus, he posits that the charges of conspiracy to defraud failed to state an offense because the conduct complained of is covered by specific statutes, that is, 15 U.S.C. Secs. 78m(d), 78ff. This proposition is not persuasive. In Minarik, prosecution solely under the defraud clause--despite the existence of a specific statutory offense governing the conduct--led to substantial confusion and prejudiced the defendant's ability to prepare for trial. Id. at 1189-90. In any case, defendant's reading of Minarik is contrary to established law.

Although it is recognized that the government may not obtain two convictions or punish the defendant twice for the same conduct by alleging violations of both the defraud and offense clauses of the conspiracy statute, see, e.g., May v. United States, 175 F.2d 994, 1002 (D.C.Cir.), cert. denied, [*1302] 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505 (1949), it may simultaneously prosecute the same conduct under both clauses. See Nersesian, 824 F.2d at 1313; United States v. Williams, 705 F.2d 603, 623-24 (2d Cir.), cert. denied, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983).

Downloaded from vLex by Rene Vazquez

The schemes alleged in the instant case involved violations of numerous statutes, including Sec. 13(d) and Sec. 1001, and the requirements that broker-dealers make and keep accurate records, 17 C.F.R. Secs. 240.17a-3, 240.17a-4. Additionally, the indictment charged broader conspiracies involving stock accumulation and stock parking, which are activities not specifically prohibited by statute. Consequently, there is no prosecutorial impropriety in charging defendant under both prongs of Sec. 371.

Defendant further argues that the conspiracy to defraud charges fail to state an offense because the mere failure to comply with a regulatory requirement to provide information did not amount to active interference with a governmental function. See Tanner v. United States, 483 U.S. 107, 130, 107 S.Ct. 2739, 2752, 97 L.Ed.2d 90 (1987) (United States or an agency thereof must be the target of the conspiracy). As noted, the SEC is charged with administering and enforcing securities laws, and in order to perform its function must receive accurate and truthful disclosure. The function of the IRS in determining the legitimacy of a return similarly may be impaired by schemes generating tax losses and by false claims for deductions. Hence, the defraud conspiracy charges state an offense.

Finally, Bilzerian urges there was insufficient proof of an agreement to commit specific offenses. A conspiracy conviction based on a multi-object conspiracy may be upheld so long as evidence is sufficient with respect to at least one of the criminal objectives. United States v. Papadakis, 510 F.2d 287, 297 (2d Cir.), cert. denied, 421 U.S. 950, 95 S.Ct. 1682, 44 L.Ed.2d 104 (1975). Viewing the evidence in the light most favorable to the government, see Glasser v. United States, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), we believe a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson, 443 U.S. at 319, 99 S.Ct. at 2789.

The evidence at trial suggested that defendant planned to acquire large blocks of stock while delaying the reporting requirements in contravention of the securities laws, and that numerous records were generated to make it appear that Jeffries and Company had acquired stock at its own risk. False records also were generated to substantiate tax deductions that Bilzerian claimed on his 1985 tax return. As to each of the conspiracies charged there is adequate evidence from which a rational juror could have concluded that a conspiracy existed to achieve at least one criminal objective, that is to say, either to violate Sec. 13(d) or to defraud the SEC and the IRS.

CONCLUSION

Accordingly, the judgment of conviction is affirmed in all respects.

LUMBARD, Circuit Judge (concurring):

I concur in the affirmance of the judgment of conviction, substantially for the reasons set forth in Judge Cardamone's opinion.

Bilzerian was not denied a fair trial because the district court precluded him from denying criminal intent without waiving the attorney-client privilege. The court had ruled preliminarily that if Bilzerian testified regarding his good faith belief in the legality of certain conduct [1] he would subject himself to cross-examination as to the basis of that claim, including questions regarding communications that otherwise would be protected by the attorney-client privilege. As a result, Bilzerian took the stand but chose not to assert his good faith belief. [*1303]

Because Bilzerian decided not to testify on these matters, his claims are not properly preserved for appeal. See United States v. Ortiz, 857 F.2d 900, 906 (2d Cir.1988), cert. denied, 489 U.S. 1070, 109 S.Ct. 1352, 103 L.Ed.2d 820 (1989). Nevertheless, there was no error in Judge Ward's rulings. If Bilzerian had asserted good faith on direct examination, he could not use the attorney-client privilege to avoid cross-examination regarding the basis of that claim. See United States v. Miller, 600 F.2d 498, 501 (5th Cir.), cert. denied, 444 U.S. 955, 100 S.Ct. 434, 62 L.Ed.2d 327 (1979).

Bilzerian's contention that the district court erroneously admitted testimony by the government's expert while it excluded similar expert testimony by the defense has no merit. At trial, Judge Ward allowed the government witness, Professor John C. Coffee, to provide background information regarding the securities laws and the filing requirements of Schedule 13D. The district court permitted Bilzerian's expert, Lee B. Spencer, Jr., to do the same, but prohibited him from opining on the propriety of describing unsecured loans as "personal funds," in a Schedule 13D.

Much of Professor Coffee's testimony, which Bilzerian now contends was improperly admitted, was not objected to at trial. As a consequence, it cannot now be assigned as error. See Fed.R.Evid. 103(a)(1); United States v. Heinemann, 801 F.2d 86, 96 (2d Cir.1986), cert. denied, 479 U.S. 1094, 107 S.Ct. 1308, 94 L.Ed.2d 163 (1987). In any event, Coffee's testimony was proper factual background information, rather than legal conclusions. See United States v. Scop, 846 F.2d 135 (2d Cir.), modified on rehearing, 856 F.2d 5 (1988); Marx & Co. v. Diners' Club, Inc., 550 F.2d 505 (2d Cir.), cert. denied, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977). Moreover, Judge Ward subsequently instructed the jury as to the limited purpose of the testimony.

Downloaded from vLex by Rene Vazquez



There was no error in excluding Spencer's testimony regarding the meaning of the phrase "personal funds" in a Schedule 13D, as it was an impermissible instruction on governing law.

Third, Bilzerian's contention that the district court erred in admitting evidence of an error in Bilzerian's 1986 personal tax return is not persuasive. Brian Murphy, an accountant who prepared tax returns for a partnership in which Bilzerian participated, testified that Bilzerian told him that part of Bilzerian's capital contribution was personal funds. On cross-examination, Bilzerian sought to establish that the source of the funds had no effect on the partnership tax return. Bilzerian also elicited testimony regarding the accuracy of the partnership tax return. On redirect, over defense objection, the government inquired into the accuracy of Bilzerian's personal tax return, and elicited testimony that Bilzerian had understated his income by $4 million. Judge Ward denied Bilzerian's motion for a mistrial. He found that Bilzerian's cross-examination had created the impression that Bilzerian accurately reported the income on all tax returns, and this had opened the door to the government's redirect. Judge Ward acted within his discretion in admitting this evidence on redirect, to rebut the possible misimpression, arising from cross-examination, that Bilzerian accurately reported on all of his 1986 tax returns. See United States v. Mang Sun Wong, 884 F.2d 1537, 1544 (2d Cir.1989), cert. denied, --- U.S. ----, 110 S.Ct. 1140, 107 L.Ed.2d 1045 (1990).

Bilzerian next argues that it was improper for the government to prosecute him under the federal false statements statute, 18 U.S.C. Sec. 1001 (1988) ("Section 1001"), for alleged mistatements and omissions in informational reports required by the Securities Exchange Act of 1934 because the government could prosecute him under Section 32(a) of the Exchange Act, 15 U.S.C. Sec. 78ff (1988) ("Section 32(a)").

It is well-settled that when two statutory provisions overlap, the government may decide under which section to proceed, unless it is clear that Congress intended one section to preempt the other. Congress has not expressed any such intent regarding these provisions. **[*1304]**

Fifth, Bilzerian asserts that even if his conduct constituted offenses under Section 1001, constitutional venue was proper only in Washington, D.C., where the reports containing the alleged mistatements and omissions were filed with the SEC. Venue in the Southern District of New York was proper, as this was where the documents were prepared and signed. See United States v. Mendel, 746 F

2d 155, 165 (2d Cir.1984), cert. denied, 469 U.S. 1213, 105 S.Ct. 1184, 84 L.Ed.2d 331 (1985).

Sixth, there is no merit to Bilzerian's claim that the government failed to prove an offense under Section 10(b) of the Exchange Act, 15 U.S.C. Sec. 78j(b) (1988) ("Section 10(b)") or Rule 10b-5, which prohibit fraudulent practices in connection with the purchase or sale of a security, because it failed to prove a "fraud" within the meaning of the provisions. He contends there was no fraud because his mistatements and omissions were not material, and that no rational jury could have found materiality. The determination of materiality generally is a jury issue. In accordance with the teachings of TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976), and Basic Inc. v. Levinson, 485 U.S. 224, 231-32, 108 S.Ct. 978, 983, 99 L.Ed.2d 194 (1988), the district court instructed the jury that a material fact "is one that would have been significant to a reasonable investor's investment decision." The jury's verdict was supported by ample evidence.

Finally, Bilzerian argues that his convictions for conspiracy in violation of 18 U.S.C. Sec. 371 (1988) should be reversed because the same conduct cannot constitute both a conspiracy to defraud the United States and a conspiracy to commit substantive offenses. We rejected this argument in United States v. Nersesian, 824 F.2d 1294, 1313 (2d Cir.), cert. denied, 484 U.S. 958, 108 S.Ct. 357, 98 L.Ed.2d 382 (1987) and in United States v. Williams, 705 F.2d 603, 623-24 (2d Cir.), cert. denied, 464 U.S. 1007, 104 S.Ct. 524, 78 L.Ed.2d 708 (1983). There was ample evidence to support Bilzerian's convictions on both conspiracy counts.

WINTER, Circuit Judge, concurring in part and dissenting in part:

I concur in Judge Cardamone's disposition of the attorney-client privilege issue.

I also concur in the affirmance of the convictions based on violations of the securities laws. Although he is an estimable scholar, I believe that much of Professor Coffee's testimony was inadmissible. These portions consisted largely of legal opinions that should have been explored solely in the court's instructions to the jury. Moreover, the defense expert, Lee B. Spencer, a former Director of the SEC's Division of Corporate Finance, was prevented by the court from answering questions that were in principle indistinguishable from those answered by Professor Coffee. Nevertheless, Professor Coffee's testimony did not deviate in substance from the instructions given by the court to the jury and did not contain any matter that might otherwise prejudice the jury. I believe, therefore, that whatever error occurred was harmless.

Downloaded from vLex by Rene Vazquez

With regard to the redirect examination of Murphy regarding Bilzerian's personal tax return, I believe that the redirect examination was improper. The cross-examination of Murphy by Bilzerian's counsel concerned the partnership returns only and merely established that the source of Bilzerian's funds was irrelevant to the partnership tax returns. In no way did this cross-examination open the door for questions regarding Bilzerian's personal tax return, and the question was improper. Reluctantly, however, I have concluded that this error was also harmless. When Bilzerian took the stand, he was cross-examined about his personal tax returns and was able to provide an exculpatory explanation of pertinent events that blunted the impact of the redirect examination of Murphy.

I respectfully dissent from the conviction under 18 U.S.C. Sec. 1001. I, of course, do not disagree with the general canon relied upon by my colleagues that criminal statutes may overlap and that, when they do, the government may choose to indict under one rather than another. I cannot agree, [*1305] however, that, because criminal statutes may overlap, Section 1001 must overlap with Section 32(a) of the 1934 Act. The bottom line is Congressional intent. Another canon of construction thus dictates that courts must insure that every part of a statute be given meaning and not be rendered superfluous. See United States v. Menasche, 348 U.S. 528, 538-39, 75 S.Ct. 513, 519-20, 99 L.Ed. 615 (1955). Because we have construed Section 101's prohibition on false statements as not requiring a finding of materiality, Section 32(a)'s prohibition on "false [statements] ... with respect to any material fact" is superfluous. My colleagues' interpretation seems particularly questionable because the two provisions were the product of virtually simultaneous Congressional consideration and action and, at the time of passage, Section 1001 contained more stringent penalties. It certainly seems somewhat odd to me that Congress would pass Section 32(a), which specifically applies to filings required by the federal securities laws, and less than twelve days later render portions of it superfluous by passing a very general statute that required a lesser standard of proof and provided harsher penalties. With the exception of United States v. Fields, 592 F.2d 638 (2d Cir.1978), the cases relied upon by my colleagues are from other circuits and involved false statements in ongoing investigations. Fields, moreover, does not stand for the proposition for which it is cited, because it deals only with the issue of materiality.

I therefore concur in part and dissent in part.

1 Section 10 of the Exchange Act, 15 U.S.C. 78j (1988), provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange--

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

2 Rule 10b-5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. Sec. 240.10b-5 (1990).

3 Section 13(d)(1) of the Exchange Act, 15 U.S.C. Sec. 78m(d)(1) (1988), provides in pertinent part:

Any person who, after acquiring directly or indirectly the beneficial ownership of any equity security of a class which is registered pursuant to section 78l of this title ... is directly or indirectly the beneficial owner of more than 5 per centum of such class shall, within ten days after such acquisition, send to the issuer of the security at its principal executive office, by registered or certified mail, send to each exchange where the security is traded, and file with the Commission, a statement containing such of the following information, and such additional information, as the Commission may by rules and regulations, prescribe as necessary or appropriate in the public interest or for the protection of investors--....

1 Bilzerian sought to testify that he acted in good faith in making certain statements in documents filed with the SEC, and in changing the structure of certain financing arrangements. In cross-examination regarding alleged prior inconsistent testimony before the SEC, Bilzerian similarly sought to assert that he believed his conduct was legal.

Downloaded from vLex by Rene Vazquez



317 F.3d 1387

**MICRO CHEMICAL, INC., Plaintiff-Appellee, v. LEXTRON, INC. and Turnkey Computer Systems, Inc., Defendants-Appellants.**

**No. 02-1155.**

**United States Court of Appeals, Federal Circuit.**

**January 24, 2003.**

[*1388] Gregory A. Castanias, Jones, Day, Reavis & Pogue, of Washington, DC, argued for plaintiff-appellee. With him on the brief was William K. Shirey. Of counsel on the brief was John Mozola, Mullin Hoard & Brown, LLP, of Amarillo, TX.

Dennis J. Mondolino, Morgan, Lewis & Bockius, LLP, of New York, NY, argued for defendants-appellants. With him on the brief was Edward M. Reisner.

Before MICHEL, Circuit Judge, PLAGER, Senior Circuit Judge, and LOURIE, Circuit Judge.

PLAGER, Senior Circuit Judge.

In this case the trial court entered a final judgment on a jury verdict awarding damages to Micro Chemical, Inc. The defendants, Lextron, Inc. and Turnkey Computer Systems, Inc. (collectively, "the defendants"), appeal, challenging the district court's understanding of Rule 702 of the Federal Rules of Evidence and of the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. [*1389] 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Defendants specifically challenge the district court's decision to admit the testimony of Micro Chemical's damages expert, as well as the district court's denial of their motion for judgment as a matter of law, or alternatively, for a new trial. Because we conclude that the district court properly performed its gatekeeping role, and did not abuse its discretion in allowing Micro Chemical's damages expert to testify, and because substantial evidence supports the jury's award of damages, we affirm the district court's judgment and its denial of the defendants' motion for a new trial.

BACKGROUND

Micro Chemical and Lextron are direct competitors in the business of providing goods and services to cattle feedlots. Among the goods they supply to their customers are drugs and equipment used to treat illnesses afflicting cattle, referred to by the parties in this litigation as "animal health products." They also offer their feedlot customers computerized medical records systems for tracking health histories and medical treatments of livestock. Micro Chemical's medical records system is the commercial embodiment of the invention in its

U.S. Patent No. 5,315,505 ("the '505 patent"), the patent at issue in this case.

The evidence indicates that Micro Chemical provides its computer systems essentially free of charge to feedlots in an effort to promote sales of its animal health products. Lextron also places its computer systems in feedlots for free or at a substantial loss. The record contains evidence that Lextron's goal also is to generate sales of its animal health products, although Lextron disputes that on appeal.

Turnkey supplies accounting system software to cattle feedlots. Among the add-on software modules offered by Turnkey is an animal records module, which tracks health and treatment histories of livestock. Turnkey has also created interfaces between its accounting system and other companies' medical records systems. The record includes evidence that Turnkey underpriced its animal records module and that sales of the animal records module support sales of its accounting system.

When the '505 patent issued in 1994, Micro Chemical filed a patent infringement suit against Lextron and Turnkey. In the course of that litigation, the defendants stipulated that their original systems infringed the '505 patent. Both defendants then modified their systems to remove the feature they believed was necessary to a finding of infringement; this feature related to a displayed warning if an animal was scheduled for shipment to a slaughterhouse before the end of the withdrawal period for all drugs administered to the animal.

An issue remained as to whether Lextron's modified system infringed. The district court conducted a Markman hearing directed to a disputed claim limitation relating to a drug withdrawal calculation. After the court issued an order adopting Micro Chemical's claim construction, Lextron stipulated that its modified system infringed under that construction. The district court entered a stipulated judgment, and an earlier appeal to this court followed. On appeal this court disagreed with the district court's claim construction, vacated the judgment, and remanded for further proceedings. *Micro Chem., Inc. v. Lextron, Inc.,* No. 97-1589, 1998 WL 386195 (Fed.Cir. June 17, 1998) (non-precedential).

In response, Micro Chemical amended its complaint to limit its infringement allegations to the defendants' unmodified systems. The only issue thus left for trial was the amount of damages from the date [*1390] the patent issued to the dates in 1997 when the defendants modified their systems.

Downloaded from vLex by Rene Vazquez



Prior to the trial on damages, the defendants filed motions *in limine* to preclude certain testimony by Micro Chemical's damages expert, Edward Fiorito. First, the defendants sought to prevent Fiorito from testifying that the defendants' 1997 modified systems could not be considered non-infringing alternatives for purposes of determining the amount of damages. The district court denied that motion without comment. The defendants also filed a motion to preclude Fiorito from testifying that a reasonable royalty for Lextron's infringing computer systems would be three percent of its revenues from sales of animal health products, as Fiorito had stated in his expert report. The trial court ruled that Micro Chemical could not recover a royalty on the animal health products themselves but could show that sales of animal health products were relevant to a reasonable royalty determination because Micro Chemical alleged that the defendants used their infringing systems as loss leaders to promote animal health product sales. The defendants further sought to preclude Fiorito from testifying at all on the grounds that his testimony would not satisfy the requirements for expert testimony set out in Rule 702 of the Federal Rules of Evidence and the Supreme Court's decision in *Daubert*. The district court reserved ruling on the defendants' *Daubert* motion.

At trial, Fiorito testified that a reasonable royalty for the defendants' infringing systems based upon a hypothetical negotiation between the parties at the time infringement began would be $400 per month per system. To support this figure, Fiorito analyzed the relevant factors set out in *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F.Supp. 1116, 166 USPQ 235 (S.D.N.Y.1970), *modified and aff'd*, 446 F.2d 295, 170 USPQ 369 (2d Cir.1971). Relying on statements made by employees of Micro Chemical and the defendants, Fiorito concluded that several factors would lead to a higher royalty, including Micro Chemical's established policy of not licensing its patents and evidence that the defendants supplied their customers with infringing systems to promote sales of other products (i.e., Lextron's animal health products and Turnkey's accounting systems). Multiplying by the number of systems and months of infringement, Fiorito testified that Lextron owed Micro Chemical damages of $1,539,600 and Turnkey owed damages of $145,600.

The defendants' damages expert, Walter Bratic, took the position that there was no connection between installation of the defendants' infringing systems and sales of the defendants' other products. He also opined that the value of the patented invention was negligible. Bratic testified that a reasonable royalty would be one percent of the defendants' imputed revenues, i.e., the revenues if the defendants had sold their infringing systems for full retail price. This would result in $12,717 in damages from Lextron and $735 from Turnkey.

The jury returned a verdict against Lextron in the amount of $1,015,180 and against Turnkey in the amount of $72,800. The defendants filed post-trial motions for judgment as a matter of law (JMOL), or in the alternative, for a new trial. The defendants now appeal the district court's decision not to exclude Fiorito's testimony, and the denial of those motions.

DISCUSSION I.

Whether proffered evidence should be admitted in a trial is a procedural **[*1391]** issue not unique to patent law, and therefore we review the district court's decision whether to admit expert testimony under the law of the regional circuit, here the Fifth Circuit. *See Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1360, 61 USPQ2d 1216, 1219 (Fed.Cir.2001). The Fifth Circuit reviews such evidentiary rulings for abuse of discretion. *Snap-Drape, Inc. v. Comm'r*, 98 F.3d 194, 197 (5th Cir.1996). The district court's interpretation of the Federal Rules of Evidence is reviewed without deference. *See Bellaire Gen. Hosp. v. Blue Cross Blue Shield of Mich.*, 97 F.3d 822, 827 (5th Cir.1996).

A.

As a preliminary matter, we reject Micro Chemical's contention that the defendants waived their right to challenge on appeal the admission of Fiorito's testimony. Under the 2000 amendment to Rule 103 of the Federal Rules of Evidence, "[o]nce the court makes a definitive ruling on the record admitting or excluding evidence, *either at or before trial*, a party need not renew an objection or offer of proof to preserve a claim of error for appeal." Fed.R.Evid. 103(a) (emphasis added); *see also Mathis v. Exxon Corp.*, 302 F.3d 448, 459 & n. 16 (5th Cir.2002) (noting that before the 2000 amendment, the Fifth Circuit required an objection at trial to preserve the error).

Downloaded from vLex by Rene Vazquez

vLex

Here, the district court made definitive rulings either before or at trial on all of the defendants' objections to Fiorito's testimony. Before trial, the district court denied the defendants' motion *in limine* objecting to Fiorito's proposed testimony that defendants' modified systems were not relevant to the determination of a reasonable royalty. Regarding the defendants' motion *in limine* objecting to the use of animal health product sales in the damages determination, the district court ruled before trial that sales of animal health products could not serve as the royalty base but could otherwise be relevant to a reasonable royalty calculation, and then reiterated its ruling in response to the defendants' objection during trial. Finally, the district court reserved ruling prior to trial on the defendants' motion *in limine* to exclude Fiorito's testimony *in toto* on *Daubert* grounds. At the conclusion of Fiorito's testimony, however, the defendants renewed their objection on *Daubert* grounds, which the district court clearly overruled at that time. Thus in each of these situations the defendants' right to appeal the admission of Fiorito's testimony was preserved.

B.

The landmark case of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), provides the analytical framework for determining the admissibility of expert testimony under Rule 702. The trial court acts as a `gatekeeper' to exclude expert testimony that is irrelevant or does not result from the application of reliable methodologies or theories to the facts of the case. *Id.* at 589-92, 113 S.Ct. 2786. In *Daubert,* the Supreme Court set forth a non-exclusive list of factors that district courts may use in evaluating expert testimony. *Id.* at 593-94, 113 S.Ct. 2786. The Court later emphasized that the *Daubert* inquiry is "a flexible one" and that the analysis will depend on the nature of the issue, the witness's expertise, and the subject of the testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). The Court also explained that the principles of *Daubert* apply not only to scientific testimony, but to all expert testimony. *Id.* at 149, 119 S.Ct. 1167.

In 2000, Rule 702 was amended in response to *Daubert* and cases applying it, including *Kumho Tire.* That rule now provides [*1392] that an expert witness with "scientific, technical, or other specialized knowledge" may testify in the form of an opinion "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702.

The defendants contend that the district court in this case failed to perform its gatekeeping duties when it allowed Fiorito to testify. Specifically, the defendants argue that Fiorito based his opinion on inaccurate facts because he relied on the statements of others and did not undertake an independent investigation of the feedlot industry or personally review the parties' financial records. The defendants further argue that Fiorito misapplied the *Georgia-Pacific* factors and that he repeatedly misstated and distorted the law regarding consideration of non-infringing alternatives and convoyed or derivative sales in determining reasonable royalty damages. We address each of these issues in turn.

First, we disagree with the defendants' assertion that Fiorito's testimony did not satisfy subpart (1) of Rule 702, which provides that expert testimony must be "based upon sufficient facts or data." Defendants confuse the requirement for sufficient facts and data with the necessity for a reliable foundation in principles and method, and end up complaining that Fiorito's testimony was not based on "reliable facts." The parties disputed many of the facts relevant in determining a reasonable royalty, the foremost being whether the defendants' modified systems would have been available at the time of a hypothetical royalty negotiation and whether the defendants promoted sales of their other products by distributing their infringing systems to feedlots free of charge or at a substantial loss. When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony. We find the Advisory Committee note to Rule 702 instructive in this regard:

When facts are in dispute, experts sometimes reach different conclusions based on competing versions of the facts. The emphasis in the amendment on "sufficient facts or data" is not intended to authorize a trial court to exclude an expert's testimony on the ground that the court believes one version of the facts and not the other.

*See also Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 249-50 (5th Cir.2002) (holding that jury was entitled to hear expert testimony and decide whether to accept or reject it after considering whether predicate facts on which expert relied were accurate). The Advisory Committee note further counsels that "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." Indeed, as the Supreme Court stated in *Daubert:* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." 509 U.S. at 595, 113 S.Ct. 2786.

Downloaded from vLex by Rene Vazquez



In this case, the trial court properly did not rule inadmissible Fiorito's damages testimony simply because it was based on Micro Chemical's version of the contested facts. The defendants had ample opportunity to rebut Fiorito's damages theory during cross-examination. They also presented their competing theory through the testimony of their own expert witness, who based his opinion testimony on the defendants' version of the disputed facts. Under these circumstances, the district court did not abuse its discretion in allowing Fiorito to testify. **[\*1393]**

Furthermore, we cannot say that Fiorito's testimony was the product of an unreliable methodology. This court has "endorsed the conceptual framework of a hypothetical negotiation between patentee and infringer as a means for determining a reasonable royalty." *Interactive Pictures Corp. v. Infinite Pictures, Inc.,* 274 F.3d 1371, 1384, 61 USPQ2d 1152, 1162 (Fed. Cir.2001). Factors relevant in a reasonable royalty determination using this method include those set out in *Georgia-Pacific. See Unisplay, S.A. v. Am. Elec. Sign Co.,* 69 F.3d 512, 517 n. 7, 36 USPQ2d 1540, 1544 n. 7 (Fed.Cir.1995). Fiorito properly applied the accepted *Georgia-Pacific* methodology to Micro Chemical's version of the disputed facts, explaining the effect each factor would have on a negotiated royalty.

The defendants contend that the district court should not have permitted Fiorito to consider sales of the defendants' other products in arriving at a reasonable royalty. Before trial, the district court ruled that Micro Chemical could not include sales of non-patented items in the royalty base but could demonstrate that those sales were relevant in determining a reasonable royalty. That ruling is consistent with one of the *Georgia-Pacific* factors — "[t]he effect of selling the patented specialty in promoting sales of other products of the [infringer]." 318 F.Supp. at 1120, 166 USPQ at 238; *see also Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.,* 750 F.2d 1552, 1568, 224 USPQ 259, 269-70 (Fed. Cir.1984) (holding that profits from sale of non-patented eyeglasses displayed on infringing racks were relevant to reasonable royalty determination). In applying that factor to this case, Fiorito testified that, in his opinion, the reasonable royalty on the defendants' infringing systems would increase because their placement in customers' feedlots would promote sales of the defendants' other products. Whether placing the infringing systems in feedlots actually promoted derivative sales of the defendants' other products is a question of fact for the jury. That Fiorito's reasonable royalty analysis relied on his resolution of the factual issue is not grounds for excluding his testimony under Rule 702.

The defendants also argue that Fiorito's testimony regarding the availability of non-infringing alternatives at the time of infringement was contrary to our decision in *Grain Processing Corp. v. American Maize-Products Co.,* 185 F.3d 1341, 51 USPQ2d 1556 (Fed.Cir.1999). We disagree. The issue in *Grain Processing* was whether the patentee was entitled to damages in the form of lost profits, which cannot be recovered if acceptable non-infringing alternatives were available during the period of infringement. We held that a non-infringing substitute not on the market during the time of infringement may nevertheless have been "available" for purposes of defeating a lost profits claim if other facts show the infringer could have manufactured the non-infringing alternative and would have known it would be acceptable to consumers at the time of infringement. *Id.* at 1349, 1353, 185 F.3d 1341, 51 USPQ2d at 1562, 1565.

This case involves reasonable royalty damages, not lost profits. This court has not had occasion to address whether the holding of *Grain Processing* has applicability in the reasonable royalty context. We need not decide that issue here, because in any event Fiorito's testimony was not inconsistent with the rule of *Grain Processing*. In discussing one of the *Georgia-Pacific* factors — "[t]he utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results," 318 F.Supp. at 1120, 166 USPQ at 238 — Fiorito testified that the fact that the defendants modified their systems in 1997 would not have reduced the royalty rate that would **[\*1394]** have been agreed upon in a hypothetical negotiation in 1994. He did not testify, as the defendants allege, that only products offered for sale in 1994 could be considered in determining a reasonable royalty. Rather, he testified that the defendants' modified systems were not "available" in 1994 because they did not exist and, in his opinion, the evidence did not show they would have been acceptable to feedlots. Fiorito's testimony was not legally erroneous; it was merely based on Micro Chemical's version of the disputed facts.

We have considered and are not persuaded by the defendants' other arguments regarding the admissibility of Fiorito's testimony, including the defendants' contention that the district court erred by refusing to give corrective instructions to the jury. Fiorito's testimony did not run afoul of Rule 702, and the district court did not abuse its discretion in admitting it.

II.

Downloaded from vLex by Rene Vazquez



The amount of damages based on a reasonable royalty is an issue of fact. *Unisplay,* 69 F.3d at 517, 36 USPQ2d at 1544. Thus, when we review a district court's denial of JMOL, we review a jury's damages award under the substantial evidence standard. *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.,* 926 F.2d 1161, 1164 n. 2, 17 USPQ2d 1922, 1925 n. 2 (Fed.Cir.1991); *see also Snyder v. Trepagnier,* 142 F.3d 791, 795 (5th Cir.1998) ("We may overturn a jury verdict only if it is not supported by substantial evidence."). We review a district court's denial of a motion for a new trial on the amount of damages for abuse of discretion. *Unisplay,* 69 F.3d at 517, 36 USPQ2d at 1544; *see also Rutherford v. Harris County,* 197 F.3d 173, 179 (5th Cir.1999) (stating that denial of motion for a new trial is reviewed for abuse of discretion, i.e., moving party must make "a clear showing of an absolute absence of evidence to support the jury's verdict" (citations omitted)).

This case is a classic example of competing experts. Each side had the opportunity to present its damages theory. Each party's expert supported his reasonable royalty determination with an analysis of relevant factors based on his client's view of the disputed facts. The outcome of the case depended to a large extent upon which predicate facts the jury believed, and then on which expert's analysis they believed. Upon reviewing the record, we cannot say that Micro Chemical's damages theory and the jury's ultimate damages award were unsupported by substantial evidence.[1] The defendants may not like the jury verdict, but it was the result of a fair trial, fairly fought. We find no reversible error in the district court's denial of the defendants' motions for JMOL or a new trial.

CONCLUSION

The judgment of the district court is

*AFFIRMED.*

[1]. We note that although the jury appears to have accepted Micro Chemical's damages theory, it reduced Lextron's award by approximately one-third and Turnkey's award by one-half.

Syllabus

# GENERAL ELECTRIC CO. ET AL. *v.* JOINER ET UX.

## CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

No. 96–188.  Argued October 14, 1997—Decided December 15, 1997

After he was diagnosed with small-cell lung cancer, respondent Joiner and his wife (hereinafter jointly respondent) sued in Georgia state court, alleging, *inter alia*, that his disease was "promoted" by his workplace exposure to chemical "PCB's" and derivative "furans" and "dioxins" that were manufactured by, or present in materials manufactured by, petitioners.  Petitioners removed the case to federal court and moved for summary judgment.  Joiner responded with the depositions of expert witnesses, who testified that PCB's, furans, and dioxins can promote cancer, and opined that Joiner's exposure to those chemicals was likely responsible for his cancer.  The District Court ruled that there was a genuine issue of material fact as to whether Joiner had been exposed to PCB's, but granted summary judgment for petitioners because (1) there was no genuine issue as to whether he had been exposed to furans and dioxins, and (2) his experts' testimony had failed to show that there was a link between exposure to PCB's and small-cell lung cancer and was therefore inadmissible because it did not rise above "subjective belief or unsupported speculation."  In reversing, the Eleventh Circuit applied "a particularly stringent standard of review" to hold that the District Court had erred in excluding the expert testimony.

*Held:*

1.  Abuse of discretion—the standard ordinarily applicable to review of evidentiary rulings—is the proper standard by which to review a district court's decision to admit or exclude expert scientific evidence. Contrary to the Eleventh Circuit's suggestion, *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579, did not somehow alter this general rule in the context of a district court's decision to exclude scientific evidence.  *Daubert* did not address the appellate review standard for evidentiary rulings at all, but did indicate that, while the Federal Rules of Evidence allow district courts to admit a somewhat broader range of scientific testimony than did pre-existing law, they leave in place the trial judge's "gatekeeper" role of screening such evidence to ensure that it is not only relevant, but reliable.  *Id.*, at 589.  A court of appeals applying "abuse-of-discretion" review to such rulings may not categorically distinguish between rulings allowing expert testimony and rulings which disallow it.  Compare *Beech Aircraft Corp.* v. *Rainey*, 488 U. S.

Syllabus

153, 172, with *United States* v. *Abel*, 469 U. S. 45, 54.   This Court rejects
Joiner's argument that because the granting of summary judgment in
this case was "outcome determinative," it should have been subjected to
a more searching standard of review.   On a summary judgment motion,
disputed issues of fact are resolved against the moving party—here,
petitioners.   But the question of admissibility of expert testimony is
not such an issue of fact, and is reviewable under the abuse-of-discretion
standard.   In applying an overly "stringent" standard, the Eleventh
Circuit failed to give the trial court the deference that is the hallmark
of abuse-of-discretion review.   Pp. 141–143.

2. A proper application of the correct standard of review indicates
that the District Court did not err in excluding the expert testimony at
issue.   The animal studies cited by respondent's experts were so dissim-
ilar to the facts presented here—*i. e.*, the studies involved infant mice
that developed alveologenic adenomas after highly concentrated, mas-
sive doses of PCB's were injected directly into their peritoneums or
stomachs, whereas Joiner was an adult human whose small-cell carcino-
mas allegedly resulted from exposure on a much smaller scale—that it
was not an abuse of discretion for the District Court to have rejected
the experts' reliance on those studies.   Nor did the court abuse its dis-
cretion in concluding that the four epidemiological studies on which
Joiner relied were not a sufficient basis for the experts' opinions, since
the authors of two of those studies ultimately were unwilling to suggest
a link between increases in lung cancer and PCB exposure among the
workers they examined, the third study involved exposure to a particu-
lar type of mineral oil not necessarily relevant here, and the fourth in-
volved exposure to numerous potential carcinogens in addition to PCB's.
Nothing in either *Daubert* or the Federal Rules of Evidence requires
a district court to admit opinion evidence that is connected to existing
data only by the *ipse dixit* of the expert.   Pp. 143–147.

3. These conclusions, however, do not dispose of the entire case.   The
Eleventh Circuit reversed the District Court's conclusion that Joiner
had not been exposed to furans and dioxins.   Because petitioners did
not challenge that determination in their certiorari petition, the ques-
tion whether exposure to furans and dioxins contributed to Joiner's can-
cer is still open.   P. 147.

78 F. 3d 524, reversed and remanded.

REHNQUIST, C. J., delivered the opinion for a unanimous Court with
respect to Parts I and II, and the opinion of the Court with respect to
Part III, in which O'CONNOR, SCALIA, KENNEDY, SOUTER, THOMAS, GINS-
BURG, and BREYER, JJ., joined.   BREYER, J., filed a concurring opinion,

Opinion of the Court

*post*, p. 147.   STEVENS, J., filed an opinion concurring in part and dissenting in part, *post*, p. 150.

*Steven R. Kuney* argued the cause for petitioners.   With him on the briefs were *John G. Kester, David H. Flint, Alexander J. Simmons, Jr., Henry W. Ewalt,* and *Gerard H. Davidson, Jr.*

*Deputy Solicitor General Wallace* argued the cause for the United States as *amicus curiae* urging reversal.   With him on the brief were *Acting Solicitor General Dellinger, Assistant Attorney General Hunger, Edward C. DuMont,* and *John P. Schnitker.*

*Michael H. Gottesman* argued the cause for respondents. With him on the brief were *Kenneth J. Chesebro, David L. Shapiro,* and *Michael J. Warshauer.**

CHIEF JUSTICE REHNQUIST delivered the opinion of the Court.

We granted certiorari in this case to determine what standard an appellate court should apply in reviewing a trial

---

*Briefs of *amici curiae* urging reversal were filed for the Chamber of Commerce of the United States by *Thomas S. Martin, Stephen A. Bokat,* and *Robin S. Conrad;* for the American Medical Association by *Jack R. Bierig, Carter G. Phillips, Kirk B. Johnson,* and *Michael L. Ile;* for the Chemical Manufacturers Association by *Bert Black, David J. Schenck,* and *Donald D. Evans;* for Dow Chemical Company by *John E. Muench* and *Robert M. Dow, Jr.;* for the Pharmaceutical Research and Manufacturers of America by *Bruce N. Kuhlik;* for the Washington Legal Foundation by *Arvin Maskin, Gerald A. Stein, Daniel J. Popeo,* and *Paul D. Kamenar;* and for Bruce Ames et al. by *Martin S. Kaufman* and *Douglas Foster.*

Briefs of *amici curiae* urging affirmance were filed for the Trial Lawyers for Public Justice by *Steven E. Fineman* and *Arthur H. Bryant;* for the Association of Trial Lawyers of America by *Jeffrey Robert White;* for Ardith Cavallo by *William A. Beeton, Jr.;* and for Peter Orris, M. D., et al. by *Gerson H. Smoger.*

Briefs of *amici curiae* were filed for the New England Journal of Medicine et al. by *Margaret S. Woodruff* and *Arlin M. Adams;* and for the Product Liability Advisory Council, Inc., et al. by *Mary A. Wells, Jan S. Amundson,* and *Quentin Riegel.*

Opinion of the Court

court's decision to admit or exclude expert testimony under
*Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579
(1993). We hold that abuse of discretion is the appropriate
standard. We apply this standard and conclude that the
District Court in this case did not abuse its discretion when
it excluded certain proffered expert testimony.

I

Respondent Robert Joiner began work as an electrician in
the Water & Light Department of Thomasville, Georgia
(City), in 1973. This job required him to work with and
around the City's electrical transformers, which used a
mineral-oil-based dielectric fluid as a coolant. Joiner often
had to stick his hands and arms into the fluid to make repairs.
The fluid would sometimes splash onto him, occasionally get-
ting into his eyes and mouth. In 1983 the City discovered
that the fluid in some of the transformers was contaminated
with polychlorinated biphenyls (PCB's). PCB's are widely
considered to be hazardous to human health. Congress,
with limited exceptions, banned the production and sale of
PCB's in 1978. See 90 Stat. 2020, 15 U. S. C. § 2605(e)(2)(A).

Joiner was diagnosed with small-cell lung cancer in 1991.
He[1] sued petitioners in Georgia state court the following
year. Petitioner Monsanto manufactured PCB's from 1935
to 1977; petitioners General Electric and Westinghouse Elec-
tric manufactured transformers and dielectric fluid. In his
complaint Joiner linked his development of cancer to his ex-
posure to PCB's and their derivatives, polychlorinated diben-
zofurans (furans) and polychlorinated dibenzodioxins (diox-
ins). Joiner had been a smoker for approximately eight
years, his parents had both been smokers, and there was a
history of lung cancer in his family. He was thus perhaps
already at a heightened risk of developing lung cancer even-
tually. The suit alleged that his exposure to PCB's "pro-

_____

[1] Joiner's wife was also a plaintiff in the suit and is a respondent here.
For convenience, we refer to respondent in the singular.

Opinion of the Court

moted" his cancer; had it not been for his exposure to these substances, his cancer would not have developed for many years, if at all.

Petitioners removed the case to federal court. Once there, they moved for summary judgment. They contended that (1) there was no evidence that Joiner suffered significant exposure to PCB's, furans, or dioxins, and (2) there was no admissible scientific evidence that PCB's promoted Joiner's cancer. Joiner responded that there were numerous disputed factual issues that required resolution by a jury. He relied largely on the testimony of expert witnesses. In depositions, his experts had testified that PCB's alone can promote cancer and that furans and dioxins can also promote cancer. They opined that since Joiner had been exposed to PCB's, furans, and dioxins, such exposure was likely responsible for Joiner's cancer.

The District Court ruled that there was a genuine issue of material fact as to whether Joiner had been exposed to PCB's. But it nevertheless granted summary judgment for petitioners because (1) there was no genuine issue as to whether Joiner had been exposed to furans and dioxins, and (2) the testimony of Joiner's experts had failed to show that there was a link between exposure to PCB's and small-cell lung cancer. The court believed that the testimony of respondent's experts to the contrary did not rise above "subjective belief or unsupported speculation." 864 F. Supp. 1310, 1326 (ND Ga. 1994). Their testimony was therefore inadmissible.

The Court of Appeals for the Eleventh Circuit reversed. 78 F. 3d 524 (1996). It held that "[b]ecause the Federal Rules of Evidence governing expert testimony display a preference for admissibility, we apply a particularly stringent standard of review to the trial judge's exclusion of expert testimony." *Id.*, at 529. Applying that standard, the Court of Appeals held that the District Court had erred in excluding the testimony of Joiner's expert witnesses. The

District Court had made two fundamental errors. First, it excluded the experts' testimony because it "drew different conclusions from the research than did each of the experts." The Court of Appeals opined that a district court should limit its role to determining the "legal reliability of proffered expert testimony, leaving the jury to decide the correctness of competing expert opinions." *Id.,* at 533. Second, the District Court had held that there was no genuine issue of material fact as to whether Joiner had been exposed to furans and dioxins. This was also incorrect, said the Court of Appeals, because testimony in the record supported the proposition that there had been such exposure.

We granted petitioners' petition for a writ of certiorari, 520 U. S. 1114 (1997), and we now reverse.

## II

Petitioners challenge the standard applied by the Court of Appeals in reviewing the District Court's decision to exclude respondent's experts' proffered testimony. They argue that that court should have applied traditional "abuse of discretion" review. Respondent agrees that abuse of discretion is the correct standard of review. He contends, however, that the Court of Appeals applied an abuse-of-discretion standard in this case. As he reads it, the phrase "particularly stringent" announced no new standard of review. It was simply an acknowledgment that an appellate court can and will devote more resources to analyzing district court decisions that are dispositive of the entire litigation. All evidentiary decisions are reviewed under an abuse-of-discretion standard. He argues, however, that it is perfectly reasonable for appellate courts to give particular attention to those decisions that are outcome determinative.

We have held that abuse of discretion is the proper standard of review of a district court's evidentiary rulings. *Old Chief* v. *United States,* 519 U. S. 172, 174, n. 1 (1997); *United States* v. *Abel,* 469 U. S. 45, 54 (1984). Indeed, our cases on

Opinion of the Court

the subject go back as far as *Spring Co.* v. *Edgar*, 99 U. S. 645, 658 (1879), where we said that "[c]ases arise where it is very much a matter of discretion with the court whether to receive or exclude the evidence; but the appellate court will not reverse in such a case, unless the ruling is manifestly erroneous." The Court of Appeals suggested that *Daubert* somehow altered this general rule in the context of a district court's decision to exclude scientific evidence. But *Daubert* did not address the standard of appellate review for evidentiary rulings at all. It did hold that the "austere" *Frye* standard of "general acceptance" had not been carried over into the Federal Rules of Evidence. But the opinion also said:

> "That the *Frye* test was displaced by the Rules of Evidence does not mean, however, that the Rules themselves place no limits on the admissibility of purportedly scientific evidence. Nor is the trial judge disabled from screening such evidence. To the contrary, under the Rules the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." 509 U. S., at 589 (footnote omitted).

Thus, while the Federal Rules of Evidence allow district courts to admit a somewhat broader range of scientific testimony than would have been admissible under *Frye*, they leave in place the "gatekeeper" role of the trial judge in screening such evidence. A court of appeals applying "abuse-of-discretion" review to such rulings may not categorically distinguish between rulings allowing expert testimony and rulings disallowing it. Compare *Beech Aircraft Corp.* v. *Rainey*, 488 U. S. 153, 172 (1988) (applying abuse-of-discretion review to a lower court's decision to exclude evidence), with *United States* v. *Abel*, *supra*, at 54 (applying abuse-of-discretion review to a lower court's decision to admit evidence). We likewise reject respondent's argument that because the granting of summary judgment in this case

Opinion of the Court

was "outcome determinative," it should have been subjected to a more searching standard of review. On a motion for summary judgment, disputed issues of fact are resolved against the moving party—here, petitioners. But the question of admissibility of expert testimony is not such an issue of fact, and is reviewable under the abuse-of-discretion standard.

We hold that the Court of Appeals erred in its review of the exclusion of Joiner's experts' testimony. In applying an overly "stringent" review to that ruling, it failed to give the trial court the deference that is the hallmark of abuse-of-discretion review. See, *e. g.*, *Koon* v. *United States*, 518 U. S. 81, 98–99 (1996).

## III

We believe that a proper application of the correct standard of review here indicates that the District Court did not abuse its discretion. Joiner's theory of liability was that his exposure to PCB's and their derivatives "promoted" his development of small-cell lung cancer. In support of that theory he proffered the deposition testimony of expert witnesses. Dr. Arnold Schecter testified that he believed it "more likely than not that Mr. Joiner's lung cancer was causally linked to cigarette smoking and PCB exposure." App. 107. Dr. Daniel Teitelbaum testified that Joiner's "lung cancer was caused by or contributed to in a significant degree by the materials with which he worked." *Id.*, at 140.

Petitioners contended that the statements of Joiner's experts regarding causation were nothing more than speculation. Petitioners criticized the testimony of the experts in that it was "not supported by epidemiological studies . . . [and was] based exclusively on isolated studies of laboratory animals." 3 Record, Doc. No. 46 (Defendants' Joint Memorandum in Support of Summary Judgment 3). Joiner responded by claiming that his experts had identified "relevant animal studies which support their opinions." 4 Record, Doc. No. 53 (Plaintiffs' Brief in Opposition to Defendants'

Motion for Summary Judgment 47). He also directed the court's attention to four epidemiological studies[2] on which his experts had relied.

The District Court agreed with petitioners that the animal studies on which respondent's experts relied did not support his contention that exposure to PCB's had contributed to his cancer. The studies involved infant mice that had developed cancer after being exposed to PCB's. The infant mice in the studies had had massive doses of PCB's injected directly into their peritoneums[3] or stomachs. Joiner was an adult human being whose alleged exposure to PCB's was far less than the exposure in the animal studies. The PCB's were injected into the mice in a highly concentrated form. The fluid with which Joiner had come into contact generally had a much smaller PCB concentration of between 0-to-500 parts per million. The cancer that these mice developed was alveologenic adenomas; Joiner had developed small-cell carcinomas. No study demonstrated that adult mice developed cancer after being exposed to PCB's. One of the experts admitted that no study had demonstrated that PCB's lead to cancer in any other species.

Respondent failed to reply to this criticism. Rather than explaining how and why the experts could have extrapolated their opinions from these seemingly far-removed animal studies, respondent chose "to proceed as if the only issue [was] whether animal studies can ever be a proper foundation for an expert's opinion." 864 F. Supp., at 1324. Of course, whether animal studies can ever be a proper foundation for an expert's opinion was not the issue. The issue was whether *these* experts' opinions were sufficiently supported by the animal studies on which they purported to rely. The studies were so dissimilar to the facts presented in this liti-

_____

[2] Epidemiological studies examine the pattern of disease in human populations.

[3] The peritoneum is the lining of the abdominal cavity.

Opinion of the Court

gation that it was not an abuse of discretion for the District Court to have rejected the experts' reliance on them.

The District Court also concluded that the four epidemiological studies on which respondent relied were not a sufficient basis for the experts' opinions. The first such study involved workers at an Italian capacitor[4] plant who had been exposed to PCB's. Bertazzi, Riboldi, Pesatori, Radice, & Zocchetti, Cancer Mortality of Capacitor Manufacturing Workers, 11 American Journal of Industrial Medicine 165 (1987). The authors noted that lung cancer deaths among ex-employees at the plant were higher than might have been expected, but concluded that "there were apparently no grounds for associating lung cancer deaths (although increased above expectations) and exposure in the plant." *Id.*, at 172. Given that Bertazzi et al. were unwilling to say that PCB exposure had caused cancer among the workers they examined, their study did not support the experts' conclusion that Joiner's exposure to PCB's caused his cancer.

The second study followed employees who had worked at Monsanto's PCB production plant. J. Zack & D. Musch, Mortality of PCB Workers at the Monsanto Plant in Sauget, Illinois (Dec. 14, 1979) (unpublished report), 3 Record, Doc. No. 11. The authors of this study found that the incidence of lung cancer deaths among these workers was somewhat higher than would ordinarily be expected. The increase, however, was not statistically significant and the authors of the study did not suggest a link between the increase in lung cancer deaths and the exposure to PCB's.

The third and fourth studies were likewise of no help. The third involved workers at a Norwegian cable manufacturing company who had been exposed to mineral oil. Ronneberg, Andersen, & Skyberg, Mortality and Incidence of Cancer Among Oil Exposed Workers in a Norwegian Cable Manufacturing Company, 45 British Journal of Indus-

---

[4] A capacitor is an electrical component that stores an electric charge.

Opinion of the Court

trial Medicine 595 (1988). A statistically significant increase in lung cancer deaths had been observed in these workers. The study, however, (1) made no mention of PCB's and (2) was expressly limited to the type of mineral oil involved in that study, and thus did not support these experts' opinions. The fourth and final study involved a PCB-exposed group in Japan that had seen a statistically significant increase in lung cancer deaths. Kuratsune, Nakamura, Ikeda, & Hirohata, Analysis of Deaths Seen Among Patients with Yusho—A Preliminary Report, 16 Chemosphere, Nos. 8/9, p. 2085 (1987). The subjects of this study, however, had been exposed to numerous potential carcinogens, including toxic rice oil that they had ingested.

Respondent points to *Daubert*'s language that the "focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." 509 U. S., at 595. He claims that because the District Court's disagreement was with the conclusion that the experts drew from the studies, the District Court committed legal error and was properly reversed by the Court of Appeals. But conclusions and methodology are not entirely distinct from one another. Trained experts commonly extrapolate from existing data. But nothing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered. See *Turpin* v. *Merrell Dow Pharmaceuticals, Inc.*, 959 F. 2d 1349, 1360 (CA6), cert. denied, 506 U. S. 826 (1992). That is what the District Court did here, and we hold that it did not abuse its discretion in so doing.

We hold, therefore, that abuse of discretion is the proper standard by which to review a district court's decision to admit or exclude scientific evidence. We further hold that, because it was within the District Court's discretion to conclude that the studies upon which the experts relied were not

Breyer, J., concurring

sufficient, whether individually or in combination, to support their conclusions that Joiner's exposure to PCB's contributed to his cancer, the District Court did not abuse its discretion in excluding their testimony. These conclusions, however, do not dispose of this entire case.

Respondent's original contention was that his exposure to PCB's, furans, and dioxins contributed to his cancer. The District Court ruled that there was a genuine issue of material fact as to whether Joiner had been exposed to PCB's, but concluded that there was no genuine issue as to whether he had been exposed to furans and dioxins. The District Court accordingly never explicitly considered if there was admissible evidence on the question whether Joiner's alleged exposure to furans and dioxins contributed to his cancer. The Court of Appeals reversed the District Court's conclusion that there had been no exposure to furans and dioxins. Petitioners did not challenge this determination in their petition to this Court. Whether Joiner was exposed to furans and dioxins, and whether if there was such exposure, the opinions of Joiner's experts would then be admissible, remain open questions. We accordingly reverse the judgment of the Court of Appeals and remand this case for proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE BREYER, concurring.

The Court's opinion, which I join, emphasizes *Daubert*'s statement that a trial judge, acting as "gatekeeper," must "'ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.'" *Ante*, at 142 (quoting *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579, 589 (1993)). This requirement will sometimes ask judges to make subtle and sophisticated determinations about scientific methodology and its relation to the conclusions an expert witness seeks to offer—particularly when a case arises in an area where the science itself is tentative or

uncertain, or where testimony about general risk levels in human beings or animals is offered to prove individual causation. Yet, as *amici* have pointed out, judges are not scientists and do not have the scientific training that can facilitate the making of such decisions. See, *e. g.*, Brief for Trial Lawyers for Public Justice as *Amicus Curiae* 15; Brief for New England Journal of Medicine et al. as *Amici Curiae* 2 ("Judges . . . are generally not trained scientists").

Of course, neither the difficulty of the task nor any comparative lack of expertise can excuse the judge from exercising the "gatekeeper" duties that the Federal Rules of Evidence impose—determining, for example, whether particular expert testimony is reliable and "will assist the trier of fact," Fed. Rule Evid. 702, or whether the "probative value" of testimony is substantially outweighed by risks of prejudice, confusion or waste of time, Fed. Rule Evid. 403. To the contrary, when law and science intersect, those duties often must be exercised with special care.

Today's toxic tort case provides an example. The plaintiff in today's case says that a chemical substance caused, or promoted, his lung cancer. His concern, and that of others, about the causes of cancer is understandable, for cancer kills over one in five Americans. See U. S. Dept. of Health and Human Services, National Center for Health Statistics, Health, United States 1996–97 and Injury Chartbook 117 (1997) (23.3% of all deaths in 1995). Moreover, scientific evidence implicates some chemicals as potential causes of some cancers. See, *e. g.*, U. S. Dept. of Health and Human Services, Public Health Service, National Toxicology Program, 1 Seventh Annual Report on Carcinogens, pp. v–vi (1994). Yet modern life, including good health as well as economic well-being, depends upon the use of artificial or manufactured substances, such as chemicals. And it may, therefore, prove particularly important to see that judges fulfill their *Daubert* gatekeeping function, so that they help assure that the powerful engine of tort liability, which can generate

Breyer, J., concurring

strong financial incentives to reduce, or to eliminate, production, points toward the right substances and does not destroy the wrong ones.  It is, thus, essential in this science-related area that the courts administer the Federal Rules of Evidence in order to achieve the "end[s]" that the Rules themselves set forth, not only so that proceedings may be "justly determined," but also so "that the truth may be ascertained."   Fed. Rule Evid. 102.

I therefore want specially to note that, as cases presenting significant science-related issues have increased in number, see Judicial Conference of the United States, Report of the Federal Courts Study Committee 97 (Apr. 2, 1990) ("Economic, statistical, technological, and natural and social scientific data are becoming increasingly important in both routine and complex litigation"), judges have increasingly found in the Rules of Evidence and Civil Procedure ways to help them overcome the inherent difficulty of making determinations about complicated scientific, or otherwise technical, evidence.   Among these techniques are an increased use of Rule 16's pretrial conference authority to narrow the scientific issues in dispute, pretrial hearings where potential experts are subject to examination by the court, and the appointment of special masters and specially trained law clerks. See J. Cecil & T. Willging, Court-Appointed Experts: Defining the Role of Experts Appointed Under Federal Rule of Evidence 706, pp. 83–88 (1993); J. Weinstein, Individual Justice in Mass Tort Litigation 107–110 (1995); cf. Kaysen, In Memoriam: Charles E. Wyzanski, Jr., 100 Harv. L. Rev. 713, 713–715 (1987) (discussing a judge's use of an economist as a law clerk in *United States* v. *United Shoe Machinery Corp.,* 110 F. Supp. 295 (Mass. 1953), aff'd, 347 U. S. 521 (1954)).

In the present case, the New England Journal of Medicine has filed an *amici* brief "in support of neither petitioners nor respondents" in which the Journal writes:

"[A] judge could better fulfill this gatekeeper function if he or she had help from scientists.  Judges should be

Opinion of STEVENS, J.

strongly encouraged to make greater use of their inherent authority . . . to appoint experts . . . .   Reputable experts could be recommended to courts by established scientific organizations, such as the National Academy of Sciences or the American Association for the Advancement of Science."   Brief, *supra*, at 18–19.

Cf. Fed. Rule Evid. 706 (court may "on its own motion or on the motion of any party" appoint an expert to serve on behalf of the court, and this expert may be selected as "agreed upon by the parties" or chosen by the court); see also Weinstein, *supra*, at 116 (a court should sometimes "go beyond the experts proffered by the parties" and "utilize its powers to appoint independent experts under Rule 706 of the Federal Rules of Evidence").   Given this kind of offer of cooperative effort, from the scientific to the legal community, and given the various Rules-authorized methods for facilitating the courts' task, it seems to me that *Daubert*'s gatekeeping requirement will not prove inordinately difficult to implement, and that it will help secure the basic objectives of the Federal Rules of Evidence, which are, to repeat, the ascertainment of truth and the just determination of proceedings. Fed. Rule Evid. 102.

JUSTICE STEVENS, concurring in part and dissenting in part.

The question that we granted certiorari to decide is whether the Court of Appeals applied the correct standard of review.   That question is fully answered in Parts I and II of the Court's opinion.   Part III answers the quite different question whether the District Court properly held that the testimony of plaintiff's expert witnesses was inadmissible. Because I am not sure that the parties have adequately briefed that question, or that the Court has adequately explained why the Court of Appeals' disposition was erroneous, I do not join Part III.   Moreover, because a proper answer to that question requires a study of the record that can be

Opinion of STEVENS, J.

performed more efficiently by the Court of Appeals than by the nine Members of this Court, I would remand the case to that court for application of the proper standard of review.

One aspect of the record will illustrate my concern. As the Court of Appeals pointed out, Joiner's experts relied on "the studies of at least thirteen different researchers, and referred to several reports of the World Health Organization that address the question of whether PCBs cause cancer." 78 F. 3d 524, 533 (CA11 1996). Only one of those studies is in the record, and only six of them were discussed in the District Court opinion. Whether a fair appraisal of either the methodology or the conclusions of Joiner's experts can be made on the basis of such an incomplete record is a question that I do not feel prepared to answer.

It does seem clear, however, that the Court has not adequately explained why its holding is consistent with Federal Rule of Evidence 702,[1] as interpreted in *Daubert* v. *Merrell Dow Pharmaceuticals, Inc.*, 509 U. S. 579 (1993).[2] In general, scientific testimony that is both relevant and reliable must be admitted and testimony that is irrelevant or unreliable must be excluded. *Id.*, at 597. In this case, the District Court relied on both grounds for exclusion.

The relevance ruling was straightforward. The District Court correctly reasoned that an expert opinion that expo-

---

[1] Rule 702 states: "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise."

[2] The specific question on which the Court granted certiorari in *Daubert* was whether the rule of *Frye* v. *United States*, 54 App. D. C. 46, 293 F. 1013 (1923), remained valid after the enactment of the Federal Rules of Evidence, but the Court went beyond that issue and set forth alternative requirements for admissibility in place of the *Frye* test. Even though the *Daubert* test was announced in dicta, see 509 U. S., at 598–601 (REHNQUIST, C. J., concurring in part and dissenting in part), we should not simply ignore its analysis in reviewing the District Court's rulings.

sure to PCB's, "furans" and "dioxins" together may cause lung cancer would be irrelevant unless the plaintiff had been exposed to those substances. Having already found that there was no evidence of exposure to furans and dioxins, 864 F. Supp. 1310, 1318–1319 (ND Ga. 1994), it necessarily followed that this expert opinion testimony was inadmissible. Correctly applying *Daubert*, the District Court explained that the experts' testimony "manifestly does not fit the facts of this case, and is therefore inadmissible." 864 F. Supp., at 1322. Of course, if the evidence raised a genuine issue of fact on the question of Joiner's exposure to furans and dioxins—as the Court of Appeals held that it did—then this basis for the ruling on admissibility was erroneous, but not because the District Judge either abused her discretion or misapplied the law.[3]

The reliability ruling was more complex and arguably is not faithful to the statement in *Daubert* that "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." 509 U. S., at 595. Joiner's experts used a "weight of the evidence" methodology to assess whether Joiner's exposure to transformer fluids promoted his lung cancer.[4] They did not suggest that any

_____

[3] Petitioners do not challenge the Court of Appeals' straightforward review of the District Court's summary judgment ruling on exposure to furans and dioxins. As today's opinion indicates, *ante,* at 147, it remains an open question on remand whether the District Court should admit expert testimony that PCB's, furans, and dioxins *together* promoted Joiner's cancer.

[4] Dr. Daniel Teitelbaum elaborated on that approach in his deposition testimony: "[A]s a toxicologist when I look at a study, I am going to require that that study meet the general criteria for methodology and statistical analysis, but that when all of that data is collected and you ask me as a patient, 'Doctor, have I got a risk of getting cancer from this?' That those studies don't answer the question, that I have to put them all together in my mind and look at them in relation to everything I know about the substance and everything I know about the exposure and come to a conclusion. I think when I say, 'To a reasonable medical probability as a medical toxicologist, this substance was a contributing cause,' . . . to his cancer,

Opinion of STEVENS, J.

one study provided adequate support for their conclusions, but instead relied on all the studies taken together (along with their interviews of Joiner and their review of his medical records). The District Court, however, examined the studies one by one and concluded that none was sufficient to show a link between PCB's and lung cancer. 864 F. Supp., at 1324–1326. The focus of the opinion was on the separate studies and the conclusions of the experts, not on the experts' methodology. *Id.*, at 1322 ("Defendants . . . persuade the court that Plaintiffs' expert testimony would not be admissible . . . by attacking the conclusions that Plaintiffs' experts draw from the studies they cite").

Unlike the District Court, the Court of Appeals expressly decided that a "weight of the evidence" methodology was scientifically acceptable.[5] To this extent, the Court of Appeals' opinion is persuasive. It is not intrinsically "unscientific" for experienced professionals to arrive at a conclusion by weighing all available scientific evidence—this is not the sort of "junk science" with which *Daubert* was concerned.[6] After all, as Joiner points out, the Environmental Protection Agency (EPA) uses the same methodology to assess risks, albeit using a somewhat different threshold than that required in a trial. Brief for Respondents 40–41 (quoting

---

that that is a valid conclusion based on the totality of the evidence presented to me. And I think that that is an appropriate thing for a toxicologist to do, and it has been the basis of diagnosis for several hundred years, anyway." Supp. App. to Brief for Respondents 19.

[5] The court explained: "Opinions of any kind are derived from individual pieces of evidence, each of which by itself might not be conclusive, but when viewed in their entirety are the building blocks of a perfectly reasonable conclusion, one reliable enough to be submitted to a jury along with the tests and criticisms cross-examination and contrary evidence would supply." 78 F. 3d 524, 532 (CA11 1996).

[6] An example of "junk science" that should be excluded under *Daubert* as too unreliable would be the testimony of a phrenologist who would purport to prove a defendant's future dangerousness based on the contours of the defendant's skull.

Opinion of STEVENS, J.

EPA, Guidelines for Carcinogen Risk Assessment, 51 Fed. Reg. 33992, 33996 (1986)).   Petitioners' own experts used the same scientific approach as well.[7]   And using this methodology, it would seem that an expert could reasonably have concluded that the study of workers at an Italian capacitor plant, coupled with data from Monsanto's study and other studies, raises an inference that PCB's promote lung cancer.[8]

The Court of Appeals' discussion of admissibility is faithful to the dictum in *Daubert* that the reliability inquiry must focus on methodology, not conclusions.   Thus, even though I fully agree with both the District Court's and this Court's explanation of why each of the studies on which the experts relied was by itself unpersuasive, a critical question remains unanswered: When qualified experts have reached relevant conclusions on the basis of an acceptable methodology, why are their opinions inadmissible?

*Daubert* quite clearly forbids trial judges to assess the validity or strength of an expert's scientific conclusions, which is a matter for the jury.[9]   Because I am persuaded

---

[7] See, *e. g.*, Deposition of Dr. William Charles Bailey, Supp. App. to Brief for Respondents 56 ("I've just reviewed a lot of literature and come to some conclusions . . .").

[8] The Italian capacitor plant study found that workers exposed to PCB's had a higher-than-expected rate of lung cancer death, though "'the numbers were small [and] the value of the risk estimate was not statistically significant.'"   864 F. Supp. 1310, 1324 (ND Ga. 1994).   The Monsanto study also found a correlation between PCB exposure and lung cancer death, but the results were not statistically significant.   *Id.*, at 1325.   Moreover, it should be noted that under Georgia law, which applies in this diversity suit, Joiner need only show that his exposure to PCB's "'promoted'" his lung cancer, not that it was the sole cause of his cancer.   Brief for Respondents 7, n. 16 (quoting Brief for Appellants in No. 94–9131 (CA11), pp. 7–10).

[9] The Court stated in *Daubert:* "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence. . . . Additionally, in the event the trial court concludes that the scintilla of evidence presented supporting a position is insufficient to

Opinion of Stevens, J.

that the difference between methodology and conclusions is just as categorical as the distinction between means and ends, I do not think the statement that "conclusions and methodology are not entirely distinct from one another," *ante*, at 146, either is accurate or helps us answer the difficult admissibility question presented by this record.

In any event, it bears emphasis that the Court has not held that it would have been an abuse of discretion to admit the expert testimony. The very point of today's holding is that the abuse-of-discretion standard of review applies whether the district judge has excluded or admitted evidence. *Ante*, at 142. And nothing in either *Daubert* or the Federal Rules of Evidence requires a district judge to reject an expert's conclusions and keep them from the jury when they fit the facts of the case and are based on reliable scientific methodology.

Accordingly, while I join Parts I and II of the Court's opinion, I do not concur in the judgment or in Part III of its opinion.

--------

allow a reasonable juror to conclude that the position more likely than not is true, the court remains free to direct a judgment, Fed. Rule Civ. Proc. 50(a), and likewise to grant summary judgment, Fed. Rule Civ. Proc. 56. . . . These conventional devices, rather than wholesale exclusion under an uncompromising 'general acceptance' test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." 509 U. S., at 596.

Downloaded from vLex by Rene Vazquez



Page 1207

**112 F.3d 1207**

**324 U.S.App.D.C. 241, 133 Lab.Cas. P 58,249,**

**47 Fed. R. Evid. Serv. 142, 6 A.D. Cases 1333,**

**10 NDLR P 40**

**Eduardo BURKHART, Appellee v. WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, Appellant.**

**No. 96-7163.**

**United States Court of Appeals, District of Columbia Circuit.**

**Argued Feb. 21, 1997.**

**Decided May 16, 1997.**

[*1208] [**242] Appeal from the United States District Court for the District of Columbia (No. 95cv00812).

Gerard J. Stief, Associate General Counsel, Washington Metropolitan Area Transit Authority, argued the cause for appellant, with [*1209] [**243] whom Robert L. Polk, General Counsel, Robert J. Kniaz, Deputy General Counsel, Washington, DC, David R. Keyser, Takoma Park, MD and Mark F. Sullivan, Thousand Oaks, CA, were on the briefs.

Marc Fiedler, Washington, DC, argued the cause and filed the brief for appellee.

Deval L. Patrick, Assistant Attorney General, United States Department of Justice, Jessica Dunsay Silver and Samuel R. Bagenstos, Attorneys, Washington, DC, were on the brief for the United States as amicus curiae.

Before EDWARDS, Chief Judge, SILBERMAN and SENTELLE, Circuit Judges.

Opinion for the Court filed by Circuit Judge SENTELLE.

Concurring opinion filed by Chief Judge EDWARDS.

SENTELLE, Circuit Judge:

Washington Metropolitan Area Transit Authority ("WMATA" or the "Authority") appeals from a judgment following a jury verdict finding WMATA (1) directly liable for negligent hiring, training, and supervision of its bus operators; (2) directly liable for violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 et seq., and the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 791 et seq.; and (3) vicariously liable for assault, battery, and infliction of emotional distress. WMATA raises a myriad of issues on appeal, many of which have been waived and others of which are frivolous. We need only consider certain of the issues, finding them sufficient

to reverse the judgment of the trial court as to the ADA and Rehabilitation Act claims and the negligent hiring, training, and supervision claims. However, we affirm the trial court's judgment as to the assault, battery, and infliction of emotional distress claims. I. Background

This case arises from a physical altercation that took place in northern Virginia between Eduardo Burkhart, plaintiff-appellee, and Archie Smith, a WMATA bus operator. On May 5, 1994, Burkhart and a friend, Basram Salman, both of whom are deaf, boarded a Metrobus in Arlington, Virginia. Burkhart and Salman each placed a thirty-cent token in the fare box. The correct fare for those with disabilities is fifty-cents. As the bus pulled away from the curb, Smith called both Burkhart and Salman back to pay the correct fare. However, because they are deaf, neither Salman nor Burkhart understood Smith's request. The events that followed this exchange are in substantial dispute. It is sufficient for our purposes to say that a series of blows was exchanged between Smith and Burkhart.

When the bus reached its destination at the Pentagon Metrorail Station, Burkhart exited the bus and began looking for a transit officer. At this point, the evidence is in dispute as to whether Burkhart was pointing to Smith or was sticking his finger in Smith's chest. In any event, Smith then grabbed Burkhart's finger. Burkhart responded by kicking Smith in the groin, causing him to release his hold of Burkhart's finger. Smith then picked up a stick, at which point he was restrained.

Ultimately, Transit Police Officer Jonathan Gray arrived on the scene. Officer Gray and Burkhart communicated by writing notes on a notepad. Burkhart testified that he requested an interpreter at some point during his exchange with Officer Gray. Officer Gray testified that no such request was ever made. An interpreter was not called to the scene. Upon completing his discussion with Officer Gray, Burkhart attempted to locate witnesses to the incident. Officer Gray then transported both Smith and Burkhart to a magistrate to press charges against one another. Both Smith and Burkhart were charged with assault and battery. However, these charges were ultimately dropped.

Downloaded from vLex by Rene Vazquez

Burkhart subsequently filed suit against WMATA and Smith for injuries sustained as a result of the altercation with Smith. Burkhart asserted claims against Smith, and against WMATA vicariously, for assault, battery, gross negligence, and infliction of emotional distress. In addition, Burkhart alleged that WMATA negligently hired, **[*1210]** **[**244]** trained, and supervised its bus operators and, as a result, caused the assault and battery at issue. Still further, Burkhart alleged that he was subject to discrimination, by reason of his disability, in violation of both the ADA and Rehabilitation Act in that WMATA failed to take appropriate steps to ensure that communications with him were as effective as communications with others. The case was tried to a jury with a magistrate judge presiding. At trial, WMATA admitted that Smith was acting within the scope of his employment with WMATA when the events at issue occurred. As a result, the district court granted Smith's unopposed motion that the claims against him be dismissed.

During the course of the trial, Burkhart called Edward Spurlock as an expert "as to how the ADA [and] Rehabilitation Act impact on police practices, procedures, and training." WMATA objected to Spurlock as a witness, and a voir dire examination of the witness was conducted during which Spurlock recounted his expertise in police training and procedures. The court accepted Spurlock "as an expert with respect to the issues of police procedures, practices, and training, as they concern the [ADA] and the Rehabilitation Act." The trial judge then allowed Spurlock to testify concerning whether WMATA and Officer Gray had complied with the requirements of the ADA and Rehabilitation Act as well as accepted police procedures.

At the conclusion of trial, the jury returned a verdict for Burkhart. The jury concluded that WMATA was vicariously liable for assault and battery, and awarded Burkhart $373.65 in damages for medical expenses incurred. In addition, the jury found WMATA vicariously liable for infliction of emotional distress, and awarded Burkhart $510.00 for medical expenses. Further, the jury found WMATA directly liable for negligent hiring, training, and supervision, and awarded Burkhart $50,000 for "injuries caused by the defendants' acts." Finally, the jury found WMATA directly liable for violations of the ADA and Rehabilitation Act, and awarded Burkhart another $50,000 in damages for "injury, embarrassment, humiliation, frustration, inconvenience, indignity and/or the stigma of discrimination." As a result, the trial court entered a judgment for Burkhart in the amount of $100,883.65 and awarded him attorneys' fees and costs of $62,071.46 on the ADA claim

WMATA appeals raising thirteen separate issues of which three warrant discussion. II. Analysis A. Expert Witness. 1. Error.

WMATA argues that the trial court erred in permitting Spurlock to testify as an expert concerning the ADA and Rehabilitation Act. Before considering whether Spurlock's testimony was proper expert testimony, we think it profitable to discuss briefly the requirements of the ADA.

The relevant provision of the ADA is Title II which governs "public entities," including agencies of state and local governments. 42 U.S.C. §§ 12131(1), 12132. Title II is divided into two parts. Part A generally prohibits disability-based discrimination by any public entity. Id. § 12132. Part B provides specific examples of prohibited discriminatory conduct in the public transportation context. Id. §§ 12142, 12143(a), 12144, 12146, 12147, 12148, 12162 (defining "discrimination for purposes of section 12132"). Of course, public transportation providers are also subject to the general nondiscrimination mandate of Title II(A). See id. § 12131 (defining a "public entity" subject to section 12132 as including "any commuter authority"). 1

The Attorney General has authority to promulgate regulations implementing Title II(A)'s general rule of nondiscrimination, id. § 12134(a), while the Secretary of Transportation has authority to promulgate regulations implementing the transportation-specific provisions of Title II(B), id. §§ 12149, **[*1211]** **[**245]** 12164. 2 Subpart E of the Attorney General's ADA regulations governs communication with the disabled by a public entity. That subpart provides, inter alia, that:

(a) A public entity shall take appropriate steps to ensure that communications with applicants, participants, and members of the public with disabilities are as effective as communications with others.

(b)(1) A public entity shall furnish appropriate auxiliary aids and services where necessary to afford an individual with a disability an equal opportunity to participate in and enjoy the benefits of, a service, program, or activity conducted by a public entity.

(2) In determining what type of auxiliary aid and service is necessary, a public entity shall give primary consideration to the requests of the individual with disabilities.

28 C.F.R. § 35.160 (1996). The Secretary of Transportation's ADA regulations require that public transportation providers "ensure that personnel are trained to proficiency, as appropriate to their duties, so that they ... properly assist and treat individuals with disabilities who use the service in a respectful and courteous way." 49 C.F.R. § 37.173.

Downloaded from vLex by Rene Vazquez



As detailed above, Burkhart alleged that WMATA violated the ADA and Rehabilitation Act by failing to ensure that communication with him was "as effective" as communication with others. Spurlock testified as an expert in support of these claims. WMATA contends that it was error for the district court to permit certain aspects of this testimony. To evaluate expert testimony, the Federal Rules of Evidence provide that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." FED.R.EVID. 702. Interpreting this provision, we apply a two-part test for determining the admissibility of expert testimony: the witness (1) must be qualified, and (2) must be capable of assisting the trier of fact. Exum v. General Elec. Co., 819 F.2d 1158, 1163 (D.C.Cir.1987). We review a district court's decision concerning the admissibility of expert testimony only for abuse of discretion. Joy v. Bell Helicopter Textron, Inc., 999 F.2d 549, 567 (D.C.Cir.1993).

a. Spurlock's Qualifications.

WMATA first objects to the magistrate judge's determination that Spurlock was qualified as an expert given that he had no prior work experience involving the ADA and Rehabilitation Act. While work experience is obviously one method by which an individual may acquire an expertise in a particular field, it "is only one among the five different ways to demonstrate an expert is qualified." Exum, 819 F.2d at 1163. A witness may be qualified as an expert based on "knowledge, skill, experience, training, or education" in the relevant field. FED.R.EVID. 702 (emphasis added).

Spurlock testified that he was a police officer with the Metropolitan Police Department for over twenty-four years. During that time he served as an instructor in police training and procedures. Prior to that Spurlock spent five years as an officer with the U.S. Capitol Police where he wrote policy and served as a trainer. Spurlock further testified that he had "taught police practice and procedures [his] entire career" and evaluated training programs

for numerous cities. Still further, Spurlock testified that he had reviewed the training requirements under the ADA and Rehabilitation Act. While Spurlock conceded that he was not an expert on the ADA and Rehabilitation Act, he asserted that he was an expert "with respect ... to how the ADA [and] Rehabilitation Act impact on police practices, procedures, and training." The trial judge agreed and accepted Spurlock as "an expert with respect to the issues of police procedures, practices, [*1212] [**246] and training, as they concern the [ADA] and the Rehabilitation Act."

In light of the foregoing testimony, we cannot find that the judge abused her discretion in so ruling. Spurlock's lack of work experience with the ADA and Rehabilitation Act "goes to the weight rather than admissibility of the evidence." Baerman v. Reisinger, 363 F.2d 309, 310 (D.C.Cir.1966).

b. Spurlock's Testimony.

WMATA also objects to the trial court's determination that Spurlock's testimony would assist the jury, arguing that it was error to permit Spurlock to offer legal conclusions concerning whether WMATA violated the ADA and Rehabilitation Act. FED.R.EVID. 704(a) provides that "otherwise admissible" opinion testimony "is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." As a result, WMATA cannot successfully argue that Spurlock improperly testified as to an "ultimate issue." Rather, WMATA argues that Spurlock's testimony was not "otherwise admissible."

Whether expert opinion testimony is "otherwise admissible" depends, in part, on whether it will "assist the trier of fact" in either "understand[ing] the evidence or ... determin[ing] a fact in issue." See FED.R.EVID. 702. Expert testimony that consists of legal conclusions cannot properly assist the trier of fact in either respect, and thus it is not "otherwise admissible." See Torres v. County of Oakland, 758 F.2d 147, 150 (6th Cir.1985) (holding that expert testimony couched in terms of a "legal conclusion" is "not helpful to the jury"); see also Weston v. WMATA, 78 F.3d 682, 684 n. 4 (D.C.Cir.1996) (stating that "legal conclusions on domestic law ... are outside [an expert] witness' area of expertise").

Downloaded from vLex by Rene Vazquez



Of course, the line between an inadmissible legal conclusion and admissible assistance to the trier of fact in understanding the evidence or in determining a fact in issue is not always bright. MICHAEL H. GRAHAM , FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 6661, at 327 (Interim ed.1992); see also Comment, The Admissibility of Expert Witness Testimony: Time to Take the Final Leap?, 42 U. MIAMI L.REV. 831, 864 n.210 (1988). The Sixth Circuit has concluded that "[t]he best resolution of this type of problem is to determine whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular. If they do, exclusion is appropriate." Torres, 758 F.2d at 151. Applying this principle in a Title VII suit, the Torres court concluded that it was improper to permit an expert to testify as to whether the plaintiff "had been discriminated against because of her national origin." Id. As the court explained, the expert's actual testimony constituted a legal conclusion for two reasons: it tracked the language of the applicable statute, and the term "discrimination" has a specialized legal meaning that is more precise than the lay understanding of the term. Id. However, the court noted in dicta that it would have been permissible for the expert to testify as to whether "national origin 'motivated' the hiring decision." Id. Testimony phrased as such would "address the factual issue of ... intent without implicating any legal terminology." Id.

The Sixth Circuit's distinction between legal conclusions and factual opinions is consistent with the notes accompanying Rule 704 which explain that the rule does not permit "opinions which would merely tell the jury what result to reach" or which are "phrased in terms of inadequately explored legal criteria." FED.R.EVID. 704 advisory committee's note. For example, "the question, 'Did T have capacity to make a will?' would be excluded, while the question, 'Did T have sufficient mental capacity to know the nature and extent of his property and the natural objects of his bounty and to formulate a rational scheme of distribution?' would be allowed." Id. Just as the advisory committee stated that an expert cannot testify as to whether an individual possessed the "capacity" to make a will, so the Sixth Circuit concluded that an expert cannot testify as to whether "discrimination" occurred for purposes of Title VII. Both terms have specialized legal meanings that are inherently beyond the area of a witness' expertise. See Weston, 78 F.3d at 684 n. 4. In other words, an expert may offer his opinion

as to facts [*1213] [**247] that, if found, would support a conclusion that the legal standard at issue was satisfied, but he may not testify as to whether the legal standard has been satisfied.

In this case, the testimony of Burkhart's expert consisted of impermissible legal conclusions rather than permissible factual opinions. Concerning Officer Gray's communication with Burkhart, Spurlock testified that the means of communication employed by Officer Gray were not "as effective" as the means of communication with others. In addition, Spurlock testified that if a "person asked for a translator," the ADA required that they be given one "unless it would change the service provided" or cause "an extraordinary expense or administrative requirement." Still further, Spurlock testified that communication with the disabled must be "equal to that of a person who is not disabled."

We are troubled by this testimony in two respects. First, Spurlock grossly misstated the law as to what constitutes "as effective" communication with the disabled. Nothing in the ADA itself or its implementing regulations dictates that a disabled individual must be provided with the type of auxiliary aid or service he requests unless it would alter the service provided or create an unreasonable burden or expense. The regulation to which Spurlock was apparently referring provides only that the type of aid or service an individual requests should be given "primary consideration." 28 C.F.R. § 35.160(b)(2). However, the Attorney General's section-bysection analysis of this provision recognizes that the individual's request need not be honored if "another effective means of communications exists." 28 C.F.R. app. § 35.160. While "[d]eference to the request of the individual is desirable," it is by no means required. See id. (emphasis added). As a result, Spurlock's testimony as to the applicable legal standard was plainly erroneous, thus demonstrating the danger in allowing experts to testify as to their understanding of the law. See Torres, 758 F.2d at 150. Each courtroom comes equipped with a "legal expert," called a judge, and it is his or her province alone to instruct the jury on the relevant legal standards. See Marx & Co. v. Diners' Club, Inc., 550 F.2d 505, 509-10 (2nd Cir.), cert. denied, 434 U.S. 861, 98 S.Ct. 188, 54 L.Ed.2d 134 (1977).

Downloaded from vLex by Rene Vazquez

vLex

Even aside from Spurlock's erroneous formulation of the pertinent law, we are also troubled by Spurlock's testimony that Officer Gray's communications with Burkhart were not "as effective" as the means of communication with others. The phrase "as effective" is lifted directly from the text of the Attorney General's regulations implementing the ADA. 28 C.F.R. § 35.160(a). Moreover, the phrase as used in the regulations is a term of art with a meaning "separate" and "distinct" from the vernacular. Torres, 758 F.2d at 151. Whether a particular form of communication is "as effective" as another is not judged on an absolute scale, but rather is a contextual determination based on the type of communication and number of people involved as well as the importance of the communication. See 28 C.F.R. app. § 35.160 (explaining that the "factors to be considered in determining whether an interpreter is required include the context in which the communication is taking place, the number of people involved, and the importance of the communication"). Therefore, by invoking a legal term of art, Spurlock's testimony constituted an impermissible legal conclusion. See Torres, 758 F.2d at 151 (finding inappropriate testimony that a defendant did not "discriminate").

It may well be permissible for an appropriate 3 expert to testify as to the difficulty an individual like Burkhart would have communicating with Officer Gray under the circumstances. It may also be permissible for an appropriate expert to testify concerning the relative merits of alternative forms of communication. But by allowing Spurlock to testify as to the legal question at issue, the trial court erred.

Spurlock also testified that Officer Gray was "not ... trained to proficiency in the requirements of the [ADA]" and the Rehabilitation Act. Again, the phrase "trained to proficiency" is lifted directly from the text of one of the regulations implementing the [**1214] [**248] ADA, 49 C.F.R. § 37.173, and is a legal term of art defined by context, id. app. § 37.173 (stating that "training must be appropriate to the duties of each employee"). By invoking this nuanced statutory term, Spurlock again offered an impermissible legal conclusion.

As a final example of impermissible expert testimony we note Spurlock's response to the question: "Were all proper police practices-- with respect to the ADA and the Rehabilitation Act and in the national standards thereby, were all the police practices in this case proper?" Spurlock responded to this question

by stating that Officer Gray should have, but failed to "gain control of the situation so that any combatants no longer cause harm to each other." Spurlock further testified that Officer Gray failed to "search for witnesses" and seize relevant evidence. This testimony plainly misstated the requirements of those statutes, as we are unable to identify any provision of the ADA or Rehabilitation Act requiring that such steps be taken.

In sum, we conclude that the trial court abused its discretion in permitting Spurlock to offer legal conclusions and misstate relevant legal principles. We emphasize that our discussion of the improper testimony by Spurlock is by no means exhaustive. We have simply highlighted those portions of the testimony we find most troubling. These examples should provide a sufficient guide on remand.

2. Prejudice.

We, of course, recognize that error alone does not warrant reversal of an otherwise valid judgment. An error that is harmless is no grounds for disturbing a judgment. See FED.R.CIV.P. 61. "The burden of demonstrating prejudice requiring reversal rests with the party asserting error." Hygh v. Jacobs, 961 F.2d 359, 365 (2nd Cir.1992). We hold that WMATA has carried its burden of proving that Spurlock's erroneously admitted testimony was sufficiently prejudicial to warrant reversal.

In Hygh, the Second Circuit considered two factors in assessing whether impermissible expert testimony as to a legal conclusion was harmless. At issue in that case was testimony by an expert concerning whether the force used by certain police officers in affecting an arrest was excessive. Id. at 361-62. In concluding that the testimony was harmless, the court first noted that the "impermissible testimony was expressed within a larger body of otherwise unobjectionable testimony concerning police procedures ... from which the jury could easily have drawn the same conclusions that [the expert] did." Id. at 365; see also Faison v. Nationwide Mortgage Corp., 839 F.2d 680, 690 (D.C.Cir.1987) (finding expert testimony harmless in that it "merely augmented other pattern evidence"), cert. denied, 488 U.S. 823, 109 S.Ct. 70, 102 L.Ed.2d 46 (1988). In addition, the court relied on the fact that the evidence supporting the expert's legal conclusion was "strong." 961 F.2d at 365; see also United States v. Smart, 98 F.3d 1379, 1381 (D.C.Cir.1996) (finding erroneous expert testimony harmless given extensive evidence of guilt), cert. denied, --- U.S. ----, 117 S.Ct. 1271, 137 L.Ed.2d 349 (1997). Neither factor is present here.

Downloaded from vLex by Rene Vazquez



Even setting aside his misstatements of the law itself, Spurlock's impermissible legal conclusions were not "expressed within a larger body of otherwise unobjectionable testimony from which the jury could easily have drawn the same conclusions that the expert did." For example, Spurlock testified that the means of communication employed by Officer Gray were not "as effective" as the means of communication with others. However, Spurlock did not provide other testimony to support this legal conclusion. Indeed, the facts indicate that Burkhart's difficulty, if any, in communicating with Officer Gray arose not because written means of communication were used, but because the communications were written in English rather than Spanish. Lack of fluency in English, of course, is not a disability within the meaning of the ADA or Rehabilitation Act.

Moreover, the evidence of ADA and Rehabilitation Act violations in this case can hardly be described as "strong." Both the ADA and Rehabilitation Act prohibit discrimination "by reason of" a disability. 42 U.S.C. § 12132; 29 U.S.C. § 794. Without deciding whether this language requires a showing of intentional discrimination or whether discriminatory [*1215] [**249] effect alone is sufficient, we note that the evidence that Burkhart was discriminated against "by reason of" his deafness is thin. Indeed, the evidence arguably shows the opposite. At trial, Burkhart introduced evidence of Smith's prior employment history, including his previous confrontations with passengers. There is no indication that these prior confrontations involved disabled persons. Further, there is no evidence that Salman, who was also deaf, was subject to abusive treatment by Smith. These facts indicate that it was Smith's general rudeness that caused Burkhart to suffer humiliation, not discrimination "by reason of" Burkhart's disability. Unfortunately for Burkhart, general rudeness towards all does not violate either the ADA or Rehabilitation Act. Cf. McWilliams v. Fairfax County Bd. of Supervisors, 72 F.3d 1191, 1195-96 (4th Cir.) (holding that Title VII does not generally prohibit rudeness at the workplace, but only that based on sex), cert. denied, --- U.S. ----, 117 S.Ct. 72, 136 L.Ed.2d 32 (1996). In addition, as discussed at length above, there is little to no evidence supporting Burkhart's claim that he was denied "as effective" communication aside from the impermissible legal conclusions rendered by Spurlock.

Given the scarcity of evidence of ADA and Rehabilitation Act

/a> violations and the lack of admissible testimony in support of Spurlock's legal conclusions, we cannot conclude that the improper expert testimony in this case was harmless. B. Negligent Hiring, Training, and Supervision Claims.

WMATA also urges that we reverse the judgment of the district court as to the negligent hiring, training, and supervision claims.

1. Duplicity.

WMATA argues that the district court erred in denying its motion to dismiss the claim for negligent hiring, training, and supervision. According to WMATA, permitting Burkhart to present claims against the Authority both for assault and battery, and negligent hiring, training, or supervision was duplicative. WMATA conceded that Smith was acting within the scope of his employment. Thus, the negligent hiring claim created no additional liability. It did, however, allow for admission of otherwise inadmissible evidence of prior unrelated passenger complaints involving Smith. See FED.R.EVID. 404 (evidence of prior bad acts is inadmissible in order to show action in conformity therewith). WMATA therefore contends that it was error to allow both claims to go to the jury.

The magistrate judge denied WMATA's motion to dismiss the negligent hiring claim as untimely. Local Rule 108(l) provides that "[a] dispositive motion in a civil action shall be filed sufficiently in advance of the pretrial conference." It is undisputed that WMATA's motion was filed one week prior to trial, well after the pretrial conference. Instead, WMATA argues that Rule 108(l) is inapplicable in that its motion to dismiss was not a "dispositive motion." According to WMATA, only those motions that "obviate[ ] the need for a trial" are "dispositive." Since dismissal of the negligent hiring claim would not have eliminated the need for a trial on the other claims, WMATA contends that its motion was not dispositive and thus not governed by Rule 108(l). This argument is plainly without merit.

A motion need not "obviate the need for a trial" to be dispositive. The term "dispositive motion" includes a motion that, if granted, would result either in the determination of a particular claim on the merits or elimination of such a claim from the case. For example, a court may grant a partial summary judgment as to fewer than all the claims in a case. A grant of partial summary judgment often leaves necessary a trial to resolve the remaining claims. See FED.R.CIV.P. 56(d). We, however, have referred to partial motions for summary judgment as "dispositive motions." E.g., Nixon v. Freeman, 670 F.2d 346, 364 (D.C.Cir.), cert. denied, 459 U.S. 1035, 103 S.Ct. 445, 74 L.Ed.2d 601 (1982).

Downloaded from vLex by Rene Vazquez



In this case, WMATA's motion, if granted, would have eliminated the negligent hiring claim from the case. It was, therefore, clearly a dispositive motion for purposes of Rule 108(l). WMATA conceded at trial that its motion to dismiss was untimely. As a result, **[*1216] [**250]** we cannot say that the trial court abused its discretion in denying the motion as untimely. 4 The fact that the trial court alternatively rejected WMATA's motion on the merits in no way undermines the timeliness ruling. United States v. Sobin, 56 F.3d 1423, 1427 & n. 4 (D.C.Cir.), cert. denied, --- U.S. ----, 116 S.Ct. 348, 133 L.Ed.2d 244 (1995). We therefore reject WMATA's claim despite serious reservations concerning the trial court's alternative denial of the motion on the merits. See Hackett v. WMATA, 736 F.Supp. 8 (D.D.C.1990).

2. Sovereign Immunity.

Because WMATA waived its duplicity claim, we are forced to consider WMATA's claim that it is immune from suits challenging its hiring, training, and supervision practices. This argument was raised below in the same untimely motion in which WMATA moved for dismissal of the negligent hiring claim as duplicitous. However, sovereign immunity claims are jurisdictional and thus cannot be waived by failure to present the defense to the trial court. See Edelman v. Jordan, 415 U.S. 651, 678, 94 S.Ct. 1347, 1363, 39 L.Ed.2d 662 (1974) (holding that Eleventh Amendment claim cannot be waived as it is jurisdictional).

WMATA was created as the result of a compact signed by Maryland, Virginia, and the District of Columbia and consented to by Congress (the "WMATA Compact"). Pub.L. No.89-774, 80 Stat. 1324 (1966) (codified as amended at D.C.CODE § 1-2431 et seq.). The WMATA Compact provides that "[t]he Authority shall be liable ... for its torts and those of its Directors, officers, employees and agents committed in the course of any proprietary function ... but shall not be liable for any torts occurring in the performance of a governmental function." D.C.CODE § 1-2431(80).

We have developed two alternative tests for identifying "governmental" functions under the WMATA Compact. Dant v. District of Columbia, 829 F.2d 69 (D.C.Cir.1987). If an activity is a "quintessential[ ] governmental" function, such as "police activit[y]," it is within the scope of WMATA's sovereign immunity. Id. at 74. For those activities that are not quintessential governmental functions, immunity will depend on whether the activity is "discretionary" or "ministerial," id., a dichotomy employed by the Federal Tort Claims Act ("FTCA

), 28 U.S.C. § 1346(b) et seq. Only those activities considered "discretionary" are shielded by sovereign immunity. See Dant, 829 F.2d at 75.

Appellees cite our opinion in Biscoe v. Arlington County, 738 F.2d 1352 (D.C.Cir.1984), cert. denied, 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985), for the proposition that supervising and instructing employees is a ministerial function. In Biscoe, we held that, under D.C. law, the activities of "supervising and instructing" police officers are ministerial in that they "involve day-to-day operational matters, not planning and policy." Id. at 1363. However, in United States v. Gaubert, 499 U.S. 315, 323, 111 S.Ct. 1267, 1274, 113 L.Ed.2d 335 (1991), the Supreme Court held that discretionary activity, for purposes of the FTCA, can include operational activities and "is not confined to the policy or planning level." Thus, the foundation upon which we based our discretionary/ministerial distinction in Biscoe was repudiated as a matter of federal law in Gaubert. We do not mean to imply that Biscoe is no longer binding precedent as to the definition of ministerial and discretionary activities under District of Columbia law. However, the question of whether an activity is a governmental function for purposes of the WMATA Compact "is one of federal law." Sanders v. WMATA, 819 F.2d 1151, 1154 (D.C.Cir.1987). Therefore, Gaubert, not Biscoe, must guide our determination of whether hiring, training, or supervising employees are discretionary functions for purposes of the WMATA Compact.

In Gaubert, the Supreme Court stated that a discretionary function "is one that involves choice or judgment" exercised "based on considerations **[*1217] [**251]** of public policy." See 499 U.S. at 322, 111 S.Ct. at 1274. A two-part test flows from this definition of a discretionary activity. Cope v. Scott, 45 F.3d 445, 448 (D.C.Cir.1995). First, a court must determine whether a " 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.' " Id. (quoting Gaubert, 499 U.S. at 322, 111 S.Ct. at 1273). If so, sovereign immunity does not bar suits based on an employee's failure to follow the prescribed course of conduct. Id. If, however, the governing statutes leave room for "choice," an exercise of such choice is exempt from suit under the FTCA if the decision is " 'susceptible to policy judgment' and involve[d] an exercise of 'political, social, [or] economic judgment.' " Id. (quoting Gaubert, 499 U.S. at 325, 111 S.Ct. at 1275).

Downloaded from vLex by Rene Vazquez



Applying this test, we hold that decisions concerning the hiring, training, and supervising of WMATA employees are discretionary in nature, and thus immune from judicial review. The parties have pointed to no law or policy "specifically prescrib[ing]" guidelines for the hiring, training, or supervision of WMATA employees. The WMATA compact confers upon WMATA broad power to "[c]reate and abolish ... employments" and "provide for the qualification, appointment, [and] removal ... of its ... employees without regard to the laws of any of the signatories," D.C.CODEs 1-2431(12)(g); "[e]stablish, in its discretion, a personnel system based on merit and fitness," id. § 1-2431(12)(h); and "[c]ontrol and regulate ... the service to be rendered," id.s 1-2431(12)(j). These provision hardly constrain WMATA's determination of whom it will employ or how it will train and supervise such employees. Thus, WMATA has choices to make.

The hiring, training, and supervision choices that WMATA faces are choices "susceptible to policy judgment." The hiring decisions of a public entity require consideration of numerous factors, including budgetary constraints, public perception, economic conditions, "individual backgrounds, office diversity, experience and employer intuition." Tonelli v. United States, 60 F.3d 492, 496 (8th Cir.1995). Similarly, supervision decisions involve a complex balancing of budgetary considerations, employee privacy rights, and the need to ensure public safety. The extent of training with which to provide employees requires consideration of fiscal constraints, public safety, the complexity of the task involved, the degree of harm a wayward employee might cause, and the extent to which employees have deviated from accepted norms in the past. Such decisions are surely among those involving the exercise of political, social, or economic judgment. See, e.g., Kirchmann v. United States, 8 F.3d 1273, 1277 (8th Cir.1993) (holding that supervision of government contractors is a "discretionary function"); Tonelli, 60 F.3d at 496 (stating that "issues of employee supervision and retention generally fall within the discretionary function exception"); K.W. Thompson Tool Co. v. United States, 836 F.2d 721 (1st Cir.1988) (holding that "failure to properly train and supervise EPA personnel" falls within the discretionary function exception).

As a result, we conclude that the hiring

training, and supervision of WMATA personnel are governmental functions. WMATA is therefore immune from suit for negligence in the performance of such functions. The district court erred in refusing to dismiss Burkhart's negligent hiring, training, and supervision claims against WMATA. III. Conclusion

For the foregoing reasons, we affirm the judgment of the district court as to the assault, battery, and infliction of emotional distress claims. We reverse the judgment of the district court as to the negligent hiring, training, and supervision claims, as well as the ADA and Rehabilitation Act claims. Because WMATA is immune from suit for negligent hiring, training, and supervision, we remand the case for retrial only of the ADA and Rehabilitation Act claims.

HARRY T. EDWARDS, Chief Judge, concurring:

I agree with the majority that plaintiff's claim of negligent hiring, supervision, and training by the Washington Metropolitan Area Transit Authority ("WMATA") should never have been submitted to the jury. [*1218]

[**252] On the principal point in issue, I am satisfied that the jury was fully justified in returning a verdict against WMATA on plaintiff's claim that WMATA violated the Americans With Disabilities Act and the Rehabilitation Act of 1973. There is substantial evidence to support the verdict on this claim, even absent the disputed testimony of plaintiff's expert witness. The record establishes that, after boarding the bus and attempting to pay his fare, the plaintiff was slapped in the face by a WMATA bus operator, who apparently had become frustrated when the plaintiff, who is deaf, did not understand his oral commands. See Transcript at 75, 135, reprinted in Joint Appendix Volume II ("J.A. II"). Further, the record demonstrates that, after the plaintiff left the bus and located a transit officer so that he could report that the bus driver had struck him, the officer refused the plaintiff's request for a sign-language interpreter and, instead, compelled him to write notes in English. See id. at 80-82, 95, 171-76, reprinted in J.A. II. Written English is the third most comfortable language for the plaintiff, behind American Sign Language and written Spanish. See id. at 194, reprinted in J.A. II. This and other similar evidence offered by the plaintiff make it clear that there was sufficient evidence to support the jury's verdict. Thus, I believe that, without the erroneous admission of the expert's testimony, the plaintiff would prevail on his principal claim.

Downloaded from vLex by Rene Vazquez



I agree, however, that the error in this case was not harmless. As I understand the "harmless error" doctrine, it is not within the province of an appellate judge to usurp the role of a jury by speculating on what a jury might have done in the absence of significant error. See Harry T. Edwards, To Err Is Human, But Not Always Harmless: When Should Legal Error Be Tolerated?, 70 N.Y.U. L. REV. 1167, 1193-94, 1205 (1995). Our role is to assess "whether the error 'had substantial and injurious effect or influence in determining the jury's verdict,' not whether the record evidence is sufficient absent the error to warrant a verdict." Id. at 1202 (footnote omitted) (quoting O'Neal v. McAninch, 513 U.S. 432, 434-36, 115 S.Ct. 992, 994, 130 L.Ed.2d 947 (1995)). In this case, it cannot be said that the error did not have a substantial and injurious effect on the verdict.

1 On appeal, WMATA contends that Part A of Title II does not apply to public transportation providers subject to Part B. We decline to address this challenge as it was not properly preserved below.

2 The Department of Justice, as amicus in this case, asserts that the Attorney General's "regulatory authority extends as far as the substantive provision it implements." United States Brief at 11. We need not determine whether this is so given that we find other error sufficient to warrant reversal.

3 We question Spurlock's expertise in the area of communications with the disabled.

4 Our concurring colleague concludes that the negligent hiring, training, and supervision claims were duplicative of the assault, battery, and infliction of emotional distress claims. Concurring Opinion at 252. However, our colleague fails to explain how he would overcome the procedural hurdles that bar consideration of WMATA's duplicity argument.

1

2

3    **UNITED STATES DISTRICT COURT**

4    **NORTHERN DISTRICT OF CALIFORNIA**

5    **SAN JOSE DIVISION**

6

7    IN RE: PERSONALWEB                          Case No.  18-md-02834-BLF
     TECHNOLOGIES, LLC ET AL., PATENT
8    LITIGATION

9                                                **ORDER GRANTING IN PART AND
                                                 DENYING IN PART AMAZON'S
10                                               MOTION FOR SUMMARY
                                                 JUDGMENT; GRANTING TWITCH'S
11                                               MOTION FOR SUMMARY
                                                 JUDGMENT; DENYING AMAZON'S
12                                               MOTION FOR JUDGMENT ON THE
                                                 PLEADINGS**

13
                                                 [Re: ECF 413, 541, 542]
14
     AMAZON.COM, INC., and AMAZON
15   WEB SERVICES, INC.,                         Case No.: 5:18-cv-00767-BLF
                                                 [Re: ECF 99, 155]
16                  Plaintiffs
17           v.

18   PERSONALWEB TECHNOLOGIES, LLC
     and LEVEL 3 COMMUNICATIONS, LLC,
19
                    Defendants,
20   PERSONALWEB TECHNOLOGIES, LLC,
21   a Texas limited liability company, and
     LEVEL 3 COMMUNICATIONS, LLC, a          Case No.: 5:18-cv-05619-BLF
22   Delaware limited liability company,     [Re: ECF 67]

23                  Plaintiffs
24           v.

25   TWITCH INTERACTIVE, INC. a Delaware
     corporation,
26
                    Defendant.
27

28

United States District Court
Northern District of California

In this multidistrict litigation ("MDL"), PersonalWeb Technologies, LLC ("PersonalWeb") alleges patent infringement by Amazon.com, Inc. and Amazon Web Services, Inc., (collectively, "Amazon") and separately by dozens of Amazon's customers, related to the customers' use of Amazon's Simple Storage Service ("S3"), in combination with Amazon's CloudFront content delivery network. The Court has designated PersonalWeb's suit against Twitch Interactive, Inc. ("Twitch") as the representative customer case.

Before the Court are three motions: (1) Amazon's Motion for Judgment on the Pleadings on Infringement Claims against CloudFront for lack of standing (ECF 413), (2) Amazon's Motion for Summary Judgment of Non-Infringement and on the alternative ground that PersonalWeb lacks standing (ECF 541), and (3) Twitch's Motion for Summary Judgment of Non-Infringement and to Exclude the Testimony of Erik de la Iglesia (ECF 542). The Court heard oral arguments on Amazon's Motion for Judgment on the Pleadings on October 3, 2019 and on Amazon and Twitch's Motions for Summary Judgment on November 14, 2019 (the "Hearing"). For the reasons stated below, the Court (1) DENIES Amazon's Motion for Judgment on the Pleadings for lack of standing, (2) GRANTS Amazon's Motion for Summary Judgment of Non-Infringement; DENIES Amazon's Motion for Summary Judgment on the alternative ground that PersonalWeb lacks standing, and (3) GRANTS Twitch's Motion for Summary Judgment of Non-Infringement; DENIES Twitch's Motion to Exclude the Testimony of Erik de la Iglesia as MOOT.

## I.    INTRODUCTION

This MDL began with PersonalWeb bringing a number of patent infringement lawsuits against Amazon's customers for their use of S3 and CloudFront. Shortly thereafter, Amazon filed an action for declaratory judgment of noninfringement of five patents-in-suit:  U.S. Patent No. 5,978,791 ("the '791 patent"); U.S. Patent Nos. 6,928,442 ("the '442 patent"); 7,802,310 ("the '310 patent"); 7,945,544 ("the '544 patent"); and 8,099,420 ("the '420 patent").  *See Amazon.com, Inc. et al v. Personal Web Technologies, LLC et al*, Case No. 5:18-cv-00767-BLF (N.D. Cal.) (the "Amazon Case"), ECF 1.  PersonalWeb filed a counterclaim, in which it brought infringement counterclaims against Amazon on three of the five patents (the '442 patent, the '310 patent, and the

2

'420 patent).[1]  ECF 257.  At PersonalWeb's request, the United States Judicial Panel on Multidistrict Litigation centralized the declaratory judgment action and the customer cases before this Court. ECF 1.  To promote judicial efficiency, the Court selected a representative customer action (*PersonalWeb Techs., LLC v. Twitch Interactive, Inc.*, No. 5:18-cv-05619-BLF (N.D. Cal.) (the "Twitch Case")) to proceed and stayed all other customer cases pending resolution of the declaratory judgment action and the Twitch case.  ECF 313.  PersonalWeb asserts claims against Twitch on four of the five patents (the '442 patent, the '310 patent, the '420 patent, and 544' patent).  ECF 198.

On October 29, 2018, PersonalWeb served its infringement contentions.  In those contentions, PersonalWeb alleged that Amazon's S3 and/or CloudFront infringe the '442, '310, and '420 patents.  ECF 543-5.  On March 13, 2019, the Court granted summary judgment finding that PersonalWeb's claims against S3 are precluded.  ECF 381.  PersonalWeb's claims against CloudFront and Twitch remained.  On August 16, 2019, the Court issued its claim construction order.  Claim Construction Order, ECF 485.  The Court construed the claim term "unauthorized or unlicensed" as "not compliant with a valid license" and the claim term "authorization" as "a valid license."[2]  *Id.* at 12, 33.

Shortly after the Court issued the Claim Construction Order, Counsel for Amazon and Twitch reached out to PersonalWeb's counsel because Amazon and Twitch believed that PersonalWeb had no viable patent infringement theories in light of the Court's constructions.  ECF 507 at 1.  In response, PersonalWeb asserted that it understood "licensed/unlicensed" to mean "valid/invalid rights to content" and that it intended to apply that understanding to its infringement analysis.  *Id.* at 1-2.  Over Amazon and Twitch's strong objection and threats of sanctions, PersonalWeb's expert did apply that understanding to his infringement analysis in his expert report, which PersonalWeb served on Twitch on August 23, 2019.  *Id.* at 2.  The following business day, PersonalWeb filed a motion seeking clarification of the Court's construction – specifically, whether

---

[1]  PersonalWeb denied that Amazon does not infringe the '544 and the '791 patents.  *See Amazon.com, Inc. et al v. Personal Web Technologies, LLC et al*, Case No. 5:18-cv-00767-BLF (N.D. Cal.), ECF 62 ¶¶ 51-56, 75-80.

[2]  The Court construed several other claim terms, none of which are relevant to any of the issues currently before the Court.

the word "license" in the Court's construction "meant something different than 'valid rights to content' (*i.e.*, a narrower/license instrument-type of meaning)." *Id.* The Court rejected PersonalWeb's understanding of its Claim Construction Order and determined that the word "license" does not require clarification or supplementation. ECF 537.

Shortly thereafter, PersonalWeb moved for Entry of Judgment of Non-Infringement in the Amazon case. ECF 538. PersonalWeb argued that the Court's Claim Construction Order has "a dispositive effect on the claims and defenses at issue in this case, and as a consequence thereof, PersonalWeb cannot meet its burden of proving infringement." *Id.* at 1-2. Amazon opposed that motion for several reasons – but mainly because Amazon had raised additional non-infringement arguments at summary judgment (independent of claim construction), the resolution of which, Amazon argued, would result in a more complete record on appeal. *See* ECF 547. The Court agreed with Amazon and denied PersonalWeb's motion for Entry of Judgment. ECF 559.

Now, Amazon seeks summary judgment on the basis that (1) Amazon does not infringe the asserted patents and (2) PersonalWeb lacks standing to assert to any claim of the patents-in-suit against Amazon CloudFront. Amazon Mot. at 1, ECF 541. As for non-infringement, Amazon first asserts that it is entitled to summary judgment because, as construed by the Court, all asserted claims require "determination of license compliance" and PersonalWeb cannot identify such license determination by Amazon CloudFront. *Id.* at 8-9. Second, Amazon brings three additional grounds for infringement, which are unrelated to the Court's claim construction. Specifically, Amazon argues that there is no (1) permitting content to be provided or accessed, (2) determining whether a copy of a data file is present, or (3) comparison to a plurality of identifiers in how CloudFront functions. *See id.* at 9-13. PersonalWeb does not oppose entry of judgment of non-infringement in favor of Amazon based on the Court's Claim Construction Order, but it does oppose (1) Amazon's three new non-infringement grounds and (2) granting of summary judgment based on lack of standing. Opp'n to Amazon Mot. at 1-2, ECF 555.

Twitch also moves for summary judgment of non-infringement based on the Court's Claim Construction Order and the same three additional grounds. Twitch Mot. at 7-13, ECF 542. Twitch also moves to strike PersonalWeb's expert report due to its non-compliance with the Court's Claim

4

1    Construction Order. *Id.* at 1. Again, PersonalWeb does not oppose entry of summary judgment

2    based on the Court's Claim Construction Order. Opp'n to Twitch Mot. at 1, ECF 551. PersonalWeb

3    opposes, however, Twitch's additional grounds for non-infringement and the exclusion of its expert

4    report. *Id.*

5        **A.    Summary of the Asserted Patents**

6        All four patents-in-suit[3] share a specification and each claims priority to a patent application

7    filed on April 11, 1995. The '442 patent is titled "Enforcement and Policing of Licensed Content

8    using Content-Based Identifiers" and was issued on August 9, 2005. ECF 406-13. The '310 patent

9    is titled "Controlling Access to Data in a Data Processing System" and was issued on September

10   21, 2010. ECF 406-2. The '544 patent is titled "Similarity-Based Access Control of Data in a Data

11   Processing System" and was issued on May 17, 2011. ECF 406-10. The '420 patent is titled

12   "Accessing Data in a Data Processing System" and was issued on January 17, 2012. ECF 406-8.

13       The patents-in-suit generally relate to methods for identifying data items in a data processing

14   system—for example, methods for efficiently naming and identifying files on a computer network.

15   According to the (shared) specification, the problems with prior art systems include that "[t]he same

16   [file] name in two different [folders] may refer to different data items, and two different [file] names

17   in the same [folder] may refer to the same data item." *See* '310 patent at 2:41–43. To address this

18   problem, the patents-in-suit produce a content-based "True Name" identifier for a file or other

19   particular data item, in an effort to ensure that identical file names refer to the same data, and

20   conversely, that different file names refer to different data. *See id.* at 6:20– 41, 34:4–12, 37:48–53.

21   In other words, the invention provides an identity for a given data item that "depends on all of the

22   data in the data item and only on the data in the data item." *See id.* at 3:54–55. "Thus the [True

23   Name] identity of a data item is independent of its name, origin, location, address, or other

24   information not derivable directly from the data, and depends only on the data itself." *See id.* at

25   3:55–58.

26       The specification states that "[a] True Name is computed using a [hash] function . . . which

27

28   ――――――――――――――――
     [3] PersonalWeb has not brought any infringement allegations as to the '791 patent and thus, the Court
     need not discuss that patent.

United States District Court
Northern District of California

reduces a data block B . . . to a relatively small, fixed size identifier, the True Name of the data block, such that the True Name of the data block is virtually guaranteed to represent the data block B and only data block B." '310 patent at 12:21–26. Larger files may be split into smaller segments. *See id.* at 13:45–49. The hash function is applied to each segment, and the resulting values are strung together into an indirect data item. *See id.* at 13:49–54. The True Name of this indirect data item is then computed and becomes the True Name of the larger file. *See id.* at 13:54–59.

The summary of the invention describes multiple uses for these True Names, including (1) to avoid keeping multiple copies of a given data file, regardless of how files are otherwise named; (2) to avoid copying a data file from a remote location when a local copy is already available; (3) to access files by data name without reference to file structures; (4) to maintain consistency in a cache of data items and allow corresponding directories on disconnected computers to be resynchronized with one another; (5) to confirm whether a user has a particular piece of data according to its content, independent of the name, date, or other properties of the data item; (6) to verify that data retrieved from a remote location is the intended data; and (7) to prove and track possession of a specific data item for purposes of legal verification. *See* '310 patent at 4:1–52. The patents-in-suit are directed to various specific aspects of this system.

**B.    The HTTP Protocol and Infringement Allegations Against Amazon CloudFront and Twitch Website**

The parties do not dispute how the accused products operate. All websites comply with HTTP protocol that governs communications between web browsers and web servers on the World Wide Web. Redacted Technical Expert Report of Erik de la Iglesia ("de la Iglesia Rep.") ¶ 18, ECF 549-7; Responsive Expert Witness Report of Dr. Jon B. Weissman on Non-Infringement ("Weissman Rep.") ¶ 26, ECF 540-6; *see also* RFC 2616, HTTP 1.1 Standard ("RFC 2616") §§ 1.1, 1.3, ECF 543-3. HTTP communications consist of messages sent back and forth between a client (*e.g.*, a web browser) and a web server. HTTP 1.1 Standard § 1.1. The HTTP protocol uses request "methods" (*e.g.*, GET, PUT, or POST) to transfer files specified by a Universal Resource Identifier ("URI"). de la Iglesia Rep. ¶ 22; Weissman Rep. ¶ 30. For example, to display the Court's website, a web browser will send an HTTP request message to the Court's servers specifying the "method"

6

as "GET" and the URI as "www.cand.uscourts.gov."  *See* Weissman Rep. ¶ 29; de la Iglesia Rep. ¶ 22 ("A URI entered in a browser address bar will transmit an HTTP GET request for that URI to the destination server for the file specified within the URI."); *see also* RFC 2616 at § 3.2.  The server processes the request and returns a response—for example, the Court's homepage or an error message.  *See* de la Iglesia Rep. ¶ 22; Weissman Rep. ¶ 33.

As "an important element of operational efficiency in web design," the HTTP protocol specifies that web browsers can store copies of files locally in their cache.  de la Iglesia Rep. ¶ 25 (citing RFC 2616 § 13); Weissman Rep. ¶¶ 37, 39.  In this context, a "cache" refers to a file downloaded from a server and stored locally on the user's computer, which reduces the response time and network bandwidth consumption on future, equivalent requests.  RFC 2616 § 1.3; *see also* de la Iglesia Rep. ¶ 25; Weissman Rep. ¶ 37.   When a web browser requests a file (*e.g.*, an image or other object) for the first time from a server, the server sends a message that includes the requested file (or a 404 NOT FOUND error status) along with certain headers, which may include an entity tag ("ETag") corresponding to the file, "max-age," and "expires" headers.  de la Iglesia Rep. ¶¶ 24, 27; Weissman Rep. ¶¶ 37-41.  An ETag uniquely identifies a specific version of a file.  Weissman Rep. ¶ 41; de la Iglesia Rep. ¶ 33. The "max-age" directive sets an expiration time for the file, for example, in seconds, relative to the time of the request.  de la Iglesia Rep. ¶ 27; Weissman Rep. ¶ 40.  If, based on the "max-age" in the header, the file has not expired, the web browser uses the version of the file stored locally in the cache without making another request to the server.  Weissman Rep. ¶ 40; de la Iglesia Rep. ¶ 28; *see also* RFC 2616, § 13.2.4.

After expiration time of "max-age," HTTP provides a mechanism called "conditional GET request" for clients to determine whether the files in their cache may still be current.  de la Iglesia Rep. ¶ 29; Weissman Rep. ¶¶ 45-46.  To accomplish this, the HTTP protocol specifies use of a conditional GET request with an "If-None-Match" header and the ETag, requesting the server to compare the ETag of the cached file with the ETag of the current version of the file at the server. de la Iglesia Rep. ¶ 32 (citing RFC 2616 at § 14.26); Weissman Rep. ¶¶ 45-46.  If the ETag included in the conditional GET request matches the current ETag of the requested file, the server responds with a "304 NOT MODIFIED" status code and no body.  de la Iglesia Rep. ¶ 33; Weissman Rep. ¶

46. By sending a "304 Not Modified message" the server tells the browser that the locally-stored cached copy is current.  de la Iglesia Rep. ¶¶ 32-33, Weissman Rep. ¶¶ 46, 48.  The browser then displays the cached (and current) version of the file.  *See* Amazon Mot. at 3-4; Opp'n to Amazon Mot. at 4.  If the ETags do not match, the server will respond with a "200 OK" response and the current version of file.  de la Iglesia Rep. ¶ 33; Weissman Rep. ¶ 46.  The browser then displays the current (not cached) version of the file.  Amazon Mot. at 3-4; Opp'n to Amazon Mot. at 4.  The HTTP protocol does not specify that ETag be generated or implemented in a particular way.  Weissman Rep. ¶¶ 42-43; de la Iglesia Rep. ¶ 33 (citing RFC 2616 §§ 13.3.3-4).

PersonalWeb contends that Amazon and Twitch's use of MD5 ETags (ETag values generated by applying the MD5 hash algorithm to the file content (*i.e.*, content-based identifiers)) to implement the HTTP protocol, including "max-age" headers, infringes the asserted claims.  *See* Opp'n to Amazon Mot. at 4; Opp'n to Twitch Mot. at 4-5; Transcript of the Hearing held on November 14, 2019 ("Hr'g. Tr.") at 48:7-9, ECF 573 (Counsel for PersonalWeb: "It's the use of the protocol with content-based ETags with max-age values that constitutes much of the infringement on many of the alleged claims.")

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56 governs motions for summary judgment.  Summary judgment is appropriate if the evidence and all reasonable inferences in the light most favorable to the nonmoving party "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  Rule 56 authorizes a court to grant "partial summary judgment" to dispose of less than the entire case and even just portions of a claim or defense.  *See* Fed. R. Civ. P. advisory committee's note, 2010 amendments.

The moving party bears the burden of showing there is no material factual dispute, by "identifying for the court the portions of the materials on file that it believes demonstrate the absence of any genuine issue of material fact."  *T.W. Elec. Serv. Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir. 1987).  In judging evidence at the summary judgment stage, the Court "does not assess credibility or weigh the evidence, but simply determines whether there is a genuine factual

8

issue for trial." *House v. Bell,* 547 U.S. 518, 559-60 (2006). A fact is "material" if it "might affect the outcome of the suit under the governing law," and a dispute as to a material fact is "genuine" if there is sufficient evidence for a reasonable trier of fact to decide in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In cases like this, where the nonmoving party will bear the burden of proof at trial on a dispositive issue (*e.g.*, patent infringement), the nonmoving party must "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. For a court to find that a genuine dispute of material fact exists, "there must be enough doubt for a reasonable trier of fact to find for the [non-moving party]." *Corales v. Bennett*, 567 F.3d 554, 562 (9th Cir. 2009).

## III.    DISCUSSION

Amazon seeks a declaration that it does not infringe five PersonalWeb patents. Amazon also seeks summary judgment on the ground that PersonalWeb lacks standing to assert any claims of the asserted patents against Amazon's CloudFront. Twitch seeks a summary judgment of non-infringement and the exclusion of PersonalWeb's expert report.

### A.    PersonalWeb's Expert Testimony

The Court first addresses the parties' disputes regarding PersonalWeb's expert testimony in the form of expert reports and declarations.

#### 1.    As to Amazon

Amazon argues that it is entitled to summary judgment because PersonalWeb failed to serve an expert report on infringement in accordance with the Court's scheduling order. Amazon Mot. at 6-8; *see also* ECF 374 (setting deadline for opening expert reports on August 23, 2019). PersonalWeb concedes that it did not serve an infringement expert report but argues that its failure to do so was "Amazon-induced" and due to the parties' discussions of potential dismissal after the Court's Claim Construction Order was issued. Opp'n to Amazon Mot. at 2-3. PersonalWeb did, however, serve a timely expert report on Twitch, authored by Mr. Erik de la Iglesia. *See* Amazon Mot. at 2.

9

United States District Court
Northern District of California

1    In its Motion, Amazon argues that the lack of an expert report means that PersonalWeb

2    "failed to put forth any evidence of infringement and it thus cannot overcome summary judgment

3    of noninfringement on those patents."  Motion at 6.  PersonalWeb responds that "Amazon is

4    attempting to receive an essentially 'default' summary judgment on issues unrelated to the Claim

5    Construction Order."  Opp'n at 3.  At the Hearing, however, Amazon conceded that PersonalWeb

6    may properly rely on the substance of Mr. de la Iglesia's report served on Twitch in both Amazon

7    and Twitch cases.  *See* Hr'g. Tr., 13:15-18.  This concession moots the "summary judgment by

8    default" argument made by Amazon.

9    That said, PersonalWeb goes one step further and asks to the Court to consider an unsigned

10   declaration authored by Mr. de la Iglesia (to be executed if the Court permits) and submitted with

11   PersonalWeb's opposition brief.  *See* Opp'n to Amazon Mot. at 3; ECF 549-6. Amazon moves to

12   strike this declaration as untimely.  Amazon Reply at 6, ECF 560.

13   As the Court mentioned at the Hearing, Rule 26 provides that a party must submit its expert

14   witness disclosures "at the times and in the sequence that the court orders." Fed.R.Civ.P.

15   26(a)(2)(D). "Rule 37(c)(1) gives teeth to th[is] requirement[ ]" by automatically excluding any

16   evidence not properly disclosed under Rule 26(a).  *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*,

17   259 F.3d 1101, 1106 (9th Cir. 2001).

18   There is no dispute that Mr. de la Iglesia's unsigned declaration was not served according to

19   the case schedule set by the Court – and instead, it accompanied PersonalWeb's opposition to

20   Amazon's Motion for Summary Judgment.  *See* ECF 374.  In his unsigned declaration, Mr. de la

21   Iglesia states: "I address in this declaration certain specific points raised by Amazon in its summary

22   judgment motion[.]"  Unsigned de la Iglesia Decl. ¶ 4, ECF 549-6.  It is not proper for Mr. de la

23   Iglesia to supplement his expert report to "revise" his disclosures in light of Amazon's challenges

24   to his analysis brought in Amazon and Twitch's motions for summary judgment.  *See Rovid v. Graco*

25   *Children's Prods.*, No. 17-cv-01506-PJH, 2018 WL 5906075, at *11 (N.D. Cal. Nov. 9, 2018) (Rule

26   26(e) does not "create a loophole through which a party who submits partial expert witness

27   disclosures, or who wishes to revise her disclosures in light of her opponent's challenges to the

28   analysis and conclusions therein, can add to them to her advantage after the court's deadline for

1    doing so has passed.") (quoting *Luke v. Family Care & Urgent Med. Clinics*, 323 F. App'x 496, 500

2    (9th Cir. 2009)).  Accordingly, the Court STRIKES Mr. de la Iglesia's untimely and unsigned expert

3    declaration and relies solely on his expert report served in the Twitch case.

### 2. As to Twitch

5    Unlike the scenario in the Amazon case, PersonalWeb served a timely expert report in the

6    Twitch case.  *See* ECF 540-4.  Twitch moves to exclude this expert report because Mr. de la Iglesia

7    did not properly apply the Court's constructions of the terms "unauthorized or unlicensed" and

8    "authorization."  *See* Twitch Mot. at 3-4.  PersonalWeb responds that the incorrect application of

9    the Court's claim construction was due to PersonalWeb's (incorrect) reading of the Claim

10   Construction Order, which the Court rejected *after* the expert reports were served.  *See* ECF 537.

11   PersonalWeb has now withdrawn all portions of Mr. de la Iglesia's report that reference the incorrect

12   construction and has submitted a redacted version of the report.  *See* ECF 549-7.  At the Hearing,

13   Counsel for Twitch conceded that the redacted version of Mr.de la Iglesia's report is acceptable.

14   Hr'g. Tr., 12:13-16.  Accordingly, the Court DENIES Twitch's motion to exclude Mr.de la Iglesia's

15   report as MOOT.

16   That said, Mr.de la Iglesia has also submitted a supplemental declaration in the Twitch case,

17   to again, "address … certain specific points raised by Twitch in its summary judgment motion."

18   ECF 551-1 ¶ 5.  For the same reasons stated above, Mr.de la Iglesia's declaration is untimely and is

19   thus, STRICKEN.

20   ### B. Non-infringement of the '544 and '791 Patents as To Amazon

21   Amazon argues that it is entitled to summary judgment as to the '544 and '791 patents

22   because PersonalWeb failed to include any infringement allegations for these patents in its

23   infringement contentions.  Amazon Mot. at 5-6; *see also* Infringement Contentions § II, ECF 543-

24   3.  PersonalWeb does not respond to this argument in its opposition brief.  *See generally* Opp'n to

25   Amazon Mot.  At the Hearing, counsel for PersonalWeb acknowledged that the '544 patent was

26   never asserted against Amazon.  Hr'g. Tr. 14:20-15:1.  Additionally, PersonalWeb does not dispute

27   that it has not brought forth any allegations of infringement of the '791 patent.  *See generally* Opp'n

28   to Amazon Mot.  The Court agrees with Amazon that PersonalWeb's failure to include infringement

United States District Court
Northern District of California

11

1    allegations in its infringement contentions entitles Amazon to summary judgment of

2    noninfringement. *See O2 Micro Int'l, Ltd. v. Monolithic Power Sys., Inc.*, 467 F.3d 1355, 1369-70

3    (Fed. Cir. 2006) (affirming grant of summary judgment for non-infringement where patentee's

4    infringement theory was not disclosed in accordance with the Patent Local Rules of this District).

5    Thus, Amazon's motion for summary judgment of non-infringement of the '544 and '791 patents is

6    GRANTED.

7        **C.    Non-infringement of the '544 Patent as to Twitch**

8        Twitch moves for summary judgment of non-infringement as to the '544 patent because

9    PersonalWeb's expert does not offer any infringement opinions for the '544 patent and even admits

10    that Twitch's website does not use that patent.  Twitch Mot. at 4 (citing de la Iglesia Rep. ¶ 195).

11        PersonalWeb responds that its failure to include any infringement analysis for the '544 patent

12    in its expert report was "Twitch-induced" and due to the parties' discussions regarding dismissal

13    after the Court's Claim Construction Order was issued.  Opp'n to Twitch Mot. at 3-4.  Specifically,

14    PersonalWeb asserts that it agreed to dismiss its '544 patent claims with prejudice because of the

15    Court's construction of the claim term "function of the one or more of part values."  *Id.* at 1; *see*

16    *also* Hr'g. Tr., 14:21-23 (Counsel for PersonalWeb: "Based upon the Court's claim construction

17    ruling, we are dropping the '544 with respect to Twitch).  Moreover, PersonalWeb's expert appears

18    to concede this issue and states: "All of the Asserted Patents are required, in my opinion, to cover

19    HTTP cache control using a content-based identifier as an ETag. The '544 patent is not required to

20    practice this method of caching."  de la Iglesia Rep. ¶ 195.

21        The Court finds that PersonalWeb's purported reasons for not including the '544 patent in

22    its expert report are irrelevant.  The fact remains that the only evidence in the record regarding

23    infringement allegations of the '544 patent is PersonalWeb's expert conceding that there is no

24    infringement.  *See* de la Iglesia Rep. ¶ 195.[4]  Thus, Twitch's motion for summary judgment as to

25    the '544 patent is GRANTED.

26

27    ─────────────────

28    [4] The Court notes that Mr. de la Iglesia did not include (and PersonalWeb did not ask the Court to consider) any infringement analysis as to the '544 patent in his now-stricken supplemental report at ECF 551-1.

United States District Court
Northern District of California

12

### D.    The Undisputed Ground for Summary Judgment: Determination of Compliance with a Valid License

There is no dispute that summary judgment in favor of Amazon is warranted based on the Court's construction of the claims in dispute.  Specifically, the Court construed "unauthorized or unlicensed" in claim 20 of the '310 patent to mean "not compliant with a valid license," and "authorization" in independent claims 25 and 166 of the '420 patent to mean "a valid license."  Claim Construction Order at 6, 12.  As a result, all asserted claims require a determination that content complies with a valid license before access to that content is permitted.

Accordingly, to infringe the asserted patents, the accused Amazon CloudFront and Twitch website must determine whether a requested content complies with a valid license before permitting access to it.  PersonalWeb concedes that Amazon CloudFront and Twitch website do not control whether or not access is compliant with a valid license.  *See* PersonalWeb's Motion for Entry of Judgment of Non-Infringement at 4 ("[U]nder this construction, Amazon would not directly infringe because it would not be the party controlling whether or not the access is compliant with or under a license."), ECF 538; PersonalWeb's Reply in Support of its Motion for Clarification at 6-7 ("Mr. de la Iglesia never asserts that Twitch's infringement of the patent involves either (a) rights to use content beyond the method for a browser to render a particular webpage, or (b) any aspect of a user's legal rights to any content."), ECF 527; Opp'n to Twitch Mot. at 1 ("PersonalWeb does *not* oppose entry of judgment of noninfringement on all of its claims" if "a direct result of the Court's Claim Construction Order").

Accordingly, the parties agree that based on the Court's construction of the claims at issue, PersonalWeb cannot meet its burden of proving infringement and Amazon and Twitch are entitled to summary judgment of non-infringement.  Amazon Mot. at 9, Opp'n to Amazon Mot. at 1, s*ee also* ECF 538 at 2; Twitch Mot. at 7-8, Opp'n to Twitch Mot. at 2.  Thus, the Court GRANTS Amazon and Twitch's motions for summary judgment on the ground that CloudFront and Twitch website do not infringe any of the asserted claims, based on the Court's construction of the asserted claims.

### E.    The Disputed Grounds for Summary Judgment

Although non-infringement based on the Court's claim construction is conceded, Amazon

and Twitch argue that summary judgment is warranted on three additional grounds, unrelated to the Court's claim construction and based on the undisputed functionality of the accused products. Amazon Mot. at 9-13; Twitch Mot. at 8-13. PersonalWeb opposes summary judgment based on these additional grounds. Opp'n to Amazon's Mot. at 1-2; Opp'n to Twitch Mot. at 2. Amazon and Twitch's arguments regarding these grounds, and PersonalWeb's opposition thereto, are substantively identical. Moreover, PersonalWeb's expert report is identical in Amazon and Twitch cases because, as discussed above, the Court considers PersonalWeb's redacted expert report (served on Twitch) in both cases. Accordingly, the Court's below analysis of the disputed grounds for non-infringement encompasses both Amazon and Twitch's motions. The Court addresses each ground in turn.

### 1. Permitting or allowing content to be provided or accessed

Amazon and Twitch argue that summary judgment is warranted as to (1) claim 20 of the '310 patent, (2) claims 25 and 166 of the '420 patent, and (3) claim 11 of the '442 patent, because "[t]here is no permitting content to be provided or accessed." Amazon Mot. at 9; Twitch Mot. at 9-11. The relevant claim language is as follows:

- "based at least in part on said content-dependent name of said particular data item, the first device (A) *permitting the content to be provided to or accessed* by the at least one other computer if it is not determined that the content is unauthorized or unlicensed, otherwise, (B) if it is determined that the content is unauthorized or unlicensed, *not permitting the content to be provided to or accessed* by the at least one other computer." Claim 20 of the '310 patent (emphasis added).

- "(C) based at least in part on said ascertaining in step (B), *selectively allowing* a copy of the particular sequence of bits *to be provided to or accessed* by or from at least one of the computers in a network of computers, wherein a copy of the sequence of bits *is not to be provided or accessed* without authorization, as determined, at least in part, based on whether or not said first content-dependent name of the particular sequence of bits corresponds to one of the plurality of identifiers." . Claim 25 of the '420 patent (emphasis added).

- "(a2) *selectively permit* the particular data item *to be made available for access and to be provided to or accessed by* or from at least some of the computers in a network of computers, wherein the data item is *not to be made available for access or provided* without authorization," Claim 166 of the '420 patent (emphasis added).

- "*allowing* the file to *be provided* from one of the computers having an authorized or

14

1    licensed copy of the file."  Claim 11 of the '442 patent (emphasis added).

2        Each of the claims at issue include an element that either ***permits/not permits*** or ***allows/not***

3    ***allows*** content to be provided or accessed.  The parties agree that after a cached file's "max-age"

4    expires, the browser sends a conditional GET request to the server with an "If-None-Match" header

5    and the file's ETag, requesting the server to compare the ETag of the cached file with the ETag of

6    the current version of the file at the server.  de la Iglesia Rep. ¶ 32 (citing RFC 2616 at § 14.26);

7    Weissman Rep. ¶¶ 45-46; Amazon Mot. at 3-4; Twitch Mot. at 5; Opp'n to Amazon Mot. at 6, 7;

8    Opp'n to Twitch Mot. at 6.  The parties also agree that when Amazon's CloudFront or Twitch's

9    server receives a conditional GET request, it compares the ETag of the file stored locally in the

10   user's cache with the ETag of the current version of that file on the server.  Amazon Mot. at 4;

11   Twitch Mot. at 5; Opp'n to Amazon Mot. at 7; Opp'n to Twitch Mot. at 6.  If the ETags match, the

12   server responds with a "304 Not Modified" message, indicating that the locally-stored cached

13   version is current.  Amazon Mot. at 4; Opp'n to Amazon Mot. at 7; Twitch Mot. at 5; Opp'n to

14   Twitch Mot. at 6-7.  If the ETags do not match, the server responds with a "200 OK response" and

15   the new version of the file.  *Id*.

16       PersonalWeb argues that (1) when Amazon's CloudFront or Twitch's server finds there to

17   be an ETag match, "it makes a determination ***to permit*** a browser to keep using the cached content

18   and sends a 304 NOT MODIFIED message to the browser" and (2) when there is no ETag match,

19   "it makes a determination ***not to permit*** a browser to keep using cached content and sends an HTTP

20   200 OK response with new content, which the browser will use instead of cached content in

21   accordance with the HTTP protocol specification RFC 2616."  Opp'n to Amazon Mot. at 7; Opp'n

22   to Twitch Mot. at 6-7 (emphasis added).

23       Amazon and Twitch reject this theory and argue that the server's response to a conditional

24   GET request where the ETags do not match (*i.e.*, the "200 OK" status and the new file) does not

25   "not permit"[5] the user "from accessing and viewing old expired content previously cached by his or

26   ─────────────────────

27   [5] PersonalWeb takes issue with Amazon and Twitch's use of the terms "prohibit" and "prevent" to describe the claim language and argues that Amazon and Twitch are seeking a new claim construction for the terms "permit/not permit" and "allow/now allow" they did not seek during claim

28   construction proceedings.  Opp'n to Amazon Mot. at 5; Opp'n to Twitch Mot. at 9.  Amazon and

United States District Court
Northern District of California

United States District Court
Northern District of California

1    her browser." Amazon Mot. at 10; Twitch Mot. at 9. In Amazon and Twitch's view, PersonalWeb's

2    interpretation of the server's functionality means that when the ETags do not match, the server is

3    not permitting access to the object the user already has, which Amazon argues is incorrect. *See*

4    Hr'g. Tr. 30:5-7 (Amazon's Counsel: "What [PersonalWeb is] saying is that when those ETags

5    don't match, the server is not permitting access to the object the user already has."). To demonstrate

6    its point, Amazon and Twitch rely on the HTTP standard's requirement that the web browser must

7    display expired content when the user (1) requests to see the browser history and (2) uses the

8    browser's "back" button. Amazon Mot. at 10 (citing Weissman Rep. ¶¶ 55-56; RFC 2616 at §

9    13.13); Twitch Mot. at 9-10.

10       PersonalWeb does not disagree that the expired cached content is available to the user

11   through the browser's "history" and "back" functions, but it argues that it is only accusing "a specific

12   transaction" between the server and the browser (*i.e.*, the processing of a conditional GET request)

13   and therefore, "Amazon[/Twitch]'s example of offline viewing of pages is irrelevant because offline

14   viewing by definition does not involve communications with the server." Opp'n to Amazon Mot.

15   at 5; Opp'n to Twitch Mot. at 9-10. According to PersonalWeb, Amazon and Twitch's examples of

16   offline viewing are simply non-infringing uses and "have nothing to do with whether the claim is

17   infringed." Opp'n to Amazon Mot. at 5-6; Opp'n to Twitch Mot. at 10. Accordingly, PersonalWeb

18   argues that Amazon's position is tantamount to a construction equating "not permit" or "not allow"

19   to "prevent access by any means forever," and should be rejected. Opp'n to Amazon Mot. at 5;

20   Opp'n to Twitch Mot. at 9. Amazon and Twitch respond that offline viewing examples simply

21   confirm that "there is no revocation of permission or ability to access when new content is provided

22   [in response to a conditional GET request]." Hr'g. Tr., 31:9-13.

23       In short, the parties do not disagree as to what a CloudFront or Twitch's server does when it

24   receives a conditional GET request and the ETags do not match: the server responds with a "200

25

26   ――――――――――――――――――――

27   Twitch respond that they are not seeking any new claim construction and that they simply used the
     verbs "preventing" or "prohibiting" as mere synonyms of "not permitting" in order to avoid double
     negatives such as "Amazon's technology does not 'not permit' access to content cached at web
     browsers." Amazon Reply at 1; *see also Twitch* Reply at 2. To avoid any doubt, the Court will not
28   use any synonyms in this Order at the cost of utilizing awkward double-negatives.

OK" response message and a copy of the current version of the requested file, which the browser then displays to the user.   However, the parties appear to have different conceptions of what it means when the cached (and stale) version of the file is not displayed to the user.  PersonalWeb believes that the server—by virtue of sending the new/current version of the content—does "not permit/not allow" the browser to continue to use the cached content – which PersonalWeb argues meets the claim limitations and is consistent with the plain and ordinary meaning of "allow" and "permit."  *See* Opp'n to Amazon Mot. at 5-9; Opp'n to Twitch Mot. at 5-10.  Amazon and Twitch disagree and argue: "If the web browser is allowed to use stale content, as the HTTP protocol specifies and PersonalWeb admits, how does it also somehow lack permission to use that content?" Amazon Reply at 3, Twitch Reply at 4 (same).

Non-infringement is a question of fact that "is amenable to summary judgment where, *inter alia*, no reasonable fact finder could find infringement."  *Ethicon Endo–Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998).  As with any summary judgment motion, the Court views all facts in a light most favorable to the nonmoving party and draws all reasonable inferences in its favor.  *IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1429 (Fed. Cir. 2000).  "Summary judgment regarding whether or not the claims read on the accused device, 'can only be granted if, after viewing the alleged facts in the light most favorable to the non-movant, there is no genuine issue whether the accused device is encompassed by the claims.'"  *Asetek Holdings, Inc. v. CoolIT Sys.*, Inc., No. C-12-4498 EMC, 2014 WL 4090400, at *5 (N.D. Cal. Aug. 19, 2014) (citing *Pitney Bowes, Inc. v. Hewlett–Packard Co.*, 182 F.3d 1298, 1304 (Fed. Cir. 1999)).

Viewing the evidence in the light most favorable to PersonalWeb, the Court concludes that the evidence does not show that CloudFront/Twitch servers permit/not permit or allow/not allow content to be provided or accessed.  The Court agrees with PersonalWeb that the claims require the system to either allow/permit or not allow/not permit access to a file based on the processing of a content-based name for that file "in the process of a specific transaction between the browser and the server" (*i.e.*, the processing of a conditional GET request received from a browser).  *See* Opp'n to Amazon Mot. at 5; Opp'n to Twitch Mot. at 9.  The problem with PersonalWeb's argument, however, is that nothing in the record shows that the server does anything more than (1) compare

17

1    ETags, (2) confirm that cached version is still current, and (3) if not, send the newest version.  None

2    of these steps "not permit/not allow" content (*i.e.*, stale cached file) to be accessed or provided.  At

3    best, the evidence shows that when ETags are not a match, the web browser displays the new version

4    of the content (which it receives with the "200 OK" message") and thus, does "not provide/not

5    show" the stale content to the user – but the browser "not providing/not showing" is not the same

6    as CloudFront/Twitch server ***not permitting*** the content to be provided or accessed.  The claims

7    require an affirmative allow/permit or not allow/not permit step and those elements cannot simply

8    be inferred from entirely different functions in the accused products (*i.e.*, the server sending a new

9    version of the content and the browser displaying that new version).

10          As the parties agree, the browser continues to have access to the stale cached file via the

11    browser's "history" and "back" functions.  It is true that the examples Amazon provides are offline

12    scenarios, but they do demonstrate that at all times, the browser is "permitted" to access/provide the

13    stale content and is not "not permitted" to do so by the server.  That said, the Court need not consider

14    Amazon's offline examples because, as explained above, the undisputed functionality of Amazon's

15    CloudFront and Twitch's server do not include any form of "permission" whatsoever.  The Court is

16    persuaded by Amazon and Twitch's argument that the server's response to a conditional GET

17    request is "a version control mechanism" and does not "not permit" the browser from continuing to

18    use the version it already has.  *See* Amazon Reply at 2; Twitch Reply at 3.  The Court disagrees with

19    PersonalWeb that Amazon is seeking a new claim construction, requiring that the accused product

20    "must 'prevent' access by any means forever."  Opp'n to Twitch Mot. at 9; Opp'n to Amazon Mot.

21    at 5.  There is simply no evidence of not permitting/not allowing of any kind by the accused products.

22          This conclusion is consistent with PersonalWeb's representation to the Patent Office.  In the

23    *inter partes* review proceeding of the '310 patent, PersonalWeb explained that "there is no logical

24    reason to have modified [the prior art] to implement a system for checking whether that same local

25    computer 20 is authorized to access a previous version of the same file" and "the local computer 20

26    is permitted to access a prior version of a file if that computer already has the current version of that

27    file."  Patent Owner's Response to IPR2013-00596, Paper 15 at 19-20, ECF 561-6.  This makes

28    sense, because nothing in the record shows that the servers have control over the browser's access

18

1    to its cached files.

2        Accordingly, the Court GRANTS Amazon's motion for summary judgment on the ground

3    that the undisputed evidence fails to show that Amazon/Twitch servers permit/not permit or

4    allow/now allow content to be provided or accessed.

5            **2.  Determining whether a copy of the data file is present using the name**

6        Next, Amazon and Twitch move for summary judgment of non-infringement of claim 10 of

7    the '442 patent[6], which requires "determining, using at least the name, whether a copy of the data

8    file is present on at least one of said computers,"  because "ETags are not used by CloudFront to

9    locate files or to determine if they are present."  Amazon Mot. at 11; *see also* Twitch Mot. at 11

10   ("ETags are not used to locate files in the accused Twitch website or to determine if they are

11   present.").  The parties agree that PersonalWeb maps the "name" limitation in this claim to an ETag

12   received in the conditional GET request from the web browser at the server.  de la Iglesia Rep. ¶

13   109; Amazon Mot. at 11; Twitch Mot. at 11.  The parties also agree that files are located by their

14   assigned URI/URL and not ETags.  Weissman Rep. ¶ 161; de la Iglesia Rep. ¶ 141; *see also* Opp'n

15   to Amazon Mot. at 11 (noting that by using the URI, Amazon can determine "that a file having that

16   URI is located at a given computer"); Opp'n to Twitch Mot. at 11 (same as to Twitch).  With that,

17   Amazon and Twitch argue that "before the ETags can be compared, the files must *already* have

18   been located, and are thus deemed present" and accordingly, the comparison of ETags "determines

19   only if two files match, not whether the files are present in any computer system."  Amazon Mot. at

20   12; Twitch Mot. at 11.

21       PersonalWeb responds that Amazon and Twitch mistake its infringement read and explains

22   its theory as follows:

23           [I]f a CloudFront PoP server[/Twitch] determines that a file at the
             browser cache is a copy of the file at the server, then the CloudFront
24           PoP server[/Twitch] can send an HTTP 304 message instructing the
             browser to keep using the cached copy for some extended time period.
25           And, conversely, if the CloudFront PoP server[/Twitch] determines
             that a copy of the file at the CloudFront PoP[/Twitch] server is not
26           already present at the browser cache, the CloudFront PoP
             server[/Twitch] can send an HTTP 200 message to provide the

27

28   ─────────────
     [6] Claim 11 of the '442 patent, which depends on claim 10, contains the same language.

                                        19

United States District Court
Northern District of California

> browser with a copy and instructions for how long of a period the browser can use the copy without having to check back with the CloudFront PoP server[/Twitch] whether it may keep using it.

Opp'n to Amazon Mot. at 9-10, Opp'n to Twitch Mot. at 10. According to PersonalWeb, by comparing ETags, Amazon or Twitch's server determines whether the file located at the browser is "actually a **copy** of the file located at the server" (*i.e.*, that the content of the file at the browser cache is a copy of the content of the file at the server). Opp'n to Amazon Mot. at 10 (emphasis added); Opp'n to Twitch Mot. at 11. PersonalWeb argues that "[i]t is not a file that is being determined as present; the claim specifically requires determining whether a 'copy' of a file is present" and "[o]nly when the two files have the same content is one a 'copy' of the other." Opp'n to Amazon Mot. at 10, 11; Opp'n to Twitch Mot. at 11, 12.

Additionally, PersonalWeb argues that Amazon is seeking a construction that equates "determining, using at least the name, whether a copy of the data file is present on at least one of said computers" to "determining, using *only* the name, whether a copy of the data file is present on at least one of said computers." Opp'n to Amazon Mot. at 2; Opp'n to Twitch Mot. at 2. In PersonalWeb's view, both URI/URL and ETags are required "to determine whether the file at the browser cache has the same content as the file at the webpage server." Opp'n to Amazon Mot. at 11; Opp'n to Twitch Mot. at 11.

PersonalWeb's expert, however, does not seem to be onboard with the infringement theory advanced in PersonalWeb's opposition to Amazon and Twitch's motions for summary judgment. Mr. de la Iglesia does not distinguish "locating a file" from "determining the presence of a copy of the file" and opines: "The name (ETag value) is used to **locate a file** as present at least in a browser cache when there is an ETag match, and **locate a file** as present in the Twitch [or Amazon] web servers if there is an ETag mismatch." de la Iglesia Rep. ¶ 112 (emphasis added); *see also* Hr'g. Tr. 78:15-16 (PersonalWeb's Counsel: "The last clause of the last sentence of paragraph 112 [of Mr. de la Iglesia's report] is not a model of clarity[.]"). Put differently, in Mr. de la Iglesia's view, if the ETag received in the conditional GET request matches the ETag of the file with the same URL/URI on the server, the Amazon/Twitch server determines that the file is present at the browser, and if the ETags do not match, then the Amazon/Twitch server determines that the file is present at the server.

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1    PersonalWeb's arguments fail for two reasons.  First, PersonalWeb may not replace its

2    expert's analysis with attorney arguments to create a factual dispute. "There must be sufficient

3    substance, other than attorney argument, to show that the issue requires trial." *Glaverbel Societe*

4    *Anonyme v. Northlake Mktg. & Supply, Inc.*, 45 F.3d 1550, 1562 (Fed. Cir. 1995); *see also*

5    *Invitrogen Corp. v. Clontech Labs.*, Inc., 429 F.3d 1052, 1068 (Fed. Cir. 2005) ("Unsubstantiated

6    attorney argument regarding the meaning of technical evidence is no substitute for competent,

7    substantiated expert testimony.").    Thus, to the extent that PersonalWeb's arguments are

8    inconsistent with Mr. de la Iglesia's expert testimony, the Court relies on the expert's stated opinion.

9    Second, the Court is persuaded by Amazon and Twitch's argument that "PersonalWeb's

10   infringement theory is unavailing even if the claims require a determination of whether a 'copy,'

11   and not the file itself, is present."  Amazon Reply at 5; Twitch Reply at 6.  The claim language

12   requires "obtaining a name for a data file" – and PersonalWeb maps the "name" to the ETag received

13   in a conditional GET request, which corresponds to the cached file at the browser.  de la Iglesia Rep.

14   ¶ 109.   The claim also requires using "***the name***" (*i.e.*, ETag received in the conditional GET

15   request) to determine "whether a copy of ***the data file*** [*i.e.*, the cached file] is present[.]"  *See* '442

16   patent, claim 10.  If the ETag of the cached file does not match the ETag of the file on the server,

17   the file on the server is neither the same nor a copy of the cached file associated with the ETag.

18   Therefore, the ETag is not used to determine the presence of a copy of ***the data file*** (*i.e.*, the cached

19   file) on the server.

20   Accordingly, the Court GRANTS Amazon and Twitch's motions for summary judgment on

21   the ground that "[t]here is no determining whether a copy of the data file is present using the name."

### 3.  Comparison to a plurality of identifiers

23   Finally, Amazon and Twitch argue that they are entitled to summary judgment as to claims

24   25 and 166 of the '420 patent because "CloudFront does not compare the received ETag with

25   *multiple* ETags as the claims require." [7]  Amazon Mot. at 12; Twitch Mot. at 12 ("Mr. de la Iglesia

26

27   _____

[7] In its motion, Amazon also moved for summary judgment of claim 69 of the '310 patent on the
28   same ground, but that claim is no longer asserted in this case. *See* Amazon Mot. at 12-13; Opp'n to
     Amazon Mot. at 11.

United States District Court
Northern District of California

points to no evidence showing that Twitch's website compares the received ETag with multiple ETags as the claims require").  Claim 25 of the '420 patent provides, in relevant part, as follows:

> ascertaining whether or not said first content-dependent name for the particular sequence of bits **corresponds to one of a plurality of identifiers**, said plurality of identifiers corresponding to a plurality of data items,

Claim 166 of the '420 patent (emphasis added). Similarly, claim 166 of the '420 patent requires:

> (a2) selectively permit the particular data item to be made available for access and to be provided to or accessed by or from at least some of the computers in a network of computers, wherein the data item is not to be made available for access or provided without authorization, as resolved based, at least in part, on whether or not at least one of said one or more content-dependent digital identifiers for said particular data item corresponds to an entry in one or more databases, each of said one or more databases comprising a plurality of identifiers, each of said identifiers in each said database **corresponding to at least one data item of a plurality of data items**, and each of said identifiers in each said database being based, at least in part, on at least some of the data in a corresponding data item.

Claim 166 of the '420 patent (emphasis added).

The parties agree that under PersonalWeb's infringement read, the content-dependent name/digital identifier is the ETag in a conditional GET request.  de la Iglesia Rep ¶ 141; Amazon Mot. at 12; Twitch Mot. at 12.  Amazon and Twitch argue that CloudFront/Twitch server "performs a one-to-one comparison" of ETags and therefore, "cannot meet the requirement of the one-to-many comparison recited in the asserted claims."  Amazon Mot. at 12-13; Twitch Mot. at 12.

PersonalWeb does not dispute the one-to-one comparison of ETags, but argues that the claim language "does not require that a content-dependent digital identifier be compared to more than one of a plurality of identifiers in a database, only that it be **ascertained** whether or not it **corresponds to one of the entries in the database**, which Amazon[/Twitch] does."  Opp'n to Amazon Mot. at 12 (emphasis added); Opp'n to Twitch Mot. at 12-13.  But PersonalWeb fails to explain how CloudFront/Twitch's one-to-one comparison of ETags "ascertain[s] whether or not [the ETag in a conditional GET request] corresponds to one of a plurality of identifiers" as required by the claims. In fact, PersonalWeb's expert reiterates the one-to-one comparison of ETags:

United States District Court
Northern District of California

> [T]he Accused Instrumentality will read the MD5 ETag value and the URL in the conditional GET request, look up the URL in its list of URLs, read the current ETag value for the matching URL, and see if that current ETag value for the URL matches the ETag value received in the request.

de la Iglesia Rep. ¶ 141. PersonalWeb's infringement theory effectively reads the "correspond[ing] to a plurality of identifiers" out of the claim language. This is not permissible. *Wolverine World Wide, Inc. v. Nike*, Inc., 38 F.3d 1192, 1199 (Fed. Cir. 1994) ("It is well settled that each element of a claim is material and essential, and that in order for a court to find infringement, the plaintiff must show the presence of every element or its substantial equivalent in the accused device.") (citing *Perkin–Elmer Corp. v. Westinghouse Elec. Corp.*, 822 F.2d 1528, 1532–33 (Fed. Cir. 1987)) (alterations omitted).

Moreover, it is only logical to expect that in order for the invention to "ascertain[] whether or not [the ETag in a conditional GET request] corresponds to one of a plurality of identifiers," there must be some sort of comparison or matching of one identifier to many (more than one). This is supported by PersonalWeb's representation to the Patent Office. In arguing why prior art did not render claim 166 of the '420 patent invalid, PersonalWeb stated that the prior art "never **compares** [an identifier] with a plurality of identifiers." Patent Owner's Preliminary Response to IPR2014-00058, Paper 9 at 12 (emphasis added), ECF 561-7.

The Court GRANTS Amazon and Twitch's motions for summary judgment on the ground that PersonalWeb has not presented evidence of "corresponding to a plurality of identifiers."

## F. PersonalWeb's Standing

Amazon challenges PersonalWeb's standing to assert infringement claims against Amazon's CloudFront in two motions. Amazon first filed a motion for Judgment on the Pleadings under Federal Rule of Civil Procedure 12(c). Mot. JOTP, ECF 413. After the Court heard oral arguments on that motion, Amazon moved for summary judgment on the same ground. Amazon Mot. at 13-14. Because the arguments presented by the parties in both of Amazon's motions substantially overlap, the Court resolves both here. For the reasons stated below, Amazon's Motion for Judgment on the Pleading and Motion for Summary Judgment on the alternative ground that PersonalWeb lacks standing are DENIED.

United States District Court
Northern District of California

United States District Court
Northern District of California

Amazon asserts that PersonalWeb lacks the right to accuse CloudFront of infringing the asserted patents because of PersonalWeb's contractual obligations to its co-party, Level 3 Communications, Inc. ("Level 3"). It is undisputed that PersonalWeb's rights to the patents asserted in this case are governed by the License Agreement between Kinetech Inc. (PersonalWeb's predecessor) and Digital-Island, Inc. (Level 3's predecessor), dated September 1, 2000 (the "Agreement"). *See* Amazon Mot. at 13; Opp'n to Amazon Mot. at 12. It us undisputed that the Agreement specifies that PersonalWeb and Level 3 each own a fifty percent (50%) undivided interest in and to the asserted patents. *See* Mot. JOTP at 2, ECF 413; Opp'n to Mot. JOTP at 2, ECF 442.

The Agreement divides certain enforcement rights between the co-owners of the asserted patents (*i.e.*, PersonalWeb and Level 3). Accordingly, Level 3 has the "first right to institute suit for infringement(s)" in Level 3's Field of Use. Agreement § 6.4.1, ECF 414-1. Level 3's Field of Use is defined as:

> the infrastructure services of one or more managed global content delivery networks (CDNs) in which a customer's content is served faster, on average. than if served from the customer's origin server or the CDN can typically serve more users than a customer's origin server alone; where at least some customer content on origin servers is replicated to possibly many alternate servers of the CDN, many of said CDN servers being at ISP sites. and where users' requests for origin content are satisfied by directing them to CDN servers.

Agreement, Schedule 1.2. To be clear, the Agreement specifies conditions, under which PersonalWeb may sue in Level 3's Field of Use. *See* Agreement § 6.4.1. But in this suit, PersonalWeb has asserted infringement claims in its own field, not Level 3's. First Am. Counterclaim ¶ 3, ECF 257 ("All infringement allegations, … are made by PersonalWeb alone, and not by Level 3. PersonalWeb alleges that the infringements at issue in this case all occur within, and are limited to, the PersonalWeb Patent Field.")[8]. At all times during this litigation, both PersonalWeb and Level 3 have been parties to this MDL and all underlying lawsuits. *See generally*

---

[8] PersonalWeb and Level 3 define "PersonalWeb Patent Field" as "fields other than the Level 3 Exclusive Field" in which PersonalWeb has, among other rights, certain defined rights to use, practice, license, sublicense, enforce and/or litigate the Patents-in-Suit. First Am. Counterclaim ¶ 2.

1    ECF 1; 62.

2        The parties' dispute arises from Amazon's claim that PersonalWeb's allegations against

3    Amazon's CloudFront are in Level 3's Field of Use – not PersonalWeb's.  Amazon argues that "the

4    only reasonable interpretation" of the Agreement is that Level 3's exclusive Field of Use is content

5    delivery networks ("CDN") and because CloudFront is a CDN, patent infringement claims against

6    CloudFront are within Level 3's Field of Use.  Amazon Mot. at 13-14.   Accordingly, Amazon

7    asserts that because PersonalWeb does not have the right to enforce the asserted patents in the field

8    of CDNs, it lacks standing to accuse CloudFront of infringement.  *See id.*; Mot. JOTP at 4-6.  For

9    its part, Level 3, although a Plaintiff in this case, confirms that it is "not asserting patent infringement

10   in this case" and "takes no position regarding Amazon's Motion for Judgment on the Pleadings."

11   ECF 429 at 1.

12       PersonalWeb does not dispute that CloudFront is a CDN but responds that Level 3's Field

13   of Use does not include "*all* CDNs" and is limited to "CDN servers being at ISP sites."  Opp'n to

14   Amazon Mot. at 12-13.  PersonalWeb points to testimony of individuals who participated in the

15   negotiations that led to the Agreement to clarify what the contracting parties intended to include in

16   Level 3's Field of Use.  *Id.* at 12-15.  In PersonalWeb's view, at a minimum, "there are disputed

17   issues of material fact on issues of construction of the Agreement."  *Id.* at 12.  In addition,

18   PersonalWeb argues that any dispute regarding the scope of Level 3's Field of Use (and whether or

19   not it encompasses Amazon's CloudFront) is between the parties to the Agreement (*i.e.*,

20   PersonalWeb and Level 3) and Amazon has no basis to challenge PersonalWeb's standing because

21   the two co-owners have been parties to this action since its inception.  Opp'n to Mot. JOTP at 2-5.

22       The Court agrees with PersonalWeb that Amazon's challenge to PersonalWeb's standing to

23   bring suit against CloudFront is misplaced.  The Patent Act provides that a "patentee" has the right

24   to initiate a "civil action for infringement of [its] patent."  35 U.S.C. § 281. The term "patentee"

25   encompasses both the owner of the patent and the assignee of all substantial rights in the patent.

26   *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264 (Fed. Cir. 2010) (citing 35 U.S.C. § 100(d)).

27   PersonalWeb and Level 3 are parties to this action and together, they own 100% of the rights to the

28   asserted patents.  Amazon cites no authority for the proposition that standing is lacking where ***all***

owners of the asserted patents, who collectively own all the rights to those patents, are parties to an infringement action, as is the case here.

When courts consider standing issues in patent cases, they aim to protect (1) "alleged infringer from facing multiple lawsuits on the same patent" and (2) "the patentee from losing substantial rights if its patent claims are invalidated or the patent rendered unenforceable in an action in which it did not participate." *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1350 (Fed. Cir. 2016). Neither issue is present under the unique facts of this case. First, even if PersonalWeb's infringement claims against CloudFront are contrary to the terms of the Agreement, Amazon will not be facing multiple lawsuits because Level 3, as a party to this action, is bound by this Court's orders and judgment. Second, Level 3 has always been a party in this case and has had ample opportunity to participate in the proceedings and protect its rights. Thus, it is irrelevant whether Level 3 is "asserting patent infringement in this case," because Level 3—as a party—is just as bound by the judgment of this Court as it would have been if it had alleged infringement on its own behalf.

In sum, whether PersonalWeb's claims against CloudFront are in Level 3's Field of Use is an issue between PersonalWeb and Level 3 and does not affect any of Amazon's substantive rights. Therefore, the Court need not interpret the Agreement to resolve Amazon's standing challenge. Amazon's challenge to PersonalWeb's standing to bring infringement claims against CloudFront is hereby DENIED.

## IV.  ORDER

For the foregoing reasons:

(1) Amazon's Motion for Judgment on the Pleadings on Infringement Claims against CloudFront for lack of standing at ECF 413 (and ECF 99 in the Amazon Case) is DENIED.

(2) Amazon's Motion for Summary Judgment of Non-Infringement at ECF 541 (and ECF 155 in the Amazon Case) is GRANTED; Amazon's Motion for Summary Judgment on the alternative ground that PersonalWeb lacks standing at ECF 541 is DENIED.

(3) Twitch's Motion for Summary Judgment of Non-Infringement at ECF 542 (and ECF 67

in the Twitch Case) is GRANTED; Twitch's Motion to Exclude the Testimony of Erik de la Iglesia at ECF 542 (and ECF 67 in the Twitch Case) is DENIED as MOOT.

**IT IS SO ORDERED.**

Dated: February 3, 2020

BETH LABSON FREEMAN
United States District Judge

Downloaded from vLex by Rene Vazquez



Page 505

550 F.2d 505

Fed. Sec. L. Rep. P 95,892, 1 Fed. R. Evid. Serv. 661

MARX & CO., INC., et al., Plaintiffs-Cross-Appellants, v. The DINERS' CLUB, INC., et al., Defendants-Cross-Appellees.

The DINERS' CLUB, INC., et al., and Diners/Fugazy Travel, Inc., Defendants-Appellants, v. William D. FUGAZY et al., Plaintiffs-Appellees.

Nos. 159, 177, Dockets 76-7050, 76-7069.

United States Court of Appeals, Second Circuit.

Argued Oct. 18, 1976.

Decided Feb. 25, 1977.

[*506] Joseph J. Santora, New York City (Hardee Barovick Konecky & Braun, New York City, of counsel), for defendants-appellants and cross-appellees; Robert B. Kay, Robert B. McKay, Stephen Ross and Salvatore A. Raniere, New York City, on the brief.

James E. Tolan, New York City (Bruce E. Pindyck, Michael E. Twomey, Olwine, Connelly, Chase, O'Donnel & Weyher, New York City, and Barry I. Fredericks, Harris, Fredericks & Korobkin, New York City, of counsel), for plaintiffs-appellees and cross-appellants.

Before HAYS, ANDERSON and GURFEIN, Circuit Judges. *

GURFEIN, Circuit Judge:

This appeal by the Diners' Club, Inc. and Diners/Fugazy Travel, Inc. (collectively "Diners") arises out of a series of transactions whereby the Fugazys sold the assets of their company, Fugazy Travel Bureau, Inc. 1 ("Fugazy Travel") to Diners Club in return for unregistered stock in the latter company. The Fugazys, plaintiffs below, allege that the defendants fraudulently induced the sale, in violation of § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder, by representing that defendant Continental Corporation was about to "take over" Diners and that the failure of Diners to use its best efforts to make effective a registration of plaintiffs' shares was part of a manipulative device to induce the plaintiffs not to offer their shares for sale from October 10, 1967 to February 6, 1970. 2 The court ultimately submitted to the jury whether Diners breached its contractual obligation to use its best efforts to register

the plaintiffs' stock.

The defendants filed various counterclaims alleging, inter alia, that they were fraudulently induced by misrepresentations of plaintiffs to purchase Fugazy Travel.

Jurisdiction was based solely on Section 27 of the Securities Exchange Act of 1934. While diversity jurisdiction was not alleged, there was a properly pleaded claim arising under Section 10(b) and Rule 10b-5 under the 1934 Act. During the trial the plaintiffs, without formal amendment, pressed a breach of contract claim based on a failure of Diners to use its best efforts to register the stock, which we shall treat as a pendent claim. 3

[*507] The case was tried to a jury in the Southern District of New York before Honorable Robert J. Ward. The court directed a verdict for the defendants on the 10(b) claim and the plaintiffs appeal. The court entered judgment for the plaintiffs on a jury verdict holding Diners liable on a breach of contract claim in the amount of $533,000, plus pre-verdict interest, and finding for the plaintiffs on Diners' counterclaims and Diners appeals.

We affirm the dismissal of plaintiffs' § 10(b) claim as well as the dismissal of defendant's counterclaims. We reverse the judgment in favor of the plaintiffs for breach of contract, and remand for a new trial.

I

Under an agreement dated October 10, 1967, Diners acquired the assets of Fugazy Travel in return for unregistered Diners stock and other consideration. Paragraph 10.2(b) of the acquisition agreement provided that, upon receipt of notification from plaintiffs that they desired registration, Diners would promptly file a registration statement for the unregistered Diners stock held by plaintiffs and would use its best efforts to cause the registration statement to become effective. 4 Plaintiffs requested Diners to file such a registration statement in April 1969. Preparation of the registration statement did not begin until July 1969, however, and it was not filed until August 28, 1969. This registration statement never became effective; it was ultimately withdrawn, over the protest of plaintiff Marx, early in 1970. 5

Downloaded from vLex by Rene Vazquez



The issues of fact tendered were whether Diners had filed a registration statement **[\*508]** promptly upon request and whether it had used its best efforts to make it effective. Plaintiffs contended that Diners should have filed on or about June 20, 1969 when its audited financials for the fiscal year ending March 31, 1969 were available and that preparatory work should have been begun immediately upon receipt of the request. 6 Diners contended that it was under no duty to file immediately because of plaintiffs' failure and refusal to fulfill certain conditions precedent to such registration rights, such as tendering one-half of the costs of registration, together with an indemnity agreement which the plaintiffs allegedly refused to give until August 24, just four days before the actual filing. 7 Diners also contended that, after the plaintiffs had formally requested the registration on April 16, 1969, the plaintiffs, during the next six to eight weeks were advancing certain alternative proposals to avoid the necessity for filing a registration statement, and that this may have resulted in a delay in commencement of the preparation of the registration statement. 8 Diners also pointed out that it had the right, which it exercised, to include in its registration statement other securities and hence, it had to obtain information regarding the other security holders which may have resulted in a delay in filing.

With regard to whether Diners used its best efforts to make the registration effective, Diners contended that within two weeks of receipt of the SEC's comments on the registration, which was received about two months after filing, it wrote two letters in response and attended a conference with the Commission staff to resolve these comments. It also noted that William D. Fugazy himself testified that there were "monumental problems" in causing the registration statement to become effective.

The jury found against Diners on these contentions. We agree with Judge Ward that there was sufficient evidence to support the verdict. Marx & Co., Inc. v. Diners Club, Inc., 400 F.Supp. 581 (S.D.N.Y.1975). The crucial issue, sufficiently posed by objection below, is whether, notwithstanding the general discretion allowed to trial judges respecting expert testimony, see Sanchez v. Safeway Stores, Inc., 451 F.2d 998 (10th Cir. 1971); Casey v. Seas Shipping Co., 178 F.2d 360 (2d Cir. 1949), the admission of the testimony of a securities law expert, Stanley Friedman, was, in the circumstances, an error of law and highly prejudicial. His testimony construed the contract, as a matter of law, and includes his opinion that the defenses of Diners were unacceptable as a matter of law. In his denial of defendant's motion for a directed verdict at the close of the evidence, the judge indicated that the plaintiffs had made a prima facie case through Friedman.

We hold that the District Court erred in permitting Friedman, an expert witness called by plaintiffs, to give his opinion as to the legal obligations of the parties under the contract. Mr. Friedman, a lawyer and a witness not named in the pretrial order, was called as a rebuttal witness on the last day of a three-week trial. 9 Friedman was qualified as an expert in securities regulation, and therefore was competent to explain to the jury the step-by-step practices ordinarily followed by lawyers and corporations in shepherding a registration **[\*509]** statement through the SEC. Indeed, Friedman had done so as an expert witness on previous occasions. In Republic Technology Fund, Inc. v. Lionel Corp., 483 F.2d 540, 552 (2d Cir. 1973), this Circuit reversed the dismissal of a breach of contract claim that the defendant had failed to cause a registration statement to become effective within a reasonable time. 483 F.2d at 552. The issue there was whether a delay of one year before the S-1 became effective was a result of an originally misleading interim statement accompanying the S-1, in which event, "the delay may well have been unreasonable." Id. Mr. Friedman gave expert testimony that six to eight weeks was all that should have been necessary to effectuate a registration statement because "much of the work going into it had already been done" in the preparation of a proxy solicitation filed by the surviving corporation in a merger. This testimony concerned the practices of lawyers and others engaged in the securities business. 10 Testimony concerning the ordinary practices of those engaged in the securities business is admissible under the same theory as testimony concerning the ordinary practices of physicians or concerning other trade customs: to enable the jury to evaluate the conduct of the parties against the standards of ordinary practice in the industry. See VII Wigmore on Evidence § 1949, at 66 (3d ed. 1940). 11

In the case at bar, however, witness Friedman's objectionable testimony did not concern only the customary practices of a trade or business. Rather, he gave his opinion as to the legal standards which he believed to be derived from the contract and which should have governed Diners' conduct. He testified not so much as to common practice as to what was necessary "to fulfill the covenant" (of the contract). For example, over the objection of defense counsel, he said that:

"I construe 'best efforts' in the context of a covenant to register shares as the assumption on the part of the person who gives the covenant an absolute, unconditional responsibility, to set to work promptly and diligently to do everything that would have to be done to make the registration statement effective. . . ." (emphasis added)

Downloaded from vLex by Rene Vazquez



Counsel made timely objection "that's a legal conclusion." Similarly, the witness opined that "the best efforts obligations requires you to pursue the registration statement unless there is cause beyond your control." 12 This testimony did not concern practices in the securities business, on which Friedman was qualified as an expert, but were rather legal opinions as to the meaning of the contract terms at issue. It was testimony concerning matters outside his area of expertise. See Federal Rule of Evidence 702. Moreover, it would not have been possible to render this testimony admissible by qualifying Friedman as an "expert in contract law." It is not for witnesses to instruct the jury as to applicable principles [*510] of law, but for the judge. As Professor Wigmore has observed, expert testimony on law is excluded because "the tribunal does not need the witness' judgment. . . . (T)he judge (or the jury as instructed by the judge) can determine equally well. . . ." The special legal knowledge of the judge makes the witness' testimony superfluous. VII Wigmore on Evidence § 1952, at 81. See 3 Corbin on Contracts § 554, p. 227 (1960). ("Construction (of a contract) is always a matter of law for the Court"). Accord, Loeb v. Hammond, 407 F.2d 779 (7th Cir. 1969) (testimony of attorney on legal significance of documents was properly excluded). "The question of interpretation of the contract is for the jury and the question of legal effect is for the judge. In neither case do we permit expert testimony." Id. at 781. 13

Not only did Friedman construe the contract, but he also repeatedly gave his conclusions as to the legal significance of various facts adduced at trial. He testified on direct examination that, pursuant to its contractual obligation, Diners Club "should have" filed its registration on or about June 20, 1969, and not at the end of August, and therefore concluded that Diners Club did not use its best efforts promptly to file. He asserted that it would not be a legal excuse (1) that Diners' employees may have been occupied in other activities, or (2) that the parties to the contract were simultaneously attempting to renegotiate the contract, "Therefore, I don't see that it excuses performance" or (3) that plaintiffs had failed to advance one-half of the costs of the registration. 14 He also gave it as his legal opinion that the fact that the parties were exploring alternatives was not a legal waiver by the plaintiffs of the requirement that Diners go forward.

Friedman was also permitted to testify, over

objection, that correspondence between the litigants relating to the payment of one-half the cost of registration by the plaintiffs, including a letter to plaintiff Marx dated July 15, was irrelevant "because the registration statement would have been filed by approximately June 20th and therefore this question comes up very much after the fact." Friedman himself conceded that his opinions were based in part on his "experience and use of the English language." His conclusion that Diners Club had no legal excuses for nonperformance was based merely on his examination of documents and correspondence, which were equally before the judge and jury. Thus Friedman's opinion testimony was superfluous. See VII Wigmore on Evidence, § 1918. 15 As Professor McCormick notes, such testimony "amounts to no more than an expression of the (witness') general belief as to how the case should be decided." McCormick on Evidence, § 12 at 26-27. The admission of such testimony would give the appearance that the court was shifting to witnesses the responsibility to decide the case. McCormick on Evidence § 12, at 27. It is for the jury to evaluate the facts in the light of the applicable rules of law, and it is therefore erroneous for a witness to state his opinion on the law of the forum. Loeb v. Hammond, supra. 16 To the prompt objections [*511] that segments of Friedman's testimony were legal conclusions, the trial judge responded by refusing to strike the testimony and by telling counsel he could cross-examine. But in such circumstances, compelling the opponent to cross-examine to repair the damage is to invite disaster, for much will turn on the obstinacy of the expert, and repetition before a jury, especially on cross-examination, is likely to impress the jury. The applicable law, not being foreign law, could, in no sense, be a question of fact to be decided by the jury.

The limits of expert testimony in securities cases should not be too difficult to draw. While the able trial judge below recognized that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," Fed.R.Ev. 704, he failed, in our view, sufficiently to emphasize "otherwise admissible." 17 With the growth of intricate securities litigation over the past forty years, we must be especially careful not to allow trials before juries to become battles of paid advocates posing as experts on the respective sides concerning matters of domestic law. See La Chemise Lacoste v. Alligator Company, Inc., 59 F.R.D. 332, 333 (D.Del.1973).

Downloaded from vLex by Rene Vazquez



One final aspect of Friedman's testimony was objectionable. The expert's dogmatic view that the registration statement should have become effective not more than 70 days after it was filed, derived not from an analysis of the facts involved in formulating this particular registration statement of this particular travel agency, but rather directly from an SEC Report statistic of the median time for such effectiveness, covering all sorts of companies in a variety of industries. The trial judge judicially noticed that the median figure was 70 days, but this hardly justified the categorical conclusions tendered to the jury by the witness as if that precise figure were irrefutable evidence on "reasonableness." Indeed, as we have seen, the witness boldly asserted that any questions relating to the period after the end of August 1969, when the registration "should have" become effective, were "irrelevant."

The issue for the jury was whether Diners' conduct was reasonable in the circumstances in which it found itself not what a median statistic showed. The statistic could have served as a possible starting point for the discussion of the particular issue involved, but it should not have been given to the jury as if it were akin to a statute of limitations without regard to the particular facts. In that sense, we would grant its relevance, however slight it might be, in evaluating it with other facts. See Fed.R.Ev. 401. In the frame within which it was used, however, the statistic, though relevant, became an item of prejudicial overweight. See Federal Rule of Evidence 403. 18

There is no doubt that in assessing damages, the jury found that, pursuant to Friedman's testimony, the registration statement should have become effective on August 29, for it measured the damages by the market price of the Diners' stock on that day, $23.50 less the $15 price received by the Fugazys on the subsequent tender offer. 19

[*512] The basis of expert capacity, according to Wigmore (§ 555), may "be summed up in the term 'experience.'" But experience is hardly a qualification for construing a document for its legal effect when there is a knowledgeable gentleman in a robe whose exclusive province it is to instruct the jury on the law. The danger is that the jury may think that the "expert" in the particular branch of the law knows more than the judge surely an inadmissible inference in our system of law. 20

In the securities law field, as in taxation, there are areas in which the expert can testify. Of course, opinions on value are clearly within the province of the knowledgeable expert. See, e. g., Spitzer v. Stichman, 278 F.2d 402, 409 (2d Cir. 1960). Illustratively also, he may testify how the bid and asked price of an over-the-counter security gets into the "pink sheets," how price stabilization works, or how a stock exchange specialist operates. But these examples have their counterparts in non-admissibility. The expert, for example, may tell the jury whether he thinks the method of trading was normal, but not, in our view, whether it amounted to illegal manipulation under Section 9 of the Securities Exchange Act of 1934. He may explain the nature of an option contract, or of a convertible preferred stock, but we doubt that he should be allowed to testify that under an option agreement one party or the other has acted unlawfully, or that a corporation should be held liable because through a recapitalization it changed the conversion ratio and that this was a breach of contract. See United States v. Cohen, 518 F.2d 727, 737 (2d Cir. 1975). 21

Recognizing that an expert may testify to an ultimate fact, and to the practices and usage of a trade, we think care must be taken lest, in the field of securities law, he be allowed to usurp the function of the judge. In our view, the practice of using experts in securities cases must not be permitted to expand to such a point, and hence we must reluctantly conclude that the leeway allowed Friedman was highly prejudicial to the appellant.

II

Diners contends that it should have had a directed verdict because it had entered into an accord and satisfaction with the plaintiffs on August 27 providing that if the Fugazys signed and performed a written agreement acknowledging the prior Payment Condition, acknowledging their non-performance of the condition, and evidencing their undertaking to guarantee personally the obligation to pay one-half the expenses and if they delivered a proper indemnity agreement, Diners would proceed with the filing of the registration statement.

Diners raised the defense of accord only after verdict. It did not request its submission to the jury. If the issue had been presented in timely fashion, the existence of the accord would have been a question of fact for the jury. Judge Ward correctly rejected the belated argument.

III

Downloaded from vLex by Rene Vazquez



Defendants Diners and Diners/Fugazy Travel filed three counterclaims against plaintiffs. The first counterclaim, based on Rule 10b-5, alleged that defendants had been defrauded by the plaintiffs [*513] into purchasing the assets of Fugazy Travel through misrepresentations and omissions concerning the nature and worth of those assets. The second counterclaim alleged that the Fugazys breached their common-law fiduciary duties to Diners and Diners/Fugazy Travel, arising from their capacities as officers and directors, by engaging in various self-dealing practices, including retention of an interest in Travelco, Inc., a franchisee of Fugazy Travel. The third counterclaim alleged that the misrepresentations and omissions underlying the first counterclaim also constituted breaches of the Purchase Agreement which, inter alia included warranties of full disclosure.

Evidence was presented by each side, and Judge Ward submitted the counterclaims to the jury in the form of a separate special verdict. The jury answered in favor of the plaintiffs on the counterclaims. After the verdict, the defendants moved to set it aside and the court denied the motion, as it had previously done on a motion for a directed verdict. Diners does not complain of the charge, but bases its appeal on the ground that the court erred in denying Diners' motions for a directed verdict and for judgment, Rule 50(b), on the counterclaims. Diners also complains of the exclusion of certain evidence relevant to its counterclaims. We affirm the judgment on the counterclaims.

Defendants' argument is essentially that the jury's verdict was unsupported by the evidence. It was established at trial that the Fugazys contracted in the Purchase Agreement and in their employment contracts not to engage in the travel business or to retain an interest in such a business. At the closing, the Fugazys signed affidavits that they had divested themselves of any such interest. It later appeared that, with respect to Travelco, some relationship continued to exist, through a management service contract with Travelco, pursuant to which the Fugazys were officers and directors. This was disclosed prior to the closing.

There was evidence, however, that the Fugazys had entered into an indemnity agreement with one Irwin Fruchtman, the purchaser of their interest in Travelco. The indemnity agreement provided, inter alia, that when a certain bank loan of Travelco (which Fruchtman had guaranteed and for which he was to be indemnified) was paid, the Fugazys would have the option to acquire 60% of the shares of Travelco for $1.00. Whether this indemnity agreement was disclosed was the subject of some dispute. As Judge Ward said in his opinion denying the Rule 50(b) motion for judgment, "The jury chose to believe plaintiffs." We can add nothing

to that gem of succinctness.

Judge Ward properly left it to the jury to determine whether the option provision of the indemnity agreement was an "interest" within the meaning of the contract. Defendants did not object to the charge, nor did they request any addition thereto. There was no evidence that plaintiffs had ever exercised their option.

Thus, there was sufficient evidence to support the verdict on all the counterclaims. Defendants also contend, however, that the District Court erred in excluding evidence relevant to its first and third counterclaims, based on alleged misrepresentations and omissions. There were three pieces of evidence said to have been wrongfully excluded, as follows: (1) the circumstances surrounding a prior unrelated lawsuit entitled "Fugazy Travel Bureau, against Tower Credit Company"; (2) a memorandum on the stationery of Fugazy Travel purportedly reflecting an offer to sell that company in 1966 to Pierbusseti, Inc. through one Piscatella for $250,000, plus the assumption of $350,000 in liabilities; (3) testimony by Piscatella to the effect that Mr. Fugazy was aware in 1966 of pitfalls in the franchising concept which was sold to Diners in 1967. Defendants urge that all three items were probative of the Fugazys' knowledge and belief at the time that they sold the assets in Fugazy Travel, Inc.

(1) With respect to the Tower Credit Company lawsuit, which took place five years before the Diners transaction, Judge Ward acted well within his discretion in refusing to admit the unsworn complaint filed in that litigation. Since it was unauthenticated [*514] hearsay involving a case that had been settled, and since the purpose for which Diners intended to use the unsworn complaint was avowedly to prove a prior fraud, the prejudicial effect of the unsworn complaint outweighed its probative value. Fed.R.Evid. 403.

(2) The unsigned memorandum was excluded on the basis of lack of authentication to bind these plaintiffs. A witness, Piscatella, did testify that he received it from Summerlin and that he subsequently had a meeting with Marx. We cannot say that the judge abused his discretion in excluding the unsigned memorandum, since the development of its background and consequent anticipated rebuttal might have tended to a confusion of issues requiring a minitrial in itself.

(3) Piscatella was permitted to testify to conversations with William Fugazy concerning the operations of his company. The judge stated that he would accept proof of admissions made, even in 1966, but that he would not accept the "self-serving positive statements" of the witness that he had personally evaluated the franchising concept and that, in his opinion, it was worthless. No further admissions were offered, and the judge's ruling was correct.

IV

Downloaded from vLex by Rene Vazquez



The District Court directed a verdict for defendants on plaintiffs' claim, under Rule 10b-5, that they were induced to sell Fugazy Travel Bureau in October 1967, on the basis of representations concerning the timing of the Continental takeover. The takeover unquestionably was effectuated in 1970; the claim is that it took place later than was allegedly represented to them. Judge Ward concluded that, as a matter of law, the defendants made no material misrepresentations prior to the closing date as to the specific date or time of the takeover; and that the plaintiffs did not rely on any representations regarding the timing of the takeover.

At trial, plaintiff Louis Fugazy testified that in October 1967 one officer of Diners Club told him that the takeover was "imminent." Plaintiff Marx testified that he was similarly told that "there would be a takeover in the foreseeable future." Plaintiff William Fugazy was told that Continental would acquire Diners "very shortly." On their cross-appeal plaintiffs contend that these were "specific representations" concerning the timing of the takeover, which was, in fact, not consummated for almost three years.

We agree with the District Court that plaintiffs did not make out a prima facie case under Rule 10b-5. As Judge Ward observed, there was no evidence that defendants indicated any specific time or method by which the takeover would occur. The general statements which were made (viewing the evidence most favorably to plaintiffs) did not constitute material misrepresentations of fact.

We need not hold that plaintiffs did not rely on these statements, although it is certainly difficult to believe that plaintiffs, sophisticated investment bankers and businessmen, would have governed their conduct in reliance on such imprecise representations. Similarly, we need not hold that these alleged representations were immaterial as a matter of law, although a reasonable man would certainly be hesitant to attach great importance to such indefinite predictions of the future. See Radiation Dynamics, Inc. v. Goldmuntz, 464 F.2d 876 (2d Cir. 1972), citing SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 849 (2d Cir.), cert. denied sub nom. Coates v. SEC, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1968); List v. Fashion Park, Inc., 340 F.2d 457 (2d Cir.), cert. denied sub nom. List v. Lerner, 382 U.S. 811, 86 S.Ct. 23, 15 L.Ed.2d 60 (1965). For the defendants never represented as a fact that

a takeover would occur within a certain period. They merely gave their general predictions as to future events. Thus, plaintiff Summerlin testified that he had been told that there was a probability of a takeover. Plaintiff Marx recognized that there was only a "possibility or probability" of a takeover, and he personally participated in attempts to try to effectuate the transaction. Plaintiff William Fugazy was told that it "looked like" [*515] Continental was going to acquire Diners. 22 Given the nature of these statements, we think the District Court properly noted the absence of any representations of specific timing. The general nature of the predictions precludes them from being representations of fact.

To establish such a misrepresentation, plaintiffs had the burden of showing that, in making these predictions as to the takeover, defendants acted with scienter, that is, an intent to deceive, manipulate or defraud. Ernst & Ernst v. Hochfelder, 425 U.S. 185, 96 S.Ct. 1375 at 1381, 47 L.Ed.2d 668 & n. 2 (1976). They did not meet this burden. There was, on the contrary, evidence that they exerted substantial efforts to bring these predictions to fruition. And, of course, it is undisputed that the takeover was effected in 1970.

Affirmed in part; reversed in part and remanded.

---

* Judge Hays concurred in the disposition of the appeal but has not had an opportunity to review the opinion because of illness.

1 The sellers included plaintiffs Marx and Co., Inc., Otto Marx, Jr., John V. Summerlin, Jr., William D. Fugazy and Louis V. Fugazy, collectively referred to as "the Fugazys."

2 Plaintiffs initially maintained that defendants also violated Rule 10b-5 by fraudulently inducing them to agree to an amendment of their employment contracts. The jury returned a verdict for the defendants on this claim and the plaintiffs do not appeal.

3 While there was no formal amendment of the complaint at trial, we think that the judge acted within his discretion in submitting the breach of contract issue to the jury, since the alternative claim was no surprise from the time of the pretrial order and the plaintiffs' opening to the jury, as well as from the briefs submitted. See Fed.R.Civ.P. 15(b). Moreover, the special verdict form which set forth separately plaintiffs' breach of contract claim was approved by counsel for the defendant.

Downloaded from vLex by Rene Vazquez



Diners maintains that the verdict was contrary to the weight of the evidence; that it was entitled to a directed verdict because its performance was excused by the Fugazys' failure to perform certain conditions precedent, viz., to tender funds sufficient to reimburse Diners for one-half of all registration expenses and to deliver an indemnity agreement, see note 4, infra, that the District Court erred in refusing to apply the defense of accord and satisfaction to bar the claim; and that the testimony of a key witness for the plaintiff, a lawyer named Stanley Friedman, went beyond the proper scope of expert testimony and was prejudicial. Plaintiffs urge, by contrast, that the evidence shows that Diners neither filed a registration statement promptly nor used its best efforts to cause it to become effective and that plaintiffs' performance of its obligations under the contract was hindered by Diners Club; that the defense of accord was never tried and, therefore, properly rejected; and that the testimony of plaintiffs' expert witness was properly admitted.

4 Paragraph 10.2(b) provides:

"If Diners shall not have filed any such registration statement subsequent to January 1, 1968 and before January 1, 1969, then, provided there are outstanding more than 25,000 shares bearing legend provided for in Section 10.1(c) hereof, the registered holders thereof (but not less than all of them) may at any time after January 1, 1969, notify Diners that they desire that Diners file such a registration statement, but only with respect to all such shares then owned by all such holders. Unless Diners shall have received an opinion from its counsel that registration is not required, or if Diners and all such registered holders, together proceeding expeditiously and in good faith after such notice, cannot obtain from the Securities and Exchange Commission a 'no-action' letter with respect to the sale of such shares, then Diners shall promptly file a registration statement and use its best efforts to cause such registration statement to become effective. Diners may include in such registration statement such other of its securities as it may desire. Anything to the contrary notwithstanding, Diners need not file any such registration statement until it may lawfully use its regularly prepared fiscal year end financial statements, as a part of such registration statement. The notifying holders shall pay Diners in advance an amount sufficient to reimburse Diners for one-half of all registration fees, printing costs, auditing fees (but only in excess of normal fees paid by Diners for its fiscal year end audit, legal fees and all other incidental out-of-pocket expenses incurred in connection with such registration statement)."

5 Before the registration statement was withdrawn, defendant Continental Corporation made a public tender offer for Diners stock. The Fugazys sold most of their shares to Continental at $15 a share, which was less than the market price at the time that the registration statement was filed, though more than the market price at the time of tender.

6 There was some evidence that Diners' officials considered Marx' request for registration a move to get Continental to buy him out and that one officer's reaction was "to do nothing."

7 In April, 1969, plaintiffs indicated that they were "prepared and hereby offer . . . to furnish the indemnity agreement. . . ." No formal agreement actually was signed and tendered until August, however.

8 For example, on May 19, 1969, Marx wrote to Diners setting forth an alternative proposal so that the Fugazys' Diners shares "would not have to be registered at this time" and solicited alternative proposals in lieu of registration.

9 Our holding with regard to the inadmissibility of the substance of Friedman's testimony makes it unnecessary to consider defendant's contentions that he was a surprise witness and an improper rebuttal witness. We note, however, that the prejudicial effect of Friedman's improperly admitted testimony may well have been heightened by the fact that he testified as the last witness on the last day of a three week trial.

10 In the Republic Technology case Mr. Friedman gave testimony concerning the practices of people engaged in this business: that it would be the practice of a prudent lawyer to research blue sky laws prior to the issuance of securities, that it would be unprofitable business practice to cause a registration statement to become effective prior to an imminent merger, and that the ordinary practice of the SEC would be to refer the registration statement to the same SEC staff that had handled the proxy solicitations of the company. Republic Technology, supra, Appendix on Appeal 292, 293, 297, 303-04.

11 Of course, expert testimony concerning the practices of a particular trade or business is not admissible if, as a matter of substantive law, only the jury's common understanding and not the customary practices or usages are relevant. Cf. Royal Loan Co. v. United States, 154 F.2d 556 (8th Cir. 1946) (testimony of securities dealers superfluous in action to recover documentary stamp tax levied on instruments "known generally as corporate securities.")

Downloaded from vLex by Rene Vazquez

12 Apparently Friedman gave similar testimony concerning the content of the "best efforts" obligation in Republic Technology Fund, Inc. v. Lionel Corp., supra, Appendix on Appeal at 279, 283, 591-93, a case tried to the court without a jury. The propriety of this testimony was not before the court on that appeal, however, because the district court had dismissed the complaint notwithstanding this testimony. Although defense counsel had objected to this testimony at trial, they did not appeal its admission since they had won below. In reversing the trial judge, moreover, this court did not rely on the improper testimony as the ground for its decision to remand.

13 Kirkland v. Nisbet, 3 Macq.Sc.App. C 766 (1859), "Evidence as to mercantile usage may be received; . . . but you cannot ask a witness what is the meaning of a written document."

14 The District Court overruled defense objections to this testimony, noting that defense counsel would have "a chance to cross-examine" Friedman. On this cross-examination Friedman amplified his view that the plaintiffs' obligation to advance costs was not a condition precedent, commenting that "Mr. Marx behaved in a reasonable way and . . . it was Diners that was behaving unreasonably. . . ." He concluded that the contractual provision for costs was "impossible of fulfillment." On cross-examination he also asserted that Diners Club was not legally justified in waiting for plaintiffs to furnish the indemnity agreement required under the contract.

15 Cf. Hawkins v. Chandler, 88 Idaho 20, 396 P.2d 123 (1969) (highway patrolman improperly testified as to reasonableness of conduct of driver of disabled wrecker); Grismore v. Consolidated Products Co., 232 Iowa 328, 5 N.W.2d 646 (1942) (abolition of "ultimate issue" rule does not mean witnesses may express opinions as to whether conduct measures up to the requisite legal standard).

16 Cf. Helms v. Sinclair Refining Co., 170 F.2d 289 (5th Cir. 1948) (oil distributor's legal conclusion that he was under a contractual duty to make a shipment); Briney v. Tri-State Mut. Green Dealers Fire Ins. Co., 254 Iowa 673, 117 N.W.2d 889 (1962) (testimony by claims agent as to the legal effect of the relationship between independent adjusters and the insurance company was properly excluded).

17

"The abolition of the ultimate issue rule does not lower the bars so as to admit all opinions. Under Rules 701 and 702, opinions must be helpful to the trier of fact, and Rule 403 provides for exclusion of evidence which wastes time. These provisions afford ample assurances against the admission of opinions which would merely tell the jury what result to reach, somewhat in the manner of the oath-helpers of an earlier day." Notes of Advisory Committee on Proposed Rule 704, Fed.R.Evid.

18 In the words of Judge Friendly, "the leap required to derive any rational conclusion from the expert's data was too great to allow a jury to take." Herman Schwabe, Inc. v. United Shoe Machinery Corp., 297 F.2d 906, 912 (2d Cir. 1962).

19 Friedman misconceived the meaning of "median." The median figure simply means that half of the registration statement took less than 70 days to become effective, and that half took more than 70 days. The jury was never told that fully half the registration statements actually took more than 70 days. Nor was any indication given to the jury of the longest period for becoming effective, nor were any reasons given for the disparity in time between the effective date of one registration statement against another. The statistic, while admissible by a stretching of relevance, should not have been accepted as undisputed fact on which to build an expert opinion without further explanation of its meaning.

20 Cf. Huff v. United States, 273 F.2d 56 (5th Cir. 1959) (testimony by government customs inspector concerning "commercial" nature of imported goods); Warren Petroleum Co. v. Thomasson, 268 F.2d 5 (5th Cir. 1959) (testimony by police officer as to liability for auto accident which he witnessed). We cannot ignore the tendency of juries on occasion "to decide simply according to the preponderance of numbers and of influential names. . . ." VII Wigmore on Evidence § 1918, at 11; see Duncan v. Mack, 59 Ariz. 36, 122 P.2d 215 (1942).

21 In Cohen, we affirmed Judge Ward in permitting the Chief of the Branch of Small Issues to give her expert opinion of the reach of the concepts of "underwriter" and "materiality."

22 Plaintiffs put great emphasis on an alleged response of Victor Herd, the head of Continental Insurance to an inquiry about his takeover plans: "Well, you don't court a girl unless you are going to marry her."

But this evidence has the same infirmity as the rest of plaintiffs' case: the only fact that was represented was Continental's general intent to effectuate the acquisition.



# Bausch & Lomb, Inc. v. Alcon Laboratories, Inc., 79 F. Supp. 2d 252 (W.D.N.Y. 2000)

**U.S. District Court for the Western District of New York - 79 F. Supp. 2d 252 (W.D.N.Y. 2000)**
**January 5, 2000**

---

**79 F. Supp. 2d 252 (2000)**

**BAUSCH & LOMB, INC., Plaintiff,**
**v.**
**ALCON LABORATORIES, INC., Defendant.**

No. 94-CV-6534L.

**United States District Court, W.D. New York.**

January 5, 2000.

**\*253 \*254** Michael Wolford, Wolford & Leclair LLP, Rochester, NY, Denis A. Polyn, Jill K. Schultz, Bausch & Lomb, Incorporated, Rochester, NY, Robert L. Baechtold, Scott K. Reed, Dominick A. Conde, Gregory B. Sephton, Daniel R. Cahoy, Fitzpatrick, Cella, Harper & Scinto, New York City, for Bausch & Lomb Incorporated, plaintiff.

William L. Dorr, Harris, Beach & Wilcox, Rochester, NY, W. Edward Bailey, Kevin J. Culligan, A. Peter Adler, Charles A. Krauss, Fish & Neave, New York City, for Alcon Laboratories, Inc., defendant.

Denis A. Polyn, Jill K. Schultz, Bausch & Lomb, Incorporated, Rochester, NY, Robert L. Baechtold, Scott K. Reed, Steven C. Kline, Fitzpatrick, Cella, Harper & Scinto, New York City, for Bausch & Lomb Incorporated, counter-defendant.

### *DECISION AND ORDER*

LARIMER, Chief Judge.

Bausch & Lomb Incorporated ("B & L"), the plaintiff in this patent infringement action, has filed a motion to preclude defendant Alcon Laboratories, Inc.'s ("Alcon") patent law expert, Robert L. Harmon, Esq., from testifying at trial. B & L contends that Alcon intends to call Harmon as a witness almost solely for the purpose of having him instruct the jury on Alcon's view of the law, thereby invading the exclusive province of the court. Alcon contends that B & L has mischaracterized Harmon's proposed testimony, and that all he will testify about are Patent and Trademark Office ("PTO") practices and procedures regarding the examination of patent applications, reexamination proceedings, interferences, and so on.

### DISCUSSION

#### I. Expert Testimony Concerning Legal Issues

Although any appeal of this decision would be to the Court of Appeals for the Federal Circuit, that court, in reviewing a district court's exercise of its discretion in determining an issue not unique to patent law, looks to the law of the circuit in which the district court sits. *Odetics, Inc. v. Storage Tech. Corp.,* 185 F.3d 1259, 1276 (Fed.Cir.1999) ("Because these evidentiary rulings raise procedural issues not unique to patent law, this court applies the law of the regional circuit where appeals from the district court would normally lie"); *WMS Gaming, Inc. v. International Game Tech.,* 184 F.3d 1339, 1361 (Fed.Cir.1999); *Dome Patent, L.P. v. Permeable Technologies, Inc.,* 190 F.R.D. 88, 92 (W.D.N.Y.1999). Matters involving evidentiary issues, such as whether to exclude testimony, are therefore governed by the law of the circuit in

which the district court is located. *See Mainland Indus., Inc. v. Standal's Patents Ltd.,* 799 F.2d 746, 749 (Fed.Cir.1986) ("Application of the rules of evidence is a procedural matter ..."; applying law of Ninth Circuit to evidentiary issue), *overruled on other grounds by A.C. Aukerman Co. v. R.L. Chaides Const. Co.,* 960 F.2d 1020 (Fed. Cir.1992). Thus, in deciding B & L's motion, I am governed by Second Circuit law.

Expert testimony should not be admitted if it will not "assist the trier of fact." Fed.R.Evid. 702. District courts therefore have the duty to ensure that an expert witness's testimony "rests on a reliable foundation." *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993). District courts have "broad discretion" in **\*255** deciding whether to admit expert testimony. *Fiataruolo v. United States,* 8 F.3d 930, 941 (2d Cir. 1993).

The Second Circuit has cautioned that "[t]he liberal rules governing expert testimony ... were not designed to open the door for the admission of all sorts of expert opinions thereby trespassing on the province of the jury and the trial court." *Id.* Although Rule 704 of the Federal Rules of Evidence states that "testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact," the Court of Appeals has also stated that "Rule 704 was not intended to allow experts to offer opinions embodying legal conclusions." *United States v. Scop,* 846 F.2d 135, 139 (2d Cir.1988). Simply put, testimony that is designed to instruct the jury on the applicable law is not admissible because, by purporting to do what lies with the exclusive province of the court, it cannot be helpful to the jury. *Id.* at 140.

**II. Harmon's Proposed Testimony**

Harmon is an attorney with a Chicago law firm. He states that his entire legal career, which began in 1963, has been spent in the field of intellectual property law. Harmon holds a Bachelor of Science degree in electrical engineering in addition to his law degree. He is the author of a treatise, *Patents and the Federal Circuit* (BNA 1994).

In his expert report prepared for this litigation, Harmon states that he expects to testify about a number of matters. I will address these *seriatim.*

**A. Patent Applications And How They Are Examined**

The first area about which Harmon expects to testify he describes as "Patent Applications And How They Are Examined." Expert Report of Robert L. Harmon ("Report"), B & L's Memorandum in Support of its Motion to Preclude Alcon's Patent Law Expert Ex. 2 at 4. To the extent that Alcon intends to elicit testimony from Harmon concerning the general procedures involved in the patent application process, such testimony may be helpful to the jury, and is therefore admissible. *See, e.g., Revlon Consumer Products Corp. v. L'Oreal S.A.,* No. 96-192, 1997 WL 158281 *3 (D.Del. Mar. 26, 1997) (defendants' expert would be allowed to "testify only as to matters of PTO practice and procedure"); *Cameco Indus., Inc. v. Louisiana Cane Mfg., Inc.,* No. 92-3158, 1995 WL 468234 *4 (E.D.La. July 27, 1995) (permitting expert to testify "about the patent application process, the operations and functions of the patent and trademark office, and the materiality of relevant prior art").

Harmon also states, however, that he expects to testify about "the problems Examiners encounter with the completeness or `file integrity' of the `shoes'[1] maintained at the PTO," and "the difficulties Examiners face in discovering and obtaining prior art references other than patents...." Report ¶ 12. He also "intend[s] to explain the time constraints under which Examiners in the PTO must operate." Report ¶ 13. I find such testimony to be inadmissible. It appears that the purpose of this testimony would be to attempt to undermine the presumption of validity under 35 U.S.C. § 282 by inviting the jury to speculate about possible defects, errors, or omissions in the application process that led to the issuance of the patent-in-suit ("the '607 patent"). If Alcon has evidence that there actually were defects in the particular application process at issue in this case, thus suggesting that deference to the PTO's determination may not be appropriate, it may seek to offer such evidence. But generalized testimony **\*256** about "problems" in the PTO is not admissible. *See Applied Materials, Inc. v. Advanced Semiconductors Materials America, Inc.,* No. 92-20643, 1995 WL 261407 *3 (N.D.Cal. Apr. 25, 1995) (excluding expert testimony concerning overwork at the PTO and other matters insinuating that the PTO does not do its job properly, as "irrelevant speculation"). As did the court in *Applied Materials,* however, I caution plaintiff that if it opens the door by suggesting that "some extraordinary deference is due in this case," *id.,* the court may revisit this

ruling.

**B. Interference and Reexamination**

Harmon states that he expects to testify about the "nature and purpose" of both interference and reexamination practice and procedure, including the terminology commonly used in those procedures. Report ¶ 16. Although B & L contends that Alcon seeks to have Harmon put his own "spin" on those procedures, B & L's Supplemental Reply Brief at 5, at this point I will not preclude this testimony. Obviously PTO procedures are foreign to the average person, and it may be helpful to the jury to hear someone experienced in those procedures explain how they operate in terms that a layperson can understand. If Harmon's testimony at some point strays beyond that into matters that are irrelevant or otherwise inadmissible, B & L can object at trial.

**C. Effective Filing Date of the '607 Patent**

Harmon states that he expects to testify about several matters relating to the effective filing date of the '607 patent. First, he states that he expects to testify that B & L filed a parent application ("the '643 application") on February 21, 1989. He also intends to testify that B & L later filed a continuation-in-part application ("the '290 application") on April 27, 1990, and that B & L abandoned the '643 application in favor of the '290 application.

At this point, I see no need for this testimony. Alcon can almost certainly put before the jury (if B & L has not done so already) evidence outlining the prosecution history of the '607 patent. Indeed, Alcon will likely be able to elicit such testimony from B & L's own witnesses on cross-examination. If, in light of the evidence that has or has not been presented by the time Harmon testifies, Alcon believes it necessary to have him testify on some of these matters, Alcon may make an application at that time, but at this point I do not intend to allow this testimony.

Harmon also states that he plans to testify about the meaning of the "effective filing

date" of an application under 35 U.S.C. § 120 and relevant case law, and the meaning of "new matter" as it relates to the effective filing date. I believe that this testimony clearly amounts to instructing the jury on the law and should be excluded. "It is not for witnesses to instruct the jury as to applicable principles of law, but for the judge." *Scop,* 846 F.2d at 140 (quoting *Marx & Co. v. Diners' Club, Inc.,* 550 F.2d 505, 510 (2d Cir.), *cert. denied,* 434 U.S. 861, 98 S. Ct. 188, 54 L. Ed. 2d 134 (1977)). The court will give whatever instructions concerning § 120 that it deems necessary.[2]

Harmon also states that he expects to testify that the effective filing date of the '607 patent is the filing date of the '290 continuation-in-part application. **\*257** He states that he bases this opinion on certain claim language in the '290 application that he believes constitutes "new matter," and that he will also base this opinion on the testimony of Alcon's expert witnesses.

At this stage, I will deny B & L's motion to preclude this testimony. In *Fiataruolo,* in which the plaintiffs sought a refund of tax penalties that had been assessed against them by the government, the Second Circuit held that the district court had not abused its discretion in allowing a certified public accountant to testify that one of the plaintiffs was not a "responsible person" under 26 U.S.C. § 6672, *i.e.* that he was not responsible for the payment of taxes. In so ruling, the Court of Appeals noted that

Expert Cohen went through and explained in some detail the payroll checks and bank account statements, providing factual explanations for those procedures that were being followed at C & C Security. Then he offered his opinion based on those procedures as to whether Fiataruolo was responsible under § 6672. Cohen's testimony gave the jury helpful information beyond a simple statement on how its verdict should read. He couched his opinion specifically "on the evidence that I looked at and the work that I did." Thus, unlike the impermissible statements in *Scop,* Cohen's opinion was not a simple bald assertion of the law and was not designed to invade the province of the trial court. *Cf. Karns v. Emerson Elec. Co.,* 817 F.2d 1452, 1459 (10th Cir.1987) (finding admissible testimony of expert who "explained the bases for his opinions in sufficient detail to permit the jury to independently evaluate his conclusions");

> *United States v. Milton,* 555 F.2d 1198, 1204 (5th Cir.1977) (finding admissible similar testimony that combined factual explanations and legal conclusions).

*Id.* at 942. Noting that the trial court admonished the jury that the expert's views were "not binding," the court stated that "the instruction adequately protected against the jury's giving undue weight to Cohen's opinion." *Id.*

As described in his expert report, Harmon's proposed testimony giving an opinion about the effective filing date of the '607 patent is similar to the expert's testimony in *Fiataruolo.* He apparently plans to state the specific factual bases for his opinion, including the testimony of Alcon's scientific experts. *See Lemelson v. General Mills, Inc.,* No. 77 C 4558, 1987 WL 26134 *1 (N.D.Ill. Dec. 1, 1987) (ruling that patent law expert could render his opinions regarding patentability and infringement after he and the court had heard the testimony of the technical witnesses). In addition, since whether a claim limitation constitutes "new matter" for purposes of § 120 is more a legal than a scientific question, Harmon would appear to be qualified to testify in that regard, and I find that his testimony could be helpful to the jury. In addition, as did the district court in *Fiataruolo,* I will instruct the jury that Harmon's opinion testimony is just that: his opinion, and that they can give it whatever weight they think it deserves.

Having said this, however, I hasten to add that this ruling should not be viewed as granting Alcon *carte blanche* to introduce "all sorts of expert opinions" in this area. *Id.* at 941. Care must be taken to limit Harmon's testimony to his opinions about whether support for the claim limitations added to the '290 application were disclosed in the '643 application, and the factual bases for that opinion. If his testimony begins to stray into areas that lie within the province of the court or jury, I will not allow it. I therefore deny B & L's motion to preclude this testimony, but without prejudice to B & L's right to object at trial if it believes that Harmon's testimony goes beyond the scope of this ruling.

### D. Invalidity

Harmon states that he intends to testify about a number of matters relating **\*258** to

what is required for a patent to be valid. He states that he will testify about the various requirements imposed by 35 U.S.C. §§ 102, 103, and 112, including matters relating to prior art, obviousness, enablement, and the "best mode" requirement. Harmon also expects to testify about the meaning of various terms of art, such as "prior invention," "conception," "reduction to practice," "written description," etc.

Based on his expert report, I believe that almost all of this proposed testimony is impermissible, as it is clearly "calculated to `invade the province of the court to determine the applicable law and to instruct the jury as to that law.'" *Scop,* 846 F.2d at 140 (quoting *FAA v. Landy,* 705 F.2d 624, 632 (2d Cir.), *cert. denied,* 464 U.S. 895, 104 S. Ct. 243, 78 L. Ed. 2d 232 (1983)). The court will instruct the jury regarding what is required of patents and patent applications, as well as what will render a patent invalid, consistent with Alcon's affirmative defenses. Testimony from a witness on those matters is unnecessary and improper. *See Amsted Indus. Inc. v. National Castings, Inc.,* 16 U.S.P.Q.2d 1737, 1990 WL 106548 *28 (N.D.Ill. July 11, 1990) (it would not be appropriate for patent law expert "to discuss the law governing patent validity ...").

I also note that Harmon's expert report, which was prepared prior to my December 22, 1999 Decision and Order denying Alcon's request for entry of judgment that the claims of the '607 patent are indefinite under 35 U.S.C. § 112 ¶ 2, indicates an intention to testify concerning the definiteness requirement of ¶ 2. At oral argument on the parties' *in limine* motions on December 21, 1999, I granted B & L's motion to preclude Alcon from offering evidence relating to its indefiniteness defense. Although I would grant B & L's motion to preclude this testimony in any event, since it constitutes an impermissible instruction on the law, for this additional reason there should be *no* testimony by Harmon relating to indefiniteness.

As with many of the matters raised by B & L's motion to preclude Harmon's testimony, however, it is difficult for the court to rule definitively on every single one of these matters at this juncture. Deciding whether Harmon may define a particular term for the jury, for example, may have to await the trial itself, so that the court can assess the nature of the proposed testimony in context, to determine whether it would be helpful to the jury, as well as whether it is truly just a definition meant to assist the jury in understanding what is being discussed, or an impermissible instruction on the law in the guise of a mere definition. I will therefore grant B & L's

motion to exclude this testimony insofar as Alcon seeks to have Harmon testify about what the law requires, but Alcon may seek to have Harmon testify about strictly factual matters and definitions of technical terms, subject to any objection by B & L and the court's ruling on whether the testimony is admissible. *See Clintec Nutrition Co. v. Baxa Corp.,* No. 43 C 7050, 1998 WL 560284 *9 (N.D.Ill. Aug. 26, 1998) (granting motion to exclude testimony of Robert Harmon about "the nature and purpose of patents, how they are obtained and reexamined, and how they are to be interpreted and construed," but permitting Harmon to "help interpret the patent and the meaning of its claims, discuss scientific principles, and define terms ...").

### E. Inequitable Conduct

Harmon states that he expects to testify about certain matters relating to Alcon's affirmative defense of inequitable conduct on the part of B & L. Whether such testimony is admissible at all is also the subject of a motion *in limine* by B & L, which seeks to preclude Alcon from offering evidence before the jury concerning issues that the jury will not be asked to decide. In response to that motion, Alcon concedes that the issue of inequitable conduct is ultimately for the court to decide, but suggests **\*259** that the jury could render an "advisory" verdict on this issue and make underlying factual findings.

Since the court anticipates issuing its ruling on B & L's motion *in limine* in the near future, I believe that the matters relating to Harmon's testimony concerning inequitable conduct will best be dealt with in the context of that ruling. If I grant the motion *in limine,* then the proposed testimony would not be relevant to any issue before the jury, and would serve only to prejudice B & L. If I deny the motion *in limine,* some expert testimony may be appropriate, but the exact scope of the testimony that I will allow will be set forth in my ruling on the motion *in limine.*

### F. Trade Secret Misappropriation and Unfair Competition

Harmon states that he intends to testify about what constitutes a trade secret, misappropriation of a trade secret, and unfair competition under New York law.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**



| | | |
|---|---|---|
| **DIAMONDBACK INDUSTRIES, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | |
| | § | **Case No. 6:19-CV-00034-ADA** |
| **REPEAT PRECISION, LLC,** | § | |
| **NCS MULTISTAGE, LLC, NCS** | § | |
| **MULTISTAGE HOLDINGS,** | § | |
| **INC., GARY MARTIN, GRANT** | § | |
| **MARTIN, and ROBERT** | § | |
| **NIPPER,** | § | |
| *Defendants.* | § | |

**ORDER**

Came on for consideration the Motion to Exclude the Report and Opinions of Bryan Garner (Dkt. 68) filed on June 27, 2019.  Plaintiff filed its Response (Dkt. 79) on July 22, 2019.  Defendants filed their Reply (Dkt. 82) on July 29, 2019.  The Court **GRANTS** the instant Motion, and the report and opinions of Mr. Garner are accordingly struck.

In support of its Motion to Dismiss, Diamondback filed a "Report of Bryan Garner."  Pl.'s Mot. to Dismiss Ex. C (Garner Rep.) (Dkt. 62).  Mr. Garner is widely and correctly recognized within the legal community as an expert lexicographer, grammarian, and textualist.  In his report, Mr. Garner offers his opinion on "the scope of Repeat Precision's license."  *Id.* ¶ 7.  He does so by providing his "reading" of the Patent License and Amended Patent License (together, the "License").  *Id.*  Mr. Garner opines on, among other things, the proper understanding of the definitions

1

used within the License (¶ 9), the "interplay between the grant and the definition of Licensed Product" (¶ 10), the "plain meaning of the provisions" (¶ 11), the application of certain legal "canons of construction" and "principles of textual interpretation" (¶¶ 13–14), and whether certain provisions of the License are unambiguous (¶ 14).

Plaintiff submits the opinions of Mr. Garner based solely on Mr. Garner's review of the Licenses. There is no argument that the License language is ambiguous. *See id.* ("[I]n my opinion the provisions in question—particularly the relevant words of the license grant and the relevant words in the definition of Licensed Products— are unambiguous."). The Courts finds that the unambiguousness of the License ends the analysis. The Court agrees with Defendants that Mr. Garner's opinions constitute legal opinions or conclusions that are, in essence, the ultimate issues of law that this Court must resolve. The Court expresses no opinion regarding the argument whether Mr. Garner reviewed relevant documents or relied on inaccurate factual allegations because the Court finds the proffer of Mr. Garner's expert opinions,[1] at best, irrelevant since the Court also finds that Mr. Garner has no specialized understanding of important patent law or industry-specific terms.[2]

The Court finds that this issue has been raised and correctly decided by a sister court in this district. Judge Yeakel faced this same issue with this same expert. *See*

---

[1] Mr. Garner cites to certain "contemporaneous facts" to support his textual analysis. Defendants dispute the merit of the factual assumptions that Mr. Garner made. The Court finds that it is irrelevant to its determination whether Mr. Garner should or should not have been able to rely on those assumptions as the Court finds his expert opinion to be inadmissible regardless of whether they are correct or not.

[2] *See Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000) (holding that expert testimony was properly admitted to interpret contract provisions having a specialized meaning in the industry).

*Lind v. Int'l Paper Co.,* 2014 WL 11332304 (W.D. Tex. Mar. 11, 2014). This Court

makes that determination even though, in *Lind,* the issue on which Mr. Garner

opined was whether the contract was ambiguous in the first place.

This Court begins, as it must, with Rule 702 of the Federal Rules of Evidence

and applies the principles articulated in *Daubert v. Merrill Dow Pharmaceuticals,*

*Inc.,* 509 U.S. 579 (1993), and its voluminous progeny. The Court is well-aware of its

role as a gatekeeper with respect to the admissibility and relevance of expert

testimony. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147 (1999). In *Lind,* Judge

Yeakel opined:

> Notwithstanding the dictates of *Daubert* and its progeny, "the rejection of
> expert testimony is the exception rather than the rule." Fed. R. Civ. P. 702,
> Adv. Comm. Notes (2000). *Daubert* did not work a "'seachange over federal
> evidence law,'" and "'the trial court's role as gatekeeper is not intended to
> serve as a replacement for the adversary system.'" *See id.* (quoting *United
> States v. 14.38 Acres of Land, More or Less, Situated in Leflore County,
> Mississippi,* 80 F.3d 1074, 1078 (5th Cir. 1996)). As *Daubert* recognized,
> "[v]igorous cross-examination, presentation of contrary evidence, and
> careful instruction on the burden of proof are the traditional and
> appropriate means of attacking shaky but admissible evidence." *Daubert,*
> 509 U.S. at 596. This court's role as a gatekeeper is not intended to
> supplant the adversary system in which vigorous cross-examination,
> presentation of contrary evidence, and careful instruction on burden of
> proof are means of attacking shaky but admissible evidence. *See id.*

*Lind,* 2014 WL 11332304, at *2. However, as Judge Yeakel observed, the limitations

on the Court's gatekeeping role are not so stringent as to permit expert opinion on

matters of law reserved to the court: "Interpretation of an unambiguous contract is a

question of law for courts." *Id.* Here, Mr. Garner's opinions are clearly directed

precisely at the ultimate decision this Court must determine with respect to the legal

construction of the License. Therefore, it is unavoidable that what Mr. Garner has

been asked to provide an expert opinion about is a legal opinion. That is not permissible. Mr. Garner's opinion is no more helpful or relevant to the Court than would be any other lawyer's opinion. *See id.* at *3.

Because the *Kona* decision provides a potential safety valve through which Mr. Garner's opinion might be relevant with respect to the issues before this Court, the Court turns to whether or not Mr. Garner adequately brings some particularized experience or expertise in either patent law, patent licensing, or the industry in which the license was entered that would permit him to proffer an expert opinion regarding construction of the License. The Court finds that Mr. Garner does not.

Mr. Garner did not review the '035 patent. While many patent license agreements are executed without some or all of the patents themselves having been read, the point here is that Mr. Garner cannot offer any expert opinion that would be based on the technology covered by the '035 patent because he did not read it, nor is there any indication that he had any generalized expertise or experience with respect to patents or patent licensing for it to matter. He did not read declarations that were submitted in support of the Motion to Dismiss, which means that his expert opinions do not address pertinent information related to the construction issue the Court must address. Defendants have submitted a citation to Mr. Garner's deposition in which he admitted that he did not know whether his expert opinions were consistent or contrary to the standard practices of patent lawyers who are drafting language to create reservations or rights in patent licenses. *See* Defs.' Reply at 6–7.

But Mr. Garner's greatest failure, in the opinion of the Court, was his failure to review any of the parties' correspondence regarding the Patent License, the Amendment to the Patent License, or any of the drafts. To be clear, the Court believes that these documents are irrelevant to the construction of an unambiguous license, but for an expert to obtain purchase under the narrow exception made by *Kona,* the Court believes that these should have been considered by an expert who purports to opine on the construction of a license, because some term may or may not have some specialized meaning. In other words, having failed to do so, and lacking any specialized experience or expertise in the patent, patent licensing, or industry-specific terms,[3] Mr. Garner's opinions are nothing more than his own legal conclusion regarding the meaning of the License terms. And that is exclusively the province of this Court.

The Court now quotes the penultimate portion of the *Lind* opinion:

> Garner's commentary and opinion regarding the meaning and import of the terms of the bonus provision are inadmissible because it constitutes legal argument that extends beyond what lawyers may offer in argument, and therefore must be excluded. *See Salas v. Carpenter,* 980 F.2d 299, 305 (5th Cir. 1992). Garner's commentary on the language of the agreements, based on grammatical principles rather than trade practice, is as inadmissible as expert testimony regarding the legal significance of the contract language itself. *See Askanase v. Fatjo,* 130 F.3d 657, 673 (5th Cir. 1997). Therefore, the court will grant Defendants' motion and exclude both Garner's report and testimony in this case.

---

[3] Defendants proffered the relevant citations to the deposition of Mr. Garner: He does not know what a frac plug, bridge plug, wireline device, isolation device, or a setting tool is. Garner Dep. at 57:3-58:8. He also has no understanding of whether the Licensed Products definitional language is common or customary language for a patent license. *Id.* at 72:24-73:10; *see* Defs.' Reply 6.

*Lind*, 2014 WL 11332304, at *3.  The same reasoning and result obtain here.  The Court finds that Mr. Garner's expert opinions are not admissible in this litigation for the reasons set forth above.  Accordingly, it is

**ORDERED** that Defendant's Motion to Exclude the Report and Opinions of Bryan Garner (Dkt. 68), filed June 27, 2019, is **GRANTED**.

**SIGNED** and **ENTERED** this the 20th day of August 2019.

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

Downloaded from vLex by Rene Vazquez

vLex

598 F.3d 558

**Marylou PRIMIANO; Charles Primiano, Plaintiffs-Appellants, v. Yan COOK; Stryker Corporation; Robert J. Tait M.D., Defendant, Howmedica Osteonics Corporation, Defendant-Appellee.**

No. 06-15563.

United States Court of Appeals Ninth Circuit.

Argued and Submitted Feb. 13, 2008.

Submission Withdrawn and Supplemental

Briefing Requested March 3, 2008.

Resubmitted July 15, 2009.

Filed March 10, 2010.

As Amended April 27, 2010.[*559]

COPYRIGHT MATERIAL OMITTED[*560]

Peter C. Wetherall, Las Vegas, NV, for plaintiffs-appellants Marylou and Charles Primiano.

Frederick D. Baker (argued), Wayne A. Wolff, San Francisco, CA; Ralph A. Campillo, Los Angeles, CA, for defendant-appellee Howmedica Osteonics Corporation.[*561]

Appeal from the United States District Court for the District of Nevada, James C. Mahan, District Judge, Presiding. D.C. No. CV-03-00373-CM/PAL.

Before: D.W. NELSON, ANDREW J. KLEINFELD, and HAWKINS, Circuit Judges.

ORDER AMENDING OPINION AND AMENDED ORDER

**ORDER**

The opinion filed on March 10, 2010, and appearing at 598 F.3d 558 (9th Cir.2010), is amended as follows:

1. At page 563, after the sentence "We review summary judgment de novo." and footnote 5, add the sentence "We review rulings on the admissibility of expert testimony under Federal Rule of Evidence 702 for abuse of discretion."

2. At page 563, at the end of the newly added sentence, append a new footnote 6 with the following text in the footnote: "*Cabrera v. Cordis Corp.*, 134 F.3d 1418, 1420 (9th Cir.1998)." Renumber the remaining footnotes accordingly.

With this amendment, the panel has unanimously voted to deny the petition for rehearing. Judge Kleinfeld has voted to deny the petition for rehearing en banc, and judges D.W. Nelson and Hawkins so recommend. No further petitions for rehearing will be entertained.

The full court has been advised of the petition for rehearing en banc and no judge of the court has requested a vote on the petition for rehearing en banc. Fed. R. App. P. 35.

The petition

for panel rehearing and the petition for rehearing en banc are denied.
OPINION

KLEINFELD, Circuit Judge:

We address admissibility under *Daubert*1 of medical testimony.

**I. Facts**

Marylou Primiano has suffered a miserable ordeal since she had elbow surgery. The question raised by her litigation2 is whether her ordeal resulted from a defective product, the artificial elbow Howmedica Osteonics Corporation manufactured. The district court granted summary judgment against her and dismissed her case, but that result could not have occurred had her medical expert's testimony been considered. His testimony would have established a genuine issue of material fact, because he thought the plastic bearing between the metal parts of the artificial elbow wore out so quickly that it must have been defective. The district court ruled that his testimony was inadmissible, leaving Primiano with inadequate evidence to establish a genuine issue of fact. The question before us is whether excluding Primiano's expert's testimony was an abuse of discretion.

Ms. Primiano, an active 36-year-old woman, fell in her kitchen and broke her elbow. The injury, serious for anyone, was especially serious for her, because she has had rheumatoid arthritis for years. Unlike osteoarthritis, a degenerative process of wear and tear on the joints, rheumatoid arthritis is a chronic inflammatory disease of the connective tissue in the joints.3 Her physician, Robert J. Tait, M.D., performed surgery April 18, 2000, two days after her fall. He replaced her elbow joint with a device made by the defendant, Howmedica, consisting of titanium pieces to replace the bone and polyeth-[*562] ylene components to prevent the metal from rubbing against metal.

Two thirds of the way through surgery, Dr. Tait discovered that Howmedica had made a mistake in the packing and shipping, so even though he was replacing Ms. Primiano's right elbow, the humeral component (the humerus is the arm bone running from the elbow to the shoulder) sent to him was labeled for the left arm. He consulted Howmedica's representative ("Did I kill him? No, I didn't.") with Ms. Primiano's arm open on the table and was told that the components are symmetrical, identical in every respect except that the locking pin goes in the opposite side of the left humeral component, so the component he had could be used. The hole had to be drilled in Ms. Primiano's bone from the inside instead of the outside, but the artificial joint would be equally functional. Dr. Tait completed the operation, and it appeared to be a success.

Downloaded from vLex by Rene Vazquez



But by July, Ms. Primiano's elbow squeaked, and by December, Dr. Tait could hear the metal-on-metal contact, which he confirmed in an x-ray. In February, Dr. Tait performed a second surgery addressing the evident failure of the implant and risk of metallosis (a destructive immune response of the body to flecks of metal shaved off by metal-on-metal contact), replacing the humeral component with a longer one. He used Howmedica's left arm humeral component again, though the long instead of the standard, to avoid having to redrill the remaining bone. He observed massive metallosis and "severe polyethylene wear" on the bearing surrounding the pin. Again, the surgery appeared to go fine. But the next month, Ms. Primiano was having trouble controlling her arm and the joint had a "cracking" sound. She obtained a second opinion from an orthopedic surgeon who concluded that the components appeared "to be adequately fixed and in good position." But in June her problems with the joint had not gone away, so she consulted a third orthopedic surgeon, who recommended a third surgery. In July this surgeon replaced her Howmedica device with one from its competitor, Zimmer. That surgeon performed a fourth surgery the next April to correct loosening. A pin backed out of position, so she needed yet another surgery, her fifth, in September.

Primiano sued Howmedica, Dr. Tait, and others in state court for negligence, strict liability, breach of warranty, and loss of consortium.4 Howmedica removed the case to federal court based on diversity. All that is before us now is the products liability case.

In the summary judgment papers, Howmedica's experts, an orthopedic surgeon and a chemist, provided opinions that the polyethylene was as it should be, and the rapid failure of the prosthesis and excessive wear on the polyethylene components resulted from "malalignment of the prosthesis" along with increased risk of complication because of Ms. Primiano's rheumatoid arthritis and her age. The product literature distributed to physicians said that the prosthesis would not restore function to the level expected with normal healthy bone, and was vulnerable to excessive loading from activity. Evidently, younger patients such as Ms. Primiano may do worse because they are more active

The manufacturer's literature says "Lwjhile the expected life of the total elbow replacement components is difficult to estimate, it is finite."

Primiano's expert witness, Arnold-Peter Weiss, M.D., declared that the polyethylene bushing had worn through in less than eight months, "not a usual or expected circumstance." Though finite, the typical lifespan of elbow prostheses "far exceeds" how long this one lasted. Dr. Weiss testified in his deposition that although wear[*563] starts immediately, elbow prostheses last as long as ten or fifteen years, even twenty, and the earliest he had seen them wear out was around five to eight years, varying with the patient's activity level. Though misalignment could cause excessive wear, he had looked at the x-rays and found no significant misalignment. Nor would ordinary daily activity produce such extraordinarily rapid wear. Nor could he find technically inappropriate use of the prosthesis by Dr. Tait. His opinion was that the extraordinarily rapid wear was caused by abrasive wear and generation of debris from movement of the titanium against the polyethylene. And he concluded that the prosthesis failed to perform in a manner reasonably to be expected by a surgeon using it, because it failed too early.

The district court granted defendants' motion to exclude Dr. Weiss's testimony as not meeting the *Daubert* standard and granted summary judgment. The court concluded that Dr. Weiss's testimony would not be helpful to the jury. The judge reasoned: "Well, I mean it's like res ipsa loquitur, the elbow failed. Now, why did it fail? Maybe it was malpractice, maybe it was Dr. Tait." The evidence of rapid wear "doesn't make it defective." "I think [Dr. Weiss's] opinion is weakened by the fact that he didn't see the plaintiff. He didn't examine her. He didn't talk to her." "[T]here's no peer review... no publication... there's got to be an objective source that he relies on." The court rejected plaintiffs argument, that testimony that the premature failure was not attributable to overuse, medical malpractice, "her physiology, " or other factors external to the device, would assist the jury.

**II. Analysis**

Downloaded from vLex by Rene Vazquez



1-11] We review summary judgment de novo.5 We review rulings on the admissibility of expert testimony under Federal Rules of Evidence 702 for abuse of discretion.6 The substantive question the jury would have to answer, in this diversity case arising out of state tort law, is established by Nevada law. The question whether evidence is admissible, though, is governed by federal law. The Federal Rules of Evidence "govern proceedings in the courts of the United States." 7 That is generally true in diversity cases because the Federal Rules of Evidence are statutes enacted by Congress.8 Though there are exceptions, such as state substantive law in the guise of an evidentiary rule, 9 no exception applies here. Ms. Primiano's burden was to establish a defect in the manufacture of the artificial elbow. In Nevada, "those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function."10 A plaintiff need not "produce direct evidence of a specific product defectfor] negate any alternative causes of the accident." 11 An "unexpected, dangerous malfunction" suffices.12 Federal Rule of Evidence 702 controlled admissibility of Dr. Weiss's opinion. That rule establishes several requirements for admissibility: (1) the evidence has to "assist the trier of fact" either "to understand the evidence" or "to determine a fact in issue"; (2) the witness has to be sufficiently qualified to render the opinion:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qual-[*564] ified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.13

Though *Daubert* is sometimes loosely spoken of as though it established the court's "gatekeeping" function, that is not quite right. Trial courts have always had a gatekeeping function for opinion evidence. *Daubert* held that Federal Rule of Evidence 702 replaces the old *Frye*14 gatekeeping test, "general acceptance in the particular field, " with a different test which is, in some respects, more open to opinion evidence.15 The requirement that the opinion testimony "assist the trier of fact" "goes primarily to relevance." 16 For scientific opinion, the court must assess the reasoning or methodology, using as appropriate such criteria

as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one.17 Shaky but admissible evidence is to be attacked by cross examina tion, contrary evidence, and attention to the burden of proof, not exclusion.18 In sum, the trial court must assure that the expert testimony "both rests on a reliable foundation and is relevant to the task at hand." 19 *Kumho Tire Co. v. Carmichael* holds that the *Daubert* frame-work applies not only to scientific testimony but to all expert testimony.20 It emphasizes, though, that the "test of reliability is 'flexible' and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case."21 The "list of factors was meant to be helpful, not definitive,"22 and the trial court has discretion to decide how to test an expert's reliability as well as whether the testimony is reliable, 23 based on "the particular circumstances of the particular case."24

We further interpreted *Daubert* on remand.25 In that case, the evidence proffered was scientific epidemiological evidence, of insufficient reliability for admissibility. We took pains to point out that the problem was methodology, not the conclusion to which the evidence would lead. "[T]he test under *Daubert* is not the correctness of the expert's conclusions but the soundness of his methodology."26 Un-[*565] der *Daubert*, the district judge is a "gatekeeper, not a fact finder." 27 When an expert meets the threshold established by Rule 702 as explained in *Daubert*, the expert may testify and the jury decides how much weight to give that testimony.

Testimony by physicians may or may not be scientific evidence like the epidemiologic testimony at issue in *Daubert*. The classic medical school texts, 28*Cecil*29 and *Harrison*, 30 explain that medicine is scientific, but not entirely a science. "[M]edicine is not a science but a learned profession, deeply rooted in a number of sciences and charged with the obligation to apply them for man's benefit."31 "Evidence-based medicine" is "the conscientious, explicit and judicious use of current best evidence in making decisions about the care of individual patients."32 "Despite the importance of evidence-based medicine, much of medical decision-making relies on judgment—a process that is difficult to quantify or even to assess qualitatively. Especially when a relevant experience base is unavailable, physicians must use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties" to "mak[e] a sound judgment."33

Downloaded from vLex by Rene Vazquez



When considering the applicability of *Daubert* criteria to the particular case before the court, the inquiry must be flexible. Peer reviewed scientific literature may be unavailable because the issue may be too particular, new, or of insufficiently broad interest, to be in the literature.34 Lack of certainty is not, for a qualified expert, the same thing as guesswork.35 "Expert opinion testimony is relevant if the knowledge underlying it has a valid connection to the pertinent inquiry. And it is reliable if the knowledge underlying it has a reliable basis in the knowledge and experience of the relevant discipline." 36 "[T]he factors identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." 37 Reliable expert testimony need only be relevant, and need not establish every element that the plaintiff must prove, in order to be admissible.38

We have some guidance in the cases for applying *Daubert.* to physicians' testimony. "A trial court should admit medical expert testimony if physicians would accept it as useful and reliable, " but it need not be conclusive because "medical knowledge is often uncertain." 39 "The human body is complex, etiology is often[**566**] uncertain, and ethical concerns often prevent double-blind studies calculated to establish statistical proof."40 Where the foundation is sufficient, the litigant is "entitled to have the jury decide upon[the experts'] credibility, rather than the judge."41 We held in *United States v. Smith* that even a physician's assistant was qualified based on experience to offer his opinion.42

Other circuits have taken similar approaches focusing especially on experience. The Sixth Circuit held that a district court abused its discretion by excluding a physician's testimony based on extensive, relevant experience even though he had not cited medical literature supporting his view.43 Likewise the Third Circuit pointed out that a doctor's experience might be good reason to admit his testimony.44Thus under our precedents and those of other circuits, the district court in this case was pushing against the current, but that alone does not imply an abuse of discretion.

A close look at the foundation for Dr. Weiss's opinion, the nature of medical opinion, and the question posed by Nevada law does. Dr. Weiss is a board certified orthopedic surgeon and a professor at Brown University School of Medicine

in the Division of Hand, Upper Extremity and Microvascular Surgery, department of Orthopedics. He has published over a hundred articles in peer-reviewed medical journals including several specifically on the elbow and at least one somewhat relat-

ed to this case, "Capitellocondylar Total Elbow Replacement: A Long-Term Follow-up Study." 45 He has years of experience implanting various elbow prostheses and has performed five to ten revisions of total elbow replacements that had been performed by other physicians. He has examined the various types of prosthetics available, and has maintained familiarity with the peer-reviewed literature. He testified that the very short lifespan of Ms. Primiano's artificial elbow is "outside of my review of the known literature." He conceded on cross examination that there was "no published peer-reviewed article that [I'm] aware of that states a strict minimum lifespan of a polyethylene component in a total elbow system, " but explained that "I wouldn't expect any literature, because you don't see it. It's hard to write a paper about something that doesn't occur. I mean, this is really bizarre."

A court would have to find that Dr. Weiss is "qualified as an expert by knowledge, skill, experience, training, or education" 46 to render an opinion on elbow replacements. The district court appears to have rejected the opinion based in part on two elements of Rule 702, whether his opinion would assist the trier of fact, and whether it was based upon sufficient facts or data.

The district court thought Dr. Weiss's opinion would not assist the jury because Dr. Weiss could not say why the plastic part of the artificial elbow failed so[**567**] quickly. The "will assist" requirement, under *Daubert,* "goes primarily to relevance." 47 What is relevant depends on what must be proved, and that is controlled by Nevada law. Nevada law establishes that "those products are defective which are dangerous because they fail to perform in the manner reasonably to be expected in light of their nature and intended function."48 In Nevada, a plaintiff need not "produce direct evidence of a specific product defect [or] negate any alternative causes of the accident."49 An "unexpected, dangerous malfunction" suffices.50 Since Dr. Weiss, with a sufficient basis in education and experience, testified that the artificial joint "fail[ed] to perform in the manner reasonably to be expected in light of [its] nature and intended function, " that was enough to assist the trier of fact. He did not have to know why it failed.

Downloaded from vLex by Rene Vazquez

The district court's other concerns, that Dr. Weiss never saw or talked to Ms. Primiano, and there was no publication supporting his opinion that the device failed extraordinarily early, both might be useful to the jury as impeachment, but neither furnished an adequate basis for excluding his opinion. What he most needed to see was what was inside her arm, not outside it, and he did. He saw the x-rays. He also saw the polyethylene from the implant installed in Primiano's first surgery. As for lack of a publication backing his opinion up, *Daubert* offers several reasons why an opinion unsupported by peer-reviewed publication may be admissible, 51 and Dr. Weiss furnished another one, that the phenomenon is so extraordinary that the specialists who publish articles do not see it in their practices.

Dr. Weiss's background and experience, and his explanation of his opinion, leave room for only one conclusion regarding its admissibility. It had to be admitted. Once admitted, the opinion precluded summary judgment, because if the jury accepted it, then the Howmedica prosthesis "failfed] to perform in the manner reasonably to be expected."52His methodology, essentially comparison of what happened with Ms. Primiano's artificial elbow with what surgeons who use artificial elbows ordinarily see, against a background of peer-reviewed literature, is the ordinary methodology of evidence based medicine: "not a science but a learned profession deeply rooted in a number of sciences, " 53 "the conscientious, explicit and judicious use of current best evidence in making decisions about the care of individual patients"54 and "reifying] on judgment—a process that is difficult to quantify or even to assess qualitatively. Especially when a relevant experience base is unavailable, physicians must use their knowledge and experience as a basis for weighing known factors along with the inevitable uncertainties" to "mak[e] a sound judgment."55[**568]

The jury may reject Dr. Weiss's opinion. It may conclude that Ms. Primiano's level of activity, or error by Dr. Tait in performing the surgery, caused the failure. Or it may conclude that the negligence that matters was in the packing

and shipping department of Howmedica, when they sent the wrong pieces to the hospital. But those possibilities bear on the merits of Ms. Primiano's claim, not the admissibility of Dr. Weiss's opinion. Given that the judge is "a gatekeeper, not a fact finder, " 56 the gate could not be closed to this relevant opinion offered with sufficient foundation by one qualified to give it.

**REVERSED.**

1. *Daubert v. Merrell Dow Pharm., Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

2. The complaint also names Mr. Primiano as a plaintiff, for his derivative claim for loss of consortium etc., and names Stryker Corporation as owner of Howmedica Osteonics Corporation, Roberl J. Tait M.D., the surgeon who operated on Ms. Primiano, and Yan Cook, a Howmedica sales representative. Only the Primianos' appeal challenging the summary judgment and exclusion of evidence in favor of Howmedica is before us.

3. *Blakislon's Gould Medical Dictionary* 1353 (3d ed.1972).

4. Primiano's complaint says that she is not suing Dr. Tait for malpractice, just as an agent ol Howmedica in selling the prosthesis.

5. *Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1029 (9th Cir.2001).

6. *Cabrera v. Cordis Corp.,* 134 F.3d 1418, 1420 (9th Cir. 1998).

7. Fed.R.Evid. 101.

8. *Sims v. Great Am. Life Ins. Co.,* 469 F.3d 870, 878-79 (10th Cir.2006).

9. *See Feldman v. Allstate Ins. Co.,* 322 F.3d 660, 666 (9th Cir.2003); *Wray v. Gregory*; 61 F.3d 1414, 1417 (9th Cir. 1995) (per curiam).

10. *Allison v. Merck & Co.,* 1 10 Nev. 762, 878 P.2d 948, 952 (1994) (internal quotation marks omitted); *Ginnis v. Mapes Hotel Corp.,* 86 Nev. 408, 470 P.2d 135, 138 (1970) (internal quotation marks omitted).

11. *Stackiewicz v. Nissan Motor Corp., USA,* 100 Nev. 443, 686 P.2d 925, 927 (1984).

12. *Id.* at 928.

13. Fed.R.Evid. 702.

14. *Fryev. United States,* 293 F. 1013 (D.C.Cir. 1923).

15. *Daubert,* 509 U.S. at 588, 113 S.Ct. 2786 ("Nothing in the text of [Rule 702] establishes 'general acceptance' as an absolute prerequisite to admissibility."); *id.* at 589, 113 S.Ct. 2786 ("That austere standard, absent from, and incompatible with, the Federal Rules of Evidence, should not be applied in federal trials.").

16. *Id.* at 591, 113 S.Ct. 2786.

17. *Id.* at 592-4, 113 S.Ct. 2786.

18. *Id.* at 596, 1 13 S.Ct. 2786.

19. *Id.* at 597, I 13 S.Ct. 2786.

20. *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999);.see *also White v. Ford Motor Co.,* 312 F.3d 998, 1007 (9th Cir.2002).

21. *Kumho Tire,* 526 U.S. at 141, 119 S.Ct. 1167.

22. *Id. at* 151, 119 S.Ct. 1167.

23. *Id.* at 152, 119 S.Ct. 1167.

24. *Id.* at 150, 1 19 S.Ct. 1 167.

Downloaded from vLex by Rene Vazquez

v|lex

25. *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 43 F.3d 1311, 1313 (9th Cir. 1995).

26. *Id.* at 1318.

27. *United States v. Sandoval-Mendoza,* 472 F.3d 645, 654 (9th Cir.2006).

28. Jock Murray. *Neurology Texts for Internists,* 123 Annals of Internal Med. 477, 47779 (1995).

29. *Cecil Textbook of Medicine* I (James B. Wvngaarden & Lloyd H. Smith Jr. eds., 17th ed.1985).

30. *Harrison's Principles of Internal Medicine* 3 (Dennis L. Kasper et al. eds., 16th ed.2005).

31. *Cecil Textbook of Medicine, supra,* at 1.

32. *Harrison's Principles of Internal Medicine, supra,* at 3.

33. *Id.*

34. *Clausen v. M/V New Carissa,* 339 F.3d 1049, 1056, 1060 (9th Cir.2003).

35. *Id.* at 1059.

36. *Sandoval-Mendoza, 472* F.3d at 654 (internal quotation marks and citation omitted

.

37. *White v. Ford Motor Cα.,* 312 F.3d 998, 1007 (9th Cir.2002) (internal quotation marks omitted).

38. *See Slilwell v. Smith & Nephew, Inc.,* 482 F.3d 1 187, 1 192 (9th Cir.2007).

39. *Sandoval-Mendoza, 472* F.3d at 655.

40. *Id.*

41. *Id.* at 656.

42. 520 F.3d 1097, 1105 (9th Cir.2008).

43. *Dickenson v. Cardiac & Thoracic Surgery of E. Tenn..* 388 F.3d 976, 982 (6th Cir.2004).

44. *Schneider ex ret. Estate of Schneider v. Fried,* 320 F.3d 396, 406-07 (3d Cir.2003).

45. Andrew J. Weiland, Arnold-Peter C.Weiss, Robert P. Wills & J. Russell Moore, *Capitellocondylar Total Elbow Replacement: A LongTerm Follow-up Study,* 71 J. ol Bone & Joint Surgery, 217, 217-22 (1989).

46. Fed.R.Evid. 702.

47. *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786.

48. *Allison v. Merck A Co.,* 1 10 Nev. 762, 878 P.2d 948, 952 (1994) (internal quotation marks omitted): *Ginnis v. Mapes Hotel Corp.,* 86 Nev. 408, 470 P.2d 135, 138 (1970) (internal quotation marks omitted).

49. *Stackiewicz v. Nissan Motor Corp., USA,* 100 Nev. 443, 686 P.2d 925, 927 (1984).

50. *Id.* at 928.

51. *Daubert,* 509 U.S. at 593, 1 13 S.Ct. 2786.

52. *Allison,* 878 P.2d at 952.

53. *Cecil Textbook of Medicine* 1 (James B. Wyngaarden & Lloyd H. Smith Jr. eds., 17th ed.1985).

54. *Harrison's Principles of Internal Medicine* 3 (Dennis L. Kasper et al. eds., 16th ed.2005).

55. *Id.*

56. *Sandoval-Mendoza, 472* F.3d at 654.

Downloaded from vLex by Rene Vazquez

618 F.3d 1025

**FORTUNE DYNAMIC, INC., a California Corporation, Plaintiff-Appellant,v.VICTORIA'S SECRET STORES BRAND MANAGEMENT, INC., a Delaware Corporation, Defendant-Appellee.**

**No. 08-56291.**

**United States Court of Appeals, Ninth Circuit.**

**Argued and Submitted Nov. 2, 2009.**

**Filed Aug. 19, 2010.[\*1026]**

COPYRIGHT MATERIAL OMITTED[\*1027]

COPYRIGHT MATERIAL OMITTED[\*1028]

James C. Fedalen, Huang, Fedalen & Lin, LLP, Encino, CA, for the plaintiff-appellant.

Diana M. Torres, Kirkland & Ellis LLP, Los Angeles, CA, for the defendant-appellee.

Appeal from the United States District Court for the Central District of California, Manuel L. Real, District Judge, Presiding. D.C. No. 2:07-cv-02962-R-JTL.

Before THOMAS G. NELSON, JAY S. BYBEE, and MILAN D. SMITH, JR., Circuit Judges.

**OPINION**

BYBEE, Circuit Judge:

In February 2007, Victoria's Secret ran a one-month marketing campaign promoting[\*1029] its new line of BEAUTY RUSH product. As part of that promotion, Victoria's Secret stores sold or gave away a hot pink tank top with the word "Delicious" written across the chest in silver typescript. Fortune Dynamic, Inc. ("Fortune"), the owner of the incontestable trademark DELICIOUS for footwear, sued Victoria's Secret for trademark infringement. The district court granted summary judgment in favor of Victoria's Secret. Mindful that "summary judgment is generally disfavored in the trademark arena," *Entrepreneur Media, Inc. v. Smith, 279 F.3d 1135, 1140 (9th Cir.2002)* (quotation marks omitted), we reverse and remand for trial.

I

Since 1987 Fortune has been in the business of designing and selling footwear for women, young women, and children. In 1997, Fortune began using DELICIOUS as a trademark on its footwear for young women. Two years later, in 1999, Fortune registered the DELICIOUS trademark for footwear on the principal register of the U.S. Patent and Trademark Office. For most of the time relevant to this appeal, Fortune depicted DELICIOUS in standard block lettering with a capital "D." 1

Fortune spends approximately $350,000 a year advertising its footwear. In the three-year period from 2005 to 2007, Fortune sold more than 12 million pairs of DELICIOUS shoes. DELICIOUS shoes are featured on Fortune's website and in its catalogs, and have appeared in fashion magazines directed specifically to young women, including *Cosmo girl, Elle girl, Teen People, Twist, In Touch, Seventeen, Latina*

ym, Shop, CB, marie claire, and *Life & Style*. DELICIOUS footwear is available in authorized retail outlets throughout the United States.2

Victoria's Secret is a well-known company specializing in intimate apparel. It sells a wide variety of lingerie, beauty products, and personal care products in its 900 retail stores. In February 2007, Victoria's Secret launched a line of personal care products under the trademark BEAUTY RUSH. At the same time, it started a promotion that included giving away a gift package of BEAUTY RUSH lip gloss and-most importantly for our case-a pink tank top to anyone who purchased $35 of beauty product.3 The tank top was folded inside a clear plastic pouch with the lip gloss and a coupon for a future BEAUTY RUSH purchase. Across the chest of the tank top was written, in silver typescript, the word "Delicious" with a capital "D." On the back, in much smaller lettering, there appeared the word "yum," and the phrase "beauty rush" was written in the back collar. Victoria's Secret models were featured wearing the tank top, as were mannequins on in-store display tables. Victoria's Secret distributed 602,723 "Delicious" tank tops in connection with its BEAUTY RUSH promotion, which lasted until March 2007. Those tank tops not sold or given away during the promotion were sold at Victoria's Secret's semi-annual sale a few months later.

Victoria's Secret executives offered two explanationsfor using the word "Delicious"[\*1030] on the tank top. First, they suggested that it accurately described the taste of the BEAUTY RUSH lip glosses and the smell of the BEAUTY RUSH body care. Second, they thought that the word served as a "playful self-descriptor," as if the woman wearing the top is saying, "I'm delicious." No one at Victoria's Secret conducted a search to determine whether DELICIOUS was a registered trademark, but Victoria's Secret had run a very similar promotion several months earlier, this one in conjunction with the launch of its VERY SEXY makeup. That promotion also included a tank top, but that tank top was "black ribbed" with "Very Sexy" written in hot pink crystals across the chest. VERY SEXY is a Victoria's Secret trademark.

In March 2007, Fortune filed a complaint alleging that Victoria's Secret's use of "Delicious" on its tank top infringed Fortune's rights in its DELICIOUS mark. After the district court denied Fortune's motion for a preliminary injunction, Victoria's Secret moved for summary judgment. In its opposition to Victoria's Secret's motion for summary judgment, Fortune submitted two pieces of expert evidence: the Marylander survey (with an accompanying declaration) and the Fueroghne declaration, both of which we discuss below.

Downloaded from vLex by Rene Vazquez



Invoking its duty to "scrutinize carefully the reasoning and methodology underlying the expert opinions offered," the district court excluded all of Fortune's proffered expert evidence. Without any of Fortune's expert evidence before it, the district court granted Victoria's Secret's motion for summary judgment, holding that the factors used to determine whether there is a likelihood of confusion "weigh[ed] in favor of Victoria's Secret," and that Fortune's claims were "entirely barred by the fair use defense." Fortune brought this timely appeal.

II

The Lanham Act creates a comprehensive framework for regulating the use of trademarks and protecting them against infringement, dilution, and unfair competition. 15 U.S.C. § 1051 *et seq.* To prove infringement, a trademark holder must show that the defendant's use of its trademark "is likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C. § 1125(a)(1)-(a)(1)(A). Protecting against a likelihood of confusion-what we have called the "core element of trademark infringement," *Brookfield Commc'ns v. W. Coast Entm't Corp.*, 174 F.3d 1036, 1053 (9th Cir.1999) (quotation marks omitted)-comports with the underlying purposes of trademark law: "[1] ensuring that owners of trademarks can benefit from the goodwill associated with their marks and [2] that consumers can distinguish among competing producers." *Thane Int'l, Inc. v. Trek Bicycle Corp.*, 305 F.3d 894, 901 (9th Cir.2002).

Eight factors, sometimes referred to as the *Sleekcraft* factors, guide the inquiry into whether a defendant's use of a mark is likely to confuse consumers: (1) the similarity of the marks; (2) the strength of the plaintiff's mark; (3) the proximity or relatedness of the goods or services; (4) the defendant's intent in selecting the mark; (5) evidence of actual confusion; (6) the marketing channels used; (7) the likelihood of expansion into other markets; and (8) the degree of care likely to be exercised by purchasers of the defendant's product. *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348-49 (9th Cir.1979). This eight-factor analysis is "pliant," illustrative rather than exhaustive, and best understood as simply providing helpful guideposts. *Brookfield Commc'ns*, 174 F.3d at 1054; *see [*1031] E & J Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1290 (9th Cir.1992) ( "This list of factors, while perhaps exhausting, is neither exhaustive nor exclusive."). The *Sleekcraft* factors are not a scorecard, a bean-counter, or a checklist. *Thane*, 305 F.3d at 901. "Some factors are much more important than others, and the relative importance of each individual factor will be case-specific." *Brookfield Commc'ns*, 174 F.3d at 1054.

The Lanham Act provides

some affirmative defenses, *see* 15 U.S.C. § 1115(b), one of which allows an accused infringer to avoid liability by showing that it has used the plaintiff's trademark "fairly," *id.* § 1115(b)(4). To establish a fair use defense, the defendant must show that it used the term "fairly and in good faith only to describe [its] goods or services." *Id.* We have recognized a nominative fair use defense and a classic fair use defense. Nominative fair use applies "where a defendant has used the plaintiff's mark to describe the *plaintiff's product*," *Cairns v. Franklin Mint Co.*, 292 F.3d 1139, 1151 (9th Cir.2002) (emphasis added), whereas classic fair use-the only defense at issue here-involves a defendant's use of a descriptive term "in its primary, descriptive sense," *id.* at 1150-51 (quotation marks omitted).

We review the district court's grant of summary judgment *de novo*, and must view the evidence in the light most favorable to Fortune. *In re Caneva*, 550 F.3d 755, 760 (9th Cir.2008). Summary judgment is improper if there are "any genuine issues of material fact"-facts which, "under the governing substantive law, could affect the outcome of the case." *Id.* (quotation marks and ellipses omitted). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 761 (quotation marks and ellipsis omitted).

III

This case is yet another example of the wisdom of the well-established principle that "[b]ecause of the intensely factual nature of trademark disputes, summary judgment is generally disfavored in the trademark arena." *Entrepreneur Media*, 279 F.3d at 1140 (quotation marks omitted). We are far from certain that consumers were likely to be confused as to the source of Victoria's Secret's pink tank top, but we are confident that the question is close enough that it should be answered as a matter of fact by a jury, not as a matter of law by a court. *See Thane*, 305 F.3d at 901 ("Likelihood of confusion is a factual determination.").

The same is true of Victoria's Secret's reliance on the Lanham Act's fair use defense. Although it is possible that Victoria's Secret used the term "Delicious" fairly-that is, in its "primary, descriptive sense"-we think that a jury is better positioned to make that determination. *Cf. KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 408 F.3d 596, 609 (9th Cir.2005) ( " *KP Permanent II* ") (noting that genuine issues of material fact indicate that the fact finder should determine whether the "defense of fair use has been established").

A

We begin with the *Sleekcraft* factors as a way of framing our discussion. We are going to discuss each factor, but we will devote most of our attention to the similarity of the marks, the strength of Fortune's mark, the proximity of the goods, and the evidence of actual confusion.

Downloaded from vLex by Rene Vazquez



Although some of the *Sleekcraft* factors will not always be helpful in assessing the likelihood of confusion, "the similarity[**1032**] of the marks ... has always been considered a critical question in the likelihood-of-confusion analysis." *GoTo.com, Inc. v. Walt Disney Co.,* 202 F.3d 1199, 1205 (9th Cir.2000). Three general principles help determine whether marks are similar. First, "[s]imilarity is best adjudged by appearance, sound, and meaning." *Entrepreneur,* 279 F.3d at 1144. Second, the "marks must be considered in their entirety and as they appear in the marketplace." *GoTo.com,* 202 F.3d at 1206. Third, "similarities are weighed more heavily than differences." *Id.*

Victoria's Secret makes two arguments against finding that the marks are similar. First, Victoria's Secret argues that its use of "Delicious" "differed completely in font, color, size and purpose from" Fortune's mark. Second, Victoria's Secret says that it "is inconceivable that a customer inside a VICTORIA'S SECRET retail store" could believe that the pink tank top with "Delicious" written on it, which was surrounded by BEAUTY RUSH product, could possibly have originated with Fortune Dynamics.

Victoria's Secret is correct that the marks have markedly different appearances. Fortune's mark is written in black, block letters on the inside heel of the shoe and on the shoe box. Victoria's Secret's "Delicious," by contrast, is written in silver cursive lettering across the chest of a hot pink tank top. On the other hand, there are substantial similarities between the marks. First, there is the obvious: the marks sound the same and look similar because they are the same word, "delicious." Moreover, in each case the word "delicious" appears alone, and not adjacent to any other word or symbol. And there is reason to think that they share the same meaning, as they are attached to items of clothing and appear to evoke desirability and pleasure.

Victoria's Secret's second argument is also not without force. It does seem unlikely that a knowledgeable consumer would believe that Fortune, which markets its shoes in a number of different retail outlets, would be selling a tank top in a Victoria's Secret store. The record reveals, however, evidence of individuals (including pop star Britney Spears) wearing Victoria's Secret's "Delicious" pink tank top on the street. This evidence suggests the possibility of post-purchase confusion, which, we have held, "can establish the required likelihood of confusion under the Lanham Act." *Karl Storz Endoscopy-America, Inc. v. Surgical Tech., Inc.,* 285 F.3d 848, 854 (9th Cir.2002

; *see Levi Strauss & Co. v. Blue Bell, Inc.,* 632 F.2d 817, 822 (9th Cir.1980). In such instances, at least, when knowledgeable consumers see the "Delicious" tank top outside Victoria's Secret stores, it seems at least plausible that they could be confused as to who produced the tank top.

Thus, in light of the principle that "similarities [between marks] are weighed more heavily than differences" and our recognition of post-purchase confusion, a jury could reasonably conclude that the "similarity of marks" factor weighs in favor of Fortune.

We turn next to the strength of Fortune's DELICIOUS mark. As a general matter, "[t]he more likely a mark is to be remembered and associated in the public mind with the mark's owner, the greater protection the mark is accorded by trademark laws." *GoTo.com,* 202 F.3d at 1207. A mark's strength is evaluated conceptually and commercially. *Id.*

A mark's conceptual strength depends largely on the obviousness of its connection to the good or service to which [**1033**] it refers. The less obvious the connection, the stronger the mark, and vice versa. Using a list originally formulated by Judge Friendly, *see Abercrombie & Fitch Co. v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976), marks are placed in one of five categories, ranging from weakest to strongest: generic, descriptive, suggestive, arbitrary, and fanciful, *GoTo.com,* 202 F.3d at 1207. At one end of the spectrum, generic marks "refer[ ] to the genus of which the particular product is a species," such as "bread" or "door," and "are not registerable" as trademarks. *Park 'N Fly, Inc. v. Dollar Park & Fly, Inc.,* 469 U.S. 189, 194, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985). At the other end of the spectrum are arbitrary marks-actual words with no connection to the product-such as Apple computers and Camel cigarettes, and fanciful marks-made-up words with no discernable meaning-such as Kodak film and Sony electronics that are inherently distinctive and therefore receive "maximum trademark protection." *Entrepreneur,* 279 F.3d at 1141. In the middle are descriptive marks, which "describe[ ] the qualities or characteristics of a good or service" and only receive protection if they acquire secondary meaning, *Park 'N Fly,* 469 U.S. at 194, 105 S.Ct. 658, and suggestive marks, which require a consumer to "use imagination or any type of multistage reasoning to understand the mark's significance" and automatically receive protection, *Zobmondo Entm't, LLC v. Falls Media, LLC,* 602 F.3d 1108, 1114 (9th Cir.2010) (quotation marks omitted).

Downloaded from vLex by Rene Vazquez



Categorizing trademarks is necessarily an imperfect science. Far from being neatly distinct and discrete, trademark categories often "blur at the edges and merge together." *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786, 790 (5th Cir.1983), *overruled in part by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.,* 543 U.S. 111, 116, 125 S.Ct. 542, 160 L.Ed.2d 440 (2004) (" *KP Permanent I* "). "The labels are more advisory than definitional, more like guidelines than pigeonholes. Not surprisingly, they are somewhat difficult to articulate and to apply." *Id.; see also Abercrombie,* 537 F.2d at 9 ("The lines of demarcation ... are not ... always bright."). The line between descriptive and suggestive marks is nearly incapable of precise description. *Lahoti v. VeriCheck, Inc.,* 586 F.3d 1190, 1197 (9th Cir.2009) ("[L]egions of trademark lawyers can stay busy arguing about how marks in the middle, not so plainly descriptive, nor so plainly [suggestive], should be categorized.").

"A suitable starting place" for attempting to draw the line between a suggestive and a descriptive mark "is the dictionary." *Zatarains,* 698 F.2d at 792; *see also Surgicenters of Am., Inc. v. Med. Dental Surgeries, Co.,* 601 F.2d 1011, 1015 n. 11 (9th Cir.1979) ("While not determinative, dictionary definitions are relevant and often persuasive in determining how a term is understood by the consuming public...."). With that in mind, two tests help distinguish between a descriptive and a suggestive mark. First, a mark is more likely suggestive if it passes the imagination test, which asks whether the mark "requires a mental leap from the mark to the product." *Brookfield Commc'ns,* 174 F.3d at 1058; *see also* 2 J. McCarthy, Trademarks and Unfair Competition § 11:71 (4th ed. 2004) ("McCarthy") ("Is some reflection or multistage reasoning process necessary to cull some direct information about the product from the term used as a mark?"). "[T]he imagination test is [the] primary criterion for evaluating" whether a mark is suggestive. *Zobmondo,* 602 F.3d at 1116 (quotation marks omitted). Second, a mark is more likely suggestive if it passes the competitor test, which asks whether "the suggestion made by the mark is so remote and subtle that it [**1034]** is really not likely to be needed by competitive sellers to describe their goods." *Id.* at 1117 (quotation marks omitted); McCarthy § 11:68.

"Delicious" carries several different meanings, including "affording great pleasure," "appealing to one of the bodily senses ... esp[ecially] involving the sense of taste or smell," "delightfully amusing," and-in a definition the dictionary itself calls "obsolete"-"characterized by ... self-indulgent

or sensuous pleasure." Webster's Third New International Dictionary 597 (1993). It "commonly refers to that which is tasted, smelled, or otherwise savored with maximum pleasure and keenest appreciation." *Id.*

We think that there is a genuine issue of material fact as to whether Fortune's DELICIOUS mark is suggestive or descriptive. The distinction is important here because if the mark is suggestive, there is a stronger likelihood that a jury could reasonably conclude that the "strength of the mark" factor favors Fortune. On the one hand, some evidence points to a finding that DELICIOUS as applied to footwear is merely descriptive. To the extent "delicious" means "affording great pleasure," for example, it seems to "directly convey a real and unequivocal idea of some characteristic, function, quality or ingredient of the product or service." McCarthy § 11:71. By that definition, DELICIOUS on footwear is nothing more than "self-laudatory advertising," a factor that cuts against categorizing the mark as suggestive. *Id.; see Zobmondo,* 602 F.3d at 1116 ("[M]erely descriptive marks need not describe the essential nature of a product; it is enough that the mark describe some aspect of the product." (quotation marks omitted)). On the other hand, a reasonable jury, viewing the evidence in the light most favorable to Fortune, might focus more on the "taste" and "smell" definitions of "delicious." In that event, the connection between DELICIOUS and footwear becomes much more attenuated, indicating that the mark is suggestive because it "requires a mental leap from the mark to the product." *Brookfield Commc'ns,* 174 F.3d at 1058. In contrast with food, to which this definition of "delicious" has a direct connection, one arguably must use some imagination-a "multi-stage reasoning process"-to get from "delicious" to footwear. McCarthy § 11:71. "Delicious" is not a descriptor the average consumer would associate with shoes.

For the same reasons, other shoe companies are unlikely to need to rely on the word "delicious" to describe their goods. Indeed, we are aware of no other shoe companies, and Victoria's Secret points to none, that use the word "delicious" to describe their product. *See Zobmondo,* 602 F.3d at 1117-18. In sum, because "[w]hich category a mark belongs in is a question of fact," *id.* at 1113, and because the decision as to whether a mark is descriptive or suggestive " 'is frequently made on an intuitive basis rather than as a result of a logical analysis susceptible of articulation,' " *Lahoti,* 586 F.3d at 1197-98 (quoting *Pizzeria Uno Corp. v. Temple,* 747 F.2d 1522, 1528 (4th Cir.1984)), we think a jury should assess the conceptual strength of Fortune's mark in the first instance.

Downloaded from vLex by Rene Vazquez



Fortune also presented evidence of the DELICIOUS mark's commercial strength, which takes into account a mark's "actual marketplace recognition." *Brookfield Commc'ns,* 174 F.3d at 1058. Although we have said that a suggestive mark is a "comparatively weak mark," *Sleekcraft,* 599 F.2d at 349, we have also noted that "advertising expenditures can transform a suggestive mark into a strong mark," *Brookfield Commc'ns,* 174 F.3d at 1058. Here, Fortune proffered evidence indicating that it spends approximately $350,000 yearly marketing its footwear and that it [*1035] sold 12,000,000 pairs of DELICIOUS shoes from 2005 to 2007. In addition, Fortune has advertised its DELICIOUS footwear in a variety of popular magazines, including *Cosmo girl, Elle girl, Teen People, Twist, In Touch, Seventeen, Latina, ym, Shop, CB, marie claire,* and *Life & Style.* Whatever its ultimate force, this evidence is sufficient to make the relative commercial strength of the DELICIOUS mark a question for the jury.

A genuine issue of material fact also exists, under the "proximity of goods" factor, with respect to whether Fortune's footwear and Victoria's Secret's tank top are related. "Where goods are related or complementary, the danger of consumer confusion is heightened." *E & J Gallo Winery,* 967 F.2d at 1291. In addressing this factor, our "focus is on whether the consuming public is likely somehow to associate [Fortune's DELICIOUS footwear] with [Victoria's Secret's tank top]." *Brookfield Commc'ns,* 174 F.3d at 1056; *see also Recot, Inc. v. Becton,* 214 F.3d 1322, 1329 (Fed.Cir.2000) (noting that the relevant question is whether the "goods can be related in the mind of the consuming public as to the origin of the goods").

Victoria's Secret contends that the fact that "two goods are used together ... does not, in itself, justify a finding of relatedness." *Shen Mfg. Co. v. Ritz Hotel, Ltd.,* 393 F.3d 1238, 1244 (Fed.Cir.2004). We have no objection to that general proposition, but the products at issue in *Shen* did not have the same relationship as the products at issue here. The court in *Shen* was comparing "cooking classes" and "kitchen textiles," which, the court held, the "consuming public" was unlikely to "perceive ... as originating from the same source" because "one is a service [and] the other ... a tangible good." *Id.* at 1245. Here, by contrast, both of the products at issue-female footwear and a female tank top-are "tangible goods" and are targeted to the same consumers: young women. Indeed, the products are complementary. *See, e.g., Avon Shoe Co. v. David Crystal, Inc.,* 279 F.2d 607, 612 (2d Cir.1960) (noting that shoes and apparel are goods "which serve both common functions and common purchasers"). Given the intuitively close relationship between women's shoes and apparel in the minds of the consuming public, a jury could reasonably conclude that the "proximity

of the goods" factor favors Fortune.

Not surprisingly, evidence of actual confusion can also support a finding of likelihood of confusion. Perhaps "[b]ecause of the difficulty in garnering such evidence," *Sleekcraft,* 599 F.2d at 353, we have held that "[s]urvey evidence may establish actual confusion," *Thane,* 305 F.3d at 902. Here, the district court refused to admit a survey conducted by Howard Marylander showing that consumers were actually confused by Victoria's Secret's use of the word "Delicious" on its promotional tank top.

Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence ... a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion." Fed. R. Evid. 702. Rule 702 imposes a "basic gatekeeping obligation" on district courts to "ensure that any and all scientific testimony"-including testimony based on "technical[ ] or other specialized knowledge"-"is not only relevant, but reliable." *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quotation marks omitted). The district court must ensure that expert testimony, whether it is based on "professional[*1036] studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152, 119 S.Ct. 1167. We review a district court's decision to exclude expert evidence for abuse of discretion. *See Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 138-39, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997).

A district court abuses its discretion if it "base[s] its decision[ ] on an erroneous legal standard." *Stormans, Inc. v. Selecky,* 586 F.3d 1109, 1119 (9th Cir.2009) (quotation marks omitted). We have long held that survey evidence should be admitted "as long as [it is] conducted according to accepted principles and [is] relevant." *Wendt v. Host Int'l, Inc.,* 125 F.3d 806, 814 (9th Cir.1997); *see Clicks Billiards, Inc. v. Sixshooters, Inc.,* 251 F.3d 1252, 1263 (9th Cir.2001); *Southland Sod Farms v. Stover Seed Co.,* 108 F.3d 1134, 1143 (9th Cir.1997); *E & J Gallo Winery,* 967 F.2d at 1292; *Keith v. Volpe,* 858 F.2d 467, 480 (9th Cir.1988). Furthermore, we have made clear that "technical inadequacies" in a survey, "including the format of the questions or the manner in which it was taken, bear on the weight of the evidence, not its admissibility." *Keith,* 858 F.2d at 480; *see Wendt,* 125 F.3d at 814 ("Challenges to survey methodology go to the weight given the survey, not its admissibility.").

Downloaded from vLex by Rene Vazquez

vLex

Howard Marylander, who holds an M.B.A. in marketing from the University of Southern California, has been retained in forty-five cases to conduct a survey to determine the likelihood of confusion as to the source of goods or services. Here, Marylander conducted an on-line survey among young women ages fifteen to twenty-four to determine the likelihood of confusion between Fortune's DELICIOUS footwear and Victoria's Secret's tank top. The survey was conducted online using an e-Rewards panel consisting of 211,000 members, ages thirteen to twenty-five. Most survey participants met two criteria: in the past six months they had purchased shoes and a tank top or in the next six months they planned to purchase shoes and a tank top. Participants were excluded if anyone in their household worked in the advertising industry.

Marylander divided the respondents into a test group and a control group, each composed of 300 members. The members of the test group were exposed to pictures of Fortune's DELICIOUS shoes and Victoria's Secret's "Delicious" tank top, one at a time and in rotated order. They were then asked a series of questions about whether they thought the two marks come from the same company, related companies, or they did not know. The same protocol was followed with the control group, of which there were also 300 members, except that instead of the word "Delicious" on the tank top, one-third of the control group saw the word "Beautiful," one-third saw "Fabulous," and one-third saw "Incredible."

Of those in the test group, 46% believed that the DELICIOUS shoes and the "Delicious" tank top came from the same company. An additional 8% thought that the companies that created the shoes and the tank top were related or associated. In the control group, 18% thought the products came from the same company, and 25% thought the companies were related or associated. Marylander concluded that 54% of the test group (46 + 8) confused the products, as compared to only 43% (18 + 25) in the control group, and that the difference was statistically significant.

According to Marylander, the survey results strongly suggested that there was a likelihood of confusion among consumers between Fortune's DELICIOUS shoes and Victoria Secret's "Delicious" tank top. He based this conclusion on three principal [*1037] factors: (1) the disparity between the amount of confusion in the test group

and the control group (11%); (2) the unusually high disparity between those who believed the products came from the same company (28%); and (3) the fact that the disparity in confusion levels would have been higher if respondents had not seen "beauty rush" in the back collar, as was the case for those consumers who only saw the tank top on models or mannequins.

The district court excluded the Marylander survey because the survey compared the products side-by-side, failed to replicate real world conditions, failed to properly screen participants, and was "highly suggestive." The district court supported most of its reasoning by reference to unpublished district court decisions, only one of which even falls within the Ninth Circuit. The court's one citation to Ninth Circuit precedent, moreover, is not helpful. In support of its conclusion that the survey should not have compared the products "side-by-side," the district court cited our decision in *Levi Strauss & Co. v. Blue Bell, Inc., 632 F.2d 817 (9th Cir.1980)*, in which we noted that "[i]t is axiomatic in trademark law that 'side-by-side' comparison is not the test." *Id.* at 822. But that statement, far from setting forth a standard for admitting survey evidence, merely provided support for our recognition of the possibility of post-sale confusion. *See id.* at 822 ("Wrangler's use of its projecting label is likely to cause confusion among prospective purchasers who carry even an imperfect recollection of Strauss's mark and who observe Wrangler's projecting label *after the point of sale*. It is axiomatic in trademark law that 'side-by-side' comparison is not the test." (emphasis added)). Indeed, the question of the admissibility of survey evidence nowhere surfaced in *Levi Strauss*. What makes the district court's misuse of *Levi Strauss* even more glaring is its failure to mention *even one* of the numerous cases in which we have held that survey evidence should be admitted "as long as [it is] conducted according to accepted principles and [is] relevant." *Wendt,* 125 F.3d at 814. In sum, we conclude that the district court abused its discretion in excluding the survey because Marylander appears to have conducted the survey in accordance with accepted principles, and because the results of the survey are relevant to the ultimate question whether Victoria's Secret's use of "Delicious" was likely to confuse consumers.

Downloaded from vLex by Rene Vazquez



By way of comparison, we approved of a similar survey in *Thane*. There, the expert conducting the survey selected 400 people over the age of 18 who had purchased a bike in the last three years or planned to purchase one within the next year. *See Thane,* 305 F.3d at 902. These bike enthusiasts were interviewed in shopping malls throughout the country. Three hundred of the respondents were shown pictures of Trek products and OrbiTrek products and asked questions about the companies' association. The remaining 100, the control group, were shown the same Trek pictures, but saw pictures from Yukon, a third company, instead of from OrbiTrek. *Id.* at 902 n. 6. The principles applied in the Marylander survey are virtually indistinguishable. Three hundred respondents were asked to compare pictures of DELICIOUS shoes and the "Delicious" tank top, and then to answer questions about the companies that produced them. A different group of 300 respondents were shown slightly different pictures and asked the same questions. Marylander then tabulated the results to come to a conclusion regarding the likelihood of confusion.

To be sure, as Victoria's Secret argues and as the district court noted, the Marylander survey has a number of shortcomings, including the fact that it was conducted over the internet (thereby failing to **[*1038]** replicate real world conditions), may have been suggestive, and quite possibly produced counterintuitive results. But these criticisms, valid as they may be, go to "issues of methodology, survey design, reliability, ... [and] critique of conclusions," and therefore "go to the weight of the survey rather than its admissibility." *Clicks Billiards,* 251 F.3d at 1263; *cf. Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 596, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Viewing the survey in the light most favorable to Fortune, as we must, we conclude that the survey creates a genuine issue of material fact as to whether consumers were confused by Victoria's Secret's use of "Delicious."

The next *Sleekcraft* factor focuses our attention on the relative sophistication of the relevant consumer, and the degree of care likely to be exercised by that consumer. The reference point for this factor "is the typical buyer exercising ordinary caution." *Sleekcraft,* 599 F.2d at 353. As we explained in *Sleekcraft,* this "standard includes the ignorant and the credulous." *Id.* "We expect" the typical buyer "to be more discerning-and less easily confused-when he is purchasing expensive items." *Brookfield Commc'ns*

174 F.3d at 1060. "On the other hand, when dealing with inexpensive products, customers are likely to exercise less care, thus making confusion more likely." *Id.*

The parties vigorously contest the relative sophistication of the young women purchasing their products. Victoria's Secret argues that "[p]urchasers of apparel are considered ... sophisticated consumers." For support, Victoria's Secret points to one court's observation that "fashion-conscious" young women "are likely to exercise a significant degree of care in purchasing their clothing, since the name of the particular designer is important in the fashion world." *Kookai, S.A. v. Shabo,* 950 F.Supp. 605, 609 (S.D.N.Y.1997). On the other hand, as Fortune points out, we have noted the absence of a "clear standard ... for analyzing moderately priced goods, such as non-designer clothing." *Surfvivor Media, Inc. v. Survivor Prods.,* 406 F.3d 625, 634 (9th Cir.2005). And a wellrespected commentator on trademark law has questioned "the wisdom of ... sweeping judicial observation[s] about relative sophisticated buying habits based on gender." McCarthy § 23:99.

We cannot determine with any degree of confidence the relative sophistication of the parties' consumers. Nor are we confident of the implications of finding that the consumers are sophisticated. We think it possible that a discerning consumer might immediately connect the like-named products more readily than an unsophisticated consumer. Whoever's right, the difficulty of trying to determine with any degree of confidence the level of sophistication of young women shopping at Victoria's Secret only confirms the need for this case to be heard by a jury.

There are also genuine issues of material fact with respect to the remaining factors (marketing channels, likelihood of expansion, and Victoria's Secret's intent). We recognize that some evidence related to these factors supports Victoria's Secret. For instance, the fact that Fortune is exclusively a wholesaler that sells its shoes to a number of authorized retail outlets, while Victoria's Secret is primarily a retailer, operating approximately 900 retail stores nationwide under its own name, cuts against Fortune. As for the likelihood of **[*1039]** expansion, Fortune has entered a licensing agreement with Chaz to use the DELICIOUS mark on clothing, but there is no indication that Chaz has begun using the license and Victoria's Secret no longer creates any clothing with the word "Delicious" on it. Finally, aside from the fact that Victoria's Secret failed to investigate the possibility that DELICIOUS was being used as a mark before promoting its tank top, there is little evidence that Victoria's Secret intended to trade on Fortune's goodwill.

Downloaded from vLex by Rene Vazquez



Nonetheless, "[l]ikelihood of confusion is a factual determination," and "district courts should grant summary judgment motions regarding the likelihood of confusion sparingly." *Thane,* 305 F.3d at 901-02. Granting summary judgment in cases in which a majority of the *Sleekcraft* factors could tip in either direction is inconsistent with that principle. Because "a jury could reasonably conclude that most of the [ *Sleekcraft* ] factors weigh in [Fortune's] favor," *Wendt,* 125 F.3d at 812; *see KP Permanent II,* 408 F.3d at 608, the district court erred in granting Victoria's Secret's motion for summary judgment on the question of likelihood of confusion.

**B**

We next turn to Victoria's Secret's argument that its use of the word "Delicious" was protected by the Lanham Act's fair use defense. 15 U.S.C. § 1115(b)(4). Long before the Lanham Act was enacted, the Supreme Court explained that "[t]he use of a similar name by another to truthfully describe his own product does not constitute a legal or moral wrong, even if its effect be to cause the public to mistake the origin ... of the product." *William R. Warner & Co. v. Eli Lilly & Co.,* 265 U.S. 526, 529, 44 S.Ct. 615, 68 L.Ed. 1161 (1924). Congress codified this common law principle in the Lanham Act's fair use defense, which allows a party to use a descriptive word "otherwise than as a mark ... [and] fairly and in good faith only to describe the goods or services of such party, or their geographic origin." 15 U.S.C. § 1115(b)(4). In establishing that its use was fair, the defendant is not required to "negate confusion." *KP Permanent I,* 543 U.S. at 118. This is because, although the Lanham Act is less than clear on the subject, the Supreme Court recently clarified that, consistent with *Eli Lilly,* "some possibility of consumer confusion must be compatible with fair use." *Id.* at 121, 125 S.Ct. 542. Finally, Victoria's Secret's subjective good faith is relevant to the inquiry, but the overall analysis focuses on whether Victoria's Secret's use of "Delicious" was "objectively fair." *Id.* at 123, 125 S.Ct. 542.

The fair use defense stems from the "undesirability of allowing anyone to obtain a complete monopoly on use of a descriptive term simply by grabbing it first." *Id.* at 122, 125 S.Ct. 542; *see Park 'N Fly, Inc. v. Dollar Park and Fly, Inc.,* 469 U.S. 189, 200, 105 S.Ct. 658, 83 L.Ed.2d 582 (1985) (noting that the Lanham Act was not intended

to "create an exclusive right to use language that is descriptive of a product"). To avoid monopolization, a company such as Victoria's Secret may invoke a trademark term in its descriptive sense "regardless of [the mark's] classification as descriptive, suggestive, arbitrary, or fanciful." *Brother Records, Inc. v. Jardine,* 318 F.3d 900, 907 (9th Cir.2003). In other words, how Fortune's DELICIOUS mark is categorized as a matter of conceptual strength has no bearing on whether Victoria's Secret is entitled to the fair use defense.

According to Victoria's Secret, it should prevail on the fair use defense because, as the Lanham Act provides, it used the term "Delicious" "otherwise than as a mark," "only to describe [its] goods or services," and "in good faith." 15 U.S.C. § 1115(b)(4). We think there is some merit to Victoria's Secret's argument, but ultimately conclude that the question of "fair use," like the question of likelihood of confusion, should be resolved by a jury. We consider each of the "fair use" factors in turn.

We first consider whether the district court correctly ruled, as a matter of law, that Victoria's Secret used "Delicious" "otherwise than as a mark." 15 U.S.C. § 1115(b)(4). The Lanham Act defines a trademark as something used "to identify and distinguish ... goods ... and to indicate the source of the goods." *Id.* § 1127. To determine whether a term is being used as a mark, we look for indications that the term is being used to "associate it with a manufacturer." *Sierra On-Line, Inc. v. Phoenix Software, Inc.,* 739 F.2d 1415, 1423 (9th Cir.1984). Indications of trademark use include whether the term is used as a "symbol to attract public attention," *JA Apparel Corp. v. Abboud,* 568 F.3d 390, 400 (2d Cir.2009), which can be demonstrated by "the lettering, type style, size and visual placement and prominence of the challenged words," McCarthy § 11:46. Another indication of trademark use is whether the allegedly infringing user undertook "precautionary measures such as labeling or other devices designed to minimize the risk that the term will be understood in its trademark sense." Restatement (Third) of Unfair Competition § 28 cmt. c (1995) ("Restatement"); *see also Packman v. Chicago Tribune Co.,* 267 F.3d 628, 639 (7th Cir.2001) (noting, in finding fair use, that the newspaper's "joy of six" t-shirt "plainly indicat[ed] the Tribune as the source").

Downloaded from vLex by Rene Vazquez



Here, there is evidence from which a reasonable jury could conclude that Victoria's Secret was using "Delicious" as a trademark. "Delicious" was written in large letters, with a capital "D," and in silver typescript across the chest, suggesting that Victoria's Secret used the word to attract public attention. Further, there is little evidence that Victoria's Secret employed "precautionary measures" to avoid confusion with Fortune's mark. It is true that the word "yum" appeared on the back of the tank top and "beauty rush" appeared in its back collar. But a jury could reasonably conclude that those hard-to-find words did not detract from the overall message broadcast loudly on the front of the shirt, "Delicious." Perhaps most important, Victoria's Secret's used "Delicious" in a remarkably similar way to how it uses two of its own trademarks–PINK and VERY SEXY. PINK is written in bold capital letters on different items of Victoria's Secret clothing, while VERY SEXY was written, in hot pink crystals, across the chest of a similar black-ribbed tank top during a very similar promotion. The fact that Victoria's Secret used "Delicious" in the same way that it uses other Victoria's Secret trademarks could be persuasive evidence to a jury that Victoria's Secret used, or at least intended to establish, "Delicious" as a trademark.

In support of its argument that Victoria's Secret used "Delicious" as a trademark, Fortune attempted to introduce the testimony of expert Dean K. Feuroghne, a forty-year advertising and marketing professional, who would have testified that Victoria's Secret used "Delicious" as a trademark. We think the district court acted within its discretion to exclude this portion of Fueroghne's testimony.4 The basis of his knowledge regarding trademark use is not entirely clear. More important, Fueroghne's opinion does not "assist" the jury because the jury is well equipped " 'to determine intelligently[*1041] and to the best possible degree' " the issue of trademark usage " 'without enlightenment from those having a specialized understanding of the subject involved in the dispute.' " Fed. R. Evid. 702 advisory committee's note (quoting Mason Ladd, *Expert Testimony*, 5 Vand. L. Rev. 414, 418 (1952)). Even though we agree that this portion of Fueroghne's

proffered testimony was properly excluded, we believe that there still remains a genuine issue of material fact as to whether Victoria's Secret used "Delicious" as a trademark.

A genuine issue of material fact also remains with respect to whether Victoria's Secret used the word "Delicious" "only to describe [its] goods or services." *15 U.S.C. § 1115(b)(4)*. To prevail on this factor, we have held, a defendant must establish that it used the word "in[its] primary, descriptive sense" or "primary descriptive meaning." *Brother Records,* 318 F.3d at 906. As a practical matter, "it is sometimes difficult to tell what factors must be considered to determine whether a use ... is descriptive." *EMI Catalogue P'ship v. Hill, Holliday, Connors, Cosmopulos Inc.,* 228 F.3d 56, 64 (2d Cir.2000). We agree with the Restatement, however, that the scope of the fair use defense varies with what we will call the descriptive purity of the defendant's use and whether there are other words available to do the describing. *See* Restatement § 28, cmt. c.

Victoria's Secret makes two points–one factual and one legal–in support of its argument that it used "Delicious" descriptively. As to facts, Victoria's Secret says that it used "Delicious" merely to "describe the flavorful attributes of Victoria's Secret's BEAUTY RUSH lip gloss and other products that feature the same popular fruit flavors." A jury, however, could reasonably conclude otherwise. For one thing, in its advertisements, Victoria's Secret described its BEAUTY RUSH lip gloss as "deliciously sexy," not delicious. For another, Victoria's Secret's executives testified that they wanted "Delicious" to serve as a "playful self-descriptor," as if the wearer of the pink tank top is saying, "I'm delicious." These examples suggest that a jury could reasonably decide that Victoria's Secret did not use "Delicious" "only to describe its goods." *See* Restatement § 28, cmt. c. ("If the original meaning of the term is not in fact descriptive of the attributes of the user's goods, services, or business, the [fair use] defense is not applicable.").

Downloaded from vLex by Rene Vazquez

vLex

As to law, Victoria's Secret argues that it used "Delicious" in a permissible "descriptive sense," even if its use of the word was not technically descriptive. Victoria's Secret points to the Second Circuit's decision in *Cosmetically Sealed Industries, Inc. v. Chesebrough-Pond's USA Co.,* 125 F.3d 28 (2d Cir.1997), in which the court noted that the statutory requirement that a defendant use the term "only to describe [its] goods or services" "has not been narrowly confined to words that describe a characteristic of the goods, such as size or quality." *Id.* at 30. Instead, that court observed, "the phrase permits use of words or images that are used ... in their 'descriptive sense.' " *Id.* Under that standard, the court held that although the defendants' use of the phrase "Seal it With a Kiss" "d [id] not describe a characteristic of the defendants' product," it was used in its " 'descriptive sense'-to describe an action that the sellers hope consumers will take, using their product." *Id.* Other Second Circuit cases have followed the same general approach. *See Car-Freshner Corp. v. S.C. Johnson & Son, Inc.,* 70 F.3d 267, 270 (2d Cir.1995) (concluding that the defendant had established fair use because its "pinetree shape" air freshener "describes ... the pine scent" and "refers to the Christmas season, during which Johnson[**1042**] sells th[e] item"); *B & L Sales Assocs. v. H. Daroff & Sons, Inc.,* 421 F.2d 352, 353 (2d Cir.1970) (upholding the defendant's use of the phrase "Come on Strong" because it "describe[d] the manner in which [the] clothing would assist the purchaser in projecting a commanding, confident, 'strong' image to his friends and admirers"). *But see EMI,* 228 F.3d at 65 (holding that, although the word "Swing" "undoubtedly describes both the action of using a golf club and the style of music on the soundtrack," "Swing, Swing, Swing [wa]s not necessarily [descriptive]").

We have no quarrel with the general proposition that the fair use defense may include use of a term or phrase in its "descriptive sense," which in some instances will describe more than just "a characteristic of the [defendant's] goods." McCarthy § 11:49; *see Brother Records,* 318 F.3d at 907. We also agree that a capacious view of what counts as descriptive supports Victoria's Secret's argument

that its use of "Delicious" qualifies as fair use. Even under this view of whether a use counts as descriptive, however, we think that a jury could reasonably conclude that Victoria's Secret's use was not fair under this factor, for three reasons.

First, although we accept some flexibility in what counts as descriptive, we reiterate that the scope of the fair use defense varies with the level of descriptive purity. Thus, as a defendant's use of a term becomes less and less purely descriptive, its chances of prevailing on the fair use defense become less and less likely. *See* Restatement § 28, cmt. c. And here, a jury could reasonably conclude, for the same reasons it might conclude that DELICIOUS as applied to footwear is not descriptive, *see supra* Part III.A.2, that Victoria's Secret's use of "Delicious" on a pink tank top did not qualify as sufficiently descriptive for Victoria's Secret to prevail on the fair use defense.

Second, even if a jury thought that there was some evidence of descriptive use, it could still reasonably conclude that the lack of "precautionary measures" on Victoria's Secret's pink tank top outweighs that evidence. Indeed, the same Second Circuit decisions upon which Victoria's Secret relies support this view. In *Cosmetically Sealed,* for example, "[t]he product name 'Color Splash' "-the defendant's trademark-"appeared in the center of the display in red block letters, at least twice the size of the lettering for 'Seal it with a Kiss.' " 125 F.3d at 29-30. And "the brand name 'CUTEX' [appeared] in block letters three times the size of the 'Seal it' instruction." *Id.* at 30. *B & L Sales* describes a similar layout: "Directly below this phrase ['Come on Strong'], in somewhat smaller, yet readily visible, block-type print appears the phrase 'With Botany 500.' Thus the copy reads 'COME ON STRONG with Botany 500.' " 421 F.2d at 353. Here, by contrast, the word "Delicious" appeared all by itself on the front of a tank top. Even though other words, such as "beauty rush" and "yum yum," appeared elsewhere on the top, a jury could reasonably conclude that in order to prevail on the fair use defense, Victoria's Secret should have been more careful about "indicating [Victoria's Secret] as the source." *Packman,* 267 F.3d at 639.

Downloaded from vLex by Rene Vazquez



Finally, there is little doubt that Victoria's Secret had at its disposal a number of alternative words that could adequately capture its goal of providing a "playful self-descriptor" on the front of its tank top. An abundance of alternative words is important because it suggests that Victoria's Secret's use was more suggestive than descriptive. *See* McCarthy § 11:45 ("[T]o be eligible for ... fair use, [a] defendant must be using the challenged designation in a descriptive, not merely suggestive, sense."). If so, restricting Victoria's Secret's use of "Delicious" does not implicate **[\*1043]** the same concerns regarding the monopolization of the lexicon that lie at the heart of the fair use defense. *See KP Permanent I,* 543 U.S. at 122, 125 S.Ct. 542; *see also Peaceable Planet, Inc. v. Ty, Inc.,* 362 F.3d 986, 991 (7th Cir.2004) ("There are many more ways of suggesting than of describing."); *Abercrombie,* 537 F.2d at 11 ("The English language has a wealth of synonyms and related words with which to describe the qualities which manufacturers may wish to claim for their products...."). Overall, we think a genuine issue of material fact remains as to whether Victoria's Secret used "Delicious" only to describe its goods or services.

The last factor of the fair use defense asks whether the defendant has exercised "good faith." We have not given this factor of the fair use defense much attention, but we agree with the Second Circuit that it involves the same issue as the intent factor in the likelihood of confusion analysis: "whether defendant in adopting its mark intended to capitalize on plaintiff's good will." *EMI,* 228 F.3d at 66. Fortune argues that a jury could construe Victoria's Secret's failure to investigate the possibility that DELICIOUS was being used as a mark as evidence of bad faith. For support, Fortune offers the other portion of Fueroghne's expert testimony, in which Fueroghne opines that "[i]t is standard practice in the advertising and marketing industry ... to perform at least a cursory search on the Internet and with the United State[s] Trademark Office to see what else is out in the market ... to avoid possible conflicts or confusion." The district court excluded this evidence for the same reasons it excluded Fueroghne's other testimony, because Fueroghne "is not an expert in any field relevant to this case."

With respect to this portion of Fueroghne's testimony, the district court is plainly wrong. Fueroghne has forty years of experience in the marketing and advertising industry, strongly suggesting that he is familiar with what companies within the industry do when placing words on a product. Fueroghne's expertise, then, is one based on experience. *Cf. Hangarter v. Provident Life and Accident Ins. Co.,* 373 F.3d 998

1016 (9th Cir.2004) (concluding that an expert's "significant knowledge of and experience within the insurance industry" provided "the minimal foundation" required to give " 'expert' testimony on the practice and norms of insurance companies in the context of a bad faith claim" (emphasis and quotation marks omitted)). More important, Fueroghne's testimony "will assist the trier of fact ... to determine a fact in issue," Fed. R. Evid. 702, as it supports an inference that Victoria's Secret acted in bad faith. Therefore, we conclude that the district court abused its discretion in excluding this portion of Fueroghne's testimony.

On the whole, we think that the evidence of malicious intent on the part of Victoria's Secret, even with Fueroghne's expert testimony, is thin at best. But Victoria's Secret's failure to investigate whether someone held a DELICIOUS trademark, combined with the other evidence discussed above, provides support for a jury's potential finding that Victoria's Secret's carelessness in its use of the word "Delicious" rendered its use of that word "objectively [un]fair." *KP Permanent I,* 543 U.S. at 123, 125 S.Ct. 542.

IV

Finally, Fortune asks us to remand the case to a different judge. Because this case does not present "unusual circumstances," *McSherry v. City of Long Beach,* 423 F.3d 1015, 1023 (9th Cir.2005), we reject Fortune's request. There is no indication in the record that the district **[\*1044]** court will be unable to put out of his mind previously expressed views or that reassignment is necessary to "preserve the appearance of justice." *Id.* (quotation marks omitted). Fortune principally relies on the district court's wholesale adoption of Victoria's Secret's proposed findings of facts and law. But although we "reiterate our disfavor of the practice [of] ... adopting one party's proposed findings of fact and conclusions of law substantially verbatim," *Vuitton Et Fils S.A. v. J. Young Enters., Inc.,* 644 F.2d 769, 778 (9th Cir.1981); *see also Silver v. Executive Car Leasing Long-Term,* 466 F.3d 727, 733 (9th Cir.2006) (remarking on the "regrettable practice of adopting the findings drafted by the prevailing party wholesale"), we decline to impose the "extraordinary measure of reassignment," *McSherry,* 423 F.3d at 1023.

V

This case should go to trial. A jury could reasonably conclude that the majority of *Sleekcraft* factors favors Fortune.

Furthermore, in light of evidence suggesting that Victoria's Secret used the term "Delicious" as a trademark and suggestively rather than descriptively, together with Victoria's Secret's failure to investigate the possibility that DELICIOUS was already being used as a trademark, there remains a genuine issue of material fact as to whether Victoria's Secret used "Delicious" unfairly.

REVERSED and REMANDED.

Downloaded from vLex by Rene Vazquez


1. In June 2007 (after this lawsuit was filed), Fortune applied to register DELICIOUS in a stylized font for use on clothing.

2. In November 2006, L'egent International, Ltd. approached Fortune to explore the possibility of L'egent's subsidiary, Chaz, using Fortune's DELICIOUS Trademark

on clothing and related accessories. Chaz signed a final licensing agreement in May 2007. Chaz has yet to use the DELICIOUS mark in commerce.

3. Forty-four Victoria's Secret stores sold the tank top for $10 with any purchase of beauty product.

4. The other portion of Fueroghne's proffered testimony is discussed below.

Downloaded from vLex by Rene Vazquez

299 F.3d 1053

**Mohamed Osman ELSAYED MUKHTAR, Plaintiff-Appellee, v. CALIFORNIA STATE UNIVERSITY, HAYWARD, a public entity, Carlos Navarro and Norma Rees, employees of the California State University in their Official and Individual Capacities, Defendants-Appellants.**

No. 01-15565.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 11, 2002.

Filed August 7, 2002.

[*1054] COPYRIGHT MATERIAL OMITTED

[*1055] COPYRIGHT MATERIAL OMITTED

[*1056] Felicia R. Reid, Curiale Dellaverson Hirschfeld Kraemer & Sloan, LLP, San Francisco, CA, argued the cause for the defendants-appellants.

Fania E. Davis, Oakland, CA, argued the cause for the plaintiff-appellee; Darryl Parker, Seattle, Washington, was on the brief.

Appeal from the United States District Court for the Northern District of California; Claudia Wilken, District Judge, Presiding. D.C. No. CV-97-02566-CW.

Before O'SCANNLAIN, TALLMAN, Circuit Judges, and KING, District Judge.*

**OPINION**

O'SCANNLAIN, Circuit Judge.

We must decide whether the district court fulfilled its obligation to ensure that the testimony of an expert witness was sufficiently reliable before it was presented to the jury.

I

California State University, Hayward ("CSUH") hired Mohamed Osman Elsayed Mukhtar ("Elsayed"), a Muslim of Sudanese origin,1 in 1990 as a tenure-track [*1057] professor in its Mass Communications Department to teach broadcast television and other foundational courses. He was the first black tenure-track professor hired by the department. CSUH eventually denied Elsayed's application for tenure. CSUH claims it did so because he lacked sufficient scholarly activity; Elsayed contends it was because of his race, religion, and national origin. Due to the nature of the dispute, it is helpful to trace Elsayed's career at CSUH, starting from the time of his hiring.

While the Ph.D. degree is normally a pre-requisite for hire in CSUH tenure-track positions, the University makes exceptions for applicants close to completing the doctorate. Non-degreed candidates, such as Elsayed when he started at CSUH in 1990, are generally expected to complete the Ph.D. within their first year of employment. Elsayed, however, did

not receive his Ph.D. from the University of Missouri until December 1995. His consistent failure to obtain his Ph.D. during his five-year probationary period at CSUH was a source of great concern among Elsayed's superiors. During that five-year period, he did not publish a single article. He did, however, consistently receive positive student evaluations and was named departmental Teacher of the Year for the 1995-96 and 1996-97 academic years. He mentored students of color, served on the Multicultural Council, and was active in the Black Faculty Association. Elsayed also participated in international humanitarian and community organizations, such as the Islamic African Relief Agency and the American Society of Humanitarian Aid and Development. He made oral presentations in numerous workshops and seminars, but none involved presenting written work.

During Elsayed's first year at CSUH, he received a reduced teaching load to enable him to complete his dissertation, as is customary. In his first annual evaluation in January 1991, Alan Smith, Dean of the School of Arts, Letters, and Social Sciences ("ALSS"), noted that if Elsayed "has not completed his degree by the time of his 1991-92 evaluation for retention, the dossier should include a statement from the candidate concerning the schedule for the completion of his degree." He also commented that Elsayed was "an enthusiastic, conscientious, and accessible teacher with a genuine interest in the education of his students." Finally, he noted that Elsayed had an article accepted for publication by *Gazette,* a mass communications journal. However, at trial Elsayed admitted that the editor had simply "showed interest," and the article was never published.

In Elsayed's second annual evaluation in January 1992, Robert Terrell, Chair of the Department of Mass Communications, expressed concern at Elsayed's failure to obtain a Ph.D.:

We feel it incumbent upon us to point out at this juncture that significant allowances/considerations were made particularly during the first year of employment to free [Elsayed] from the traditional obligations of the appointment in order that he might be encouraged to complete the degree. Such was not the case. We are now informed that completion is anticipated during the summer, 1992. We point out the seriousness of the condition to recommend to [Elsayed] that *future evaluations will bear heavily on his showing good faith and meeting this obligation by this new target date.*

Downloaded from vLex by Rene Vazquez



(emphasis added). Terrell noted the "uniformly positive response" to Elsayed as a teacher; his evaluations were "more than generally enthusiastic." Terrell also encouraged him to "broaden his horizon and seek positions in the faculty governance [*1058] structure," rather than limiting himself to the Multicultural Council. Finally, he recommended that Elsayed "adhere more stringently to the specific obligations attendant to a faculty appointment ... namely, keeping posted office hours and regular attendance at departmental meetings."

Dean Smith also warned Elsayed in January 1992 that "failure to complete this essential task [of finishing his Ph.D.] will negatively influence his chances of maintaining his current relationship with the university." While noting his "impressive" classroom skills, Smith also recommended that Elsayed assume more responsibility for the department's administrative obligations.

In his third evaluation in April 1993, Terrell expressed frustration over Elsayed's lack of a Ph.D., going so far as to recommend that his employment at CSUH be terminated at the end of the 1993-94 academic year if he did not complete his dissertation by the end of summer 1993.

Last year Professor Elsayed was informed that the failure to complete his dissertation would "negatively influence his chance of maintaining his current relationship with the university." This observation has been repeated on numerous occasions since. Professor Elsayed was released from all responsibilities during the summer of 1992 so he would have ample time to complete his dissertation. At the end of the summer, he promised to be finished by December. In December he promised to be finished by June. He currently promises to be done by the end of the summer of 1993. *Professor Elsayed's failure to complete his dissertation, despite numerous chances to do so, raises serious questions regarding his continued employment at CSUH.*

(emphasis added). While recognizing that Elsayed was "popular with many students," Terrell noted that his "teaching evaluations indicate an ongoing problem with organization." Furthermore, Elsayed "has done little or no publishing since arriving at CSUH three years ago." Finally, "he rarely participates in mainstream faculty governance procedures," despite being "strongly urged to broaden his involvement with the campus community."

In April 1993, Mary Cullinan, Interim Dean of ALSS, echoed Terrell's concern regarding Elsayed's lack of a Ph.D. She noted

that Elsayed was a "popular instructor," but should "create detailed syllabi for his classes, provide ample office hours for students, and give students early and ample feedback on how they are doing." She also highlighted his failure to complete a number of professional works in progress.

The fourth evaluation, in March 1994, noted that Elsayed did not meet the summer 1993 Ph.D. deadline and set the new deadline for summer 1994. Terrell again stated that Elsayed's failure to complete his dissertation "might have significant, negative consequences." He observed that although Elsayed was a "sensitive, caring professor," he did not grade assignments in a timely fashion and taught in a "disorganized fashion." Terrell encouraged him to "devote more time and attention to becoming a better organized teacher" and expressed concern over Elsayed's practice of occasionally having students do portions of his work, which, Terrell felt, came "perilously close to being a violation of professional ethics."

Terrell wrote that "[t]oo many of the activities [Elsayed] cites as evidence of his professional achievement are insufficiently centered on mass communication." He recommended that Elsayed "devote more time and attention to producing articles and other texts such that he can clearly demonstrate his mastery of scholarship." He continued to note Elsayed's lack of [*1059] campus involvement, stating that he "needs to get more directly involved in advising students, working with alumni, participating in faculty governance, [and] representing the department at campus and professional meetings." In short, "Professor Elsayed is not pulling his fair share of the department's load at this time." Terrell ended his evaluation with this stern warning: "I strongly recommend that [Elsayed] be informed — in the bluntest possible fashion — that prolonging completion of his dissertation will be a mistake of the most serious sort."

The new Dean of ALSS, Carlos Navarro, reiterated Terrell's concerns, stating that Elsayed needed "to make dramatic improvements" in the area of campus involvement. He also noted that Elsayed's position would be strengthened if he contributed to scholarly publications and organizations.

Elsayed's fifth evaluation in March 1995 indicated that the Mass Communications Promotion and Tenure Committee ("Tenure Committee") was "troubled" by Elsayed's "lack of progress toward attaining a doctorate." It "urge[d] him to complete some of his works in progress," and advised that it was "important" for him to "publish [ ] in the appropriate journals in his field or show evidence of completed scholarly productivity."

Downloaded from vLex by Rene Vazquez



Dean Navarro's May 1995 evaluation recommended that Elsayed be retained for a sixth year, "but not without grave reservations about the quality of [his] faculty profile," including the lack of the Ph.D. Dean Navarro again recognized that Elsayed received "strong teaching evaluations"; however, "unfortunately, there [were] no peer evaluations which allow him to be evaluated by professionals in his area of expertise." In his letter, Dean Navarro recommended that an independent outside reviewer assess Elsayed's professional achievement. Again noting that Elsayed "has not played any significant role in the life of the department and the university," despite being advised to, he warned that Elsayed "needs to make dramatic improvement in this area."

With respect to Elsayed's scholarly activities, Dean Navarro wrote:

There is very little evidence, if any, that the candidate has made any serious efforts to publish or to present papers or productions at professional meetings.... This candidate has not apparently seen this area as part of his professional responsibility to strive towards excellence. Certainly papers based on his dissertation in progress might have been presented at scholarly meetings. *It would not be unfair to argue that this candidate has demonstrated weakness in his scholarly activity.*

(emphasis added). Elsayed testified that it took him five years to receive his Ph.D. because one committee chair died, the second left to teach elsewhere, and the third took a sabbatical. Thus, he had to take frequent trips to Missouri to recruit three new chairs and familiarize them with his methodology, literature review, and preliminary analysis and findings.

In the fall of 1995, Elsayed applied for tenure. CSUH's tenure policy states: "[T]enure constitutes more than a recognition of past teaching performance and scholarly work. It is a judgment by the faculty that the individual will contribute in the future to the development of the University." Faculty are evaluated on five criteria, which are ranked in order of most to least weighty: (1) possession of a Ph.D degree (required), (2) instructional achievement, (3) professional achievement, (4) internal university contributions, and (5) external representation. A candidate must clearly satisfy *all* the criteria, but the tenure policy provides that "[e]xceptional ratings on one or more of the criteria may [*1060] offset *minor* deficiencies with respect to other criteria." (emphasis added).

CSUH President Norma Rees has the ultimate authority to make tenure decisions. Prior to her review, a candidate's dossier is reviewed by three separate Tenure Committees — the department committee, the school committee, and the University committee — as well as the department chair and school 11471 dean. Each makes an independent assessment of the candidate without relying on the previous evaluation.

At the time he applied for tenure, Elsayed reported completing his dissertation and anticipated receiving his Ph.D in December 1995. He also reported that his article, "Elijah, Wallace and Farrakan: The Growth and Schism of the Black Muslims as Reflected In Their Newspapers, 1930-1984," had been accepted for publication in the refereed journal of the International Institute of Islamic Thought, *The American Journal of Islamic Social Sciences* ("*AJISS*"). Contrary to his original report, the article had simply been recommended for publication sometime in 1996. It was never published. Elsayed testified that he asked *AJISS* to suspend publishing his article because Dean Navarro and President Rees had told him that *AJISS* was not an appropriate scholarly publication.

The Mass Communications Departmental Committee, by a vote of 2-1, recommended Elsayed for tenure. The person voting against tenure believed that "the delayed activity toward achieving the Ph.D. degree signals a lack of promise in professional achievement." The ALSS School Committee, by a vote of 4-1, also endorsed Elsayed. The dissenter found "that the areas of [teaching] strength did not compensate for an overall weak profile of achievement and contribution." CSUH Provost Frank Martino testified that departmental and school recommendations for tenure are typically unanimous, and a "split vote signals trouble."

Dean Navarro recommended against tenure, finding a "dearth of evidence in the area of professional achievement." He did not regard *AJISS* as a journal of Elsayed's peers, and Elsayed had not produced any other papers or documentary films during his five years at CSUH. Also lacking was any "significant evidence of contributions in the area of committee or faculty governance work." Dean Navarro received the report of an outside reviewer he commissioned to evaluate Elsayed, Professor John Hewitt.[2] Dr. Hewitt found Elsayed's professional achievement "a bit thin," but "would expect him to blossom out in the next few years with more work." Regarding internal university contributions, Hewitt noted that he "would expect more from a junior faculty member." Nevertheless, Hewitt *recommended* Elsayed for tenure.

Downloaded from vLex by Rene Vazquez

vLex

The University Committee voted 3-2 in favor of tenure. The dissenters found that Elsayed's instructional achievement did not offset "serious deficiencies" in the area of professional achievement and internal university contributions. President Rees was troubled by the split votes; ten faculty (including Dr. Hewitt, the outside reviewer) had recommended tenure and five had not. Rees was not impressed with Elsayed's professional achievement, and she found little evidence that Elsayed challenged his students or developed creative learning procedures. In her letter to Elsayed informing him of her decision, she wrote that the reason for denial was that he "did not meet university standards in the areas of instructional and professional achievement." **[*1061]**

Elsayed grieved the denial of tenure. The arbitrator found procedural errors in the tenure review process and remanded for further consideration. In late 1997, the new interim Dean of ALSS, James Fay, conducted a second tenure review. This time, both the Departmental and School Tenure Committees' recommendations were *against* granting Elsayed tenure.

Dean Fay found that Elsayed's "failure to publish, or to present alternative evidence of sufficiently vigorous scholarly endeavor, renders his professional achievement below the standard ... needed for tenure." As of December 1997, Elsayed still had "no publications to his credit," and no one at the *AJISS* could confirm that Elsayed's article was going to be published. In April 1998, the five-member University Committee unanimously recommended *against* tenure, finding insufficient documentation of instructional or professional achievement.

In May 1998, Rees again denied tenure. Elsayed grieved the second denial, and the same arbitrator again found in his favor, directing that Elsayed be awarded tenure. However, a state court vacated the arbitration award.

Elsayed then brought this employment discrimination action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, against CSUH and Navarro, Rees, and Martino in their official and individual capacities. At trial, both sides presented witnesses who testified as to whether Elsayed was qualified for a tenured appointment. Dr. David Wellman, an expert witness who has devoted much of his career to investigating how racism persists without open bigotry, testified that race was a factor in CSUH's decision to deny Elsayed tenure. After a nine-day jury trial, the jury found for Elsayed and awarded him $637,000 in economic, emotional distress, and punitive damages.3

CSUH's timely appeal followed.

II

On appeal, CSUH challenges two of the district court's evidentiary rulings, which, it argues, were not harmless.

A

First, CSUH contends that the district court erred by allowing Elsayed to testify that, after the second round of arbitration, the arbitrator ordered that he be granted tenure because CSUH did not have reasonable support for its decision.4 Having the jury hear the decision of a quasi-judicial factfinder caused unfair prejudice, CSUH argues.5 Federal Rule of Evidence 403 provides that evidence, even if relevant, "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." We have emphasized that it is important to view the challenged evidence in light of the *record [*1062] as a whole*. *United States v. Nguyen*, 284 F.3d 1086, 1090 (9th Cir.2002).

Here, the district court allowed the testimony because it did not want "to artificially exclude facts in the narrative," so the arbitration could be "mentioned, but [not] played up in any way." When Elsayed testified about the arbitrator's decision, the judge explicitly told the jury that it had been vacated by a state court, and Elsayed himself also testified that the arbitrator's grant of tenure had been vacated. Finally, the jury instructions included the information that "[t]he university asked the state court to vacate the arbitrator's award, and the state court did so."

While we agree that the prejudice of having the jury hear this marginally relevant evidence would normally outweigh the value of providing the jury with the case's entire factual history, the jury repeatedly heard that a state court had vacated the arbitrator's decision. Because it had the "full story," we believe that the jury was able to give the arbitrator's decision the weight it merited — very little. As such, any prejudice flowing from learning about the arbitrator's ruling was immediately (and repeatedly) minimized by the revelation that a state court had vacated it. CSUH's argument fails; the district court did not abuse its discretion under these circumstances.

B

Second, CSUH challenges the admission of testimony by Dr. Wellman, Elsayed's expert on racial discrimination. Dr. Wellman has developed eight criteria for "decoding" white behavior — all of which he found present in CSUH's decision to deny Elsayed tenure:

a. The University's justification for denying tenure lacked "credence;"

b. Tenure criteria were applied inconsistently;

c. Inconsistent tenure criteria advantaged whites and disadvantaged blacks;

d. Tenure criteria shifted when challenged;

e. Statistical evidence showed disparate treatment;

f. Procedural violations occurred in the tenure process;

Downloaded from vLex by Rene Vazquez



g. University officials trivialized and dismissed Elsayed's qualifications and accomplishments; and

h. University officials failed to follow procedures for reducing racial inequality.

As a threshold matter, Elsayed argues that because CSUH failed to make a contemporaneous objection to Dr. Wellman's testimony, we should review the district court's decision to admit his testimony for plain error. *See United States v. Varela-Rivera,* 279 F.3d 1174, 1177 (9th Cir.2002); *see also Sablan v. Dep't of Finance,* 856 F.2d 1317, 1323 (9th Cir.1988) ("[A] plain error standard ... requires us to consider whether the alleged error was highly prejudicial and whether the error affected the substantial rights of the[appellant]."). However, CSUH made explicit objections to Dr. Wellman's testimony in its motion in limine, which the district court denied.

Contemporaneous objection is not required where, as here, the trial court definitively ruled on a motion in limine after exploring CSUH's objection. *See* Fed.R.Evid. 103(a)(2) ("Once the court makes a definitive ruling on the record admitting or excluding evidence, either at or before trial, a party need not renew an objection or offer of proof to preserve a claim of error for appeal."); *see also Varela-Rivera,* [*1063] 279 F.3d at 1177-78; *Scott v. Ross,* 140 F.3d 1275, 1285 (9th Cir.1998).

Here, the district court made clear at the outset of the trial that it was admitting Dr. Wellman's testimony subject to the limitation that he not offer a legal conclusion. However, it declined to exclude Dr. Wellman's testimony concerning an ultimate factual issue, *i.e.,* whether race was a factor in CSUH's decision to deny Elsayed tenure. Dr. Wellman's testimony stayed within these parameters, and because he did not violate the district court's in limine ruling, no additional objection was necessary. Therefore, we are satisfied that CSUH properly preserved the arguments it now makes before us, and, thus, we review the district court's evidentiary rulings for an abuse of discretion.6 *See Varela-Rivera,* 279 F.3d at 1177.

Federal Rule of Evidence 702 allows admission of "scientific, technical, or other specialized knowledge" by a qualified expert if it will "assist the trier of fact to understand the evidence or to determine a fact in issue." Expert testimony is admissible pursuant to Rule 702 if it is both relevant7 and reliable. *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The trial court must act as a "gatekeeper" to exclude "junk science" that does not meet Rule 702's reliability standards by making a preliminary determination that the expert's testimony is reliable. *See Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 147-48, 119 S

Ct. 1167, 143 L.Ed.2d 238 (1999); *Gen. Elec. Co. v. Joiner,* 522 U.S. 136, 142, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997); *Daubert,* 509 U.S. at 589-90, 592-93, 113 S.Ct. 2786. As the Supreme Court emphasized, however, "[t]he inquiry envisioned by Rule 702 is ... a flexible one," *Daubert,* 509 U.S. at 594, 113 S.Ct. 2786, and must be "tied to the facts of a particular case." *Kumho Tire,* 526 U.S. at 150, 119 S.Ct. 1167 (quotation marks omitted).

The trial court's "special obligation" to determine the relevance and reliability of an expert's testimony, *Kumho Tire,* 526 U.S. at 147, 119 S.Ct. 1167, is vital to ensure accurate and unbiased decision-making by the trier of fact. *Kumho Tire* described the "importance of *Daubert's* gatekeeping requirement ... to make certain that an expert ... employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152, 119 S.Ct. 1167. Or, more specifically, the trial judge must ensure that "junk science" plays no part in the decision. Maintaining *Daubert's* standards is particularly important considering the aura of authority experts [*1064] often exude, which can lead juries to give more weight to their testimony.8

*Daubert* provided a non-exhaustive list of factors for determining whether expert testimony is sufficiently reliable to be admitted into evidence, including: (1) whether the scientific theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) whether there is a known or potential error rate, and (4) whether the theory or technique is generally accepted in the relevant scientific community. *Daubert,* 509 U.S. at 593-94, 113 S.Ct. 2786; *see also Kumho Tire,* 526 U.S. at 141, 119 S.Ct. 1167 (holding that *Daubert's* factors apply to testimony based on technical and specialized knowledge, not just scientific knowledge).

A trial court not only has broad latitude in determining whether an expert's testimony is reliable, but also in deciding *how* to determine the testimony's reliability. *United States v. Hankey,* 203 F.3d 1160, 1167 (9th Cir.2000); *see also Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167. Indeed, a separate, pretrial hearing on reliability is not required. *E.g., United States v. Alatorre,* 222 F.3d 1098, 1102 (9th Cir.2000) ("Nowhere in *Daubert, Joiner,* or *Kumho Tire* does the Supreme Court mandate the form that the inquiry into relevance and reliability must take."); *Hopkins v. Dow Corning Corp.,* 33 F.3d 1116, 1124 (9th Cir.1994). Surely, however, the trial court's broad latitude to make the reliability determination does *not* include the discretion to abdicate completely its responsibility to do so.

Downloaded from vLex by Rene Vazquez



Thus, the question we must answer: did the district court fulfill its gatekeeping function and determine that Dr. Wellman's testimony was reliable? In response to CSUH's motion in limine to exclude Dr. Wellman's testimony, the district court ordered each side to submit *Daubert* briefs. Before ruling that Dr. Wellman's testimony was admissible, the district court reviewed two briefs in support of CSUH's motion, three opposition briefs, two declarations from Dr. Wellman, excerpts from Dr. Wellman's deposition, his preliminary report, and his curriculum vitae. On the first day of the trial, the district court decided to admit his testimony, but without any discussion of its reliability.

The district court's analysis of and ruling on CSUH's motion in limine consisted in its entirety:

Well, I see Wellman and [CSUH's expert witnesses on Elsayed's academic qualifications] as essentially parallel, and I would prefer that none of them express their own opinion about whether this decision was right or wrong. But if any of them are going to, then I guess all of them have to.

And since both sides have prepared on the basis that they all will, I suppose you would prefer that I let all of them do it, rather than none of them do it. But I really would want to downplay as much as possible any of them substituting their judgment for what the jury ultimately has to find, which is whether, in fact, this decision was based on race discrimination or based on legitimate academic concerns.

They each have their own opinion, which is essentially what the jury will have to decide, so I don't exactly know how we're going to avoid having each of them go through all of the evidence and **[*1065]** essentially deliberate as jurors and argue about which — what means what and what factor goes which way.

It's not really appropriate, so I guess we'll just have to try to keep it as brief as possible, in Dr. Wellman's case, on general factors that would lead to such decisions, and likewise in [CSUH] expert's case on general factors that would lead to such decisions, as opposed to their trying to convince the jury of their own view of what the truth is of what the underlying state of mind was.

So that's about all the guidance I can give on that.

Then, in response to a comment from CSUH's counsel, the district court commented that

each [expert] is opining

on the true reason when, in fact, it's the jury who has to decide what the true reason is. So I guess we'll just have to play it by ear in terms of trying to direct both of their testimony towards general factors that the jury can apply, as opposed to making — presenting their opinions of how the decision should be made based on the evidence.

And I don't want to hear them each go through all the evidence and say "this means this and that means that," and "I read this testimony and that testimony." That will take too long and it really will invade the province of the jury.

So I guess Wellman will be first, and so we'll just have to apply what guidelines we can to his testimony and then the same guidelines will be applied to [CSUH] witness' testimony.

As is apparent from the above recital, the district court said nothing about the *reliability* of Dr. Wellman's testimony.9 It appears that the district court was concerned only with whether the expert witnesses would testify on an "ultimate issue" that is properly for the jury to decide.10 [*1066] In fact, the only indication we have that the district court found Dr. Wellman's testimony reliable is the fact that it was admitted over CSUH's reliability objections. Surely *Daubert* and its progeny require more.11

In *Alatorre*, we upheld the district court's admission of expert testimony; it had ruled on the testimony's reliability after allowing detailed voir dire of the expert in front of the jury. *Alatorre,* 222 F.3d at 1105. We were careful to distinguish *United States v. Velarde,* 214 F.3d 1204 (10th Cir.2000), where the Tenth Circuit reversed and remanded for a new trial because the district court failed to conduct *any* reliability determination, instead deciding that since it had "had this [expert] testimony before in trials, and it's not new and novel," it was admissible. *Id.* at 1208. *Velarde* held that "[w]hile ... the trial court is accorded great latitude in determining how to make *Daubert* reliability findings before admitting expert testimony, *Kumho* and *Daubert* make it clear that the court must, on the record, make *some* kind of reliability determination." *Id.* at 1209 (emphasis in original).

Instead, we found *Hankey*, where the district court conducted extensive voir dire of the expert witness, on point. *Hankey,* 203 F.3d at 1168-69. Importantly, the district court in *Hankey* "made findings that the foundation for [the expert's] opinions was relevant and reliable." *Id.* at 1170. Likewise, in *Alatorre*, the district court "after voir dire ... ruled on the relevance and reliability of [the expert's] testimony." *Alatorre,* 222 F.3d at 1105.

Downloaded from vLex by Rene Vazquez

vLex

The fact that we drew a distinction between the district court's explicit findings of reliability in *Alatorre* and *Hankey* and the district court's complete failure to make any reliability finding in *Velarde* suggests that we require a district court to make *some* kind of reliability determination to fulfill its gatekeeping function. Here, we find the district court's reliability determination (or lack thereof) analogous to the district court's failure in *Velarde*. We agree with the Tenth Circuit that "some ... reliability determination must be apparent from the record" before we can uphold a district court's decision to admit expert testimony. *Velarde,* 214 F.3d at 1210. As such, we must conclude that the district court abdicated its gatekeeping role by failing to make *any* determination that Dr. Wellman's testimony was reliable and, thus, did not fulfill its obligation as set out by *Daubert* and its progeny.12

### III

Despite the district court's evidentiary error in admitting Dr. Wellman's testimony without a reliability finding, the jury's verdict is reversible on appeal only if CSUH can demonstrate that the error was not harmless, *i.e.,* "a party must demonstrate that the allegedly erroneous evidentiary ruling more probably than not was the cause of the result reached." *Jauregui v. City of Glendale,* 852 F.2d 1128, 1133 (9th Cir.1988); *United States v. Rahm,* 993 F.2d 1405, 1415 (9th Cir.1993). If we are unable to say that the probabilities favor the same result and are unsure whether the error was harmless, a new [*1067] trial is required. *United States v. Mitchell,* 172 F.3d 1104, 1111 (9th Cir.1999).

CSUH argues that Dr. Wellman's testimony was not harmless because it was cloaked in authority and addressed the central element of Elsayed's case. *See United States v. Arenal,* 768 F.2d 263, 270 (8th Cir.1985) (finding prejudice because the erroneously admitted testimony enjoyed an expert's "aura of expertise"). Without Dr. Wellman's testimony, CSUH asserts, Elsayed's evidence could show only a difference of academic opinion regarding his tenure qualifications. Thus, because the remaining evidence was evenly divided and contradictory, Dr. Wellman's testimony was not harmless.

To establish racial discrimination in the employment context, Elsayed must demonstrate that the reason CSUH gave for denying Elsayed tenure — lack of scholarly achievement — is a mere pretext for illegal racial discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 147, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Thus, we look to what evidence Elsayed presented, other than Dr. Wellman's testimony, that would tend to establish pretext.13 Six CSUH professors testified that they believed Elsayed was qualified for a tenure appointment

and Dr. Hewitt, the outside expert hired to evaluate Elsayed, also recommended tenure despite his misgivings. The jury knew of Elsayed's instructional achievement, book-length dissertation, and article recommended for publication in *AJISS,* which, in fact, was never published. Finally, both arbitrations found procedural errors in the tenure process, although the second arbitration had been vacated in state court. Thus, Elsayed argues, there was plenty of evidence, even apart from Dr. Wellman's testimony, upon which the jury could have based its decision. We are not persuaded.

Once Dr. Wellman's testimony is excluded, the remaining evidence seems to indicate, at most, a mere difference of academic opinion — not discrimination — and does not undermine the University's nondiscriminatory reason for denying Elsayed tenure.14 Indeed, academic tenure decisions involve subjective judgments on scholarship that neither courts nor juries are well qualified to make. *See Lynn v. Regents of Univ. of Cal.,* 656 F.2d 1337, 1342-44 (9th Cir.1981). Furthermore, the jury heard evidence on CSUH's record of hiring people of color, who comprise a slightly *higher* percentage of CSUH's faculty than expected based on the academic labor pool. Without Dr. Wellman's testimony, [*1068] Elsayed's racial discrimination case becomes a disagreement among academic professionals, which is something that Title VII does not proscribe.

Dr. Wellman drew the inference of discrimination for the jury in a case otherwise based entirely on less-than-convincing circumstantial evidence. Thus, it is hard for us to see how Dr. Wellman's testimony, which addressed the central issue of Elsayed's case, was harmless; rather it "more probably than not was the cause of the result reached." *Jauregui,* 852 F.2d at 1133; *see also Hester v. BIC Corp.,* 225 F.3d 178, 185-86 (2d Cir.2000) (where plaintiff's racial discrimination case was otherwise based on comparative evidence, the expert's testimony drawing an inference of discrimination for the jury could have been enough to tilt the balance); *Burkhart v. Washington Metro. Area Transit Auth.,* 112 F.3d 1207, 1214-15 (D.C.Cir.1997) (where evidence of discrimination was not "strong" expert testimony about regulatory standards was prejudicial and required new trial).

Therefore, the district court's erroneous admission of Dr. Wellman's testimony without the proper reliability determination was not harmless, and CSUH is entitled to a new trial.15

**VACATED AND REMANDED** for a new trial. Each party shall bear its own costs and attorney's fees on appeal. This panel shall retain jurisdiction over any future appeal in this matter.

* The Honorable Samuel P. King, Senior United States District Judge for the District of Hawaii, sitting by designation.

Downloaded from vLex by Rene Vazquez

vLex

1. After undergoing tribal initiation as a youth in the Sudan, tribal elders carved warrior marks into Elsayed's face. He also wears the warrior hair-style, commonly known as dreadlocks.

2. In obtaining an outside reviewer, Dean Navarro violated CSUH policy by not first securing Elsayed's consent and by failing to put in writing his reasons for requesting the review.

3. The district court granted Martino's motion for judgment as a matter of law, which reduced the punitive damages award by $15,000. Elsayed does not appeal from that order.

4. Elsayed testified:

After two years of arbitration, and motions, and examinations of hundreds of documents, the arbitrator concluded that the University in the second-in the remand not only committed the same procedural errors, but they actually added new ones.

And as far as their judgment, they also found that they did not use reasonable arguments to support their position. And, therefore, she concluded that the only remedy for the situation is to grant me tenure.

And she concluded by granting me tenure, which was later vacated by a judge.

5. In a motion in limine, which the district court denied, CSUH objected to having the jury hear the second arbitration's result. CSUH also made a contemporaneous objection at trial, which the district court denied.

6. Elsayed also argues that the doctrine of invited error should preclude our review because CSUH cross-examined Dr. Wellman as to why he thought race influenced the tenure decision. Invited error occurs when the appellant opens the door to objectionable testimony by introducing it, rather than waiting for the appellee to do so. *Ohler v. United States,* 529 U.S. 753, 755, 120 S.Ct. 1851, 146 L.Ed.2d 826 (2000); *United States v. Segal,* 852 F.2d 1152, 1155 (9th Cir.1988). Where, as here, a party simply cross-examines a witness to counter evidence already admitted, the error is not invited. *United States v. Weitzenhoff,* 35 F.3d 1275, 1287 n. 8 (9th Cir. 1994).

7. Encompassed in the determination of whether expert testimony is relevant is whether it is helpful to the jury, which is the "central concern" of Rule 702. *United States v. Rahm,* 993 F.2d 1405, 1413 (9th Cir.1993); *see also Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 591, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Despite arguing that the substance of Dr. Wellman's testimony was well within the common sense knowledge of laypersons and, thus, not helpful to the jury, CSUH conceded at oral argument that Dr. Wellman's testimony was "absolutely" relevant. Therefore, we proceed only on

the question of reliability.

8. This concern is also reflected in our prohibition on expert witnesses offering their legal conclusions. *See infra* n. 10.

9. Nor did the district court determine that Dr. Wellman's testimony would be helpful to the jury. To be admissible, "expert testimony must ... address an issue beyond the common knowledge of the average layman." *United States v. Vallejo,* 237 F.3d 1008, 1019 (9th Cir.), *amended by* 246 F.3d 1150 (9th Cir.2001); *see also United States v. Hanna,* 293 F.3d 1080, 1086 (9th Cir.2002). Elsayed argues that Dr. Wellman's specialized sociological knowledge was helpful because it assisted the jury to identify and to analyze coded expressions of contemporary racism. As Elsayed argued in his opposition to CSUH's motion in limine, data indicate "that while there is an increasing trend toward verbal tolerance in relation to issues of race and racism, there is a discrepancy between such statements and the routine everyday practices of white Americans. What white Americans say in opinion polls on the subject of race is often contradicted by their behavior." Indeed, "[s]ocial scientists in particular may be able to show that commonly accepted explanations for behavior are, when studied more closely, inaccurate. These results sometimes fly in the face of conventional wisdom." *Tyus v. Urban Search Mgmt.,* 102 F.3d 256, 263 (7th Cir.1996); *see also United States v. Hall,* 93 F.3d 1337, 1342-43 (7th Cir.1996) ("[S]ocial science testimony is an integral part of many cases, [including] employment discrimination actions."). We express no opinion, however, as to whether Dr. Wellman's testimony would, in fact, be helpful to the jury. *See supra* n. 7.

10. It is well-established, however, that expert testimony concerning an ultimate issue is not per se improper. *E.g., Shad v. Dean Witter Reynolds, Inc.,* 799 F.2d 525, 529 (9th Cir. 1986). Indeed, Federal Rule of Evidence 704(a) provides that expert testimony that is "otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact." However, an expert witness cannot give an opinion as to her *legal conclusion, i.e.,* an opinion on an ultimate issue of law. *E.g., McHugh v. United Serv. Auto. Ass'n,* 164 F.3d 451, 454 (9th Cir.1999); *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir.1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's.") (emphasis in original).

11. CSUH does not argue that Dr. Wellman was unqualified to provide expert testimony. Indeed, his curriculum vitae is quite impressive.

Downloaded from vLex by Rene Vazquez



12. We express no opinion on the merits of whether Dr. Wellman's testimony was, in fact, reliable or of the reliability of such evidence in general. *See Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 ("The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate."). This determination must be made in the first instance by the trial court.

13. "It is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097 (quotation marks omitted) (emphasis in original).

14. Elsayed alleges that Dean Navarro called him a "pothead" and commented that foreign professors do not understand American students' culture and attitudes. Dean Navarro's testimony is less sinister than Elsayed makes it seem, however. Elsayed's counsel asked, "Did you ever make the statement that foreigners don't understand American students' attitudes?" Dean Navarro responded, "Yes, I may have made the generalization that sometimes I found that some foreign professors don't understand American high school culture. I have two young people that just graduated from high school, and sometimes their standards and expectations for behavior in class or their knowledge gets to be a little — or lack of knowledge sometimes is shocking to professors abroad."

Far from being a criticism of foreign professors, Dean

Navarro's comment is, in fact, more an indictment of American teenagers. Also, Dean Navarro testified that he did not recall ever referring to Elsayed as a "pot-head." Seen in their proper context, Dean Navarro's remarks fail to live up to the discriminatory billing first given to them by Elsayed. We find that the jury could not have based its decision on Dean Navarro's remarks alone.

15. Because we remand for a new trial, we do not reach the question of whether there was sufficient evidence to support the award of punitive damages against Dean Navarro and President Rees. However, we note that Title VII provides for punitive damages, which may be awarded "if the complaining party demonstrates that the respondent engaged in a discriminatory practice ... with *malice or with reckless indifference* to the federally protected rights of an aggrieved individual." 42 U.S.C. § 1981a(b)(1) (emphasis added). To award punitive damages, the individuals' conduct must have been more than just intentional discrimination — instead they must have known they were acting in violation of federal law. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 535-36, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999); *see also Ngo v. Reno Hilton Resort Corp.*, 140 F.3d 1299, 1304 (9th Cir.1998) ("Punitive damages may not be awarded ... where a defendant's discriminatory conduct is merely `negligent in respect to the existence of a federally protected right.'" (quoting *Hernandez-Tirado v. Artau*, 874 F.2d 866, 870 (1st Cir.1989))).