# EXHIBIT 5

# DOCUMENT TO BE SEALED

1      UNITED STATES DISTRICT COURT

2      FOR THE WESTERN DISTRICT OF WASHINGTON

3            AT SEATTLE

4    -------------------------------------------x
     VALVE CORPORATION,

5              Plaintiff,

6        - versus -    Case No.:  2:23-cv-1016-JNW

7

8    LEIGH ROTHSCHILD, ROTHSCHILD
     BROADCAST DISTRIBUTION SYSTEMS,
     LLC, DISPLAY TECHNOLOGIES, LLC,

9    PATENT ASSET MANAGEMENT, LLC,
     MEYLER LEGAL, PLLC, and SAMUEL

10   MEYLER,
              Defendants.

11   -------------------------------------------x

12

13        * * * C O N F I D E N T I A L * * *

14

15        VIDEOTAPED DEPOSITION OF:

16

17             LEIGH ROTHSCHILD

18

19        Wednesday, August 27, 2025

20        9:55 a.m. ET - 8:34 p.m. ET

21

22

23      REPORTED STENOGRAPHICALLY BY:

24      Stacey E. Raikes, RMR, CRR

25          Job No. 10171404

Confidential

1

2

3

\* \* \* \* \* \* \* \* \* \* \* \*

4

5

6

7        VIDEOTAPED STENOGRAPHIC DEPOSITION of LEIGH

8    ROTHSCHILD, taken in the above-entitled matter before

9    STACEY E. RAIKES, a stenographic machine reporter,

10   Registered Merit Reporter, Certified Realtime

11   Reporter, and Notary Public for the State of Florida,

12   taken on Tuesday, August 27, 2025, commencing at 9:55

13   a.m. ET.

14

15

16

17        \* \* \* \* \* \* \* \* \* \* \* \*

18

19

20

21

22

23

24

25

**Confidential**

1   A P P E A R A N C E S:

2

3   KILPATRICK TOWNSEND & STOCKTON LLP

4   BY:  DARIO A. MACHLEIDT, ESQ.

5        - and -

6   BY:  KATHLEEN R. GEYER, ESQ.

7   1420 Fifth Avenue, Suite 3700

8   Seattle, Washington  98101

9   (206) 467.9600

10   dmachleidt@kts.com

11   kgeyer@kts.com

12   Attorneys for the Plaintiff

13

14

15   KILPATRICK TOWNSEND & STOCKTON LLP

16   BY:  KENGYEH K. CHU, ESQ.

17   4208 Six Forks Road, Suite 1400

18   Raleigh, North Carolina  27609

19   (919) 420.1733

20   kchu@ktslaw.com

21   Attorneys for the Plaintiff

22

23

24

25

**Confidential**

Leigh Rothschild    Valve Corporation vs.
Leigh Rothschild, et al.

1    A P P E A R A N C E S:  (Continued)

2

3    DNL ZITO

4    BY:  REN.A. VAZQUEZ, ESQ.

5    1250 Connecticut Avenue Northwest, Suite 700

6    Washington, DC  20036

7    (202) 466.3500

8    rvazquez@dnlzito.com

9    Attorneys for the Defendants

10

11

12

13

14

15

16

17

18

19    ALSO PRESENT:

20

21    Paul Smith, Legal Video Specialist

22

23

24

25

**Confidential**

Leigh Rothschild

**Valve Corporation vs.**
Leigh Rothschild, et al.

1

I N D E X

2

LEIGH ROTHSCHILD

3

EXAMINATION BY                         PAGE

4

5

ATTORNEY MACHLEIDT                         8

6

E X H I B I T S

7

NUMBER                DESCRIPTION              PAGE

8

9

Exhibit 6     Documents Bates stamped
              Valve_000010121 - 10133        23

10

Exhibit 7     Documents Bates stamped
              ROTHSCHILD0035206 - 35219        56

11

12

Exhibit 8     Documents Bates stamped
              ROTHSCHILD0031677 - 31680        60

13

Exhibit 9     Documents Bates stamped
              ROTHSCHILD0031664 - 31672        61

14

15

Exhibit 10    Documents Bates stamped
              Valve_00008336 - 8389        92

16

Exhibit 11    Documents Bates stamped
              VALVE_00010357 - 10378        92

17

18

Exhibit 12    Documents Bates stamped
              ROTHSCHILD0035889 - 35899        102

19

Exhibit 13    Documents Bates stamped
              ROTHSCHILD0033169 - 33217        108

20

21

Exhibit 14    Documents Bates stamped
              ROTHSCHILD0002495 - 2504        118

22

Exhibit 15    Documents Bates stamped
              ROTHSCHILD0029766 - 29786        119

23

24

Exhibit 16    Topics Document        131

25

Leigh Rothschild

**Confidential**

Valve Corporation vs.
Leigh Rothschild, et al.

1          E X H I B I T S

2

       NUMBER          DESCRIPTION              PAGE

3

4      Exhibit 17    Documents Bates stamped
                     ROTHSCHILD0032312 - 32332      164

5

       Exhibit 18    Declaration of Donald

6                    McPhail in Support of
                     Motion to Withdraw          215

7

       Exhibit 19    Documents Bates stamped

8                    ROTHSCHILD0031518 - 31532      220

9      Exhibit 20    Documents Bates stamped
                     ROTHSCHILD0031584 - 31615      227

10

       Exhibit 21    Documents Bates stamped

11                   ROTHSCHILD0032272 - 32273      232

12     Exhibit 22    Documents Bates stamped
                     ROTHSCHILD0032241 - 32250      296

13

       Exhibit 23    Documents Bates stamped

14                   ROTHSCHILD0035173 - 35176      305

15     Exhibit 24    Documents Bates stamped
                     DISCORD-VALVE-0001 - 0020      312

16

       Exhibit 25    Handwritten notes of

17                   the witness             317

18

19

20

21

22

23

24

25

www.aptusCR.com

**Confidential**

Leigh Rothschild                                                  Valve Corporation vs.
                                                          Leigh Rothschild, et al.

1    ---------------------------------------------------------

2              P R O C E E D I N G S

3                 9:55 a.m. ET

4    ---------------------------------------------------------

5         THE VIDEOGRAPHER:  We're now on the

6    record.  Today's date is August 27, 2025, and

7    the time is 9:55 a.m.

8         This is the deposition of Leigh Rothschild

9    being taken in the matter of Valve Corporation

10   versus Leigh Rothschild, et al., pending in the

11   United States District Court for the Western

12   District of Washington, case number

13   2:23-cv-1016-JNW.

14        We are at 701 Brickell Avenue, suite 3300,

15   Miami, Florida.

16        My name is Paul Smith of Aptus Court

17   Reporting located at 401 West A Street, suite

18   1680, San Diego, California.

19        Will counsel please identify yourselves

20   and state whom you represent?

21        ATTORNEY MACHLEIDT:  Dario Machleidt on

22   behalf of Valve Corporation.  With me today are

23   Kate Geyer and Ken Chu.

24        ATTORNEY VAZQUEZ:  RenÈ Vazquez for

25   defendants and Mr. Leigh Rothschild.

**Confidential**

Leigh Rothschild                                                    Valve Corporation vs.
                                                                   Leigh Rothschild, et al.

1    Because I don't recall the details, are you a

2    beneficiary of that trust?

3        A.   I don't believe so, but I don't know with

4    specificity.

5        Q.   Are you --

6        A.   I don't know.

7        Q.   Are you the beneficiary of any trusts?

8            ATTORNEY VAZQUEZ:  Objection.  Relevance.

9            THE WITNESS:  Yeah.

10       A.   I decline to answer the question as it

11   seeks personal financial information irrelevant to

12   the claims at issue.

13       Q.   Are you the beneficiary of any trusts that

14   also have an ownership interest in PAM?

15       A.   Could you repeat that question?  That's a

16   bit of a complex question.

17       Q.   Are you the beneficiary of any trusts

18   where those trusts have an ownership interest in

19   PAM?

20       A.   I don't believe so.

21       Q.   I'm not asking for the dollar figure, at

22   least not yet, but sitting here today, do you have

23   an approximate idea of how much money you have in

24   your checking accounts?

25           ATTORNEY VAZQUEZ:  Objection.  Relevance.

**Confidential**

1      irrelevant question.

2          ATTORNEY MACHLEIDT:  RenÈ.

3          THE WITNESS:  So, Counsel, you're

4      instructing me not to answer?

5          ATTORNEY VAZQUEZ:  Can I confer with my

6      client, please?

7          ATTORNEY MACHLEIDT:  You may.

8          THE VIDEOGRAPHER:  Going off record at

9      11:04 a.m.

10             (Recess.)

11         THE VIDEOGRAPHER:  Back on record at 11:14

12     a.m.

13         ATTORNEY MACHLEIDT:  RenÈ, I'll give it to

14     you first.

15         ATTORNEY VAZQUEZ:  Yeah.  Counsel, he's

16     not going to answer questions related to his

17     personal life, which would include nannies, any

18     employees that he has on a personal basis.  So

19     he's just not going to answer questions along

20     those lines.

21         We can go, you know, as you ask questions,

22     but that's going to be the general gist.

23         ATTORNEY MACHLEIDT:  Hopefully you know

24     that I need this for the record, you know,

25     regardless of what happens --

**Confidential**

1    Q.   Mr. Rothschild, do you have children?

2    A.   I do.

3    Q.   How many children do you have?

4    A.   I decline to answer the question as it's

5    irrelevant to the claims at issue.

6        ATTORNEY VAZQUEZ:  Objection.  Relevance.

7    I concur.

8        ATTORNEY MACHLEIDT:  When you say concur,

9    do you mean you're instructing him not to

10   answer?

11       ATTORNEY VAZQUEZ:  I'm advising him not to

12   answer.

13       ATTORNEY MACHLEIDT:  You're not

14   instructing him.  You are not telling your

15   client to refuse to answer the question how

16   many --

17       ATTORNEY VAZQUEZ:  I'm leaving it up to my

18   client.

19   A.   On my own advice, I respectfully decline

20   to answer the question.  Of course, I'll abide by

21   any court order directing me to respond, Counsel.

22   Q.   Do any of your children have management

23   responsibility with respect to PAM?

24   A.   They do not.

25   Q.   Are any of your children in positions of

**Confidential**

1      Q.   Are RBDS and Display Technologies covered

2    by the insurance that PAM has?

3      A.   I do not know if they're covered or not.

4    There is a dispute going on with the insurance

5    company, as you referenced.

6      Q.   Are you familiar --

7         ATTORNEY MACHLEIDT:  Strike that.

8    BY ATTORNEY MACHLEIDT:

9      Q.   Do you play computer games?

10     A.   Not really.  I don't have time.  I wish I

11   did.

12     Q.   Are you familiar with Valve's Steam

13   platform?

14     A.   Only to the extent that they sued me for

15   whatever unknown reason and only to the extent that

16   I see the Steam gift cards whenever I'm in Best Buy

17   offering people, you know, a gift card so they can

18   use the Steam service.  I've never been -- to give

19   you a complete answer, I've never used the Steam

20   service and I don't know much about it, if anything.

21     Q.   What, if anything, do you know about the

22   Valve Corporation?

23     A.   I know that they're extremely aggressive,

24   that they have me here for whatever reason, that

25   they're extremely hostile, apparently, to me, to my

**Confidential**

1    attorneys, that they've gone, you know, to the

2    extent of suing, which I've never seen before in my

3    career, attorneys for representing me and their law

4    firms.  I know that they have a bad reputation in

5    several ways.  I know that they sued a previous

6    attorney in another matter.  And I believe that I

7    read that the circuit threw the book at them for

8    that.  Or said that that was improper.  And

9    occasionally, I'll read articles about their CEO.

10        Q.    What, if anything, do you recall about the

11   other lawsuit against an attorney that you

12   referenced?

13        A.    Just that I read a blurb in one of the

14   subscriptions that I have, email subscriptions, that

15   there was a case where Valve was involved in suing

16   an attorney.  And I may have -- these deals are

17   just -- this recollection there were -- my knowledge

18   of this is somewhat vague, but I believe that they

19   said that it went to the circuit and the circuit

20   kind of slammed Valve for suing an attorney, which

21   is, of course, I would point out, exactly what

22   Valve, in my opinion, improperly did for whatever

23   reason.  We don't understand.  Outrageous, in our

24   opinion, suing Sam Meyler, the local attorney in

25   this matter, as well as his law firm.  As well as me

**Confidential**

1    individually.

2        Q.    When you reference Valve's current lawsuit

3    against an attorney, is your answer limited to

4    Samuel Meyler?

5        A.    No, it's limited to Sam Meyler as well as

6    the Meyler law firm.  They were both defendants in

7    the action as well as me and several, as we've

8    referenced and discussed today, several of my

9    entities.

10            And I'd like to add to that, we don't

11    understand the damages, if any, that Valve has

12    suffered in this matter.  We've asked for them.

13    We've never gotten an answer.  You know, we don't

14    understand why in a matter where we sued Valve and

15    admitted that we made a mistake that Valve has now

16    gone, you know, unbelievably aggressive and spent

17    huge amounts of money on what we don't seem to

18    understand, based on my understanding and based on

19    what Valve has publicly stated in this matter, to

20    crush, you know, an inventor.  We understand also

21    that's their attitude against the inventor

22    community.  Crush them.

23        Q.    Why --

24            ATTORNEY MACHLEIDT:  Strike that.

25    BY ATTORNEY MACHLEIDT:

**Confidential**

1      Q.   You just said we also understand that

2    that's Valve's general approach to the inventor

3    community.

4         I paraphrased a little, but did I get that

5    mostly right?

6      A.   Yes.  I believe that's an accurate

7    representation of what I said.

8      Q.   When you say we, who are you referring to?

9      A.   My colleagues and I who have done research

10   on Valve, right, and seen articles about Valve that

11   were negative in terms of their actions.

12     Q.   What actions are you referring to?

13     A.   Actions in suing -- well, actions in suing

14   my own attorney, actions in suing me, actions in

15   suing my attorney's law firm, actions in suing, as I

16   referenced a minute ago, another attorney that the

17   federal circuit apparently said they shouldn't.

18   Other cases that Valve's been involved in where

19   they've been extremely aggressive.  Other

20   complaints, also, that we've referenced against

21   Valve, the company.  Consumer complaints.  Numerous.

22     Q.   Other than the current lawsuit that has

23   brought us here today, are you aware of Valve ever

24   bringing a lawsuit against an individual inventor

25   named on a patent?

**Confidential**

1      A.   I'm not aware of it, but that doesn't mean

2   that it's occurred.  I'm not specifically aware of

3   them suing another individual other than me.  As I

4   said, I am aware of them suing another attorney

5   other than my attorney, Sam Meyler, and his law

6   firm.

7      Q.   The --

8           ATTORNEY MACHLEIDT:  Strike that.

9   BY ATTORNEY MACHLEIDT:

10      Q.   In any of your prior answers when you

11   referred to attorneys, is Randall Garteiser packaged

12   up as part of your answer or is he in a separate

13   category?

14      A.   I don't understand the question.

15      Q.   At the tail end of the -- I'll call them

16   the Texas lawsuits with SPIS, QTI, and Symbology, do

17   you understand that Valve sought sanctions against

18   the plaintiffs and Randall Garteiser?

19      A.   I do.  Absolutely understand that.

20      Q.   I'll ask it this way:

21           What are your views on Valve's desire to

22   attempt to sanction Mr. Garteiser, who, at least at

23   the time, represented your companies?

24           ATTORNEY VAZQUEZ:  I'm going to instruct

25      you.  You can answer to the -- but to the

1    don't feel I've given you a full answer, if you

2    could repeat the question again, I can expand upon

3    my answer.  If you'd like me to.

4        Q.   Are you aware that the defendants in the

5    current lawsuit moved to dismiss Valve's lawsuit?

6        A.   Absolutely.  That the defendants,

7    including myself, yes, we filed a motion to dismiss,

8    which Judge Whitehead denied.

9        Q.   In light of the fact that Judge Whitehead

10   denied your motion to dismiss and the fact that the

11   case remains ongoing, do you leave any room for the

12   possibility that Valve is pursuing this lawsuit

13   because it believes the lawsuit has merit as opposed

14   to, as you said, Valve is simply trying to punish

15   you?

16       A.   I believe, on point, that this is a

17   meritless lawsuit that Valve has set to pursue for

18   industry reasons, perhaps, to make it clear that, if

19   you're an inventor, a successful inventor, have over

20   150 patents that I've invented; we've received money

21   from numerous Fortune 500 and 100 companies; I've

22   sold patents to companies like Apple for many

23   dollars; I believe that Valve's position is they

24   want to crush the little guy, the inventor in this

25   case, me.  More outrageous, the attorney that's

Leigh Rothschild                                                           Valve Corporation vs.
                                                                          Leigh Rothschild, et al.

1    handling me.  They want to send a note to the

2    industry that, if you sue a company like Valve, or

3    particularly Valve, you're going to be hurt.

4          So you hire a law firm.  You give the law

5    firm millions of dollars and you just spend as much

6    tame as money as you can, you know, billing the

7    client and hoping that you'd have some success.  The

8    matter at hand is a matter under the Consumer

9    Protection Act with a matter of $25,000 in limits,

10   and it's clear to me and my colleagues that your --

11   that Valve has spent hundreds of thousands, if not

12   millions, of dollars in legal fees on pursuing this

13   matter.  It seems outrageous.  It seems abusive.  It

14   seems egregious.  And in my career, we've never seen

15   anything like it.  The industry takes it upon -- my

16   industry colleagues think they've never seen

17   anything like it.  The whole matter is outrageous,

18   and once again, I make the statement:  I don't know

19   why I'm here for a simple mistake that we made that

20   could have been remedied, that the contract called

21   for remedy, that Valve has decided to go after me,

22   go after my attorney, rough up my nanny, in pursuing

23   this matter.  I think it's outrageous.  And I think

24   the only benefit that's being made in this whole

25   matter is to your law firm.

**Confidential**

1          Does that answer your question?

2      Q.   The mistake that you referenced in your

3    answer, are you referring to Display Technologies

4    filing a lawsuit in 2022 against Valve for

5    infringement of the licensed '723 patent?

6      A.   There was a lawsuit filed -- I don't know

7    the particular patent number.  My memory is not that

8    clear.  We filed a case.  My attorney Jay Johnson,

9    who was suffering from terminal cancer, filed the

10   case, which we gave him authority to file.  Our

11   mistake.  His mistake.

12          As soon as we were notified by Jay Johnson

13   that the case was -- that your client Valve already

14   had a license on the patent, we immediately, as per

15   the contract, apologized and withdrew and dismissed

16   the complaint without any damage, from our opinion,

17   to your client Valve.  That's the matter I'm

18   referring to.  Apologies given.

19      Q.   Do you have an understanding of whether

20   that lawsuit was filed and dismissed in 2022?

21      A.   I don't know the exact date.  I will tell

22   you, Counsel, that as soon as we found out from my

23   counsel, Jay Johnson, that a mistake was made, we

24   immediately -- I immediately instructed my

25   colleagues to apologize and immediately instructed

**Confidential**

1    executed by Valve's Scott Lynch and myself as

2    managing director and myself as -- and myself as

3    managing director of another entity and

4    individually.  And individually.

5        Q.   You mentioned that Valve is out to crush

6    the little guy.  How many other lawsuits are you

7    aware that Valve brought, meaning Valve served as

8    the plaintiff against anybody?

9        A.   My colleagues have told me -- I'm not

10   aware specifically in terms of style of cases, but

11   my colleagues have told me this egregious behavior

12   has occurred from Valve previously.

13       Q.   What egregious behavior of Valve's are you

14   referring to?

15       A.   Well, the egregious behavior of playing

16   lawfare where Valve acts as either a plaintiff or

17   defendant and tries to use the huge amounts of

18   revenue stream from their billion dollar company to

19   crush a little company by spending millions of

20   dollars in terms of mindless litigation, as we're

21   seeing in this case.

22       Q.   If Valve gets sued, meaning it's a

23   defendant, and there's merit to Valve's defense, but

24   it's going to cost more money than settling, is it

25   your view that Valve should settle a meritless

**Confidential**

1    is a lawyer?

2        A.   No, not in the least.  No one seemed to

3    have told me that.  The Court doesn't seem to object

4    to that.  The case is going on.  I believe that's

5    perfectly, you know, perfectly within the realm of,

6    you know, of legal propriety.

7            When someone makes a defamation statement,

8    you know, under the law, you have every right to

9    sue.  But, of course, it will depend now.  That will

10   be up to the Court to decide whether the case is,

11   you know, a reasonable case and to rule, you know,

12   in our favor, in our favor.  No.  Absolutely not.

13   The outside the legal limits is filing, you know,

14   not for defamation, just for harassment, just for

15   abuse of process just going after attorneys for, you

16   know, the reason that why not?

17           Valve has, I guess, billions of dollars,

18   from what I read.  You know, and just used the money

19   to crush the little guy, crush the little guy's

20   attorneys?  No.  Simple abuse of process.  Simple

21   abuse of process, as we hope that the Court will see

22   and that Valve will pay.

23       Q.   You do agree that Valve prevailed over

24   your motion to dismiss its lawsuit; correct?

25       A.   I do agree that the Court ruled the case

1    year.  I don't know.  I don't know.  I didn't think

2    it was that long as a year.

3        Q.   You have the Global Settlement and License

4    Agreement in front of you.  I believe this is

5    Exhibit 17.

6        A.   I do.

7        Q.   And you had asked for it.

8            Where in this agreement is the provision

9    or provisions that you contend contemplate Display

10   Technologies filing a lawsuit on a licensed patent

11   and calling it a mistake, apologizing, and quickly

12   dismissing it?

13       A.   Could you read back that question or could

14   you -- not read back.  Could you ask me that

15   question, again?  Much appreciated.

16       Q.   Where in this Exhibit 17 Global Settlement

17   and License Agreement does it contemplate actions

18   like those that Display Technologies took, namely,

19   suing Valve on a licensed patent?

20       A.   You're asking me where does it give us the

21   rights in this agreement to sue Valve on a patent

22   that's already been licensed?

23           I would say there's nowhere in this

24   agreement that contemplates us suing Valve on a

25   license -- on a patent license that they already

**Confidential**

1    had.  To do so would be a mistake.

2        In this case, what actually happened is it

3    was a mistake, which, as I testified previously to,

4    we immediately apologized for.  We made a human

5    mistake.

6        Q.    I misunderstood then.  I thought there was

7    something in the license that you wanted to point

8    out to me and that's why you asked for it.  Am I

9    mistaken?

10        A.    You are mistaken.  We're talking about,

11    Counsel, two different -- I know it's an innocent

12    mistake on your part.  So thank you for correcting

13    that.  There's two different things.

14        The question you just asked me was there

15    anything in the agreement that contemplates the

16    right for us to sue, I thought you said, even though

17    Valve has a license.  No, nothing in that.  We

18    shouldn't be suing on licenses that we've already

19    given out.  To do so would be a simple mistake.  In

20    this case, what actually happened it was a simple

21    mistake, which, of course, we apologized.

22        What I said previously -- if you want, the

23    court reporter could read back the testimony -- what

24    I said previously was theres's a provision in there,

25    should that happen, Counsel, for us to withdraw the

1   suit, dismiss it, you know, to dismiss that

2   immediately to -- if the lawsuit is filed

3   incorrectly, we would take action to immediately

4   dismiss the suit and the agreement does not

5   contemplate any penalty for doing so.  Of which,

6   now, Valve has decided that the penalty would be two

7   years of litigation, millions of dollars, in my

8   opinion, being spent with the ability to sue the

9   attorney, sue the law firm, sue me individually,

10  cause all kinds of problems, cause abuse of process

11  and harassment.

12         Valve, on their own, decided that they

13  would do that even though the agreement doesn't

14  allow for any of that.  So that's kind of a mystery

15  to me.  As you asked before, Counsel, why Valve

16  would decide to take that on?  I can only think it's

17  aggressive and egregious behavior, which is

18  consistent with some of the other things that Valve

19  has done during its operations.

20         So that's my conclusion.  But I'll be

21  happy to point out the section where it covers that

22  for you, which, I think, is your question.

23     Q.   Yes.  And for the sake of cleaning up the

24  record, the provision that you're referring to that

25  allows anybody to fix or withdraw or whatever, if

Leigh Rothschild                                              **Valve Corporation vs.**
                                                              **Leigh Rothschild, et al.**

1    they go to court and they shouldn't have, please

2    point that --

3        A.   Sure.

4        Q.   -- provision out to me.

5        A.   Sure, sure.  It's going to take a while.

6    Do you want to take a break or do you want me to

7    just sit here and read it, because I'm going to have

8    to go through the whole agreement.  May take ten

9    minutes or so.

10       Q.   Let's take a break while you do that.

11       A.   Am I allowed to take the agreement with

12   me?

13       Q.   Yes, but don't mark it up.

14       A.   I wouldn't touch it.

15       Q.   Yeah.

16       ATTORNEY MACHLEIDT:  RenÈ, do you want to

17   stick here for a second?  Off the record.

18       THE VIDEOGRAPHER:  Going off record at

19   4:34 p.m.

20            (Recess.)

21       THE VIDEOGRAPHER:  Back on record at 4:51

22   p.m.

23   BY ATTORNEY MACHLEIDT:

24       Q.   Mr. Rothschild, we took a break in

25   response to a question I had asked where I wanted to

**Confidential**

1    know which provision of the Global Settlement and

2    License Agreement you were referring to in terms of

3    addressing what happens when a lawsuit occurs that

4    should not occur.

5          What provision were you thinking of?

6       A.   First, I'd like to mention the provision

7    3.5.  If you'd like, Counsel, I'd be happy to read

8    it into the record.

9          And then there's, also, I'd like to --

10   like to add to that, add to my testimony, after 3.5,

11   I'd point out to the Court through this testimony

12   provision 3.3 and 9.5.

13         May I read it into the record?

14      Q.   No, because the document is an exhibit of

15   record.  So you don't have to --

16      A.   Okay.

17      Q.   -- go through that.  You said 9.5?

18      A.   I said let's start with 3.5.

19      Q.   I apologize.

20      A.   Oh, no problem.

21      Q.   The third section was 9.5?

22      A.   Two other references that I'd like to

23   mention in my testimony.  After 3.5, I wanted to

24   mention 3.3.  And more, even more importantly than

25   3.3 would be 9.5.  But most important, 3.5.

Leigh Rothschild

1      Q.   In the situation where, for instance,

2   Display Technologies files a lawsuit against Valve

3   for a patent that is already covered by the Global

4   Settlement and License Agreement, what is your view

5   that 3.3, 3.5, and 9.5 provide to the parties in

6   that situation?

7      A.   To answer your question, 3.5 reads:  In

8   the event that a licensor brings a claim under the

9   licensed patents against any licensee, third party,

10   or any entity that claims that the alleged

11   infringing conduct arises out of any communication,

12   interaction, transaction, cooperation, or

13   contractual obligation with or on behalf of a

14   licensee, then upon the licensee providing written

15   notice and sufficient written license to corroborate

16   the claim, then licensee shall have ten days cause

17   such claim to be dismissed with respect to such

18   entity to the extent the claim is based on the

19   conduct that is properly subject to protection from

20   suit under Sections 2.11, 2.2, 3.1, or 3.2.

21          I would point out for the record and for

22   my testimony, that's exactly what happened as was

23   contemplated by the agreement by 3.5.  My company,

24   who's the subject to this agreement, Display

25   Technologies -- I say my company -- Patent Asset

**Confidential**

1    Management, which owns Display Technologies,

2    inadvertently filed a lawsuit against -- made a

3    human error, made a mistake, apologized for the

4    mistake, filed a lawsuit, which was listed as for

5    one of the licenses that were on here, which Valve

6    had rights to.  Immediately, within the ten-day

7    period, which Section 3.5 provides, immediately

8    through counsel, notified Valve that we had made

9    this mistake, this human error, and immediately

10    dismissed the case.

11        So I don't still understand why 3.5 didn't

12    satisfy Valve sufficiently and why they would bring

13    this abuse of process, you know, lawsuit against

14    myself, my attorney, and his law firm.  I'm either

15    thinking that Valve didn't -- wasn't, you know,

16    knowledgeable of what the provision was in 3.5,

17    that's my first theory, or the attorney, your firm,

18    your firm, didn't read the agreement that they filed

19    under, didn't read the agreement that was subject to

20    the lawsuit, which would be a terrible thing if

21    you're not reading agreements before you file

22    complaints.  That would be correct, wouldn't it?

23        And the third thing I'm thinking is that

24    Valve just doesn't care what the agreement says and,

25    as I testified earlier today, that they just plan on

**Confidential**

1    punishing the inventor and doing whatever they can

2    to put down the inventor.

3         So but it's very clear to me and to others

4    that I've consulted on this provision without

5    specificity that this agreement -- that this

6    provision covers exactly what occurred.  And as a

7    result of it, again, we ask the main question why am

8    I here?  Why did Valve sue?

9         If you'd like to discuss or you'd like me

10   to concurrently discuss 9.5 and 3.3, we could do so.

11   Or I'd like to, at some point, add testimony

12   relative to those provisions.

13       Q.   When you refer to Valve's attorneys in

14   your prior answer, are you referring to, for

15   example, myself?

16       A.   I'm referring to your law firm and the

17   series of attorneys, including you, yes, that

18   they've hired to pursue this action.  The attorneys

19   that have been on this case and the law firm that

20   Valve hired, which is your firm.  Yes, and you;

21   correct.

22       Q.   Have you and I met before today?

23       A.   Never met, never spoke.  Today's our first

24   time.  It's my pleasure to meet you.

25       Q.   What do you believe I have done wrong with

**Confidential**

1      Q.   Please tell me whatever you recall about

2    the --

3         ATTORNEY MACHLEIDT:  Strike that.

4    BY ATTORNEY MACHLEIDT:

5      Q.   Remind me, was there a written settlement

6    agreement between yourself and Ms. Casangen?

7      A.   I testified to earlier there was.

8      Q.   Please tell me what you remember of the

9    terms of that agreement, understanding you haven't

10   seen it for a while.

11     A.   I have memory of the terms of that

12   agreement.  I do have a memory.

13     Q.   Please tell me what you recall in terms of

14   the specific terms of that agreement.

15     A.   Here we go.  I decline to answer the

16   question as I believe it's irrelevant, harassing,

17   and outside the scope of the litigation.

18         ATTORNEY VAZQUEZ:  Same issue as before.

19     I'm going to object on relevance and he's not

20     going to answer based on relevance.

21         ATTORNEY MACHLEIDT:  Is the decision not

22     to answer his and his alone or are you

23     instructing him not to answer?

24         ATTORNEY VAZQUEZ:  I'm leaving it up to my

25     client.

1    BY ATTORNEY MACHLEIDT:

2        Q.   What is it about that question that you

3    find harassing?

4        A.   I find it irrelevant, which I think, if

5    you're asking irrelevant questions, they border on

6    harassment.  Or actually, I don't know.  I guess

7    this would be a personal matter of definition.  I

8    find them to be harassing.

9            So in my context, in my definitional,

10   definition of harassment, but on my own advice, I

11   respectfully decline to answer the question.  Of

12   course I would abide, absolutely, by any court order

13   that would direct me to respond and give you that

14   what I consider to be irrelevant information to the

15   causes of action that your client has sued me under.

16   Or sued my entities under.

17       Q.   Do you understand that, while you may view

18   it as irrelevant, I don't know because I don't have

19   it in my hands.

20       A.   Uh-huh.

21       Q.   Does that make sense to you?

22       A.   It does.

23       Q.   I know you're not a lawyer, but you've

24   been involved in one way or another with a lot of

25   lawsuits.

Confidential

1       A.   Uh-huh.

2       Q.   Do you generally think it's appropriate

3   for the party that holds the information to

4   determine what's relevant and what's not in a case

5   like this?

6       A.   I think that, if there's a cause of action

7   in a lawsuit that's brought against someone, you

8   would have -- certain questions would be allowed,

9   certain questions wouldn't.

10          Now, if Tim Cook were to fall in WalMart,

11  they might ask him the circumstances, and they

12  should, about how he fell in WalMart, but I don't

13  think the fact that he had an executive assistant

14  four years ago to know what he settled with her or

15  maybe who he's dating or what food that he's buying

16  from Whole Food in the morning, I would find those

17  questions, and I think Mr. Cook's attorney, if he

18  has a good attorney, would find them to be

19  harassing, irrelevant, and I would hope that if Cook

20  has a good attorney, Mr. Cook has a good attorney,

21  his attorney would, you know, tell Mr. Cook not to

22  answer.  And only then the Court, you know, would

23  tell him to answer.  And you would hope that, you

24  know, the judge would also agree that the questions

25  are abusive, harassing, and irrelevant to the fact

1    that, you know, that the matter at hand.  In the

2    example I gave, what does his assistant have to do

3    with him falling in a WalMart?

4         So I find the same thing to be true here.

5    You're asking a lot of questions, and in all due

6    respect, that are totally irrelevant to the matters

7    at hand, which are the causes of action that your

8    client has brought against me.  But it would be up

9    to the Court, I realize, as, I guess, a relatively

10   sophisticated litigant, for the Court to determine

11   that.

12        ATTORNEY MACHLEIDT:  RenÈ, I think you and

13        I both got tossed under the bus with that

14        answer.

15   BY ATTORNEY MACHLEIDT:

16        Q.   Do you intend to testify in trial, if this

17   case goes that far?

18        A.   Absolutely.

19        Q.   Do you believe that Valve has the ability

20   to probe the credibility of witnesses that testify

21   against it?

22        A.   I'm not an attorney.  I would rely upon my

23   counsel -- hopefully, good counsel -- to tell me

24   what they can and can't ask and to take it from

25   there so.

**Confidential**

1    agreement as irrelevant?

2        A.   My answers as follows:  In many of the

3    questions today, they were totally irrelevant; they

4    were totally abusive; they totally constitute, in my

5    opinion, harassment.  I've said before.  I say that

6    now on the record.  I have given as much latitude as

7    I can to answer irrelevant questions.  I'll continue

8    to do my best to do that.

9        When the questions get so irrelevant and

10   so stupid, quite honestly, that I choose not to

11   answer them, I will take it upon myself or get

12   advice from my legal counsel, who's sitting to my

13   left side, and do so appropriately.

14       As far as Tim Cook, excuse me for giving

15   the Tim Cook example.  It could be anyone, that any

16   attorney.  In this case, it's you as the attorney

17   that's asking, in my opinion, irrelevant, abusive,

18   harassing questions.  I state that on the record,

19   and I'd like it to be preserved.  I hope it's

20   preserved on the record because, hopefully, we'll be

21   using it in court.

22       Q.   The fact that I'm asking you about the

23   terms of a settlement agreement relating in some way

24   to your company or companies, you consider me to be

25   asking you irrelevant and stupid questions?

**Confidential**

1    A.   I do.  I do.  I can affirmatively state

2    that I do.

3    Q.   And throughout the entirety of my attempt

4    to get that information, has your counsel ever

5    instructed you not to answer?

6    A.   In some questions today he answered -- he

7    asked me not to answer.  But, no, not on that one.

8    It was up to me.  Upon my own advice, I've decided

9    not to -- upon my own perspective, I've decided not

10   to answer that.  And again, I will be more than

11   happy to answer if, in the wisdom of the Court,

12   which I believe in, that the Court tells me to

13   answer.  Absolutely happy to abide.  But, hopefully,

14   the Court will think that it is irrelevant.  We

15   shall see.  If you take it to court.

16   Q.   Limited to the Casangen agreement,

17   throughout my attempt to get answers about the terms

18   of that agreement, your counsel has never instructed

19   you not to answer; is that correct?

20   A.   That is correct.

21   Q.   You mentioned you have an NDA or there's

22   an NDA relating to a Mr. Medina; correct?

23   A.   We have -- I don't know if you'd call it,

24   Counsel, an NDA.  It's a confidentiality agreement.

25   I believe it's entitled a confidentiality agreement.

Leigh Rothschild                                        Valve Corporation vs.
                                                       Leigh Rothschild, et al.

1        Q.   Who is Adam Diamond?

2        A.   Adam Diamond is a former general counsel.

3    Patent attorney.  Member of the patent bar and

4    former employee as general counsel to my company.

5        Q.   When you say my company, you mean PAM?

6        A.   I mean PAM, the company that I'm CEO of.

7        Q.   When did Mr. Diamond stop working for PAM?

8        A.   I don't recollect that with any kind of

9    specificity, but many years ago.

10       Q.   Is there an NDA bearing his name?

11       A.   Our policy was to have NDAs with all the

12   employees.  I think there would have been, but I'm

13   not certain.

14       Q.   If an employee of PAM refused to sign an

15   NDA, what would happen?

16       A.   No one ever -- I can't say what would

17   happen, Counsel, because no one ever refused to

18   sign.  When offered, everyone signed.  It was a

19   condition of employment to sign.

20       Q.   Did you have a nanny in 2023?

21       A.   Yes.

22       Q.   Do I recall correctly that you earlier

23   mentioned Valve harassed your nanny?

24       A.   Yes.  Valve sent a process server over who

25   physically roughed up the nanny; right.  Valve, or

1    the attorney for Valve, your firm, I guess, I guess

2    it was your firm that sent a process server over,

3    because you hired the process server, I would

4    believe.  If that's not correct, you could tell me.

5    And that process server physically assaulted my

6    nanny when serving the process when the -- when

7    serving the complaint.  We filed a police complaint,

8    which is still pending.

9        Q.   Please tell me everything that you recall

10   about the altercation between the process server and

11   your nanny.

12       A.   She came to the door -- what I recall -- I

13   wasn't there, but I believe that the situation was I

14   guess I was arriving home, if I remember.  She said

15   they -- your process server, meaning your firm, I

16   guess, hired this server.  So, of course, they'd

17   have liability.  And they came to the door and we

18   have a gate.  They got into the neighborhood, which

19   is gated.

20            They came to the gate at my house and they

21   asked to see me.  And I guess Ms. Ruiz, who's the

22   nanny, said that I wasn't home.  And they said who

23   are you, and she said I don't -- I guess she said I

24   don't know or I'm the nanny.  And he said that's

25   good enough, something like that.  I don't -- having

**Confidential**

Leigh Rothschild                                    Valve Corporation vs.
                                                    Leigh Rothschild, et al.

1    not been there, I'm just giving you my hearsay on

2    this.

3          And he said I'm going to serve you, and

4    she said I'm not.  And he -- she, I guess, walked

5    away.  And he grabbed her arm and twisted it and

6    caused physical injury to her.  And then, I guess,

7    if I remember correctly, he dropped the complaint on

8    the floor and said it was served.

9          When -- as soon as they told me about it,

10   I called the police and we filed a police report.

11   To the best of my knowledge, I've not heard that the

12   incident has been prosecuted.  I haven't heard

13   anything actually from the police.  I don't know if

14   Ms. Ruiz has, but I haven't heard anything and she

15   hasn't related anything to me.

16          So I believe the complaint is still

17   lodged, the complaint against the police officer --

18   against the -- I'm sorry, against the process

19   server.  It wasn't a police officer.  Against the

20   process server is still an active complaint.

21       Q.   I assume the complaint also names my law

22   firm; correct?

23       A.   I don't know if you would say that it

24   names your firm.  Your firm was indicated in

25   discussing this.  The police came over and, I

**Confidential**

1    believe, in discussing this, we told them that it

2    was a Valve complaint and your firm's name was on

3    the complaint.  So probably then they were told, the

4    police, that it was your firm that hired the process

5    server.  I would guess so.  I would guess so, yeah.

6    But I don't know if you're named physically.  You

7    know, actually, I should say, not physically,

8    actually, in the complaint.  I don't know how that

9    works.  I'm not a police officer.  So I don't know

10    how that works.  But I know a complaint was filed

11    and I know that immediately I instructed my attorney

12    at the time, Don McPhail, to immediately relate it

13    to the Valve people.  And I think that it was

14    related to Chris Shank, maybe.  And Shank basically

15    told Donny -- you know, he didn't think it was of

16    consequence.  It was a big joke.  My nanny doesn't

17    think it's a big joke.

18        Q.   You believe Mr. Shank spoke to

19    Mr. McPhail, your outside counsel, and said that

20    this altercation you described was of little or no

21    consequence?

22        A.   I believe it was related to me.  Now, I'm

23    not sure it was -- that my attorney -- I know one of

24    my -- one of my attorneys.  I think it was McPhail,

25    but I'm not certain.  I know that someone at Valve

1    was related immediately this information and they

2    told me that the attorney basically said blow it out

3    your ear or something like that.  I couldn't care

4    less.  It was a very derogatory comment that was

5    made.  Like who cares.  That's your problem.  It was

6    very disgusting comment, quite actually.  I'm happy

7    to testify to that.  It made me sick to my stomach.

8         Q.   I actually do want you to testify to that.

9    I'm trying to --

10        A.   Sure.  I'll testify to the Court, too.

11        Q.   I'm trying to learn as much as possible.

12        A.   Sure.  You had no knowledge of this?

13        Q.   I got factual research -- I'm limited to

14   asking you questions.

15        A.   I understand.

16        Q.   So that's the dance we do.

17        A.   That's right.

18        Q.   Is it common practice for your outside

19   counsel to contact opposing parties?

20        A.   Outside counsel to contact opposing

21   parties.  The attorney.  Is it common practice for

22   my attorney to contact the opposing counsel on a

23   case that they're both involved in; is that your

24   question?

25        Q.   No?

1      A.  Sorry.

2      Q.  I didn't say opposing counsel.  I said the

3  opposing party.  Chris Shank is in-house counsel for

4  Valve.  He is not the lawyer for Valve in this

5  lawsuit.  I am and my firm is.

6      A.  Right.

7      Q.  So my question is --

8      A.  Right.

9      Q.  -- would it be common for Mr. McPhail to

10 directly reach out to Mr. Shank as opposed to, for

11 example, me as outside counsel?

12     A.  So --

13     ATTORNEY VAZQUEZ:  I'm going to -- wait.

14     I'm going to advise you you can answer, but

15     only to the extent that you're not divulging

16     privileged information.

17     A.  I'd like to amend my testimony.  I don't

18 know who my counsel -- I said to you before.  I

19 don't know who was my counsel that contacted Valve.

20 I believe it was McPhail, but I'm not certain.  And

21 I don't know who they contacted for Valve.  I

22 thought it was the Valve -- I'm sure -- I'm pretty

23 certain it wasn't Valve, the Valve principles,

24 because we've never talked.  Well, I guess we've

25 talked to -- I guess my attorneys have talked to

1   Shank.

2          So I'm not sure where the contact was

3   made, whether it was McPhail to Shank or McPhail to

4   one of the members of your law firm, not possibly

5   including you, sir.

6          So someone was talked to.  It was related

7   to me the comment was made who cares; we couldn't

8   care less; it's not a serious matter, as far as

9   we're concerned.  But I want my testimony to reflect

10  I'm not sure it was McPhail and I don't know who on

11  the other side representing Valve was talked to.  So

12  my testimony should be amended to reflect that.  It

13  could be Shank, it could be you, sir, meaning

14  Dario -- I'm sorry, I don't remember your last name.

15  Could be you.  It could be Shank or it could have

16  been one of the other members of your firm or

17  another member of Valve.

18      Q.   You're saying it's possible that, when

19  contacted by your lawyer, we don't know, it could be

20  McPhail, it could be somebody else, but when

21  contacted about this altercation --

22      A.   Right.

23      Q.   -- potentially, my response was along the

24  lines of blow it out your ear, we don't care?

25      A.   Right.  But it -- I'm not saying that it

**Confidential**

1    was you.  It was someone that represented Valve.

2    Either a Valve principal, meaning either a Valve

3    representative that works for Valve, a Valve

4    employee, a Valve employee, or an attorney for

5    Valve.  Which attorney for Valve, if it was an

6    attorney, I don't know, sir.  Might have been you,

7    might have been one of your colleagues.

8            The point that we're trying to make here

9    is that the remark as related to me was yes, blow it

10   out your ear.  Are you kidding?  We couldn't care

11   less.  Absolutely.

12       Q.   I'll represent to you that, in the summons

13   that was ultimately served upon you, the contact

14   information in that summons is my own and the number

15   is mine, and even though the record reflects it, I'm

16   Dario Machleidt, meaning if somebody wanted to make

17   a phone call specific to the summons, they very

18   likely would have called me.  Does that make sense?

19       A.   I don't know who they called.  So whether

20   or not -- what information is on the summons is -- I

21   appreciate you telling me that.  I have no idea who

22   they called.  It may be that someone else that

23   you're deposing could tell you.  So there are other

24   people that were involved.  Mr. Falcucci was aware

25   of it as well.

**Confidential**

1      Q.   Did Mr. Falcucci become aware of this

2    through you or through other means?

3      A.   Immediately.  Immediately.  The day it

4    happened.  The moment it happened.  Right after.

5    Mr. Falcucci was immediately informed of what

6    happened.  Immediately.  As was my outside counsel.

7    At the time, my outside counsel was Don McPhail; so

8    I assume it was from him.  If my memory serves

9    correct, it what was McPhail that was immediately

10   informed and Falcucci.

11           And I don't know -- I know the comment

12   that was passed back, but I don't know who they

13   talked to.  I thought it might have been Shank.  It

14   could have been you, sir.  It could have been one of

15   your colleagues.  I think I've testified now over

16   and over to that in the last few minutes now, sir.

17   But the response was disgusting.

18      Q.   I don't ever want to limit your answer.

19   I'm not allowed to.  But just trying to make the

20   record clear, the response that you said was

21   disgusting, please tell me everything that you

22   recall about what that response actually was.

23      A.   All I recall is that I asked -- I guess

24   either McPhail or Falcucci -- you can see my memory

25   is not perfect on this matter.  Other matters, yes.

1    This one not.

2          Whoever related it to me said that -- I

3    said something like what did they say?  And he said

4    they couldn't care less; blow it out your ear; you

5    know, we couldn't care; that's her problem; couldn't

6    care; it never happened; or if it did happen, we

7    don't care.  Something to that extent, which I

8    considered in my own mind, using my own terminology,

9    disgusting.  Once again, showed me what kind of

10   people Valve -- what kind of persons Valve -- you

11   know, the kind of company that Valve is, that they

12   wouldn't care, that they assaulted my nanny.  And

13   certainly, she cared and I cared.

14         And my children were -- my children, I

15   would also like to add, were part of this in the

16   fact that they witnessed the whole thing where the

17   nanny was physically abused, physically assaulted --

18   a better word -- right in front of my children.

19       Q.   The fact that Valve hired Kilpatrick

20   Townsend, my law firm --

21       A.   Right.

22       Q.   -- which --

23         ATTORNEY MACHLEIDT:  Strike that.

24   BY ATTORNEY MACHLEIDT:

25       Q.   The fact that Valve hired Kilpatrick

1   Townsend, my law firm, which then contracted, hired,

2   a process server in Florida to serve a summons on

3   you and things went south, you put the blame

4   squarely on Valve; correct?

5        A.   No, I -- no, that's not true.  Let's make

6   this clear.

7             I put the blame first on the process

8   server, who, obviously, wasn't acting in a proper

9   fashion to rough up the nanny, grab her arm and

10  twist it and while she's screaming.  He's holding on

11  to her while my children are watching.  So I think

12  he's principally at fault.

13            I have no knowledge of whether or not

14  Valve or you or one of your colleagues from your law

15  firm instructed the process server to assault my

16  nanny.  I certainly would hope not.  So I have no

17  knowledge of that.  I only know what the -- I only

18  know what I'm told and what occurred, you know, in

19  terms of assaulting the nanny.  Who caused that to

20  happen, certainly, we know that the process server

21  caused it to happen.

22            Whether or not the process server was

23  directed to do that by either your law firm or you,

24  sir, or one of your colleagues, or Valve, I have no

25  knowledge of that.  We have not discovered that.

**Confidential**

1    Possibly, in the future, we'll discover it.  Or the

2    police will discover it.  But right now, I have no

3    knowledge of that.

4        Q.   Do you intend to seek discovery into

5    whether I instructed the process server to assault

6    your nanny?

7        A.   I intend to try to find out as much as I

8    can about this, if my attorneys agree that that is a

9    wise decision on my part.  And certainly, intend to

10   inform the Court about it in my testimony.

11       Q.   Because much of your testimony admittedly

12   seems to come from hearsay, from what people have

13   told you, what actual information do you have to

14   provide to a court that you are able to testify

15   about with respect to this alleged assault?

16       A.   No, it's all hearsay.  You're absolutely

17   right.  I only have the information that was told to

18   me by the nanny.  So only that information.  So it's

19   absolutely hearsay.  Absolutely.  Of course, you

20   know, we would have the assault on file with the

21   police.  But yeah, no, it's hearsay.

22       Q.   Do you --

23       A.   I still think it's of interest.

24       Q.   Do you intend to inform the Court about

25   what your nanny has told you?

1          A.    I think we've already informed the Court

2    in pleadings, but I'm not certain of that.

3    Certainly, Mr. McPhail, who represented me initially

4    in the case, knew about it.  I thought he put it in

5    the pleadings, but I'm not sure.  Certainly, in my

6    testimony, if called upon by counsel, I would

7    certainly be happy to relate it to the Court and to

8    the jury.

9          Q.    Again, because of the hearsay issues that

10   exist in a courtroom, do you intend to bring your

11   nanny to trial to testify as to this alleged

12   assault?

13         A.    I would seek whatever legal advice on that

14   matter and then act accordingly.

15         Q.    How long have you known Stephen Lobbin?

16         A.    Two years or so.  I believe.  It may be

17   three years, Counsel.  May be three years.

18         Q.    Has Mr. Lobbin represented you in patent

19   infringement matters?

20         A.    He has.  He has.

21         Q.    Approximately how many patent infringement

22   matters has Mr. Lobbin handled for you?

23         A.    Less than ten.  Less than -- no more

24   than -- actually, I'm sorry.

25              No more than ten.  Less than ten.  In that

1   approximate number.  Approximately ten.  Something

2   like that.  Maybe a little less.  I don't think it's

3   more, but -- than ten cases.

4       Q.   Is Mr. Lobbin the lawyer representing you

5   in the defamation case with Rachel Lamkin?

6       A.   He's one of the lawyers.

7       Q.   What role does Mr. Lobbin play in the --

8   I'll call it -- the defamation case?

9       A.   He acts as primary counsel along with an

10  associate counsel.

11      Q.   As of August 27, 2025, does Mr. Lobbin

12  continue to represent you in the Lamkin defamation

13  case?

14      A.   He absolutely does.  He's counsel of

15  record as of today along with Ed O'Connor.

16      Q.   At the risk of opening a can of worms,

17  please tell me what you know about Rachel Lamkin.

18      A.   Yeah.  I question the relevancy of this

19  matter.  I decline to answer the question as it

20  seeks information that's irrelevant in my opinion to

21  the causes of action that you've brought against

22  myself, my attorney, my entities, and not only that,

23  but the attorney's law firm.

24           And there's an active case going on in

25  this matter, as you've pointed out, so I wouldn't

1    want to be on the record here for something that is

2    involved in another case, particularly when I

3    believe I deem your question to be irrelevant.

4        Q.    Is Ms. Lamkin currently representing

5    Starbucks in patent infringement lawsuits involving

6    one or more of your monetization entities?

7        A.    I do not know if Ms. Lamkin currently

8    represents Starbucks in any matter, but I will be

9    happy to testify, as I am now, be happy to state

10   that Ms. Lamkin no longer represents Starbucks in

11   the Starbucks action that was brought against my

12   entity, Analytical Technologies, as the case has

13   been settled.

14       Q.    When was the case settled?

15       A.    The case was settled several months ago.

16   Probably four or five months ago.  With the

17   provision that was in the agreement that the Court

18   would provide a ruling on a certain matter.  I don't

19   remember what the matter was.  And the Court decided

20   on their own volition, Judge Payne, not to rule on

21   that matter.  So now the case has been totally

22   settled.

23           So it was partially settled and a

24   settlement agreement was reached several months ago,

25   four or five months ago, I guess, and they were

**Confidential**

1    waiting for a final settlement agreement, if the

2    Court would rule on a particular matter.  And I

3    don't remember what it was.  Might have been a 101

4    matter or an infringement matter.

5           In any case, the Court refused to rule and

6    they just said that they're not taking orders from

7    Ms. Lamkin.  She asked for the ruling.  The Court

8    refused.  The settlement's now been finalized.  So

9    start -- so Lamkin does not represent -- there's no

10   active Starbucks matter against Analytical

11   Technology -- there's no matter Analytical versus

12   Starbucks.  The style of that case has been settled.

13       Q.   As recently as this year, Ms. Lamkin

14   represented Starbucks against one of your patent

15   monetization companies and that lawsuit led to a

16   settlement.

17           Separate from that, you personally have

18   sued Ms. Lamkin for defamation; is that correct?

19       A.   That's correct.

20       Q.   Do you continue to refuse to answer my

21   questions about what you know of Ms. Lamkin because

22   you consider them to be irrelevant?

23       A.   Yes, I do.  And I'd like to confer with

24   counsel, who can give me further instructions on the

25   matter.

**Confidential**

1      Q.    I'm going to say no.

2           ATTORNEY MACHLEIDT:  And I can't stop you

3      if you drag him out, but I'm going to object to

4      the witness now repeatedly refusing to answer

5      questions because he deems them to be

6      irrelevant.  For that reason, and

7      unfortunately, for many other reasons, whenever

8      you decide to walk out at the seven-hour mark,

9      as you said, we will keep this deposition open.

10          RenÈ, you know that that is completely

11     inappropriate.  The witness does not get to set

12     the bounds of what is relevant.  You haven't

13     fought you on any privilege, but this is

14     inappropriate.

15          ATTORNEY VAZQUEZ:  Your objection --

16          ATTORNEY MACHLEIDT:  Say your peace,

17     please.

18          ATTORNEY VAZQUEZ:  Your objection is

19     noted.  I cannot force my client to testify.

20     A.    And in regard to your question on Lamkin,

21     on my own advice, I respectfully decline to answer

22     the question.  I'll abide by any -- certainly happy

23     to abide by any court order directing me to respond.

24     Q.    There's nothing that you're willing to

25     tell me about Ms. Lamkin?

Confidential

1       A.   If you'll ask questions, I would -- let's

2    take it -- Counsel, let's take it question by

3    question.  Happy to try to answer questions that I

4    deem to be relevant.  And I don't believe I'm

5    required to answer questions that are irrelevant.

6    But, at the end of the day, that's up to the Court

7    to decide, isn't it?

8       Q.   You understand that a deposition has to

9    proceed where, even if your counsel objects because

10   my question is irrelevant or poorly worded or I just

11   wasn't paying attention, he objects, but we still

12   take the testimony because there's no judge to make

13   a ruling.

14      A.   Uh-huh.

15      Q.   You understand that; correct?

16      A.   I understand that.

17      Q.   Okay.

18      A.   If counsel's asking irrelevant, harassing,

19   abusive questions that the client -- I'm sorry, that

20   the deponent, which I am, does not have to answer,

21   but, of course, then it would go to the Court or a

22   magistrate of the Court and that magistrate or that

23   court would decide.  But, hopefully, the Court will

24   decide if the counsel is silly enough to answer

25   irresponsible, harassing, abusive, irrelevant

**Confidential**

1     questions like the example I gave you, the

2     hypothetical example about Tim Cook dating someone,

3     hopefully, the Court would put a stop to it.

4          So we'll see what the Court does here

5     since you're asking me to -- since you keep firing

6     off at irrelevant harassing questions.  But, again,

7     on Lamkin, take it question by question.  I'm happy

8     to try to answer.

9          Q.   Has Ms. Lamkin taken your deposition?

10         A.   In the past, she has.

11         Q.   How many times has Ms. Lamkin deposed you?

12         A.   Once, I believe.  It might be twice, but I

13    think once.

14         Q.   Was that in relation to a patent

15    infringement lawsuit?

16         A.   It was.

17         Q.   Did Ms. Lamkin accuse you indirectly and

18    specifically certain of your patent monetization

19    companies of failing to pay attorney fee awards?

20         A.   She has.

21         Q.   Did Ms. Lamkin say that your monetization

22    companies, when facing attorney fee awards, they go

23    bankrupt?

24         A.   Ms. Lamkin made that statement to

25    Bloomberg, to Bloomberg News, absolutely, that when

**Confidential**

1    remember this, but this particular case at all.

2        Q.   When a defendant, in this case, Blue Jeans

3    Network, informs, in this case, RBDS's outside

4    counsel about allegations of invalidity, what steps,

5    if any, were taken within PAM to see whether the

6    allegations are correct?

7        A.   Immediately --

8             ATTORNEY VAZQUEZ:  Hold, hold.

9             On the grounds of privilege, make sure

10        that you don't divulge any discussions with

11        outside counsel.

12        A.   Immediately, our attorney will take an

13    opinion on the matter, number one.  And usually, the

14    attorney or -- will refer it back to us.  And to get

15    additional research on the matter from our research

16    group.  And then we'll take a position on the matter

17    once we have the attorney's position, the attorney's

18    recommendation, and very importantly, the research

19    group's recommendation.

20             Many of the defendants will defend their

21    patent, will defend their products, and the

22    infringement allegations with a number of claims.

23    Sometimes they're true.  Many times they're not.

24        Q.   The fact that the Exhibit 23 letter is

25    dated 2021 and, as of August 2025, RBDS continues to

**Page 309**

**Confidential**

Leigh Rothschild                                    Valve Corporation vs.
                                                   Leigh Rothschild, et al.

1    assert the '221 patent, what does that indicate to

2    you about RBDS's views of the potential invalidity

3    of claim 7 of the '221 patent?

4        ATTORNEY VAZQUEZ:  Objection.  Calls for a

5        legal conclusion.

6        A.   I have no opinion other than the fact that

7    if we're filing cases -- filing a particular case,

8    we're filing it with merit and diligence beforehand.

9    That would be my opinion.

10        I don't take a legal -- I don't have a

11   legal opinion on infringement on the claim 7 or any

12   of the other claims except that, if we are

13   proceeding with the case, it's our opinion,

14   obviously, that there's infringement and that claim

15   7 is a valid claim.

16       Q.   This Exhibit 23 letter states that -- and

17   I'm looking at the bottom of the first paragraph --

18   we expect Rothschild to dismiss its related case

19   against Blue Jeans for the same reasons.  If

20   Rothschild does not intend to do so promptly, please

21   let me know.  Based on our investigation of the

22   allegations in the complaint, we do not believe any

23   payment is warranted to resolve this dispute.

24        Did I read that correctly?

25       A.   Absolutely.  Word for word.

**Page 310**

**Confidential**

1      A.  So I'm going to pull them off now, put

2    them on here, scan them, and then hand them to you.

3      Q.  That's perfect.  And I think all of that

4    can happen off the record.  Unless --

5      A.  Or on the record.

6        ATTORNEY MACHLEIDT:  René, it's getting

7    hot in here.  So I imagine --

8        ATTORNEY VAZQUEZ:  Yeah.

9        THE WITNESS:  Well, when they turn off the

10   air conditioning, it's probably a sign it's

11   time to go.

12       ATTORNEY MACHLEIDT:  All right.  Ready to

13   go off the record?

14       ATTORNEY VAZQUEZ:  Yeah.

15       THE VIDEOGRAPHER:  Going off record at

16   8:34 p.m.  And this concludes the deposition

17   for today.

18      (Proceedings were concluded at 8:34 p.m.)

19          * * * * * * * * * *

20      (Handwritten notes of the witness are received

21   and marked as Exhibit 25 for Identification.)

22

23

24

25

**Confidential**

Leigh Rothschild

1      C E R T I F I C A T E

2

3    STATE OF FLORIDA   )

4    COUNTY OF LEE      )

5

6

7         I, STACEY E. RAIKES, a Registered Merit

8    Reporter, Certified Realtime Reporter, and Notary

9    Public within and for the State of Florida, do

10   hereby certify:

11        That the witness whose examination is

12   hereinbefore set forth was duly sworn by me and

13   that this transcript of such examination is a true

14   record of the testimony given by such witness.

15        I further certify that I am not related to

16   any of the parties to this action by blood or

17   marriage and that I am in no way interested in the

18   outcome of this matter.

19        IN WITNESS WHEREOF, I have hereunto set my

20   hand this 2nd of September 2025.

21

22

23

24        _____

25        STACEY E. RAIKES, RMR, CRR

**Page 318**