# EXHIBIT 2
## FILED UNDER SEAL

Patent Asset Management / Rothschild Broadcast

# Transcript Export

Deponent: Garteiser, Randall

September 4, 2025

1/15/2026 10:53 am

GARTEISER, RANDALL Deposition Transcript

Full - Designations



**everchron**

The operating system for lawyers ®

Page 1

1          UNITED STATES DISTRICT COURT
                    FOR THE
2          WESTERN DISTRICT OF WASHINGTON

3    VALVE CORPORATION,        )
                               )
4              Plaintiff,      )
                               )
                               )
5    Versus                    ) CIVIL ACTION NO.
                               ) 23-CV-1016-JNW
6                              )
                               )
7    ROTHSCHILD ET AL.,        )
                               )
8              Defendants.     )

9          -----------------------------------

10         ORAL AND VIDEOTAPED DEPOSITION OF

11             RANDALL GARTEISER

12             SEPTEMBER 4, 2025

13                 VOLUME 1

14     CONFIDENTIAL ATTORNEYS' EYES ONLY
           -----------------------------------

15

16       ORAL AND VIDEOTAPED DEPOSITION OF RANDALL

17   GARTEISER, produced as a witness at the instance of the

18   Plaintiff, and duly sworn, was taken in the above-styled

19   and -numbered cause on September 4th, 2025, from

20   11:08 a.m. to 5:32 p.m., before Shawna Gauntt-Hicks,

21   Certified Shorthand Reporter in and for the State of

22   Texas.

23

24    JOB NO. 10170619

25

```
 1                    A P P E A R A N C E S

 2     FOR THE PLAINTIFF:

 3         Mr. Dario A. Machleidt
           Ms. Kathleen Geyer
 4         KILPATRICK TOWNSEND & STOCKTON LLP
           1420 Fifth Avenue
 5         Suite 3700
           Seattle, Washington 98101
 6         Phone: 206.516.2857
           E-mail: Dmachleidt@kilpatricktownsend.com

 7         E-mail: Kgeyer@ktslaw.com

 8     FOR THE DEFENDANT, LEIGH ROTHSCHILD, AND RANDALL

 9     GARTEISER:

10         Mr. Rene A. Vasquez
           DNL ZITO
11         1250 Connecticut Avenue NW
           Suite 700
12         Washington, D.C. 20036
           Phone: 703.989.2244

13         E-mail: Rvazquez@dnlzito.com

14

15

16     ALSO PRESENT:
       Brian James, videographer
17     Colin Jensen, attorney

18

19

20

21

22

23

24

25
```

Page 3

1          The deposition of RANDALL GARTEISER taken before

2     Shawna Gauntt-Hicks, Certified Shorthand Reporter,

3     pursuant to notice.

4          The reading and signing of the deposition is not

5     waived.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

1                          I N D E X

2

3                                                        PAGE

4    Appearances....................................... 2

5    RANDALL GARTEISER

6    Examination by Mr. Machleidt......................  7
     Examination by Mr. Vazquez....................... 135

7    Reexamination by Mr. Machleidt................... 138

8    Signature and Changes............................144-146

9    Reporter Certification...........................141-143

10                          EXHIBITS

11   NO.      DESCRIPTION                            PAGE

12   Exhibit 65 Engagement Letter.....................  20

13   Exhibit 66 E-mail................................  25

14   Exhibit 67 Complaint.............................  53

15   Exhibit 68 Complaint.............................  57

16   Exhibit 69 E-mail................................  68

17   Exhibit 70 Notice of Dismissal with Prejudice........  78

18   Exhibit 71 E-mail................................  89

19   Exhibit 72 E-mail................................  95

20   Exhibit 73 E-mail................................  99

21   Exhibit 74 Memorandum Opinion and Order............. 107

22   Exhibit 75 Settlement and License Agreement.......... 109

23   Exhibit 76 E-mail................................ 113

24   Exhibit 77 Defendant Valve Corporation's Motion for

25             Sanctions................................. 126

**Page 5**

1    Exhibit 78 Defendant Valve Corporations's Motion for
             Sanctions................................. 126

2             REQUESTED DOCUMENTS/INFORMATION

3                      (NONE)

4

5               CERTIFIED QUESTIONS
                      (NONE)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

```
 1                   P R O C E E D I N G S

 2                   (REPORTER'S NOTE:  Quotation marks may

 3                   not reflect direct/exact quote.)

 4

 5                   (On the record at 11:08 a.m.)

 6                   THE VIDEOGRAPHER:  We're on the video

 7       record.  The time is 11:08.  Today's date is Thursday,

 8       September 4th, 2025.

 9                   Will counsel please state your appearance

10       for the record, starting with the taking attorney.

11                   MR. MACHLEIDT:  Dario Machleidt on behalf

12       of Valve Corporation.  And with me today is Kate Geyer.

13                   MR. VAZQUEZ:  Rene Vazquez on behalf of the

14       defendants and Mr. Randall Garteiser.

15                   THE VIDEOGRAPHER:  Will the court reporter

16       please swear in the witness.

17                   THE COURT REPORTER:  Mr. Garteiser, if you

18       will please raise your right hand for me.

19                   Do you solemnly swear or affirm that the

20       testimony you're about to give will be the truth, the

21       whole truth, and nothing but the truth?

22                   THE WITNESS:  I do.

23                   THE COURT REPORTER:  Thank you.

24                   RANDALL GARTEISER,

25        having been first duly sworn, testified as follows:
```

Page 7

```
 1                    EXAMINATION

 2   BY MR. MACHLEIDT:

 3       Q.  Please tell us your full name.

 4       A.  Randall Thomas Garteiser.

 5       Q.  Mr. Garteiser, where do you work?

 6       A.  Garteiser Honea, PLLC, in Tyler, Texas.

 7       Q.  What is your home address?

 8       A.  119 West Ferguson Street is my mailing address.

 9   And then I have a place also:  14077 County Road 1148,

10   Tyler, Texas.

11       Q.  Are you admitted to the bar in Texas?

12       A.  I am.

13       Q.  Are you also admitted to the bar in California?

14       A.  I believe I am, yes.  I am.

15       Q.  Mr. Garteiser, what is your profession?

16       A.  I'm an attorney.

17       Q.  How long have you been an attorney?

18       A.  I've been an attorney since right after -- I

19   graduated in May -- after the 9/11, the terrorist

20   attack.  So I would say I served on active duty for a

21   year.  And then after that I started a clerkship in

22   California.  So I think it's around 2003.

23       Q.  What was your first post law school legal job?

24       A.  I clerked for the Honorable James Ware in

25   United States District Court for the District of -- for
```

Valve Corporation                                                    Affirmative

Valve Corporation                                                    Affirmative

Garteiser, Randall Deposition                                                                September 4, 2025

**Page 8**

1    the Northern District of California.

2        Q.  What did you do after your clerkship?

3        A.  I worked for the law firm Quinn Emanuel.

4        Q.  How many years did you work for Quinn Emanuel?

5        A.  I worked until the housing crisis, I think, in

6    2008.  So five years.

7        Q.  What type of work did you do while you were at

8    Quinn Emanuel?

9        A.  I did patent litigation.

10        Q.  What title or titles did you have while you

11    worked at Quinn Emanuel?

12        A.  I was an associate at Quinn Emanuel.

13        Q.  While you were at Quinn Emanuel, did any of

14    your cases go to trial?

15        A.  I'm not -- it came -- we settled on the

16    courthouse steps.

17        Q.  Where did you work after Quinn Emanuel?

18        A.  I worked for Garteiser Law Group.

19        Q.  What was your role at Garteiser Law Group?

20        A.  I was an attorney in Marin County, California.

21        Q.  Did you found Garteiser Law?

22        A.  I did.

23        Q.  What led you to go from -- I'll strike that.

24            While you worked at Quinn Emanuel, rough

25    order of magnitude, how big was the firm?

Garteiser, Randall Deposition

September 4, 2025

Page 9

1      A.  I'm not sure.  It was -- I don't believe

2  there's a Chicago office at the time, or if there was,

3  it just started.  So there was an L.A. office, Chicago,

4  Redwood Shores, Silicon Valley office that I was in.

5  And there may have been another office in New York.  No,

6  I know there was a New York office.  So I don't -- I'd

7  say at least 300 attorneys.

8      Q.  The Garteiser Law Group -- did I get the name

9  right?

10     A.  Correct.

11     Q.  How many lawyers were there at Garteiser Law

12  Group?

13     A.  Two.

14     Q.  What led you to go from a couple-hundred-lawyer

15  law firm to a two-lawyer law firm?

16     A.  The circumstances were that there's a lot of --

17  in Silicon Valley, there's a lot of startups.  And Quinn

18  Emanuel had already reached a point where they were

19  basically at a -- they started off as a plaintiffs'

20  firm.  But they ended up doing more defense work.  And

21  they couldn't -- there was a lot of -- I guess there was

22  a need for patent litigators that could work on cases

23  that did not require the same evergreen retainer that

24  firms like Quinn Emanuel required but still needed

25  representation.

CONFIDENTIAL

Page 10

1     Q.  What --

2     A.  So that was a niche that we filled.  And we

3 were able to do it in Marin County, which was -- which

4 was nice.  I moved from below San Francisco to north of

5 San Francisco and -- and enjoyed it.

6     Q.  What is an "evergreen retainer"?

7     A.  I believe an evergreen retainer, as I've heard

8 it used, is basically you have to put, like, a quarter

9 million down for Quinn to represent you or -- or any --

10 you know, in this example, I'm mentioning Quinn

11 Emanuel -- to cover -- to basically get your case -- get

12 representation.  And then if there's a bill that comes

13 in, then instead of using that retainer to pay the bill,

14 they just pay the bill each month or each quarter.

15     Q.  Understanding you may not have insight into

16 Quinn Emanuel now, while you worked there, was it your

17 understanding that the, give or take, quarter-million

18 retainer, that stayed with Quinn Emanuel until the case

19 was over?

20     A.  I believe so.  For defense work.

21     Q.  What about for plaintiffs' side work?  Was

22 there also a similar retainer agreement?

23     A.  Well, there -- there, again, was another

24 opportunity for us to start up.  The management

25 committee would not touch cases unless the -- the

**Page 11**

1    potential return on investment was very high.  So let's

2    say 100 million or at least 50 million.  And so I wasn't

3    privy to those conversations.  This is hearsay.  So I'm

4    not quite sure why we're talking about this.

5              I need to mark this confidential,

6    attorneys' eyes only.  Because, you know, I don't want

7    to share any trade secrets from Quinn.  And anyway --

8              MR. VAZQUEZ:  Yes, Dario, I meant to put

9    that on the record earlier.  We would like this

10   designated AEO, please.

11             THE WITNESS:  I'd love to be forthcoming as

12   I can, but at the same time.

13             THE COURT REPORTER:  So you want the whole

14   transcript eyes only?

15             MR. MACHLEIDT:  I believe that's what

16   Mr. Vazquez and Mr. Garteiser are asking for.  And we

17   have no problem with it.

18             Rene, that was just a confirmation that the

19   entire transcript for now is going to be confidential

20   and AEO, whenever we get around to putting that into the

21   protective order.

22             MR. VAZQUEZ:  Okay.

23        Q.  (BY MR. MACHLEIDT)  After the Garteiser Law

24   Group, where did you work?

25        A.  My colleague Christopher Honea joined me.  And

Garteiser, Randall Deposition

September 4, 2025

**Page 12**

1    we changed our name from Garteiser Law Group to

2    Garteiser Honea.

3         Q.  When did that happen?

4         A.  I want to say 2009, maybe 2010.

5         Q.  Is Mr. Honea sitting in this room today?

6         A.  No.

7         Q.  How long have you worked with him?

8         A.  I met Chris Honea at Quinn Emanuel.  And then

9    he went and worked in Dallas.  And then I needed help

10   and he wanted to get back to California.  So we joined

11   up and worked on patent cases.  I've always had a lot of

12   respect for him.

13        Q.  Who is representing you today for purposes of

14   your deposition?

15        A.  Rene Vazquez.

16        Q.  You know the gentleman sitting --

17             MR. MACHLEIDT:  I know you can't see it on

18   the video.

19        Q.  (BY MR. MACHLEIDT)  -- but a little bit to

20   Ms. Geyer's left?

21        A.  Yes.  That's Colin Jensen.

22        Q.  Who is Mr. Jensen?

23        A.  He's our -- our COO of the law firm.  And he

24   also has been with us for a while, since -- since Marin

25   County.

Garteiser, Randall Deposition                                                September 4, 2025

Page 13

1            MR. MACHLEIDT:  Rene, at some point we're

2    going to get into documents that have been stamped

3    confidential, for the most part, from your side.  We

4    don't intend to show them to Mr. Jensen simply for

5    protective order issues.  We will send them to you by

6    e-mail.  Is that your understanding?  Any reason that

7    you want things to be different?

8            MR. VAZQUEZ:  No.  That's fine.

9      Q.  (BY MR. MACHLEIDT)  What type of work do you do

10   at Garteiser Honea?

11     A.  I'm not sure I understand what you're -- you're

12   asking.

13     Q.  I see a sign outside the conference room that

14   says "IP Trial Lawyers."

15            Is that a tagline you use for your law

16   firm?

17     A.  That was a tagline we used in the past.

18            MR. VAZQUEZ:  Object based on Robins.

19     Q.  (BY MR. MACHLEIDT)  Do you personally do any

20   transactional work?

21     A.  No.

22     Q.  As you practice --

23     A.  I mean, we have.  We've done some trademark

24   work.

25     Q.  Is your practice primarily focused on

Valve Corporation                                          Affirmative

**Page 14**

1    litigation?

2        A.  Yes.

3        Q.  How much of your current legal work would you

4    say is intellectual property litigation as opposed to

5    all the other types of litigation?

6        A.  Currently?

7        Q.  Correct.

8        A.  About at least 95 percent.

9        Q.  Approximately when did you first begin

10   practicing in intellectual property litigation?

11       A.  During my first clerkship in Delaware for the

12   summer with The Honorable Judge McKelvie, for the United

13   States District Court for the District of Delaware.  And

14   I started to see intellectual property cases.  And as an

15   engineer from Chevron, I thought it was an exciting

16   field to go into.  So I did.  So that was back in, like,

17   2000.

18       Q.  You mentioned you were an engineer at Chevron

19   at least a moment.

20           What is your undergraduate degree in?

21           MR. VAZQUEZ:  Objection.  Relevance.

22       A.  Chemical engineering or process engineering.

23   Chemical engineering is the degree.

24       Q.  (BY MR. MACHLEIDT)  Where did you get that

25   degree?

Garteiser, Randall Deposition

September 4, 2025

**Page 15**

1      A.  Tulane University.

2      Q.  Did you say Tulane?

3      A.  Uh-huh.

4      Q.  Where did you get your law degree?

5      A.  University of Texas School of Law.

Valve Corporation                    Affirmative

6      Q.  Mr. Garteiser, you mentioned you're being

7  defended or represented today by Rene Vazquez.

8           Has he ever worked at Garteiser Honea?

9      A.  Yes.

10     Q.  Does Mr. Vazquez currently have a -- strike

11 that.

12           Is Mr. Vazquez currently employed by

13 Garteiser Honea?

14     A.  No.

15     Q.  When did his employment end with Garteiser

16 Honea?

17     A.  I don't recall.

18     Q.  Do you know a Stephen Lobbin?

19     A.  A Stephen who?

20     Q.  Lobbin, L-O-B-B-I-N.

21     A.  Maybe if you show me a picture.  I don't

22 recognize the name.

23     Q.  You know a Samuel Meyler?

24     A.  I -- I don't recall that name.

25     Q.  Do you know Leigh Rothschild?

Garteiser, Randall Deposition                                    September 4, 2025

**Page 16**

```
  1        A.  Yes.
  2        Q.  Who is Mr. Rothschild?
  3        A.  He's a very well-known inventor and very
  4   creative person that I've had the pleasure to meet, I
  5   guess, about two or three years ago.
  6        Q.  How did you meet Mr. Rothschild?
  7        A.  Yeah, I -- I don't recall.
  8        Q.  Have you ever personally represented
  9   Mr. Rothschild in a legal dispute?
 10        A.  Oh, boy.  I -- I don't -- I don't know.  I
 11   don't think so.
 12        Q.  Have you ever represented -- I apologize.  Are
 13   you still thinking on...
 14        A.  Yeah.  I'm just trying to make sure.  I -- I
 15   don't believe so.
 16        Q.  Have you ever represented a company owned or
 17   controlled by Mr. Rothschild?
 18        A.  I represent -- no.
 19        Q.  Well, you represented a company called
 20   Symbology Innovations?
 21        A.  Yes.
 22        Q.  What role, if any, does Mr. Rothschild have
 23   with respect to Symbology Innovations?
 24        A.  I don't know.
 25        Q.  Does Mr. Rothschild have any connection
```

**Valve Corporation**    Affirmative

**Valve Corporation**    Affirmative

Garteiser, Randall Deposition                                                                        September 4, 2025

**Page 17**

1    whatsoever with Symbology Innovations?

2              MR. VAZQUEZ:  I'm going to object based on

3    privilege.  I'm going to instruct you not to answer

4    unless you're able to without divulging attorney-client

5    communications.

6        A.  Yeah, I'm -- I'm not sure.  Can you repeat that

7    question?  What was -- what is his role?  Can you -- or

8    can you have the reporter --

9        Q.  (BY MR. MACHLEIDT)  I can take another shot at

10   it.

11       A.  Okay.

12       Q.  I'm obviously not looking for privileged

13   information.

14              What connection, if any, does

15   Mr. Rothschild have to the company you said you

16   represented, namely, Symbology Innovations?

17              MR. VAZQUEZ:  Again, if your answer is

18   based on communications you had with Mr. Rothschild,

19   then we object on privilege and instruct you not to

20   answer.

21       A.  Yeah.  Any -- anything -- I wouldn't attempt to

22   answer that.  It would be through an attorney-client

23   communication.

24       Q.  (BY MR. MACHLEIDT)  Do you take the position

25   that an engagement agreement between yourself and a

Garteiser, Randall Deposition                                                    September 4, 2025

Page 18

1    client is privileged?

2        A.  Do I take the position that an engage- -- the

3    agreement itself?  I would think so.

4        Q.  Meaning if today I asked you for your

5    engagement agreement between Garteiser Honea and

6    Symbology Innovations, what would you do?

7        A.  I would ask you would you be willing to show me

8    your engagement with Valve Corporation?  And if so, why

9    not?  And then I'd ask you -- well, let me talk to my

10   other partner, Chris Honea, who's not here, and see if

11   we can provide you that information.

12       Q.  Have you ever represented Rothschild Broadcast          **Valve Corporation**          Affirmative

13   Distribution Systems?

14       A.  RBDS?  I believe so.

15       Q.  What connection, if any, does Mr. Leigh

16   Rothschild have to the company Rothschild Broadcast

17   Distribution Systems?

18            MR. VAZQUEZ:  Objection.  Based on

19   privilege.

20            If your answer, it will depend on

21   attorney-client communications, I'm instructing you not

22   to answer.

23       A.  I'm going to follow the advice of my counsel.

24       Q.  (BY MR. MACHLEIDT)  Are you familiar with the          **Valve Corporation**          Affirmative

25   company Patent Asset Management?

Garteiser, Randall Deposition

September 4, 2025

Page 19

| 1 | A. Yes. |
|---|---|

Valve Corporation | Affirmative

2    Q. How is it that you've become familiar with

3  Patent Asset Management?

4    A. I don't want to disclose attorney-client

5  communications.

6    Q. Please tell me -- please tell me everything

7  that you can that's not privileged about Patent Asset

8  Management.

9        MR. VAZQUEZ: Again, I'm going to object

10  based on privilege. Also, to the extent that you're not

11  divulging attorney-client communications.

12    A. I believe it's a parent corporation for RBDS.

13    Q. (BY MR. MACHLEIDT) What role, if any, does

14  Mr. Rothschild have with respect to Patent Asset

15  Management?

16        MR. VAZQUEZ: Objection. Privilege.

17        I'm instructing you not to answer if it

18  will divulge attorney-client communications.

19    A. I'm going to follow advice of my attorney.

20    Q. (BY MR. MACHLEIDT) You won't disclose, to the

21  best of your knowledge, what role Mr. Rothschild has

22  with respect to Patent Asset Management on the basis of

23  the answer being privileged; is that correct?

24    A. Well, it's also vague. I mean, I -- but yeah,

25  that's -- anything I know would be through communication

**Page 20**

1    with RBDS.

2         Q.  Are you refusing to answer my question because

3    it's vague or because the answer calls for privilege?

4         A.  I believe it calls for privilege.

5              MR. MACHLEIDT:  We're going to go to our          Valve Corporation                    Affirmative

6    first exhibit and mark this 65.

7              (Exhibit 65 marked.)

8              MR. MACHLEIDT:  Rene, Kate is going to send

9    it to you.  And while I never like doing this, I think

10   simply because you are doing this remote, I'll give you

11   the Bates numbers to see if it's helpful for you.

12             Does that work for you?

13             MR. VAZQUEZ:  Is there -- all right.  All

14   right.  Give me the Bates number.  I'll do my best to

15   try to locate it.

16             MR. MACHLEIDT:  No.  Rene.  Rene.  Sorry.

17   The first part of what I said, Kate is going to e-mail

18   the document to you.

19             MR. VAZQUEZ:  I see that.  Okay.  Thank

20   you.  Thank you.  All right.

21             MR. MACHLEIDT:  And tell you what, if

22   you're fine with just the e-mails, I will avoid going

23   forward reading any Bates numbers, because I hate it.

24   So we'll e-mail them to you.

25             MR. VAZQUEZ:  Yeah.  Let's -- e-mails are

Kilpatrick Townsend & Stockton LLP

Garteiser, Randall Deposition                                                        September 4, 2025

                                                                          **Page 21**

1     fine.

2                    MR. MACHLEIDT:  Good deal.

3                    Here is Exhibit 65.

4                    Rene, let me know -- obviously, there's no

5     rush here.  Let me know when you've got it in your

6     e-mail --

7                    MR. VAZQUEZ:  Yep.  Yeah.

8                    MR. MACHLEIDT:  -- and I'll wait until --

9     until that happens.

10                   MR. VAZQUEZ:  Okay.

11        Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, I think

12    you're doing what I was about to ask you to do.  While

13    we wait for Mr. Vazquez to confirm that he's got it on

14    his end, look through as much of the Exhibit 65 as you

15    need to do.

16                   MR. VAZQUEZ:  Okay.  Yes.  E-mail just

17    arrived.  I'm in the process of opening up the exhibits.

18    Okay.  I have it open.

19        Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, have you had

20    a chance to look through Exhibit 65?

21        A.  I have, yes.

22        Q.  What is Exhibit 65?                    Valve Corporation          Affirmative

23        A.  It is an engagement to monetize a patent

24    portfolio for the client, Display Technologies, LLC.

25        Q.  Flip to the very back page of this Exhibit 65.

Page 22

1  It's numbered 4 at the bottom.  Let me know when you're

2  there.

3      A.  Yes, I'm there.

4      Q.  Do you see Mr. Vazquez's signature in the

5  Garteiser Honea line?

6      A.  I do.

7      Q.  This engagement agreement with the client of

8  Display Technologies -- is the law firm representing

9  Display Technologies Garteiser Honea?

10     A.  I'm sorry.  Could you ask that question one

11  more time?

12     Q.  Who are the parties to this engagement                    Valve Corporation        Affirmative

13  agreement that we have at Exhibit 65?

14     A.  Okay.  Display Technologies, LLC, and Garteiser

15  Honea PLLC.

16     Q.  Whether from memory or based on what you see in

17  this Exhibit 65, what connection, if any, did Mr. Leigh

18  Rothschild have with Display Technologies?  At least as

19  of April 5th, 2023, the date of this engagement

20  agreement?

21          MR. VAZQUEZ:  Objection.  Privilege.

22          Only answer to the extent you can do so

23  without divulging attorney-client communications.

24     A.  Yeah.  I -- I had mentioned earlier you had        Valve Corporation        Affirmative

25  asked about a -- a client that we had at Garteiser Honea

Page 23

1  by the name of RBDS.  This engagement is related to

2  Display Technologies, LLC.  And in addition to myself at

3  the firm and Christopher Honea and Michael Scott Fuller,

4  at this time in 2023, Rene Vazquez was also with the

5  firm.  So I don't have any personal knowledge of this

6  document.

7       Q.  (BY MR. MACHLEIDT)  Do you see at the top left

8  of the first page, it's got "Display Technologies, LLC"?

9       A.  I do.

10       Q.  Do you see below that it says "c/o Leigh

11  Rothschild?

12       A.  Manager.

13            And there's a Daniel Falcucci, I believe is

14  his name, as well on the e-mail line.  But -- I'm sorry.

15  What's the question?

16       Q.  When you represented Display Technologies, did

17  you understand Mr. Leigh Rothschild to be the manager of

18  Display Technologies?

19       A.  I'm not sure.  I didn't really work on Display

20  Technologies as much as my colleague at the time, Rene

21  Vazquez, but I did work with Daniel Falcucci -- that has

22  his e-mail address here quite a bit, when I did work on

23  Display Technologies, LLC.

24       Q.  What role did Mr. Falcucci have with respect to

25  Display Technologies when you -- or during the time when

Garteiser, Randall Deposition                                                                            September 4, 2025

**Page 24**

1    you mentioned you corresponded with him?

2              MR. VAZQUEZ:  Objection.  Privilege.

3              I instruct you not to answer if doing so

4    will divulge attorney-client communications.

5         A.  Seems like -- I mean, that was -- can you ask

6    that question again or what was the question exactly?

7    What was his role?

8         Q.  (BY MR. MACHLEIDT)  Correct.

9              If you'd like, I can break it down more.

10   Just let me know.

11        A.  Yes, that might help.

12        Q.  We've had a handful of privilege objections and

13   instructions.  So I'll begin at a very high level.

14             Daniel Falcucci, did he work for Display

15   Technologies?

16             MR. VAZQUEZ:  Objection.  Privilege.

17             I'm going to instruct you not to answer if

18   doing so would violate attorney-client communications.

19        Q.  (BY MR. MACHLEIDT)  I don't even know that

20   Mr. Falcucci was the client.  So I don't know that there

21   is an attorney-client privilege.  I'm just trying to get

22   to whether Mr. Vazquez's objections and instructions

23   have merit or not.  If Mr. Falcucci was a third party,

24   then there is no privilege.  So I'm trying to find out

25   how much I can dig.

CONFIDENTIAL                                                      Kilpatrick Townsend & Stockton LLP

Garteiser, Randall Deposition                                                                September 4, 2025

**Page 25**

1          Does that make sense to you?

2          A.  Yeah, but we're asking -- you're asking me

3    questions about this Exhibit 65, and I didn't sign this

4    document.  So is there another document you can show me?

5    Because I -- because a lot of this is kind of hard to

6    remember.  Some of this is like -- like this document

7    here is in 2023.  So can we, like, put this document

8    aside and maybe show me some more?  And then we circle

9    back to this one?

10         Q.  We might.

11              At the top of this Exhibit 65, what is the          **Valve Corporation**          Affirmative

12   name of the law firm letterhead there?

13         A.  It's our letterhead, Garteiser Honea.

14         Q.  Garteiser Honea.  In that name, is Garteiser

15   meant to be you, Mr. Randall Garteiser?

16         A.  I guess so, yeah.

17         Q.  You mentioned earlier that you did more work

18   for RBDS than Display Technologies.

19         A.  I thought so, but I did, you know, work on --

20   well, anyway.  Yes.

21              (Exhibit 66 marked.)

22         Q.  (BY MR. MACHLEIDT)  Let's go to Exhibit 66.

23         A.  Thank you.

24         Q.  Mr. Garteiser, while Exhibit 66 makes its way

25   to Mr. Vazquez, please take a look through the document

September 4, 2025

Page 26

1    and let me know when you're done.

2             MR. MACHLEIDT:  And, Rene, same thing,

3    obviously.  Let me know when you've got the document in

4    front of you.

5             MR. VAZQUEZ:  I'll let you know.  It just

6    arrived.  I'm in the process of opening it.  Okay.  I

7    have it open.

8        Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, I'm not

9    going to interrupt you if you're still looking at the

10   document.

11       A.  Okay.

12       Q.  Before getting to this Exhibit 66,

13   Mr. Garteiser, did you prepare for today's deposition?

14       A.  Yes.

15       Q.  What did you do to prepare for today's

16   deposition?

17       A.  I spoke with Rene Vazquez.

18       Q.  What, if anything, else did you do to prepare

19   for today's deposition?

20       A.  Kind of reviewed the docket to see what cases I

21   still have active and what -- spoke to my other partner,

22   Christopher Honea.

23       Q.  Other than the docket you mentioned, did you

24   review any documents in preparation for today's

25   deposition?

Garteiser, Randall Deposition

September 4, 2025

Page  27

1        A.  No.

2        Q.  Do you recall reviewing a subpoena to produce

3    documents served upon you or your law firm?

4        A.  Now, I believe at the time we were -- there was

5    another firm involved.  I don't remember their name.

6    And so some of the documents I believe that were being

7    asked were already -- the cases were over.  So under the

8    protective order I believe that we didn't have those

9    documents to produce.

10            But aside from that, I didn't know who was

11   responding to that request for documents, whether it was

12   going to be us or the law firm that I thought was

13   representing us.  Munger Tolls, maybe.  Munger --

14       Q.  Merchant & Gould?

15       A.  Merchant & Gould.  Sorry.

16       Q.  No worries.

17       A.  So I just wasn't quite sure.  And I think at

18   that time too your colleague Kate did not know whether

19   it was appropriate to contact me directly or Munger

20   Tolls [sic].  So it got a little confusing.  So nobody

21   followed up.  I didn't really -- I kind of moved on.

22       Q.  Mr. Garteiser, I imagine there's plenty you and

23   I disagree on, but I think we definitely agree it got

24   confusing around that time.

25       A.  Yeah.  I didn't -- like I said, if there's

Kilpatrick Townsend & Stockton LLP

Garteiser, Randall Deposition

September 4, 2025

**Page 28**

1    something -- anyway, that's -- I -- I -- I don't know

2    how I could have any documents that -- in addition to

3    what you already have.  But anyway...

4        Q.  Is it fair to say that whether it was Merchant

5    & Gould or Mr. Vazquez or the DNL Zito law firm, you did

6    not provide any documents from your own files as part of

7    a response to a document subpoena in this matter?

8        A.  Yes.

9        Q.  Did you search for responsive documents,

10   responsive to the document subpoena, understanding that

11   happened a while ago?

12       A.  Yeah.  I honestly -- I don't recall.  I just

13   remember there -- there being a conflict with the

14   protective order.  So I'd have to go back and look at my

15   notes on that and whether we're talking about RBDS or

16   Display Technologies.  It might -- might make a

17   difference.

18       Q.  To the best of your recollection, what was that

19   conflict with the protective order that you just

20   mentioned?

21       A.  Oh, it seemed like some of these cases were

22   coming to an end, like Symbology.  And so under

23   protective order, you know, we were supposed to destroy

24   everything, and then you were asking for documents.  It

25   seemed like it overlapped.  But if -- if I had the

CONFIDENTIAL

Garteiser, Randall Deposition                                    September 4, 2025

Page 29

1    subpoena to look at, maybe that would help remind me.

2           I -- I noticed that, and maybe it was

3    because that you -- Valve was talking with Munger --

4       Q.  Merchant.

5       A.  -- Merchant & Gould.  I just didn't -- there

6    wasn't any follow-up, really, that got to me.  So I

7    didn't -- I didn't follow up on that.

8       Q.  Mr. Garteiser, do you have Exhibit 66 in front

9    of you?

10      A.  I do.

11          MR. MACHLEIDT:  And, Rene, I think you said

12   yes.  Do you have it in front of you too?

13          MR. VAZQUEZ:  I do.

14      Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, I'm going to

15   read some of the text at the -- near the top left of

16   this Exhibit 66.  Bear with me.

17          It says "Rothschild Broadcast Distribution

18   Systems, LLC."

19          Below that it says "C/O Leigh Rothschild,

20   Manager."

21          Scroll down a little bit.  And it says

22   "leigh@patentmgmt.com."

23          And below that it says

24   "daniel@patentmgmt.com."

25          I know that was a mouthful, but did I read

Valve Corporation                                    Affirmative

Garteiser, Randall Deposition                                                                September 4, 2025

                                                                                                    **Page 30**

1    that correctly?

2          A.  I believe so.

3                MR. MACHLEIDT:  Did we have somebody join?

4    I don't have a Zoom or a computer in front of me.  So I

5    heard a little -- I heard --

6                MR. VAZQUEZ:  It looks like there's someone

7    named Alex Acosta that just joined.

8                MR. ACOSTA:  I apologize.  I'm from Aptus.

9    I'm just making sure everything's going well.

10               MR. MACHLEIDT:  No need to apologize.

11               MR. ACOSTA:  I apologize --

12               MR. MACHLEIDT:  No.  No need.  No need to

13   apologize.  Just wanted to make sure we knew all the

14   players.

15         Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, what is --          **Valve Corporation**                Affirmative

16   what is Exhibit 66?

17         A.  It says it's an engagement to monetize patent

18   portfolios for, it looks like, RBDS.

19         Q.  Do you recall doing work at any point in the

20   past few years relating to monetizing the patent

21   portfolios of RBDS?

22         A.  Yes.

23         Q.  Do you understand Leigh Rothschild to be the

24   manager of RBDS?

25         A.  I believe he was one of the managers.  I

Garteiser, Randall Deposition                                              September 4, 2025

Page 31

1    considered Daniel and Leigh as the client for RBDS

2    through their representation at Patent Asset Management.

3           MR. MACHLEIDT:  Do you mind reading that

4    answer back to me?

5           (Whereupon, the requested portion of the

6           record was read back.)

7    Q.  (BY MR. MACHLEIDT)  What do you mean in your

8    prior answer by "through representation at Patent Asset

9    Management"?

10   A.  Well, I believe that when I spoke to them that

11   it was through their role as like a parent company.

12   Everything is just kind of -- yeah.  I'll wait for a

13   question.

14   Q.  You mentioned parent company.  Do you mean you

15   understood Patent Asset Management to be the parent

16   company of Rothschild Broadcast Distribution Systems?

17   A.  Yes.  I believe that on our initial disclosures

18   filed in different cases for RBDS, I believe -- maybe we

19   didn't have to -- it wasn't public, but maybe in one

20   district or something, we had to disclose that.  So I

21   feel like that's not an attorney-client communication.

22   That's just a fact.

23   Q.  Trying to kind of sum it all up.  Looking at        Valve Corporation          Affirmative

24   this Exhibit 66, engagement agreement between your law

25   firm and Rothschild Broadcast Distribution Systems, you

September 4, 2025

Page 32

1  understood PAM to be the parent company and you

2  considered Leigh Rothschild and Daniel Falcucci as the

3  client for purposes of this engagement?

4      A.  For purposes of this engagement -- I don't

5  know.  I didn't sign this document.  Rene Vazquez did.

6  So...

7      Q.  Who did more work on behalf of RBDS, you or

8  Mr. Vazquez?

9      A.  Boy, I don't recall.

10     Q.  Are you currently doing work for RBDS?  Meaning

11  you, Mr. Garteiser.

12     A.  No.

13     Q.  Is your law firm doing any work for RBDS?

14     A.  No.  Garteiser Honea is not presently doing any

15  work for RBDS.

16     Q.  Is Garteiser Honea doing any work for any

17  company connected in any way with Leigh Rothschild?

18         MR. VAZQUEZ:  Objection.  Vague.

19     A.  Yeah.  I -- I'm going to -- I'm going to need a

20  little help on that one.  We have -- I'm not trying to

21  be vague.  I'd have to -- I'd have to look and confirm.

22  I was in the process of doing some of that before this

23  depo, but I didn't finish completing that task.

24     Q.  (BY MR. MACHLEIDT)  When was the most recent

25  time that you had correspondence with either Daniel

**Valve Corporation**                                    Affirmative

Kilpatrick Townsend & Stockton LLP

**Page 33**

1    Falcucci or Leigh Rothschild?

2        A.  I believe I spoke to Daniel about three weeks

3    ago.

4        Q.  Did you speak to Mr. Falcucci about three weeks

5    ago for litigation purposes?

6        A.  Actually, I was -- I was calling him to catch

7    up and ask him -- tell him I couldn't find a particular

8    University of Texas Law cap that I wanted to provide to

9    Leigh Rothschild that he had -- he had admired.

10       Q.  You mentioned that you did not sign this

11   Exhibit 66, engagement agreement but Mr. Vazquez signed

12   it.

13           Do I remember your testimony correctly?

14       A.  Yes.

15       Q.  Mr. Vazquez signed this engagement agreement.

16           Was he authorized to do so on behalf of the

17   Garteiser Honea law firm?

18       A.  Yes.

19       Q.  Sitting here today, do you have any

20   recollection about your specific work on behalf of RBDS?

21           MR. VAZQUEZ:  Objection.  Vague.

22       A.  I think we handled a couple cases for RBDS.  At

23   least I would -- I would like to think it was four or

24   five for sure.  But I'm sitting here today without

25   having access to a computer or any -- any other

Garteiser, Randall Deposition                                                    September 4, 2025

**Page  34**

1    documentation.  I'm -- I'm not sure how much I did, but

2    I did work on RBDS.

3        Q.  (BY MR. MACHLEIDT)  Did you take any cases on

4    behalf of RBDS to trial?

5        A.  No, we did not take any case involving RBDS to

6    trial.

7        Q.  Did you take any cases on behalf of Display

8    Technologies to trial?

9        A.  No, I do not believe that we took any cases to

10   trial involving Display Technologies.

11       Q.  Mr. Garteiser, you can look at Exhibit 66 or

12   Exhibit 65.  There are similarities.  My question is do

13   you see on the first page of, for instance, Exhibit 66,

14   there's a paragraph at the bottom that begins, "The

15   client reserves"?

16       A.  Okay.

17       Q.  Do you see that paragraph?

18       A.  Yes.

19       Q.  Does the first sentence of the final paragraph

20   on the first page of Exhibit 66 read "The client

21   reserves final decision and discretion as to all

22   settlement/license rates and all associated terms"?

23       A.  I do.

24       Q.  Who is the client being referred to in this

25   Exhibit 66, engagement agreement?

**Valve Corporation**                                            Affirmative

**Valve Corporation**                                            Affirmative

Garteiser, Randall Deposition                                                   September 4, 2025

Page 35

1        A.  Rothschild Broadcast Distribution Systems, LLC.

2        Q.  To the extent it happened when Rothschild

3   Broadcast Distribution Systems told you its final

4   decision as to a settlement or a license rate or

5   agreement, what individuals from the client communicated

6   with you?

7        A.  Could you repeat that question?

8        Q.  I was afraid you're going to say that.  No,

9   don't worry.  I'm going to take an attempt to ask a

10  better question.

11            RBDS is a company; correct?

12       A.  Yes.

13       Q.  When you correspond with the company, is it

14  fair to say that there are actual people that you

15  communicate with who are representing the company?

16       A.  Yes.

17       Q.  Who was or who were the actual people                Valve Corporation        Affirmative

18  representing RBDS when you worked with RBDS to, for

19  instance, get a final settlement or license rate as part

20  of one of your litigations?

21            MR. VAZQUEZ:  Objection.  Form.

22       A.  It seemed like there was -- there was a team         Valve Corporation        Affirmative

23  that involved Daniel Falcucci and two other ladies, that

24  I can't recall their names right now, and Leigh

25  Rothschild.

CONFIDENTIAL                                                      Kilpatrick Townsend & Stockton LLP

Page 36

1      Q.  (BY MR. MACHLEIDT)  Please go to page 2.  Make

2  it easier.  Exhibit 66, are you looking at page 2?

3      A.  Yes.

4      Q.  On page 2 of this Exhibit 66, engagement

5  agreement, do you see the rather long paragraph that is

6  titled "Contingency Fee Arrangement"?

7      A.  Yes.

8      Q.  Did Garteiser Honea have a contingency fee

9  arrangement for its representation of RBDS and also

10  Display Technologies?

11      A.  Yes.

Valve Corporation                                    Affirmative

12      Q.  I can read what's here, but obviously, we're

13  here getting your testimony.

14            At a high level, what were the terms of the

15  contingency fee arrangement that your firm had with RBDS

16  and Display Technologies?

17      A.  I -- I don't recall.  I would have to look at

18  this document to refresh my recollection.

19      Q.  Mr. Garteiser, please take a look through the

20  contingency fee arrangement paragraph, and when you're

21  done, let me know.

22      A.  It looks like a bargain.

23      Q.  What did you say?

24      A.  I said it looks like a bargain.  It's my

25  attempt to be -- humor.

Garteiser, Randall Deposition                                                    September 4, 2025

                                                                    Page 37

1        Q.  Fair enough.

2            Why do you say that the contingency fee

3    arrangement with Display Technologies and RBDS looks

4    like a bargain?

5        A.  I'm not.  It was just a bad joke.

6        Q.  Mr. Garteiser, at a high level, having                Valve Corporation            Affirmative

7    refreshed, looking at the text in front of you, what was

8    the contingency fee arrangement that your firm had with

9    RBDS and Display Technologies?

10       A.  And it was a contingency arrangement as

11   described in this paragraph.  It seemed to kind of give

12   the client an incentive to settle earlier in the case

13   because then they would recover more money.  And then --

14   but as the case went on, then the client would get less

15   money and the firm would get more money.

16           I'm -- I'm not quite sure how else to

17   answer the question.

18       Q.  Whose idea was it to enter into a contingency

19   fee arrangement with respect to your firm's

20   representation of Display Technologies and RBDS?

21       A.  We --

22           MR. VAZQUEZ:  I'm going to object.  Sorry.

23   I'm going to object based on privilege to the extent

24   that you can only answer by divulging attorney-client

25   communications.  And if that's the case, I'm going to

Garteiser, Randall Deposition

September 4, 2025

**Page 38**

```
 1    instruct you not to answer.

 2         A.  I -- I didn't sign this document, but I -- I

 3    will say as a general rule, Garteiser Honea prefers to

 4    do contingency fee work as opposed to hourly work on the

 5    plaintiff's side.

 6         Q.  (BY MR. MACHLEIDT)  Have you ever done

 7    contingency fee work on the defense side?

 8         A.  Not in the last year or two.  Not that I recall

 9    right now.

10         Q.  I'm not objecting to your answer as vague, but

11    you mentioned not that you recall and not in the last

12    year or two.  So I'm going to ask again.

13         A.  Sure.

14         Q.  And it's going to sound repetitive.  Is that

15    okay for you?

16         A.  Yeah.  I.

17         Q.  Let me --

18         A.  Go ahead.

19         Q.  Yeah.

20         A.  Ask the question.  I'll answer it.  Sorry.

21         Q.  Well, no.  You're a lawyer.  You know what I'm

22    doing.  I want to try to get a clean record.  Does that

23    make sense to you?

24         A.  Okay.

25         Q.  Mr. Garteiser, has your law firm ever done
```

**Valve Corporation**                    Affirmative

Kilpatrick Townsend & Stockton LLP

Page 39

1    defense side work on a contingency fee basis?

2         A.   Defense work on a contingency fee basis?  As

3    I -- no.  We would not do defense work on a contingency

4    fee basis.  I'm not --

5         Q.   Why would your law firm, Garteiser Honea, not

6    do defense side work on a contingency fee basis?

7         A.   I don't know.  I'm not -- I'm -- I guess I'm

8    not smart enough to have figured out how to -- how that

9    would -- would work.

10        Q.   That was a very humble answer.  But can you

11   expand on why, frankly, you -- you don't know how that

12   would work?

13        A.   Yeah.  I don't really know how to expand upon

14   that.  I think sometimes firms pay a flat rate or

15   something to defend against the case every month.  I've

16   heard of that.  But that's not something that -- I

17   don't -- I don't remember us ever doing anything like

18   that.

19             THE VIDEOGRAPHER:  Excuse me.  J. Zito.

20             MR. VAZQUEZ:  Go ahead.

21        Q.   (BY MR. MACHLEIDT)  Did Garteiser Honea ever    Valve Corporation                    Affirmative

22   get paid a contingency fee for any work it did on behalf

23   of Display Technologies or RBDS?

24        A.   Yes.

25        Q.   Approximately how much in a contingency fee in

Garteiser, Randall Deposition                                                           September 4, 2025

Page 40

1    total did Garteiser Honea earn from its work on behalf

2    of Display Technologies and RBDS?

3        A.  In 2025 -- we're in August or September now --

4    I don't believe we've made any -- any money when we were

5    representing Technology -- Display Technologies, LLC, or

6    Rothschild Distribution or RBDS.  And then I think in

7    prior years there was some money made.  I just don't

8    have those -- I don't recall the exact amount, but...

9        Q.  Did Garteiser Honea begin representing RBDS and          Valve Corporation          Affirmative

10   Display Technologies in 2023?  If you need to, certainly

11   look at the engagement agreement.

12       A.  It appears so, based on Exhibit 65 and 66,

13   which are these engagement letters signed between

14   Garteiser Honea and respectively -- respectively,

15   Display Technologies, LLC, and then separately,

16   Rothschild Broadcast Distribution Systems, LLC.

17       Q.  Who was responsible for covering the costs of

18   the litigation -- namely, the client or Garteiser

19   Honea -- with respect to the engagement agreements we're

20   looking at here, Exhibit 65 and 66?

21       A.  I mean, it seems a little bit of both.  It's a

22   little complicated, but I don't really -- I think that

23   Garteiser Honea paid costs and we kept track of costs,

24   and then we got reimbursed for costs if there was a

25   recovery.

CONFIDENTIAL                                                    Kilpatrick Townsend & Stockton LLP

Garteiser, Randall Deposition                                                    September 4, 2025

**Page 41**

1          Q.  Does a recovery include both a judgment from

2     the court or jury as well as money obtained through a

3     license or settlement agreement?

4          A.  I'm not -- I'm not sure.  I mean, I think it

5     would be the latter.  When there was a judgment, if

6     there's a judgment that invalidated a patent, we

7     would -- we would not receive any reimbursement.

8          Q.  While you represented Display Technologies and

9     RBDS, was there ever a judgment, to the best of your

10    recollection, that invalidated one of the company's

11    patents?

12         A.  Not -- not that I recall.

13         Q.  Can you flip to the very last page of

14    Exhibit 66?

15                Let me know when you're there,

16    Mr. Garteiser.

17         A.  Okay.

18         Q.  Do you see the paragraph at the top of this

19    last page of Exhibit 66 that is titled "Bank Account for

20    Payments"?

21         A.  Yes.

22         Q.  Do you see reference to depositing recoveries

23    into a, quote, "separate bank account maintained by the

24    client"?

25         A.  Yes.

Page 42

1          Q.  Did Garteiser Honea ever deposit or transfer

2     any funds into a bank account maintained by the client

3     as referenced in this Exhibit 66?

4          A.  Could you ask that again or say that again?

5          Q.  Did Garteiser Honea ever deposit funds into a

6     bank account maintained by the client as that phrase is

7     used here in Exhibit 66?

8          A.  No.

9          Q.  Did Garteiser Honea ever -- strike that.

10               Is your answer specific to RBDS?

11          A.  Based on this agreement, I -- I think at --

12     Exhibit 66 and 65, I would answer the same way.

13               In some cases you have an IOLTA, but we

14     didn't have one here.

15          Q.  Mr. Garteiser, you jumped two or three

16     questions ahead of me.  My -- I was going to ask you why

17     not have an IOLTA account for these representations?

18          A.  Well, a lot of times the settlement amounts in

19     IOLTA, the -- in Texas, you have an obligation to -- to

20     try to draw interest on accounts and cover that -- the

21     client recover that interest, not some bar-picked

22     charity or -- or -- or program that the IOLTA account

23     might fund through the Texas Bar.  And so sometimes for

24     tax purposes or prior dealings with other client -- or

25     other law firms or what have you, sometimes a patentee

Garteiser, Randall Deposition

September 4, 2025

**Page 43**

1    wants to have the money go to his account.

2            And sometimes when you settle with a client

3    that is a foreign infringer, I think like Panasonic or

4    LG, the payments have to go directly to the patentee.

5    So in this case, it would have to go to RBDS or

6    Rothschild Broadcast Distribution Systems, LLC.  And if

7    it doesn't, then they won't make the -- the -- they're

8    not allowed to send a wire to the law firm on behalf of

9    RBDS.

10            So in this situation, it appears, based on

11   this bank account for payments, that the client had its

12   own bank account set up for -- to receive payments and

13   then we would get our reimbursement or -- and -- for

14   costs and any contingency fee from that client account.

15       Q.  Tell me if I get this right, and I appreciate       **Valve Corporation**                    Affirmative

16   your explanation.  Looking at Exhibit 66, for Garteiser

17   Honea's representation of RBDS, if there was any

18   recovery -- for example, a settlement agreement where a

19   defendant paid to settle a lawsuit -- those funds would

20   go first to a bank account maintained by RBDS.  And from

21   that RBDS bank account, Garteiser Honea would receive

22   its share of the contingency fee payment.

23            Is that right?

24       A.  Yes.  That's my understanding or recollection.

25       Q.  The bank account maintained by the client, is

Kilpatrick Townsend & Stockton LLP

**Page 44**

1   that referring to a bank account of Leigh Rothschild

2   personally, a bank account of RBDS, or a bank account of

3   Patent Asset Management?

4       A.  I'm pretty sure it was a bank account by the

5   client, Rothschild Broadcast Distribution Systems, LLC.

6   Especially if it was like a foreign -- like I said, a

7   settlement with a -- or license with a foreign company,

8   they have to -- the names need to match.  The name of

9   the patentee needs to match the name on the settlement

10  agreement.  And so -- and so, therefore, the bank

11  account needs to match, I should say.

12      Q.  What if the name on the settlement agreement --

13  for example, for licensor -- includes each of Leigh

14  Rothschild personally, RBDS, and Patent Asset

15  Management?

16      A.  Boy, I don't know.

17          MR. VAZQUEZ:  Objection.  Vague.

18      A.  Yeah, I don't know.  I've never had that -- I

19  don't recall being in that position.  So I don't know.

20      Q.  (BY MR. MACHLEIDT)  When Garteiser Honea

21  received a contingency fee payment from, for instance,

22  RBDS, who or what entity provided the contingency fee

23  payment to your law firm?

24          MR. VAZQUEZ:  Objection.  Vague.

25      A.  With respect to RBDS, I believe that I answered

**Page 45**

1    that, that it was RBDS.

2        Q.  (BY MR. MACHLEIDT)  Do you know for a certainty

3    as you sit here today?

4        A.  Man, I'm pretty certain.

5        Q.  Do you know for certain whether, when Garteiser

6    Honea received a contingency fee payment for work done

7    for RBDS, whether the payment came from RBDS or whether

8    the payment came from Patent Asset Management?

9            MR. VAZQUEZ:  Objection.  Form.

10       A.  I thought I just answered that.  If -- if the

11   settlement was with RBDS and a defendant, then the

12   payment would come from RBDS.  I'm pretty sure about

13   that.

14           MR. MACHLEIDT:  By the way, I have no idea

15   how long we've been going.  Does anybody need a break?

16           MR. VAZQUEZ:  Actually, I could use a

17   break.

18           MR. MACHLEIDT:  Sure.

19           THE VIDEOGRAPHER:  We're off the video

20   record.  The time is 12:24.

21           (Whereupon, a recess was had.)

22           THE VIDEOGRAPHER:  We're on the video

23   record.  The time is 12:38.

24       Q.  (BY MR. MACHLEIDT)  Welcome back,

25   Mr. Garteiser.

Page 46

1     Can you go back to Exhibit 66?

2     A.  Okay.

3     Q.  Under the Enforcement Plan title on the first

4  page, do you see the paragraph that begins "The

5  agreed-upon enforcement plan"?

6     A.  I do.

7     Q.  There's a reference to investigation and

8  evaluation of any -- of any potential infringing parties

9  as part of this engagement agreement with RBDS.

10          Mr. Garteiser, what did your investigation

11  and evaluation entail with respect to representing RBDS?

12          MR. VAZQUEZ:  Objection.  Form.

13     A.  I believe with RBDS, what we would do is make

14  sure that -- that there's infringement and then we would

15  compare the claims of the patent to the infringing

16  product.

17          And if I could look at the patents, the

18  '221 or the '089, that would help me kind of remember

19  the technology.  But that would be basically what we

20  would do.  And then we would have communication with the

21  client.  That I'm not getting into right now.

22     Q.  (BY MR. MACHLEIDT)  Would part of your

23  investigation, as it's referred to here in the

24  engagement agreement, would it involve the review of any

25  prior cases involving RBDS?

Valve Corporation                                    Affirmative

Valve Corporation                                    Affirmative

Garteiser, Randall Deposition                                                    September 4, 2025

Page  47

1        A.  Yeah, I don't -- I don't think so.  I guess

2    it'd just depend.

3        Q.  You mean if there's a prior claim construction

4    relating to, for instance, a '221 patent for RBDS, that

5    would not be part of your investigation?

6        A.  No, not necessarily.

7        Q.  Well, I don't want to interrupt if you're

8    thinking.

9        A.  No, I mean -- I mean if I -- if I -- I'm just

10   trying to remember about RBDS in particular.  I mean,

11   most of the -- I just -- I'm trying to understand the

12   question.  So we're -- there's a -- it's -- it's like

13   present day and I'm doing an investigation for potential

14   infringer of RBDS.  Is that the situation?  And you're

15   asking me as part of my pre-suit investigation under

16   Rule 11, would I go and look back at other RBDS cases?

17            Honestly, I wouldn't necessarily do that

18   because I'm moving forward here.  But again, I worked on

19   this with Rene Vazquez.  But yeah, that -- I -- I

20   don't -- I don't know what -- really what the question

21   is.  Would I look back?  I guess no.

22        Q.  I don't want to put words in your mouth.  I      **Valve Corporation**          Affirmative

23   wrote as part of one of your recent answers that your

24   investigation would involve ensuring that there was

25   infringement of the RBDS patent; is that right?

Page 48

1        A.   Yeah.

2               MR. VAZQUEZ:  Objection.  Misstates prior

3    testimony.

4        A.   I would -- I would try to make sure that the    | Valve Corporation                     Affirmative

5    patent's infringed before we asserted the patent.

6    That's kind of a -- I feel like an obligation under Rule

7    11.

8        Q.   (BY MR. MACHLEIDT)  Is it possible to infringe

9    the claims of a patent when that patent has already been

10   licensed to the alleged infringer?

11              MR. VAZQUEZ:  Objection.  Form.

12       A.   That could be.  Just have to look at the

13   agreement.  Sometimes it would depend on if it was

14   product specific or if it was just to the client, to the

15   accused infringer.  And maybe the accused infringer

16   thinks that they don't -- the new products are licensed

17   under the old license.  It just -- I guess it would just

18   depend.

19       Q.   (BY MR. MACHLEIDT)  Do you agree with me that

20   the terms of any license agreement would matter to

21   answering the question of whether the license agreement

22   sheds light on infringement or not?

23              MR. VAZQUEZ:  Objection.  Form.

24       A.   You take -- it seems like you're taking a jump

25   that I'm not following.  So I -- I -- I can't really

Page 49

1    answer that without more foundation on your question.

2            I kind of feel like you're asking me to

3    speculate on something that I'm -- I'm -- I -- I don't

4    want to speculate on things.  So if you could provide me

5    better -- a clearer situation or something.

6        Q.  (BY MR. MACHLEIDT)  I promise you I'm working

7    on it.  My brain is a half step slow because of the lack

8    of sleep that is going around.

9            Mr. Garteiser, did you say that the terms

10   of the agreement matter?

11       A.  I honestly don't know what agreement we're

12   talking about.  Are we talking about Exhibit 66 or a

13   different agreement?

14       Q.  As part of your investigation, as part of your

15   pre-suit investigation on behalf of RBDS, did that

16   involve determining whether a potential infringer was

17   already a named party to a license agreement with RBDS?

18           MR. VAZQUEZ:  Objection.  Form.

19       A.  That was not part of -- of anything that I

20   personally did.  I would know that if I had the case, if

21   I -- I -- I don't recall when I worked for RBDS filing a

22   lawsuit against the same entity twice.

23       Q.  (BY MR. MACHLEIDT)  My question was a little

24   bit different.  Specific to the pre-suit stage, before

25   you file a lawsuit, what steps did you take, if any, to

Valve Corporation                                            Affirmative

Valve Corporation                                            Affirmative

September 4, 2025

Page 50

1   see whether a potential infringer already had entered

2   into a license agreement with RBDS?

3       A.  I believe that answer calls for attorney-client

4   privilege information.  So I can't -- it would involve a

5   communication with the client.  So I don't feel

6   comfortable answering it other than I already have.  I

7   think I've already answered it.

8       Q.  When you represented RBDS before filing a

9   lawsuit against an alleged infringer, did you ask the

10  client whether the alleged infringer already was a named

11  party to a license agreement with RBDS?

12              MR. VAZQUEZ:  Objection.  Privilege.  I'm

13  going to instruct you not to answer to the extent you

14  have to divulge attorney-client communications.

15      A.  I'm following advice of my attorney.

16      Q.  (BY MR. MACHLEIDT)  You won't answer my

17  question because of privilege?

18      A.  My attorney had instructed me not to answer

19  your question.

20      Q.  When you represented RBDS in patent

21  infringement lawsuits, before you -- strike that.

22              When you represented RBDS in infringement

23  and licensing matters, who identified potential

24  infringers?

25              MR. VAZQUEZ:  Objection.  Form.

Garteiser, Randall Deposition                                                    September 4, 2025

Page 51

1      A.  I believe that calls for privileged

2  information.

3      Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, are you

4  choosing not to answer my question?

5          MR. VAZQUEZ:  I'm going to object based on

6  privilege and instruct my client not to answer to the

7  extent that it will divulge attorney-client

8  communications.

9      A.  Yeah, I'm not going to answer that question

10  because it calls for attorney-client communications.

11      Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, before       **Valve Corporation**        Affirmative

12  filing a lawsuit on behalf of RBDS against a potential

13  infringer, did the client, whether that's the Rothschild

14  RBDS or Patent -- Patent Asset Management, did the

15  client ever inform you whether the potential infringer

16  was already a named party to a license agreement?

17          MR. VAZQUEZ:  Objection.  Privilege.

18          Instruct my client not to answer that.

19          THE WITNESS:  Can you read your question

20  back?  Or can you?

21          (Whereupon, the requested portion of the

22           record was read back.)

23      A.  Yeah.  I'm going to listen to the advice of my    **Valve Corporation**        Affirmative

24  counsel and not answer the question because it involves

25  attorney-client communications.

**Page 52**

1          Q.  (BY MR. MACHLEIDT)  I think there may have

2     been -- strike that.

3               Maybe there was another question, but --

4     meaning the question you read, I believe it was maybe

5     one or two --

6               THE COURT REPORTER:  Before that?

7               MR. MACHLEIDT:  Correct.  And, Rene, I

8     won't accuse you of coaching if you agree with me.

9               MR. VAZQUEZ:  I'm sorry.  I'm having a

10    little bit of problems hearing you.  Can you speak up a

11    little bit more, please?

12              MR. MACHLEIDT:  Yeah, absolutely.

13              (Whereupon, the requested portion of the

14               record was read back.)

15              MR. MACHLEIDT:  I believe I asked -- I did

16    ask that question.

17              Rene, can you hear me okay?  Rene, can you

18    hear me?

19              MR. VAZQUEZ:  Yeah.  Yeah.  I objected and

20    instructed Mr. Garteiser not to answer that question.

21              THE COURT REPORTER:  So that one --

22              MR. MACHLEIDT:  And tell you what, I think

23    I can --

24              THE COURT REPORTER:  I can go back.

25              MR. MACHLEIDT:  No, no, I think you're

Garteiser, Randall Deposition

September 4, 2025

**Page 53**

1    fine.

2       Q.  (BY MR. MACHLEIDT)  Whether I asked it or not,

3    Mr. Garteiser, I'm going to ask you another question.

4              When you represented -- strike that.

5              MR. MACHLEIDT:  Rene, right now can you

6    hear me okay?

7              MR. VAZQUEZ:  Yes, much better.  Thank you.

8              MR. MACHLEIDT:  Yeah.  No worries.

9       Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, when you

10    represented RBDS before filing a lawsuit against a

11    potential infringer, did the client -- whether you

12    consider the client Leigh Rothschild, Patent Asset

13    Management, or RBDS, did the client ever tell you

14    whether or not a license agreement existed that named

15    the alleged infringer you were about to sue?

16              MR. VAZQUEZ:  Objection.  Privilege.  I'm

17    instructing Mr. Garteiser not to answer that question.

18       A.  Okay.  I'm going to follow the advice of my

19    attorney and not answer that question on the basis of

20    attorney-client privilege.

21              MR. MACHLEIDT:  Let's go to Exhibit 67.

22              Rene, this is coming your way.

23              MR. VAZQUEZ:  Okay.

24              (Exhibit 67 marked.)

25       Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, while we

Garteiser, Randall Deposition                                                  September 4, 2025

Page 54

1    wait for e-mail to do its thing, please look through

2    Exhibit 67 as much as you need to.

3        A.  Let's see.  The venue is proper under 1400(b).

4    Okay.  How can I -- how can I help you?

5        Q.  I'm just waiting at the moment for your counsel

6    to confirm that he has this in front of him as well.

7                MR. VAZQUEZ:  E-mail just arrived.  I'm in

8    the process of opening the exhibit.  I have the exhibit

9    open.

10       Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, have you had

11   a chance to look through Exhibit 67?

12       A.  I have.  I honestly can't say I really remember

13   it.  I noticed it's got D-50023 Bates number on the

14   first page.  And it ends with D-50033.  And there's --

15   there's not that -- what would you say? -- the

16   endorsement or caption at the top, like it's -- you

17   know, it's been filed with the court.  But there is a

18   case number -- case civil action number here.

19                So I just don't -- looking at it right now,

20   I just don't know if it was filed.  But go ahead.

21   What's your question?

22       Q.  I'm going to make a few representations and

23   your counsel will disagree with me if I get anything

24   wrong.  If I do, I certainly don't intend to get

25   anything wrong.

Kilpatrick Townsend & Stockton LLP

**Page 55**

1    You mentioned the Bates number begins with

2    D, and then it has some other information.  My

3    understanding is that when there was a handoff from the

4    Merchant & Gould lawyers to the DNL Zito Law Firm,

5    documents on behalf of the defendants that were produced

6    now to us from the DNL Zito Law Firm, they had this

7    different prefix, if you will, beginning with the letter

8    D.

9        Will you take that representation from me

10   subject to anything that Mr. Vazquez wants to add?

11       MR. VAZQUEZ:  Nothing to add.

12       A.  Okay.

13       Q.  (BY MR. MACHLEIDT)  Go to the back of

14   Exhibit 67 and just confirm for me on the pages ending

15   in 33 and then 32, which is the second to last page,

16   that is your electronic signature that appears on this

17   document.

18       A.  When it's -- it's my name italicized.  It's not

19   like some sort of -- it's not authentic to me.  Like, I

20   didn't go into some sort of Docusign or -- so anything

21   like that.  It's just -- it's something that you can do

22   in Word and then convert to a PDF.  But go on.

23       Q.  Do you see -- let's take the page ending in 32

24   on this Exhibit 67.  Do you see down at the bottom, it's

25   got your name italicized, and before that there is a

**Page 56**

1    italicized s in between two forward slashes?

2        A.  I see that.

3        Q.  Mr. Garteiser, when you, as a litigation

4    attorney file documents with, frankly, any federal

5    court, do you electronically sign your signature on

6    documents that you submit to the court?

7        A.  I -- I do it in this manner shown here.

8        Q.  In other words, you'll agree with me that the

9    italicized signature of yours down at the bottom of this

10   Exhibit 67 ending on page 32, the backslash, s,

11   backslash, Randall T. Garteiser, that is meant to be

12   your electronic signature connected to this document

13   that is Exhibit 67.

14       A.  Well, I'm just not sure if this is a draft or

15   not because it doesn't have, like, some things that it

16   would normally have if it was actually filed.  So I'm a

17   little confused because there's no endorsement, like,

18   you know, at the top that it was Docket Number 1, for

19   example, as being the complaint in -- and so I'm just --

20   I'm just not sure if it was -- if it was a draft or not.

21            Because -- the reason why I say that is

22   because in California I need to use the California Bar

23   number.  And this one has the Texas Bar number.  And

24   then it -- it doesn't even have Chris's bar number.  So

25   it just looks -- it looks a little off to me, you know,

**Page 57**

1    like it might not be finalized.

2              MR. MACHLEIDT:  Let's go off the record for

3    a few moments to see if we can't address some of the

4    issues you raised.

5              THE VIDEOGRAPHER:  We're off the video

6    record.  The time is 1:01.

7              (Whereupon, a recess was had.)

8              THE VIDEOGRAPHER:  We're on the video

9    record.  The time is 1:20.

10             (Exhibit 68 marked.)

11        Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, I'm going to

12   say welcome back, even though you never left.  I'm going

13   to do a lot of talking about Exhibit 68 just to

14   hopefully move us along.

15             Does that work for you?

16        A.  Okay.

17        Q.  Exhibit 68 is titled "Complaint."  The caption

18   is Rothschild Broadcast Distribution Systems as the

19   plaintiff and Plex as the defendant.  This Exhibit 68 is

20   68 pages and has the ECF stamp across the top for Case

21   Number 5:23-CV-04773.

22             I know that was a lot.  Was that all

23   correct?

24        A.  I believe so.

25        Q.  Now, Mr. Garteiser, the fact that Exhibit 68

Page 58

1   has the ECF stamp across the top, does that indicate to

2   you that this complaint, together with any attachments,

3   if any, was actually filed with, in this instance, the

4   U.S. District Court for the Northern District of

5   California?

6       A.  Yes.

7       Q.  Mr. Garteiser, please flip to page ending in

8   25247 at the top.  It's page 10 of 11 of this Exhibit 68

9   complaint.

10          Let me know when you're there.

11      A.  Okay.

12      Q.  Is that your electronic signature down at the          **Valve Corporation**          Affirmative

13  bottom of this page 10 of 11 of the complaint?

14      A.  Yes.

15      Q.  If you flip the page to page 11 of 11, is that

16  also your signature down at the bottom where it says

17  Certificate of Service?

18      A.  Correct.

19      Q.  Briefly, if you will, but -- strike that.

20          Mr. Garteiser, what is Document 68?                     **Valve Corporation**          Affirmative

21      A.  It's a complaint that RBDS, LLC, filed against

22  Plex, Incorporated.

23      Q.  Who represented RBDS with respect to the

24  complaint against Plex.

25      A.  Garteiser Honea, my law firm.

Page 59

1      Q.  What patent does RBDS accuse Plex of infringing

2  as part of this Exhibit 68 complaint?

3      A.  It appears to be the 8,856,221 patent.

4      Q.  Is it okay if I just refer to that as the

5  '221 patent?

6      A.  Okay.

7      Q.  Do you agree that your law firm filed this

8  complaint on behalf of RBDS against Plex on or around

9  September 15, 2023?

10      A.  Yes.  In the Northern District of California.

11      Q.  Mr. Garteiser, it's tough to see because

12  there's a lot at the top, but are you able to turn to

13  page 13 at the top?  It says "Document 1-2" of this

14  Exhibit 68.

15      A.  Okay.

16      Q.  One more page.  Are you there?  And I can

17  short-circuit it.  You're where I want you to be, the

18  complaint -- the patent.

19      A.  Okay.

20      Q.  Mr. Garteiser, did you or your law firm attach

Valve Corporation                                          Affirmative

21  as an exhibit to the -- what I'm going to call the Plex

22  complaint, the '221 patent?

23      A.  It appears so.

24      Q.  If you don't mind, flip the pages such that you

25  get to the end of the patent.  And, again, not hiding

Page 60

1    anything.  I'm looking at the first page of what is

2    referred to as the Exhibit B up at the top.  It's the

3    claim chart.

4         A.  Okay.

5         Q.  Mr. Garteiser, are you looking at the claim

6    chart that is attached to the RBDS versus Plex

7    complaint?

8         A.  Yes.

9         Q.  Is Exhibit B to the RBDS versus Plex an          Valve Corporation                    Affirmative

10   infringement claim chart for the '221 patent being

11   compared to a flex -- a Plex product?

12        A.  I mean, I think that that's a generalization.

13   It's -- it's meant to -- I wouldn't say it's final.

14   What I would say is that this is what we included to --

15   as part of the Rule 11 investigation to confirm that we

16   believe there's infringement.  As I mentioned before,

17   and I can't -- I don't recall on this one, but sometimes

18   we even hire an outside engineering firm to help us with

19   that confirmation.  It's -- it's a preliminary chart

20   that seems to cover at least Claim 1 of the '221 patent.

21        Q.  Sitting here today, do you have any

22   recollection of who prepared the Exhibit B claim chart

23   that is part of the RBDS versus Plex complaint?

24        A.  It would have been prepared by attorneys at

25   Garteiser Honea with possibly the cooperation of

Garteiser, Randall Deposition                                                      September 4, 2025

**Page 61**

1    Copperpod Consulting Group.  I don't know the exact

2    name.

3         Q.  What is Copperpod?

4         A.  Copperpod is an engineering group that -- of

5    engineers in the computer science and electrical field

6    that would understand these algorithms in -- seen in

7    these figures and then help us to determine whether

8    there's infringement or not.  Like, for example,

9    Figure 2.  It kind of shows a flow pattern, and they

10   would help us to map the claims to the alleged accused

11   product.

12        Q.  What role, if any, did Copperpod have in the

13   drafting of the complaint distinct from the claim charge

14   that we're looking at comparing the '221 patent to a

15   Plex product?

16        A.  No --

17             MR. VAZQUEZ:  Objection.  Form.

18        A.  No input.  This is -- the complaint would be

19   drafted by Garteiser Honea with, I guess, approval from

20   the client.

21        Q.  (BY MR. MACHLEIDT)  This Exhibit 68 complaint

22   between RBDS and Plex, you agree with me that it was

23   actually filed with the federal court?

24        A.  As I -- as I -- I mentioned before, when I was

25   looking at Exhibit 67, this appears to be what was filed

Garteiser, Randall Deposition                                                    September 4, 2025

Page 62

1    as -- actually filed as Exhibit 68.  It just seems like

2    it's -- it's got some mistakes in it that I normally

3    wouldn't -- wouldn't make.  For example, the first

4    paragraph, it has '221 with the -- there's not the

5    apostrophe facing the wrong direction after the -- the

6    quote mark.

7              So anyway, there's some little things here

8    that -- and I -- normally we would -- we wouldn't use

9    Texas.  We would use the bar number for California.  And

10   so -- so anyway, it just seems like that I -- I -- to

11   answer your question, yes, it was filed.  It's not --

12   I'm not proud of it.

13       Q.  Is it possible that your firm, Garteiser Honea,

14   filed this Exhibit 68 claim, but at least portions of it

15   were written by someone or some people who are not

16   employed by your law firm?

17              MR. VAZQUEZ:  Objection.  Vague.

18       A.  No.  No.  This looks like something that --

19   that we filed.  I mean it -- well, let me double-check

20   that.  Sure.

21              As far as the ECF attorney that filed this,

22   it would have been me, with the assistance of Colin

23   Jensen, who helps us with all computer matters.  I may

24   have had input from Rene Vazquez on this one.  I just

25   don't recall.  It seems like we're going into some of

Page 63

1    the prosecution history, and he's very skilled at that.

2              Let's see, it was September 2023.  Okay.

3    So what was the question, sir?  I'm sorry.

4        Q.  (BY MR. MACHLEIDT)  You don't have to

5    apologize.

6              Mr. Garteiser, I know you're flipping

7    through pages.  So before I get to my next question, I'm

8    going to wait until you tell me you're comfortable going

9    forward.

10       A.  Okay.  Go ahead.

11       Q.  Is there more that you want to look at in this

12   Exhibit 68?

13       A.  I just wanted to ask the question.  I don't

14   know if I answered your question.  I think you asked me

15   if -- if there are portions of this that I -- that

16   Garteiser Honea didn't draft.  I don't believe so.  I

17   mean, I think that, right or wrong, we drafted it.

18   And -- and if it wasn't me, it was in coordination with

19   Rene Vazquez, my -- my cocounsel when this was filed.

20       Q.  Mr. Garteiser, is it correct that your law firm

21   filed this Exhibit 68 complaint on behalf of Rothschild

22   Broadcast Distribution Systems against Plex with the

23   approval of the client, namely, Rothschild Broadcast

24   Distribution Systems?

25       A.  Correct.

Valve Corporation                                    Affirmative

Page 64

1      Q.  When you say approval from the client, are

2  there any other people or entities that you're referring

3  to other than Rothschild Broadcast Distribution Systems?

4      A.  No.  I mean, as a general rule -- I mean, we

5  would never -- Garteiser Honea wouldn't file a lawsuit

6  without conferring with the client.

7      Q.  In terms of the actual -- forgive me for saying

8  it in what's probably an odd way, but the actual human

9  at RBDS who gives the go-ahead, would it have been

10  Mr. Leigh Rothschild?

11      A.  I don't recall.  It could have been someone

12  else in -- that works for the client, RBDS.  It could

13  have been Daniel -- I -- I don't remember -- Falcucci.

14  I don't remember right now if -- if anybody in

15  particular signed off on it.

16      Q.  Mr. Garteiser, in this Exhibit 68, if you will,

17  please flip through the document until you get to page

18  that has paragraph 43 on it.  It's page 9 of 11, if

19  that's helpful.

20      A.  Okay.

21      Q.  It's short.  So if you'll bear with me.  Please          **Valve Corporation**          Affirmative

22  read out loud paragraph 43 of this complaint.

23      A.  It says "Defendant has committed these acts of

24  literal infringement or infringement under the doctrine

25  of equivalence of the '221 patent without license or

September 4, 2025

Page 65

1    authorization."

2        Q.   What investigation did you do to ensure you

3    were comfortable making the representations in

4    paragraph 43?

5        A.   I -- I don't recall.  I'm sure I would have --

6    you know, I -- we had had this client from that --

7    earlier this year.  This is September of 2023.  And I

8    believe the other document, 66, the engagement letter,

9    was signed in February of 2023.  So I'm not sure if

10   Garteiser Honea itself did any actual verification with

11   respect to paragraph 43.

12       Q.   Who, if anyone, did any actual verification

13   with respect to the statements in paragraph 43?

14            MR. VAZQUEZ:  I'm going to advise the

15   client to not answer if this will divulge

16   attorney-client communications under a privilege

17   objection.

18       A.   Yeah.  I -- I -- could you say the -- ask the

19   question again?

20       Q.   (BY MR. MACHLEIDT)  Yes, but I'm going to see

21   if we can get a little closer to an answer.  And

22   obviously, everything I say, your counsel may chime in,

23   but I'm going to try to break it up.

24            Does that work for you?

25       A.   Please.

Garteiser, Randall Deposition                                                September 4, 2025

Page 66

1      Q.  Specific to paragraph 43 in this Plex

2  complaint, do you know -- and I'm not asking for the

3  identity.  I'm simply asking whether there's more to

4  inquire.

5          Do you know who, if anyone, confirmed the

6  accuracy of what is in paragraph 43?

7          MR. VAZQUEZ:  Answer yes or no -- no to

8  that.

9      A.  I -- I don't know.

10     Q.  (BY MR. MACHLEIDT)  Earlier today, I'd asked

11 you, specific to the RBDS engagement agreement, whether

12 your firm's investigation into infringement would

13 involve research into whether there were existing

14 licenses with the potential infringer.

15          Do you remember somewhat that discussion

16 you and I had?

17     A.  Yes.

18     Q.  Did -- strike that.  What work, if any, would

19 Garteiser Honea do on behalf of RBDS to see whether

20 there was a prior license or authorization involving an

21 alleged infringer?

22     A.  Say that one more time.  What would we do?

23 What would Garteiser Honea do with respect to what?

24     Q.  What would -- strike that.

25          In paragraph 43, it ends with the statement

**Page 67**

```
 1    "without license or authorization."

 2              My question is specific to investigations

 3    that your firm did on behalf of RBDS, what did you do,

 4    if anything, to determine whether a defendant's acts

 5    were with or without license?

 6              MR. VAZQUEZ:  I'm going to object to that

 7    on attorney work product privilege.  Instruct my client

 8    not to answer that.

 9       Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, are you

10    going to take Mr. Vazquez's instruction and not answer

11    my question?

12       A.  I don't remember -- to be -- you know, I -- I

13    couldn't answer it if I -- if it wasn't privileged.  I

14    just don't -- I don't remember it.

15       Q.  Mr. Garteiser, you mentioned not long ago that

16    your firm would not file a complaint on behalf of a

17    client without first getting approval from the client.

18              Do I remember that right?

19       A.  Yeah, I mean, that's the general rule.  We

20    would -- we wouldn't file a lawsuit without check- --

21    checking with the client first.

22       Q.  Did RBDS approve of the language that is

23    reflected in this paragraph 43 of the complaint against

24    Plex?

25              MR. VAZQUEZ:  Objection.  Privilege.
```

Page 68

1    Instruct Mr. Garteiser not to answer to the extent it

2    involves attorney-client communications.

3            THE WITNESS:  I'm not sure if they read

4    every paragraph.  So I -- but yeah, I'm not going to --

5    sorry -- I strike that.

6            I -- I'm going to rely on my client's -- I

7    mean, my attorney's advice and not answer the question

8    because it would involve attorney-client communications.

9      Q.  (BY MR. MACHLEIDT)  Specific to this complaint

10   dated September of 2023, who identified Plex as a

11   defendant to go after for infringement of the

12   '221 patent?

13           MR. VAZQUEZ:  Going to object both on

14   attorney work product and on attorney-client privilege

15   grounds.  And instruct Mr. Garteiser not to answer the

16   question to the extent it will divulge attorney-client

17   communications or attorney work product.

18     A.  I'm going to follow the advice of my counsel.

19           (Exhibit 69 marked.)                  Valve Corporation          Affirmative

20           MR. MACHLEIDT:  Go to Exhibit 69.

21           Rene, it's coming your way.  Let me know

22   when you've got it.

23           MR. VAZQUEZ:  Okay.

24     Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, while that's

25   happening, because your Counsel doesn't have the

Garteiser, Randall Deposition                                                      September 4, 2025

Page 69

1    document yet, I'm going to ask you a few more questions

2    about Exhibit 68.

3        A.  Okay.

4        Q.  The claim chart that is Exhibit B in the

5    Exhibit 68 Plex complaint, who paid for it?

6        A.  Pardon?

7        Q.  Who paid for the commission or creation of the

8    claim chart that is Exhibit B to the Plex complaint?

9            MR. VAZQUEZ:  Objection.  Lacks foundation.

10       A.  Yeah.  I -- I don't know.  I just don't recall.

11   I mean, ultimately, if there was no settlement, we would

12   probably eat the cost.  I just -- I -- I don't even know

13   if we didn't do that one ourselves, but I think we had

14   assistance.  We like to kind of, under our Rule 11

15   obligation, try to get a second opinion from other

16   engineers that practice computer science or electrical

17   engineering.

18           MR. VAZQUEZ:  I have Exhibit 69 open.

19       Q.  (BY MR. MACHLEIDT)  That second opinion you

20   referred to with respect to RBDS versus Plex, would it

21   have come from -- did you say Copperpod?

22       A.  Yes.

23       Q.  Trying to build a foundation here.  Has

24   Garteiser Honea ever paid Copperpod to prepare a claim

25   chart?

Kilpatrick Townsend & Stockton LLP

Garteiser, Randall Deposition

September 4, 2025

Page 70

```
1        A.  Yes.

2        Q.  Has Garteiser Honea ever paid Copperpod --

3   strike that.

4            Do you have an idea in your mind about the

5   cost of a Copperpod claim chart?

6        A.  It would depend.

7        Q.  Did Garteiser Honea ever pay Copperpod to

8   prepare a claim chart on behalf of or for use in an RBDS

9   lawsuit?

10       A.  Yes, I believe so.  And I believe this is one

11  of those situations here with Plex, Exhibit 68.

12       Q.  The Exhibit B claim chart that is in

13  Exhibit 68 -- in other words, the '221 infringement

14  chart against Plex -- how much did it cost to commission

15  that from Copperpod?

16       A.  I don't -- I don't recall right now, but based

17  on my 20 years' experience, I would say -- I don't know.

18  It's a pretty good one.  What I mean by that is it's,

19  you know, 42 pages or something.  So it seems pretty

20  detailed.  I -- I'm not sure.  I hate to speculate.

21       Q.  It did cost some amount of money to commission

22  the '221 claim chart that's attached to Exhibit 68.

23            Is that a fair statement?

24       A.  Yes.

25       Q.  Copperpod didn't work for free?
```

**Valve Corporation**                                    Affirmative

CONFIDENTIAL

Kilpatrick Townsend & Stockton LLP

September 4, 2025

Page 71

```
 1        A.  No.  And then -- and we -- as a general rule, a
 2   client, in this case, RBDS, wouldn't want us to file a
 3   lawsuit against the defendant if -- if they didn't
 4   infringe.
 5            And this goes back to our -- as an
 6   attorney, our Rule 11 obligations to kind of, as I
 7   mentioned before, we -- we try to make sure there's
 8   infringement.  That's what our accountant is for.  So
 9   that's how that occurred.  Or that's why we would take
10   the time to do the chart as opposed to just kind of
11   recite the claim language into the complaint without
12   doing a more detailed analysis.
13        Q.  Based on your, give or take, 20 years of
14   experience litigating cases, how much time does it take
15   to prepare an infringement claim chart as detailed as
16   the one we see here in Exhibit B to the Plex complaint?
17        A.  It might -- it might take 20 hours or 40.  It
18   just depends how familiar.  I don't remember at -- at
19   this point, you know, if the -- we started working with
20   the client in February and now it's September.  If there
21   were other cases before this one, I don't recall, but
22   that would help.  You know, the familiarity with the
23   patent can significantly reduce the amount of time it
24   takes.  There's a very -- there's a steep learning
25   curve.  I think that's the right way to say that.
```

Page 72

1    Q.  Mr. Garteiser, do you have Exhibit 69 in front

2    of you?

3    A.  Yes, sir.

4    Q.  What is it -- well, strike that.

5         Have you seen Exhibit 69 before today?

6    A.  I -- I have.

7    Q.  What is Exhibit 69?

**Valve Corporation**     Affirmative

8    A.  It's a letter from Joel Kauth -- an e-mail --

9    sorry -- K-A-U-T-H, Joel, on 18 September.

10   Q.  What year is this e-mail dated?

11   A.  Oh, September 18th, 2023.  Two -- two or three

12   days after we filed this lawsuit.

13   Q.  What is Mr. Kauth or Kauth conveying to you in

14   this Exhibit 69 e-mail?  Strike that.

15        Who is the recipient of the Exhibit 69

**Valve Corporation**     Affirmative

16   e-mail?

17   A.  It appears to be just me.

18   Q.  What is the subject of this Exhibit 69 e-mail?

19   A.  It's the case number that appears in

20   Exhibit 68, RBDS versus Plex.  And it's got the case

21   number.

22   Q.  You mentioned just a moment ago that this

23   e-mail at least is -- indicates that it was sent on

24   September 18th of 2023, which is just a few days after

25   the date of the RBDS versus Plex complaint.

Page 73

| | | |
|---|---|---|
| 1 | Is that fair? | |
| 2 | A.  Yes. | |
| 3 | Q.  What information -- strike that. | |
| 4 | Who do you understand Mr. Joel Kauth to be? | Valve Corporation    Affirmative |
| 5 | A.  An attorney for Plex. | |

6    Q.  You understand him to be in-house counsel or

7    outside counsel for Plex?

8    A.  I believe he's outside counsel, based on his

9    signature block.  I don't know if that's Knobbe.  I

10   don't know what the KPPB stands for right now.  I don't

11   recall.

12   Q.  What information is Plex's outside counsel    **Valve Corporation**    Affirmative

13   conveying to you through this September 18, 2023,

14   e-mail?

15   MR. VAZQUEZ:  Objection.  Vague.

16   A.  It seems to reference a prior case from 2016    **Valve Corporation**    Affirmative

17   that the parties settled, that we weren't aware of when

18   we filed our lawsuit.  So he's saying that RBDS,

19   paragraph 43, saying there's no license or

20   authorization, which is kind of boilerplate language

21   that we would include in any case, is -- is wrong.  And

22   that by filing this lawsuit, we have breached a covenant

23   not to sue.  So -- so what's the -- that's what he says

24   here.

25   Q.  (BY MR. MACHLEIDT)  You mentioned that your

**Page 74**

1    firm was not aware of the 2016 Plex lawsuit when you

2    filed the September 2023 complaint on behalf of RBDS

3    against Plex.

4         A.  Well, I -- I guess I wasn't aware of the -- the

5    scope of it, because I didn't have the settlement

6    agreement, because our firm didn't do it.  Paragraph 47,

7    I believe we mentioned that Plex was aware of the patent

8    because of -- or the patent family because of a prior

9    case.

10              So I just don't -- I don't remember all the

11   details right now, or if I even prepared that particular

12   section.  So I'm -- I'm -- I'm a little bit -- I need to

13   look at the settlement agreement.  I probably would have

14   asked for that.  I don't want to disclose

15   attorney-client work product or communications.

16        Q.  If you had in your possession the 2016

17   settlement agreement between RBDS and Plex, would you

18   have made the statements in paragraph 43 that Plex has

19   committed infringement without license?

20        A.  Not intentionally.

21              MR. VAZQUEZ:  Objection.  (Indiscernible.)

22        A.  Yeah.  Not intentionally.  I mean, I wouldn't

23   write a false statement, you know, not realizing I was

24   doing it.  I mean, it could be a copy and paste from a

25   prior case, but I don't -- I just don't -- I don't

Page 75

1    remember this in particular.  I'm sure I would have, you

2    know, investigated when I got this letter.

3             I mean, as a general rule, if we make a

4    mistake, we try to promptly correct it to the extent we

5    did something wrong.  It was -- I don't know -- under

6    the settlement agreement if there was a, like, time to

7    cure a defect or what have you.  I don't remember.  Like

8    I said, I -- I don't know if I have that settlement

9    agreement from 2016.  I don't remember much about this

10   case, to be honest.

11       Q.  Did you or your firm dismiss the 2023 lawsuit

12   against Plex?

13       A.  I'm not sure.  Since I don't remember it that

14   well, we probably did.  I just don't know if -- what

15   rationale that went into that decision.

16             I know a lot more about the charts because

17   I personally like to put Exhibit B to the RBDS

18   complaint, like I like to do Exhibit B to the complaint.

19   So that just kind of helps me remember the case, or

20   remember the chart at least.  But I don't remember the

21   details of -- of Plex.

22             I -- I -- I think that because I'm having

23   trouble remembering that we probably decided it's a

24   close call.  And since we're in the Northern District of

25   California, we'd probably err on the side of dismissing

Garteiser, Randall Deposition

September 4, 2025

Page 76

1    rather than getting into a dispute in that particular

2    district.  It's not particularly favorable for

3    plaintiff.  Plaintiff patentees, I should say.

4        Q.  What did you mean when you say "close call" in

5    your prior answer?

6        A.  A lot of times people say they have a licensing

7    defense and they -- and they don't.  You know, they --

8    we've had a case with like 90 patent -- 90 defendants

9    back before the Patent Act -- or the America Invents

10   Act, which is a litigation -- or -- or legislation that

11   passed and where you could name more than one defendant

12   in a lawsuit.

13            And so court allowed a lot of the

14   defendants to file an early law -- early summary

15   judgment motion on a licensing defense.  And -- and so

16   people filed their -- their defenses that thought they

17   had a license, possibly through a third party or

18   directly even.  I don't recall the details.  It was

19   about 15 years ago and the judge never ruled on any of

20   the summary judgment motions and ended up retiring.

21            So to me, a license -- or a claim that

22   there's a license is -- it's a defense.  It's not

23   necessarily a true statement.

24            And here, because there's an indication

25   that they knew about the patent family based on the

Page 77

1    prior litigation or prior -- I think that's what it

2    says.  Let me look at paragraph 67 -- or 47 -- sorry --

3    yeah.  "Defendant had knowledge about the patent due to

4    a prior litigation about January 2023."

5              So I -- I don't -- it doesn't reference

6    2016.  So -- so it seems like maybe we filed -- I don't

7    know -- January 2023.  We didn't represent them yet.  So

8    I believe this might have been a situation where

9    Leigh -- what is it? -- Rothschild Broadcast

10   Distribution Systems, LLC, had prior counsel who passed

11   away.

12             And so I believe that that person may have

13   filed this lawsuit.  And then I think that's when RBDS

14   reached out to Garteiser Honea and we started working

15   with -- with them on this litigation.  So it was a

16   little sloppy, I think, with the handoff between the

17   prior attorney who passed away and -- and -- and our

18   firm.

19       Q.  The complaint that, for example, is Exhibit 68,

20   do you agree that the complaint is the initiating

21   document for a lawsuit?

22       A.  I don't know.  It sounds like a legal term.

23       Q.  It may be.  Mr. Garteiser, you are a lawyer;

24   correct?

25       A.  Yeah, I just don't -- I don't know if that's

Garteiser, Randall Deposition                                                                September 4, 2025

Page 78

1    the -- it might be a civil cover page.  I don't really

2    know what you mean by that, but I -- I do seem to recall

3    now that -- that -- that prior counsel had filed maybe

4    this lawsuit and then passed away or -- or somehow maybe

5    we -- this -- I just -- do you have any other documents

6    you can show me on this related to Plex?  Sir?

7        Q.  Oh, I'm thinking.

8        A.  We wouldn't have went through this much detail

9    of the chart and paragraph 47 if there wasn't, you know,

10   more to this.  So...

11            (Exhibit 70 marked.)                      Valve Corporation          Affirmative

12            MR. MACHLEIDT:  Let's go to Exhibit 70.

13            MR. VAZQUEZ:  I just received it.  In the

14   process of opening it.  Okay.  I have it opened.

15       Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, do you have

16   Exhibit 70 in front of you?

17       A.  Yes.

18       Q.  Whose names appear at the top left of         Valve Corporation          Affirmative

19   Exhibit 40 -- Exhibit 70?

20       A.  My name and the part- -- my partner's name of

21   Christopher Honea.

22       Q.  There are no other lawyer names on this

23   exhibit; correct?

24       A.  Correct.

25       Q.  For example, Rene Vazquez does not appear.

CONFIDENTIAL                                                  Kilpatrick Townsend & Stockton LLP

Garteiser, Randall Deposition                                                September 4, 2025

Page 79

1         A.  No, he's not admitted in California, and

2    neither is Michael Scott Fuller.

3         Q.  What is Exhibit 70?

4         A.  It's titled "Notice of Dismissal with

5    Prejudice."  It appears two days after we were contacted

6    by Joel Kauth in Exhibit 69, that we took a day to do

7    some investigating, and then we promptly dismissed,

8    realizing that we had made a mistake.

9         Q.  What mistake are you referring to?

10        A.  Based on -- on using Exhibit 69 to refresh my

11   recollection that before -- way before, almost a decade

12   earlier, there was a lawsuit in 2016.  And in that

13   lawsuit, there was a resolution that allowed them to

14   have -- Plex to have a license.

15              And so Joel let us know that, and I guess

16   we had confidential or privileged communications with

17   the client.  And the result of that was that we

18   dismissed with prejudice the next day after a day of

19   investigation.

20        Q.  Did you mention earlier that Garteiser Honea

21   was not involved in the lawsuit that led to the 2016

22   Plex license?

23        A.  That's correct.  We did not represent RBDS

24   until, it appears, February of 2023.

25        Q.  Does that mean that Garteiser Honea was not

Valve Corporation                                              Affirmative

Page 80

1    involved in any way in the negotiations leading up to

2    any 2016 license between RBDS and Plex?

3        A.  Correct.  I didn't -- again, we didn't

4    represent RBDS until February 2023.  And at that time,

5    Rene Vazquez signed an engagement letter on behalf of

6    Garteiser Honea with RBDS.

7        Q.  You referred to Rule 11 a few times today.  Is

8    it your opinion -- strike that.

9            What part of a pre-suit investigation

10   before filing an infringement lawsuit, in your view,

11   involves determining whether the infringement is

12   actually licensed conduct?

13           MR. VAZQUEZ:  Objection.  Form.

14       A.  I'm sorry.  Could -- what part of the pre-suit

15   investigation is the obligation of the law firm with

16   regards to what?

17       Q.  (BY MR. MACHLEIDT)  Take another crack at it.

18   Under Rule 11, or any other obligation, before filing a

19   patent infringement lawsuit, does Garteiser Honea

20   determine whether the defendant is actually already

21   licensed to do what they're accused of is infringement?

22       A.  You know, we -- we sure would like to.  I mean,

23   we spent a lot of time on that complaint, and it, you

24   know, it didn't work -- it was a mistake.  And so we

25   would have loved to have saved that time and not made

Garteiser, Randall Deposition                                                                    September 4, 2025

Page 81

1    that mistake and not, you know, had a 42-page PIC,

2    preliminary infringement contention, worked up on it and

3    confirmed by an outside source and then draft up the

4    complaint and, you know, pay the money -- filing fee and

5    all that without -- without a good faith belief that

6    they infringed.

7              So here I think that, because it was

8    2016 -- 2016, I'm not even sure if -- you know, as far

9    as talking to the -- the -- the client I think was at a

10   disadvantage too because the prior -- I don't know if

11   Daniel Falcucci was even there in 2016.  I just don't --

12   I don't know when he joined RBDS and PAM.

13       Q.  Was Mr. Leigh Rothschild with RBDS in 2016, to

14   the extent you know?

15       A.  I -- I honestly don't know.  With RBDS, he is

16   actually the patentee, but beyond that I'm not sure.

17       Q.  You mentioned something along the lines of it

18   would have been nice to save the time that you put into

19   preparing the 2023 complaint against Plex.

20              Could you have saved that time simply by

21   asking Mr. Rothschild whether there was a license

22   agreement naming Plex?

23              MR. VAZQUEZ:  Objection.  Form.  Calls for

24   speculation.

25              I'm sorry.  Counsel, could you repeat the

Valve Corporation                                    Affirmative

Kilpatrick Townsend & Stockton LLP

Garteiser, Randall Deposition                                    September 4, 2025

Page 82

1    question?

2                MR. MACHLEIDT:  Do you mind reading that

3    back?

4                THE COURT REPORTER:  Sure.

5                MR. MACHLEIDT:  I want to also hear it for

6    myself.

7                (Whereupon, the requested portion of the

8                 record was read back.)

9                MR. VAZQUEZ:  I'll assume my original

10   objections.

11        A.  I think -- and -- and it sounds like a          **Valve Corporation**          Affirmative

12   hypothetical.  And I don't feel comfortable answering

13   hypotheticals.

14        Q.  (BY MR. MACHLEIDT)  Before doing all the work

15   that you mentioned leading to the September 2023

16   complaint between RBDS and Plex, including the Exhibit B

17   claim chart, did you ask Mr. Rothschild whether Plex

18   already had a license to the '221 patent?

19                MR. VAZQUEZ:  Objection.  Privilege.

20                I'm instructing Mr. Garteiser not to answer

21   that.

22        A.  Yeah.  I'm -- I'm going to listen to my         **Valve Corporation**          Affirmative

23   attorney's advice and not answer the question because it

24   calls for attorney-client question-and-answer

25   communication.

Kilpatrick Townsend & Stockton LLP

Garteiser, Randall Deposition                                          September 4, 2025

Page 83

Valve Corporation                                                      Affirmative

1        Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, had you

2   known in September of '23 that Plex was already licensed

3   to the '221 patent, would you have filed on behalf of

4   RBDS an infringement lawsuit accusing Plex of infringing

5   the '221 patent?

6        A.  RBDS would not want me to file something that

7   was not correct.  And we wouldn't want to file something

8   that was not correct.  So to the extent that there was a

9   harmless error here or a mistake made, we tried to

10  promptly correct it by dismissing with prejudice.

11       Q.  If I say anything you disagree with, certainly

12  let me know.

13            In September of 2023, you, on behalf of

14  RBDS, filed a lawsuit publicly accusing Plex of

15  infringing the '221 patent.  Plex was already licensed

16  to the '221 patent and had to do the work to tell you

17  that fact.

18            Why do you consider that to be a harmless

19  error?

20            MR. VAZQUEZ:  Objection.  Argumentative.

21  Objection.  Form.

22       A.  Why do I consider that a harmless error.

23            What harm are you referring to, sir?

24            MR. MACHLEIDT:  Would you mind reading the

25  answer -- obviously not this one but the prior one,

Garteiser, Randall Deposition                                         September 4, 2025

                                                            Page 84

1      where I believe it was Mr. Garteiser who used the phrase

2      "harmless error."  And if he did not, I apologize.

3                 (Whereupon, the requested portion of the

4                  record was read back.)

5          Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, why do you

6      consider RBDS's lawsuit against Plex in 2023 that --

7      strike that.

8                 Why do you consider a September 2023                Valve Corporation          Affirmative

9      lawsuit against Plex to be harmless error?

10         A.  Oh, because it seems like we corrected it

11     within a day or two.  It wasn't like -- somebody told us

12     there was a problem and we fixed it.  So -- but before

13     we fixed it, we did our investigation to make sure that,

14     as I mentioned before, that things are correct.

15                And I -- I think that RBDS and Garteiser

16     Honea, both were at a disadvantage with regards to this

17     prior 2016 agreement because of the passage of a prior

18     attorney that worked for RBDS.  I don't remember his

19     name right now.

20         Q.  Do you know whether that prior attorney whose

21     name you don't remember had any involvement in the 2016

22     Plex license?

23         A.  I believe that he -- he did, but I don't know

24     how much and I didn't know him personally.

25         Q.  Is it fair to say that you and your firm did no

CONFIDENTIAL                                          Kilpatrick Townsend & Stockton LLP

Garteiser, Randall Deposition                                                    September 4, 2025

Page 85

1   investigation before filing the September 2023 complaint

2   against Plex to determine whether Plex was already

3   licensed to the '221 patent?

4                 MR. VAZQUEZ:  Objection.  Form.  Objection.

5   Mistakes prior testimony.

6       A.  I believe that the other -- the prior attorney

7   had -- had passed away.  And I'm not -- I believe there

8   was trouble that -- that RBDS had trouble maybe even

9   getting some files from -- from his office or from his

10  home office.  I'm not quite sure what the situation was,

11  but I believe he was a senior attorney who had -- was a

12  solo practitioner.

13                 So -- so I don't recall how much

14  investigation I did or anyone else did prior to this.

15  It was -- to the extent that we did investigate it, we

16  obviously missed that.

17      Q.  (BY MR. MACHLEIDT)  Everything that you just

18  said about the other counsel, the other firm, you know

19  it for a fact or are you just speculating?

20      A.  Well, I believe that it came up when we were

21  trying to find some documents maybe not even related to

22  RBDS, but just in general prior, like apparently there

23  was an attorney that maybe had written some letters.  So

24  we had inquired about it with regards to possible prior

25  notice of a patent.

Kilpatrick Townsend & Stockton LLP

Garteiser, Randall Deposition                                              September 4, 2025

Page 86

1                    At the time I think there were -- the

2       attorney would send a letter based on the agreement we

3       have with RBDS such that we could possibly follow up

4       with the potential defendant or infringer prior to even

5       filing the lawsuit and see if they wanted to take a

6       license to the patent.

7                    I don't believe that that happened here and

8       I don't believe that we had a letter because, again, I

9       don't think we were able to obtain it from prior counsel

10      who may have sent the letter on behalf of RBDS.

11         Q.  Would Garteiser Honea file a lawsuit -- in this

12      case, the one against Plex in 2023 -- without first

13      believing it had a Rule 11 basis to file that lawsuit?

14         A.  I think I've answered that question.

15         Q.  Will you humor me and answer it again?

16         A.  No.

17                    MR. VAZQUEZ:  Objection.  Asked and

18      answered.

19         Q.  (BY MR. MACHLEIDT)  You're refusing to answer

20      my question?

21         A.  I've already answered your question.  I think

22      you're harassing me at this point.  You know, I

23      mentioned -- I indicated that we apparently made a

24      mistake.  We were notified of the mistake and we fixed

25      it promptly.  I don't know what else to tell you.

Garteiser, Randall Deposition                                                                September 4, 2025

**Page 87**

1          As a law clerk, sometimes mistakes happen.

2   I saw them.  And how we handled this and how RBDS

3   handled it would be in line -- in common of anything I

4   saw when I was clerking for over a year at -- in the

5   Northern District of California for The Honorable James

6   Ware.

7              MR. MACHLEIDT:  Objection.  Move to strike.

8   Objection as nonresponsive and move to strike.

9      Q.  (BY MR. MACHLEIDT)  On Exhibit 70, you see down

10  at the bottom it says "Each party to bear its own

11  attorneys' fees, costs, and expenses"?

12     A.  Correct.

13     Q.  Does that mean that any attorneys' fees, costs

14  and expenses RBDS incurred -- strike that.

15              Does that mean that any attorneys' fees,

16  costs, and expenses that Plex incurred as part of what

17  you call a mistake, Plex has to shoulder those expenses?

18              MR. VAZQUEZ:  Objection.  Form.

19     A.  I don't remember the details of this agreement,

20  but it -- it looks like I spoke with Joel Kauth that

21  sent me an e-mail on September 18th, 2023, after this

22  and after we had done a little investigating and then

23  got their permission to file this dismissal, since they

24  hadn't yet answered, as a notice as opposed to like a

25  joint motion or something like that.

September 4, 2025

Page 88

1        Q.  (BY MR. MACHLEIDT)  You know for a fact that

2    RBDS got Plex's permission to file this dismissal as

3    opposed to RBDS simply filed it on its own?

4        A.  I don't recall, but I'm -- I would think that

5    we got their permission.  I don't see the return e-mail

6    here.  So that's why I -- I implied or assumed that I

7    called him and spoke with them.  Probably apologized for

8    making the mistake in the first place.  Probably even

9    told him my frustration after preparing such a nice

10   chart, that we had -- we apologize for the prior

11   license.  We weren't aware of it.

12              MR. MACHLEIDT:  Let's go off the record for

13   a few minutes.

14              THE VIDEOGRAPHER:  We're off the video

15   record.  The time is 2:23.

16              (Off the record at 2:23 p.m.)

17              (On the record at 3:20 p.m.)

18              THE VIDEOGRAPHER:  On the video record.

19   The time is 3:20.

20       Q.  (BY MR. MACHLEIDT)  Welcome back,

21   Mr. Garteiser.

22       A.  Thank you.

23       Q.  I want to do my best to kind of wrap up what we

24   were talking about before lunch.  You mentioned a lawyer

25   who had passed away.

Garteiser, Randall Deposition                                                 September 4, 2025

Page 89

1              Do you recall?  Was that J. Johnson?

2       A.  I believe so.

3       Q.  I'm going to ask you initially what are

4  hopefully just yes-or-no questions.  And then depending

5  on where we go, I may expand and give Mr. Vazquez time

6  to interject.

7              Does that work for you?  Mr. Garteiser,

8  does that work for you?

9       A.  Sure.  Yes.

10      Q.  Have you ever corresponded with Mr. Johnson in

11  any way:  phone, e-mail, hardcopy letter, facsimile?

12      A.  No.  I never met him.

13      Q.  You -- is it fair to say that you never

14  discussed RBDS with Mr. Johnson?

15      A.  Correct.

16      Q.  You never discussed Plex with Mr. Johnson?

17      A.  No.  I don't -- I don't believe so.  I -- I

18  don't have -- I didn't look up his obituary, but I'm

19  pretty sure that by the time we got retained for RBDS,

20  he was already passed away.

21              (Exhibit 71 marked.)

22              MR. MACHLEIDT:  Let's go to Exhibit 71.  To

23  make things confusing, Exhibit 71 has a big old

24  Exhibit 64 text right in the center.

25              Rene, that is coming your way.

                                    Kilpatrick Townsend & Stockton LLP

Page 90

1      Q.  (BY MR. MACHLEIDT)  And, Mr. Garteiser, while

2    we wait on that, please look through Exhibit 71, which I

3    inevitably will call 64 several times.

4             MR. VAZQUEZ:  It's arrived.  I'm opening

5    it.  And I've got it open.

6      Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, have you

7    seen Exhibit 71 before today?

8      A.  No.  I'm not familiar with this case number up

9    at the top, the 5:24-703 PCP.  Or at least I don't

10   remember it.

11     Q.  Do you see in Exhibit 71, if you flip to --

12   it's called page 2 of 12 -- near the top it says

13   "FRE 408, Display v. Discord"?

14     A.  Okay.  Yes, that sounds familiar.

15     Q.  Did you represent Display Technologies in both

16   licensing discussions and infringement litigation

17   against Discord?

18     A.  At one point I did both.  I don't know if I did

19   both the entire time, but it would have been someone

20   from the firm if it wasn't me, I believe.

21     Q.  The page 2 of 12 of this Exhibit 71, what is

22   shown on the second page of the exhibit?

23     A.  I don't know.  It's got a -- I guess this is an

24   e-mail that Matt Warren produced.  It's got a weird

25   bookshelf picture that -- that I'm not familiar with.

Garteiser, Randall Deposition                                                                September 4, 2025

Page 91

1    I'm not familiar with this setup or format, but it

2    appears to be a -- an e-mail where I made an early

3    resolution offer of 170- to Discord and -- and then

4    attached a master asset list.

5         Q.  The -- forgive me.  Were you finished?

6         A.  I think so.

7         Q.  The offer that you mentioned, on whose behalf

8    are you providing to Mr. Warren an offer of $170,000?

9         A.  I believe it was on behalf of Display

10   Technologies, LLC.  And to the extent it was beyond

11   them, then the Patent Asset Management subsidiaries.

12   There's a -- I say that because the attachment has a

13   list of patents.

14        Q.  Mr. Garteiser, the -- you bring up the

15   attachment which follows the page 2 of 12 on this

16   exhibit.  The offer of resolution that you made to

17   Mr. Warren -- that's what I understand to be, at the

18   time, Discord's counsel -- that $170,000, was it for a

19   license for Discord to all of the patents that are

20   included in the master asset list of this exhibit?

21        A.  I don't remember.  I don't recall settling with

22   Discord.  Jennifer Kash of this law firm, Warren Kash.

23   And Warren used to be at Quinn Emanuel.  And I always

24   got the impression that Matt Warren was just completely

25   overbilling on this case to try to impress his partner.

Page 92

1    I don't know what his -- I don't know what was going on,

2    but it seemed like he was.

3            I guess what I'm trying to say is that I --

4    I -- I found him very difficult to work with and Discord

5    to be very difficult to work with.

6        Q.  I think you answered the follow-up question

7    that I had, but when you referenced this case and the

8    difficulty you had with Mr. Warren, specifically you're

9    referring to it was difficult for you to deal with

10   Discord and Mr. Warren, with respect to the -- I'm going

11   to call it Display Technologies lawsuit.

12           Is that fair?

13       A.  Correct, this case number, 5:24-703.  And it

14   just struck me as -- it stood out more than others.  And

15   the only thing I could piece together was that he had --

16   was trying to impress someone that I had known from

17   Quinn Emanuel, who was now a partner at his firm --

18       Q.  Understanding --

19       A.  -- or -- or her firm.

20       Q.  I believe you mentioned something along the

21   lines of billing, but I -- I don't have a LiveNote.  So

22   I'm going to reset.

23           But why did you find it difficult to deal

24   with Mr. Warren and his client Discord?

25       A.  Well, just even this, this is Exhibit 64.  So

Garteiser, Randall Deposition                                                    September 4, 2025

Page 93

1    he filed a document with 64-plus exhibits.  I mean, it's

2    ridiculous.  Like, you know, like, it takes me half a

3    day just to open all the exhibits.  You know?  I mean,

4    it was -- it just -- I couldn't believe that all that

5    was required.  I didn't think it was necessary.  And he

6    just seemed to have some sort of axe to grind with

7    either me, personally -- I guess, me, personally, like I

8    said.  That's the only connection I could really find.

9    I don't -- I don't know or don't recall if he had any

10   prior relationship with Display Technologies or anyone

11   else.

12       Q.  Do you recall -- or you mentioned the case

13   number we see at the top of this Exhibit 71.

14            Did you represent Display Technologies in a

15   lawsuit against Discord?

16       A.  I believe I asked and answered that, didn't --

17   didn't I?

18       Q.  You might have.  I -- I'll blame -- I'll blame

19   the lunch on that one.

20       A.  I believe I was counsel of record for this

21   case, 5:24-cv-703, and so...

22       Q.  Mr. Garteiser, I think my question could have

23   been much clearer.  So I apologize.  I'll try to cut to

24   the chase a little bit.

25            The offer that you made here of $170,000,

Page  94

1    was it approved by your client for you to make that

2    offer to Discord?

3                    MR. VAZQUEZ:  Objection.  Privilege.

4                    I'm going to instruct Mr. Garteiser not to

5    answer to the extent it requires divulging

6    attorney-client communications.

7        A.  Yeah.  I'm -- I'm going to listen to my

8    attorney.

9        Q.  (BY MR. MACHLEIDT)  I will -- I apologize,

10   Mr. Garteiser.  I know you're still looking to --

11       A.  Well, I was just trying to figure out, it may

12   have been just for the Display patents.  I'm just not

13   sure.  I -- I -- it feels like I would have mentioned

14   more.  He may have asked about other patents.  I don't

15   remember.

16       Q.  I know this is a hypothetical and that's always

17   difficult, but I'll ask it to see if it gets me

18   anywhere.  If Discord had agreed to pay $170,000, to

19   which bank account would you have asked the money to be

20   transferred to?  Meaning --

21                    MR. VAZQUEZ:  Objection.  Calls for

22   speculation.

23                    MR. MACHLEIDT:  I apologize, Rene.

24       Q.  (BY MR. MACHLEIDT)  -- meaning Display

25   Technologies, PAM -- as you mentioned, there are a lot

Page 95

1    of other names on the exhibit -- you know, some other

2    bank account?

3                MR. VAZQUEZ:  Form.  Objection.

4        A.  I stand by my -- I remember more about this

5    e-mail now.  You know, like maybe this, this definitely

6    was not a license to all these patents.  Instead it was

7    like here's an amount.  And then to the extent that

8    there might have been a covenant not to sue for three

9    years or two years or five years or whatever, here are

10   some potential other patents, I think, so that they

11   could.  That he had asked for, I believe.

12               If you take the deposition of Matt and he

13   disagrees, then I don't know what to say.

14       Q.  (BY MR. MACHLEIDT)  I'll represent to you that

15   I have no intent to take his deposition.  So he can't

16   agree or disagree with you.

17               (Exhibit 72 marked.)

18               MR. MACHLEIDT:  Let's go to Exhibit 72,

19   please.

20       Q.  (BY MR. MACHLEIDT)  And while that works its

21   way to Rene, Mr. Garteiser, I'll just point out that

22   this one says Exhibit 68 on the front.

23               So Mr. Warren filed even more exhibits than

24   64?

25       A.  I honestly think he filed an affidavit with

Page  96

1   200 paragraphs and -- or something, I don't -- it was

2   rather lengthy.

3            MR. VAZQUEZ:  I've received the e-mail.

4   I'm opening up the exhibit.  And I have it open.

5       Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, do you have

6   Exhibit 72 in front of you?

7       A.  Yes.

8       Q.  Looking at the back page -- in other words, the

9   page with substance on it -- have you seen this exhibit

10  before?

11      A.  No, but I've seen this e-mail, I guess, before.

12  It appears to be something that was sent to me.

13      Q.  Mr. Garteiser, is Exhibit 72 -- and I'll just

14  focus on the -- the second page, kind of the top half --

15  are we looking at an e-mail from you to Matt Warren?

16  And still near the top, there's a subject:  "Discussions

17  between Discord and Patent Asset Management."

18      A.  Correct.

19      Q.  At some point during your discussions -- strike

20  that.

21            In this Exhibit 72 e-mail, do you see

22  reference to Patent Asset Management, Symbology

23  Innovations, and Display Technologies?

24      A.  Honestly, I'm having trouble understanding what

25  I was trying to say to Matt Warren in my e-mail to him.

Garteiser, Randall Deposition                                                September 4, 2025

Page 97

1    It says "Respectfully, upon review edits, Discord had no

2    motivation to resolve its alleged patent infringement

3    with Patent Asset Management, even though we've sent

4    your client charts for Symbology Innovations and Display

5    Technologies."

6                So I guess I was saying before there was no

7    motivation, but now -- maybe now that they have actual

8    infringement charts, we could -- they had something to

9    actually point at.  We had something to point at.  So it

10   wasn't so abstract.

11                But I don't recall this 90-day stand down

12   named in -- named in NDA.  I guess they sent us an NDA.

13   I don't -- I don't know.  It's -- let me ask.  Wait for

14   a question.  I apologize.

15       Q.  Oh, no.  No problem at all.

16                And I think you -- you did kind of get to

17   the heart of my prior question.  Your e-mail does

18   reference Patent Asset Management, Symbology, and

19   Display Technologies; correct?

20       A.  Correct.  I think at the time there was some

21   prior negotiations or something before the lawsuit was

22   filed.  Maybe not with me but with a representative from

23   Patent Asset Management on behalf of its subsidiaries.

24   They had reached out to Discord.

25                And -- and when that didn't work out,

Page 98

1    they -- we filed a lawsuit in the Northern District of

2    California, where Discord was located.

3        Q.  Do you recall what the outcome was of the

4    lawsuit with Discord?

5        A.  I don't recall right now.  I believe I ended up

6    just focusing on the litigation, and maybe I had another

7    colleague come in and take care of settlement

8    discussions, because I didn't really think that -- I

9    don't know -- Mr. Warren and I didn't really get along.

10               So I thought it was best for the client if

11   maybe another attorney attempted to resolve the dispute

12   with him.  So sometimes, if that happens, we will, you

13   know, substitute out.  And more likely than not, that

14   would have been Rene Vazquez, and if not Rene, probably

15   Christopher Honea.

16       Q.  Sitting here today, do you know whether -- and

17   I'll -- strike that.

18               I don't want to get the licensor

19   information wrong.  So I'm going to focus on -- on

20   Discord, and add anything you need to to your answer.

21               But the question is, in the ultimate

22   settlement agreement with Discord, assuming one took

23   place, did Discord end up paying any money to any entity

24   as part of a resolution of this lawsuit?

25       A.  I don't believe so.  I -- I -- I just don't

Page 99

1    remember.  But I -- I -- I seem to recall that -- that

2    it was a walkaway and this -- we were all happy -- or I

3    was happy that we didn't have to deal with Mr. Matt

4    Warren anymore.

5        Q.  What, if any, rights or benefits did Discord

6    obtain as part of the walkaway?

7        A.  I don't --

8            MR. VAZQUEZ:  Objection.  Form.  Lacks

9    foundation.

10       A.  Yeah.  I don't remember.  But if you have like

11   a settlement agreement, I'm more than happy to refresh

12   my recollection.  It's been about a year or a year and a

13   half.

14       Q.  (BY MR. MACHLEIDT)  The -- going back to

15   Exhibit 71, there's the master asset list.

16           Did Discord obtain a license to any of the

17   patents that are included in this master asset list?

18       A.  I really don't remember.  I'd have to look at

19   the settlement agreement if there was one.

20       Q.  Do you recall as part of the Discord litigation

21   whether Discord served a subpoena on TD Bank?

22       A.  I -- I don't recall.

23           (Exhibit 73 marked.)

24           MR. MACHLEIDT:  Let's go to Exhibit 73.

25           Rene, that should be on its way to you.

Garteiser, Randall Deposition                                                    September 4, 2025

**Page 100**

1          MR. VAZQUEZ:  Okay.  I've got the e-mail.

2   And the exhibit is open.

3          Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, have you had

4   a chance to look at Exhibit 73?

5          A.  Yes.

6          Q.  Does this exhibit refresh your recollection on

7   whether there was a -- I'll call it a subpoena dispute

8   as part of the Discord litigation?

9          A.  Yes.

10         Q.  Without certainly telling me anything

11  privileged, but what do you recall about Discord's

12  attempt to serve a subpoena on TD Bank?

13         A.  Looking at this page marked Rothschild 0034489,

14  it seems like they were trying to subpoena Patent Asset

15  Management, LLC, and I indicated they're a non-party to

16  litigation and that it was improper to -- to serve a

17  subpoena on a non-party.

18             And in -- in fact, it's going -- trying to

19  subpoena the bank account in general, even for any --

20  even for the plaintiff was -- seemed improper.

21             So I recall too that they had a lot of --

22  they wanted to ask questions, I believe, related to the

23  parent.  But I could be confusing this with another

24  case.  But anyway, I guess I'll -- if you have

25  another -- you might have another document to show me.

CONFIDENTIAL                                              Kilpatrick Townsend & Stockton LLP

Garteiser, Randall Deposition

September 4, 2025

Page 101

1          Q.  When you say "parent," are you referring to

2    Patent Asset Management?

3          A.  Yes.  I mean, it -- it didn't seem appropriate.

4    And the whole structure of this case was very different

5    than anything I'd seen in about 22 years of practicing,

6    in that they were challenging standing.  And we clearly

7    said in the complaint that we have standing, the

8    patentee has standing -- Display Technologies.

9                   So they just were creating a dispute that

10   shouldn't be disputed because even based on the USPTO

11   recording -- recordings of assignment, everything was

12   perfect.

13                  And -- and then there's a newer-appointed

14   judge, I believe, who, after hearing, seemed to give

15   credence -- or seemed to give, like, some sort of -- he

16   wanted more briefing on it.  Because I -- I had not

17   really came across this defense before and he made it

18   clear at the hearing that we needed to -- if standing is

19   challenged, you know, then all of a sudden now the

20   defendant gets to -- we have to -- the burden shifts to

21   the plaintiff and we need to prove that -- that we have

22   standing.

23                  And I was kind of at a loss for a while

24   because I didn't know -- well, it's assigned to them.  I

25   don't know what else I can do to show you that -- that

Page 102

1    we have standing.

2            So that's kind of what I remember about

3    this.  And the opposing counsel and the new judge, newly

4    appointed judge, all were indicators in my professional

5    practice as a -- as a contingency fee attorney to --

6    to -- to try to get out of this case as quickly as

7    possible because it's -- it's -- it's going to be a lot

8    of work and a headache, I guess you could say.

9        Q.  How, if at all, did the judge resolve the --

10   the standing issue?

11       A.  I don't think the judge did resolve it.  I

12   think that -- I seem to recall he asked for some

13   additional briefing and we provided it.  And -- and then

14   I think that the -- the parties filed a joint dismissal

15   with prejudice.  I just don't recall much after that.

16           But that was -- at the time that was

17   very -- I had not dealt with that situation before and

18   had never had an issue raised like that for a defense

19   like that.

20       Q.  Do you see reference to an activist lawyer near

21   the bottom?  Well, I'll say near the middle of this

22   Exhibit 73 on the first page.

23       A.  Okay.  What's your question?

24       Q.  When you -- strike that.

25           Do you agree with me that Exhibit 73 begins

Page 103

1    with an e-mail from you to a Maureen Haney, among

2    others, dated July 15, 2024?

3        A.  I -- it appears to.

4        Q.  Near the bottom of your July 15, 2024, e-mail,

5    you make reference to an activist lawyer.  Is that

6    Mr. Warren?

7        A.  I'm not sure.  I would think so, since

8    you're -- I think that subpoena came from him or -- or I

9    think that's -- I don't think I've seen a copy of the

10   subpoena, but I believe there's some communication about

11   a subpoena to this bank, TD.

12       Q.  Did TD Bank ever produce documents in response

13   to the subpoena?

14       A.  I don't remember.  I don't remember us getting

15   any documents from TD Bank.

16            MS. GEYER:  Can we go off the record?

17            MR. MACHLEIDT:  Yeah.  Sure.

18            THE VIDEOGRAPHER:  We're off the video

19   record.  The time is 3:54.

20            (Whereupon, a recess was had.)

21            THE VIDEOGRAPHER:  On the video record.

22   The time is 3:57.

23       Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, switching          Valve Corporation                    Affirmative

24   topics a little bit in or around September of 2023, did

25   you represent Quantum Technologies or QTI, Social

Garteiser, Randall Deposition                                                          September 4, 2025

Page 104

1    Positioning Input Systems, and Symbology Innovations in

2    patent infringement lawsuits against Valve and its

3    customer Gearbox?

4         A.  Yes.

5         Q.  What's the easiest way for me to refer to that

6    collective:  QTI, SPIS and Symbology?

7         A.  I don't know.

8         Q.  Is it okay if I refer to Quantum Technologies     **Valve Corporation**          Affirmative

9    Innovations?

10        A.  Believe so.

11        Q.  Can I call that QTI?

12        A.  Uh-huh.

13        Q.  SPIS instead of Social Positioning Input

14   Systems?

15        A.  Okay.

16        Q.  Is that okay?

17             Mr. Garteiser, who made the decision to

18   file the QTI, SPIS, and Symbology lawsuits against Valve

19   in the Eastern District of Texas?

20             MR. VAZQUEZ:  I'm going to object based on

21   privilege and instruct Mr. Garteiser not to answer to

22   the extent he would be revealing attorney-client

23   communications.

24        A.  I think that would be an attorney-client

25   privileged communication.  I'm not able to answer that

Garteiser, Randall Deposition                                                    September 4, 2025

Page  105

1    question.

2        Q.  (BY MR. MACHLEIDT)  How -- strike that.

3              How did the Court in East Texas resolve

4    each of the QTI, SPIS, and Symbology lawsuits filed

5    against Valve?

6        A.  Well, that's a little compound.  Maybe we can

7    break that up.  Maybe you can help me.

8        Q.  I -- that's fair.

9              Before I get into that, is Mr. Rothschild,

10   the manager of SPIS, QTI, and Symbology -- all of those

11   LLCs?

12             MR. VAZQUEZ:  Object based on privilege.

13             You can answer but only to the extent that

14   it's not the -- divulging attorney-client

15   communications.

16       A.  Yeah.  Honestly, I don't know.  I'd have to

17   look in the engagement letters.

18       Q.  I'll try to narrow my admittedly compound

19   earlier question.

20             Did Magistrate Judge Payne ultimately          **Valve Corporation**         Affirmative

21   conclude that venue was not proper over Valve in the

22   Eastern District of Texas?

23       A.  I believe so, but I think something else

24   happened before that with respect to Symbology.  But I

25   believe that's the case, that -- that there was an issue

Kilpatrick Townsend & Stockton LLP

Page 106

1    with venue.  And I had not asserted a counterclaim but

2    had a venue provision in there, I believe, as if I had

3    asserted a counterclaim or something.

4            Anyway, go ahead.  What's -- what's the

5    next question, then?  I think there's an order from the

6    judge that said venue was ultimately not proper, that --

7    that the Epic [sic] had not availed itself or something

8    of the district, even though it -- it appeared to me

9    that they had.

10    Q.  You mentioned Epic.  Did you mean Valve?

11    A.  Sorry.  Yes.  Valve.  There was a case with

12    Epic that overlapped in some cases with Valve.

13    Q.  You mentioned recalling something involving

14    Symbology, and I'm certainly not putting words in your

15    mouth, but do you recall whether one or more of

16    Symbology's patents was invalidated by the district

17    Court in East Texas?

18    A.  I believe so.  I -- I know that -- that we --

19    we believe our patent is valid.  It was issued from the

20    patent office, and we presume it to be valid.  And the

21    Court, applying kind of the -- the Section 101 standard,

22    disagreed with us and found the patent to not be

23    patentable.

24            And so when that happened, and I believe

25    that we -- I believe that happened in a different case.

Page  107

1    And then -- then we promptly dismissed the case, that

2    case, this case.  Sorry about that.  I believe that

3    that -- I don't know if that happened in this case or in

4    another case, but when it did happen, we -- in the other

5    pending cases involving Symbology, even though we were

6    thinking about appealing at the time, we went ahead and

7    dismissed to mitigate any damages to anybody else as

8    opposed to stay.  I believe we decided to dismiss.  But

9    I -- I don't remember.  And it might be -- might depend

10   on the particular defendant.

11              MR. MACHLEIDT:  Let's go to Exhibit 73.

12              THE COURT REPORTER:  75.

13              MR. MACHLEIDT:  Oh, 75.

14              THE COURT REPORTER:  Oh, I'm sorry.  74.

15              MR. MACHLEIDT:  Okay.  It was in -- it was

16   in the middle.

17              (Exhibit 74 marked.)          Valve Corporation        Affirmative

18      Q.  (BY MR. MACHLEIDT)  Mr. Garteiser --

19              MR. VAZQUEZ:  Counsel.  Counsel, is this

20   the -- the exhibit, the most recent one that I got?

21              MR. MACHLEIDT:  No.  Exhibit 74 is making

22   its way to you.

23              MR. VAZQUEZ:  Oh.  Okay.

24      Q.  (BY MR. MACHLEIDT)  And, Mr. Garteiser, please,

25   while -- while we wait for that to happen, look through

Garteiser, Randall Deposition                                                      September 4, 2025

Page 108

1      the exhibit.  I'll say this now:  I don't intend to ask

2      too many questions.  But it does need to get into the

3      record.

4              MR. VAZQUEZ:  Just received the e-mail and

5      I have it open.

6          Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, have you had

7      a chance to look through Exhibit 74?

8          A.  Somewhat.

9          Q.  Please let me know when you're ready for me to

10     ask a few questions.  If you want to look through more

11     of it, please certainly do so.

12         A.  Okay.  I'm ready.

13         Q.  Mr. Garteiser, have you seen the Exhibit 74          Valve Corporation          Affirmative

14     order before today?

15         A.  Yes.

16         Q.  What is Exhibit 74?

17         A.  It's an order dated January 31st, 2025.

18         Q.  What relationship is there between this

19     Exhibit 74 order and what you and I have been referring

20     to as the QTI, SPIS, and Symbology lawsuits against

21     that?

22         A.  I don't know how the SPIS case plays into this,

23     but the Court references in this order Symbology and

24     QTI.  And it found that I, Mr. Garteiser, to be

25     sanctioned.  And the Court also held that the Court does

Page  109

1    not find sanctions against Symbology and QTI jointly and

2    severally appropriate.  That's on line 20 -- or page 20.

3    So Court had me do some -- several hours of community --

4    not community service, continuing legal education.

5         Q.  Mr. Garteiser, if you are finished, you can set

6    that exhibit aside.

7         A.  Okay.

8              (Exhibit 75 marked.)

9              MR. MACHLEIDT:  Let's go to Exhibit 75.

10             Rene, this is the Discord agreement.  I

11   think this is what you mentioned already having in your

12   e-mail; is that -- is that correct?

13             MR. VAZQUEZ:  Yep, I've got it.

14             MR. MACHLEIDT:  Great.

15        Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, you should

16   have Exhibit 75 in front of you.  Let me know when

17   you're ready for me to ask a couple questions about it.

18        A.  Did this -- where did this document come from?

19        Q.  We -- and I'm happy to answer that question.

20   We subpoenaed Discord.  They produced what you see here.

21   And I'll say the Rothschild defendants produce the same

22   agreement to us as well.  This is with the Discord,

23   essentially, Bates numbers down at the bottom.

24        A.  Okay.  I'm ready.

25        Q.  Mr. Garteiser, have you seen Exhibit 75 before?

Valve Corporation                                          Affirmative

Garteiser, Randall Deposition                                    September 4, 2025

Page 110

1          A.  I honestly don't remember it.  I had mentioned

2     before that maybe one of my other colleagues may have

3     taken over resolution of this, but as the lead attorney

4     on the case, I noticed that I'm the one to be noticed

5     under Cection 7.  So if you want to ask me any

6     questions, I'll try to answer them.

7          Q.  Is Exhibit 75 a settlement and license                    **Valve Corporation**                    Affirmative

8     agreement between Discord on the one hand and then

9     Display Technologies, Patent Asset Management, and Leigh

10    Rothschild on the other hand?

11         A.  Yes.

12         Q.  The lawsuit that you and I talked about

13    earlier, where you represented Display Technologies, is

14    it correct that Display Technologies asserted the '195

15    and the '723 patents against Discord in that lawsuit?

16         A.  I'm not sure.  I'm going to check.

17         Q.  And, Mr. Garteiser, look at anything you need

18    to.  I think if you look at the second "whereas" clause

19    in this Exhibit 75 agreement.  That's where I'm looking.

20         A.  Ah.  Okay.  So it appears that we asserted both

21    patents.

22         Q.  Just to clean it up on my end, Display                    **Valve Corporation**                    Affirmative

23    Technologies asserted the '195 and the '723 patents

24    against Discord in the case where you represented

25    Display Technologies?

CONFIDENTIAL                                         Kilpatrick Townsend & Stockton LLP

Page 111

1         A.  It appears so.  I -- I don't recall.  But

2    that's what this "whereas" clause says on the first

3    page.

4         Q.  If you flip to about the middle of the stack of

5    documents you have there, in this Exhibit 75.  At the

6    top, there's a heading that says "Exhibit A, patent

7    list."

8              Please let me know when you get there.

9         A.  Okay.

10        Q.  Without refreshing on the agreement -- and I'm

11   not stopping you from doing that -- but sitting here

12   today, what rights, if any, did Discord get to the

13   patents that are contained in this Exhibit A to

14   Exhibit 75?

15        A.  I don't remember.

16        Q.  Mr. Garteiser, can you please turn to the

17   second to last page and at the top it's indicated

18   Exhibit B.  Please let me know when you're there.

19        A.  Sorry.  What page?

20        Q.  It is the second to last page, but at the top

21   it says "Exhibit B."

22        A.  Okay.  I see that.

23        Q.  Is Exhibit B to this Exhibit 75 settlement

24   agreement titled "Joint Stipulation of Dismissal with

25   Prejudice"?

Valve Corporation                                    Affirmative

Garteiser, Randall Deposition                                          September 4, 2025

Page 112

1        A.  Yes.

2        Q.  The plaintiff that's referred to in this joint

3   stipulation is Display Technologies; correct?

4        A.  Correct.

5        Q.  The defendant, as we've been referring to, is

6   Discord.

7        A.  Discord, Incorporated.

8        Q.  The -- I'm going to read the second "whereas"

9   clause, and I'm going to attempt to do this as a -- as a

10   way not to go through the entire agreement.  This clause

11   says "Whereas plaintiff and defendant have settled this

12   action on terms that do not include, require or

13   contemplate any monetary or equivalent payment by

14   defendant."

15            Did I read that correctly?

16        A.  Correct.

17        Q.  This may be a little bit repetitive, but I do

18   think there's some difference to what we discussed

19   earlier.  So I apologize for any overlap.

20            But what led you to go from a $170,000

21   initial offer from Discord to ultimately a walkaway

22   where Discord didn't have to pay any money?

23            MR. VAZQUEZ:  Objection.  Attorney work

24   product privilege.  I'm instructing Mr. Garteiser not to

25   answer that question.

Kilpatrick Townsend & Stockton LLP

**Page 113**

1    A.  Yeah.  I -- I think that calls for a legal or

2    attorney-client privilege.  I will say that I mentioned

3    earlier that he was very difficult to work -- you know,

4    is a difficult person -- Mr. Warren -- and would file

5    motions like that subpoena that he knew wasn't going to

6    win but there might be a 5 percent chance or something.

7              So anyway, I don't want to waive privilege.

8    I apologize.

9              The -- the -- what I -- what I meant to say

10   by that last statement is that the docket kind of speaks

11   for itself.

12             (Exhibit 76 marked.)

13             MR. MACHLEIDT:  Let's go to 76.

14   Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, in a moment,

15   and that moment is now, you will be handed Exhibit 76.

16   It's short.  Certainly please read through it.

17             MR. MACHLEIDT:  And, Rene, it is on its way

18   to you.

19             MR. VAZQUEZ:  Okay.  Hey, Dario.  I'm

20   sure -- I'll blame my -- my age and some degrading

21   hearing and the fact that I'm fighting a cold right now,

22   so my ears are probably a little stuffy, but could

23   you -- could you maybe speak up a little more?  I'm

24   starting to have a little difficulty understanding you.

25             MR. MACHLEIDT:  Yeah, absolutely.  Rene,

Garteiser, Randall Deposition                                          September 4, 2025

Page  114

1    the answer is yes.  I -- I am rarely told to speak up.

2    So I am --

3               MR. VAZQUEZ:  Much better.  Thank you.

4               MR. MACHLEIDT:  Am I getting quiet?  Can

5    you hear me?  Am I getting -- okay.

6       Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, if it sounds

7    like I'm yelling at you for my next series of questions,

8    you can blame your lawyer.

9               MR. VAZQUEZ:  Blame it on me.

10              Okay.  E-mail received and exhibit opened.

11      Q.  (BY MR. MACHLEIDT)  Mr. Garteiser -- strike

12   that.

13              MR. MACHLEIDT:  Rene, this is just for us.

14   Right now when I'm talking, do I sound quiet to you?

15              MR. VAZQUEZ:  No.  That -- this is perfect.

16              MR. MACHLEIDT:  Okay.

17              MR. VAZQUEZ:  Quite better than before.

18   Thank you.

19              MR. MACHLEIDT:  You're welcome.

20      Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, have you          **Valve Corporation**                    Affirmative

21   seen Exhibit 76 before today?

22      A.  I believe so, but it -- it's been about

23   18 months.

24              I didn't print this.  The format's

25   different than what an e-mail I would print would look

Garteiser, Randall Deposition                                                                September 4, 2025

Page  115

1    like.

2        Q.  Mr. Garteiser, understanding that you did not

3    print this Exhibit 76, does it look like a two-e-mail

4    e-mail chain from February 2024?

5        A.  I believe so.

6        Q.  In the February 6, 2024, e-mail that is in the

7    middle of this Exhibit 76, is that an e-mail from you

8    that begins "Following up to avoid any

9    misunderstandings"?

10       A.  I believe so.

11       Q.  What information are you conveying in this

12   February 6, 2024, e-mail?

13       A.  I think we had a discussion on the telephone --

14   me and counsel, Dario, yourself -- and we were -- I

15   wanted to follow up on it and kind of put it in writing

16   so you'd have something to take to your client.

17       Q.  Do you see in your Number 4 on this Exhibit 76,

18   there's reference to the payment of $225,000 within

19   15 days of effective date?

20       A.  I see that as a term if -- typically the amount

21   is lower when payments made within 15 days instead of 60

22   or -- or some other amount of time.  I think that there

23   was something here about settling with -- by end of the

24   month or something, or end of the quarter.

25       Q.  Mr. Garteiser, I don't want to rush you.  Are

Valve Corporation                                                          Affirmative

Garteiser, Randall Deposition                                    September 4, 2025

Page 116

1    you still looking at the document?

2        A.  Yes.  What's the next question?

3        Q.  In the -- I'll call it Term Number 2, in your

4    February 6, 2024, e-mail, do you see reference to cases

5    in both Washington and Texas?

6        A.  Yeah.  I think that was -- the whole idea was

7    global peace.

8        Q.  What are you referring to when you identify the

9    Washington case?

10       A.  Oh, I don't know.  Any -- any litigation going

11   on in the Western District of Washington, I believe.  I

12   think there was some sort of declaratory judgment action

13   that Valve had asserted against -- I'm not sure who.  I

14   don't -- I'm not a member of that.  I'm not an attorney

15   on that case.

16       Q.  Understanding that you're not an attorney on

17   the -- the Washington case, what authority did you have

18   to make an offer to Valve to settle the Washington case

19   in addition to the Texas cases?

20           MR. VAZQUEZ:  Objection.  Attorney-client

21   privilege.  Instructing Mr. Garteiser not to answer

22   unless he can do so without divulging attorney-client

23   communications.

24       A.  I mean, I think, like, with respect to this

25   communication, I'll have to follow the advice of my

Valve Corporation                                    Affirmative

Page 117

1    counsel and not answer the question because it would

2    involve discussions with the client.

3        Q.  (BY MR. MACHLEIDT)  With respect to the

4    Washington case, is it correct that you had not

5    represented Mr. Rothschild, Patent Asset Management,

6    Display Technologies or RBDS in any lawsuit against

7    Valve in the wtate of Washington?

8        A.  That is correct.

9        Q.  All right.  Sticking with this, Exhibit 76,

10   your e-mail of February 6, 2024, there's a reference to

11   Texas, mainly cases in Texas.

12            What cases were you referring to with that

13   statement?

14       A.  I believe it was the -- the two cases that we

15   had just talked about with Symbology and QTI.  But also

16   the other one that you'd mentioned earlier -- I believe

17   it was SPIS -- relating to the goggles, the goggles that

18   were controlled by software that Valve made.  That was

19   our allegation of infringement.

20       Q.  The Texas cases referred to here, as you

21   mentioned -- QTI, SPIS, and Symbology -- were those all

22   patent infringement cases filed against Valve where you

23   did represent the plaintiffs?

24       A.  Garteiser Honea represented the plaintiffs in

25   those Texas cases:  SPIS, Symbology, and QTI.

**Valve Corporation**                                      Affirmative

Garteiser, Randall Deposition

September 4, 2025

**Page 118**

1      Q.  As part of the settlement offer that you were

2   providing to Valve on February 6, 2024, is it correct

3   that one of the terms required Valve to pay to

4   Rothschild, or several of his entities, $225,000 within

5   15 days of any potential effective date of a settlement

6   agreement?

7            MR. VAZQUEZ:  Objection.  Form.

Valve Corporation                                    Affirmative

8      A.  Yeah.  And this was in February of 2024.  We

9   had excellent infringement charts that showed

10  infringement.  And I believe at that time we had also --

11  Garteiser Honea had another lawsuit where a dental

12  implant, like a Perfect Smile-type place, we had --

13  venue was found proper in that case.

14            And so -- so we felt that with the stores

15  in Plano and the relationship, the joint relationship

16  with Gearbox on developing software, that venue would be

17  proper here.

18            And also that the prior agreement that the

19  other Court, I was told, would most likely transfer the

20  case to Eddy, Texas.  So -- so it made sense to file the

21  cases in -- in -- in my -- here in Texas.  That was

22  my -- what I recall.

23            And so it says here that you can take your

24  time, but I mentioned that the Court rules, you know,

25  and transfers the case -- this was pending at the

Page 119

1    time -- that it would make it more difficult for my

2    client -- for me to get a settlement.  Settlement

3    numbers sometimes with my clients go up, not down,

4    because different land -- different milestones are

5    passed.  Here, this milestone, when it passed, it went

6    against our client.  The judge in Washington didn't

7    allow or -- or denied the transfer motion.  And so

8    that -- that is a data point that was in play or

9    occurring at this stage.

10            I also believe the Symbology patent was

11    still valid at this time and had not been found invalid

12    under Section 101 at this time.

13        Q.  Do you see -- I've marked it all up, but do you

14    see reference to my client's thoughts in this -- well,

15    in your February 6, 2024, e-mail?

16        A.  Well, it's in the singular.

17        Q.  I meant to make it possessive or...

18        A.  In the plural.

19            Yeah.  I -- I -- maybe I meant that too.  I

20    don't know.  So I don't know.  Let me -- let me just

21    read this.

22            It appears that -- I don't know -- the

23    language is kind of loose there on my part.  I shouldn't

24    have probably said "my client's."  It looked like what I

25    was implying is that an order might be coming down on

Garteiser, Randall Deposition                                      September 4, 2025

Page  120

1    Thursday or Friday, because that's typically -- when I

2    was a law clerk, that's when the Court would issue

3    orders.  I didn't clerk for any -- any of the judges in

4    these cases.  But I -- I don't know what February 6th

5    was, but I bet you it was -- it was probably a Monday or

6    Friday.

7              And I was just mentioning here that

8    sometimes the parties, if they're trying to settle a

9    case, the Court already wants to immediately know if the

10   parties reached their resolution.  So they kind of put

11   pencils down and don't waste judicial resources or

12   provide an adversary -- I'm sorry -- advisory opinion.

13   And so I wanted to be cognizant of that.

14             And so that's, I believe, what that meant.

15       Q.  Mr. Garteiser, simply to break it up a little

16   bit for me down the road, in this Exhibit 76, and in

17   particular your February 6, 2024, e-mail, do you see

18   reference to "my client's thoughts"?

19       A.  I do.

20       Q.  When you wrote "my client's thoughts," what

21   client or clients did you have in mind?

22       A.  Symbology, SPIS, and QTI.

23       Q.  Were you excluding from this reference to your

24   clients -- Display Technologies, RBDS, PAM, and

25   Mr. Rothschild -- namely, all defendants in the

Page 121

1    Washington case against Valve?

2         A.  I honestly don't think I was putting too much

3    thought into it, to be honest.  Maybe I should have put

4    more.  I was just trying to impress upon Valve, through

5    you, that if we do reach a settlement, then it would

6    resolve all the cases that were currently pending.  And

7    so that's what I meant by -- I was trying to explain

8    what I meant by global peace.

9              So while I -- we weren't involved in the

10   decision about whether or not -- or the briefing on

11   whether or not the case might get transferred, I knew

12   that it was an inflection point in that case that would

13   make it more difficult for the parties to settle after

14   we passed that point.

15             And -- and it ended up kind of being true,

16   that it did make it more difficult to settle after that

17   point.  I don't believe the parties have settled yet,

18   the parties in the Western District of Washington.

19        Q.  In this February 6, 2024, e-mail, is it correct

20   that you are conveying your clients' willingness to, as

21   you say, get global peace between the parties in

22   exchange partly for Valve paying to your client

23   $225,000?

24             MR. VAZQUEZ:  I'm going to advise my client

25   that -- I'm going to object based on privilege and

Garteiser, Randall Deposition                                                                    September 4, 2025

**Page 122**

1    advise Mr. Garteiser that he can answer but only to the

2    extent he's not divulging attorney-client

3    communications.

4        A.  I'll just say that I think the document speaks

5    for itself.

6        Q.  (BY MR. MACHLEIDT)  Let me try this a different

7    way.  And I'm not trying to -- to be clever and I'm not

8    trying to get attorney-client privilege information.

9             In this -- in this Term 4, where it says                    Valve Corporation              Affirmative

10   "Payment of $225,000," did you -- did you mean that

11   Valve is going to get paid or Valve is going to do the

12   paying?

13       A.  That Valve would pay -- make a payment of

14   $225,000 to resolve the -- the cases and, as a result of

15   that, get a settlement and license agreement.

16       Q.  Part of the settlement offer that you're

17   conveying in this February 6, 2024, e-mail is that Valve

18   would pay to your clients $225,000 in exchange for a

19   settlement and license agreement.

20             Is that a fair way to describe what we're

21   looking at in this Exhibit 76?

22       A.  Well, it looks like there's also a covenant not

23   to sue and some other things that are a little bit --

24   or, you know, they're a little bit harder to articulate

25   based on that synopsis.  I don't want to leave anything

Garteiser, Randall Deposition                                                      September 4, 2025

**Page 123**

```
 1    out.  I hate to make a list and then leave something

 2    off.  That's why I prefer to refer to the document.

 3             And, also, it looks like it includes users,

 4    publishers, makers that have used Valve's accused

 5    functionality.  So it seemed like it would -- it was

 6    more than just Valve that might be recipient.

 7        Q.  To whom was Valve meant to make the $225,000

 8    payment?

 9        A.  I don't know.  We didn't get that far.  I'm not

10    sure how it would have been structured.  This one may

11    have went to the firm.  I -- I really don't know.  It's

12    kind of a hypothetical.

13        Q.  And, Mr. Garteiser, I agree with you, that is a

14    hypothetical.  And I hope you understand, from my point

15    of view, there's just a little bit of digging I have to

16    do because there's a reference to PAM.  There were three

17    plaintiffs in Texas.  There are more defendants in

18    Washington.  And I can't even ask you who is your client

19    that you're referring to here, because there's so many

20    parties.

21             So I'm not trying to confuse or trick or be

22    vague intentionally.  I'm just trying to legitimately

23    learn who, for example, is the client that you're

24    referring to here.  So you're right, it's a

25    hypothetical.  But do you understand why I have to ask
```

Valve Corporation                                        Affirmative

Page **124**

1    the questions in the way that I am?

2       A.  Okay.  Do you have any other questions?

3       Q.  Understanding that this Exhibit 76 and the

4    e-mails here have more than just what I'm asking you, is

5    it fair to say that your client or clients were willing

6    to dismiss the Texas patent infringement cases against

7    Valve in exchange for, among other things, the payment

8    from Valve of $225,000 to your clients?

9       A.  I'm not sure who the payment would eventually

10   go to, but yeah, I would agree that it would --

11   something along those lines where, as long as in the --

12   the case and the other cases went away.  We're trying

13   to -- to resolve, I guess, not just the cases in Texas

14   but also wanted to have Valve, apparently -- I -- I

15   don't remember if there's counterclaims in -- in -- I

16   don't know in Washington, whether any of the defendants

17   that you mentioned have counterclaims against Valve.  I

18   just don't -- I don't know.  So I don't know what the

19   payment would have done.

20              But the -- again, this was a particular

21   stage in the case before an inflection point and before

22   some other things occurred.  Before we -- well, anyway.

23      Q.  At this point in time, February of 2024, your

24   clients did not offer to pay Valve $225,000; correct?

25      A.  SPIS, QTI, and Symbology -- I -- I did not have

Valve Corporation                                            Affirmative

**Page 125**

1  any permission from the client to pay any money to Valve

2  Corporation.

3      Q.  Do you see at the top of this Exhibit 76, the

4  subject line includes the text "Valve and PAM related

5  cases."

6      A.  I see that.

7      Q.  Does PAM refer to Patent Asset Management?

8      A.  Yes.  And related cases would mean its

9  subsidiaries, like Symbology or QTI or RBDS, I guess,

10  related cases.  I didn't -- I don't represent RBDS in

11  the Western District of Washington, but I believe that's

12  more of a declaratory judgment case.

13      Q.  Mr. Garteiser, what connection, if any, is

14  there between the $225,000 that your clients wanted

15  Valve to pay and what your clients considered to be the

16  extent of Valve's infringement?

17          MR. VAZQUEZ:  Objection.  Privilege.  Only

18  answer to the extent that you can do so without

19  divulging attorney-client communications.

20      A.  Honestly, I need you to ask the question again.

21  I guess it's a little late in the day.  I don't think I

22  understood it.

23      Q.  (BY MR. MACHLEIDT)  And by the way, I promise

24  you, we're very close to being done.

25          My question was that $225,000 that you

Page  126

1    refer to in your e-mail of February 6, 2024, was it just

2    a lump sum to try to make everything go away, or did it

3    have some connection to what your clients considered to

4    be the extent of Valve's alleged infringement?

5                MR. VAZQUEZ:  Objection.

6          A.  That's -- yeah.  That's a -- there's a lot

7    of -- it -- it calls for attorney-client communications.

8          Q.  (BY MR. MACHLEIDT)  Does that mean that you

9    will not answer the question because it's privileged?

10         A.  Correct.

11         Q.  Or the answer would be privileged?

12         A.  Correct.  I'm -- I'm worried about if I answer

13   it, I might waive privilege and then other stuff comes

14   out that shouldn't come out or is inappropriate to be

15   disclosed.

16                (Exhibits 77 and 78 marked.)

17                MR. MACHLEIDT:  Exhibit 77.

18                (Discussion off the record.)

19                MR. MACHLEIDT:  Rene, 77 and 78 are finding

20   their way to you.

21                MR. VAZQUEZ:  Okay.

22                MR. MACHLEIDT:  And at the risk of saying

23   something wrong and everybody hating me, I think these

24   are the last exhibits for today.

25                MR. VAZQUEZ:  Okay.

CONFIDENTIAL

Garteiser, Randall Deposition                                    September 4, 2025

**Page 127**

1      Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, have you had

2  a chance to look through 77 and 78?

3      A.  Okay.

4          MR. MACHLEIDT:  Rene, let me know when you

5  get the documents.

6          MR. VAZQUEZ:  Will do.  Okay.  E-mail just

7  arrived.  I presume we're starting with 77.

8          MR. MACHLEIDT:  Yes.

9          MR. VAZQUEZ:  I've got it -- I've got it

10  pulled up.

11          MR. MACHLEIDT:  Do you have 78 as well?

12          MR. VAZQUEZ:  I do.

13      Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, let me know

14  when I can ask you a few questions about these two

15  documents.

16      A.  Okay.  Go ahead.

17      Q.  Is Exhibit 77 Valve's motion for sanctions in

18  the QTI case?

19      A.  Yes.

20      Q.  Do you see at the top of this Exhibit 77, it

21  says "Confidential, Attorneys' Eyes Only"?

22      A.  Okay.

23      Q.  You see that text?

24      A.  Yes.

25      Q.  Do you understand that that confidentiality

Garteiser, Randall Deposition                                                                September 4, 2025

**Page  128**

1    designation was with respect to the protective order in

2    place in the QTI Texas lawsuit?

3         A.  Okay.

4         Q.  Is that your understanding?

5         A.  I think so.

6         Q.  If you look at Exhibit 78, this is a

7    screenshot, if you will, of part of the Exhibit 77

8    motion for sanctions.  You see the "attorneys' eyes

9    only" designation up at the top?  And we've tried to

10   include some of the metadata for this document.  There

11   is a entry that says "Custodian."  Next to it there is

12   the name "Rothschild, Leigh."

13              Do you see the custodian information I just

14   read?

15        A.  I've never seen this document before,

16   Exhibit 78.  I'm not -- I didn't produce this document.

17        Q.  I'm going to try to take it piecemeal.  You're

18   correct.  You didn't produce this document.  I think you

19   had indicated you did not produce any documents in

20   response to the subpoena.

21              Setting that aside, do you see in

22   Exhibit 78, "Custodian, Rothschild, Leigh"?

23        A.  Yeah.  I don't know what it means.

24        Q.  Mr. Garteiser, did you provide to Mr. Leigh

25   Rothschild Valve's confidential motion for sanctions as

Garteiser, Randall Deposition                                                      September 4, 2025

Page 129

1    part of the Quantum Technology Innovations lawsuit?

2        A.  I may have.  I -- I don't remember, but I may

3    have.

4        Q.  If you did -- strike that.

5            When, if ever, did you inform Valve of the

6    fact that you provided its confidential information to

7    Leigh Rothschild, who was not somebody permitted to

8    review confidential information under any protective

9    order?

10       A.  I disagree.  I think that under the protective

11   order, typically there's at least one client

12   representative that can review documents that are --

13   what do you call it? -- they call it documents that are

14   considered attorneys' eyes only.  It's just that they

15   don't want it to be distributed throughout the whole

16   firm.  So, typically, there's one in-house person that

17   is allowed to look at the document.

18           So I don't know if it was -- I don't

19   remember all the details.  So -- but I would like to

20   look at the protective order to confirm that I, in

21   fact -- if you're implying that I violated the

22   protective order, I'd like to look at it to confirm

23   whether that's the case or not.

24           Also, I think it was on page 7 or 8 of the

25   Court's order.  The Court indicated that that it did not find

Page 130

1    Symbology -- I'm sorry -- Symbology and QTI liable under

2    Rule 11.  So I would have to had shown that document to

3    someone, I would think, for -- to -- to get -- keep them

4    abreast of the situation and the seriousness of the

5    Rule 11 motion for sanctions.

6              So are you implying that your client just

7    designated this thing attorneys' eyes only to create

8    this got-you moment now?

9        Q.  Sitting here today, do you recall whether Valve

10   provided you with both a redacted version of its motion

11   for sanctions and then also the under-seal AEO version?

12       A.  I don't recall, sitting here today, what the

13   difference was between the two.  When I read this, I

14   just remember getting a little confused between this

15   motion and another one and whether it was e-mailed to me

16   previously or not.  I got quite confused between the

17   different filings in the different cases, to be

18   truthful.

19              And this whole 1391(c)(2), I had left that

20   in there as a remnant from a long time ago and failed to

21   remove it, from what I can remember, in that case or

22   from another case that involved a counterclaim.

23              So that's why I admitted my mistake and

24   took complete responsibility for this -- this mistake in

25   filing the third amended complaint.

Garteiser, Randall Deposition

September 4, 2025

**Page 131**

1           MR. MACHLEIDT:  I object as nonresponsive

2    and move to strike.

3        Q.  (BY MR. MACHLEIDT)  Mr. Garteiser, would you

4    like to see, I think as you indicated, the protective

5    order from the Texas cases?

6        A.  Yeah.  That'd be great.

7           MR. MACHLEIDT:  Let's go off the record

8    while we get the protective order.

9           THE VIDEOGRAPHER:  Off the video record.

10   The time is 5:01.

11              (Off the record at 5:01 p.m.)

12              (On the record at 5:15 p.m.)

13           THE VIDEOGRAPHER:  On the video record.

14   The time is 5:15.

15       Q.  (BY MR. MACHLEIDT)  Welcome back,

16   Mr. Garteiser.  Before the break, you had asked to see

17   the protective order from the -- the Texas cases.  Would

18   you still like to see it?

19       A.  If you have a copy, yes.

20       Q.  We have a copy on the computer.

21       A.  Okay.

22       Q.  We lost Colin, which means our printing

23   abilities have disappeared.

24       A.  Yeah.  He's got children.

25       Q.  But please, you are now looking at the

Page 132

1    protective order from the Texas cases against Valve.

2    Your -- your lawyer, Mr. Vazquez, has a copy as well.

3    Mr. Garteiser, let me know when you're ready for a

4    question or two.

5        A.  Okay.  Yeah, I'm ready.

6        Q.  Is it your position that you were permitted

7    under the protective order to provide Valve's AEO motion

8    for sanctions to -- to Leigh Rothschild?

9        A.  My position is that I don't believe I provided

10    it to Leigh Rothschild.  And if I did, I didn't mean to,

11    but I don't think I did.  If anything, I provided it to

12    the coordinated -- the contact that I had for QTI, which

13    was my contact for most of the RBDS cases I handled --

14    in all my cases, was Daniel Falcucci.

15            And I believe that our protective order, it

16    stipulates outside -- outside attorneys' eyes only.  And

17    then it just has attorneys' eyes only.  And he's an

18    attorney and this was designated just attorneys' eyes

19    only.  But I -- I do respect the protective order and I

20    did treat it as confidential and did not share it with

21    many parties -- or any parties other than Daniel, that I

22    can recall, which would explain maybe why on Exhibit 78

23    there's a -- this custodian for this Merchant & Gould

24    production has the client ID of Leigh Rothschild.

25            But I'm guessing on that last part, because

Page 133

1    I didn't produce the document.

2         Q.  Do you recall providing to Mr. Falcucci the

3    under-seal motion for sanctions?

4         A.  I don't recall.  If I had a redacted version, I

5    would have sent that.  But I may have sent a sealed

6    version as well, because, sitting here today, I don't

7    remember what exactly was redacted.  It was striking

8    our -- my Rule 11 or our third amended complaint that I

9    believe wasn't filed under seal.

10             So I'm not -- I'm not quite sure what would

11   have designated an outside attorneys' eyes only

12   designation other than just confidential.  But I do note

13   that this Document 37 was marked confidential and then

14   attorneys' eyes only.

15             So as far as I know, I didn't share it with

16   a non-attorney.

17        Q.  I believe I know the answer to this question,

18   but did you provide the under-seal motion for sanctions

19   to Mr. Falcucci who afterwards provided it to Leigh

20   Rothschild?

21        A.  I have no idea.  I don't know if Leigh

22   Rothschild ever saw the document.  I would assume that

23   the production involved everybody at PAM and it was just

24   done under his name.  I don't think that it's fair to

25   say that because some document says "Rothschild

Garteiser, Randall Deposition                                                    September 4, 2025

Page 134

1   Custodial" on Exhibit 78, that that means that he

2   collected the document from just his files, as opposed

3   to the other two ladies that work with him and Daniel

4   that works with him.

5           MR. MACHLEIDT:  Mr. Garteiser, I do

6   appreciate your time today.  I have no more questions.

7           And I pass the witness.

8           Rene, sorry.  That was quiet.  Rene, we're

9   done here.  And we passed the witness.

10          THE WITNESS:  Rene, coming straight --

11  coming to us straight from the southern beaches of

12  France.

13          MR. VAZQUEZ:  No, no, no, no.  I'm not in

14  France now.  I'm in --

15          THE WITNESS:  I know.  I know.

16          MR. VAZQUEZ:  I wish I were in France now.

17          THE COURT REPORTER:  Do you want to read

18  and sign or waive?

19          MR. VAZQUEZ:  I'm in Virginia.

20          THE WITNESS:  I don't know.

21          MR. MACHLEIDT:  Rene may have questions,

22  though.

23          THE WITNESS:  Yeah.

24          MR. VAZQUEZ:  I just have a few questions.

25  Give me one second.  Okay.

Garteiser, Randall Deposition                                        September 4, 2025

Page 135

```
 1                      EXAMINATION

 2   BY MR. VAZQUEZ:

 3        Q.  Okay.  Mr. Garteiser, in your experience as a

 4   patent litigator, when you enter into a settlement with

 5   a defendant, is it typical to memorialize that with a

 6   license and/or settlement agreement?

 7             MR. MACHLEIDT:  Object to form.

 8        A.  Yes.

 9        Q.  (BY MR. VAZQUEZ)  And those settlement or

10   license agreements, in your experience, is it typical to

11   include what's -- what's known as cure provisions in

12   those agreements?

13             MR. MACHLEIDT:  Same objection.

14        A.  Yes.  It typically is in agreements that --

15   that -- that we produce.  We do, at least, at Garteiser

16   Honea.

17        Q.  (BY MR. VAZQUEZ)  What is your understanding of

18   what a cure provision does?

19        A.  I think the -- the best example would be what

20   we saw with -- trying to get the name of the firm --

21   what -- what occurred with RBDS and Plex, with

22   Exhibit 68.  And a mistake was made and then we cured

23   it, and by -- by promptly dismissing the lawsuit.

24             So, typically, there'd be a period of time

25   to -- to fix a problem once it's brought to your
```

Garteiser, Randall Deposition                                                September 4, 2025

Page  136

1    attention.  And typically, the cure provision wouldn't

2    start until you're notified that there's something to

3    fix.

4                MR. MACHLEIDT:  Move to strike as

5    nonresponsive.

6        Q.  (BY MR. VAZQUEZ)  The cure provisions that --

7    strike that.

8                Based on your experience, typically, just

9    kind of generally, how many days do you -- are -- are

10   given in these cure provisions to rectify a -- a

11   potential, I guess, a potential breach of that

12   agreement?

13               MR. MACHLEIDT:  Object to form.

14       A.  I'd say 30 days from the time that you're

15   notified is pretty standard.

16       Q.  (BY MR. VAZQUEZ)  Going back to Exhibit 69.

17       A.  Okay.

18       Q.  Again, this is -- this is a letter from

19   Mr. Joel Kauth informing you -- I'm sorry -- it's dated

20   September 18th, 2023, informing you that -- that Plex

21   was licensed to the '221 patent; is that right?

22       A.  Correct.

23       Q.  Going to Exhibit 70, please.

24       A.  Okay.  It's a notice of dismissal with

25   prejudice.

Page 137

1     Q.  Notice of dismissal with prejudice that,

2  according to the document here, was filed on

3  September 20th, 2023; is that right?

4     A.  Correct.  I got the e-mail.  It stated

5  6:00 o'clock on September 18th, 2023.  And then -- on a

6  Monday.  And then on Wednesday, two days later on

7  September 20th, after we did an investigation, we

8  realized that over 12 years beforehand there had been a

9  resolution involving '221 patent.  So we promptly

10  dismissed with prejudice.

11     Q.  So you dismissed with those -- you dismissed

12  with prejudice with -- two days after you received the

13  letter shown in Exhibit 69?

14     A.  Correct.

15     Q.  We don't have that previous settlement

16  agreement in 2016, but based on your experience of cure

17  provisions, would you -- would you say that your

18  dismissal of the lawsuit would have likely fallen within

19  any cure provision in the agreement?

20          MR. MACHLEIDT:  Object to form.

21     A.  Yeah, I think it did.  And I -- I believe when

22  I talked to Joel K-A-U-T-H in Exhibit 69, the reason why

23  he kind of phrased it the way he did when he says the --

24  the above-referenced lawsuit is incorrect and he

25  identifies the paragraph Number 43 to be a -- he's --

Garteiser, Randall Deposition                                                    September 4, 2025

Page  138

1    here's the part I mentioned, "Lawsuit is in breach of

2    covenant not to sue previously granted by RBDS."  And

3    then he asked us to dismiss it immediately as part of

4    like a cure provision.  And we did, on -- within 15 days

5    or 30, but we did it here in 2.

6                    I didn't do the 2016 agreement.  I think

7    counsel that passed away, that previously represented

8    RBDS, may have had a copy in his files or -- or maybe

9    RBDS had a copy.  But I -- I wasn't involved with that

10   settlement and I didn't -- I wasn't privy to that

11   agreement or I would have never filed a lawsuit to begin

12   with.

13       Q.  Okay.  Yeah.

14                    MR. VAZQUEZ:  I have no further questions

15   of the witness.  Back to you, Dario.

16                    MR. MACHLEIDT:  One or two, real quick.

17                    THE WITNESS:  Okay.

18                         REEXAMINATION

19   BY MR. MACHLEIDT:

20       Q.  Let's stick with Exhibit 70.  And just to

21   reset, when you on behalf of RBDS dismissed the

22   September of 2023 lawsuit against Plex, you did so with

23   prejudice; correct?

24       A.  In this situation, yes.

25       Q.  Why did you dismiss the RBDS versus Plex

Page 139

1   lawsuit with prejudice?

2       A.  I believe that I spoke with opposing counsel

3   and they confirmed to me that they had a license to the

4   '221 patent.  I want to say it was someone that worked

5   at Knobbe.  I just don't recognize the initials of that

6   firm, KBB.

7               But anyway -- and then I talked, I believe,

8   with the client and they seem to have confirmed what

9   Plex or Flex -- Plex had said.  So we dismissed with

10  prejudice, with each side bearing its own costs and

11  fees.

12      Q.  Would it have been acceptable for you, on

13  behalf of RBDS, to dismiss this September 2023 lawsuit

14  against Plex but to do so without prejudice?

15      A.  I don't know.  It calls for a hypothetical.  I

16  dismissed it with prejudice.

17      Q.  Why did you not dismiss without prejudice?

18      A.  I don't recall.  I think, again, it calls for a

19  hypothetical.  I believe it was done because I saw

20  evidence that the -- the same product or -- or product

21  that was -- was licensed was covered by the prior

22  agreement or the covenant not to sue in particular.

23              So I don't -- like I said, I don't have

24  that agreement.  I don't feel comfortable answering

25  beyond that.

CONFIDENTIAL                                    Kilpatrick Townsend & Stockton LLP

Garteiser, Randall Deposition                                                September 4, 2025

Page 140

1          Q.  Because RBDS dismissed this lawsuit with

2     prejudice, does it mean that RBDS cannot sue Plex for

3     infringement of the '221 patent again?

4          A.  I mean, if we did, if RBDS did, I think that

5     Plex would let them know and they would -- it would be

6     promptly dismissed again.  But I don't think anybody

7     would intentionally do it.  I mean, we wouldn't

8     intentionally do it -- Garteiser Honea.

9          Q.  What is the significance of RBDS having

10    dismissed its lawsuit against Plex with as opposed to

11    without prejudice?

12         A.  I'm not sure.  I think that was something that

13    opposing counsel requested.

14              MR. MACHLEIDT:  Pass the witness.

15              MR. VAZQUEZ:  I have nothing more.

16              THE VIDEOGRAPHER:  We're off the video

17    record.  The time is 5:32.

18              THE COURT REPORTER:  Mr. Vazquez, do you

19    want a copy of the deposition transcript?

20              MR. VAZQUEZ:  Yes, please.

21              (Off the record at 5:32 p.m.)

22

23

24

25

Garteiser, Randall Deposition                                                                September 4, 2025

Page 141

1                      UNITED STATES DISTRICT COURT
                                 FOR THE
2                     WESTERN DISTRICT OF WASHINGTON

3   VALVE CORPORATION,              )
                                    )
4             Plaintiff,            )
                                    )
                                    )
5   Versus                         ) CIVIL ACTION NO.
                                    ) 23-CV-1016-JNW
6                                   )
                                    )
7   ROTHSCHILD et al.,              )
                                    )
8             Defendants.           )

9                     REPORTER'S CERTIFICATION
                      DEPOSITION OF RANDALL GARTEISER
10                    CONFIDENTIAL ATTORNEYS' EYES ONLY

11                       SEPTEMBER 4, 2025

12

13        I, Shawna Gauntt-Hicks, Certified Shorthand

14   Reporter in and for the State of Texas, hereby certify

15   to the following:

16        That the witness, RANDALL GARTEISER, was duly sworn

17   by the officer and that the transcript of the oral

18   deposition is a true record of the testimony given by

19   the witness;

20        That the deposition transcript was submitted on

21   _____ to the witness or to the attorney

22   for the witness for examination, signature and return to

23   me by _____;

24        That the amount of time used by each party at the

25   deposition is as follows:

Garteiser, Randall Deposition

September 4, 2025

Page 142

1

2          Mr. Dario A. Machleidt - 04 HOURS:30 MINUTE(S)
           Ms. Kathleen Geyer - 00 HOURS:00 MINUTE(S)

3          Mr. Rene A. Vasquez - 00 HOURS:07 MINUTE(S)

4          That pursuant to information given to the

5     Deposition officer at the time said testimony was taken,

6     the following includes counsel for all parties of

7     record:

8          Mr. Dario A. Machleidt, Attorney for Plaintiff
           Ms. Kathleen Geyer, Attorney for Plaintiff

9          Mr. Rene A. Vasquez, Attorney for Defendants
               LEIGH ROTHSCHILD and RANDALL GARTEISER

10

11         I further certify that I am neither counsel for,

12    related to, nor employed by any of the parties or

13    attorneys in the action in which this proceeding was

14    taken, and further that I am not financially or

15    otherwise interested in the outcome of the action.

16         I further certify that pursuant to FRCP Rule

17    30(f)(1), that the signature of the deponent,

18    RANDALL GARTEISER, was requested by the deponent or a

19    party before the completion of the deposition and that

20    the signature is to be before any notary public and

21    returned within 30 days from date of receipt of the

22    transcript.  If returned, the attached Changes and

23    Signature Page contains any changes and the reasons

24    therefore;

25         I further certify that I am neither counsel,

Kilpatrick Townsend & Stockton LLP

Garteiser, Randall Deposition

September 4, 2025

Page 143

1    related to, nor employed by any of the parties in the

2    action in which this proceeding was taken, and further

3    that I am not financially or otherwise interested in the

4    outcome of the action.

5        Certified to by me this the 11th day of September,

6    2025.

7

8

9                         ---------------------------------
                          Shawna Gauntt-Hicks
                          Texas CSR No. 9353
10                        Expiration Date:  12/31/17
                          APTUS COURT REPORTING
11                        401 West A Street
                          Suite 1680
12                        San Diego, California
                          619.546.9151

13

14

15

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL

Page  144

1                    DECLARATION UNDER PENALTY OF PERJURY

2        Case Name: Valve Corporation
                   vs. Leigh Rothschild, et al.

3        Date of Deposition: 09/04/2025

4        Job No.: 10170619

5

6                    I, RANDALL GARTEISER, hereby certify

7        under penalty of perjury under the laws of the State of

8        _____ that the foregoing is true and correct.

9                    Executed this _____ day of

10       _____, 2025, at _____.

11

12

13                         _____

14                         RANDALL GARTEISER

15

16       NOTARIZATION (If Required)

17       State of _____

18       County of _____

19       Subscribed and sworn to (or affirmed) before me on

20       this _____ day of _____, 20__,

21       by_____,    proved to me on the

22       basis of satisfactory evidence to be the person

23       who appeared before me.

24       Signature: _____ (Seal)

25

Garteiser, Randall Deposition

September 4, 2025

**Page 145**

1    DEPOSITION ERRATA SHEET
     Case Name: Valve Corporation
2            vs. Leigh Rothschild, et al.
     Name of Witness: Randall Garteiser
3    Date of Deposition: 09/04/2025
     Job No.: 10170619
4    Reason Codes:  1. To clarify the record.
                    2. To conform to the facts.
5                    3. To correct transcription errors.

6    Page _____ Line _____ Reason _____

7    From _____ to _____

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   Page _____ Line _____ Reason _____

23   From _____ to _____

24   Page _____ Line _____ Reason _____

25   From _____ to _____

CONFIDENTIAL

Garteiser, Randall Deposition

September 4, 2025

**Page 146**

```
 1    DEPOSITION ERRATA SHEET

 2    Page _____ Line _____ Reason _____

 3    From _____ to _____

 4    Page _____ Line _____ Reason _____

 5    From _____ to _____

 6    Page _____ Line _____ Reason _____

 7    From _____ to _____

 8    Page _____ Line _____ Reason _____

 9    From _____ to _____

10    Page _____ Line _____ Reason _____

11    From _____ to _____

12    Page _____ Line _____ Reason _____

13    From _____ to _____

14    Page _____ Line _____ Reason _____

15    From _____ to _____

16    Page _____ Line _____ Reason _____

17    From _____ to _____

18    Page _____ Line _____ Reason _____

19    From _____ to _____

20    Page _____ Line _____ Reason _____

21    From _____ to _____

22    _____ Subject to the above changes, I certify that the
              transcript is true and correct

23    _____ No changes have been made. I certify that the
              transcript  is true and correct.

24

              _____

25                    RANDALL GARTEISER
```