# EXHIBIT 3
## FILED UNDER SEAL

Patent Asset Management / Rothschild Broadcast

# Transcript Export

Deponent: Kazanjian, Constance

September 12, 2025

1/15/2026 10:54 am



The operating system for lawyers ®

Page 1

1                    UNITED STATES DISTRICT COURT

2              FOR THE WESTERN DISTRICT OF WASHINGTON

3                          AT SEATTLE

4    -----------------------------------------x
     VALVE CORPORATION,

5                        Plaintiff,

6              - versus -    Case No.:  2:23-cv-1016-JNW

7
     LEIGH ROTHSCHILD, ROTHSCHILD
8    BROADCAST DISTRIBUTION SYSTEMS,
     LLC, DISPLAY TECHNOLOGIES, LLC,
9    PATENT ASSET MANAGEMENT, LLC,
     MEYLER LEGAL, PLLC, and SAMUEL
10   MEYLER,
                        Defendants.
11   -----------------------------------------x

12

13          * * * C O N F I D E N T I A L * * *

14

15              VIDEOTAPED DEPOSITION OF:

16

17              CONSTANCE KAZANJIAN

18

19            Friday, September 12, 2025

20            10:10 a.m. ET - 1:36 p.m. ET

21

22

23            REPORTED STENOGRAPHICALLY BY:

24            Stacey E. Raikes, RMR, CRR

25                Job No. 10172707

Kazanjian, Constance Deposition                                                    September 12, 2025

Page 2

1

2

3

4                         * * * * * * * * * * *

5

6

7            VIDEOTAPED STENOGRAPHIC DEPOSITION of

8     CONSTANCE KAZANJIAN, taken in the above-entitled

9     matter before STACEY E. RAIKES, a stenographic

10    machine reporter, Registered Merit Reporter,

11    Certified Realtime Reporter, and Notary Public for

12    the State of Florida, taken on Friday, September 12,

13    2025, commencing at 10:10 a.m. ET.

14

15

16

17                     * * * * * * * * * * *

18

19

20

21

22

23

24

25

CONFIDENTIAL                                                    Kilpatrick Townsend & Stockton LLP

**Page 3**

```
 1    A P P E A R A N C E S:

 2

 3    KILPATRICK TOWNSEND & STOCKTON LLP

 4    BY:  DARIO A. MACHLEIDT, ESQ.

 5           - and -

 6    BY:  KATHLEEN R. GEYER, ESQ. (via Zoom)

 7    1420 Fifth Avenue, Suite 3700

 8    Seattle, Washington  98101

 9    (206) 467.9600

10    dmachleidt@kts.com

11    kgeyer@kts.com

12    Attorneys for the Plaintiff

13

14

15    DNL ZITO

16    BY:  REN  A. VAZQUEZ, ESQ. (via Zoom)

17           - and -

18    BY:  JOSEPH J. ZITO, ESQ. (via Zoom)

19    1250 Connecticut Avenue Northwest, Suite 700

20    Washington, DC  20036

21    (202) 466.3500

22    rvazquez@dnlzito.com

23    Attorneys for the Defendants

24

25
```

Kazanjian, Constance Deposition                                                    September 12, 2025

Page 4

```
1    A P P E A R A N C E S:  (Continued)

2

3    HOFFMAN, LARIN & AGNETTI, P.A.

4    BY:  JOHN B. AGNETTI, ESQ.

5    901 North Miami Beach Boulevard, Suite 201

6    Miami, Florida  33162

7    (305) 653.5555

8    info@hlalaw.com

9    Attorneys for the Witness

10

11

12

13

14

15

16

17

18

19

20   ALSO PRESENT:

21

22   Danny Holguin, Legal Video Specialist

23   Adriane Glick Chayoun, Paralegal (via Zoom)

24

25
```

Kazanjian, Constance Deposition

September 12, 2025

**Page 5**

```
 1                    I N D E X

 2                CONSTANCE KAZANJIAN

 3    EXAMINATION BY                        PAGE

 4

 5    ATTORNEY MACHLEIDT                      7

 6    ATTORNEY ZITO                         105

 7

 8

 9

10

11

12                E X H I B I T S

13

14    NUMBER            DESCRIPTION         PAGE

15    Exhibit 80    Complaint Bates stamped
16                  VALVE_00003891 - 3929     6
      Exhibit 81    Documents Bates stamped
17                  VALVE_00006043 - 6057   103

18

19

20

21

22

23

24

25
```

Page 6

```
1    ------------------------------------------------

2                    P R O C E E D I N G S

3                    10:10 a.m. ET

4    ------------------------------------------------

5        (Complaint Bates stamped Valve_00003891 - 3929

6         received and marked as Exhibit 80 for

7                   Identification.)

8        THE VIDEOGRAPHER:  Good morning.  We are

9    now on the record.  Today's date is September

10   12, 2025, and the time is 10:10 a.m.

11       This is the video-recorded deposition of

12   Constance Kazanjian being taken in the matter

13   of Valve Corporation versus Leigh Rothschild,

14   et al., pending in the United States District

15   Court for the Western District of Washington,

16   case number 23-cv-1016-JNW.

17       We are at Hoffman Larin & Agnetti, 901

18   North Miami Beach Boulevard, suite 201, in

19   Miami Beach, Florida.

20       My name is Danny Holguin of Aptus Court

21   Reporting located at the 401 West A Street,

22   suite 1680, San Diego, California 92101.

23       Will counsel please identify yourselves

24   and state whom you represent?

25       ATTORNEY MACHLEIDT:  Dario Machleidt on
```

Page 7

1    behalf of Valve Corporation.  And I may have a

2    colleague on the Zoom, Kate Geyer, or not,

3    because I can't see.

4         THE VIDEOGRAPHER:  Yes, she's here.

5         ATTORNEY VAZQUEZ:  Ren  Vazquez for the

6    defendants.  Also present from DNL Zito is

7    Joseph Zito on Zoom.

8         ATTORNEY AGNETTI:  John Agnetti on behalf

9    of the deponent, Constance Kazanjian.

10         THE VIDEOGRAPHER:  Okay, thank you.

11         The court reporter today is Stacey Raikes.

12         And, Madame Court Reporter, will you

13    please swear in the witness?

14      (Whereupon, the Stenographic Reporter

15       administered the oath to the witness.)

16      C O N S T A N C E   K A Z A N J I A N,

17    having been first duly sworn or affirmed, was

18         examined and testified as follows:

19           (Time noted:  10:12 a.m.)

20    EXAMINATION BY ATTORNEY MACHLEIDT:

21      Q.   Please tell us your full name.

22      A.   Constance Joy Kazanjian.

23      Q.   Ms. Kazanjian, if you're comfortable with

24    it --

25         ATTORNEY VAZQUEZ:  I'm sorry to interrupt,

Kazanjian, Constance Deposition                                                          September 12, 2025

Page 8

1    Counsel.  The connection is still pretty bad.

2    It's cutting in and out, just so you know.

3         ATTORNEY MACHLEIDT:  Is the audio or the

4    video or both cutting in and out?

5         ATTORNEY VAZQUEZ:  Both.

6         ATTORNEY MACHLEIDT:  I mean, can we --

7         ATTORNEY AGNETTI:  Can I ask you a

8    question?  Are you using our wifi?

9         THE VIDEOGRAPHER:  Yeah.

10        ATTORNEY AGNETTI:  I've never had a

11   problem.  I just want you to know I've done a

12   million depositions that are hybrid in this

13   room.  I never once have had a problem.

14        Can I make a suggestion?

15        ATTORNEY MACHLEIDT:  Yeah, please.

16        ATTORNEY AGNETTI:  Maybe what we need to

17   do is reconnect to Zoom and see if that solves

18   the problem.

19        THE VIDEOGRAPHER:  Okay.  All right.

20        ATTORNEY AGNETTI:  So why don't we go off?

21   I'm going to have Adriane reconnect and I think

22   she has it up on her computer and maybe she

23   takes it down after she gets up, but I think

24   she's the host.  So let me -- my suggestion

25   would be sometimes when we have this problem,

Kazanjian, Constance Deposition                                                                September 12, 2025

Page 9

1          if we just reconnect, it solves the problem.

2          So let me just -- why doesn't everyone go off

3          Zoom and then we'll go back on?

4               THE VIDEOGRAPHER:  All right.  We're going

5          off the record.  The time is 10:13 a.m.

6                         (Recess.)

7               THE VIDEOGRAPHER:  We are on the record.

8          The time is 10:38 a.m.

9     BY ATTORNEY MACHLEIDT:

10         Q.   Welcome back.

11         A.   Thank you.

12         Q.   Let's reset.

13              Please tell us your full name.                    Valve Corporation          Affirmative

14         A.   Constance Joy Kazanjian.

15              ATTORNEY AGNETTI:  Just for the record

16         this, is a confidential proceeding and for

17         attorney's eyes only.

18    BY ATTORNEY MACHLEIDT:

19         Q.   Ms. Kazanjian, are you represented by

20    counsel today?

21         A.   I am.

22         Q.   Who is your lawyer?

23         A.   John Agnetti.

24         Q.   Are you a lawyer?

25         A.   No.

Kazanjian, Constance Deposition                                                           September 12, 2025

Page 10

1      Q.   Do you know a Mr. Rothschild?

2      A.   I do.

3            (Discussion off the record.)

4    BY ATTORNEY MACHLEIDT:

**Valve Corporation**                    Affirmative

5      Q.   Do you know a Mr. Leigh Rothschild?

6      A.   Yes, I do.

7      Q.   Just generally, how do you know him?

8      A.   I worked for him.

9      Q.   Approximately during what period of time

10   did you work for him?

11     A.   2011 through February of 2015, I think.

12   Or '16.  I'm not sure.  I think '16.

13     Q.   What type of work did you do for

14   Mr. Rothschild during that time period?

15     A.   I was hired to monetize his assets, which

16   were his patents.

17     Q.   I think we'll get into details in a

18   moment, but when you say monetize, what do you mean

19   by that?

20     A.   Either sell or license his patents.

21     Q.   When did you meet Mr. Rothschild?

22     A.   In 2000 at the University of Miami.

23     Q.   When was the last time you spoke to

24   Mr. Rothschild?

25     A.   It was in a deposition here in this

Page 11

1    office.  I don't know what the date was.

2        Q.   Do you know approximately the year?  Don't

3    need anything specific.

4        A.   2023 or '4?  No?  20 -- it wasn't '25.  I

5    do not know.

6        Q.   Outside of a deposition and any proceeding

7    like that, approximately when was the last time you

8    had any interaction with Mr. Rothschild?

9        A.   February of 2016.

10       Q.   Approximately when was the last time you                    **Valve Corporation**                    Affirmative

11   had any interaction with Mr. Rothschild?

12       A.   February 2016.

13       Q.   What happened on February 2016 that let

14   you recall that was the last time you interacted

15   with him?

16       A.   He fired me.

17       Q.   When you say that you worked for

18   Mr. Rothschild, what company or companies in

19   particular were you employed by?

20       A.   I was employed by Inventar.

21       Q.   What was the business of Inventar?

22       A.   Monetizing his patents.

23       Q.   What was Mr. Rothschild's role at

24   Inventar?

25       A.   He ran everything.

Kazanjian, Constance Deposition                                    September 12, 2025

**Page 12**

1      Q.   During the time period that you worked for

2   Mr. Rothschild, how many employees did Inventar

3   have?

4      A.   I was the only -- well, let's see.  It

5   changed periodically.  At the beginning, I was one

6   of the few employees.  I don't know what -- I don't

7   know how you describe employees.  He had a lot of

8   people working on specific areas but weren't

9   employed, I don't think, by Inventar.  I really

10   don't know how the structure was set up.

11      Q.   Did Mr. Rothschild have a title at the

12   company?

13      A.   I don't know.

14      Q.   Are you familiar with the company Valve          Valve Corporation          Affirmative

15   Corporation?

16      A.   Yes.

17      Q.   What do you know about Valve Corporation?

18      A.   Somewhere around 2015, Rothschild sued

19   Valve and -- for licensing of his patent.

20      Q.   What role, if any, did you have in that

21   lawsuit against Valve?

22      A.   Interviewing and securing counsel,

23   litigation -- law firms.

24      Q.   I know we're going back in time, but do

25   you have any recollection of the names of the law

Page 13

1    firms that might have been involved?

2        A.   On the Valve?

3        Q.   Correct.

4        A.   I'm sorry, I don't remember.

5        Q.   Other than interviewing and selecting

6    counsel for the --

7            ATTORNEY MACHLEIDT:  Well, strike that.

8    BY ATTORNEY MACHLEIDT:

9        Q.   When you say selecting and interviewing

10   counsel, are you referring to outside counsel?

11       A.   Yes.

12       Q.   Other than the work you did in terms of

13   selecting outside counsel, what role, if any, did

14   you have in terms of the lawsuit against Valve?

15       A.   I did as I was told.

16       Q.   Does that mean you did as you were told by

17   Mr. Rothschild?

18       A.   Yes.

19       Q.   During the course of the lawsuit against

20   Valve, did you have any interactions with outside

21   counsel?

22       A.   Yes.  Usually, Leigh was on the calls when

23   we did that.  In fact, almost every time, he was on

24   the call.

25       Q.   What role, if any, did you have in terms

Valve Corporation                                              Affirmative

Kazanjian, Constance Deposition                                              September 12, 2025

Page 14

1   of identifying Valve as a target for a lawsuit?

2       A.   Nothing.

3       Q.   Do you know who was responsible for

4   identifying Valve?

5       A.   Leigh.

6       Q.   Do you know how Valve came to the

7   attention of Mr. Rothschild?

8       A.   I really don't.

9       Q.   Do you have any specific recollection of

10  the lawsuit against Valve Corporation?

11      A.   I don't.

12      Q.   Do you recall the particular -- and I'll

13  just say Rothschild plaintiff -- that sued Valve?

14      A.   I don't remember.

Valve Corporation                                    Affirmative

15      Q.   Do you recall how the lawsuit against

16  Valve was resolved?

17      A.   There was a settlement.

18      Q.   Do you recall the date of the settlement?

19      A.   It was before February of 2016, but I

20  don't know when.

21      Q.   What role, if any, did you have in terms

22  of the parties reaching a settlement in that

23  lawsuit?

24      A.   Nothing.

25      Q.   Have you ever seen the settlement

Kazanjian, Constance Deposition                                                    September 12, 2025

**Page 15**

1   agreement?

2       A.   I don't recall.

3       Q.   Fair to say that you don't recall any

4   specific terms of the settlement agreement?

5       A.   None, no.  Those were all Leigh.

6       Q.   Are you familiar with the company Patent

7   Asset Management?

8       A.   I don't think so.

9       Q.   Sometimes referred to as PAM, does that

10  ring any bells for you?

11      A.   No, it doesn't.  I'm sorry.

12      Q.   Not a problem.

13           What about the company Rothschild

14  Broadcast Distribution Systems, does that ring a

15  bell?

16      A.   Yes, that does, yes.

17      Q.   What about Display Technologies, does that

18  ring a bell?

19      A.   Yes.

20      Q.   Let's go to our first exhibit.  It's

21  Exhibit 80.

22           ATTORNEY MACHLEIDT:  Counsel, you have it.

23      Q.   And, Ms. Kazanjian, you have it in front

24  of you.

25           ATTORNEY MACHLEIDT:  Ren , I see you.  Can

Valve Corporation                                          Affirmative

Kazanjian, Constance Deposition                                          September 12, 2025

**Page 16**

1      you hear me okay, by the way?

2          ATTORNEY VAZQUEZ:  I can.

3          ATTORNEY MACHLEIDT:  All right.  I'm going

4      to send you and Joe Exhibit 80, and that is the

5      complaint in the -- well, I'll just call it the

6      complaint and we'll go from there.

7          Anybody else?  Well, I'll let you forward

8      it to anybody else.  Does that work for you?

9          ATTORNEY VAZQUEZ:  Yes.

10          ATTORNEY MACHLEIDT:  Same thing we did

11      last time.  Obviously, let me know when you

12      have my email.

13          ATTORNEY VAZQUEZ:  Will do.

14                    (Pause.)

15  BY ATTORNEY MACHLEIDT:

16      Q.  While we wait for the internet to do its

17  thing, Ms. Kazanjian, you have Exhibit 80 in front

18  of you.  Please take a look through it, and when I

19  hear from defense counsel that we're good to go,

20  I'll start asking you some questions about it.

21                    (Pause.)

22          ATTORNEY VAZQUEZ:  Email just arrived.

23      Opening the exhibit.

24          All right.  I have it opened.

25  BY ATTORNEY MACHLEIDT:

Kazanjian, Constance Deposition                                                          September 12, 2025

**Page 17**

1        Q.   Ms. Kazanjian, you have Exhibit 80 in

2   front of you.  Are you familiar with that document?

3        A.   I am.

4        Q.   What is Exhibit 80?

5        A.   This was a lawsuit I filed -- I was the

6   plaintiff -- against Leigh and his companies.

7        Q.   At whatever high level you're comfortable

8   with, what was the general nature of the lawsuit

9   that you filed against Mr. Rothschild and some of

10  his companies?

11            ATTORNEY VAZQUEZ:  Objection based on

12       relevance.

13       Q.   That's going to happen from time to time.

14       A.   Okay.

15       Q.   Your lawyer may object, defense counsel

16  may object.  Unless somebody tells you not to

17  answer, the way the process goes is you still need

18  an answer.  Does that work for you?

19       A.   Yes, it does.

20       Q.   And if you don't mind, just to clean it

21  up, I'll ask the question, again.

22       A.   Certainly.

23       Q.   Ms. Kazanjian, at a high level, what was

24  the nature of the lawsuit that you filed against

25  Mr. Rothschild and some of his companies?

Kazanjian, Constance Deposition                                            September 12, 2025

Page 18

1        A.   To settle monies that I felt he owed me.

2        Q.   Please turn to the second page of Exhibit

3   80.  And in particular, I'm looking at Paragraph 7.

4             Are you there?

5        A.   I am.

6        Q.   Do you see the name Rothschild Broadcast    **Valve Corporation**                    Affirmative

7   Distribution Systems?

8        A.   I do.

9        Q.   Is it okay if I refer to that company as

10   RBDS?

11        A.   Yes.

12        Q.   And then if you flip the page and you look

13   at Paragraph 10, do you see Display Technologies?

14        A.   I do.

15        Q.   Understanding that there are more

16   defendants named in this lawsuit, is it correct that

17   three of the defendants in your lawsuit were

18   Mr. Rothschild himself, RBDS, and Display

19   Technologies?

20        A.   Yes.

21        Q.   Please turn a couple of pages and let me

22   know when you see Paragraph 22 in front of you.

23        A.   Yes.

24        Q.   Do you see in this Paragraph 22 of Exhibit

25   80, there's a mention of a business relationship and

Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                                September 12, 2025

**Page 19**

1    also a friendship between yourself and

2    Mr. Rothschild?

3        A.   Yes.

4            ATTORNEY VAZQUEZ:  Objection.  Relevance.

5    BY ATTORNEY MACHLEIDT:

6        Q.   At some point in time, is it correct that

7    you had both a business relationship and a

8    friendship with Mr. Rothschild?

9        A.   I did.

_Valve Corporation_                                          Affirmative

10           ATTORNEY VAZQUEZ:  Same objection.

11   BY ATTORNEY MACHLEIDT:

12       Q.   Currently, is it fair to say that you have

13   neither a business relationship nor a friendship

14   with Mr. Rothschild?

15       A.   That is correct.

_Valve Corporation_                                          Affirmative

16           ATTORNEY VAZQUEZ:  Objection.

17           ATTORNEY MACHLEIDT:  Ren , obviously --

18           ATTORNEY VAZQUEZ:  Yeah, let's -- yeah, I

19   was just about to say.

20           I'm going to generally object based on

21   relevance to all questions related to this

22   exhibit.

23           ATTORNEY MACHLEIDT:  Yeah.  Fair enough.

24   When we talk down the road.  I won't say you

25   waived any relevance objections to this

Kazanjian, Constance Deposition                                                    September 12, 2025

Page 20

1          exhibit.

2               ATTORNEY VAZQUEZ:  All right.  Very good.

3          Thank you.

4               ATTORNEY MACHLEIDT:  You're welcome.

5     BY ATTORNEY MACHLEIDT:

6          Q.   Between, roughly, 2000 and 2011, what type

7     of interactions did you have with Mr. Rothschild?

8          A.   He was involved at the University of Miami

9     and we maintained a friendship when I left the

10    university.

11         Q.   Did Mr. Rothschild ever do any work,

12    whether paid or free, for the University of Miami?

13         A.   He was a volunteer.

14         Q.   Do you know what department or departments

15    he volunteered for?

16         A.   The School of Business.

17         Q.   What type of volunteer work did he do for

18    the School of Business?

19         A.   He was very involved with students in an

20    entrepreneurship business plan competition that his

21    name was attached to at the university.

22         Q.   I know we're going far back in time.

23         A.   Yeah.

24         Q.   But do you happen to know if his name is

25    still attached to this competition?

Kazanjian, Constance Deposition

September 12, 2025

**Page 21**

1      A.   It's not.

2      Q.   Take a look at Paragraph 24 of this

3   Exhibit 80.  And if you don't mind, read it to

4   yourself and let me know when you're finished.

5      A.   Yes.

6      Q.   Is it correct that, in 2011, you became

7   aware that Mr. Rothschild had a business plan that

8   involved placing his patents into a company for a

9   public offering?

10      A.   Yes.

11      Q.   How did you come to be aware of

12   Mr. Rothschild's then business plan?

13      A.   That's how we started our business

14   relationship.  He felt it was a good way to package

15   his patents and form a company that would monetize

16   that asset, those assets.

17      Q.   Obviously, specific to whatever you may

18   know, before 2011, did Mr. Rothschild monetize any

19   of his patents?

20      A.   He did.

21      Q.   How, before 2011, did Mr. Rothschild

22   monetize his patents?

23      A.   He sold patents.

24      Q.   How did you come to know that before 2011

25   Mr. Rothschild sold patents?

Valve Corporation                                    Affirmative

Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                                           September 12, 2025

Page  22

1        A.   He told me.

2        Q.   Before 2011 when Mr. Rothschild sold

3    patents, do you know if he sold them personally or

4    did he sell them through a company?

5        A.   I don't know how he -- I don't know the --

6    I don't know that.

7        Q.   You mentioned -- and, by the way, if I say

8    anything that relates to your prior testimony and I

9    get it wrong, just tell me.  Does that work for you?

10       A.   Absolutely.

11       Q.   I believe you mentioned in 2011

12   Mr. Rothschild wanted to or began to package his

13   patents to monetize them.

14       A.   Yes.

15       Q.   Correct?

16       A.   Yes.

17       Q.   How did that differ with what

18   Mr. Rothschild was doing before 2011, namely,

19   selling his patents?

20       A.   He was selling one at a time.

21       Q.   Please read Paragraph 25 and let me know

22   when you're finished.

23                   (Pause.)

24       A.   Yes.

25       Q.   How did the business plan in the 2011 time

**Valve Corporation**                                      Affirmative

Kazanjian, Constance Deposition                                                    September 12, 2025

Page 23

1    period work out?  Namely, where Mr. Rothschild

2    intended to package his patents and monetize them.

3        A.   He couldn't get any investors to put money

4    into this company he wanted to form.

5        Q.   What role, if any, did you have in terms

6    of trying to get investors for this venture?

7        A.   I participated with Leigh introducing

8    investors to Leigh and Leigh tried to convince them

9    to participate in this venture.

10            ATTORNEY AGNETTI:  Connie, when you say

11       Leigh, you mean Leigh Rothschild?

12            THE WITNESS:  Yes, I'm sorry.

13            ATTORNEY MACHLEIDT:  We were about --

14            THE WITNESS:  Sorry.

15            ATTORNEY MACHLEIDT:  Thank you, Counsel.

16            THE WITNESS:  Sorry.

17   BY ATTORNEY MACHLEIDT:

18       Q.   No, you don't have to apologize, but I was

19   going to do the same thing so perfect.

20       A.   Okay.

21       Q.   In court, we're very formal.  It's also

22   Mr. and Mrs.

23       A.   I'll be more formal.

24       Q.   You do whatever works for you.

25       A.   Okay.

Kazanjian, Constance Deposition                                              September 12, 2025

**Page 24**

```
1            ATTORNEY MACHLEIDT:  But thank you,

2       Counsel.

3   BY ATTORNEY MACHLEIDT:

4       Q.   How many investors expressed interest in

5   this patent monetization plan?

6       A.   No one.

7       Q.   To the best of your recollection, how many

8   investors or, I guess, potential investors did you

9   and Mr. Rothschild contact?

10      A.   Several.

11      Q.   Do you have any specific recollection of

12  any responses from the potential investors to you or

13  Mr. Rothschild?

14      A.   They thought the business plan was flawed.

15      Q.   Again, to the best of your recollection,

16  what were the flaws or what was the flaw in the

17  plan?

18      A.   I don't know that specifically.

19      Q.   Do you see in Paragraph 26 of this Exhibit

20  80 there's a reference to Mr. Rothschild having 33

21  lifetime patents as of December 2011?

22      A.   Yes.

23      Q.   While you worked for Mr. Rothschild or

24  Inventar, what type of knowledge did you have about

25  Mr. Rothschild's patent assets?
```

Valve Corporation                                                            Affirmative

Kazanjian, Constance Deposition                                        September 12, 2025

Page 25

1      A.   I knew that he had 30 when we started

2    working together.  And he continued to successfully

3    get additional patents during the time that I worked

4    with him.

5      Q.   Did Mr. Rothschild ever tell you why he

6    was interested in obtaining additional patents?

7      A.   He loved inventing.

8      Q.   From the beginning of your work with          **Valve Corporation**          Affirmative

9    Mr. Rothschild, was the plan always to monetize the

10   patents in some way or another?

11     A.   Yes.

12     Q.   Please read Paragraph 27 of this Exhibit

13   80.

14               (Pause.)

15     A.   Yeah, that's correct.

16     Q.   What advice did you give to Mr. Rothschild     **Valve Corporation**          Affirmative

17   in the 2011 time period about continuing to try to

18   monetize his patents?

19     A.   At that point in time, no one was buying

20   patents.  Very few were being sold.  And so he

21   needed money and that's when he decided it was time

22   to start getting licensing agreements on companies

23   he felt were infringing on his intellectual

24   property.

25     Q.   When you say that in the 2011 time period,

Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                                September 12, 2025

Page 26

1    no one was buying patents, do you mean nobody was

2    buying Mr. Rothschild's patents?

3         A.   Yes.

4         Q.   Or --

5         A.   Yes.  I should have been more specific,

6    yes.  That's exactly true.

7         Q.   Do you see the reference in this Paragraph          **Valve Corporation**          Affirmative

8    27 to a $9 million capital raise?

9         A.   That was the company that he wanted to

10   start.  He wanted -- that was the basis of it, to

11   raise $9 million in asset -- in capital and have

12   people invest in his -- at that point in time, there

13   were 30 patents.  But they were more being

14   accumulated as that process started.

15        Q.   How did the attempt to raise $9 million in

16   capital turn out?

17        A.   We didn't get one investor.

18        Q.   Does that mean that you did not obtain --

19   and by you, you, Mr. Rothschild -- did not obtain

20   any capital?

21        A.   No capital.

22        Q.   Do you recall any discussions in the time

23   frankly --

24             ATTORNEY MACHLEIDT:  Well, strike that.

25   BY ATTORNEY MACHLEIDT:

Kazanjian, Constance Deposition                                                    September 12, 2025

Page 27

1    Q.   Did Mr. Rothschild express to you any

2    negative sentiment about wanting to obtain $9

3    million and then ultimately obtaining zero dollars?

4    A.   He wasn't happy.

5    Q.   When you talk about investors or potential

6    investors, what type of investors were you and

7    Mr. Rothschild attempting to get involved in the

8    capital raise?

9    A.   Leigh was the provider of potential

10   investors.  He and Robert Feingold, his attorney.

11   And they had -- I think there was a CEO they had

12   hired out of New York.  I don't know who he -- I

13   forget his name.  But they, the three of them, had

14   come up with this business plan when I was brought

15   onboard.

16        So they were already starting the process.

17   I wasn't involved with the design of that business

18   plan, but I learned very quickly from watching the

19   reaction of investors, it wasn't a good, solid plan.

20   Nobody felt it was -- that they would invest in that

21   plan.

22   Q.   And when you say that plan, do you mean

23   the plan to acquire new patents?

24   A.   No -- yes, but the business plan was

25   investing in the 30 plan -- the 30 patents that he

Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                                    September 12, 2025

Page  28

1    already had and monetizing those by licensing or

2    sale of those -- that asset.

3        Q.   In around the 2011 time period, how many

4    litigations had Mr. Rothschild --

5            ATTORNEY MACHLEIDT:  Strike that.

6    BY ATTORNEY MACHLEIDT:

7        Q.   When you mention licensing, do you mean          **Valve Corporation**          Affirmative

8    licensing connected to allegations of infringement

9    or, at that time, were licensing discussions

10   disconnected from any threat of a lawsuit?

11       A.   The business plan, when that failed, then

12   the next decision that Mr. Rothschild made was to

13   take and file the lawsuits on the specific patent

14   individually and find -- and secure settlement and

15   licensing agreements.  That was the next course of

16   action that he started on.

17       Q.   Who came up with the, as you mentioned,

18   next course of action?  Namely, to find potential

19   infringers for licenses?

20       A.   Mr. Rothschild.

21       Q.   Did he ever tell you why he thought that

22   was the proper next course of action to take?

23       A.   I think it was his only option.

24       Q.   What do you mean by that being his only

25   option?

Page 29

1      A.   His business plan for forming a company

2   failed.  He was not selling any of his assets, his

3   patents.  This would be the next logical step, which

4   he took.

5      Q.   In the 2011 time period, were you aware of

6   the ways in which Mr. Rothschild was earning a

7   living?

8      A.   I believe this was the only way.  His

9   assets were -- his income was derived from selling

10  his patents.

11     Q.   You're not aware of Mr. Rothschild

12  having -- I'll call it any sort of side business or

13  side venture where he earned income disconnected

14  from anything having to do with his patents?

15     A.   I have no knowledge of that.

16     Q.   Would you please read Paragraphs 32 and

17  33, and always to yourself, and let me know when

18  you're done?

19                  (Pause.)

20     A.   Yes.

21     Q.   At some point in time, were you the vice

22  president of Inventar?

23     A.   I was.

24     Q.   Do you see in Paragraph 33 a reference to

25  promises relating to a compensation agreement which

Kazanjian, Constance Deposition                                                    September 12, 2025

Page 30

1    subsequently turned out to be false and misleading?

2        A.   Exactly.

3        Q.   What did Mr. Rothschild do to convince you

4    to become the vice president of Inventar?

5        A.   It was before we had started -- it was

6    when he was forming the company and I met with

7    Mr. Feingold and they -- this was when they were

8    describing to me their plan to do a $9 million

9    capital raise and form a company and I would be part

10   of that company.  And it was very appealing.

11       Q.   What, if anything, about the -- I'll call

12   it the pitch to get you to join the company turned

13   out to be false and misleading?

14       A.   All of it.

15       Q.   I hate to do the lawyer thing, but what

16   specifically do you mean by all of it?

17       A.   There was the salary agreement, the car

18   compensation, the description of the job

19   description, none of that happened.  It was all

20   predicated on the capital raise and the formation of

21   a company.  So, therefore, none of that came to be a

22   reality.

23       Q.   The capital raise, understanding it did

24   not happen, what was it contingent on?

25       A.   Getting investors to believe that his

Valve Corporation                                      Affirmative

Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                September 12, 2025

Page 31

1  patents were able to be monetized and they would see

2  a return on their investment.

3      Q.   Understanding that it did not work out,

4  what was the intent in terms of how investors would

5  monetize the patents that they now had ownership of?

6      A.   It would be no different than what he went

7  on to do without them, which is find companies that

8  he believed to be infringing upon his intellectual

9  property and signing a settlement agreement and

10  giving them a license to use that intellectual

11  property.

12      Q.   Certainly, feel free to look through

13  whatever paragraphs you might need of Exhibit 80,

14  but approximately at what point in time did you

15  become aware that Mr. Rothschild was making a pivot

16  away from trying to sell his patents to licensing

17  his patents?

18      A.   It was early on.  There were -- as hard as

19  he tried to sell patents to raise money so he could

20  live, he was not successful.  The investors did not

21  join his company or invest in his company.  The only

22  option he had left was to do licensing agreements.

23      Q.   The decision to do licensing agreements,

24  ballpark in terms of years, approximately when was

25  that decision made?

Page 32

1        A.   It probably wasn't until 2012, maybe.  I

2   don't know when the first lawsuits were filed.  I

3   don't remember that.

4        Q.   Sticking with the attempts to get

5   investors, in other words, before the licensing

6   efforts, when, if ever, would Mr. Rothschild

7   threaten investors with infringement lawsuits?

8        A.   Investors?  I'm confused.  There were no

9   investors.

10       Q.   Did Mr. Rothschild ever threaten potential

11  investors that, if they did not acquire one of his

12  patents or patent portfolios, that he would sue them

13  for patent infringement?

14       A.   Oh, I don't know.

15       Q.   You were never made aware of whether the

16  attempts to monetize Mr. Rothschild's patents

17  through sales, whether those were accompanied by

18  threats of infringement?

19       A.   I'm not aware of that.

20       Q.   If that had happened, would you have been

21  made aware of it?

22            ATTORNEY VAZQUEZ:  Objection.  Calls for

23  speculation.

24       A.   I don't know.

25       Q.   Yeah, I'll concede that objection.

Page 33

```
 1          ATTORNEY AGNETTI:  You do understand the

 2     question; right?  He's not asking you that as

 3     it relates to investing.  When you changed your

 4     model to --

 5          THE WITNESS:  Oh.

 6     A.   Okay.  Say that, again.  So let me see if

 7  I can -- maybe I misunderstood.

 8          ATTORNEY AGNETTI:  I don't think she

 9     understood your question.

10          THE WITNESS:  Yeah.

11     A.   I was still back on nobody invested $9

12  million to be part of this.  So that confused me.  I

13  apologize.

14     Q.   You don't have to apologize.  I guarantee

15  you I'll have many questions that I need to do

16  better with.

17     A.   Okay.

18     Q.   Let me try another way.  Does that work

19  for you?

20     A.   Absolutely.

21     Q.   You mentioned, sort of in the

22  pre-licensing scenario, where Mr. Rothschild was

23  trying to get investors to buy in to his patents or

24  to buy his patents or invest in his patents.

25          You were never made aware of
```

Kazanjian, Constance Deposition                                                      September 12, 2025

Page 34

1    Mr. Rothschild threatening potential investors with

2    infringement lawsuits; is that a fair statement?

3        A.   Yes.

4        Q.   Based on your role as vice president of

5    Inventar and just in general --

6        A.   Uh-huh.

7        Q.   -- your working relationship with

8    Mr. Rothschild, if some of the attempts to settle

9    the patents -- sorry, to sell the patents had been

10   accompanied by threats of infringement, is that

11   something, as vice president, you would have been

12   made aware of?

13           ATTORNEY VAZQUEZ:  Objection.  Form.  And

14       objection.  Calls for speculation.

15       A.   What I do -- what I did witness, we did go

16   out to Seattle and met with Intellectual Ventures

17   many times trying to sell patent portfolios or

18   patents, and he'd always been very successful doing

19   that, but when we were not successful doing that and

20   after the business plan was set aside and we were

21   moving forward with the trying to sell assets, it

22   did not work.  They were not buying and -- but he

23   never threatened.  You know, there would be no

24   reason for him to threaten Intellectual Ventures.

25           We also dealt with patent brokers.  And he

Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                                September 12, 2025

Page 35

1    wouldn't have had any reason to threaten the broker.

2    But he -- to my knowledge, I never witnessed him

3    call any company and say if you don't, I mean, I

4    didn't witness that.

5         Q.   Take a look at Paragraph 38 of the

6    complaint that is Exhibit 80 and let me know when

7    you're done.  And in fact, look at also Paragraph

8    37.

9                    (Pause.)

10        A.   Yes.  Yes, okay.

11        Q.   Is it correct that, when you worked as

12   vice president of Inventar, you and also

13   Mr. Rothschild reached out to the patent acquisition

14   teams at, for example, Samsung and Amazon?

15        A.   Yes.

16        Q.   What is a patent acquisition team?

17        A.   Each company, Samsung, Apple, they all

18   have it.  They have patent acquisition attorneys

19   that they buy patents all the time.  And so we tried

20   to sell patents directly to them that pertained to

21   their product, products.  Never in my presence did

22   Leigh threaten to sue them.

23        Q.   During the time period where you and

24   Mr. Rothschild were, for instance, reaching out to

25   the patent acquisition teams of Samsung and Amazon,

Kazanjian, Constance Deposition                                                              September 12, 2025

Page 36

1   you have no recollection of Mr. Rothschild

2   threatening the companies with infringement

3   lawsuits?

4       A.   I was in meetings with these people and

5   offered them and Leigh made his -- he explained to

6   them how they were infringing.  And maybe -- he

7   never said I'm going to sue you that I heard, but

8   that doesn't mean that he didn't have conversations

9   with them when I was not present.

10      Q.   Please take a look at Paragraph 41 and let

11  me know when you're done.

12                  (Pause.)

13      A.   Yes.

14      Q.   In 2013, what, if any, Rothschild patent

15  portfolio did you and Mr. Rothschild try to sell?

16      A.   I don't remember.

17      Q.   Do you see a reference to Mr. Rothschild's

18  portfolio being not sellable?

19      A.   Yes.

20      Q.   This may touch on what you and I have

21  already talked about, but what was it about

22  Mr. Rothschild's patent portfolio that made it not

23  sellable?

24      A.   A couple things.  One was he was used to

25  selling at a very high rate, good return, to

CONFIDENTIAL                                                              Kilpatrick Townsend & Stockton LLP

**Page 37**

1    Intellectual Ventures when they were amassing their

2    portfolio and his patents fit right in.  But when

3    you go to sell a portfolio on the open market and

4    Intellectual Ventures is divesting at that point, it

5    became difficult and the pricing was very low.

6         Q.   When you say that Mr. Rothschild's

7    portfolio -- and the quote I have is fit right in

8    with Intellectual Ventures --

9         A.   Uh-huh.

10         Q.   -- what do you mean by that?

11         A.   Intellectual Ventures was building a war

12    chest, so to speak, and Leigh had the type of

13    intellectual property that fit into their model.  So

14    he was very successful in selling to them.

15              But when that business plan proved to have

16    some flaws, they weren't buying.  In fact, they were

17    divesting.  And they even called Leigh and asked him

18    if he wanted to buy his patents back.

19         Q.   You and I have talked about Intellectual

20    Ventures a few times.  I think we should probably

21    get on the same page.

22              What is Intellectual Ventures?

23         A.   It was an arm of -- I don't know too much

24    about it.  I mean, I did go to the meetings and I

25    was there, but, obviously, Microsoft was a parent of

Kazanjian, Constance Deposition                                                                          September 12, 2025

Page 38

1  it.  I'm not sure.  I don't know the structure.  I'm

2  speculating.  I don't know.

3      Q.  When you say you went to meetings at

4  Intellectual Ventures, what was the purpose of those

5  meetings?

6      A.  To sell them patents.

7      Q.  What was it about Mr. Rothschild's patents

8  that, as you said, fit right into the IV -- into the

9  Intellectual Ventures model?

10      A.  Right.  That's what their words were when

11  we spoke with them, but they weren't buying.

12      Q.  Please take a look at Paragraph 43 and let

13  me know when you're done.

14              (Pause.)

15      A.  Uh-huh.

16      Q.  Before getting into details, Exhibit 80

17  you mentioned is the complaint or is part of the

18  lawsuit that you filed against Mr. Rothschild;

19  correct?

20      A.  Yes.

21      Q.  Feel free to look through the document and

22  potentially also the final pages that have dates,

23  but when did you cause this complaint to be filed

24  with a court?

25          ATTORNEY AGNETTI:  It's on the first page.

Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                                                    September 12, 2025

Page 39

1            THE WITNESS:  Is it?

2            ATTORNEY AGNETTI:  On the top.

3      A.   April 5th of 2017.

4      Q.   The information that you and I have been

5   discussing so far, much of it stems --

6            ATTORNEY MACHLEIDT:  Strike that.

7   BY ATTORNEY MACHLEIDT:

8      Q.   The information that you and I have been

9   discussing so far, is it fresh in your mind or,

10  knowing that the complaint was filed in 2017, is it

11  somewhat difficult to recall at times?

12     A.   It's very difficult.  I've blocked it all

13  out.  Moved on.

14     Q.   Does reviewing the complaint, Exhibit 80,

15  help refresh your recollection about events of the

16  past?

17     A.   It does.

18     Q.   At any point in time when looking through

19  Exhibit 80, the complaint, either now or in the

20  past, have you identified any errors or things in

21  this exhibit that conflict with your memory of past

22  events?

23     A.   No.

24     Q.   I asked you to look at Paragraph 43.  Have

25  you had a chance to read it?

CONFIDENTIAL                                              Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                          September 12, 2025

Page 40

1        A.   I have.

2        Q.   When --

3             ATTORNEY MACHLEIDT:  Strike that.

4    BY ATTORNEY MACHLEIDT:

5        Q.   In the 2011, 2012, 2013, time period when

6    you worked with Mr. Rothschild, was it always as

7    vice president of Inventar?

8        A.   I don't think there was ever -- I don't

9    know the corporate structure of Inventar.  I have no

10   idea what that corporate structure was.  And so

11   working as a vice president means nothing, because

12   there was no company.

13       Q.   What do you mean there was no company?

14       A.   I don't -- I didn't see any business

15   being -- I didn't see any business being done as

16   Inventar.

17       Q.   Are you familiar with the term                Valve Corporation          Affirmative

18   non-practicing entity?

19       A.   Yes.

20       Q.   Is it okay if I call that an NPE?

21       A.   Absolutely.

22       Q.   What is your understanding of what a

23   non-practicing entity or NPE is?

24       A.   That Mr. Rothschild's patent was never

25   used by Mr. Rothschild to monetize that patent.

Kazanjian, Constance Deposition                                                    September 12, 2025

Page 41

1      Q.   What do you mean that Mr. Rothschild's

2   patents were never used by him?

3      A.   He didn't form a company.  He didn't have

4   an entity that was using his technology to sell a

5   product or build a business.  He did not do that.

6      Q.   Once you and Mr. Rothschild and

7   potentially others realized that the attempts to get

8   investors to buy in to the patent portfolios was not

9   working, what came next?

10     A.   It was a gradual process.  It was just an

11  evolution.  The premise of the business was to bring

12  in money from the patents by selling the patents or

13  licensing the technology.  So he just evolved into

14  doing it without the company.  Or the investors

15  being partners with him.

16     Q.   In this Paragraph 43 of your complaint,

17  the second sentence says, "Kazanjian and Rothschild

18  focused on asserting Rothschild's intellectual

19  property rights in court rather than selling his

20  patents."  Do you see that?

21     A.   Yes.

22     Q.   What did you mean by the phrase that the

23  focus was on asserting Rothschild's intellectual

24  property rights in court?

25     A.   Suing for licensing agreement.

Valve Corporation                                        Affirmative

Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                           September 12, 2025

Page 42

1          Q.   You mentioned that it happened gradually,

2     but do you have any specific recollection of

3     discussions involving Mr. Rothschild where the

4     decision was made to make that shift to suing for

5     licensing agreements?

6          A.   That was conversations with Robert

7     Feingold, who was an attorney that was working with

8     Leigh to form the company, and Feingold said -- and

9     he was right -- Leigh, there's no other way.  And

10    Leigh said let's just do it without the investors.

11    That was how that happened.

12              ATTORNEY ZITO:  I'm going to object there.

13         This is Mr. Zito.  That discussion included an

14         attorney.  That would be privileged.

15              ATTORNEY MACHLEIDT:  I think we're going

16         to agree to disagree.  And we can certainly

17         discuss this if and when this gets used later.

18              I don't think it's at all clear that any

19         lawyer was a lawyer of Ms. Kazanjian's here,

20         whether through Inventar or otherwise, so we

21         disagree.

22              ATTORNEY ZITO:  Okay.  Well, I'm going to

23         maintain that objection and a caution that if

24         the lawyer was a lawyer representing

25         Mr. Rothschild, any of his companies, and she

Kazanjian, Constance Deposition                                                    September 12, 2025

Page  43

1    was an employee or a consultant, then her

2    communications with that lawyer would be

3    privileged.  Especially -- she just described a

4    conversation with Mr. Rothschild, a lawyer, and

5    her were all in the conversation.  That would

6    be a privileged conversation.  That's our

7    objection and our caution.

8        ATTORNEY AGNETTI:  Well, on behalf of

9    Ms. Kazanjian, the privilege belongs to whoever

10   that lawyer was representing.  If you're

11   raising that privilege on behalf of

12   Mr. Rothschild or one of his companies, you

13   have to say that and instruct her not to

14   answer.

15       ATTORNEY ZITO:  Correct.

16       ATTORNEY AGNETTI:  Or my client's going

17   to -- my client doesn't raise the privilege.

18   It's not her privilege.  That's number one.

19       And number two, it sounds to me like she's

20   describing a business meeting that has nothing

21   to do with any legal advice.  But, you know, I

22   could be wrong.  I wasn't there.

23       ATTORNEY ZITO:  All right.  For the sake

24   of clarity, and we did this at other

25   depositions, we are not waiving any privilege

Kazanjian, Constance Deposition                                          September 12, 2025

**Page  44**

1    and we are going to raise privilege on behalf

2    of the defendants as a whole at any time we

3    think that it is and any conversations she had

4    with a lawyer with Mr. Rothschild regarding

5    whether or not to sue has business

6    implications.  But it's also legal advice.  So

7    then we are invoking that privilege on behalf

8    of the defendants.

9         ATTORNEY AGNETTI:  Okay.  But for each

10   question, you're going to have to raise the

11   privilege, because my client won't know and she

12   shouldn't guess.  And if you raise the

13   privilege, I'm going to instruct her not to

14   answer it pending a court determination whether

15   it's privileged or not, since it's your

16   privilege.

17        ATTORNEY ZITO:  Thank you.  We appreciate

18   that.

19        ATTORNEY AGNETTI:  Okay.  So but I need

20   you to tell me that you're raising it.  I can't

21   guess what you want to raise and what you don't

22   want to raise.

23        ATTORNEY ZITO:  Okay.  I understand.  And

24   until she'd answered that question that me and

25   him and a lawyer sat down and talked about it,

**Page 45**

1        I didn't know it implicated privilege.

2            ATTORNEY AGNETTI:  I gotcha.

3            So, Connie, just give me a chance to let

4        him raise his privilege.

5            THE WITNESS:  Okay.

6            ATTORNEY AGNETTI:  If there's something

7        involving Mr. Feingold or any other attorney.

8        Okay?

9            THE WITNESS:  Okay.

10       BY ATTORNEY MACHLEIDT:

11           Q.   Ms. Kazanjian, this touches on what you

12       and I mentioned earlier about you being a VP.

13           Were you ever formally an employee of

14       Inventar?  Did you file taxes with Inventar; did you

15       get a W2, a 1040, nothing like that?

16           A.   No, everything came from Rothschild

17       Holdings Something Limited.  I don't know.

18           Q.   Could it have been Rothschild Trust

19       Holdings LLC?

20           A.   Yes, that was it.  That was it.

21           ATTORNEY MACHLEIDT:  Joe, you can take a

22       look at Mr. Rothschild's answer in this case.

23       I can send it to you, if you need.  Paragraph 4

24       says at no time was plaintiff, namely,

25       Ms. Kazanjian, an employee of either defendant

Valve Corporation                                    Affirmative

Page 46

```
1    Leigh Rothschild or Rothschild Trust Holdings

2    LLC and he uses that to argue that the breach

3    of contract is actually without cause.

4        You do not get both ways.  You don't get

5    to say that Ms. Kazanjian was not an employee

6    of anybody and now say that she was an employee

7    and, therefore, was part of any privilege you

8    want to assert.  So the answer is no, we

9    disagree.

10        If you want to object and say privilege,

11   that's fine, but if you shut this down because

12   you're asserting a privilege now because it

13   benefits Mr. Rothschild, whereas, it did not

14   during the lawsuit with Ms. Kazanjian, that is

15   not acceptable.  You don't -- that's not a

16   heads, you win and tails, we lose scenario.

17        ATTORNEY ZITO:  Well, our instruction

18   remains.  Our claim of privilege remains.

19   Ms. Kazanjian just said the opposite of what

20   you read out of that answer.  I didn't write

21   the answer.  I have no idea whether that

22   changed, whether that was a mistake, whether

23   that was true or not true, but she does not

24   have to be a W2 employee.  If she is employed

25   as a consultant or in any manner and the
```

Page 47

1     conversation is with the attorney representing

2     counsel about legal advice, then she's covered

3     under the privilege.  It's not some third-party

4     who wandered in and overheard a conversation.

5     So even if she wasn't an employee, the

6     privilege still attaches.

7          ATTORNEY MACHLEIDT:  Yeah, we disagree.

8          ATTORNEY ZITO:  So our instruction

9     remains.  So I'm leaving the privilege.  No,

10    you can't ask her what communication -- what

11    conversations -- I'm okay with you asking her

12    did you have a conversation, yes or no, that's

13    fine, as we know.  But, no, you can't ask her

14    the substance of legal advice provided by a

15    lawyer to any of the defendants while she was

16    part of that legal decision.  She's not a

17    third-party just because she doesn't fill out a

18    W2.

19         ATTORNEY AGNETTI:  So on behalf of

20    Ms. Kazanjian -- this is John Agnetti -- I have

21    no dog in this fight.  If you raise the

22    privilege, I'm going to instruct her to not

23    answer until there's a determination whether a

24    privilege exists or not, because I don't want

25    to -- I don't want the horse out of the barn,

Page 48

1    so to speak.  Okay?  So I want to respect your

2    client's position and let the Court tell me

3    whether I have to answer it or not.

4        ATTORNEY MACHLEIDT:  And by the way --

5        ATTORNEY ZITO:  Thank you.

6        ATTORNEY MACHLEIDT:  -- Mr. Agnetti, yeah,

7    I respect that.  I know Ms. Kazanjian's a

8    third-party.  I've said my peace.

9        ATTORNEY AGNETTI:  Right.

10       ATTORNEY MACHLEIDT:  But, to your point,

11   I'm not going to -- if we get into a fight down

12   the road, Mr. Zito and I.  I'm not going to

13   force anybody to say anything now for the

14   reasons you said.  I think everybody's made

15   their point clear.  Maybe it won't be an issue

16   down the road.

17       ATTORNEY AGNETTI:  Gotcha.

18       ATTORNEY MACHLEIDT:  But I understand

19   where you're coming from.

20   BY ATTORNEY MACHLEIDT:

21       Q.   Ms. Kazanjian, what is your understanding

22   of a contingency fee agreement with a lawyer or a

23   law firm?

24       A.   It's for a percentage of the net

25   settlement, they will waive their fees and take a

Valve Corporation                    Affirmative

Kazanjian, Constance Deposition                                      September 12, 2025

Page 49

1    payment based on the agreement, the percentage

2    agreement.

3         Q.   You mentioned earlier that -- and again,

4    correct me if I'm wrong -- but part of your work

5    with Mr. Rothschild around this time was identifying

6    outside counsel.

7         A.   Yes.

8         Q.   The outside counsel that you identified

9    and ultimately Mr. Rothschild and/or you retained,

10   how many times was the engagement on an hourly basis

11   as opposed to contingency?

12        A.   I can't remember once.  It was all

13   contingency.

14        Q.   You and I talked about this earlier today.

15   I asked you if you knew RBDS and Display

16   Technologies.

17        A.   Yes.

18        Q.   Do you remember that?

19        A.   I do.

20        Q.   Let's begin with Rothschild Broadcast

21   Distribution Systems, what role or what hand did you

22   have in the creation of that company?

23        A.   I set up the corporation in Texas and

24   secured an office address through a -- I forget what

25   they're called.  We paid for an office address

Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                                September 12, 2025

Page 50

1    through a company in Texas.

2            ATTORNEY AGNETTI:  Are you talking about a

3        virtual office?

4            THE WITNESS:  Yeah.  Thank you.

5    BY ATTORNEY MACHLEIDT:

6        Q.   Simply, to have it all come from you, when

7    you say that you paid for an office address, what do

8    you mean by that?

9        A.   We set up a corporation and arranged for a

10   virtual office in Texas.  I forget the company we

11   used, but that was how we set up all the companies.

12       Q.   What physical office space did RBDS

13   actually have in some location in Texas?

14       A.   None.

15       Q.   You mentioned something along the lines of

16   that's how you set up all the companies.

17       A.   Uh-huh.

18       Q.   What did you mean by that?

19       A.   Every company Leigh -- Mr. Rothschild,

20   every patent was put into a separate company.  You

21   know, Display Technologies was one.  Scanning

22   Technologies another.  All of those.  They were all

23   set up, but the settlement agreements and everything

24   was done under Rothschild Trust.

25       Q.   I'm going to get to some of that in a

**Valve Corporation**                                               Affirmative

Page 51

1    moment, but closing out RBDS, why did you form or

2    why did you help form RBDS in the first place?

3        A.   Because I was told to by Mr. Rothschild

4    and Mr. Feingold.

5        Q.   I don't want anybody to get in trouble

6    here; so I'll do this slow and remind you to answer

7    slowly.

8        A.   Okay.

9        Q.   Specific to what you recall Mr. Rothschild

10    telling you, what did he tell you specifically about

11    the formation of RBDS?

12        A.   To form the corporation, use the Texas

13    address, and he was the manager.

14        Q.   Do you recall anything else specific to

15    your instructions to create RBDS?

16        A.   It was a pretty simple incorporation.  It

17    wasn't complicated.

18        Q.   Why Texas for RBDS?

19        A.   Mr. Rothschild and Mr. Feingold believed

20    it to be a good --

21            ATTORNEY ZITO:  Objection.  Objection.

22    Instruction.  Now you're telling --

23            THE WITNESS:  Okay.

24            ATTORNEY ZITO:  -- what Mr. Feingold's

25    legal advice was --

Kazanjian, Constance Deposition                                        September 12, 2025

Page 52

1          THE WITNESS:  Okay.

2          ATTORNEY ZITO:  -- to your employer.

3     Okay.  Don't answer.

4          ATTORNEY AGNETTI:  Based upon the

5     objection by the person holding the privilege,

6     I'm going to instruct you not to answer --

7          THE WITNESS:  Okay.

8          ATTORNEY AGNETTI:  -- until we get

9     clarification from the Court.

10          THE WITNESS:  Okay.

11          ATTORNEY MACHLEIDT:  I won't do this every

12     single time, but on behalf of Valve, we

13     disagree with the privilege assertion there.

14     But I'll move forward.

15          THE WITNESS:  Okay.

16     BY ATTORNEY MACHLEIDT:

17     Q.  You mentioned virtual office, and I                 Valve Corporation        Affirmative

18     touched on it a little bit, but what exactly is a

19     virtual office?

20     A.  For a monthly fee, anyone can have access

21     to their office space if they need it, access to

22     their -- if you have a company meeting, you can do

23     that.  But, mainly, most all -- everything that was

24     done was for the purposes of an address for the

25     corporation.

Kazanjian, Constance Deposition                                          September 12, 2025

Page 53

1        Q.   What was the purpose of RBDS?

2        A.   The purpose of it -- the asset that was

3    linked to that company was a patent or a series of

4    patent portfolio in some cases.  I don't remember

5    exactly which patent was associated with it, but

6    that was the purpose of the company.

7        Q.   When you say asset, do you mean a patent

8    or potentially several patents?

9        A.   Yes.

10        Q.   Specific to whatever patent or patents may

11    have been linked to RBDS, what was the purpose of

12    RBDS with respect to those patent assets?

13        A.   It was -- okay.  The patents within that

14    company -- again, I don't know the patent -- here's

15    where I'm -- I can't speak directly.

16             I set up the corporation.  I had nothing

17    to do with that corporation after I set it up.  So

18    I -- and I cannot tell you whether the patents were

19    linked to that corporation because I never -- I

20    never did anything like that.  So I can't tell you I

21    did that.

22             But what I can tell you is that, as we

23    moved forward and licensing agreements were done, I

24    didn't handle that.  So I don't know if it was

25    done -- if there was actually a corporation set up

Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                                September 12, 2025

Page 54

1   and taxes were paid out of that corporation, I can't

2   tell you that.  But I believe everything was under

3   the umbrella of Rothschild Trust.  So that's -- I

4   can't tell you that I did anything with that,

5   because I didn't, but that's what I understood.

6        Q.   Would you take a look at Paragraph 48 of

7   your complaint and let me know when you're done.

8                (Pause.)

9        A.   Uh-huh.

10        Q.   Have you looked at it?

11        A.   I did.

12        Q.   Specific to any potential lawsuits, what        Valve Corporation        Affirmative

13   was the purpose of, for example, RBDS and Display

14   Technologies or what did you understand the purpose

15   to be?

16        A.   They were the plaintiffs.

17        Q.   Did you mention earlier or a moment ago

18   that companies like RBDS and Display Technologies

19   were under the umbrella of the Rothschild Trust

20   Holdings?

21        A.   Umbrella is my word.  But that's what I

22   believed.

23        Q.   Why, for example, was RBDS created to be

24   named as a plaintiff in a patent infringement case?

25        A.   You'll have to ask Mr. Rothschild and

Kazanjian, Constance Deposition                                        September 12, 2025

Page 55

1    Mr. Feingold.

2        Q.  Other than potentially patents, what

3    assets, if any, did RBDS have, to your knowledge?

4        A.  None that I know of.

5        Q.  What about Display Technologies, what

6    assets, other than patents, did it have?

7        A.  None that I know of.

8        Q.  Do you recall any specific discussions

9    with Mr. Rothschild about non-patent assets to be

10   held by, for example, RBDS?

11       A.  He would -- I did question.  Because I was

12   setting up these corporations, I did question.  He

13   basically said it was none of my business.

14       Q.  Did you follow up any further?

15       A.  No.

16       Q.  I know you and I have talked about RBDS

17   and Display Technologies.  I'm looking at Paragraph

18   47 of the complaint.

19       A.  Uh-huh.

20       Q.  You can look at that.  Certainly refer to

21   your recollection.  Is it fair to say that you

22   created more than just those two LLCs?

23       A.  I created all of them.

24       Q.  At whose direction did you create all of

25   the LLCs?

Page 56

```
 1        A.    Mr. Feingold and Mr. Rothschild.

 2        Q.    Do you understand LLC to be limited

 3   liability corporation?

 4        A.    I do.  I followed their directives.

 5        Q.    And I actually said corporation.  I think

 6   it's limited liability company.

 7        A.    They were LLCs, yes.

 8        Q.    Outside of any discussions --

 9              ATTORNEY MACHLEIDT:  Strike that.

10   BY ATTORNEY MACHLEIDT:

11        Q.    Let's take Mr. Feingold, set him to the

12   side.

13              What, if any, discussions did you have

14   with Mr. Rothschild specific to creating LLCs as

15   opposed to some other corporate entity?

16        A.    He -- I never questioned him.  It was his

17   decision.

18        Q.    While you worked --

19              ATTORNEY MACHLEIDT:  Strike that.

20   BY ATTORNEY MACHLEIDT:

21        Q.    Let's use a specific example.

22              While you worked for Mr. Rothschild, one

23   of the LLCs was used to file a lawsuit against

24   Valve; correct?

25        A.    Yes.
```

Valve Corporation                                    Affirmative

Kazanjian, Constance Deposition                                                September 12, 2025

Page 57

1      Q.   The patent or patents that were asserted

2   against Valve, was Mr. Rothschild the inventor --

3      A.   Yes.

4      Q.   -- named on those patents?

5      A.   Yes.

6      Q.   During the time that you had a business                    **Valve Corporation**        Affirmative

7   relationship with Mr. Rothschild, when, if ever, did

8   Mr. Rothschild file a patent infringement lawsuit

9   where he was personally the named plaintiff?

10      A.   Every one of these corporations, none of

11   them used his name.  I mean, everything was done by

12   the corporation, not with his name personally, that

13   I was involved with.

14      Q.   Did you ever ask Mr. Rothschild why he

15   didn't simply file patent infringement lawsuits in

16   his own name?

17      A.   I did.

18      Q.   What was his response to why

19   Mr. Rothschild did not file patent infringement

20   lawsuits in his own name?

21         ATTORNEY VAZQUEZ:  I'm going to interject

22      here for a second and say that, to the extent

23      that any of these discussions also involve

24      Mr. Feingold, then we object based on

25      privilege.  And I would instruct -- I would

Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition

September 12, 2025

Page 58

1    advise that the witness not answer, if that

2    discussion involved Mr. Feingold.

3        THE WITNESS:  It did.

4        ATTORNEY AGNETTI:  Based upon my client's

5    representations that these conversations were

6    in the presence of Mr. Feingold and based upon

7    the objection and the raising of privilege,

8    until a judge instructs us on how to proceed,

9    or the Court instructs us how to proceed, I'm

10   going to instruct you not to answer.

11       ATTORNEY MACHLEIDT:  Same as before.  We

12   disagree, but I'm going to see if I can nibble

13   around the edges a little bit.

14       Do you mind reading my question back?

15       (Record read back by the Court Reporter.)

16   BY ATTORNEY MACHLEIDT:

17   Q.  When did you first have any interactions

18   with Mr. Feingold?

19   A.  At the very, very beginning.  Day one when

20   they interviewed me for the position.

21   Q.  Was Mr. Feingold in-house or outside

22   counsel for, I'll say, Inventar?

23   A.  In this particular case, he was part of --

24   he was part of the team putting together the

25   business plan and the capital raise.  So I didn't

Page 59

1    see him in that light as an attorney.  He was a

2    business partner with this venture.

3        Q.   My earlier question -- or my recent

4    question was what did Mr. Rothschild tell you about

5    why he never filed a lawsuit personally in his own

6    name.  I'm not reasking that question, but -- yes or

7    no, or you don't recall -- do you recall one or more

8    specific conversations with Mr. Rothschild about

9    that topic?

10       A.   Yes, and Mr. Feingold was not present at

11   this time, but the first time we had a settlement on

12   one of the -- and I don't even know which company it

13   was -- where we -- the plaintiff was one of these

14   companies, but the settlement agreement and the

15   check was made to Rothschild Trust Holdings.  And I

16   asked Leigh why that was, because it didn't make any

17   sense to me that we were suing as a plaintiff and

18   accepting money as -- and he said don't worry about

19   any of this, my accountant has everything under

20   control.

21       Q.   Other than what you just said --

22            ATTORNEY MACHLEIDT:  Strike that.

23   BY ATTORNEY MACHLEIDT:

24       Q.   You indicated that Mr. Feingold was there

25   as part of the discussion, if you will, about why

Valve Corporation                              Affirmative

Page 60

1   Mr. Rothschild did not, you know, ever file a

2   lawsuit in his own name.  And now, just a moment

3   ago, you said Mr. Feingold was not necessarily

4   always there.  Obviously, I'm trying to parse this

5   out.

6        A.   Right.

7        Q.   And with that long statement of mine,

8   again, yes, no, or maybe you don't recall, when you

9   and Mr. Rothschild talked about him not filing

10  lawsuits in his own name, was Mr. Feingold a part of

11  those discussions?

12       A.   No.

13       Q.   Was Mr. Feingold --

14            ATTORNEY MACHLEIDT:  Strike that.

15  BY ATTORNEY MACHLEIDT:

16       Q.   Did Mr. Rothschild indicate to you in any

17  way that the answer to the question of why he didn't

18  file in his own name, did he indicate that that had

19  anything to do with Mr. Feingold?

20       A.   No.

21       Q.   Ensuring that you set aside any legal

22  discussions, anything with Mr. Feingold, what did

23  Mr. Rothschild tell you about why he did not file

24  patent infringement lawsuits in his own name and,

25  instead, did so with the companies you formed?

**Valve Corporation**                                    Affirmative

Kazanjian, Constance Deposition                                                September 12, 2025

Page 61

1          A.   I don't think I ever got a straight

2    answer.  I tried.  And I was confused why, if

3    employed by Inventar, I never got a check from

4    Inventar, why I always got it from Rothschild

5    Holding.  I mean, I asked all these questions

6    because it didn't make sense to me, but it didn't --

7    he -- those were his decisions.  He made them.  I

8    don't think he had -- I don't know if he had advice

9    or not.  I have no knowledge of that.  But I do know

10   everything Leigh Rothschild does, it's his decision.

11         Q.   You mentioned earlier patent brokers.  Is

12   Mavexar, LLC a patent broker?

13         A.   No.  They're -- this is how Leigh started

14   the litigation.  He didn't have any knowledge of how

15   to do this litigation so he hired Mavexar.  And

16   Mavexar had a track record of doing this type of

17   litigation.  And so they were hired initially to do

18   the first lawsuits.

19         Q.   When you say they had a track record of

20   doing this type of litigation, what do you mean by

21   that?

22         A.   Leigh introduced them to me as a company

23   that has a great reputation, lots of success in

24   doing assertion programs for inventors.  That's how

25   they were introduced to me.

Kazanjian, Constance Deposition                                                    September 12, 2025

**Page 62**

1          Q.    Did they charge a --

2          A.    Yes, they did.

3          Q.    -- flat -- did they charge a flat fee?

4          A.    No, a percentage.

5          Q.    If they helped with assertion programs and

6      all of them failed, did Mavexar get paid anything?

7          A.    No.  They were successful.

8          Q.    How, if at all, was Mavexar successful

9      with respect to helping Mr. Rothschild monetize his

10     patents?

11         A.    They filed lawsuits with -- not they.

12     They introduced us to attorneys that were willing to

13     take on assertion programs on a contingency basis

14     and they were instrumental in those introductions.

15     That's basically what they did.

16         Q.    By the way, I know we started a little bit

17     late.  I know we have a lot of people in the room

18     and then also on Zoom.  I tend to just start of

19     march forward.

20         A.    Oh, keep going.

21         Q.    Okay.

22         A.    Keep going.  Do not stop.

23              ATTORNEY AGNETTI:  Give me a two-minute

24     break, because I'm a diabetic so I'm just going

25     to get a bagel and sit here.  So just give me

Page 63

1      two minutes.

2          ATTORNEY MACHLEIDT:  We will go off the

3      record for two minutes and nobody will run

4      away.

5          THE VIDEOGRAPHER:  Going off the record.

6      The time is 11:58 a.m.

7                  (Recess.)

8          THE VIDEOGRAPHER:  We're on the record.

9      The time is 12:10 p.m.

10     BY ATTORNEY MACHLEIDT:

11         Q.   Welcome back.

12         A.   Thank you.

13         Q.   Approximately how long did Mr. Rothschild

14     make use of Mavexar before stopping working with

15     them?

16         A.   I don't know for sure.  I can't remember.

17         Q.   When Mr. Rothschild --

18         ATTORNEY MACHLEIDT:  Strike that.

19     BY ATTORNEY MACHLEIDT:

20         Q.   Bear with me.  I'm going to see if my

21     understanding is correct.  And it's probably going

22     to be wrong and then you're going to have to fix it.

23     Is that okay?

24         A.   Absolutely.  In the, I'll call them, early

25     days of licensing efforts, is it correct that

Page  64

1    Mr. Rothschild, through Inventar, would pay Mavexar,

2    which would then make connections to outside

3    counsel, who would then file lawsuits on behalf of

4    Mr. Rothschild's LLCs like Display Technologies and

5    RBDS?

6              ATTORNEY VAZQUEZ:  Objection.  Form.

7    BY ATTORNEY MACHLEIDT:

8        Q.   Full stop.  That's my question.

9        A.   Inventar never hired anybody.  Inventar

10   never did anything.  I don't know why that was

11   even -- nothing was ever -- I never witnessed

12   Inventar do anything as a company.

13       Q.   My very long question, if I had just cut

14   out Inventar and said Mr. Rothschild hired or --

15       A.   Yes, that's the way to do it.  Absolutely.

16       Q.   In the early licensing attempt days, is it

17   correct that Mr. Rothschild would hire or pay

18   Mavexar, which would then make connections to

19   outside counsel, who would then represent, for

20   instance, an RBDS or Display Technologies in a

21   patent infringement lawsuit on a contingency fee

22   basis?

23       A.   Yes.  Yes.  Correct.

24       Q.   Before --

25             ATTORNEY MACHLEIDT:  Strike that.

Page 65

1   BY ATTORNEY MACHLEIDT:

2       Q.   You mentioned, at least at times, being        Valve Corporation        Affirmative

3   aware of the fact that settlement money was paid to

4   Rothschild Trust Holdings; is that right?

5       A.   It all was.

6       Q.   When --

7            ATTORNEY MACHLEIDT:  Strike that.

8   BY ATTORNEY MACHLEIDT:

9       Q.   How often --

10           ATTORNEY MACHLEIDT:  Strike that.

11  BY ATTORNEY MACHLEIDT:

12      Q.   The Display Technologies and RBDS, can I        Valve Corporation        Affirmative

13  refer to them as collectively like monetizing

14  companies, LLCs, what works best for you to kind of

15  talk about them collectively?

16      A.   They're the plaintiffs.

17      Q.   Okay.  So in my next couple of questions,

18  if I say plaintiffs --

19      A.   Uh-huh.

20      Q.   -- or the Rothschild plaintiffs, you and I

21  will understand that to mean Display Technologies,

22  RBDS, essentially, all the LLCs that you formed?

23      A.   Exactly.

24      Q.   I should say that you formed at

25  Mr. Rothschild's direction.

Kazanjian, Constance Deposition

September 12, 2025

Page 66

1   A.   Yes.  Thank you.

2   Q.   Obviously, before you stopped working for

3   Mr. Rothschild, how often did you become aware that

4   one of the Rothschild plaintiffs would successfully

5   settle a case and the settlement monies would go

6   into a bank account for the plaintiff as opposed to

7   another entity's bank account?

8   A.   Never.

9   Q.   How often --

10  ATTORNEY MACHLEIDT:  Strike that.

11  BY ATTORNEY MACHLEIDT:

12  Q.   While you were working for Mr. Rothschild,          Valve Corporation          Affirmative

13  approximately how many cases, patent infringement

14  cases, were resolved that led to settlements and

15  licensing revenue?

16  A.   During the time that I was employed -- not

17  employed, worked with Leigh, I think we did 369

18  lawsuits.

19  (Discussion off the record.)

20  BY ATTORNEY MACHLEIDT:                                   Valve Corporation          Affirmative

21  Q.   The 369 or so lawsuits, did some of them

22  settle and lead to licensing revenue?

23  A.   Most of them.

24  Q.   When a defendant in one of these lawsuits

25  brought by a Rothschild plaintiff, when the

Page 67

1    defendant paid to settle the case, what entity's

2    bank account were the funds deposited into?

3        A.   I believe it was Rothschild Trust

4    Holdings.

5        Q.   What was Mr. Rothschild's role with

6    respect to Rothschild Trust Holdings?

7        A.   I don't know.  I would assume that he was,

8    however they set it up, the trustee or the manager

9    or I don't know what -- I don't exactly know what

10   that was.  I didn't set it up.  I have no idea.

11       Q.   Who were the beneficiaries of that trust?

12       A.   I don't know.  I could guess.

13       Q.   When you --

14       ATTORNEY MACHLEIDT:  Strike that.

15   BY ATTORNEY MACHLEIDT:

16       Q.   Did you receive at least one paycheck

17   during the time that you worked --

18       A.   Every paycheck was from Rothschild Trust.

19       Q.   You covered three questions ahead of me.

20       A.   Huh.

21       Q.   To make it clean, if you don't mind.

22       A.   Go ahead.

23       Q.   When you received a paycheck while you        Valve Corporation        Affirmative

24   were working for Mr. Rothschild, what entity gave

25   you that paycheck?

Page 68

1          A.   Rothschild Trust Holdings.

2          Q.   What connection, if any, was there between

3     Rothschild Trust Holdings and, for example, RBDS?

4          A.   Once again, that is a question I asked

5     frequently of Mr. Rothschild and never could get a

6     straight answer.

7          Q.   Did you and Mr. Rothschild, outside the

8     presence and excluding Mr. Feingold, ever discuss

9     settlement offers to be made to defendants involved

10    in lawsuits with Mr. Rothschild's LLCs?

11         A.   Yes.

12         Q.   Did you ever discuss the amounts of, for

13    example, opening settlement offers to be made?

14         A.   Every one of those decisions were solely

15    and completely Leigh Rothschild's.  We often talked

16    about it, but his decisions were very clear and

17    completely his own.

18         Q.   In terms of the amount of money to offer a

19    defendant in terms of an opening settlement offer,

20    who were all the people who made that decision?

21         A.   It was a process.  If we were working with

22    Mavexar, they would give us their input.  If we were

23    working with Shore Chan or any of the attorneys we

24    were working with, they would give their opinion.

25    But Leigh would make the decision.  And he would

Kazanjian, Constance Deposition                                      September 12, 2025

Page 69

1    often disagree, but he would make the decision.

2         Q.   The disagreements that you recall with

3    respect to numbers proposed by others, did

4    Mr. Rothschild want the number to be bigger or

5    smaller?

6         A.   Bigger.

7         Q.   The Valve lawsuit that was filed while you

8    were still working with Mr. Rothschild, what role,

9    if any, did Mavexar have in this case?

10        A.   I don't know that they were involved with

11   that case.  I don't really remember specifically

12   which ones were with Mavexar and when we were not

13   working with them.

14        Q.   Did Mr. Rothschild ever seek your input on

15   what amount of money to offer to settle a case?

16        A.   No, these were all his decisions.

**Valve Corporation**                          Affirmative

17        Q.   Do you have any recollection on what, if

18   any, amount of money was paid by Valve to settle the

19   lawsuit?

20        A.   No.

21        Q.   Earlier, you and I discussed the acronym

22   NPE.  Do you remember that?

23        A.   I do.

24        Q.   Are you also familiar with the term patent

25   troll?

**Valve Corporation**                          Affirmative

Kazanjian, Constance Deposition                                              September 12, 2025

Page **70**

1        A.   Yes.

2        Q.   Did you ever have discussions with

3    Mr. Rothschild that involved in any way, shape, or

4    form patent troll?

5        A.   Absolutely.  He was very proud of it.

6        Q.   Please tell me with respect to discussions

7    you had with Mr. Rothschild and specifically where

8    you recall discussing the term patent troll; what do

9    you mean he was proud of it?

10       A.   He smiled.  He loved it.  He was very

11   proud of what he was doing.  Very proud and very

12   happy.  And he was making a lot of money.  He was

13   doing -- he was happy.

14       Q.   What were Mr. Rothschild's --

15            ATTORNEY MACHLEIDT:  Strike that.

16   BY ATTORNEY MACHLEIDT:

Valve Corporation                                    Affirmative

17       Q.   Understanding things were going well

18   financially, what did Mr. Rothschild tell you about

19   that label in general or applied to himself, namely,

20   patent troll?

21       A.   It was self-explanatory in the context

22   that it was being used.  He had lots of litigation

23   going on at that point and he was making big

24   settlement money from all of the litigation.  So I

25   think he felt like he earned the title.

Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                          September 12, 2025

Page 71

1        Q.    You mean Mr. Rothschild felt that he

2   earned the title of patent troll?

3        A.    I think he did.  He enjoyed it.

4        Q.    Did Mr. Rothschild ever tell you that it

5   was defamatory or slanderous for somebody else to

6   label him a patent troll?

7        A.    Never.  Never in my presence did he say

8   that.

9        Q.    Would you look at Paragraph 60 of the

10  Exhibit 80 complaint and let me know when you've had

11  a chance to look at it?

12                       (Pause.)

13       A.    Yes.

14       Q.    There's a reference here to designing and

15  implementing one of the largest patent assertion

16  companies in the United States.

17       A.    Yes.

18       Q.    Do you see that?

19       A.    Yes.

20       Q.    What do you mean in this paragraph by that

21  statement?

22       A.    I was responsible for building the

23  relationship with law firms that would be willing to

24  take this on a contingency basis.  And as you know,

25  an attorney is going to be very careful before they

Kazanjian, Constance Deposition                                                                September 12, 2025

Page 72

1    sign on their human capital to do a lawsuit of the

2    magnitude of an assertion program.  So I built good

3    relationships with the attorneys we were working

4    with.  We were -- at that point, we were not using

5    Mavexar.  We had moved on from paying them to handle

6    that, and I was the liaison between Leigh Rothschild

7    and the firm.  So that program allowed him to

8    continue inventing.  That was his passion, that was

9    his life, so that's why we worked well together for

10   a while.

11        Q.   When you refer in this paragraph to the

12   largest patent assertion companies in the United

13   States, is it fair to say that you mean collectively

14   between all the LLCs?

15        A.   Yes.

16        Q.   The firms, what have you, it's a

17   collective entity?

18        A.   Absolutely.  And during the time that I

19   was with him, went from 30 patents to over 100.

20        Q.   At any point during the time that you          **Valve Corporation**        Affirmative

21   worked with Mr. Rothschild, did you learn about his

22   approximate annual compensation?

23        A.   I knew what the settlements were and I

24   knew what I was paid.  It didn't take -- it wasn't a

25   rocket scientist to figure out that he was making a

CONFIDENTIAL                                                                    Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                          September 12, 2025

Page 73

1    lot of money and I was making a little bit of money.

2        Q.   Was Mr. Rothschild's compensation based,

3    of course, in terms of your knowledge, based on

4    settlement monies, was it consistent year over year

5    or did it vary?

6        A.   It built as we moved forward.  It built.

7    I mean, because, at the beginning, he wasn't sure --

8    you know, he tried -- he was trying to sell patents,

9    he was trying to start -- do the capital raise.

10   There was a lot of diversions.  And when all of

11   those other approaches failed, that's when it really

12   started to go.

13       Q.   What was the largest net compensation from

14   pending cases for Mr. Rothschild personally that you

15   have personal knowledge of?

16       A.   I can't tell you that.  It's so long ago.

17   I don't remember.

18       Q.   Would potentially looking at Paragraph 65

19   in this complaint refresh your recollection?

20       A.   It might.

21                  (Pause.)

22       A.   That is actually accurate, but that was

23   collective.  It wasn't one big settlement.  Yeah,

24   that's actually accurate.  Very accurate.

25       Q.   Having looked at your complaint, and in

CONFIDENTIAL                                    Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                                September 12, 2025

Page  74

1    particular, Exhibit 65, do you have a refreshed

2    recollection about Mr. Rothschild's annual

3    compensation while you worked with him?

4        A.   It was -- that was a typical year and it

5    was consistent.  Some years it was more, but minimum

6    a million.

Valve Corporation                                              Affirmative

7        Q.   And when you say, minimum a million --

8        A.   Uh-huh.

9        Q.   -- do you mean that Mr. Rothschild,

10   personally, after company expenses and contingencies

11   paid to lawyers and all of that stuff, that he was

12   consistently taking home about a million dollars per

13   year?

14       A.   Yes, he was.

15       Q.   Comparatively, what were you taking home

16   per year?

17       A.   $80,000 was a big year for me.

18       Q.   What, if anything, did Mr. Rothschild ever

19   tell you about the discrepancy in those two numbers?

20       A.   These were his assets; he spent a lot of

21   money accumulating these patents and maintaining

22   them; and that if we were doing business with other

23   inventors, that would be -- I would get a higher

24   percentage and I would be building a stake in that

25   entity, which we were heading towards doing.

Kazanjian, Constance Deposition

September 12, 2025

Page 75

```
 1        Q.   You mentioned you were heading towards

 2   doing that --

 3        A.   Uh-huh.

 4        Q.    -- while you worked for or with

 5   Mr. Rothschild.

 6        A.   Yes.

 7        Q.   Did that ever come to pass?

 8        A.   No, it never did.  Shockingly.  But we did

 9   represent other inventors, and he always had a

10   reason why I was not eligible for the compensation

11   he promised.

12        Q.   When there was, for instance, a settlement

13   for a case that was brought by Display Technologies

14   as the plaintiff, how much money percentage wise or

15   approximately was kept from the settlement amount in

16   the plaintiff bank account?

17        A.   No.

18        Q.   How do you know that to be the case?

19        A.   Because there were no bank accounts.

20   There was no money going to the plaintiff.  It was

21   all going to Rothschild Trust Holdings.

22        Q.   Around the time when you were working with

23   Mr. Rothschild, you were not aware of any bank

24   accounts in the name of any of the plaintiff LLCs?

25        A.    None.
```

Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                                                      September 12, 2025

Page 76

1        Q.    Did any law firm that you reached out to

2     with respect to asserting Mr. Rothschild's patents,

3     did any law firm ever say no?

4        A.    Let me think.  They never said no to Leigh

5     Rothschild directly, but when I approached different

6     firms and said this is, you know, this is a case,

7     would you consider it, I really can't even remember

8     anybody saying no.  I can't recall anybody.

9        Q.    Please take a look at Paragraph 72.  And

10    as always, read it to yourself.  Let me know when

11    you're finished.

12                      (Pause.)

13        A.    That is true.

14        Q.    Because I will be asking you a couple of          Valve Corporation                Affirmative

15    questions, if you don't mind, please read Paragraph

16    72 out loud and be mindful that -- don't speak too

17    fast because then it gets tough to type it all down.

18        A.    I will do.  Do you want me to read it?

19        Q.    Please.

20        A.    "Rothschild transfers each patent to a

21    specific corporation from those listed above," which

22    are the plaintiffs in all the other cases.

23    "Kazanjian created all the listed corporations for

24    the exclusive purpose of using the corporation to

25    assert Rothschild's patents in court.  However, when

Page 77

1   settlement monies are received, they do not flow to

2   the corporation named as a plaintiff in the suit.

3   Instead, the money is transferred to defendant

4   Rothschild Trust Holdings LLC where it fraudulently

5   converted for Rothschild's personal use in order to

6   defraud creditors and Kazanjian from monies that

7   were due and owing."

8        And I think it's fair for me to add, he

9   loved the -- he took great pride in being judgment

10  proof.

11       Q.   How do you know that Mr. Rothschild took

12  great pride in being judgment proof?

13       A.   He said it often.

14       Q.   What specifically do you recall

15  Mr. Rothschild saying about being judgment proof?

16       A.   It was in context of past partners he had

17  had, past situations he had had.  During the time

18  that I was working with him, everything was done

19  appropriately and there were no judgments on any of

20  the litigation I was part of that anybody got a

21  judgment against him.

22       ATTORNEY MACHLEIDT:  I hate to do this,

23  but because I don't want to tread too much new

24  ground, could you read the last two questions

25  and the last two answers.

Page 78

1          (Record read back by the Court Reporter.)

2     BY ATTORNEY MACHLEIDT:

3          Q.   When you say everything was done

4     appropriately while you were working with

5     Mr. Rothschild, what specifically do you mean by

6     that?

7          A.   There were no -- there was no lawsuits

8     filed by any of the settlements, the parties that --

9     the defendants.  Settlements were made, payments

10    were made, and there was no reason to have anything

11    else to do with prior defendants.  We never had a

12    problem.

13         Q.   When, if ever, do you recall                Valve Corporation          Affirmative

14    Mr. Rothschild telling you that he was judgment

15    proof with respect to defendants that he had settled

16    with?

17         A.   He was talking about a prior partner in --

18    I don't even know what the company was or what the

19    situation was.  But the partner had come forward and

20    had a meeting with him and he was relaying to me the

21    meeting.  And I don't even -- I didn't pay attention

22    to who these people were, but he smiled and he said

23    I wish him good luck.  I am -- bring it on; I am a

24    litigator; I will bring it; I will take care of it;

25    I will do it; it's not a problem; I'm expert at

Kazanjian, Constance Deposition                                          September 12, 2025

Page 79

1    being judgment proof.

2         Q.   What do you understand judgment proof to

3    mean?

4         A.   Just that.  Hiding -- I don't know what he

5    does.  I can't tell you if he hid assets.  I can't

6    tell you.  I was not involved in his financial

7    arrangements.

8         Q.   In this Paragraph 72, are the words in

9    this paragraph your words?

10        A.   Yes.

11        Q.   At the end of this Paragraph 72, there's a

12   reference to defrauding creditors.  Do you see that?

13        A.   Yes.

14        Q.   What specifically did you mean by accusing

15   Mr. Rothschild of defrauding creditors?

16        A.   I can specifically tell you one instance

17   that led me to say that.

18             When I first started working with Leigh,

19   he was renovating a townhouse he had just bought at

20   Quayside and the townhouse needed a contractor and

21   permitting and everything and so I assisted with

22   that project.  I kind of over -- I took over the

23   project and assisted with it.

24             What I found was Leigh kept making changes

25   in the scope of work and it delayed the project.

Page  80

1    But the contractor, in his contract, had a clause

2    that said if he did not finish the work by a

3    specific date, every day he would get a per diem

4    owed to Leigh for not completing the job.  What the

5    contractor didn't do -- and none of this I was aware

6    of while I was working with him, but I found out

7    after the project was completed.  The contractor had

8    failed to document the change orders and he had to

9    pay Leigh the per diem.  And I felt so sorry for the

10   contractor, because everything was -- it was not his

11   doing, it was Leigh making change orders, but the

12   poor man didn't do it.

13           And so when I said to Leigh, said, you

14   know, all of this was done because we changed this,

15   we did that, I specifically said because I felt it

16   was an injustice to the contractor.  And that's when

17   Leigh and I had that conversation.

18       Q.   Did you and Mr. Rothschild ever have any

19   discussions about the potential for one of the

20   defendants in these patent law suits counterclaiming

21   or seeking its attorney fees or, frankly, becoming

22   the aggressor and trying to get money from

23   Mr. Rothschild?

24       A.   Early on, we didn't have any problems.  As

25   it was getting to 2015 and into -- well, 2015, there

Valve Corporation                                                    Affirmative

Kazanjian, Constance Deposition

September 12, 2025

Page 81

1    was pushback and there were people -- and I don't

2    remember specifically, because I didn't get involved

3    on that side of it.  He and the attorneys all

4    handled that.  But I did see some pushback from

5    defendants.  And so that was -- you know, I think he

6    had built such a reputation up that people were

7    pushing back.  But I didn't have any interaction

8    with any of them.

9        Q.   What do you mean by pushing back?

10       A.   I think his reputation as a patent troll

11   and an NPE all started -- you know, he was getting a

12   lot of notoriety and I think when he started filing

13   these lawsuits, after all of that had come to light,

14   I think people started to kind of say wait a minute,

15   let me fight this more.  That's my guess, but we

16   never discussed it.

17       Q.   Take a look at Paragraph 112.

18                    (Pause.)

19       A.   Yes.

20       Q.   What, if anything, did you learn while

21   working for Mr. Rothschild in terms of his use of or

22   conversion of settlement monies for his own personal

23   use?

24       A.   He had a nice lifestyle and he spent money

25   freely.

CONFIDENTIAL

Kazanjian, Constance Deposition                                                                          September 12, 2025

**Page 82**

1          Q.   While you worked with Mr. Rothschild,

2     before things went south --

3          A.   Uh-huh.

4          Q.   -- approximately how often would the two

5     of you communicate in any way, email, phone call,

6     what have you?

7          A.   He was my friend.  I trusted him.  I loved

8     his children.  He relied on me to help him.  He

9     called me constantly.  There wasn't a dinner with my

10     family that I didn't have to take a call from Leigh

11     because he needed help with one of his children.  He

12     needed certificates made for a class, whatever it

13     was.  I was his friend and, in that capacity, I did

14     a lot of family things with him.  And he was always

15     at every family event I had.

16               So we were close.  We were friends.  It

17     was very hurtful to me that all the promises that,

18     out of friendship, didn't come to pass.  So I talked

19     to him constantly.

20          Q.   During any conversation only with you and

21     Mr. Rothschild, did he ever mention that using the

22     plaintiff LLC structure protected his personal

23     assets?

24          A.   I had to wonder that, because that seemed

25     to me why his name -- he was vain enough that he

Kilpatrick Townsend & Stockton LLP

Page 83

1    wanted Rothschild in the name of the plaintiffs, but

2    not enough to use his own name.  And the fact that

3    he -- the way he structured everything, I started to

4    seriously wonder.

5            I mean, at the beginning, it was he's my

6    friend; I trust what he's doing; I know his

7    accountant and, you know.  But then, as things

8    started to develop and every time I was supposed to

9    get something, he had a reason why I didn't get it,

10   I started to question the structure and how it was

11   set up.  And yes, I do -- I have to say, I did

12   wonder that.

13        Q.   The name Rothschild Broadcast Distribution

14   Systems, who picked that name?

15        A.   Leigh did.  Mr. Rothschild did.

16        Q.   To the extent you know, why did he pick

17   that name?

18        A.   I don't know.  It's all part of his

19   persona.

20        Q.   He wanted his name in that company's name?

21        A.   Yeah, yeah.

22        Q.   During the time that you worked with

23   Mr. Rothschild and lawsuits were being filed on

24   behalf of his plaintiff LLCs, what was the most

25   common venue for the lawsuits?

Kazanjian, Constance Deposition                                                    September 12, 2025

Page 84

1          A.    Texas.

2          Q.    Limiting an answer to yes or no or you

3    don't know, do you know why Texas was the most

4    common venue for the lawsuits?

5          A.    I think it started with Mavexar.  They

6    recommended it, if I remember correctly, and at that

7    time, Texas was working very hard to establish

8    themselves in this arena.

9                So it was the Mavexar people.  Lillian

10   Wong, I believe, was the one that first suggested

11   it.  And Leigh and I had no experience in this.  So

12   we listened to her and she did a very good job for

13   Leigh.

14         Q.    What do you mean that she did a very good

15   job for him?

16         A.    She did a good job in setting up those

17   lawsuits and introducing Mr. Rothschild to the

18   attorneys that we were using at that time.  And she

19   knew what she was doing.  She worked with Eric

20   Spangenberg, I think, at that time.  Eric -- I think

21   that's his name -- was doing some litigation in this

22   area way back in 2011 or '12 and he had a good

23   reputation as well.  So Leigh found Mavexar through

24   Spangenberg, I think.  I'm not sure how that

25   happened.

Page 85

| | | Valve Corporation | Affirmative |

1     Q.   During the time that you worked with

2     Mr. Rothschild, were there any lawsuits filed on

3     behalf of one of his plaintiff LLCs where the

4     defendant refused to settle and simply said we're

5     going to litigate?

6         A.   Oh, yes, there were.  Yes.

7         Q.   What was Mr. Rothschild's approach to

8     dealing with those types of defendants who would not

9     settle?

10        A.   Bring it on.  Those were his words.  I

11    litigate for -- I'm a litigator.  I'm not afraid of

12    lawsuits.

13        Q.   While you worked for Mr. Rothschild --

14            ATTORNEY MACHLEIDT:  Well, strike that.

15    BY ATTORNEY MACHLEIDT:

16        Q.   For the types of cases where he says bring

17    it on, do you have at least one case, actual example

18    in your mind where the defendant said we won't

19    settle and Mr. Rothschild said bring it on?

20        A.   Several times.  It wasn't just one.  That

21    was his -- that was the model he followed and the

22    attorneys that were representing him knew that.  He

23    wouldn't back down.

| | | Valve Corporation | Affirmative |

24        Q.   Understanding Mr. Rothschild would not

25    back down and knowing some defendants would not pay,

Page 86

1    the couple of cases that you have in your mind, how

2    were they resolved?

3        A.   They eventually settled.  He was right.

4        Q.   Did any defendant ever convince

5    Mr. Rothschild that the infringement allegations

6    made by, you know, Display Technologies, by, you

7    know, any of his LLCs, that they were simply wrong?

8        A.   No, he knew he was right and he was -- he

9    felt he was right and he was going to stand behind

10   his allegation.

11           But now, I have to say, as things started

12   to unwind in our relationship and in 2015 he was --

13   I was no longer in his confidence, so that's when

14   things were happening that I wasn't part of.  And I

15   did see, you know, things that -- there was more

16   pushback or resistance by the defendant.  So I

17   wasn't part of those discussions.

18       Q.   I'm not prying into personal details, so

19   if you don't want to answer, certainly don't answer.

20   Okay?

21       A.   Uh-huh.

22       Q.   Does that work for you?

23       A.   Yes.

24       Q.   Are you paying your lawyer today on an

25   hourly basis?

**Page 87**

1       A.   Yes.

2       Q.   What is your understanding about the

3   general fee structure for a defense side litigation?

4       A.   Are we talking Leigh Rothschild's model?

5   Fees were contingent.

6       Q.   We're close.  I understand Mr. Rothschild    **Valve Corporation**                      Affirmative

7   with his plaintiff LLCs would hire lawyers on

8   contingency.

9       A.   Yes.

10      Q.   What, if anything, do you know about how

11  the defendants --

12      A.   Oh, they paid fee structure.  They had to

13  pay for the litigation that they were in the middle

14  of.

15      Q.   What do you mean they had to pay?

16      A.   Well, very few -- okay.  Leigh could hire

17  an attorney -- or anybody on an assertion program

18  like this, you hire an attorney on a fee basis and

19  there's a percentage of the settlement and that's

20  how your fee gets paid.

21          If you're a defendant or you're in a

22  deposition like I am, there's no way John Agnetti is

23  going to do this on contingency.  I have no gain

24  here.  So it's a pretty simple model.  If you're

25  being sued and you have to defend yourself, you're

**Page 88**

1    going to pay on an hourly basis.

2        Q.   Setting aside anything discussed or

3    stemming from Mr. Feingold and, obviously, to the

4    extent you know, what connection was there between

5    the initial settlement offers that were made to

6    resolve the lawsuits brought by the Rothschild

7    plaintiff LLCs and, for instance, the knowledge that

8    the defendants were likely paying on an hourly

9    basis?

10       A.   None.  I mean, I don't understand.  The

11   settlement agreement had nothing to do with what

12   they paid their attorneys.

13       Q.   Do you have an idea --

14           ATTORNEY MACHLEIDT:  Well, strike that.

15   BY ATTORNEY MACHLEIDT:

16       Q.   While you worked with Mr. Rothschild, did

17   any cases that you were involved in, did they go to

18   trial?

19       A.   Let me think.  Not during the initial

20   phase of the work we were doing together.

21           After 2015, I'm not sure.  Possibly.  I

22   don't remember that, though.  I don't think so.

23       Q.   Do you have a sense -- and if so, I'll dig

24   into where it comes from -- but do you have a sense

25   of how much it would cost to defend, for example, a

Valve Corporation                                    Affirmative

Kazanjian, Constance Deposition

September 12, 2025

Page 89

1   single patent infringement case from start of the

2   lawsuit until the end of trial?

3           ATTORNEY VAZQUEZ:  Objection.  Calls for

4   speculation.

5       A.   It would depend on how long the process

6   took, how many hours, billable hours the firm had.

7   It could be a big number.  And I think his model was

8   simply ask for a number that's below that threshold.

9   That makes it worthwhile to go to court.  Meaning,

10   ask for something that is a small enough number that

11   it's better to settle than to go to trial.

12       Q.   While you worked --

13           ATTORNEY MACHLEIDT:  Strike that.

14   BY ATTORNEY MACHLEIDT:

15       Q.   This is going to sound repetitive, but --

16       A.   It's okay.

17       Q.   -- there are always things that we lawyers

18   do that are repetitive.  Does that work for you?

19       A.   Absolutely.

20       Q.   While you worked with Mr. Rothschild --

21   and I'm going to ask you to just say yes, no, or you

22   don't know.

23       A.   Uh-huh.

24       Q.   Did you ever come to learn what

25   Mr. Rothschild's settlement model was in terms of

Valve Corporation                              Affirmative

Page 90

1  how the settlement number has to relate to how much

2  it's going to cost the defendant to pay to defend?

3      A.  We never discussed it, but it was my

4  speculation.

5      Q.  You mentioned in your prior answer that --

6  and again, if I say anything wrong, correct me.

7      A.  Uh-huh.

8      Q.  But the, you know, the number that the

9  plaintiff would offer to settle a case had to be

10 below the threshold; correct?

11     A.  That was -- I watched him as he was

12 processing the response to a settlement offer or,

13 you know, request for an offer to settle and I

14 watched how his mind was working.  And his

15 conversations were talking out loud.  You know,

16 what's it worth -- at what point is it not worth it

17 to settle and to go forward?  And he said little

18 things that led me to believe that was the way his

19 thought process was going.

20     Q.  Specific to picking a settlement number,

21 what do you recall hearing Mr. Rothschild say about

22 how that number should relate to the potential

23 defense costs of litigating a case?

24     A.  I think it depended on where we were in

25 the case.  If we were early on, it was one number.

Kazanjian, Constance Deposition                                                                September 12, 2025

Page 91

1    And as we got deeper into litigation and he -- you

2    know, resistance, he seemed to -- it was a

3    calculation.  He looked like he was making

4    calculations on at what point would this push this

5    to the point of going into litigation in court

6    versus a settlement.

7           He was a very calculating man.  He walked

8    all of the -- you know, he was constantly -- it's

9    like playing chess.  He was constantly pushing and

10   moving and thinking and he had a very strategic mind

11   and he looked at things as -- in that light.

12          ATTORNEY VAZQUEZ:  I'm going to object

13       here based on hearsay and speculation.  Calls

14       for speculation.

15          Go ahead.

16   BY ATTORNEY MACHLEIDT:

17       Q.   Everything that you said in your prior

18   answer, the stuff that you say you heard, who did

19   you hear it from?

20       A.   From Leigh.  I was on many phone calls

21   with him where he's talking about, you know,

22   settlement agreements and things with the attorneys

23   that were representing him.  So it wasn't -- I'm not

24   repeating what the attorneys said, but I am telling

25   you the guidance they were getting from Leigh.

Kazanjian, Constance Deposition                                    September 12, 2025

**Page 92**

1    Q.   Did Mr. Rothschild want to give settlement

2    offers --

3         ATTORNEY ZITO:  I'm sorry.  Let me go

4    ahead and object just so we're reserving them.

5    Then we would instruct not to answer and

6    actually strike.  If all that was from

7    conversations between Leigh and his counsel

8    that you were privy to, which you didn't

9    indicate earlier, so I didn't make the

10   objection earlier.  That's all privileged.  So

11   I apologize for having to go backwards, but you

12   should have mentioned in the beginning that

13   this was conversations with lawyers.

14        ATTORNEY MACHLEIDT:  We oppose -- don't

15   tell the witness what she should or should not

16   do.

17        ATTORNEY AGNETTI:  For the record, I mean,

18   I believe that the privilege has been waived

19   since the question was answered, but it's up to

20   the judge to make that decision.

21        ATTORNEY ZITO:  No, hold on.  Whoa, whoa,

22   whoa.  The privilege cannot be waived if we

23   were not aware that she was talking about

24   conversations with -- that included lawyers.

25        Soon as she made that comment, that's when

Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                                    September 12, 2025

**Page 93**

1   I made and invoked the privilege.  It has not

2   been waived.  You cannot now go depose

3   Mr. Fitzgerald because this witness has waived

4   our privilege with attorney communications.

5   That's not correct.  We are not allowing that.

6   And we are instructing, please stop answering

7   these questions if they're based upon

8   conversations that included attorneys, whether

9   it's Mr. Fitzgerald, outside counsel, or

10  otherwise.

11      ATTORNEY AGNETTI:  Just for the record, my

12  client is not being represented by you; my

13  client is being represented by me.

14      ATTORNEY ZITO:  I agree.

15      ATTORNEY AGNETTI:  And I take great

16  abridge to the suggestion that you're

17  instructing my client on how to answer

18  questions.

19      So if you have an objection, raise it.  If

20  you raise it timely and you're raising

21  privilege, as I told you earlier, I will

22  respect that and instruct her not to answer

23  until the judge tells me otherwise.

24      ATTORNEY ZITO:  I was not instructing your

25  client.  Pardon me if I phrased that

Kazanjian, Constance Deposition                                    September 12, 2025

**Page 94**

1        incorrectly.  I was going by your earlier

2        conversation that you wanted me to raise the

3        privilege and make that as an instruction, not

4        simply an objection.  I apologize if I

5        misphrased it.

6              ATTORNEY AGNETTI:  Sure enough.

7              ATTORNEY MACHLEIDT:  We oppose and we'll

8        move on.

9    BY ATTORNEY MACHLEIDT:

10        Q.   Setting aside -- and I think defense

11   counsel said Fitzgerald.  I assume he meant Fein?

12        A.   Feingold.

13        Q.   Feingold.  I want to make sure that my

14   attorney tracker is correct.

15        A.   Well, there were also conversations that

16   Leigh had, many, without anybody, just conversations

17   with me, that were exactly the same as that.  I

18   repeated.

19              So it's confusing on who was on the call

20   when Leigh and I were having -- he called me all the

21   time.  There was -- my phone was on buzzing

22   constantly with Leigh.  So he'd think out loud.

23   He'd -- you know, this was not just a conversation

24   with a set of attorneys, this was conversation that

25   Leigh and I had on a regular basis.

Kazanjian, Constance Deposition                                                September 12, 2025

Page 95

1       Q.   I appreciate that.

2            Trying to set aside any phone calls where

3    a lawyer was in the room, on the phone, anything

4    said that you even suspect came from or originated

5    from Mr. Feingold, is it fair to say that you recall

6    Mr. Rothschild saying that it was important for

7    settlement offers to be below the cost a defendant

8    had to pay to litigate a case?

9       A.   Yes.  And to be --

10           ATTORNEY VAZQUEZ:  Objection.  Hearsay.

11      A.   To be clear, Robert Feingold.

12           ATTORNEY AGNETTI:  Don't say anything

13      about Robert Feingold.

14           THE WITNESS:  No, no.  I'm just --

15      A.   His role was contract production.  He was

16   his attorney for settlement agreement -- and not

17   even that, because the attorneys handling the case

18   would do the settlement agreements, but Mr. Feingold

19   was a contract specialist.  And so many of the

20   conversations that Robert had with Mr. Rothschild

21   was about contracts.  Most -- was very seldom

22   involved with settlement conversations.

23      Q.   I appreciate that.  Nevertheless, I think

24   to keep the peace as much as possible --

25      A.   Absolutely.

Kazanjian, Constance Deposition                                        September 12, 2025

Page 96

1      Q.    -- yes, if an answer you think involves in

2    any way a lawyer or Mr. Feingold, certainly --

3      A.    I'll be very careful.

4      Q.    Well, not only that.  Feel free to say it

5    up front.  Mr. Zito can say what he wants.

6      A.    Okay.

7      Q.    I'm sure he and I will disagree, but I

8    will be ultraconservative on that point.

9      A.    Okay.

10           ATTORNEY AGNETTI:  So if you say

11      Mr. Feingold was involved in this conversation,

12      how do you want me to handle it?

13           THE WITNESS:  Yeah.

14           ATTORNEY AGNETTI:  Okay?

15           THE WITNESS:  That's fine.  Yeah.

16    BY ATTORNEY MACHLEIDT:

17      Q.    Did you mention earlier that, to the best

18    of your recollection, no defendant was ever able to

19    convince Mr. Rothschild that the defendant actually

20    was not infringing some patent of his?

21      A.    No.

22      Q.    We might have had a double negative so I'm

23    going to try again.

24      A.    Yes.

25      Q.    Did a defendant --

Kazanjian, Constance Deposition                                                    September 12, 2025

**Page 97**

1          A.   Yes.

2          Q.   -- to the best of your --

3               Did a defendant, to the best of your

4     recollection, ever manage to convince Mr. Rothschild

5     that the defendant actually was not infringing a

6     patent of Mr. Rothschild's?

7          A.   Oh.  Yes.  There were occasions, yes.

8     There definitely were.

9          Q.   How did a defendant convince

10    Mr. Rothschild that there was no infringement?

11         A.   I don't know that the defendant did, but

12    the attorney, the law firm representing him did.

13         Q.   The law firm representing the defendant

14    did?

15         A.   The plaintiff.

16         Q.   Oh.

17              ATTORNEY VAZQUEZ:  I'm going to object.

18              ATTORNEY ZITO:  Objection.  Yeah,

19         privilege.  Please do not answer.

20              THE WITNESS:  Okay.

21    BY ATTORNEY MACHLEIDT:

22         Q.   In terms of settlement offers -- and

23    again, I'll just -- all the lawyer stuff, put it to

24    the side.  If your answer in any way involves

25    lawyers, just say so and I'll move on.

Kazanjian, Constance Deposition                                    September 12, 2025

Page 98

1        A.    Okay.

2        Q.    Does that work for you?

3        A.    Absolutely.

4        Q.    Did you and Mr. Rothschild ever discuss

5   settlement offers to be made by a Rothschild

6   plaintiff where the amount of money to be offered

7   had some connection to the extent of the

8   infringement?

9        A.    Yes.

10       Q.    Please tell me what you recall about those

11   discussions.

12       A.    Leigh had a group of people that he used

13   in India to do the claim charting, to determine the

14   extent of the infringement.  They did -- before a

15   lawsuit was even considered, they would do that.

16   And in that -- in those claim charts were the, you

17   know, the presumed infringement, the amount of it.

18            Did they go to the royalty?  The royalty

19   component to the claim chart was always looked at

20   very carefully.  And so, before a lawsuit was even

21   filed, Mr. Rothschild had already done that due

22   diligence.

23       Q.    What do you mean by royalty component of a

24   claim chart?

25       A.    Well, in order to understand the

Kazanjian, Constance Deposition                                                September 12, 2025

Page 99

1    infringement, you have to analyze what the amount of

2    the infringement is.  And you can only speculate

3    before you start your lawsuit and start doing, you

4    know, the investigative part of it in a lawsuit.

5    You get -- the claim charting helps you understand

6    what the infringement is, and to the extent of the

7    amount of infringement, what the defendant -- what

8    portion of their income is related to the amount of

9    input from the patents that Leigh Rothschild owned.

10         Q.   Did Mr. Rothschild have a, while you

11   worked with him, a standard opening settlement

12   offer?

13         A.   No, no standard.

14         Q.   While you worked with Mr. Rothschild, were

15   you ever privy -- were you ever made aware of the

16   annual gross revenue obtained by all of the

17   settlements in a given year?

18         A.   I was able to -- yes, I knew every

19   settlement that -- every settlement I saw, I knew

20   the amount of the settlement and it didn't take me

21   long to figure out how much money he was making.

22              And then on the settlement, based on our

23   agreement, he would give me a recap of what he --

24   what the total settlement was and then what I got.

25   So I got those sheets from him.  Oftentimes, they

CONFIDENTIAL                                          Kilpatrick Townsend & Stockton LLP

Kazanjian, Constance Deposition                                                                September 12, 2025

Page **100**

1    were -- the math was wrong, the calculations were

2    off.  I mean, I had a lot of that, but yes.

3        Q.   What was the largest figure in terms of

4    gross revenue that you recall in a given year in

5    terms of money earned through settlements by all of

6    the Rothschild plaintiffs in that year?

7        A.   It was always --

8             ATTORNEY VAZQUEZ:  Objection.

9        A.   -- over a million.  Over a million in

10   annual income to him.

11       Q.   Ex -- not excluding, but in terms of gross

12   revenue, including the contingencies paid to the

13   lawyers and any overhead, to the extent there was

14   any, do you have any recollection in your mind of

15   the greatest -- the biggest gross revenue number

16   while you worked with Mr. Rothschild?

17       A.   Oh, I can't remember.  It was always over

18   a million.  And as far as expenses, he deducted the

19   expenses from my side.  So that's where our

20   relationship started to really break down is that's

21   where I started to push back myself and say this is

22   not an equitable -- this isn't what we discussed.

23   And he kept changing my agreement to include the

24   payment to his house manager, payment to his nanny,

25   all of those things he wanted to take out of my

**Valve Corporation**                                                    Affirmative

**Valve Corporation**                                                    Affirmative

CONFIDENTIAL                                                    Kilpatrick Townsend & Stockton LLP

Page 101

1    agreement.

2        Q.   I'm going to ask my next series of

3    questions, hopefully, in a way that gets us in and

4    out a little bit quickly, but before that, do you

5    need a break?

6        A.   No.

7        Q.   Are you doing okay?

8        A.   Fine.

9        Q.   We're looking at the complaint that you

10   filed against Mr. Rothschild --

11       A.   Uh-huh.

12       Q.   -- and several of his companies.

13            What difficulties, if any, did you or your

14   representatives have when trying to serve the

15   summons and complaint on Mr. Rothschild?

16       A.   It was almost comical.  It was impossible.

17   He avoided service better than anybody I've ever

18   witnessed.  He is a masterful -- he's masterful.

19   And even when -- and we literally staked out his

20   apartment, his townhouse.  We had people in the

21   bushes, in the parking garage.

22            When he finally got to his park -- when he

23   finally was served, Leigh refused to take it and the

24   server had to leave it on the hood of his car

25   because he refused to touch it.  That's how insane

Kazanjian, Constance Deposition                                    September 12, 2025

Page 102

1    it got.  And it cost me a lot of money to do that.

2    So anything he can do to avoid, he will do it.

3        Q.   Are you aware personally, so not that you

4    heard it through other people, but are you aware

5    personally of other instances when Mr. Rothschild

6    actively avoided being served?

7        A.   He used to tell stories.  I mean, when I

8    tell you when I -- when I would -- when we were

9    talking and he would -- somebody would approach him

10   and something happened and he was trying to explain

11   who this person was and why he was so angry, he was

12   a former partner.

13            People have said to me why did you think

14   you'd be any different?  Good question.  But I

15   believed in him.  He was a friend for, you know, 18,

16   17 years.  It was hard to believe that, as much as I

17   did for his family, as much as he was part of my

18   family, that he would do this.  But he took great

19   pride in it so I really should have known better.

20            Yes, he has -- this is a game to him.  He

21   will do everything to avoid what his -- the

22   consequences.  He will do everything.

23       Q.   Is avoiding service one of the ways that

24   he attempts to be judgment proof?

25       A.   I don't know how -- I don't know how you

Kilpatrick Townsend & Stockton LLP

Page 103

1    become judgment proof, but he actually -- that was

2    his word.  I've never known anybody who was judgment

3    proof except Leigh Rothschild.  Or claimed to be.

4         ATTORNEY MACHLEIDT:  Why don't we go off

5    the record for, say, three or five minutes.  I

6    want to set up the next series of exhibits.

7    I'll email them to defense counsel.  We'll put

8    them in front of you.  And we're on the

9    downward slope to me being done.

10        THE WITNESS:  Thank you.

11        ATTORNEY MACHLEIDT:  You're welcome.

12        THE VIDEOGRAPHER:  Okay.  Going off the

13   record.  The time is 1:14 p.m.

14             (Recess.)

15   (Documents Bates stamped VALVE_00006043 - 6057

16   is received and marked as Exhibit 81 for

17             Identification.)

18        THE VIDEOGRAPHER:  We're on the record.

19   The time is 1:27 p.m.

20   BY ATTORNEY MACHLEIDT:

21   Q.   Welcome back.

22        You have Exhibit 81 in front of you and it

23   looks like you've had a chance to look through it.

24        Have you seen Exhibit 81 before today?

25   A.   No.

Kazanjian, Constance Deposition                                               September 12, 2025

Page 104

1       Q.   Rothschild Connected Devices Innovations

2   LLC, are you familiar with that company?

3       A.   I think so.

4       Q.   Sitting here today, you can't say for sure

5   whether it was one of the companies that you

6   created?

7       A.   I'll be honest, I can't remember.  I'm

8   looking at the list on this document just to see if

9   it's there, but I really don't remember.

10      Q.   You can set that aside.

11           I thank you very much for your time today.

12           ATTORNEY MACHLEIDT:  I pass the witness.

13      Q.   Which means now the other lawyers get a

14  chance to ask some questions, but my questioning is

15  finished, at least for now, unless I have to follow

16  up.  Again, thank you very much.

17      A.   You're welcome.

18           ATTORNEY MACHLEIDT:  Joe, Ren , are you

19  guys on?

20           ATTORNEY VAZQUEZ:  We are.

21           ATTORNEY MACHLEIDT:  Okay.

22           ATTORNEY VAZQUEZ:  Can you give us maybe

23  around five minutes for me and Joe to consult

24  here?

25           ATTORNEY MACHLEIDT:  No, no, take the

Kazanjian, Constance Deposition                                      September 12, 2025

Page 105

1        time.  We just -- we lost your video, so we

2        just wanted to make sure.  As long as you can

3        hear, yeah, we can -- oh, there you are.

4               Yeah, yeah, of course.

5               ATTORNEY VAZQUEZ:  Okay.  We'll be back in

6        five minutes.

7               ATTORNEY MACHLEIDT:  Sure.

8               ATTORNEY VAZQUEZ:  Okay, thanks.

9               THE VIDEOGRAPHER:  Going off the record.

10       The time is 1:29 p.m.

11                       (Recess.)

12              THE VIDEOGRAPHER:  We're on the record.

13       The time is 1:32 p.m.

14       EXAMINATION BY ATTORNEY ZITO:

15          Q.   Yeah, hi.

16               Did you have any bookkeeping or accounting

17       responsibilities for any of the Rothschild entities

18       while you were there?

19          A.   No.

20          Q.   Okay.  Any access to checking accounts,

21       checkbooks, or anything like that, banking accounts?

22          A.   No.

23          Q.   Okay.  You indicated that there were no

24       bank accounts for any entities.

25               ATTORNEY MACHLEIDT:  Object to form.

CONFIDENTIAL

1       Q.   How did you know -- how did you know that?

2       A.   Leigh told -- Leigh Rothschild told me.

3       Q.   All right.  Did you see payments made by

4  defendants in lawsuits?  And by see, I mean did you

5  see the wire transfer, the check, or anything like

6  that?

7            ATTORNEY MACHLEIDT:  Object to form.

8       A.   It was referenced on settlement.

9  Statements from Mavexar, any settlement statement,

10  it said where the check was going.

11      Q.   Okay.  And so that was a check from

12  Mavexar or a check from defendants?

13      A.   It was from the defendant through Mavexar.

14  The payment was made to Mavexar and then to Leigh

15  Rothschild and it was paid to Rothschild Trust

16  Holdings.

17      Q.   And Rothschild Trust Holdings is the

18  account that paid you also; correct?

19      A.   Correct.

20      Q.   Okay.  You made some reference to being

21  Leigh's partner.  Do you recall that and is that

22  correct?

23            ATTORNEY MACHLEIDT:  Object to form.

24      A.   When we started working together, he

25  called me his partner.  That's the only reference

Kazanjian, Constance Deposition                                                September 12, 2025

Page 107

1    that was ever made.  I was never officially a

2    partner legally.

3         Q.   Okay.  Did you ever make any capital

4    contributions or other contributions to the

5    business?

6         A.   No.

7         Q.   Okay.  And there was no formal partnership

8    agreement?

9         A.   I had an employment agreement.

10        Q.   And were you personally liable for any of

11   the business costs or expenses or exposures?

12        A.   No.

13        Q.   Okay.  I got one other note.

14             Did you ever hear Mr. Rothschild compare

15   himself to any other famous inventors?

16        A.   He loved Edison.  Yes.

17        Q.   And generally, I don't need you to recount

18   everything, generally, what did he say about Edison?

19             ATTORNEY MACHLEIDT:  Object to form.  This

20        would be hearsay.

21        A.   Again, it was -- we had -- he loved to

22   talk about inventors and he loved to -- anybody who

23   would listen, he with talk about inventions and

24   inventors and how the process works.

25        Q.   Did you consider him an inventor?

Page  108

1      A.   I did.

2      Q.   Did you consider him a good inventor?

3      A.   I did.

4      Q.   Did other people consider him a good

5   inventor?

6           ATTORNEY MACHLEIDT:  Object to form.

7      A.   I don't know about that.

8      Q.   Okay.  All right.

9           ATTORNEY ZITO:  I have no further

10   questions.  Thank you.

11          ATTORNEY AGNETTI:  None from me.  We'll

12   read and sign.

13          ATTORNEY MACHLEIDT:  No further questions

14   from me.

15          THE VIDEOGRAPHER:  Okay.  Counsel, any

16   video orders?

17             (Discussion off the record.)

18          THE VIDEOGRAPHER:  Let's go off the

19   record.  This concludes the video-recorded

20   deposition of Constance Kazanjian.  We're going

21   off the record.  The time is 1:36 p.m.

22          Thank you.

23        (Proceedings were concluded at 1:36 p.m.)

24             * * * * * * * * * *

25

Page  109

```
 1                C E R T I F I C A T E

 2

 3     STATE OF FLORIDA   )

 4     COUNTY OF LEE      )

 5

 6

 7          I, STACEY E. RAIKES, a Registered Merit

 8     Reporter, Certified Realtime Reporter, and Notary

 9     Public within and for the State of Florida, do

10     hereby certify:

11          That the witness whose examination is

12     hereinbefore set forth was duly sworn by me and

13     that this transcript of such examination is a true

14     record of the testimony given by such witness.

15          I further certify that I am not related to

16     any of the parties to this action by blood or

17     marriage and that I am in no way interested in the

18     outcome of this matter.

19          IN WITNESS WHEREOF, I have hereunto set my

20     hand this 16th of September 2025.

21

22

23

24          --------------------------

25          STACEY E. RAIKES, RMR, CRR
```

Kazanjian, Constance Deposition                                              September 12, 2025

                                                                    Page 110

1              DECLARATION UNDER PENALTY OF PERJURY

2    Case Name: Valve Corporation
            vs. Leigh Rothschild, et al.

3    Date of Deposition: 09/12/2025

4    Job No.: 10172707

5

6              I, CONSTANCE KAZANJIAN, hereby certify

7    under penalty of perjury under the laws of the State of

8    _____ that the foregoing is true and correct.

9              Executed this _____ day of

10   _____, 2025, at _____.

11

12

13              _____

14              CONSTANCE KAZANJIAN

15

16   NOTARIZATION (If Required)

17   State of _____

18   County of _____

19   Subscribed and sworn to (or affirmed) before me on

20   this _____ day of _____, 20__,

21   by_____,    proved to me on the

22   basis of satisfactory evidence to be the person

23   who appeared before me.

24   Signature: _____ (Seal)

25

Kazanjian, Constance Deposition

September 12, 2025

**Page 111**

```
1   DEPOSITION ERRATA SHEET
    Case Name: Valve Corporation
2          vs. Leigh Rothschild, et al.
    Name of Witness: Constance Kazanjian
3   Date of Deposition: 09/12/2025
    Job No.: 10172707
4   Reason Codes:  1. To clarify the record.
                   2. To conform to the facts.
5                  3. To correct transcription errors.

6   Page _____ Line _____ Reason _____

7   From _____ to _____

8   Page _____ Line _____ Reason _____

9   From _____ to _____

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24  Page _____ Line _____ Reason _____

25  From _____ to _____
```

CONFIDENTIAL

Kazanjian, Constance Deposition                                                September 12, 2025

**Page  112**

1    DEPOSITION ERRATA SHEET

2    Page _____ Line _____ Reason _____

3    From _____ to _____

4    Page _____ Line _____ Reason _____

5    From _____ to _____

6    Page _____ Line _____ Reason _____

7    From _____ to _____

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   _____ Subject to the above changes, I certify that the
             transcript is true and correct

23   _____ No changes have been made. I certify that the
             transcript  is true and correct.

24

             _____

25                   CONSTANCE KAZANJIAN

CONFIDENTIAL                                                Kilpatrick Townsend & Stockton LLP