# EXHIBIT 6

## FILED UNDER SEAL

Videotaped Deposition of

# Sugouri Batra

September 05, 2025

Valve Corporation

vs.

Leigh Rothschild, et al.

**Page 1**

1   UNITED STATES DISTRICT COURT

  FOR THE WESTERN DISTRICT OF WASHINGTON

2   AT SEATTLE

  -------------------------------------------x

3   VALVE CORPORATION,

4         Plaintiff,

5

        Case No.:-

6         2:23-cv-1016

            (JNW)

7   -against--

8

  LEIGH ROTHSCHILD, ROTHSCHILD BROADCAST

9   DISTRIBUTION SYSTEMS, LLC, DISPLAY

  TECHNOLOGIES, LLC, PATENT ASSET MANAGEMENT,

10   LLC, MEYLER LEGAL, PLLC, and SAMUEL

  MEYLER,

11         Defendants.

12   -------------------------------------X

13

14       DATE: September 5, 2025

15       TIME: 11:34 a.m. EST

16

17

18     VIDEO DEPOSITION of SUGOURI BATRA, a

19   Non-Party Witness herein, taken by the

20   Plaintiff, pursuant to Federal Rules of

21   Civil Procedure, and Subpoena, held

22   virtually via Zoom, at the above-mentioned

23   date and time, before MARINA DUBSON, a

24   Notary Public of the State of New York.

25   JOB NO. 10172200

**Page 2**

1   APPEARANCES:

2

3   KILPATRICK TOWNSEND & STOCKTON LLP

  Attorney for Plaintiff

4   VALVE CORPORATION

  1420 Fifth Avenue, Suite 3700

5   Seattle, Washington 98101

  (206) 467.9600

6   BY:  KATHLEEN R. GEYER, ESQ.

    Kgeyer@kilpatricktownsend.com

7

    DARIO A. MACHLEIDT, ESQ

8     Dmachleidt@kilpatricktownsend.com

9

10   HOUSETONIP

  Attorney for Witness

11   SUGOURI BATRA

  5353 West Alabama Street, Suite 303

12   Houston, Texas 7056

  (832) 800-4133

13   BY:  SHEA PALAVAN, ESQ.

    Shea@housetonip.com

14

15   DNL ZITO

  Attorney for Defendants

16   LEIGH ROTHSCHILD, ROTHSCHILD BROADCAST

  DISTRIBUTION SYSTEMS, LLC, DISPLAY

17   TECHNOLOGIES, LLC, PATENT ASSET MANAGEMENT,

  LLC, MEYLER LEGAL, PLLC, and SAMUEL

18   MEYLER

  1250 Connecticut Avenue Northwest,

19   Suite 700

  Washington, DC 20036

20   (202) 466.3500

  BY:  JOSEPH J. ZITO, ESQ.

21     Jzito@dnlzito.com

22     RENÉ A. VAZQUEZ, ESQ.

    Rvazquez@dnlzito.com

23

    ROBERT CADLE, ESQ.

24

  (Cont'd next page.)

25

**Page 3**

1   APPEARANCES (cont'd)

2

3

  ALSO PRESENT:

4

5   MIRANDA PERALES, videographer

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**Page 4**

1     IT IS HEREBY STIPULATED AND AGREED,

2   by and between the attorneys for the

3   respective parties, as follows:

4

5   THAT all objections, except as to the form

6   of the questions, shall be reserved to the

7   time of the trial;

8

9   THAT the within examination may be signed

10   and sworn to before any Notary Public with

11   the same force and effect as if signed and

12   sworn to before the Court;

13

14   THAT filing of the original transcript of

15   the examination is waived.

16

17

18

19

20

21

22

23

24

25

Case 2:23-cv-01016-JNW    Document 193-4    Filed 01/15/26    Page 4 of 37
Sugouri Batra                                                           Valve Corporation vs.
                                                                     Leigh Rothschild, et al.

Page 5

1           S. Batra
2      THE REPORTER:  Are you ordering
3  a copy of this transcript?
4      MR. ZITO:  Yes, regular
5  turnaround.
6      MR. PALAVAN:  No, but the
7  witness will read and sign.
8          XXXX
9      THE VIDEOGRAPHER:  We're now on
10  the record.
11      Today's date is September 5,
12  2025, and the time is 11:34 a.m.
13  Eastern Time.
14      This is the remote video
15  deposition of Sugouri Batra via Zoom
16  video conference being taken in the
17  matter of Valve Corporation versus
18  Leigh Rothschild, et al, on behalf of
19  plaintiff, pending in the United
20  States District Court for the Western
21  District of Washington.  Case number
22  is 2:23-cv-1016 (JNW).
23      The witness is appearing
24  remotely from New York City,
25  New York.

Page 6

1           S. Batra
2      My name is Miranda Perales
3  appearing for Aptus Court Reporting
4  located at 400 West A Street, Suite
5  1680, San Diego, California 92101.
6      I am the official videographer,
7  and this is the only authorized video
8  recording of this deposition.  The
9  audio and the video recording will
10  take place at all times unless all
11  counsel agree to go off the video
12  record.
13      Will counsel please identify
14  yourselves and state who you're with
15  Kate Geyer with Kilpatrick Townsend
16  on behalf of Plaintiff Valve
17  Corporation.  And with me is my
18  colleague Dario Machleidt.
19      MR. PALAVAN:  Shea Palavan on
20  behalf of the deponent, Sugouri
21  Batra, from HoustonIP.
22      MR. ZITO:  This is Joseph Zito.
23  And with me is René Vazquez on behalf
24  of all of the defendants in the case.
25      THE VIDEOGRAPHER:  Ms. Court

Page 7

1           S. Batra
2  reporter, please swear in the
3  witness.
4      THE REPORTER:  Will Counsel
5  please stipulate that in lieu of
6  formally swearing in the witness in
7  person, the Reporter will instead ask
8  the witness to acknowledge that their
9  testimony will be true under the
10  penalties of perjury.
11      That, Counsel will not object
12  to the admissibility of the
13  transcript based on proceeding in
14  this way, meaning virtually.
15      And that, the witness has
16  verified that she is, in fact,
17  Sugouri Batra.
18      So stipulated?
19      MS. GEYER:  Yes, for plaintiff.
20      MR. PALAVAN:  Yes, for
21  deponent.
22      MR. ZITO:  Yes, so stipulated.
23      (Whereupon, the Witness was
24  sworn in by the Court Reporter at
25  this time.)

Page 8

1           S. Batra
2          XXXX
3  S U G O U R I   B A T R A,
4      after having first been duly sworn by
5      a Notary Public of the State of New
6      York, was examined and testified as
7      follows:
8  EXAMINATION
9  BY MS. GEYER:
10      Q.   Good morning.  Could you please
11  state your full name for the record?
12      A.   Sugouri Batra.
13      Q.   What is your home address?
14      MR. PALAVAN:  You can just give
15      the city and state.
16      THE WITNESS:  I live in New
17      York City, New York.  Pretty sure you
18      have my home address.
19      Q.   Can you please confirm your
20  full home address for the record?  And if
21  this is an issue of confidentiality, we can
22  mark the transcript as confidential.
23      A.   215 East ninety -- 215 East
24  91st Avenue, apartment 14B, New York,
25  New York.

Sugouri Batra

Page 9

S. Batra

1
2    Q.    Do you have anything in front
3  of you today besides your computer?
4    A.    A note pad.
5    Q.    Is there anything on that note
6  pad?
7    A.    No.
8    Q.    Is there anyone in the room
9  with you?
10    A.    No.
11    Q.    Do you have anything open on
12  your computer besides Zoom?
13    A.    No.
14    Q.    Are you a lawyer?
15    A.    Yes.
16    Q.    Where did you go to law school?
17    A.    University of Miami.
18    Q.    When did you graduate from
19  University of Miami law school?
20    A.    2016.
21    Q.    What states are you barred in?
22    A.    Florida, Texas.  I have the
23  patent bar.  And in the Supreme Court.
24    Q.    Where did you go to undergrad?
25    A.    University of Miami.

Page 10

S. Batra

1
2    Q.    What did you study in
3  undergrad?
4    A.    Biology and psychology.
5    Q.    Did you get a degree in both
6  biology and psychology?
7    A.    Yes.
8    Q.    When did you graduate from
9  undergrad?
10    A.    2013.
11    Q.    When did you start working for
12  Mr. Rothschild or one of his related
13  entities?
14    A.    March of 2021.
15    Q.    When you were working for Mr.
16  Rothschild -- strike that.
17        What specific entity were you
18  employed by?
19    A.    Patent Asset Management.
20    Q.    When did you stop working for
21  Patent Asset Management?
22    A.    October of 2022.
23    Q.    Why did you stop working for
24  Patent Asset Management?
25        MR. ZITO:  Objection if that's

Page 11

S. Batra

1
2  confidential or privileged
3  information.
4        THE WITNESS:  I wanted better
5  opportunity.
6    Q.    It was your choice to leave
7  Patent Asset Management?
8    A.    Yes.
9    Q.    What was your job title at
10  Patent Asset Management?
11    A.    General counsel.
12    Q.    You were general counsel for
13  the full time you worked there?
14    A.    Yes.
15    Q.    Would it surprise you if Mr.
16  Rothschild had told us that he fired you
17  from Patent Asset Management?
18    A.    No.
19    Q.    Why would that not surprise
20  you?
21    A.    It just doesn't.
22    Q.    Were you fired from Patent
23  Asset Management?
24    A.    No.
25    Q.    What was your role as general

Page 12

S. Batra

1
2  counsel -- strike that.
3        If I refer to Patent Asset
4  Management as PAM, just to say less words,
5  is that okay?
6    A.    Yes, of course.
7    Q.    What was your role as general
8  counsel at PAM?
9        MR. PALAVAN:  To the extent it
10    doesn't reveal privileged
11    information.
12        THE WITNESS:  So, I basically
13    managed patent prosecution as well as
14    litigation.  And my duties also
15    included finding, hiring, firing
16    outside counsel, transactional work.
17    So, redlining various agreements,
18    settlement agreements, NDAs,
19    covenants not to sue, consulting
20    agreements, agreements with outside
21    counsel, things like that.
22    Q.    Did you perform all of these
23  tasks on behalf of Patent Asset Management
24  and subsidiaries of Patent Asset
25  Management?

Valve Corporation vs.
Leigh Rothschild, et al.

Sugouri Batra

Page 13

S. Batra
1
2     A.    Mostly for PAM.  Sometimes for
3  the subs, subsidiaries, as well.
4     Q.    Did you have any
5  responsibilities for the financial side of
6  the business?
7     A.    Could you please clarify what
8  you mean?
9         MR. PALAVAN:  Yeah.  Objection.
10     Vague.
11     Q.    Did you have any
12  responsibilities for setting up bank
13  accounts on behalf of PAM or any of its
14  subsidiaries?
15     A.    No.
16     Q.    Did you have any
17  responsibilities that involved moving money
18  that -- between PAM or its subsidiaries?
19     A.    No.
20     Q.    Did you have any
21  responsibilities related to ensuring
22  outside counsel got paid?
23         MR. PALAVAN:  Objection.
24     Vague.
25         MR. PALAVAN:  Can you reask?

Page 14

S. Batra
1
2  That's kind of broad.  Not to be
3  obtuse, you know.  It can include
4  just sending an e-mail or collections
5  and stuff.  Can you be a little more
6  specific?
7         MS. GEYER:  No.  I am going to
8  let my question stand, and I would
9  appreciate if you just objected.  I
10  can ask more targeted questions based
11  on the answers.
12         MR. PALAVAN:  Okay.  Then my
13  objection remains.
14         Objection.  Vague.
15         THE WITNESS:  Do I respond?
16         MR. PALAVAN:  Yes.  You respond
17  how you want.  If you want
18  clarification --
19         THE WITNESS:  Could you ask the
20  question again, please?
21     Q.    Of course.
22         Did you have any
23  responsibilities for ensuring outside
24  counsel was paid?
25         MR. PALAVAN:  Again, objection.

Page 15

S. Batra
1
2  Vague.
3         THE WITNESS:  So, I -- it was
4  not in my power to ensure that anyone
5  got paid, but I would, as a matter of
6  courtesy, remind Mr. Rothschild that
7  whoever needed to get paid was
8  needing to get paid.
9     Q.    Were you responsible for any
10  payments made to PAM or any of its
11  subsidiaries as a result of any licensing
12  agreements?
13         MR. PALAVAN:  Objection.
14     Vague.
15         THE WITNESS:  What do you mean?
16  Responsible how?
17     Q.    Sorry.  I didn't mean to
18  interrupt you.
19         Were you responsible for --
20  well, strike that.
21         Did you have access to any of
22  the PAM or subsidiary bank accounts?
23     A.    No.
24     Q.    Did you have any authorization
25  on behalf of PAM or any subsidiaries to

Page 16

S. Batra
1
2  make payments?
3     A.    No.
4         MR. PALAVAN:  Objection.
5     Vague.
6     Q.    Did you have access to any PAM
7  or its subsidiaries' credit cards?
8     A.    No.
9     Q.    Could you write checks on
10  behalf of PAM or any of its subsidiaries?
11     A.    No.
12     Q.    One of your responsibilities
13  was overseeing patent litigation, correct?
14     A.    Yes.
15     Q.    Does that involve active, filed
16  litigations?  Or would that include any
17  pre-filing enforcements, such as demand
18  letters?
19     A.    It would include both.
20     Q.    Did you have any role in
21  identifying potential targets for patent
22  litigation?
23     A.    For some campaigns, yes.  For
24  others, no.
25     Q.    What do you mean when you say a

Sugouri Batra

Valve Corporation vs.
Leigh Rothschild, et al.

Page 17

S. Batra

1    "campaign"?
2    "campaign"?
3       A.    By "campaign," I mean a
4    specific patent asset or like a specific
5    patent portfolio.
6       Q.    How many campaigns were you --
7    did you oversee at your time at PAM?
8       A.    I don't recall.
9       Q.    Was it more than ten?
10      A.    Probably.
11      Q.    Who decides when to start a
12   campaign?
13      MR. PALAVAN:  Objection.
14   Vague.  Speculation.
15      Answer to the ability you can,
16   again, without revealing privileged
17   information.
18      THE WITNESS:  Mr. Rothschild
19   would be among.  Other than that,
20   probably outside counsel.
21      Q.    Mr. Rothschild and outside
22   counsel would identify which patent or
23   patent portfolios to begin asserting; is
24   that correct?
25      MR. ZITO:  Objection.  Calls

Page 18

S. Batra

1    for privileged communications.
2    Assert privilege.  Sorry.
3       MS. GEYER:  Joe, just for you,
4    I wasn't trying to get privilege.  I
5    was trying to repeat her last answer
6    back. So, just so you know, I wasn't
7    trying to get there.  So, I'll try
8    that again.
9       MR. ZITO:  No accusation there,
10   but once you get into the substance
11   of deliberations or the existence of
12   deliberations, that's privileged
13   communication.
14      MS. GEYER:  Got it.
15      Q.    What would happen after
16   Mr. Rothschild and outside counsel decide
17   to start a campaign?
18      MR. PALAVAN:  Objection.
19   Vague.
20      THE WITNESS:  The campaign
21   would start.
22      Q.    What would that entail?
23      A.    Either a letter or a lawsuit.
24      Q.    Who would decide whether to

Page 19

S. Batra

1    send a letter or a lawsuit?
2       MR. PALAVAN:  Objection.
3    Speculation.
4       You can answer to the ability
5    you know.
6       THE WITNESS:  Generally,
7    definitely Mr. Rothschild.  And then
8    specifically, I don't recall the
9    specifics for each campaign.
10      Q.    What would cause Mr. Rothschild
11   to choose to go forward with a demand
12   letter as opposed to filing a lawsuit?
13      MR. ZITO:  Objection.  Calls
14   for privileged communication.
15      MR. PALAVAN:  Objection.
16   Speculation.
17      MS. GEYER:  Joe, for the
18   record, was that an instruction not
19   to answer or a caution?
20      MR. ZITO:  I'm not her
21   attorney, so I cannot instruct
22   Ms. Batra, but I am objecting to the
23   question and would be suggesting she
24   not answer it because it would reveal

Page 20

S. Batra

1    privilege, and we're not waiving
2    privilege to that question.
3       MR. PALAVAN:  I'm going to
4    instruct her to answer to the extent
5    you can without revealing privileged
6    information.
7       THE WITNESS:  I don't feel
8    comfortable answering to the extent I
9    feel like I would be compromising
10   privilege.
11      Q.    What role would you play in
12   deciding -- strike that.
13      Did you play a role in deciding
14   whether to send a demand letter or file a
15   litigation?
16      A.    I'm sorry.  Could you repeat
17   that, please?
18      Q.    Did you play a role in deciding
19   whether to send a letter versus file a
20   litigation during a campaign?
21      MR. PALAVAN:  Objection.  Vague.
22      Sorry.  Go ahead.
23      THE WITNESS:  I did not make

Sugouri Batra

Valve Corporation vs.
Leigh Rothschild, et al.

Page 21

1          S. Batra
2      decisions.  I did make suggestions at
3      times, yes.
4      Q.   Is the ultimate decision
5   whether to file a lawsuit or send a demand
6   letter always Mr. Rothschild?
7          MR. PALAVAN:  Objection.
8      Speculation.
9          THE WITNESS:  I'm not sure --
10      I'm not uncomfortable [sic] answering
11      a question that has "always" in it,
12      but generally, yes.
13      Q.   I believe you said earlier that
14   sometimes you were responsible for
15   identifying potential targets for campaigns
16   and then sometimes it was not you.  Is my
17   memory correct?
18      A.   Yes.
19      Q.   When it wasn't you, who else
20   was responsible for identifying potential
21   targets?
22          MR. PALAVAN:  Objection.
23      Speculation.
24          THE WITNESS:  There were
25      various vendors that PAM worked with

Page 22

1          S. Batra
2      that made the claim charts, so it
3      would be one of them.
4      Q.   Who were those vendors?
5      A.   There were two firms in India.
6   I don't recall the names.
7      Q.   When you were responsible for
8   identifying the potential targets, were you
9   the one drafting the claim charts for those
10   targets?
11      A.   No.
12      Q.   Were claim charts always
13   drafted by those third-party vendors you
14   referenced?
15          MR. PALAVAN:  Objection.
16      Speculation.
17          THE WITNESS:  Generally, from
18      what I remember, yes.
19      Q.   Did you perform any
20   investigation into those targets -- strike
21   that.
22          After you identified targets
23   for investigation, what would happen
24   between that step and requesting claim
25   charts from the third parties?

Page 23

1          S. Batra
2      MR. ZITO:  Objection to the
3   extent it might reveal privileged
4   communications.
5          MR. PALAVAN:  Objection.
6   Speculation.
7          Answer to the best you can
8   without revealing privileged
9   information.
10          THE WITNESS:  I don't think I
11   can answer without compromising
12   privilege.
13      Q.   After you received claim charts
14   from the third parties, was any additional
15   investigation performed related to those
16   targets?
17          MR. PALAVAN:  Objection.
18      Speculation.
19          MR. ZITO:  Same objection.
20          THE WITNESS:  Yes.
21      Q.   What additional investigation
22   would be performed?
23      A.   I don't feel comfortable
24   answering to the extent it will compromise
25   privilege.

Page 24

1          S. Batra
2      Q.   Who would perform that
3   investigation?
4          MR. PALAVAN:  Objection.
5      Speculation.
6          THE WITNESS:  It would depend
7   on the campaign.
8      Q.   Who are all the people that
9   would perform that additional
10   investigation?
11          MR. PALAVAN:  Objection.
12      Speculation.
13          THE WITNESS:  So, as I
14   mentioned, the outside vendors would
15   for sure, and then also outside
16   counsel and whatever other counsel
17   that was ultimately involved in
18   bringing the suit.
19      Q.   When you say any other
20   counsel --
21      A.   Like local.
22      Q.   Thank you.
23      A.   Sometimes.  Not always.
24      Q.   When you were general counsel
25   at PAM, were there any other in-house

Page 25

S. Batra

1
2  attorneys?
3       A.   Yes.  There were a few at a
4  certain point.
5       Q.   Who were they?  What are their
6  names?
7       A.   One attorney, her first name
8  was Nicolle.  I don't remember her last
9  name.  There was also Daniel.  I don't
10 remember his last name.  And then I want to
11 say that's all I recall at this point in
12 terms of attorneys in-house.
13      Q.   Was it Nicolle Lafosse?
14      A.   Yes.
15      Q.   And Daniel Falcucci sound
16 familiar?
17      A.   Yes.
18      Q.   Is there anything
19 non-privileged you can tell me about any
20 analysis, research or diligence that PAM
21 did before sending a demand letter or
22 filing a lawsuit?
23           MR. ZITO:  Same caution.
24      Privilege.
25           MR. PALAVAN:  Objection.

Page 26

S. Batra

1
2       Vague.
3           THE WITNESS:  I don't want to
4      risk compromising privilege.
5       Q.   Do you know who had access to
6  the bank accounts for PAM and its
7  subsidiaries?
8           MR. PALAVAN:  Objection.
9      Speculation.
10          THE WITNESS:  Yes.
11     Mr. Rothschild.
12      Q.   Was Mr. Rothschild the only
13 person who had access to the bank accounts
14 of PAM and its subsidiaries?
15      A.   I don't know.
16          MR. PALAVAN:  Objection.
17     Speculation.
18      Q.   Did Mr. Rothschild have
19 approval for -- strike that.
20          Did Mr. Rothschild have to
21 approve of payments made by PAM to outside
22 counsel?
23          MR. PALAVAN:  Objection.
24     Speculation and vague.
25          THE WITNESS:  I'm not sure how

Page 27

S. Batra

1
2  to answer that.
3       Q.   Did Mr. Rothschild have to sign
4  off on payments that were made?
5           MR. PALAVAN:  Objection.
6      Speculation.  Vague.
7           THE WITNESS:  I'm not aware of
8      any like signing off on amounts to be
9      paid.  I do know he would often have
10     discussions on amounts that are owed
11     and to be paid, which I usually am
12     not a part of.  And there have been
13     plenty of those types of discussions.
14     I do know that.
15      Q.   Do you know whether there's any
16 authorization or approval requirements
17 before any of those payments were made?
18          MR. PALAVAN:  Objection.
19     Speculation.  Vague.
20          THE WITNESS:  If Mr. Rothschild
21     decided to pay, he would pay.  If he
22     decided not to, he wouldn't.  I don't
23     know what his internal procedure is
24     in deciding that.
25      Q.   Did Mr. Rothschild himself

Page 28

S. Batra

1
2  handle all those payments?
3       A.   Correct.  At least during the
4  time I was there.
5       Q.   During the time you were there,
6  did Mr. Rothschild handle -- strike that.
7       I think my line of questions
8  was limited to outside counsel, and I kind
9  of dropped that from the question.
10          So, just to clear it up a
11 little bit:  Mr. Rothschild was responsible
12 for making all the payments to outside
13 counsel; is that correct?
14          MR. PALAVAN:  Objection.
15     Speculation.
16          THE WITNESS:  That's fair to
17     state -- say, yes.
18      Q.   Was Mr. Rothschild responsible
19 for making payments to any vendors that you
20 used?
21      A.   Yes.
22      Q.   Was Mr. Rothschild responsible
23 for making any employee payroll payments?
24      A.   Yes, through PAM, of course.
25      Q.   Were all of the payments to

Page 29

S. Batra

1  outside counsel, vendors, and payroll done
2  through PAM?
3
4     A.   I don't know.
5     Q.   When you said "through PAM,"
6  was that specific to payroll?
7     A.   Yes.
8     Q.   So, payroll is paid through
9  PAM?
10    A.   Yes.  PAM would pay me, and I
11  believe the other employees as well, not
12  Mr. Rothschild individually.
13    Q.   Mr. Rothschild individually
14  wasn't paid through PAM?
15    A.   I don't know.  I am saying the
16  paycheck would not come from him.  It would
17  come from PAM.
18    Q.   Sorry.  I got it.
19    A.   I have no idea how he paid
20  himself.
21    Q.   That was my next question.  So,
22  thank you.
23        I believe you referenced there
24  were discussions with Mr. Rothschild
25  related to some of the payment issues.

Page 30

S. Batra

1
2        Who else was in those
3  discussions?
4        MR. ZITO:  I am going to object
5     and caution on privilege.  Certainly,
6     these could involve issues of
7     legality of payments, obligations for
8     payments, contractual obligations,
9     all of which would be legal
10     conversations.
11        MR. PALAVAN:  Objection.
12     Speculation.
13        You can answer to the extent
14     you know and can do so without
15     revealing privileged information.
16        THE WITNESS:  Shea, are the
17     names of the attorneys who owed
18     money, is divulging that privilege?
19     Could be potentially privilege?
20        MR. PALAVAN:  I mean, I would
21     defer to Mr. Zito and his firm,
22     whether or not they would consider
23     that privileged or assert the
24     privilege.
25        MR. ZITO:  To the extent that

Page 31

S. Batra

1  you actually do or do not know
2  that -- I don't even know that -- you
3  would have gotten that information
4  from Mr. Rothschild.  And as
5  Mr. Rothschild's and/or PAM's
6  in-house counsel, he would have given
7  you that information because he was
8  seeking your legal advice on it.  So,
9  yes, even the names of people who may
10  or may not have paid, may or may not
11  have disputed, would be part of
12  privileged communication.  Yes.
13        MS. GEYER:  I am going to back
14     up a bit because I think my question
15     wasn't clear based on everything I've
16     heard from people.  So, I am going to
17     give a narrative and explain what I
18     am asking for and try to ask better
19     questions.
20        I'm asking for conversations
21     she was personally part of, that she
22     was testifying to, who else was in
23     that conversation; so, not things she
24     learned because Mr. Rothschild told

Page 32

S. Batra

1  her that he talked to someone about
2  it; things where she was actually
3  present for and who else was just
4  like on the phone with her, if it was
5  a phone call, if it was in person,
6  for example.
7        And I think that's all
8  something that's privilege log.  That
9  would be on a privilege log.
10        Joe, do you disagree with that?
11        MR. ZITO:  You're asking was
12     Dan in the room and part of the
13     conversation.  That would not be
14     objectionable.
15        MS. GEYER:  That was what I was
16     trying to ask:  For the conversations
17     where Ms. Batra was present related
18     to payment discussions, who else was
19     in the room?  Because, not hiding
20     anything, I'm trying to understand
21     was anyone else besides
22     Mr. Rothschild involved with or
23     responsible for finances.  Maybe I
24     can try asking it that way instead.

Page 33

S. Batra

1
2      THE WITNESS:  Could you repeat
3   the question?
4      MS. GEYER:  I'll withdraw my
5   last question to the extent it's
6   still pending anymore.  I'll try a
7   different thing.
8   BY MS. GEYER:
9      Q.   Besides Mr. Rothschild, were
10  any other PAM employees involved in or
11  responsible for ensuring payments happened;
12  for example, to outside counsel, vendors,
13  or payroll?
14      MR. PALAVAN:  Objection.
15   Speculation.
16      A.   So, the paralegal at the time,
17  Christina -- I am forgetting her last
18  name -- she would know more about this.
19  She would be more closely following on who
20  is owed what, who is getting paid what, and
21  who eventually gets paid what.
22      Q.   Is that Christina Arias?
23      A.   Yes.
24      Q.   Was Ms. Arias working there the
25  entire time you were at PAM?

Page 34

S. Batra

1
2      A.   I think so.
3      Q.   Do you recall working with any
4   other paralegals at your time at PAM?
5      A.   Yes.  I'm forgetting her name.
6   I think it's Aisha.  I don't know.  She was
7   there a while before me, and she left a
8   little after I had joined, and I am blanking
9   on her name, though.
10      Q.   That one, I don't have in front
11  of me either.
12      A.   She worked before -- she was
13  employed there before Christina left.
14      Q.   Do you know why Aisha left PAM?
15      MR. PALAVAN:  Objection.
16   Speculation.
17      THE WITNESS:  I don't recall.
18      Q.   Was Nicolle Lafosse working at
19  PAM the whole time you were there?
20      A.   Not the full time.  She left
21  some time before.
22      Q.   Do you know why Ms. Lafosse
23  left PAM?
24      A.   I don't recall.
25      MR. PALAVAN:  Objection.

Page 35

S. Batra

1
2   Speculation.
3      THE WITNESS:  I don't recall.
4      MS. GEYER:  And Shea, I am
5   trying to ask questions, do you know
6   who, to not have you object to
7   speculation.
8      So, I am -- I don't think it's
9   appropriate to object to speculation
10   because I am asking her if she knows,
11   because she can say no.  Just wanted
12   to point that out.
13      Q.   I believe you said one of your
14  other responsibilities was with respect to
15  agreements, NDAs, covenants not to sue; is
16  that correct?
17      A.   Yes.
18      Q.   What specifically were your
19  responsibilities for those agreements?
20      A.   Redlining them, sometimes
21  having calls with outside counsel to
22  negotiate certain points.  Other times,
23  completely redoing past templates or past
24  forms, things like that.
25      Q.   Were you responsible for

Page 36

S. Batra

1
2   negotiations with third parties directly?
3   Or did you work for outside counsel?
4      A.   What do you mean by third party
5   specifically?
6      Q.   When you do covenants not to
7   sue, for example, those would be negotiated
8   between PAM or one of its subsidiaries and
9   then a third-party target; is that correct?
10      A.   Correct.
11      Q.   In those situations, would you
12  be responsible for directly working with
13  the third party, or did you work through
14  outside counsel?
15      A.   So, sometimes yes, sometimes
16  no.  Sometimes I would do it directly.
17  Other times, outside counsel would do a lot
18  of it and I would come in towards the end
19  to finalize.  So, it just really depends.
20      Q.   Before all those agreements are
21  finalized, would Mr. Rothschild have to
22  approve of the draft and the terms therein?
23      A.   Absolutely.
24      Q.   Was there ever a time where
25  Mr. Rothschild did not approve of the final

Page 37

S. Batra

1
2    drafts and the terms for any agreement?
3          MR. PALAVAN:  Objection.
4       Speculation.
5          THE WITNESS:  Not that I am
6       aware of.
7       Q.    When you said NDA -- well,
8    strike that.
9          Was Mr. Rothchild involved in
10   any of the negotiations with the
11   third-party targets?
12         MR. PALAVAN:  Objection.
13      Speculation.
14         THE WITNESS:  Sometimes.  Yes.
15      Q.    What were the reasons why he
16   would get involved in some of the specific
17   negotiations?
18         MR. PALAVAN:  Objection.
19      Speculation.
20         And answer to the best you can
21   without divulging privileged
22   information.
23         THE WITNESS:  I don't recall
24      specifics.
25      Q.    You mentioned NDAs as well; is

Page 38

S. Batra

1
2    that right?
3       A.    Yes.
4       Q.    That's nondisclosure
5    agreements?
6       A.    Correct.
7       Q.    Were those nondisclosure
8    agreements for -- well, strike that.
9          Were those nondisclosure
10   agreements for third-party targets to
11   engage in negotiations, or were those
12   nondisclosure agreements, for example, for
13   employees or ex-employees?
14      A.    Neither.
15      Q.    What were they for?
16      A.    These would arise in the
17   context of purchasing new assets or
18   selling, like if there are patent brokers
19   involved.
20      Q.    When you say purchasing and
21   selling new assets, that means patents or
22   patent applications?
23      A.    Correct.
24      Q.    Were there any other assets
25   besides patents and patent applications?

Page 39

S. Batra

1
2          MR. PALAVAN:  Objection.
3       Speculation.
4          THE WITNESS:  Not that I
5       recall.
6       Q.    Did you have any
7    responsibilities with respect to like
8    corporate formation documents or
9    registrations with secretaries of states
10   for PAM or any of its subsidiaries?
11      A.    That was more under Daniel's
12   department.
13      Q.    Did Mr. Falcucci work at PAM
14   the entire time you were there?
15      A.    I don't think so.  I think he
16   came after I was employed.
17      Q.    Do you recall, did he replace
18   anyone when he came in?
19      A.    No.  From what I remember, his
20   role was kind of a new role at the company
21   at the time.
22      Q.    Prior to Mr. Falcucci starting
23   at PAM, was someone else responsible for
24   the corporate formation or secretary of
25   state registrations for PAM and its

Page 40

S. Batra

1
2    subsidiaries?
3       A.    I don't recall.
4       Q.    That was never in your job
5    responsibilities even before Mr. Falcucci
6    joined?
7       A.    What specifically?
8       Q.    Corporate formation documents,
9    registrations with the secretary of state,
10   those kind of things related to corporate
11   formalities for PAM and its subsidiaries?
12      A.    I don't recall.  I might have
13   looked into some of this stuff, but it
14   wasn't really my focus.
15      Q.    Did you ever assist with
16   creating a new PAM subsidiary?
17         MR. PALAVAN:  Objection.
18      Vague.
19         THE WITNESS:  Probably, but I
20      don't remember any specific
21      companies.
22      Q.    When you worked for PAM, did
23   you know how many subsidiaries it actually
24   had?
25      A.    At some point, I probably did.

Sugouri Batra

Page 41

S. Batra

1  Q.   Order of magnitude, do you
2  recall how many it was?
3
4  A.   No.
5  Q.   Was it more than 20?
6  A.   I don't recall.
7  Q.   More than 10?
8  A.   Yes.
9  Q.   Do you know why PAM had so many
10  subsidiaries?
11      MR. ZITO:  Objection.  Calls
12  for privileged communication.
13      THE WITNESS:  Yeah.  I prefer
14      not to answer on the basis of
15      privilege, please.
16  Q.   Do you have any non-privileged
17  information regarding why PAM has so many
18  subsidiaries?
19  A.   I don't think so.
20  Q.   Outside of the subpoena in this
21  case, are you familiar with Valve
22  Corporation?
23  A.   No.
24  Q.   When you were at Patent Asset
25  Management, did you have -- strike that.

Page 42

S. Batra

1
2      When you were at Patent Asset
3  Management, did you have any responsibility
4  for any lawsuits filed against Valve in
5  2022?
6  A.   What do you mean by "any
7  responsibility," please?
8  Q.   Were you aware that certain PAM
9  entities filed patent infringement
10  litigation against Valve in September of
11  2022?
12  A.   Yes.
13  Q.   As part of your
14  responsibilities, did you oversee those
15  lawsuits?
16      MR. PALAVAN:  Objection.
17  Vague.
18      THE WITNESS:  To the extent I
19      could.  I believe I left like a month
20      afterwards.
21  Q.   At least the initial filing of
22  those lawsuits in September of 2022, you
23  would have been involved in that process;
24  is that right?
25  A.   Yes, making sure the lawsuit

Page 43

S. Batra

1
2  gets filed.  Correct.
3  Q.   Do you remember which PAM
4  entity sued Valve in September of 2022?
5  A.   No.
6  Q.   Do you know that -- strike
7  that.
8      Do you know how many lawsuits
9  against Valve PAM subsidiaries filed in
10  September of 2022?
11  A.   I think at least two.
12  Q.   It would be two different
13  subsidiaries because those would be two
14  different patent or patent portfolios under
15  each subsidiary; is that right?
16  A.   Yes.
17  Q.   I'll represent -- I know you
18  don't remember the names.  I'll represent
19  the two entities were Display Technologies
20  and Social Positioning Input Systems, or
21  SPIS.  Does that sound familiar at all?
22  A.   Yes.
23  Q.   Do you recall what happened in
24  the Display Technologies versus Valve
25  lawsuit in September of 2022?

Page 44

S. Batra

1
2  A.   I'm sorry.  Could you repeat
3  that?
4  Q.   Do you know how the Display
5  Technologies versus Valve lawsuit in
6  September of 2022 resolved?
7  A.   I don't recall.
8  Q.   Do you recall that Valve
9  informed outside counsel for Display
10  Technologies that it was already licensed
11  to the patent asserted against it?
12  A.   Yes.
13  Q.   Did Display Technologies do any
14  investigations before suing Valve in
15  September of 2022 to ensure that or to
16  check whether Valve was licensed to that
17  patent?
18      MR. ZITO:  That's going to be
19      another caution.  Don't reveal any
20      privileged communications.
21      MR. PALAVAN:  Yeah.  Just to
22      the ability you can without revealing
23      privilege.
24      THE WITNESS:  Could you repeat
25      the question, please?

Sugouri Batra

Valve Corporation vs.
Leigh Rothschild, et al.

Page 45

S. Batra

2    Q.    Did Display Technologies check
3  whether Valve was already licensed to the
4  asserted patents in the September 2022
5  lawsuit before it filed the complaint?
6        MR. PALAVAN:  Objection.
7    Speculation.
8        THE WITNESS:  I don't recall
9    what Display did, but I do know that
10    I was informed of the prior
11    settlement after the lawsuit had been
12    filed.
13    Q.    Were you aware of the prior
14  settlement with Valve before the -- either
15  of the 2022 cases were filed against
16  Valve -- strike that.
17        Were you aware of the
18  settlement -- sorry.  We're going to go
19  back one more step.
20        The settlement with Valve you
21  referenced, is that the 2016 license
22  agreement that Valve entered into?
23    A.    Yes.
24    Q.    Were you aware of that license
25  agreement before the September 2022 Display

Page 46

S. Batra

2  Technologies case against Valve?
3    A.    No.
4    Q.    Prior to filing the complaint
5  in the September '22 Display Technologies
6  lawsuit, did anyone at PAM check to see
7  whether Valve had a license to the asserted
8  patent in that suit?
9        MR. PALAVAN:  Objection.
10    Speculation.
11        THE WITNESS:  I don't recall.
12    Q.    Did you personally check
13  whether Valve was already licensed in the
14  asserted patent in the September 2022
15  Display Technologies case before the case
16  was filed?
17    A.    No.
18    Q.    Would someone at PAM be
19  responsible for checking whether a
20  potential defendant was already licensed to
21  a patent before a complaint was filed?
22    A.    Yes.  Mr. Rothschild would.
23    Q.    Does Mr. Rothschild need to
24  approve of complaints before they're filed?
25    A.    Absolutely.

Page 47

S. Batra

2    Q.    Did Mr. Rothschild approve of
3  the 20- -- September 2022 Display
4  Technologies versus Valve complaint before
5  it was filed?
6    A.    Yes.
7    Q.    How did you learn about the
8  2016 settlement agreement with Valve after
9  the Display Technologies lawsuit was filed
10  in September of 2022?
11    A.    I think because Valve had
12  brought it up.
13    Q.    You learned about it from Valve
14  and not anyone at PAM?
15    A.    I think so.
16    Q.    Who at PAM was primarily
17  responsible for the 2022 lawsuits against
18  Valve?
19    A.    Responsible in what way?
20    Q.    Making the decision to file
21  them and overseeing them.
22    A.    To file them, would be
23  Mr. Rothschild.
24    Q.    Who at PAM was primarily
25  responsible for overseeing the actual

Page 48

S. Batra

2  litigation itself, tracking their status?
3    A.    I performed that role.
4    Q.    Until you left in October 2022?
5    A.    Correct.  But I do remember
6  spending most of October doing transitional
7  work.  So, I probably stopped doing status
8  overseeing type work sometime in September.
9    Q.    Did someone replace you as
10  general counsel, and you were transitioning
11  them in October?
12    A.    From my understanding, Daniel
13  was to replace me.
14    Q.    When you left PAM, did you sign
15  an NDA or a confidentiality agreement?
16    A.    I don't think I signed
17  anything.
18    Q.    Have you ever been asked to
19  sign an NDA or confidentiality agreement
20  about your work at PAM?
21    A.    I don't recall.
22    Q.    Are you aware of any other
23  former employees of PAM that were subject
24  to NDAs or confidentiality agreements?
25        MR. ZITO:  To the extent that

Sugouri Batra

Valve Corporation vs.
Leigh Rothschild, et al.

Page 49

S. Batra

1    that doesn't reveal a privileged
2    communication.
3         THE WITNESS:  I don't recall.
4         MS. GEYER:  If counsels, both
5    counsel, all counsel, would indulge
6    me and Ms. Batra to five minutes so I
7    can just look at my notes, I think
8    I'm close to wrapping this up.
9         MR. ZITO:  No objection.
10        MR. PALAVAN:  No objection.
11        MS. GEYER:  Off the record.
12        THE VIDEOGRAPHER:  We're off
13    the record at 12:34 p.m.
14        (Whereupon, a short break was
15    taken at this time.)
16        THE VIDEOGRAPHER:  This is
17    beginning of media number two.  We're
18    back on the record at 12:46 p.m.
19    BY MS. GEYER:
20        Q.   The Display Technologies we
21    were talking about in the September of 2022
22    lawsuits against Valve, they're a
23    subsidiary of PAM, right?
24        A.   Yes.  At least during the time
25

Page 50

S. Batra

1    I was there, they were.  Yep.
2         Q.   At the time of the September
3    2022 lawsuit, Display Technologies was a
4    subsidiary of PAM?
5         A.   I think that's accurate.  Yep.
6         Q.   Why use subsidiaries to file
7    lawsuits and not have PAM directly file
8    those lawsuits?
9         MR. ZITO:  Same caution as to
10    privilege.
11        MR. PALAVAN:  Just answer the
12    best you can to the extent you know.
13        THE WITNESS:  Yeah.  I'm going
14    to be over cautious here and not
15    answer at the risk of compromising
16    privilege.
17        Q.   Do you have any non-privileged
18    information about why PAM uses subsidiaries
19    to file patent infringement lawsuits
20    instead of filing them directly?
21        A.   No, I do not.  Also, I'd like
22    to clarify about the subs line of
23    questioning.  I think they were
24    subsidiaries.  I am not like a hundred
25

Page 51

S. Batra

1    percent sure what the relationships were
2    because those existed -- predated my time
3    there.  So, I'm actually not sure if
4    legally, technically speaking, if those
5    companies were set up like subsidiaries
6    because it happened well before I joined.
7         Q.   Do you know whether those
8    companies, putting aside legal definition
9    of subsidiaries, were they wholly owned by
10    PAM?
11        A.   I'm not sure.
12        Q.   Earlier, you mentioned patent
13    brokers in one of your answers.
14        Do you remember that?
15        A.   Yes.
16        Q.   What is a patent broker?
17        A.   Patent broker is a person or
18    company that is in the business of
19    brokering patent assets.
20        Q.   What does it mean to broker
21    patent assets?
22        A.   Buy or sell.
23        Q.   Are patent brokers middle men,
24    or do they actually own patent assets that
25

Page 52

S. Batra

1    they're trying to buy or sell?
2         A.   It depends.  Sometimes they own
3    the assets, sometimes they don't.  Most of
4    the times, they don't, from my experience
5    with them at PAM.
6         Q.   When you worked at PAM, do you
7    know how much revenue was in the PAM bank
8    account at any time?
9         A.   No idea.
10        Q.   Did you ever know how much
11    revenue was in the PAM bank account while
12    you worked there?
13        A.   No.  Financial information like
14    this were not accessible to the employees,
15    at least not to me.  Definitely not to me.
16        Q.   Did you ever know how much
17    revenue was in any of the PAM affiliated
18    companies?
19        I'm using that instead of
20    subsidiaries, just based on your last
21    answer.
22        A.   Thank you.
23        No.
24        Q.   For example, you don't know how
25

Valve Corporation vs.
Leigh Rothschild, et al.

Page 53

S. Batra

1
2  much revenue was in the Display
3  Technologies' bank account when you filed
4  the September 2022 lawsuit against Valve?
5      A.   Correct.  I did not.  Yeah.
6      Q.   Do you know Constance
7  Kazanjian?
8      A.   No.  Doesn't ring a bell.
9      Q.   When was the last time you
10  talked to Mr. Leigh Rothschild?
11     A.   The last day I worked there, so
12  October 2022.
13     Q.   You haven't had any
14  conversations with Mr. Rothschild after
15  your last day of work?
16     A.   Correct.
17     Q.   Have you talked to anyone else
18  who works for or worked with -- sorry.
19  Strike that.
20         Since you stopped working at
21  PAM, have you talked to Nicolle Lafosse?
22     A.   I think I ran into her at a
23  networking Bitcoin event after.  So,
24  probably then.  But otherwise, no.
25     Q.   Were any of the discussions you

Page 54

S. Batra

1
2  had with Nicolle Lafosse when you ran into
3  her about Valve?
4      A.   No.
5      Q.   Were any of those discussions
6  about your time at PAM?
7      A.   No.
8      Q.   Since you stopped working for
9  PAM, have you talked to Daniel Falcucci?
10     A.   Not that I recall.
11     Q.   Since you stopped working at
12  PAM, have you talked to Christina Arias?
13     A.   No.
14     Q.   Since you stopped working at
15  PAM, have you talked to Aisha, who we don't
16  know her last name?
17     A.   No.
18     Q.   Since you stopped working at
19  PAM, have you talked to anyone else who
20  worked at PAM while you were there?
21     A.   My attorney, Shea.  We had some
22  overlap at PAM.
23     Q.   Anyone else besides Shea?
24     A.   There's a gentleman.  He was
25  part of the vendor -- overseas vendor

Page 55

S. Batra

1
2  company.  I forget the name of the company,
3  but the gentleman's name is Saqish.  So, I
4  have spoken with him.  I have also seen him
5  at a conference.
6         And then I do want to clarify,
7  Shea was outside counsel at PAM during some
8  of the time that I was in-house counsel.
9      Q.   Prior to your deposition and
10  specifically related to this case, did you
11  ever speak to anyone at Merchant & Gould?
12     A.   No.
13     Q.   Specific to this case prior to
14  your deposition, did you speak with anyone
15  at DNL Zito?
16     A.   No.  First time I'm hearing
17  about them.
18     Q.   Did you ever recommend anyone
19  you know to apply for a job at Patent Asset
20  Management?
21     A.   I would not, no.
22     Q.   Why wouldn't you?
23     A.   For many reasons.
24     Q.   What reasons are those?
25         MR. ZITO:  Just the same

Page 56

S. Batra

1
2  caution, if it would reveal any
3  privileged communications.
4         THE WITNESS:  I know I can do
5  this without compromising privilege.
6  Just give me a second while I think
7  of the appropriate words.
8      Q.   Take the time you need.  I know
9  privilege is a hard line to walk, so
10  whatever you need to do.
11     A.   May I please discuss with my
12  attorney real quick?
13         MS. GEYER:  Of course.  Can we
14  go off the record?
15         THE VIDEOGRAPHER:  Going off
16  the record at 12:57 p.m.
17         (Whereupon, a short break was
18  taken at this time.)
19         THE VIDEOGRAPHER:  This is the
20  beginning of media number three.
21  We're back on the record at 1:01 p.m.
22         THE WITNESS:  So, the question
23  I am answering is why I would not
24  recommend PAM for others, for people
25  that I know, to work there.  And my

S. Batra

1
2      answer is I would not recommend
3      people that I know to work at PAM
4      because I -- the way that he operated
5      is not the way that I -- does not
6      align with the way that I want to
7      practice law.  And so, I would highly
8      encourage others to find other work
9      that is better for them in all the
10     ways.
11  BY MS. GEYER:
12     Q.    I'm mindful of privilege when I
13  am asking this, and I know it's probably
14  putting you in a tough position.
15         At a high level, what about how
16  Mr. Rothschild worked did not align with
17  how you want to practice the law?
18         MR. ZITO:  I'm going to object
19     again.  That calls for not only
20     privilege and privileged
21     communication, but also her opinion
22     which would be a legal opinion which
23     would be work product.  I don't think
24     she can answer that question.
25         MS. GEYER:  I disagree with

S. Batra

1
2      that.  What my question was getting
3      towards and what it sounded like her
4      answer was were actions, not
5      conversations.  So, to the extent
6      they're not conversations, I don't
7      think it's privileged.  This is not a
8      legal opinion.  This is a personal
9      opinion.
10         MR. ZITO:  First of all, the
11     privilege doesn't just go to
12     conversations.  If an attorney
13     witnesses his client do something,
14     then that attorney cannot say what
15     that client did -- the client did in
16     their presence, whether they did it
17     verbally, with hand signals, with a
18     sign, or physically did something.
19         Privilege doesn't only apply to
20     conversations.  Also, privilege
21     extends to mental impressions of the
22     attorney.  Privilege extends to the
23     work product of the attorney.  So,
24     it's not just a conversation.  That's
25     not the only thing that's privileged.

S. Batra

1
2      And even if it's a personal
3      observation and a personal opinion --
4      let's say he always kept the heat up
5      at 87 degrees in the office, and
6      people sweated like crazy, and I
7      think that's bad business practice --
8      that's her opinion.  But because
9      she's a lawyer, that would then
10     become her mental legal impression of
11     the situation that's directed by her
12     client.
13         MS. GEYER:  Absolutely not,
14     Joe.  I'm sorry.  But not that one,
15     Joe.
16         MR. ZITO:  Absolutely.
17     Absolutely.
18         MS. GEYER:  I'm not anyone's
19     lawyer.  I am not going to instruct
20     anyone to do anything.  I think we
21     can have a fight over whether or not
22     the answer is privileged, and if you
23     want to move to strike it as
24     privileged later, that's on you.
25         I think the way you just

S. Batra

1
2      described the fact that someone's
3      opinions about the temperature in a
4      building, because I'm a lawyer and I
5      have an opinion about it, that that
6      inherently makes it privileged, I
7      think is just so far contrary to the
8      law that I am actually concerned now
9      about all the instructions you've
10     been giving in all the depositions in
11     our case about privilege, because
12     that's wild to me.
13         I think this is not a fight for
14     us to have.  I think your instruction
15     has been heard.  Ms. Batra can decide
16     where she thinks the line is in
17     consultation with her lawyer if she
18     wants.  If we need to have a fight
19     later about the answer and the
20     privileged nature of it, we can.
21         MR. ZITO:  I agree, but if her
22     opinion is that high temperature is
23     unhealthy for people and that would
24     be violation of the state law or
25     state employment law, yes, that is

Sugouri Batra

Valve Corporation vs.
Leigh Rothschild, et al.

| | |
|---|---|
| Page 61 | Page 63 |

Page 61

S. Batra

1  S. Batra
2  absolutely legal opinion.
3      If she said I personally like
4  to wear wool sweaters and coats to
5  work so it makes me uncomfortable,
6  that wouldn't be legal opinion.  But
7  again, I don't know.  But it doesn't
8  just go to a conversation.  I'm
9  objecting to it.
10      MS. GEYER:  Your second
11  hypothetical was slightly better than
12  your first one, to be clear.  I think
13  we have our dispute.  It's on the
14  record.
15      Madam Court Reporter, could you
16  please read back what my original
17  question was?
18      (Whereupon, the requested
19  portion of the transcript was read
20  back by the reporter.)
21      THE WITNESS:  Okay.  Here's
22  what I think I would be comfortable
23  saying.  So, basically it's the whole
24  like new school versus old school way
25  of patent litigation, that based on

Page 62

S. Batra

1  S. Batra
2  what I started learning at like --
3  what's happening in the patent field
4  and from conferences I was attending
5  and my other experiences, all of this
6  did not align with how PAM was
7  operating.
8      Essentially, I evolved, but
9  they -- you know, PAM did not, and it
10  was time for me to move on.  When I
11  first started, it was an incredible
12  experience.  I had just passed the
13  patent bar, and here I was, general
14  counsel of a patent monetization
15  company.  And in many ways in the
16  beginning, it was kind of like a
17  dream job.  I was doing prosecution,
18  you know, overseeing litigation.  I
19  was coordinating with other outside
20  counsel, many of which -- they were
21  all much, much older than me.  It was
22  a pretty cool gig until I learned,
23  until I plateaued, and until it
24  wasn't.
25      So, I'm very grateful for

Page 63

S. Batra

1  S. Batra
2  having had the opportunities to learn
3  what to do, what not to do, how to
4  do, how to do things even better,
5  thanks to all other wonderful patent
6  colleagues that I met along the way.
7  But yes, I would not recommend PAM to
8  anyone that I know after having
9  worked there.
10      Q.   When you say you evolved your
11  practice based on conferences and your
12  experiences, what is that evolution?
13      A.   So, overall patent litigation
14  has gotten way more sophisticated, way
15  more -- just a lot more needs to go on, you
16  know, than I guess what you could have done
17  before.  Even in terms of the complaints
18  and, you know, what you're positively
19  pleading, things like that.  Again, now I'm
20  getting into specifics and I don't want to.
21      But overall, the field was
22  moving in a different way.  I feel like
23  that's where I wanted to go and that's
24  where I went.
25      MR. ZITO:  I'm going to move to

Page 64

S. Batra

1  S. Batra
2  strike that answer as her opinion on
3  patent law at PAM and its
4  subsidiaries and how it was
5  practiced, the decisions that were
6  made, the way it was practiced,
7  things that were done.  I think
8  that's clearly privileged
9  information.  So, I'm going to move
10  to strike that answer.
11      MS. GEYER:  We oppose.  I think
12  your motion is mischaracterizing her
13  answer completely.
14      MR. PALAVAN:  I agree with
15  that.  I don't think there's any
16  privilege in there.  It's all her
17  experience of what she learned about
18  the field.
19      So, if somebody in a conference
20  talked about change that needs to be
21  done, I think that's beyond anything
22  privileged.
23      Q.   Would you recommend working
24  with Leigh Rothschild personally?
25      A.   No.

Page 61..64

Page 65

S. Batra

1
2    Q.    Why not?
3    A.    Same answer.  I would not
4    recommend anyone doing any personal
5    dealings with Mr. Rothschild.
6    Q.    Are there any other reasons why
7    you would never recommend anyone doing any
8    dealings with Mr. Rothschild besides what
9    you've already talked about?
10        THE WITNESS:  May I consult
11    with my attorney real quick?
12        MS. GEYER:  Absolutely.
13        THE WITNESS:  Thank you.
14        MS. GEYER:  Can we please go
15    off the record?
16        THE VIDEOGRAPHER:  Going off
17    the record at 1:11 p.m.
18        (Whereupon, a short break was
19    taken at this time.)
20        THE VIDEOGRAPHER:  This is
21    beginning of Media Number 4.  We're
22    back on the record at 1:15 p.m.
23        MS. GEYER:  Would it help if I
24    had the court reporter read back the
25    pending question?

Page 66

S. Batra

1
2        THE WITNESS:  Sure.
3        MS. GEYER:  Madam Court
4    Reporter, could you please read back
5    the last question?
6        (Whereupon, the requested
7    portion of the transcript was read
8    back by the reporter.)
9        THE WITNESS:  No.  I wish I
10    could, but I can't.
11    Q.    When you say you can't or you
12    wish you could, is that because the reasons
13    are privileged?
14    A.    Correct.
15    Q.    Did PAM have a human resource
16    department?
17    A.    Not that I recall.
18    Q.    Are the things that you're
19    concerned about that make you not want to
20    recommend anyone work with Leigh Rothschild
21    things that you would have liked to take to
22    an HR Department?
23        MR. PALAVAN:  I would instruct
24    you to be careful on that.
25        THE WITNESS:  Could you

Page 67

S. Batra

1
2    clarify, like what types of things?
3    Q.    I don't know, because some of
4    your concerns you can't tell me.  I am
5    trying to understand at a high level -- I'm
6    trying to understand around the edges in a
7    way that isn't going to implicate
8    privilege.
9    A.    In an abundance of caution, I
10    won't answer that.
11        MR. ZITO:  I'm going to object
12    to this whole line of questions.  It
13    is completely irrelevant to this case
14    and inappropriate.
15        MS. GEYER:  We definitely
16    disagree on relevance there.  We're
17    allowed to inquire into the
18    credibility of a named defendant.
19        MR. ZITO:  That's not what
20    you're inquiring into.  We made our
21    objection.
22        MS. GEYER:  Agree to disagree.
23    Q.    When you worked for Patent
24    Asset Management, did you work remotely or
25    in an office?

Page 68

S. Batra

1
2    A.    At first, we worked remotely,
3    because I believe it was the height of the
4    pandemic when I started.  And then we did
5    go -- we had some in-person meetings, a few
6    meetings.  But overall, yes, it stayed
7    remote.
8    Q.    In those in-person meetings,
9    was Mr. Rothschild there personally or in
10    person?
11    A.    Yes.
12    Q.    Would you be in the same room
13    as Mr. Rothschild again today?
14        MR. ZITO:  Again, same
15    objection.  Inappropriate question
16    and irrelevance.  And I don't need to
17    discuss my objection with you.
18    That's not appropriate, Ms. Geyer.  I
19    made my objections.
20        MS. GEYER:  Then you can leave
21    out your narrative as well.
22        MR. ZITO:  No narrative there.
23    That's my objection.
24        THE WITNESS:  I will not be
25    hanging out with him voluntarily, be

Page 69

S. Batra

1
2    in the same place with him.  I mean,
3    if I happen to run into him, I'll say
4    hello.  No hard feelings, but I will
5    not be calling him to see how he's
6    doing.
7        Q.    Earlier, I think you talked
8    about old school versus new school patent
9    litigation.  Am I remembering that
10   correctly?
11       A.    Yes.
12       Q.    What is old school, or what did
13   you mean by old school patent litigation?
14       A.    Without revealing too much
15   specifics, old school basically is how
16   patent litigation was done around or
17   shortly after Alice.  And then new school
18   patent litigation is how patent litigation
19   is currently being handled for the most
20   part much after Alice and in light of all
21   of the recent case law that's come out that
22   has in some way, shape, or form cautioned
23   or otherwise created more precise contours
24   on the specific statutory limitations or
25   specific requirements of patent eligibility

Page 70

S. Batra

1
2    and patent ability, things like that.  So,
3    where the patent law was, you know, a
4    decade or two ago versus where it is now,
5    it's very different.  I would even go as
6    far as to say that currently it's kind of
7    a -- it's not as pro -- it's not pro
8    patent.  It's almost like anti patent
9    atmosphere that one really needs to
10   navigate.  So, those would be the
11   differences between old school and new
12   school.
13       Q.    And you consider the work that
14   PAM does to be in the old school camp while
15   you were there?
16       A.    Generally.  But then there were
17   also campaigns that I pride us, and PAM,
18   and the attorneys that were involved in
19   those campaigns, that were handled
20   differently in the new school way.  Very
21   proud of those.  So, generally, yeah, but
22   not always.
23       Q.    Would you say that the Display
24   Technologies and SPIS cases against Valve
25   in September of 2022, would those be the

Page 71

S. Batra

1
2    old school way or new school way?
3        A.    Hard to say.  I would have to
4    look at the specific complaints and the
5    case.  But, yeah, hard to say.  But then at
6    that point, I feel like I shouldn't answer
7    it, so...
8        Q.    What would you be looking for
9    in the complaint that would tell you
10   whether it fell into the old school or new
11   school bucket?
12       A.    Probably like the depth of
13   analysis, what's been positively pleaded in
14   the complaint, things like that.
15       Q.    Can you be any more specific?
16       A.    I can't.
17       Q.    So the record is clear:  You
18   can't because of privilege?
19       A.    Correct.  And also, it's kind
20   of hard to quantify as well, looking at
21   documents to equate the depth of
22   analysis and things like that.
23           MS. GEYER:  I know I said this
24       last time when I asked for a
25       five-minute break, but I do think I'm

Page 72

S. Batra

1
2    actually really close to wrapping up
3    this time.  So, if counsel agrees, we
4    can go off the record for a quick
5    break.
6           THE VIDEOGRAPHER:  Going off
7       the record at 1:26 p.m.
8           (Whereupon, a short break was
9       taken at this time.)
10          THE VIDEOGRAPHER:  This is
11      beginning of media number five.
12          We're back on the record at 1:36 p.m.
13   BY MS. GEYER:
14       Q.    I know I've asked you a number
15   of questions.  And we had some privilege
16   stuff, so I kind of want to close
17   everything out.
18          What, if anything else, can you
19   tell me about why you would not recommen
20   anyone working with Mr. Rothschild that is
21   not privileged?
22       A.    Nothing.
23       Q.    At the beginning of the
24   deposition, I asked you if you would have
25   been surprised to learn that Mr. Rothschild

Page 73

S. Batra

1 had said that he fired you.
2
3     Did Mr. Rothschild ever
4 threaten to fire you or file a lawsuit
5 against you?
6     A.   Yes.
7     Q.   When was that?
8     A.   A few times.  I don't recall
9 exactly.
10    Q.   Were those threats to fire you,
11 or were they threats to file a lawsuit, or
12 both?
13    A.   To fire me.
14    Q.   Is there anything
15 non-privileged you can tell me about the
16 reasons he made those threats to fire you?
17    A.   Monetary.  Basically, when I
18 finally decided to leave, he had told me
19 that he could no longer pay me what he's
20 paying me, and if I didn't agree to a
21 substantial pay cut, that I -- that I won't
22 be able to work there.
23     And in response, I said, thank
24 you, I will not be agreeing to that.  And I
25 decided to leave.

Page 74

S. Batra

1
2     To which he said, you're fired.
3     So, it went on something like
4 that.
5     Q.   Is there anything
6 non-privileged you can tell me about why he
7 wanted to make you take a substantial pay
8 cut?
9     A.   I'm sorry.  Could you repeat
10 that?
11    Q.   Is there anything
12 non-privileged you can tell me about why
13 Mr. Rothschild was demanding you take a
14 substantial pay cut?
15    A.   I don't know why he -- like he
16 was having monetary issues since I joined.
17 So, my job was, I guess, like always on the
18 line.
19    Q.   Do you know what those monetary
20 issues were?
21    A.   Yeah.  Just like, oh, we can't
22 afford this.
23    Q.   Not enough revenue to afford
24 your position?
25    A.   I don't know the specifics,

Page 75

S. Batra

1 like who, what revenue.  I don't know.  But
2 yeah, that's all I can say right now.
3 Yeah.
4     Q.   How substantial was the pay
5 cut?
6     A.   Can I consult my calculator?
7     Q.   Absolutely.  I never heard that
8 one before.  That was good.
9     A.   I would say about one-third of
10 a cut.
11     MS. GEYER:  I pass the witness.
12     MR. ZITO:  I'm sorry.  Did you
13 say you pass the witness?
14     MS. GEYER:  Yes.
15     MR. ZITO:  I will defer to
16 Mr. Palavan, ask my questions when
17 he's done.
18     MR. PALAVAN:  Nothing for me as
19 well.
20     MR. ZITO:  I guess I would like
21 to explore a little bit about this
22 old school/new school.  I am not sure
23 I was following.
24          XXXX

Page 76

S. Batra

1 EXAMINATION
2 BY MR. ZITO:
3     Q.   Do you know what year Alice was
4 decided, the Supreme Court version of
5 Alice?
6     A.   Yes.  In 2012, I want to say.
7     Q.   It was 2014.
8     I'm assuming you learned about
9 Alice in law school in a patent class?
10    A.   Correct.
11    Q.   Do you consider Alice good law,
12 bad law, or are you neutral?
13    A.   I think Alice did not age well.
14    Q.   What I take that as:  It was
15 not well-decided law as opposed to good or
16 bad?
17     MR. PALAVAN:  I'm going to
18 object to the extent -- I don't want
19 to be annoying, but if you're going
20 have her talk about, you know, her
21 opinions on case law, I don't think
22 that's really too relevant here.  If
23 you want to have more general
24 questions, that's fine.  I'm not

Page 77

S. Batra

1
2      trying to be annoying, but she's not
3      a law professor or anything.
4          MR. ZITO:  I agree.  Her
5      opinions on old school, new school,
6      bad law, aren't anything relevant at
7      all to this case.  I agree 100
8      percent.  But they have been let in,
9      and I am going to need to clarify
10     them.  So, I am not trying to be
11     annoying either.
12         MS. GEYER:  Objection to
13     counsel testifying.
14         Joe, you said earlier that --
15     you'd asked me not to argue with
16     objections.  I would ask you to do
17     the same thing.
18         MR. ZITO:  Thank you.  I really
19     very much appreciate the advice from
20     you, Kate.  I think that's very
21     helpful.
22 BY MR. ZITO:
23     Q.   Now, when you say "old school,"
24 do you mean patents that were issued before
25 Alice?  And by new school, you mean patents

Page 78

S. Batra

1
2 that were issued after Alice?
3     A.   No.  That's not what I mean.  I
4 mean the general style of -- general style
5 of enforcement.
6     Q.   How is that related to Alice?
7     A.   I was giving a rough timeframe
8 in case you wanted to consult the type of
9 cases that were being brought around that
10 time versus now.
11     Q.   Do you think that all cases
12 before Alice were put together better, and
13 all cases after Alice are not?
14     A.   I can't agree with either of
15 those statements.
16     Q.   Okay.  So, you were just using
17 Alice as a time reference to when you
18 perceive there was a change in how patent
19 law was conducted?
20     A.   Yes.
21     Q.   Okay.  All right.  Then that
22 answers my questions as to where old
23 school, new school, and Alice came
24 together.  You were not -- I am just trying
25 to make sure I got your answer.

Page 79

S. Batra

1
2      You're not referring to patents
3 issued before or patents issued after
4 Alice, correct?
5     A.   Correct.
6     Q.   Are you referring to patents
7 that have 101 considerations as opposed to
8 patents that don't have 101 considerations?
9         MS. GEYER:  Object to form.
10         THE WITNESS:  What do you mean?
11     Q.   You understand Alice refers to
12 section 101, 35 USC, section 101 subject
13 matter?
14     A.   Yes.
15     Q.   Okay.  So, when you interjected
16 Alice into old school/new school, were you
17 referring to old school as patents that do
18 not have 101 issues and new school as
19 patents that do have 101 issues?
20     A.   Not specifically.  I am
21 referring to just a general style of
22 enforcement when I mean old school versus
23 new school.
24         MR. ZITO:  Thank you.  Those
25     are my clarifying questions.  Thank

Page 80

S. Batra

1
2 you.  I pass the witness.
3         MS. GEYER:  Give me 30 seconds.
4     We don't need to go off the record
5     but I am going to mute myself.
6         (Whereupon, an off-the-record
7     discussion was held.)
8 EXAMINATION
9 BY MS. GEYER:
10     Q.   What is the general style of
11 enforcement for old school as you've been
12 using that term?
13     A.   I'd rather not get into
14 specifics.
15     Q.   I was trying to keep it
16 general, using your phrase, general style
17 of enforcement.  At a level you're
18 comfortable explaining, can you please
19 explain what you mean by the old school
20 general style of enforcement?
21     A.   I think I'm better equipped to
22 give some insights on the newer style,
23 because I just wasn't practicing law when
24 the older was being done.  So, from the
25 newer style, the newer style of enforcement

Page 81

```
1          S. Batra
2    would entail much greater analysis.  It
3    would entail much greater evaluation.  It
4    would entail more thorough claim charts.
5    Things like that.
6       Q.   When you say greater analysis,
7    more thorough, that's in comparison to the
8    old school style; is that right?
9       A.   Correct.  Yes.
10          MS. GEYER:  I have no further
11    questions.
12          MR. ZITO:  Thank you,
13    Ms. Batra.
14          (Page break to accommodate
15    jurat.)
16    THE VIDEOGRAPHER:  Do you want to get the orders on
        record or off?
17    MR. ZITO:  Off record.
18    THE VIDEOGRAPHER: This concludes the deposition for today.
        We're now off the record at 1:49 p.m. Eastern Time.
19
20    (Whereupon, at 1:50 P.M., the Examination of this
        Witness was concluded.)
21
22
23
24
25
```

Page 82

```
1          S. Batra
2          E X H I B I T S
3
4    PLAINTIFF EXHIBITS
5
6    EXHIBIT   EXHIBIT              PAGE
7    NUMBER   DESCRIPTION
8    (None)
9
10
11          I N D E X
12
13    EXAMINATION BY          PAGE
14    MS. GEYER                8
15    MR. ZITO                76
16
17      INFORMATION AND/OR DOCUMENTS REQUESTED
18    INFORMATION AND/OR DOCUMENTS      PAGE
19    (None)
20
21      QUESTIONS MARKED FOR RULINGS
22    PAGE LINE QUESTION
23    (None)
24
25
```

Page 83

```
1          S. Batra
2          C E R T I F I C A T E
3
4    STATE OF NEW YORK     )
                           :
5    COUNTY OF RICHMOND    )
6
7      I, MARINA DUBSON, a Notary Public for
8    and within the State of New York, do hereby
9    certify:
10      That the witness whose examination is
11    hereinbefore set forth was duly sworn and
12    that such examination is a true record of
13    the testimony given by that witness.
14      I further certify that I am not
15    related to any of the parties to this
16    action by blood or by marriage and that I
17    am in no way interested in the outcome of
18    this matter.
19      IN WITNESS WHEREOF, I have hereunto
20    set my hand this 5th day of September 2025.
21
22
23    _____
24          MARINA DUBSON
25
```

Page 84

```
1    DECLARATION UNDER PENALTY OF PERJURY
2    Case Name: Valve Corporation
        vs. Leigh Rothschild, et al.
3    Date of Deposition: 09/05/2025
4    Job No.: 10172200
5
6      I, SUGOURI BATRA, hereby certify
7    under penalty of perjury under the laws of the State of
8    _____ that the foregoing is true and correct.
9      Executed this _____ day of
10    _____, 2025, at _____.
11
12
13    _____
14          SUGOURI BATRA
15
16    NOTARIZATION (If Required)
17    State of _____
18    County of _____
19    Subscribed and sworn to (or affirmed) before me on
20    this _____ day of _____, 20__,
21    by_____,   proved to me on the
22    basis of satisfactory evidence to be the person
23    who appeared before me.
24    Signature: _____ (Seal)
25
```

**Sugouri Batra**

Valve Corporation vs.
Leigh Rothschild, et al.

Page 85

1  DEPOSITION ERRATA SHEET

Case Name: Valve Corporation

2       vs. Leigh Rothschild, et al.

Name of Witness: Sugouri Batra

3  Date of Deposition: 09/05/2025

Job No.: 10172200

4  Reason Codes:  1. To clarify the record.

2. To conform to the facts.

5            3. To correct transcription errors.

6  Page _____ Line _____ Reason _____

7  From _____ to _____

8  Page _____ Line _____ Reason _____

9  From _____ to _____

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  Page _____ Line _____ Reason _____

23  From _____ to _____

24  Page _____ Line _____ Reason _____

25  From _____ to _____

Page 86

1  DEPOSITION ERRATA SHEET

2  Page _____ Line _____ Reason _____

3  From _____ to _____

4  Page _____ Line _____ Reason _____

5  From _____ to _____

6  Page _____ Line _____ Reason _____

7  From _____ to _____

8  Page _____ Line _____ Reason _____

9  From _____ to _____

10  Page _____ Line _____ Reason _____

11  From _____ to _____

12  Page _____ Line _____ Reason _____

13  From _____ to _____

14  Page _____ Line _____ Reason _____

15  From _____ to _____

16  Page _____ Line _____ Reason _____

17  From _____ to _____

18  Page _____ Line _____ Reason _____

19  From _____ to _____

20  Page _____ Line _____ Reason _____

21  From _____ to _____

22  _____ Subject to the above changes, I certify that the

transcript is true and correct

23  _____ No changes have been made. I certify that the

transcript  is true and correct.

24

_____

25            SUGOURI BATRA

**Sugouri Batra**

**1**

**10** 41:7

**100** 77:7

**101** 79:7,8,12,18,19

**11:34** 5:12

**12:34** 49:14

**12:46** 49:19

**12:57** 56:16

**14B** 8:24

**1680** 6:5

**1:01** 56:21

**1:11** 65:17

**1:15** 65:22

**1:26** 72:7

**1:36** 72:12

**1:49** 81:18

**1:50** 81:20

**2**

**20** 41:5

**20-** 47:3

**2012** 76:7

**2013** 10:10

**2014** 76:8

**2016** 9:20 45:21 47:8

**2021** 10:14

**2022** 10:22 42:5,11,
22 43:4,10,25 44:6,
15 45:4,15,25 46:14
47:3,10,17 48:4
49:22 50:4 53:4,12
70:25

**2025** 5:12

**215** 8:23

**22** 46:5

**2:23-cv-1016** 5:22

**3**

**30** 80:3

**35** 79:12

**4**

**4** 65:21

**400** 6:4

**5**

**5** 5:11

**8**

**87** 59:5

**9**

**91st** 8:24

**92101** 6:5

**A**

**a.m.** 5:12

**ability** 17:15 19:5
44:22 70:2

**able** 73:22

**absolutely** 36:23
46:25 59:13,16,17
61:2 65:12 75:8

**abundance** 67:9

**access** 15:21 16:6
26:5,13

**accessible** 52:15

**accommodate** 81:14

**account** 52:9,12 53:3

**accounts** 13:13 15:22
26:6,13

**accurate** 50:6

**accusation** 18:10

**acknowledge** 7:8

**actions** 58:4

**active** 16:15

**actual** 47:25

**additional** 23:14,21
24:9

**address** 8:13,18,20

**admissibility** 7:12

**advice** 31:9 77:19

**affiliated** 52:18

**afford** 74:22,23

**age** 76:14

**ago** 70:4

**agree** 6:11 60:21
64:14 67:22 73:20
77:4,7 78:14

**agreeing** 73:24

**agreement** 37:2
45:22,25 47:8 48:15,
19

**agreements** 12:17,
18,20 15:12 35:15,
19 36:20 38:5,8,10,
12 48:24

**agrees** 72:3

**ahead** 20:24

**Aisha** 34:6,14 54:15

**Alice** 69:17,20 76:4,6,
10,12,14 77:25 78:2,
6,12,13,17,23 79:4,
11,16

**align** 57:6,16 62:6

**allowed** 67:17

**amounts** 27:8,10

**analysis** 25:20 71:13,
22 81:2,6

**and/or** 31:6

**annoying** 76:20 77:2,
11

**answer** 17:15 18:6
19:5,20,25 20:5
23:7,11 27:2 30:13
37:20 41:14 50:12,
16 52:22 57:2,24
58:4 59:22 60:19
64:2,10,13 65:3
67:10 71:6 78:25

**answering** 20:9 21:10
23:24 56:23

**answers** 14:11 51:14
78:22

**anti** 70:8

**anymore** 33:6

**anyone's** 59:18

**apartment** 8:24

**appearing** 5:23 6:3

**applications** 38:22,
25

**apply** 55:19 58:19

**appreciate** 14:9
77:19

**appropriate** 35:9 56:7
68:18

**Sugouri Batra**

Valve Corporation vs.
Leigh Rothschild, et al.

approval 26:19 27:16

approve 26:21 36:22,
25 46:24 47:2

Aptus 6:3

argue 77:15

Arias 33:22,24 54:12

aside 51:9

asked 48:18 71:24
72:14,24 77:15

asking 31:19,21
32:12,25 35:10
57:13

assert 18:3 30:23

asserted 44:11 45:4
46:7,14

asserting 17:23

asset 10:19,21,24
11:7,10,17,23 12:3,
23,24 17:4 41:24
42:2 55:19 67:24

assets 38:17,21,24
51:20,22,25 52:4

assist 40:15

assuming 76:9

atmosphere 70:9

attending 62:4

attorney 19:22 25:7
54:21 56:12 58:12,
14,22,23 65:11

attorneys 25:2,12
30:17 70:18

audio 6:9

authorization 15:24
27:16

authorized 6:7

Avenue 8:24

aware 27:7 37:6 42:8
45:13,17,24 48:22

---

**B**

back 18:7 31:14
45:19 49:19 56:21
61:16,20 65:22,24
66:4,8 72:12

bad 59:7 76:13,17
77:6

bank 13:12 15:22
26:6,13 52:8,12 53:3

bar 9:23 62:13

barred 9:21

based 7:13 14:10
31:16 52:21 61:25
63:11

basically 12:12 61:23
69:15 73:17

basis 41:14

Batra 5:1,15 6:1,21
7:1,17 8:1,12 9:1
10:1 11:1 12:1 13:1
14:1 15:1 16:1 17:1
18:1 19:1,23 20:1
21:1 22:1 23:1 24:1
25:1 26:1 27:1 28:1
29:1 30:1 31:1 32:1,
18 33:1 34:1 35:1
36:1 37:1 38:1 39:1
40:1 41:1 42:1 43:1
44:1 45:1 46:1 47:1
48:1 49:1,7 50:1
51:1 52:1 53:1 54:1
55:1 56:1 57:1 58:1
59:1 60:1,15 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1,

13

beginning 49:18
56:20 62:16 65:21
72:11,23

behalf 5:18 6:16,20,
23 12:23 13:13
15:25 16:10

believe 21:13 29:11,
23 35:13 42:19 68:3

bell 53:8

best 23:7 37:20 50:13

better 11:4 31:19
57:9 61:11 63:4
78:12 80:21

beyond 64:21

biology 10:4,6

bit 28:11 31:15 75:22

Bitcoin 53:23

blanking 34:8

break 49:15 56:17
65:18 71:25 72:5,8
81:14

bringing 24:18

broad 14:2

broker 51:17,18,21

brokering 51:20

brokers 38:18 51:14,
24

brought 47:12 78:9

bucket 71:11

building 60:4

business 13:6 51:19
59:7

buy 51:23 52:2

---

**C**

calculator 75:7

California 6:5

call 32:6

calling 69:5

calls 17:25 19:14
35:21 41:11 57:19

camp 70:14

campaign 17:2,3,12
18:18,21 19:10
20:21 24:7

campaigns 16:23
17:6 21:15 70:17,19

cards 16:7

careful 66:24

case 5:21 6:24 41:21
46:2,15 55:10,13
60:11 67:13 69:21
71:5 76:22 77:7 78:8

cases 45:15 70:24
78:9,11,13

cause 19:11

caution 19:20 25:23
30:5 44:19 50:10
56:2 67:9

cautioned 69:22

cautious 50:15

certain 25:4 35:22
42:8

Certainly 30:5

change 64:20 78:18

charts 22:2,9,12,25
23:13 81:4

check 44:16 45:2
46:6,12

**Sugouri Batra**

checking 46:19

checks 16:9

choice 11:6

choose 19:12

Christina 33:17,22
34:13 54:12

city 5:24 8:15,17

claim 22:2,9,12,24
23:13 81:4

clarification 14:18

clarify 13:7 50:23
55:6 67:2 77:9

clarifying 79:25

class 76:10

clear 28:10 31:16
61:12 71:17

clearly 64:8

client 58:13,15 59:12

close 49:9 72:2,16

closely 33:19

coats 61:4

colleague 6:18

colleagues 63:6

collections 14:4

come 29:16,17 36:18
69:21

comfortable 20:9
23:23 61:22 80:18

communication
18:14 19:15 31:13
41:12 49:3 57:21

communications
18:2 23:4 44:20 56:3

companies 40:21
51:6,9 52:19

company 39:20 51:19
55:2 62:15

comparison 81:7

complaint 45:5 46:4,
21 47:4 71:9,14

complaints 46:24
63:17 71:4

completely 35:23
64:13 67:13

compromise 23:24

compromising 20:10
23:11 26:4 50:16
56:5

computer 9:3,12

concerned 60:8
66:19

concerns 67:4

concluded 81:20

concludes 81:18

conducted 78:19

conference 5:16 55:5
64:19

conferences 62:4
63:11

confidential 8:22
11:2

confidentiality 8:21
48:15,19,24

confirm 8:19

consider 30:22 70:13
76:12

considerations 79:7,
8

Constance 53:6

consult 65:10 75:7
78:8

consultation 60:17

consulting 12:19

context 38:17

contours 69:23

contractual 30:8

contrary 60:7

conversation 31:24
32:14 58:24 61:8

conversations 30:10
31:21 32:17 53:14
58:5,6,12,20

cool 62:22

coordinating 62:19

copy 5:3

corporate 39:8,24
40:8,10

Corporation 5:17
6:17 41:22

correct 16:13 17:24
21:17 28:3,13 35:16
36:9,10 38:6,23 43:2
48:5 53:5,16 66:14
71:19 76:11 79:4,5
81:9

correctly 69:10

counsel 6:11,13 7:4,
11 11:11,12 12:2,8,
16,21 13:22 14:24
17:20,22 18:17
24:16,20,24 26:22
28:8,13 29:2 31:7
33:12 35:21 36:3,14,
17 44:9 48:10 49:6
55:7,8 62:14,20 72:3
77:13

counsels 49:5

course 12:6 14:21
28:24 56:13

court 5:20 6:3,25
7:24 9:23 61:15
65:24 66:3 76:5

courtesy 15:6

covenants 12:19
35:15 36:6

crazy 59:6

created 69:23

creating 40:16

credibility 67:18

credit 16:7

currently 69:19 70:6

cut 73:21 74:8,14
75:6,11

**D**

Dan 32:13

Daniel 25:9,15 48:12
54:9

Daniel's 39:11

Dario 6:18

date 5:11

day 53:11,15

dealings 65:5,8

decade 70:4

decide 18:17,25
60:15

decided 27:21,22
73:18,25 76:5

decides 17:11

deciding 20:13,14,19
27:24

decision 21:4 47:20

decisions 21:2 64:5

**Sugouri Batra**

Valve Corporation vs.
Leigh Rothschild, et al.

**defendant** 46:20
67:18

**defendants** 6:24

**defer** 30:21 75:16

**definitely** 19:8 52:16
67:15

**definition** 51:9

**degree** 10:5

**degrees** 59:5

**deliberations** 18:12,
13

**demand** 16:17 19:12
20:15 21:5 25:21

**demanding** 74:13

**department** 39:12
66:16,22

**depend** 24:6

**depends** 36:19 52:3

**deponent** 6:20 7:21

**deposition** 5:15 6:8
55:9,14 72:24 81:18

**depositions** 60:10

**depth** 71:12,21

**described** 60:2

**Diego** 6:5

**differences** 70:11

**different** 33:7 43:12,
14 63:22 70:5

**differently** 70:20

**diligence** 25:20

**directed** 59:11

**directly** 36:2,12,16
50:8,21

**disagree** 32:11 57:25
67:16,22

**discuss** 56:11 68:17

**discussion** 80:7

**discussions** 27:10,13
29:24 30:3 32:19
53:25 54:5

**Display** 43:19,24
44:4,9,13 45:2,9,25
46:5,15 47:3,9 49:21
50:4 53:2 70:23

**dispute** 61:13

**disputed** 31:12

**District** 5:20,21

**divulging** 30:18
37:21

**DNL** 55:15

**documents** 39:8 40:8
71:21

**doing** 48:6,7 62:17
65:4,7 69:6

**draft** 36:22

**drafted** 22:13

**drafting** 22:9

**drafts** 37:2

**dream** 62:17

**dropped** 28:9

**duly** 8:4

**duties** 12:14

**E**

**e-mail** 14:4

**earlier** 21:13 51:13
69:7 77:14

**East** 8:23

**Eastern** 5:13 81:18

**edges** 67:6

**either** 18:24 34:11
45:14 77:11 78:14

**eligibility** 69:25

**employed** 10:18
34:13 39:16

**employee** 28:23

**employees** 29:11
33:10 38:13 48:23
52:15

**employment** 60:25

**encourage** 57:8

**enforcement** 78:5
79:22 80:11,17,20,
25

**enforcements** 16:17

**engage** 38:11

**ensure** 15:4 44:15

**ensuring** 13:21 14:23
33:11

**entail** 18:23 81:2,3,4

**entered** 45:22

**entire** 33:25 39:14

**entities** 10:13 42:9
43:19

**entity** 10:17 43:4

**equate** 71:21

**equipped** 80:21

**Essentially** 62:8

**et al** 5:18

**evaluation** 81:3

**event** 53:23

**eventually** 33:21

**evolution** 63:12

**evolved** 62:8 63:10

**ex-employees** 38:13

**exactly** 73:9

**Examination** 8:8 76:2
80:8 81:20

**examined** 8:6

**example** 32:7 33:12
36:7 38:12 52:25

**existed** 51:3

**existence** 18:12

**experience** 52:5
62:12 64:17

**experiences** 62:5
63:12

**explain** 31:18 80:19

**explaining** 80:18

**explore** 75:22

**extends** 58:21,22

**extent** 12:9 20:5,9
23:3,24 30:13,25
33:5 42:18 48:25
50:13 58:5 76:19

**F**

**fact** 7:16 60:2

**fair** 28:16

**Falcucci** 25:15 39:13,
22 40:5 54:9

**familiar** 25:16 41:21
43:21

**far** 60:7 70:6

**feel** 20:8,10 23:23
63:22 71:6

**feelings** 69:4

**fell** 71:10

**field** 62:3 63:21 64:18

**fight** 59:21 60:13,18

**Sugouri Batra**

**file** 20:15,20 21:5
47:20,22 50:7,8,20
73:4,11

**filed** 16:15 42:4,9
43:2,9 45:5,12,15
46:16,21,24 47:5,9
53:3

**filing** 19:13 25:22
42:21 46:4 50:21

**final** 36:25

**finalize** 36:19

**finalized** 36:21

**finally** 73:18

**finances** 32:24

**financial** 13:5 52:14

**find** 57:8

**finding** 12:15

**fine** 76:25

**fire** 73:4,10,13,16

**fired** 11:16,22 73:2
74:2

**firing** 12:15

**firm** 30:21

**firms** 22:5

**first** 8:4 25:7 55:16
58:10 61:12 62:11
68:2

**five** 49:7 72:11

**five-minute** 71:25

**Florida** 9:22

**focus** 40:14

**following** 33:19 75:24

**follows** 8:7

**forget** 55:2

**forgetting** 33:17 34:5

**form** 69:22 79:9

**formalities** 40:11

**formally** 7:6

**formation** 39:8,24
40:8

**former** 48:23

**forms** 35:24

**forward** 19:12

**front** 9:2 34:10

**full** 8:11,20 11:13
34:20

**further** 81:10

---

**G**

**general** 11:11,12,25
12:7 24:24 48:10
62:13 76:24 78:4
79:21 80:10,16,20

**generally** 19:7 21:12
22:17 70:16,21

**gentleman** 54:24

**gentleman's** 55:3

**getting** 33:20 58:2
63:20

**Geyer** 6:15 7:19 8:9
14:7 18:4,15 19:18
31:14 32:16 33:4,8
35:4 49:5,12,20
56:13 57:11,25
59:13,18 61:10
64:11 65:12,14,23
66:3 67:15,22 68:18,
20 71:23 72:13
75:12,15 77:12 79:9
80:3,9 81:10

**gig** 62:22

**give** 8:14 31:18 56:6

**80:3,22

**given** 31:7

**giving** 60:10 78:7

**go** 6:11 9:16,24 19:12
20:24 45:18 56:14
58:11 61:8 63:15,23
65:14 68:5 70:5 72:4
80:4

**going** 14:7 20:4 30:4
31:14,17 44:18
45:18 50:14 56:15
57:18 59:19 63:25
64:9 65:16 67:7,11
72:6 76:18,20 77:9
80:5

**good** 8:10 75:9 76:12,
16

**gotten** 31:4 63:14

**Gould** 55:11

**graduate** 9:18 10:8

**grateful** 62:25

**greater** 81:2,3,6

**guess** 63:16 74:17
75:21

---

**H**

**hand** 58:17

**handle** 28:2,6

**handled** 69:19 70:19

**hanging** 68:25

**happen** 18:16 22:23
69:3

**happened** 33:11
43:23 51:7

**happening** 62:3

**hard** 56:9 69:4 71:3,5,
20

**heard** 31:17 60:15
75:8

**hearing** 55:16

**heat** 59:4

**height** 68:3

**held** 80:7

**hello** 69:4

**help** 65:23

**helpful** 77:21

**hiding** 32:20

**high** 57:15 60:22 67:5

**highly** 57:7

**hiring** 12:15

**home** 8:13,18,20

**Houstonip** 6:21

**HR** 66:22

**human** 66:15

**hundred** 50:25

**hypothetical** 61:11

---

**I**

**idea** 29:19 52:10

**identified** 22:22

**identify** 6:13 17:22

**identifying** 16:21
21:15,20 22:8

**implicate** 67:7

**impression** 59:10

**impressions** 58:21

**in-house** 24:25 25:12
31:7 55:8

**in-person** 68:5,8

**inappropriate** 67:14

**Index: file–inappropriate**

**Sugouri Batra**

68:15

**include** 14:3 16:16,19

**included** 12:15

**incredible** 62:11

**India** 22:5

**individually** 29:12,13

**indulge** 49:6

**information** 11:3
12:11 17:17 20:7
23:9 30:15 31:4,8
37:22 41:17 50:19
52:14 64:9

**informed** 44:9 45:10

**infringement** 42:9
50:20

**inherently** 60:6

**initial** 42:21

**Input** 43:20

**inquire** 67:17

**inquiring** 67:20

**insights** 80:22

**instruct** 19:22 20:5
59:19 66:23

**instruction** 19:19
60:14

**instructions** 60:9

**interjected** 79:15

**internal** 27:23

**interrupt** 15:18

**investigation** 22:20,
23 23:15,21 24:3,10

**investigations** 44:14

**involve** 16:15 30:6

**involved** 13:17 24:17
32:23 33:10 37:9,16

38:19 42:23 70:18

**irrelevance** 68:16

**irrelevant** 67:13

**issue** 8:21

**issued** 77:24 78:2
79:3

**issues** 29:25 30:6
74:16,20 79:18,19

---

### J

**JNW** 5:22

**job** 11:9 40:4 55:19
62:17 74:17

**Joe** 18:4 19:18 32:11
59:14,15 77:14

**joined** 34:8 40:6 51:7
74:16

**Joseph** 6:22

**jurat** 81:15

---

### K

**Kate** 6:15 77:20

**Kazanjian** 53:7

**keep** 80:15

**kept** 59:4

**Kilpatrick** 6:15

**kind** 14:2 28:8 39:20
40:10 62:16 70:6
71:19 72:16

**know** 14:3 18:7 19:6
26:5,15 27:9,14,15,
23 29:4,15 30:14
31:2,3 33:18 34:6,
14,22 35:5 40:23
41:9 43:6,8,17 44:4
45:9 50:13 51:8

52:8,11,17,25 53:6
54:16 55:19 56:4,8,
25 57:3,13 61:7
62:9,18 63:8,16,18
67:3 70:3 71:23
72:14 74:15,19,25
75:2 76:4,21

**knows** 35:10

---

### L

**Lafosse** 25:13 34:18,
22 53:21 54:2

**law** 9:16,19 57:7,17
60:8,24,25 64:3
69:21 70:3 76:10,12,
13,16,22 77:3,6
78:19 80:23

**lawsuit** 18:24 19:2,13
21:5 25:22 42:25
43:25 44:5 45:5,11
46:6 47:9 50:4 53:4
73:4,11

**lawsuits** 42:4,15,22
43:8 47:17 49:23
50:8,9,20

**lawyer** 9:14 59:9,19
60:4,17

**learn** 47:7 63:2 72:25

**learned** 31:25 47:13
62:22 64:17 76:9

**learning** 62:2

**leave** 11:6 68:20
73:18,25

**left** 34:7,13,14,20,23
42:19 48:4,14

**legal** 30:9 31:9 51:9
57:22 58:8 59:10
61:2,6

**legality** 30:7

**legally** 51:5

**Leigh** 5:18 53:10
64:24 66:20

**let's** 59:4

**letter** 18:24 19:2,13
20:15,20 21:6 25:21

**letters** 16:18

**level** 57:15 67:5
80:17

**license** 45:21,24 46:7

**licensed** 44:10,16
45:3 46:13,20

**licensing** 15:11

**lieu** 7:5

**light** 69:20

**liked** 66:21

**limitations** 69:24

**limited** 28:8

**line** 28:7 50:23 56:9
60:16 67:12 74:18

**litigation** 12:14
16:13,22 20:16,21
42:10 48:2 61:25
62:18 63:13 69:9,13,
16,18

**litigations** 16:16

**little** 14:5 28:11 34:8
75:22

**live** 8:16

**local** 24:21

**located** 6:4

**log** 32:9,10

**longer** 73:19

**look** 49:8 71:4

**looked** 40:13

**Sugouri Batra**

**looking** 71:8,20

**lot** 36:17 63:15

---

**M**

**Machleidt** 6:18

**Madam** 61:15 66:3

**magnitude** 41:2

**making** 28:12,19,23 42:25 47:20

**managed** 12:13

**Management** 10:19, 21,24 11:7,10,17,23 12:4,23,25 41:25 42:3 55:20 67:24

**March** 10:14

**mark** 8:22

**matter** 5:17 15:5 79:13

**mean** 13:8 15:15,17 16:25 17:3 30:20 36:4 42:6 51:21 69:2,13 77:24,25 78:3,4 79:10,22 80:19

**meaning** 7:14

**means** 38:21

**media** 49:18 56:20 65:21 72:11

**meetings** 68:5,6,8

**memory** 21:17

**men** 51:24

**mental** 58:21 59:10

**mentioned** 24:14 37:25 51:13

**Merchant** 55:11

**met along** 63:6

**Miami** 9:17,19,25

**middle** 51:24

**mindful** 57:12

**minutes** 49:7

**Miranda** 6:2

**mischaracterizing** 64:12

**monetary** 73:17 74:16,19

**monetization** 62:14

**money** 13:17 30:18

**month** 42:19

**morning** 8:10

**motion** 64:12

**move** 59:23 62:10 63:25 64:9

**moving** 13:17 63:22

**mute** 80:5

---

**N**

**name** 6:2 8:11 25:7,9, 10 33:18 34:5,9 54:16 55:2,3

**named** 67:18

**names** 22:6 25:6 30:17 31:10 43:18

**narrative** 31:18 68:21,22

**nature** 60:20

**navigate** 70:10

**NDA** 37:7 48:15,19

**NDAS** 12:18 35:15 37:25 48:24

**need** 46:23 56:8,10 60:18 68:16 77:9 80:4

**needed** 15:7

**needing** 15:8

**needs** 63:15 64:20 70:9

**negotiate** 35:22

**negotiated** 36:7

**negotiations** 36:2 37:10,17 38:11

**Neither** 38:14

**networking** 53:23

**neutral** 76:13

**never** 40:4 65:7 75:8

**new** 5:24,25 8:5,16, 17,24,25 38:17,21 39:20 40:16 61:24 69:8,17 70:11,20 71:2,10 77:5,25 78:23 79:18,23

**newer** 80:22,25

**Nicolle** 25:8,13 34:18 53:21 54:2

**ninety** 8:23

**non-privileged** 25:19 41:16 50:18 73:15 74:6,12

**nondisclosure** 38:4, 7,9,12

**Notary** 8:5

**note** 9:4,5

**notes** 49:8

**number** 5:21 49:18 56:20 65:21 72:11, 14

---

**O**

**object** 7:11 30:4 35:6, 9 57:18 67:11 76:19 79:9

**objected** 14:9

**objecting** 19:23 61:9

**objection** 10:25 13:9, 23 14:13,14,25 15:13 16:4 17:13,25 18:19 19:3,14,16 20:22 21:7,22 22:15 23:2,5,17,19 24:4,11 25:25 26:8,16,23 27:5,18 28:14 30:11 33:14 34:15,25 37:3, 12,18 39:2 40:17 41:11 42:16 45:6 46:9 49:10,11 67:21 68:15,17,23 77:12

**objectionable** 32:15

**objections** 68:19 77:16

**obligations** 30:7,8

**observation** 59:3

**obtuse** 14:3

**October** 10:22 48:4,6, 11 53:12

**off-the-record** 80:6

**office** 59:5 67:25

**official** 6:6

**oh** 74:21

**okay** 12:5 14:12 61:21 78:16,21 79:15

**old** 61:24 69:8,12,13, 15 70:11,14 71:2,10 75:23 77:5,23 78:22

---

Sugouri Batra

Valve Corporation vs.
Leigh Rothschild, et al.

79:16,17,22 80:11,
19 81:8

**older** 62:21 80:24

**once** 18:11

**one-third** 75:10

**open** 9:11

**operated** 57:4

**operating** 62:7

**opinion** 57:21,22
58:8,9 59:3,8 60:5,
22 61:2,6 64:2

**opinions** 60:3 76:22
77:5

**opportunities** 63:2

**opportunity** 11:5

**oppose** 64:11

**opposed** 19:13 76:16
79:7

**Order** 41:2

**ordering** 5:2

**orders** 81:16

**original** 61:16

**outside** 12:16,20
13:22 14:23 17:20,
21 18:17 24:14,15
26:21 28:8,12 29:2
33:12 35:21 36:3,14,
17 41:20 44:9 55:7
62:19

**overall** 63:13,21 68:6

**overlap** 54:22

**overseas** 54:25

**oversee** 17:7 42:14

**overseeing** 16:13
47:21,25 48:8 62:18

**owed** 27:10 30:17

33:20

**owned** 51:10

_____

**P**

**p.m.** 49:14,19 56:16,
21 65:17,22 72:7,12
81:18,20

**pad** 9:4,6

**page** 81:14

**paid** 13:22 14:24
15:5,7,8 27:9,11
29:8,14,19 31:11
33:20,21

**Palavan** 5:6 6:19 7:20
8:14 12:9 13:9,23,25
14:12,16,25 15:13
16:4 17:13 18:19
19:3,16 20:4,22
21:7,22 22:15 23:5,
17 24:4,11 25:25
26:8,16,23 27:5,18
28:14 30:11,20
33:14 34:15,25 37:3,
12,18 39:2 40:17
42:16 44:21 45:6
46:9 49:11 50:12
64:14 66:23 75:17,
19 76:18

**PAM** 12:4,8 13:2,13,
18 15:10,22,25 16:6,
10 17:7 21:25 24:25
25:20 26:6,14,21
28:24 29:3,5,9,10,
14,17 33:10,25 34:4,
14,19,23 36:8 39:10,
13,23,25 40:11,16,
22 41:9,17 42:8
43:3,9 46:6,18
47:14,16,24 48:14,
20,23 49:24 50:5,8,
19 51:11 52:6,7,8,
12,18 53:21 54:6,9,

12,15,19,20,22 55:7
56:24 57:3 62:6,9
63:7 64:3 66:15
70:14,17

**PAM's** 31:6

**pandemic** 68:4

**paralegal** 33:16

**paralegals** 34:4

**part** 27:12 31:12,22
32:13 42:13 54:25
69:20

**parties** 22:25 23:14
36:2

**party** 36:4,13

**pass** 75:12,14 80:2

**passed** 62:12

**patent** 9:23 10:19,21,
24 11:7,10,17,22
12:3,13,23,24 16:13,
21 17:4,5,22,23
38:18,22,25 41:24
42:2,9 43:14 44:11,
17 46:8,14,21 50:20
51:13,17,18,20,22,
24,25 55:19 61:25
62:3,13,14 63:5,13
64:3 67:23 69:8,13,
16,18,25 70:2,3,8
76:10 78:18

**patents** 38:21,25 45:4
77:24,25 79:2,3,6,8,
17,19

**pay** 27:21 29:10
73:19,21 74:7,14
75:5

**paycheck** 29:16

**paying** 73:20

**payment** 29:25 32:19

**payments** 15:10 16:2

26:21 27:4,17 28:2,
12,19,23,25 30:7,8
33:11

**payroll** 28:23 29:2,6,8
33:13

**penalties** 7:10

**pending** 5:19 33:6
65:25

**people** 24:8 31:10,17
56:24 57:3 59:6
60:23

**Perales** 6:2

**perceive** 78:18

**percent** 51:2 77:8

**perform** 12:22 22:19
24:2,9

**performed** 23:15,22
48:3

**perjury** 7:10

**person** 7:7 26:13
32:6 51:18 68:10

**personal** 58:8 59:2,3
65:4

**personally** 31:22
46:12 61:3 64:24
68:9

**phone** 32:5,6

**phrase** 80:16

**physically** 58:18

**place** 6:10 69:2

**plaintiff** 5:19 6:16
7:19

**plateaued** 62:23

**play** 20:12,14,19

**pleaded** 71:13

**pleading** 63:19

**Sugouri Batra**

**Valve Corporation vs.
Leigh Rothschild, et al.**

**please** 6:13 7:2,5
8:10,19 13:7 14:20
20:18 41:15 42:7
44:25 56:11 61:16
65:14 66:4 80:18

**plenty** 27:13

**point** 25:4,11 35:12
40:25 71:6

**points** 35:22

**portfolio** 17:5

**portfolios** 17:23
43:14

**portion** 61:19 66:7

**position** 57:14 74:24

**Positioning** 43:20

**positively** 63:18
71:13

**potential** 16:21
21:15,20 22:8 46:20

**potentially** 30:19

**power** 15:4

**practice** 57:7,17 59:7
63:11

**practiced** 64:5,6

**practicing** 80:23

**pre-filing** 16:17

**precise** 69:23

**predated** 51:3

**prefer** 41:13

**presence** 58:16

**present** 32:4,18

**pretty** 8:17 62:22

**pride** 70:17

**primarily** 47:16,24

**prior** 39:22 45:10,13

46:4 55:9,13

**privilege** 18:3,5 20:2,
3,11 23:12,25 25:24
26:4 30:5,18,19,24
32:9,10 41:15 44:23
50:11,17 56:5,9
57:12,20 58:11,19,
20,22 60:11 64:16
67:8 71:18 72:15

**privileged** 11:2 12:10
17:16 18:2,13 19:15
20:6 23:3,8 30:15,23
31:13 37:21 41:12
44:20 49:2 56:3
57:20 58:7,25 59:22,
24 60:6,20 64:8,22
66:13 72:21

**pro** 70:7

**probably** 17:10,20
40:19,25 48:7 53:24
57:13 71:12

**procedure** 27:23

**proceeding** 7:13

**process** 42:23

**product** 57:23 58:23

**professor** 77:3

**prosecution** 12:13
62:17

**proud** 70:21

**psychology** 10:4,6

**Public** 8:5

**purchasing** 38:17,20

**put** 78:12

**putting** 51:9 57:14

---

**Q**

---

**quantify** 71:20

**question** 14:8,20
19:24 20:3 21:11
28:9 29:21 31:15
33:3,5 44:25 56:22
57:24 58:2 61:17
65:25 66:5 68:15

**questioning** 50:24

**questions** 14:10 28:7
31:20 35:5 67:12
72:15 75:17 76:25
78:22 79:25 81:11

**quick** 56:12 65:11
72:4

---

**R**

---

**ran** 53:22 54:2

**read** 5:7 61:16,19
65:24 66:4,7

**real** 56:12 65:11

**really** 36:19 40:14
70:9 72:2 76:23
77:18

**reask** 13:25

**reasons** 37:15 55:23,
24 65:6 66:12 73:16

**recall** 17:8 19:9 22:6
25:11 34:3,17,24
35:3 37:23 39:5,17
40:3,12 41:3,6 43:23
44:7,8 45:8 46:11
48:21 49:4 54:10
66:17 73:8

**received** 23:13

**recommend** 55:18
56:24 57:2 63:7
64:23 65:4,7 66:20
72:19

**record** 5:10 6:12
8:11,20 19:19 49:12,

14,19 56:14,16,21
61:14 65:15,17,22
71:17 72:4,7,12 80:4
81:16,17,18

**recording** 6:8,9

**redlining** 12:17 35:20

**redoing** 35:23

**refer** 12:3

**reference** 78:17

**referenced** 22:14
29:23 45:21

**referring** 79:2,6,17,21

**refers** 79:11

**regarding** 41:17

**registrations** 39:9,25
40:9

**regular** 5:4

**related** 10:12 13:21
23:15 29:25 32:18
40:10 55:10 78:6

**relationships** 51:2

**relevance** 67:16

**relevant** 76:23 77:6

**remains** 14:13

**remember** 22:18
25:8,10 39:19 40:20
43:3,18 48:5 51:15

**remembering** 69:9

**remind** 15:6

**remote** 5:14 68:7

**remotely** 5:24 67:24
68:2

**René** 6:23

**repeat** 18:6 20:17
33:2 44:2,24 74:9

**Sugouri Batra**

Valve Corporation vs.<br>Leigh Rothschild, et al.

**replace** 39:17 48:9,13

**reporter** 5:2 7:2,4,7, 24 61:15,20 65:24 66:4,8

**Reporting** 6:3

**represent** 43:17,18

**requested** 61:18 66:6

**requesting** 22:24

**requirements** 27:16 69:25

**research** 25:20

**resolved** 44:6

**resource** 66:15

**respect** 35:14 39:7

**respond** 14:15,16

**response** 73:23

**responsibilities** 13:5, 12,17,21 14:23 16:12 35:14,19 39:7 40:5 42:14

**responsibility** 42:3,7

**responsible** 15:9,16, 19 21:14,20 22:7 28:11,18,22 32:24 33:11 35:25 36:12 39:23 46:19 47:17, 19,25

**result** 15:11

**reveal** 12:10 19:25 23:3 44:19 49:2 56:2

**revealing** 17:16 20:6 23:8 30:15 44:22 69:14

**revenue** 52:8,12,18 53:2 74:23 75:2

**right** 38:2 42:24 43:15 49:24 75:3

78:21 81:8

**ring** 53:8

**risk** 26:4 50:16

**role** 11:25 12:7 16:20 20:12,14,19 39:20 48:3

**room** 9:8 32:13,20 68:12

**Rothschild** 5:18 10:12,16 11:16 15:6 17:18,21 18:17 19:8, 11 21:6 26:11,12,18, 20 27:3,20,25 28:6, 11,18,22 29:12,13, 24 31:5,25 32:23 33:9 36:21,25 37:9 46:22,23 47:2,23 53:10,14 57:16 64:24 65:5,8 66:20 68:9,13 72:20,25 73:3 74:13

**Rothschild's** 31:6

**rough** 78:7

**run** 69:3

---

**S**

**San** 6:5

**Saqish** 55:3

**saying** 29:15 61:23

**school** 9:16,19 61:24 69:8,12,13,15,17 70:11,12,14,20 71:2, 10,11 75:23 76:10 77:5,23,25 78:23 79:16,17,18,22,23 80:11,19 81:8

**school/new** 75:23 79:16

**second** 56:6 61:10

**seconds** 80:3

**secretaries** 39:9

**secretary** 39:24 40:9

**section** 79:12

**see** 46:6 69:5

**seeking** 31:9

**seen** 55:4

**sell** 51:23 52:2

**selling** 38:18,21

**send** 19:2 20:15,20 21:5

**sending** 14:4 25:21

**September** 5:11 42:10,22 43:4,10,25 44:6,15 45:4,25 46:5,14 47:3,10 48:8 49:22 50:3 53:4 70:25

**set** 51:6

**setting** 13:12

**settlement** 12:18 45:11,14,18,20 47:8

**shape** 69:22

**Shea** 6:19 30:16 35:4 54:21,23 55:7

**short** 49:15 56:17 65:18 72:8

**shortly** 69:17

**sic** 21:10

**side** 13:5

**sign** 5:7 27:3 48:14, 19 58:18

**signals** 58:17

**signed** 48:16

**signing** 27:8

**situation** 59:11

**situations** 36:11

**slightly** 61:11

**Social** 43:20

**somebody** 64:19

**someone's** 60:2

**sophisticated** 63:14

**sorry** 15:17 18:3 20:17,24 29:18 44:2 45:18 53:18 59:14 74:9 75:13

**sound** 25:15 43:21

**sounded** 58:3

**speak** 55:11,14

**speaking** 51:5

**specific** 10:17 14:6 17:4 29:6 37:16 40:20 55:13 69:24, 25 71:4,15

**specifically** 19:9 35:18 36:5 40:7 55:10 79:20

**specifics** 19:10 37:24 63:20 69:15 74:25 80:14

**speculation** 17:14 19:4,17 21:8,23 22:16 23:6,18 24:5, 12 26:9,17,24 27:6, 19 28:15 30:12 33:15 34:16 35:2,7,9 37:4,13,19 39:3 45:7 46:10

**spending** 48:6

**SPIS** 43:21 70:24

**spoken** 55:4

Index: replace–spoken

**Sugouri Batra**

**stand** 14:8

**start** 10:11 17:11 18:18,22

**started** 62:2,11 68:4

**starting** 39:22

**state** 6:14 8:5,11,15 28:17 39:25 40:9 60:24,25

**statements** 78:15

**states** 5:20 9:21 39:9

**status** 48:2,7

**statutory** 69:24

**stayed** 68:6

**step** 22:24 45:19

**stipulate** 7:5

**stipulated** 7:18,22

**stop** 10:20,23

**stopped** 48:7 53:20 54:8,11,14,18

**Street** 6:4

**strike** 10:16 12:2 15:20 20:13 22:20 26:19 28:6 37:8 38:8 41:25 43:6 45:16 53:19 59:23 64:2,10

**study** 10:2

**stuff** 14:5 40:13 72:16

**style** 78:4 79:21 80:10,16,20,22,25 81:8

**subject** 48:23 79:12

**subpoena** 41:20

**subs** 13:3 50:23

**subsidiaries** 12:24 13:3,14,18 15:11,25 16:10 26:7,14 36:8

39:10 40:2,11,23 41:10,18 43:9,13 50:7,19,25 51:6,10 52:21 64:4

**subsidiaries'** 16:7

**subsidiary** 15:22 40:16 43:15 49:24 50:5

**substance** 18:11

**substantial** 73:21 74:7,14 75:5

**sue** 12:19 35:15 36:7

**sued** 43:4

**suggesting** 19:24

**suggestions** 21:2

**Sugouri** 5:15 6:20 7:17 8:12

**suing** 44:14

**suit** 24:18 46:8

**Suite** 6:4

**Supreme** 9:23 76:5

**sure** 8:17 21:9 24:15 26:25 42:25 51:2,4, 12 66:2 75:23 78:25

**surprise** 11:15,19

**surprised** 72:25

**swear** 7:2

**swearing** 7:6

**sweated** 59:6

**sweaters** 61:4

**sworn** 7:24 8:4

**Systems** 43:20

---

**T**

---

**take** 6:10 56:8 66:21

74:7,13 76:15

**taken** 5:16 49:16 56:18 65:19 72:9

**talk** 76:21

**talked** 32:2 53:10,17, 21 54:9,12,15,19 64:20 65:9 69:7

**talking** 49:22

**target** 36:9

**targeted** 14:10

**targets** 16:21 21:15, 21 22:8,10,20,22 23:16 37:11 38:10

**tasks** 12:23

**technically** 51:5

**Technologies** 43:19, 24 44:5,10,13 45:2 46:2,5,15 47:4,9 49:21 50:4 70:24

**Technologies'** 53:3

**tell** 25:19 67:4 71:9 72:19 73:15 74:6,12

**temperature** 60:3,22

**templates** 35:23

**ten** 17:9

**term** 80:12

**terms** 25:12 36:22 37:2 63:17

**testified** 8:6

**testifying** 31:23 77:13

**testimony** 7:9

**Texas** 9:22

**thank** 24:22 29:22 52:23 65:13 73:23 77:18 79:24,25 81:12

**thanks** 63:5

**thing** 33:7 58:25 77:17

**things** 12:21 31:24 32:3 35:24 40:10 63:4,19 64:7 66:18, 21 67:2 70:2 71:14, 22 81:5

**think** 23:10 28:7 31:15 32:8 34:2,6 35:8 39:15 41:19 43:11 47:11,15 48:16 49:8 50:6,24 53:22 56:6 57:23 58:7 59:7,20,25 60:7,13,14 61:12,22 64:7,11,15,21 69:7 71:25 76:14,22 77:20 78:11 80:21

**thinks** 60:16

**third** 22:25 23:14 36:2,4,13

**third-party** 22:13 36:9 37:11 38:10

**thorough** 81:4,7

**threaten** 73:4

**threats** 73:10,11,16

**three** 56:20

**time** 5:12,13 7:25 11:13 17:7 28:4,5 33:16,25 34:4,19,20, 21 36:24 39:14,21 49:16,25 50:3 51:3 52:9 53:9 54:6 55:8, 16 56:8,18 62:10 65:19 71:24 72:3,9 78:10,17 81:18

**timeframe** 78:7

**times** 6:10 21:3 35:22 36:17 52:5 73:8

**Sugouri Batra**

Valve Corporation vs.
Leigh Rothschild, et al.

title 11:9

today 9:3 68:13 81:18

Today's 5:11

told 11:16 31:25
73:18

tough 57:14

Townsend 6:15

tracking 48:2

transactional 12:16

transcript 5:3 7:13
8:22 61:19 66:7

transitional 48:6

transitioning 48:10

true 7:9

try 18:8 31:19 32:25
33:6

trying 18:5,6,8 32:17,
21 35:5 52:2 67:5,6
77:2,10 78:24 80:15

turnaround 5:5

two 22:5 43:11,12,13,
19 49:18 70:4

type 48:8 78:8

types 27:13 67:2

---

**U**

ultimate 21:4

ultimately 24:17

uncomfortable 21:10
61:5

undergrad 9:24 10:3,
9

understand 32:21
67:5,6 79:11

understanding 48:12

unhealthy 60:23

United 5:19

University 9:17,19,25

USC 79:12

use 50:7

uses 50:19

usually 27:11

---

**V**

vague 13:10,24 14:14
15:2,14 16:5 17:14
18:20 20:23 26:2,24
27:6,19 40:18 42:17

Valve 5:17 6:16 41:21
42:4,10 43:4,9,24
44:5,8,14,16 45:3,
14,16,20,22 46:2,7,
13 47:4,8,11,13,18
49:23 53:4 54:3
70:24

various 12:17 21:25

Vazquez 6:23

vendor 54:25

vendors 21:25 22:4,
13 24:14 28:19 29:2
33:12

verbally 58:17

verified 7:16

version 76:5

versus 5:17 20:20
43:24 44:5 47:4
61:24 69:8 70:4
78:10 79:22

video 5:14,16 6:7,9,
11

videographer 5:9 6:6,
25 49:13,17 56:15,

19 65:16,20 72:6,10
81:16,18

violation 60:24

virtually 7:14

voluntarily 68:25

---

**W**

waiving 20:2

walk 56:9

want 14:17 25:10
26:3 55:6 57:6,17
59:23 63:20 66:19
72:16 76:7,19,24
81:16

wanted 11:4 35:11
63:23 74:7 78:8

wants 60:18

Washington 5:21

wasn't 18:5,7 21:19
29:14 31:16 40:14
62:24 80:23

way 7:14 32:25 47:19
57:4,5,6 59:25 61:24
63:6,14,22 64:6 67:7
69:22 70:20 71:2

ways 57:10 62:15

we're 5:9 20:2 45:18
49:13,18 56:21
65:21 67:16 72:12
81:18

wear 61:4

well-decided 76:16

went 63:24 74:3

West 6:4

Western 5:20

wholly 51:10

wild 60:12

wish 66:9,12

withdraw 33:4

witness 5:7,23 7:3,6,
8,15,23 8:16 11:4
12:12 14:15,19 15:3,
15 17:18 18:21 19:7
20:8,25 21:9,24
22:17 23:10,20 24:6,
13 26:3,10,25 27:7,
20 28:16 30:16 33:2
34:17 35:3 37:5,14,
23 39:4 40:19 41:13
42:18 44:24 45:8
46:11 49:4 50:14
56:4,22 61:21 65:10,
13 66:2,9,25 68:24
75:12,14 79:10 80:2
81:20

witnesses 58:13

wonderful 63:5

wool 61:4

words 12:4 56:7

work 12:16 36:3,13
39:13 48:7,8,20
53:15 56:25 57:3,8,
23 58:23 61:5 66:20
67:24 70:13 73:22

worked 11:13 21:25
34:12 40:22 52:7,13
53:11,18 54:20
57:16 63:9 67:23
68:2

working 10:11,15,20,
23 33:24 34:3,18
36:12 53:20 54:8,11,
14,18 64:23 72:20

works 53:18

wouldn't 27:22 55:22
61:6

**Sugouri Batra**

**wrapping** 49:9 72:2

**write** 16:9

---

### X

**XXXX** 5:8 8:2 75:25

---

### Y

**yeah** 13:9 41:13
44:21 50:14 53:5
70:21 71:5 74:21
75:3,4

**year** 76:4

**Yep** 50:2,6

**York** 5:24,25 8:6,17,
24,25

---

### Z

**Zito** 5:4 6:22 7:22
10:25 17:25 18:10
19:14,21 23:2,19
25:23 30:4,21,25
32:12 41:11 44:18
48:25 49:10 50:10
55:15,25 57:18
58:10 59:16 60:21
63:25 67:11,19
68:14,22 75:13,16,
21 76:3 77:4,18,22
79:24 81:12,17

**Zoom** 5:15 9:12