# EXHIBIT 1
# SEALED

Patent Asset Management / Rothschild Broadcast

# Transcript Export

Deponent: Batra, Sugouri

September 5, 2025

1/23/2026 11:48 am

BATRA, SUGOURI Deposition Transcript                                    Full - Designations



The operating system for lawyers ®

**Page 1**

```
 1   UNITED STATES DISTRICT COURT
     FOR THE WESTERN DISTRICT OF WASHINGTON
 2   AT SEATTLE
     -----------------------------------------x
 3   VALVE CORPORATION,

 4                   Plaintiff,

 5                         Case No.:·
                           2:23-cv-1016
 6                         (JNW)

 7        -against--

 8
     LEIGH ROTHSCHILD, ROTHSCHILD BROADCAST
 9   DISTRIBUTION SYSTEMS, LLC, DISPLAY
     TECHNOLOGIES, LLC, PATENT ASSET MANAGEMENT,
10   LLC, MEYLER LEGAL, PLLC, and SAMUEL
     MEYLER,

11                   Defendants.

12   ------------------------------------X

13

14              DATE: September 5, 2025

15              TIME:  11:34 a.m. EST

16

17

18      VIDEO DEPOSITION of SUGOURI BATRA, a

19   Non-Party Witness herein, taken by the

20   Plaintiff, pursuant to Federal Rules of

21   Civil Procedure, and Subpoena, held

22   virtually via Zoom, at the above-mentioned

23   date and time, before MARINA DUBSON, a

24   Notary Public of the State of New York.

25   JOB NO. 10172200
```

Batra, Sugouri Deposition                                                      September 5, 2025

Page 2

```
1    APPEARANCES:

2

3    KILPATRICK TOWNSEND & STOCKTON LLP
     Attorney for Plaintiff
4    VALVE CORPORATION
     1420 Fifth Avenue, Suite 3700
5    Seattle, Washington 98101
     (206) 467.9600
6    BY:   KATHLEEN R. GEYER, ESQ.
           Kgeyer@kilpatricktownsend.com
7
           DARIO A. MACHLEIDT, ESQ
8          Dmachleidt@kilpatricktownsend.com

9

10   HOUSETONIP
     Attorney for Witness
11   SUGOURI BATRA
     5353 West Alabama Street, Suite 303
12   Houston, Texas 7056
     (832) 800-4133
13   BY:   SHEA PALAVAN, ESQ.
           Shea@housetonip.com

14

15   DNL ZITO
     Attorney for Defendants
16   LEIGH ROTHSCHILD, ROTHSCHILD BROADCAST
     DISTRIBUTION SYSTEMS, LLC, DISPLAY
17   TECHNOLOGIES, LLC, PATENT ASSET MANAGEMENT,
     LLC, MEYLER LEGAL, PLLC, and SAMUEL
18   MEYLER
     1250 Connecticut Avenue Northwest,
19   Suite 700
     Washington, DC 20036
20   (202) 466.3500
     BY:   JOSEPH J. ZITO, ESQ.
21         Jzito@dnlzito.com

22         RENÉ A. VAZQUEZ, ESQ.
           Rvazquez@dnlzito.com
23
           ROBERT CADLE, ESQ.
24
           (Cont'd next page.)
25
```

Batra, Sugouri Deposition                                                    September 5, 2025

Page 3

```
 1     APPEARANCES (cont'd)

 2

 3     ALSO PRESENT:

 4

 5     MIRANDA PERALES, videographer

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

CONFIDENTIAL

Batra, Sugouri Deposition                                                    September 5, 2025

**Page 4**

1          IT IS HEREBY STIPULATED AND AGREED,

2     by and between the attorneys for the

3     respective parties, as follows:

4

5     THAT all objections, except as to the form

6     of the questions, shall be reserved to the

7     time of the trial;

8

9     THAT the within examination may be signed

10    and sworn to before any Notary Public with

11    the same force and effect as if signed and

12    sworn to before the Court;

13

14    THAT filing of the original transcript of

15    the examination is waived.

16

17

18

19

20

21

22

23

24

25

CONFIDENTIAL                                           Kilpatrick Townsend & Stockton LLP

Batra, Sugouri Deposition                                                                September 5, 2025

Page 5

```
 1              S. Batra

 2          THE REPORTER:  Are you ordering

 3     a copy of this transcript?

 4          MR. ZITO:  Yes, regular

 5     turnaround.

 6          MR. PALAVAN:  No, but the

 7     witness will read and sign.

 8                XXXX

 9          THE VIDEOGRAPHER:  We're now on

10     the record.

11          Today's date is September 5,

12     2025, and the time is 11:34 a.m.

13     Eastern Time.

14          This is the remote video

15     deposition of Sugouri Batra via Zoom

16     video conference being taken in the

17     matter of Valve Corporation versus

18     Leigh Rothschild, et al, on behalf of

19     plaintiff, pending in the United

20     States District Court for the Western

21     District of Washington.  Case number

22     is 2:23-cv-1016 (JNW).

23          The witness is appearing

24     remotely from New York City,

25     New York.
```

CONFIDENTIAL                                                   Kilpatrick Townsend & Stockton LLP

Batra, Sugouri Deposition                                                September 5, 2025

**Page 6**

```
 1              S. Batra

 2         My name is Miranda Perales

 3    appearing for Aptus Court Reporting

 4    located at 400 West A Street, Suite

 5    1680, San Diego, California 92101.

 6         I am the official videographer,

 7    and this is the only authorized video

 8    recording of this deposition.  The

 9    audio and the video recording will

10    take place at all times unless all

11    counsel agree to go off the video

12    record.

13         Will counsel please identify

14    yourselves and state who you're with

15    Kate Geyer with Kilpatrick Townsend

16    on behalf of Plaintiff Valve

17    Corporation.  And with me is my

18    colleague Dario Machleidt.

19         MR. PALAVAN:  Shea Palavan on

20    behalf of the deponent, Sugouri

21    Batra, from HoustonIP.

22         MR. ZITO:  This is Joseph Zito.

23    And with me is René Vazquez on behalf

24    of all of the defendants in the case.

25         THE VIDEOGRAPHER:  Ms. Court
```

Batra, Sugouri Deposition                                    September 5, 2025

**Page 7**

1              S. Batra

2    reporter, please swear in the

3    witness.

4         THE REPORTER:  Will Counsel

5    please stipulate that in lieu of

6    formally swearing in the witness in

7    person, the Reporter will instead ask

8    the witness to acknowledge that their

9    testimony will be true under the

10   penalties of perjury.

11        That, Counsel will not object

12   to the admissibility of the

13   transcript based on proceeding in

14   this way, meaning virtually.

15        And that, the witness has

16   verified that she is, in fact,

17   Sugouri Batra.

18        So stipulated?

19        MS. GEYER:  Yes, for plaintiff.

20        MR. PALAVAN:  Yes, for

21   deponent.

22        MR. ZITO:  Yes, so stipulated.

23        (Whereupon, the Witness was

24   sworn in by the Court Reporter at

25   this time.)

Batra, Sugouri Deposition                                                    September 5, 2025

Page 8

```
 1                    S. Batra
 2                    XXXX
 3      S U G O U R I    B A T R A,
 4          after having first been duly sworn by
 5          a Notary Public of the State of New
 6          York, was examined and testified as
 7          follows:
 8      EXAMINATION
 9      BY MS. GEYER:
10          Q.    Good morning.  Could you please
11      state your full name for the record?
12          A.    Sugouri Batra.
13          Q.    What is your home address?
14              MR. PALAVAN:  You can just give
15          the city and state.
16              THE WITNESS:  I live in New
17          York City, New York.  Pretty sure you
18          have my home address.
19          Q.    Can you please confirm your
20      full home address for the record?  And if
21      this is an issue of confidentiality, we can
22      mark the transcript as confidential.
23          A.    215 East ninety -- 215 East
24      91st Avenue, apartment 14B, New York,
25      New York.
```

Valve Corporation                                                    Affirmative

Batra, Sugouri Deposition                                                    September 5, 2025

Page 9

1            S. Batra

2        Q.    Do you have anything in front

3    of you today besides your computer?

4        A.    A note pad.

5        Q.    Is there anything on that note

6    pad?

7        A.    No.

8        Q.    Is there anyone in the room

9    with you?

10        A.    No.

11        Q.    Do you have anything open on

12    your computer besides Zoom?

13        A.    No.

14        Q.    Are you a lawyer?                    Valve Corporation          Affirmative

15        A.    Yes.

16        Q.    Where did you go to law school?

17        A.    University of Miami.

18        Q.    When did you graduate from

19    University of Miami law school?

20        A.    2016.

21        Q.    What states are you barred in?

22        A.    Florida, Texas.  I have the

23    patent bar.  And in the Supreme Court.

24        Q.    Where did you go to undergrad?

25        A.    University of Miami.

Batra, Sugouri Deposition                                    September 5, 2025

**Page 10**

1           S. Batra

2      Q.   What did you study in

3    undergrad?

4      A.   Biology and psychology.

5      Q.   Did you get a degree in both

6    biology and psychology?

7      A.   Yes.

8      Q.   When did you graduate from

9    undergrad?

10      A.   2013.

11      Q.   When did you start working for                    **Valve Corporation**              Affirmative

12    Mr. Rothschild or one of his related

13    entities?

14      A.   March of 2021.

15      Q.   When you were working for Mr.

16    Rothschild -- strike that.

17           What specific entity were you                     **Valve Corporation**              Affirmative

18    employed by?

19      A.   Patent Asset Management.

20      Q.   When did you stop working for

21    Patent Asset Management?

22      A.   October of 2022.

23      Q.   Why did you stop working for

24    Patent Asset Management?

25           MR. ZITO:  Objection if that's

Kilpatrick Townsend & Stockton LLP

Batra, Sugouri Deposition                                                    September 5, 2025

**Page 11**

```
1              S. Batra

2       confidential or privileged

3       information.

4          THE WITNESS:  I wanted better      Valve Corporation          Affirmative

5       opportunity.

6       Q.    It was your choice to leave

7    Patent Asset Management?

8       A.    Yes.

9       Q.    What was your job title at

10   Patent Asset Management?

11      A.    General counsel.

12      Q.    You were general counsel for

13   the full time you worked there?

14      A.    Yes.

15      Q.    Would it surprise you if Mr.

16   Rothschild had told us that he fired you

17   from Patent Asset Management?

18      A.    No.

19      Q.    Why would that not surprise

20   you?

21      A.    It just doesn't.

22      Q.    Were you fired from Patent

23   Asset Management?

24      A.    No.

25      Q.    What was your role as general
```

Batra, Sugouri Deposition                                                September 5, 2025



Page 12

1              S. Batra

2    counsel -- strike that.

3          If I refer to Patent Asset                    Valve Corporation          Affirmative

4    Management as PAM, just to say less words,

5    is that okay?

6        A.   Yes, of course.

7        Q.   What was your role as general

8    counsel at PAM?

9          MR. PALAVAN:  To the extent it

10         doesn't reveal privileged

11         information.

12         THE WITNESS:  So, I basically                 Valve Corporation          Affirmative

13         managed patent prosecution as well as

14         litigation.  And my duties also

15         included finding, hiring, firing

16         outside counsel, transactional work.

17         So, redlining various agreements,

18         settlement agreements, NDAs,

19         covenants not to sue, consulting

20         agreements, agreements with outside

21         counsel, things like that.

22       Q.   Did you perform all of these

23    tasks on behalf of Patent Asset Management

24    and subsidiaries of Patent Asset

25    Management?

CONFIDENTIAL                                        Kilpatrick Townsend & Stockton LLP

Batra, Sugouri Deposition                                                    September 5, 2025

Page 13

1                S. Batra

2        A.   Mostly for PAM.  Sometimes for

3   the subs, subsidiaries, as well.

**Valve Corporation**                                          Affirmative

4        Q.   Did you have any

5   responsibilities for the financial side of

6   the business?

7        A.   Could you please clarify what

8   you mean?

9            MR. PALAVAN:  Yeah.  Objection.

10       Vague.

**Rothschild**                                                Counter
Untimely

11       Q.   Did you have any

12   responsibilities for setting up bank

13   accounts on behalf of PAM or any of its

14   subsidiaries?

15       A.   No.

16       Q.   Did you have any

17   responsibilities that involved moving money

18   that -- between PAM or its subsidiaries?

19       A.   No.

20       Q.   Did you have any

21   responsibilities related to ensuring

22   outside counsel got paid?

23            MR. PALAVAN:  Objection.

24       Vague.

25            MR. PALAVAN:  Can you reask?

Batra, Sugouri Deposition                                                September 5, 2025

**Page 14**

```
 1              S. Batra
 2     That's kind of broad.  Not to be
 3     obtuse, you know.  It can include
 4     just sending an e-mail or collections
 5     and stuff.  Can you be a little more
 6     specific?
 7         MS. GEYER:  No.  I am going to
 8     let my question stand, and I would
 9     appreciate if you just objected.  I
10     can ask more targeted questions based
11     on the answers.
12         MR. PALAVAN:  Okay.  Then my
13     objection remains.
14         Objection.  Vague.
15         THE WITNESS:  Do I respond?
16         MR. PALAVAN:  Yes.  You respond
17     how you want.  If you want
18     clarification --
19         THE WITNESS:  Could you ask the
20     question again, please?
21     Q.   Of course.
22         Did you have any
23 responsibilities for ensuring outside
24 counsel was paid?
25         MR. PALAVAN:  Again, objection.
```

Batra, Sugouri Deposition                                    September 5, 2025

**Page 15**

```
 1              S. Batra

 2        Vague.

 3              THE WITNESS:  So, I -- it was

 4        not in my power to ensure that anyone

 5        got paid, but I would, as a matter of

 6        courtesy, remind Mr. Rothschild that

 7        whoever needed to get paid was

 8        needing to get paid.

 9     Q.   Were you responsible for any

10  payments made to PAM or any of its

11  subsidiaries as a result of any licensing

12  agreements?

13              MR. PALAVAN:  Objection.

14        Vague.

15              THE WITNESS:  What do you mean?

16        Responsible how?

17     Q.   Sorry.  I didn't mean to

18  interrupt you.

19              Were you responsible for --

20  well, strike that.

21              Did you have access to any of

22  the PAM or subsidiary bank accounts?

23     A.   No.

24     Q.   Did you have any authorization

25  on behalf of PAM or any subsidiaries to
```

Valve Corporation                          Affirmative

Batra, Sugouri Deposition                                                      September 5, 2025

**Page 16**

1                    S. Batra

2    make payments?

3        A.   No.

4            MR. PALAVAN:  Objection.

5        Vague.

6        Q.   Did you have access to any PAM

7    or its subsidiaries' credit cards?

8        A.   No.

9        Q.   Could you write checks on

10   behalf of PAM or any of its subsidiaries?

11       A.   No.

12       Q.   One of your responsibilities

13   was overseeing patent litigation, correct?

14       A.   Yes.

15       Q.   Does that involve active, filed

16   litigations?  Or would that include any

17   pre-filing enforcements, such as demand

18   letters?

19       A.   It would include both.

20       Q.   Did you have any role in

21   identifying potential targets for patent

22   litigation?

23       A.   For some campaigns, yes.  For

24   others, no.

25       Q.   What do you mean when you say a

Valve Corporation                    Affirmative

Valve Corporation                    Affirmative



Page 17

S. Batra

2    "campaign"?

3        A.    By "campaign," I mean a

4    specific patent asset or like a specific

5    patent portfolio.

6        Q.    How many campaigns were you --

7    did you oversee at your time at PAM?

8        A.    I don't recall.

9        Q.    Was it more than ten?

10       A.    Probably.

11       Q.    Who decides when to start a

12   campaign?

13           MR. PALAVAN:  Objection.

14       Vague.  Speculation.

15           Answer to the ability you can,

16       again, without revealing privileged

17       information.

18           THE WITNESS:  Mr. Rothschild

19       would be among.  Other than that,

20       probably outside counsel.

21       Q.    Mr. Rothschild and outside

22   counsel would identify which patent or

23   patent portfolios to begin asserting; is

24   that correct?

25           MR. ZITO:  Objection.  Calls

**Valve Corporation**                    Affirmative

**Valve Corporation**                    Affirmative

Batra, Sugouri Deposition                                        September 5, 2025

Page 18

                              S. Batra

1
2       for privileged communications.
3       Assert privilege.  Sorry.
4           MS. GEYER:  Joe, just for you,
5       I wasn't trying to get privilege.  I
6       was trying to repeat her last answer
7       back.  So, just so you know, I wasn't
8       trying to get there.  So, I'll try
9       that again.
10          MR. ZITO:  No accusation there,
11      but once you get into the substance
12      of deliberations or the existence of
13      deliberations, that's privileged
14      communication.
15          MS. GEYER:  Got it.
16      Q.   What would happen after
17  Mr. Rothschild and outside counsel decide
18  to start a campaign?

**Valve Corporation**                              Affirmative

19          MR. PALAVAN:  Objection.
20      Vague.

**Valve Corporation**                              Affirmative

21          THE WITNESS:  The campaign
22      would start.
23      Q.   What would that entail?
24      A.   Either a letter or a lawsuit.
25      Q.   Who would decide whether to

Kilpatrick Townsend & Stockton LLP

Batra, Sugouri Deposition                                                September 5, 2025

Page 19

1              S. Batra

2    send a letter or a lawsuit?

| | |
|---|---|
| **Valve Corporation** | Affirmative |

3         MR. PALAVAN:  Objection.

4    Speculation.

5         You can answer to the ability

6    you know.

| | |
|---|---|
| **Valve Corporation** | Affirmative |

7         THE WITNESS:  Generally,

8    definitely Mr. Rothschild.  And then

9    specifically, I don't recall the

10   specifics for each campaign.

11        Q.   What would cause Mr. Rothschild

12   to choose to go forward with a demand

13   letter as opposed to filing a lawsuit?

14        MR. ZITO:  Objection.  Calls

15   for privileged communication.

16        MR. PALAVAN:  Objection.

17   Speculation.

18        MS. GEYER:  Joe, for the

19   record, was that an instruction not

20   to answer or a caution?

21        MR. ZITO:  I'm not her

22   attorney, so I cannot instruct

23   Ms. Batra, but I am objecting to the

24   question and would be suggesting she

25   not answer it because it would reveal

Batra, Sugouri Deposition                                                    September 5, 2025

**Page 20**

```
 1                 S. Batra
 2      privilege, and we're not waiving
 3      privilege to that question.
 4          MR. PALAVAN:  I'm going to
 5      instruct her to answer to the extent
 6      you can without revealing privileged
 7      information.
 8          THE WITNESS:  I don't feel
 9      comfortable answering to the extent I
10      feel like I would be compromising
11      privilege.
12      Q.   What role would you play in
13      deciding -- strike that.
14          Did you play a role in deciding
15      whether to send a demand letter or file a
16      litigation?
17      A.   I'm sorry.  Could you repeat
18      that, please?
19      Q.   Did you play a role in deciding
20      whether to send a letter versus file a
21      litigation during a campaign?
22          MR. PALAVAN:  Objection.
23      Vague.
24          Sorry.  Go ahead.
25          THE WITNESS:  I did not make
```

Rothschild                                                     Counter
Untimely

Rothschild                                                     Counter
Untimely

Kilpatrick Townsend & Stockton LLP



**Page 21**

1              S. Batra

2      decisions.  I did make suggestions at

3      times, yes.

*Rothschild — Counter — Untimely*

4      Q.   Is the ultimate decision

5 whether to file a lawsuit or send a demand

6 letter always Mr. Rothschild?

*Valve Corporation — Affirmative*

7         MR. PALAVAN:  Objection.

8      Speculation.

9         THE WITNESS:  I'm not sure --

10      I'm not uncomfortable [sic] answering

11      a question that has "always" in it,

12      but generally, yes.

13      Q.   I believe you said earlier that

14 sometimes you were responsible for

15 identifying potential targets for campaigns

16 and then sometimes it was not you.  Is my

17 memory correct?

18      A.   Yes.

19      Q.   When it wasn't you, who else

20 was responsible for identifying potential

21 targets?

*Valve Corporation — Affirmative*

22         MR. PALAVAN:  Objection.

23      Speculation.

24         THE WITNESS:  There were

25      various vendors that PAM worked with

*Valve Corporation — Affirmative*

Batra, Sugouri Deposition

September 5, 2025

Page 22

1              S. Batra

2         that made the claim charts, so it

3         would be one of them.

4         Q.   Who were those vendors?

5         A.   There were two firms in India.

6    I don't recall the names.

**Valve Corporation**    Affirmative

7         Q.   When you were responsible for

8    identifying the potential targets, were you

9    the one drafting the claim charts for those

10   targets?

11        A.   No.

12        Q.   Were claim charts always

13   drafted by those third-party vendors you

14   referenced?

**Valve Corporation**    Affirmative

15            MR. PALAVAN:  Objection.

16        Speculation.

17            THE WITNESS:  Generally, from

18        what I remember, yes.

**Valve Corporation**    Affirmative

19        Q.   Did you perform any

20   investigation into those targets -- strike

21   that.

22            After you identified targets

23   for investigation, what would happen

24   between that step and requesting claim

25   charts from the third parties?



Page 23

1           S. Batra

2           MR. ZITO:  Objection to the

3      extent it might reveal privileged

4      communications.

5           MR. PALAVAN:  Objection.

6      Speculation.

7           Answer to the best you can

8      without revealing privileged

9      information.

10          THE WITNESS:  I don't think I

11     can answer without compromising

12     privilege.

13      Q.    After you received claim charts

14     from the third parties, was any additional

15     investigation performed related to those

16     targets?

Rothschild                                              Counter
403, 502, MIL 3, Improper Counter, Untimely

17          MR. PALAVAN:  Objection.

18     Speculation.

19          MR. ZITO:  Same objection.

20          THE WITNESS:  Yes.

21      Q.    What additional investigation

22     would be performed?

23      A.    I don't feel comfortable

24     answering to the extent it will compromise

25     privilege.

Rothschild                                              Counter
403, 502, MIL 3, Improper Counter, Untimely

Batra, Sugouri Deposition

September 5, 2025

Page 24

1           S. Batra

2      Q.   Who would perform that

3   investigation?

4           MR. PALAVAN:  Objection.

5      Speculation.

6           THE WITNESS:  It would depend

7      on the campaign.

8      Q.   Who are all the people that

9   would perform that additional

10  investigation?

_Rothschild_                    Counter
Untimely

11          MR. PALAVAN:  Objection.

12      Speculation.

13          THE WITNESS:  So, as I

14      mentioned, the outside vendors would

15      for sure, and then also outside

16      counsel and whatever other counsel

17      that was ultimately involved in

18      bringing the suit.

_Rothschild_                    Counter
Untimely

19      Q.   When you say any other

20  counsel --

21      A.   Like local.

22      Q.   Thank you.

23      A.   Sometimes.  Not always.

24      Q.   When you were general counsel

25   at PAM, were there any other in-house

_Rothschild_                    Counter
Untimely

Batra, Sugouri Deposition

September 5, 2025

Page 25

1            S. Batra

2    attorneys?

3        A.    Yes.  There were a few at a

4    certain point.

5        Q.    Who were they?  What are their

6    names?

7        A.    One attorney, her first name

8    was Nicolle.  I don't remember her last

9    name.  There was also Daniel.  I don't

10   remember his last name.  And then I want to

11   say that's all I recall at this point in

12   terms of attorneys in-house.

13       Q.    Was it Nicolle Lafosse?

14       A.    Yes.

15       Q.    And Daniel Falcucci sound

16   familiar?

17       A.    Yes.

18       Q.    Is there anything

19   non-privileged you can tell me about any

20   analysis, research or diligence that PAM

21   did before sending a demand letter or

22   filing a lawsuit?

23          MR. ZITO:  Same caution.

24      Privilege.

25          MR. PALAVAN:  Objection.

**Rothschild**                                    Counter
Incomplete (add answer 25:17), Untimely

CONFIDENTIAL                                    Kilpatrick Townsend & Stockton LLP

Batra, Sugouri Deposition

September 5, 2025

Page 26

```
1               S. Batra

2       Vague.

3           THE WITNESS:  I don't want to

4       risk compromising privilege.

5       Q.    Do you know who had access to

6   the bank accounts for PAM and its

7   subsidiaries?

8           MR. PALAVAN:  Objection.

9       Speculation.

10          THE WITNESS:  Yes.

11      Mr. Rothschild.

12      Q.   Was Mr. Rothschild the only

13  person who had access to the bank accounts

14  of PAM and its subsidiaries?

15      A.   I don't know.

16          MR. PALAVAN:  Objection.

17      Speculation.

18      Q.   Did Mr. Rothschild have

19  approval for -- strike that.

20          Did Mr. Rothschild have to

21  approve of payments made by PAM to outside

22  counsel?

23          MR. PALAVAN:  Objection.

24      Speculation and vague.

25          THE WITNESS:  I'm not sure how
```

**Valve Corporation**                                    Affirmative

**Valve Corporation**                                    Affirmative

Batra, Sugouri Deposition                                                      September 5, 2025

**Page  27**

1                    S. Batra

2          to answer that.

3          Q.   Did Mr. Rothschild have to sign      **Valve Corporation**          Affirmative

4    off on payments that were made?

5              MR. PALAVAN:  Objection.

6          Speculation.  Vague.

7              THE WITNESS:  I'm not aware of       **Valve Corporation**          Affirmative

8          any like signing off on amounts to be

9          paid.  I do know he would often have

10         discussions on amounts that are owed

11         and to be paid, which I usually am

12         not a part of.  And there have been

13         plenty of those types of discussions.

14         I do know that.

15         Q.   Do you know whether there's any

16   authorization or approval requirements

17   before any of those payments were made?

18             MR. PALAVAN:  Objection.

19         Speculation.  Vague.

20             THE WITNESS:  If Mr. Rothschild     **Valve Corporation**          Affirmative

21         decided to pay, he would pay.  If he

22         decided not to, he wouldn't.  I don't

23         know what his internal procedure is

24         in deciding that.

25         Q.   Did Mr. Rothschild himself

Page 28

1                    S. Batra

2    handle all those payments?

3        A.    Correct.  At least during the

4    time I was there.

5        Q.    During the time you were there,

6    did Mr. Rothschild handle -- strike that.

7             I think my line of questions

8    was limited to outside counsel, and I kind

9    of dropped that from the question.

10            So, just to clear it up a

11   little bit:  Mr. Rothschild was responsible

12   for making all the payments to outside

13   counsel; is that correct?

14            MR. PALAVAN:  Objection.

15     Speculation.

16            THE WITNESS:  That's fair to

17     state -- say, yes.

18       Q.    Was Mr. Rothschild responsible

19   for making payments to any vendors that you

20   used?

21       A.    Yes.

22       Q.    Was Mr. Rothschild responsible

23   for making any employee payroll payments?

24       A.    Yes, through PAM, of course.

25       Q.    Were all of the payments to

Valve Corporation                                    Affirmative

Valve Corporation                                    Affirmative

Batra, Sugouri Deposition                                                September 5, 2025

Page 29

```
 1                    S. Batra

 2    outside counsel, vendors, and payroll done

 3    through PAM?

 4         A.    I don't know.

 5         Q.    When you said "through PAM,"

 6    was that specific to payroll?

 7         A.    Yes.

 8         Q.    So, payroll is paid through

 9    PAM?

10         A.    Yes.  PAM would pay me, and I

11    believe the other employees as well, not

12    Mr. Rothschild individually.

13         Q.    Mr. Rothschild individually

14    wasn't paid through PAM?

15         A.    I don't know.  I am saying the

16    paycheck would not come from him.  It would

17    come from PAM.

18         Q.    Sorry.  I got it.

19         A.    I have no idea how he paid

20    himself.

21         Q.    That was my next question.  So,

22    thank you.

23              I believe you referenced there

24    were discussions with Mr. Rothschild

25    related to some of the payment issues.
```

CONFIDENTIAL                                                Kilpatrick Townsend & Stockton LLP

September 5, 2025

**Page 30**

```
 1              S. Batra

 2         Who else was in those

 3    discussions?

 4         MR. ZITO:  I am going to object

 5    and caution on privilege.  Certainly,

 6    these could involve issues of

 7    legality of payments, obligations for

 8    payments, contractual obligations,

 9    all of which would be legal

10    conversations.

11         MR. PALAVAN:  Objection.

12    Speculation.

13         You can answer to the extent

14    you know and can do so without

15    revealing privileged information.

16         THE WITNESS:  Shea, are the

17    names of the attorneys who owed

18    money, is divulging that privilege?

19    Could be potentially privilege?

20         MR. PALAVAN:  I mean, I would

21    defer to Mr. Zito and his firm,

22    whether or not they would consider

23    that privileged or assert the

24    privilege.

25         MR. ZITO:  To the extent that
```

**Page 31**

```
 1                S. Batra

 2      you actually do or do not know

 3      that -- I don't even know that -- you

 4      would have gotten that information

 5      from Mr. Rothschild.  And as

 6      Mr. Rothschild's and/or PAM's

 7      in-house counsel, he would have given

 8      you that information because he was

 9      seeking your legal advice on it.  So,

10      yes, even the names of people who may

11      or may not have paid, may or may not

12      have disputed, would be part of

13      privileged communication.  Yes.

14           MS. GEYER:  I am going to back

15      up a bit because I think my question

16      wasn't clear based on everything I've

17      heard from people.  So, I am going to

18      give a narrative and explain what I

19      am asking for and try to ask better

20      questions.

21           I'm asking for conversations

22      she was personally part of, that she

23      was testifying to, who else was in

24      that conversation; so, not things she

25      learned because Mr. Rothschild told
```

Batra, Sugouri Deposition                                    September 5, 2025

Page 32

1              S. Batra

2    her that he talked to someone about

3    it; things where she was actually

4    present for and who else was just

5    like on the phone with her, if it was

6    a phone call, if it was in person,

7    for example.

8         And I think that's all

9    something that's privilege log.  That

10   would be on a privilege log.

11        Joe, do you disagree with that?

12        MR. ZITO:  You're asking was

13   Dan in the room and part of the

14   conversation.  That would not be

15   objectionable.

16        MS. GEYER:  That was what I was

17   trying to ask:  For the conversations

18   where Ms. Batra was present related

19   to payment discussions, who else was

20   in the room?  Because, not hiding

21   anything, I'm trying to understand

22   was anyone else besides

23   Mr. Rothschild involved with or

24   responsible for finances.  Maybe I

25   can try asking it that way instead.

CONFIDENTIAL

September 5, 2025

Page 33

1                    S. Batra

2            THE WITNESS:  Could you repeat

3        the question?

4            MS. GEYER:  I'll withdraw my

5        last question to the extent it's

6        still pending anymore.  I'll try a

7        different thing.

8    BY MS. GEYER:

9        Q.    Besides Mr. Rothschild, were

10   any other PAM employees involved in or

11   responsible for ensuring payments happened;

12   for example, to outside counsel, vendors,

13   or payroll?

14            MR. PALAVAN:  Objection.

15        Speculation.

16        A.    So, the paralegal at the time,

17   Christina -- I am forgetting her last

18   name -- she would know more about this.

19   She would be more closely following on who

20   is owed what, who is getting paid what, and

21   who eventually gets paid what.

22        Q.    Is that Christina Arias?

23        A.    Yes.

24        Q.    Was Ms. Arias working there the

25   entire time you were at PAM?

Batra, Sugouri Deposition                                                      September 5, 2025

                                                                    **Page 34**

1                          S. Batra

2           A.    I think so.

3           Q.    Do you recall working with any

4    other paralegals at your time at PAM?

5           A.    Yes.  I'm forgetting her name.

6    I think it's Aisha.  I don't know.  She was

7    there a while before me, and she left a

8    little after I had joined.  I am blanking

9    on her name, though.

10          Q.    That one, I don't have in front

11   of me either.

12          A.    She worked before -- she was

13   employed there before Christina left.

14          Q.    Do you know why Aisha left PAM?

15               MR. PALAVAN:  Objection.

16           Speculation.

17               THE WITNESS:  I don't recall.

18          Q.    Was Nicolle Lafosse working at

19   PAM the whole time you were there?

20          A.    Not the full time.  She left

21   some time before.

22          Q.    Do you know why Ms. Lafosse

23   left PAM?

24          A.    I don't recall.

25               MR. PALAVAN:  Objection.

Batra, Sugouri Deposition                                              September 5, 2025

                                                              **Page 35**

1                    S. Batra

2         Speculation.

3              THE WITNESS:  I don't recall.

4              MS. GEYER:  And Shea, I am

5         trying to ask questions, do you know

6         who, to not have you object to

7         speculation.

8              So, I am -- I don't think it's

9         appropriate to object to speculation

10        because I am asking her if she knows,

11        because she can say no.  Just wanted

12        to point that out.

13        Q.   I believe you said one of your

14   other responsibilities was with respect to

15   agreements, NDAs, covenants not to sue; is

16   that correct?

17        A.   Yes.

18        Q.   What specifically were your

19   responsibilities for those agreements?

20        A.   Redlining them, sometimes

21   having calls with outside counsel to

22   negotiate certain points.  Other times,

23   completely redoing past templates or past

24   forms, things like that.

25        Q.   Were you responsible for

Batra, Sugouri Deposition                                                    September 5, 2025

Page 36

1              S. Batra

2    negotiations with third parties directly?

3    Or did you work for outside counsel?

4         A.   What do you mean by third party

5    specifically?

6         Q.   When you do covenants not to

7    sue, for example, those would be negotiated

8    between PAM or one of its subsidiaries and

9    then a third-party target; is that correct?

10        A.   Correct.

11        Q.   In those situations, would you

12   be responsible for directly working with

13   the third party, or did you work through

14   outside counsel?

15        A.   So, sometimes yes, sometimes

16   no.  Sometimes I would do it directly.

17   Other times, outside counsel would do a lot

18   of it and I would come in towards the end

19   to finalize.  So, it just really depends.

20        Q.   Before all those agreements are

21   finalized, would Mr. Rothschild have to

22   approve of the draft and the terms therein?

23        A.   Absolutely.

24        Q.   Was there ever a time where

25   Mr. Rothschild did not approve of the final

**Valve Corporation**                                          Affirmative

Batra, Sugouri Deposition                                                      September 5, 2025

Page 37

1              S. Batra

2    drafts and the terms for any agreement?          **Valve Corporation**          Affirmative

3         MR. PALAVAN:  Objection.

4      Speculation.

5         THE WITNESS:  Not that I am          **Valve Corporation**          Affirmative

6      aware of.

7      Q.    When you said NDA -- well,

8    strike that.

9         Was Mr. Rothschild involved in

10   any of the negotiations with the

11   third-party targets?

12        MR. PALAVAN:  Objection.

13     Speculation.

14        THE WITNESS:  Sometimes.  Yes.

15     Q.    What were the reasons why he

16   would get involved in some of the specific

17   negotiations?

18        MR. PALAVAN:  Objection.

19     Speculation.

20        And answer to the best you can

21     without divulging privileged

22     information.

23        THE WITNESS:  I don't recall

24     specifics.

25     Q.    You mentioned NDAs as well; is

Batra, Sugouri Deposition                                                September 5, 2025

Page 38

1                    S. Batra

2    that right?

3         A.   Yes.

4         Q.   That's nondisclosure

5    agreements?

6         A.   Correct.

7         Q.   Were those nondisclosure

8    agreements for -- well, strike that.

9              Were those nondisclosure

10   agreements for third-party targets to

11   engage in negotiations, or were those

12   nondisclosure agreements, for example, for

13   employees or ex-employees?

14        A.   Neither.

15        Q.   What were they for?

16        A.   These would arise in the

17   context of purchasing new assets or

18   selling, like if there are patent brokers

19   involved.

20        Q.   When you say purchasing and

21   selling new assets, that means patents or

22   patent applications?

23        A.   Correct.

24        Q.   Were there any other assets

25   besides patents and patent applications?

Batra, Sugouri Deposition                                        September 5, 2025

**Page 39**

1           S. Batra

2           MR. PALAVAN:  Objection.

3       Speculation.

4           THE WITNESS:  Not that I

5       recall.

6       Q.    Did you have any

7   responsibilities with respect to like

8   corporate formation documents or

9   registrations with secretaries of states

10  for PAM or any of its subsidiaries?

11      A.    That was more under Daniel's

12  department.

13      Q.    Did Mr. Falcucci work at PAM

14  the entire time you were there?

15      A.    I don't think so.  I think he

16  came after I was employed.

17      Q.    Do you recall, did he replace

18  anyone when he came in?

19      A.    No.  From what I remember, his

20  role was kind of a new role at the company

21  at the time.

22      Q.    Prior to Mr. Falcucci starting

23  at PAM, was someone else responsible for

24  the corporate formation or secretary of

25  state registrations for PAM and its

September 5, 2025

Page 40

```
 1                    S. Batra
 2   subsidiaries?
 3        A.   I don't recall.
 4        Q.   That was never in your job
 5   responsibilities even before Mr. Falcucci
 6   joined?
 7        A.   What specifically?
 8        Q.   Corporate formation documents,
 9   registrations with the secretary of state,
10   those kind of things related to corporate
11   formalities for PAM and its subsidiaries?
12        A.   I don't recall.  I might have
13   looked into some of this stuff, but it
14   wasn't really my focus.
15        Q.   Did you ever assist with
16   creating a new PAM subsidiary?
17             MR. PALAVAN:  Objection.
18        Vague.
19             THE WITNESS:  Probably, but I
20        don't remember any specific
21        companies.
22        Q.   When you worked for PAM, did
23   you know how many subsidiaries it actually
24   had?
25        A.   At some point, I probably did.
```

Batra, Sugouri Deposition                                                          September 5, 2025

**Page 41**

1                    S. Batra

2       Q.    Order of magnitude, do you

3   recall how many it was?

4       A.    No.

5       Q.    Was it more than 20?

6       A.    I don't recall.

7       Q.    More than 10?

8       A.    Yes.

9       Q.    Do you know why PAM had so many    | Valve Corporation    Affirmative

10   subsidiaries?

11             MR. ZITO:  Objection.  Calls

12       for privileged communication.

13             THE WITNESS:  Yeah.  I prefer    | Valve Corporation    Affirmative

14       not to answer on the basis of

15       privilege, please.

16       Q.    Do you have any non-privileged

17   information regarding why PAM has so many

18   subsidiaries?

19       A.    I don't think so.

20       Q.    Outside of the subpoena in this

21   case, are you familiar with Valve

22   Corporation?

23       A.    No.

24       Q.    When you were at Patent Asset

25   Management, did you have -- strike that.

CONFIDENTIAL

Page  42

S. Batra

2      When you were at Patent Asset

3   Management, did you have any responsibility

4   for any lawsuits filed against Valve in

5   2022?

6      A.    What do you mean by "any

7   responsibility," please?

8      Q.    Were you aware that certain PAM

9   entities filed patent infringement

10   litigation against Valve in September of

11   2022?

12      A.    Yes.

13      Q.    As part of your

14   responsibilities, did you oversee those

15   lawsuits?

16         MR. PALAVAN:  Objection.

17      Vague.

18         THE WITNESS:  To the extent I

19      could.  I believe I left like a month

20      afterwards.

21      Q.    At least the initial filing of

22   those lawsuits in September of 2022, you

23   would have been involved in that process;

24   is that right?

25      A.    Yes, making sure the lawsuit

Valve Corporation                    Affirmative

Valve Corporation                    Affirmative

Page 43

1            S. Batra

2    gets filed.  Correct.

3        Q.   Do you remember which PAM

4    entity sued Valve in September of 2022?

5        A.   No.

6        Q.   Do you know that -- strike

7    that.

8            Do you know how many lawsuits

9    against Valve PAM subsidiaries filed in

10   September of 2022?

11       A.   I think at least two.

12       Q.   It would be two different

13   subsidiaries because those would be two

14   different patent or patent portfolios under

15   each subsidiary; is that right?

16       A.   Yes.

17       Q.   I'll represent -- I know you

18   don't remember the names.  I'll represent

19   the two entities were Display Technologies

20   and Social Positioning Input Systems, or

21   SPIS.  Does that sound familiar at all?

22       A.   Yes.

23       Q.   Do you recall what happened in

24   the Display Technologies versus Valve

25   lawsuit in September of 2022?

**Valve Corporation**                    Affirmative

**Valve Corporation**                    Affirmative

Batra, Sugouri Deposition                                                      September 5, 2025

Page  44

1                  S. Batra

2        A.   I'm sorry.  Could you repeat

3    that?

4        Q.   Do you know how the Display

5    Technologies versus Valve lawsuit in

6    September of 2022 resolved?

7        A.   I don't recall.

8        Q.   Do you recall that Valve                    Valve Corporation          Affirmative

9    informed outside counsel for Display

10   Technologies that it was already licensed

11   to the patent asserted against it?

12       A.   Yes.

13       Q.   Did Display Technologies do any

14   investigations before suing Valve in

15   September of 2022 to ensure that or to

16   check whether Valve was licensed to that

17   patent?

18            MR. ZITO:  That's going to be

19       another caution.  Don't reveal any

20       privileged communications.

21            MR. PALAVAN:  Yeah.  Just to

22       the ability you can without revealing

23       privilege.

24            THE WITNESS:  Could you repeat

25       the question, please?

Batra, Sugouri Deposition                                                                September 5, 2025

**Page 45**

1                    S. Batra

2        Q.    Did Display Technologies check                    | Valve Corporation    Affirmative

3    whether Valve was already licensed to the

4    asserted patents in the September 2022

5    lawsuit before it filed the complaint?

6            MR. PALAVAN:  Objection.

7        Speculation.

8            THE WITNESS:  I don't recall                        | Valve Corporation    Affirmative

9        what Display did, but I do know that

10        I was informed of the prior

11        settlement after the lawsuit had been

12        filed.

13        Q.    Were you aware of the prior

14    settlement with Valve before the -- either

15    of the 2022 cases were filed against

16    Valve -- strike that.

17            Were you aware of the

18    settlement -- sorry.  We're going to go

19    back one more step.

20            The settlement with Valve you                      | Valve Corporation    Affirmative

21    referenced, is that the 2016 license

22    agreement that Valve entered into?

23        A.    Yes.

24        Q.    Were you aware of that license                   | Rothschild    Counter
                                                                 | Untimely
25    agreement before the September 2022 Display

CONFIDENTIAL                                                                Kilpatrick Townsend & Stockton LLP



Page 46

1              S. Batra

2    Technologies case against Valve?                    Rothschild          Counter
                                                          Untimely
3         A.   No.

4         Q.   Prior to filing the complaint            Valve Corporation   Affirmative

5    in the September '22 Display Technologies

6    lawsuit, did anyone at PAM check to see

7    whether Valve had a license to the asserted

8    patent in that suit?

9              MR. PALAVAN:  Objection.

10         Speculation.

11              THE WITNESS:  I don't recall.           Valve Corporation   Affirmative

12         Q.   Did you personally check

13    whether Valve was already licensed in the

14    asserted patent in the September 2022

15    Display Technologies case before the case

16    was filed?

17         A.   No.

18         Q.   Would someone at PAM be

19    responsible for checking whether a

20    potential defendant was already licensed to

21    a patent before a complaint was filed?

22         A.   Yes.  Mr. Rothschild would.

23         Q.   Does Mr. Rothschild need to

24    approve of complaints before they're filed?

25         A.   Absolutely.

Batra, Sugouri Deposition                                                        September 5, 2025

Page  47

1              S. Batra

2        Q.   Did Mr. Rothschild approve of                    **Valve Corporation**        Affirmative

3   the 20- -- September 2022 Display

4   Technologies versus Valve complaint before

5   it was filed?

6        A.   Yes.

7        Q.   How did you learn about the

8   2016 settlement agreement with Valve after

9   the Display Technologies lawsuit was filed

10  in September of 2022?

11       A.   I think because Valve had

12  brought it up.

13       Q.   You learned about it from Valve

14  and not anyone at PAM?

15       A.   I think so.

16       Q.   Who at PAM was primarily

17  responsible for the 2022 lawsuits against

18  Valve?

19       A.   Responsible in what way?

20       Q.   Making the decision to file

21  them and overseeing them.

22       A.   To file them, would be

23  Mr. Rothschild.

24       Q.   Who at PAM was primarily                         **Valve Corporation**        Affirmative

25  responsible for overseeing the actual

Batra, Sugouri Deposition                                                    September 5, 2025

Page 48

1                    S. Batra

2   litigation itself, tracking their status?

3        A.   I performed that role.

4        Q.   Until you left in October 2022?

5        A.   Correct.  But I do remember

6   spending most of October doing transitional

7   work.  So, I probably stopped doing status

8   overseeing type work sometime in September.

9        Q.   Did someone replace you as

10  general counsel, and you were transitioning

11  them in October?

12       A.   From my understanding, Daniel

13  was to replace me.

14       Q.   When you left PAM, did you sign

15  an NDA or a confidentiality agreement?

16       A.   I don't think I signed

17  anything.

18       Q.   Have you ever been asked to

19  sign an NDA or confidentiality agreement

20  about your work at PAM?

21       A.   I don't recall.

22       Q.   Are you aware of any other

23  former employees of PAM that were subject

24  to NDAs or confidentiality agreements?

25            MR. ZITO:  To the extent that

Valve Corporation                                                    Affirmative

September 5, 2025

**Page 49**

```
 1                 S. Batra

 2       that doesn't reveal a privileged

 3       communication.

 4            THE WITNESS:  I don't recall.

 5            MS. GEYER:  If counsels, both

 6       counsel, all counsel, would indulge

 7       me and Ms. Batra to five minutes so I

 8       can just look at my notes, I think

 9       I'm close to wrapping this up.

10            MR. ZITO:  No objection.

11            MR. PALAVAN:  No objection.

12            MS. GEYER:  Off the record.

13            THE VIDEOGRAPHER:  We're off

14       the record at 12:34 p.m.

15            (Whereupon, a short break was

16       taken at this time.)

17            THE VIDEOGRAPHER:  This is

18       beginning of media number two.  We're

19       back on the record at 12:46 p.m.

20       BY MS. GEYER:

21       Q.   The Display Technologies we

22       were talking about in the September of 2022

23       lawsuits against Valve, they're a

24       subsidiary of PAM, right?

25       A.   Yes.  At least during the time
```

Batra, Sugouri Deposition                                                   September 5, 2025

Page 50

```
 1                 S. Batra

 2     I was there, they were.  Yep.

 3         Q.   At the time of the September

 4     2022 lawsuit, Display Technologies was a

 5     subsidiary of PAM?

 6         A.   I think that's accurate.  Yep.

 7         Q.   Why use subsidiaries to file

 8     lawsuits and not have PAM directly file

 9     those lawsuits?

10             MR. ZITO:  Same caution as to

11         privilege.

12             MR. PALAVAN:  Just answer the

13         best you can to the extent you know.

14             THE WITNESS:  Yeah.  I'm going

15         to be over cautious here and not

16         answer at the risk of compromising

17         privilege.

18         Q.   Do you have any non-privileged

19     information about why PAM uses subsidiaries

20     to file patent infringement lawsuits

21     instead of filing them directly?

22         A.   No, I do not.  Also, I'd like

23     to clarify about the subs line of

24     questioning.  I think they were

25     subsidiaries.  I am not like a hundred
```

Valve Corporation                                            Affirmative

Valve Corporation                                            Affirmative

Batra, Sugouri Deposition                                                September 5, 2025

**Page 51**

```
 1                S. Batra

 2   percent sure what the relationships were

 3   because those existed -- predated my time

 4   there.  So, I'm actually not sure if

 5   legally, technically speaking, if those

 6   companies were set up like subsidiaries

 7   because it happened well before I joined.

 8        Q.   Do you know whether those

 9   companies, putting aside legal definition

10   of subsidiaries, were they wholly owned by

11   PAM?

12        A.   I'm not sure.

13        Q.   Earlier, you mentioned patent

14   brokers in one of your answers.

15             Do you remember that?

16        A.   Yes.

17        Q.   What is a patent broker?

18        A.   Patent broker is a person or

19   company that is in the business of

20   brokering patent assets.

21        Q.   What does it mean to broker

22   patent assets?

23        A.   Buy or sell.

24        Q.   Are patent brokers middle men,

25   or do they actually own patent assets that
```

Batra, Sugouri Deposition                                              September 5, 2025

**Page 52**

1                    S. Batra

2     they're trying to buy or sell?

3         A.   It depends.  Sometimes they own

4     the assets, sometimes they don't.  Most of

5     the times, they don't, from my experience

6     with them at PAM.

7         Q.   When you worked at PAM, do you

8     know how much revenue was in the PAM bank

9     account at any time?

10        A.   No idea.

11        Q.   Did you ever know how much          **Valve Corporation**        Affirmative

12    revenue was in the PAM bank account while

13    you worked there?

14        A.   No.  Financial information like

15    this were not accessible to the employees,

16    at least not to me.  Definitely not to me.

17        Q.   Did you ever know how much

18    revenue was in any of the PAM affiliated

19    companies?

20             I'm using that instead of

21    subsidiaries, just based on your last

22    answer.

23        A.   Thank you.

24             No.

25        Q.   For example, you don't know how

**Page  53**

1                    S. Batra

2     much revenue was in the Display

3     Technologies' bank account when you filed

4     the September 2022 lawsuit against Valve?

5          A.    Correct.  I did not.  Yeah.

6          Q.    Do you know Constance

7     Kazanjian?

8          A.    No.  Doesn't ring a bell.

9          Q.    When was the last time you

10    talked to Mr. Leigh Rothschild?

11         A.    The last day I worked there, so

12    October 2022.

13         Q.    You haven't had any

14    conversations with Mr. Rothschild after

15    your last day of work?

16         A.    Correct.

17         Q.    Have you talked to anyone else

18    who works for or worked with -- sorry.

19    Strike that.

20              Since you stopped working at

21    PAM, have you talked to Nicolle Lafosse?

22         A.    I think I ran into her at a

23    networking Bitcoin event after.  So,

24    probably then.  But otherwise, no.

25         Q.    Were any of the discussions you

Batra, Sugouri Deposition                                                    September 5, 2025

**Page 54**

1                    S. Batra

2    had with Nicolle Lafosse when you ran into

3    her about Valve?

4          A.   No.

5          Q.   Were any of those discussions

6    about your time at PAM?

7          A.   No.

8          Q.   Since you stopped working for

9    PAM, have you talked to Daniel Falcucci?

10         A.   Not that I recall.

11         Q.   Since you stopped working at

12   PAM, have you talked to Christina Arias?

13         A.   No.

14         Q.   Since you stopped working at

15   PAM, have you talked to Aisha, who we don't

16   know her last name?

17         A.   No.

18         Q.   Since you stopped working at

19   PAM, have you talked to anyone else who

20   worked at PAM while you were there?

21         A.   My attorney, Shea.  We had some

22   overlap at PAM.

23         Q.   Anyone else besides Shea?

24         A.   There's a gentleman.  He was

25   part of the vendor -- overseas vendor

Batra, Sugouri Deposition                                    September 5, 2025

Page 55

```
 1                    S. Batra
 2      company.  I forget the name of the company,
 3      but the gentleman's name is Saqish.  So, I
 4      have spoken with him.  I have also seen him
 5      at a conference.
 6              And then I do want to clarify,
 7      Shea was outside counsel at PAM during some
 8      of the time that I was in-house counsel.
 9          Q.   Prior to your deposition and
10      specifically related to this case, did you
11      ever speak to anyone at Merchant & Gould?
12          A.   No.
13          Q.   Specific to this case prior to
14      your deposition, did you speak with anyone
15      at DNL Zito?
16          A.   No.  First time I'm hearing
17      about them.
18          Q.   Did you ever recommend anyone
19      you know to apply for a job at Patent Asset
20      Management?
21          A.   I would not, no.
22          Q.   Why wouldn't you?
23          A.   For many reasons.
24          Q.   What reasons are those?
25              MR. ZITO:  Just the same
```

Valve Corporation                                    Affirmative

Batra, Sugouri Deposition                                    September 5, 2025

Page 56

1                    S. Batra

2          caution, if it would reveal any

3          privileged communications.

4                THE WITNESS:  I know I can do

5          this without compromising privilege.

6          Just give me a second while I think

7          of the appropriate words.

8          Q.    Take the time you need.  I know

9     privilege is a hard line to walk, so

10    whatever you need to do.

11         A.    May I please discuss with my

12    attorney real quick?

13                MS. GEYER:  Of course.  Can we

14         go off the record?

15                THE VIDEOGRAPHER:  Going off

16         the record at 12:57 p.m.

17                (Whereupon, a short break was

18         taken at this time.)

19                THE VIDEOGRAPHER:  This is the

20         beginning of media number three.

21         We're back on the record at 1:01 p.m.

22                THE WITNESS:  So, the question        Valve Corporation          Affirmative

23         I am answering is why I would not

24         recommend PAM for others, for people

25         that I know, to work there.  And my

Kilpatrick Townsend & Stockton LLP

Batra, Sugouri Deposition

September 5, 2025

Page 57

1          S. Batra

2          answer is I would not recommend

3          people that I know to work at PAM

4          because I -- the way that he operated

5          is not the way that I -- does not

6          align with the way that I want to

7          practice law.  And so, I would highly

8          encourage others to find other work

9          that is better for them in all the

10         ways.

**Valve Corporation**                    Affirmative

11    BY MS. GEYER:

12         Q.    I'm mindful of privilege when I

13    am asking this, and I know it's probably

14    putting you in a tough position.

15              At a high level, what about how

16    Mr. Rothschild worked did not align with

17    how you want to practice the law?

**Valve Corporation**                    Affirmative

18              MR. ZITO:  I'm going to object

19         again.  That calls for not only

20         privilege and privileged

21         communication, but also her opinion

22         which would be a legal opinion which

23         would be work product.  I don't think

24         she can answer that question.

25              MS. GEYER:  I disagree with

**Page 58**

1           S. Batra

2      that.  What my question was getting

3      towards and what it sounded like her

4      answer was were actions, not

5      conversations.  So, to the extent

6      they're not conversations, I don't

7      think it's privileged.  This is not a

8      legal opinion.  This is a personal

9      opinion.

10          MR. ZITO:  First of all, the

11     privilege doesn't just go to

12     conversations.  If an attorney

13     witnesses his client do something,

14     then that attorney cannot say what

15     that client did -- the client did in

16     their presence, whether they did it

17     verbally, with hand signals, with a

18     sign, or physically did something.

19          Privilege doesn't only apply to

20     conversations.  Also, privilege

21     extends to mental impressions of the

22     attorney.  Privilege extends to the

23     work product of the attorney.  So,

24     it's not just a conversation.  That's

25     not the only thing that's privileged.

September 5, 2025

Page 59

```
 1              S. Batra

 2      And even if it's a personal

 3      observation and a personal opinion --

 4      let's say he always kept the heat up

 5      at 87 degrees in the office, and

 6      people sweated like crazy, and I

 7      think that's bad business practice --

 8      that's her opinion.  But because

 9      she's a lawyer, that would then

10      become her mental legal impression of

11      the situation that's directed by her

12      client.

13           MS. GEYER:  Absolutely not,

14      Joe.  I'm sorry.  But not that one,

15      Joe.

16           MR. ZITO:  Absolutely.

17      Absolutely.

18           MS. GEYER:  I'm not anyone's

19      lawyer.  I am not going to instruct

20      anyone to do anything.  I think we

21      can have a fight over whether or not

22      the answer is privileged, and if you

23      want to move to strike it as

24      privileged later, that's on you.

25           I think the way you just
```

Batra, Sugouri Deposition                                          September 5, 2025

Page 60

```
 1                S. Batra

 2      described the fact that someone's

 3      opinions about the temperature in a

 4      building, because I'm a lawyer and I

 5      have an opinion about it, that that

 6      inherently makes it privileged, I

 7      think is just so far contrary to the

 8      law that I am actually concerned now

 9      about all the instructions you've

10      been giving in all the depositions in

11      our case about privilege, because

12      that's wild to me.

13          I think this is not a fight for

14      us to have.  I think your instruction

15      has been heard.  Ms. Batra can decide

16      where she thinks the line is in

17      consultation with her lawyer if she

18      wants.  If we need to have a fight

19      later about the answer and the

20      privileged nature of it, we can.

21          MR. ZITO:  I agree, but if her

22      opinion is that high temperature is

23      unhealthy for people and that would

24      be violation of the state law or

25      state employment law, yes, that is
```

Batra, Sugouri Deposition                                                September 5, 2025

Page  61

```
 1              S. Batra
 2    absolutely legal opinion.
 3        If she said I personally like
 4    to wear wool sweaters and coats to
 5    work so it makes me uncomfortable,
 6    that wouldn't be legal opinion.  But
 7    again, I don't know.  But it doesn't
 8    just go to a conversation.  I'm
 9    objecting to it.
10        MS. GEYER:  Your second
11    hypothetical was slightly better than
12    your first one, to be clear.  I think
13    we have our dispute.  It's on the
14    record.
15        Madam Court Reporter, could you
16    please read back what my original
17    question was?
18        (Whereupon, the requested
19    portion of the transcript was read
20    back by the reporter.)
21        THE WITNESS:  Okay.  Here's
22    what I think I would be comfortable
23    saying.  So, basically it's the whole
24    like new school versus old school way
25    of patent litigation, that based on
```

Valve Corporation                                      Affirmative

Batra, Sugouri Deposition

September 5, 2025

Page  62

1              S. Batra

2        what I started learning at like --

3        what's happening in the patent field

4        and from conferences I was attending

5        and my other experiences, all of this

6        did not align with how PAM was

7        operating.

8            Essentially, I evolved, but

9        they -- you know, PAM did not, and it

10       was time for me to move on.  When I

11       first started, it was an incredible

12       experience.  I had just passed the

13       patent bar, and here I was, general

14       counsel of a patent monetization

15       company.  And in many ways in the

16       beginning, it was kind of like a

17       dream job.  I was doing prosecution,

18       you know, overseeing litigation.  I

19       was coordinating with other outside

20       counsel, many of which -- they were

21       all much, much older than me.  It was

22       a pretty cool gig until I learned,

23       until I plateaued, and until it

24       wasn't.

25            So, I'm very grateful for

**Valve Corporation**                                    Affirmative

September 5, 2025

Page  63

1            S. Batra

2        having had the opportunities to learn

3        what to do, what not to do, how to

4        do, how to do things even better,

5        thanks to all other wonderful patent

6        colleagues that I met along the way.

7        But yes, I would not recommend PAM to

8        anyone that I know after having

9        worked there.

10        Q.    When you say you evolved your

11    practice based on conferences and your

12    experiences, what is that evolution?

13        A.    So, overall patent litigation

14    has gotten way more sophisticated, way

15    more -- just a lot more needs to go on, you

16    know, than I guess what you could have done

17    before.  Even in terms of the complaints

18    and, you know, what you're positively

19    pleading, things like that.  Again, now I'm

20    getting into specifics and I don't want to.

21            But overall, the field was

22    moving in a different way.  I feel like

23    that's where I wanted to go and that's

24    where I went.

25            MR. ZITO:  I'm going to move to

**Valve Corporation**                                    Affirmative

Batra, Sugouri Deposition

September 5, 2025

Page 64

```
 1              S. Batra
 2    strike that answer as her opinion on
 3    patent law at PAM and its
 4    subsidiaries and how it was
 5    practiced, the decisions that were
 6    made, the way it was practiced,
 7    things that were done.  I think
 8    that's clearly privileged
 9    information.  So, I'm going to move
10    to strike that answer.
11         MS. GEYER:  We oppose.  I think
12    your motion is mischaracterizing her
13    answer completely.
14         MR. PALAVAN:  I agree with
15    that.  I don't think there's any
16    privilege in there.  It's all her
17    experience of what she learned about
18    the field.
19         So, if somebody in a conference
20    talked about change that needs to be
21    done, I think that's beyond anything
22    privileged.
23      Q.   Would you recommend working
24   with Leigh Rothschild personally?
25      A.   No.
```

Valve Corporation                    Affirmative

Kilpatrick Townsend & Stockton LLP

Batra, Sugouri Deposition                                                                September 5, 2025

**Page 65**

1                      S. Batra

2        Q.    Why not?

3        A.    Same answer.  I would not

4    recommend anyone doing any personal

5    dealings with Mr. Rothschild.

6        Q.    Are there any other reasons why

7    you would never recommend anyone doing any

8    dealings with Mr. Rothschild besides what

9    you've already talked about?

Valve Corporation                                       Affirmative

10              THE WITNESS:  May I consult

11    with my attorney real quick?

12              MS. GEYER:  Absolutely.

13              THE WITNESS:  Thank you.

14              MS. GEYER:  Can we please go

15    off the record?

16              THE VIDEOGRAPHER:  Going off

17    the record at 1:11 p.m.

18              (Whereupon, a short break was

19    taken at this time.)

20              THE VIDEOGRAPHER:  This is

21    beginning of Media Number 4.  We're

22    back on the record at 1:15 p.m.

23              MS. GEYER:  Would it help if I

24    had the court reporter read back the

25    pending question?

Batra, Sugouri Deposition                                                    September 5, 2025

Page 66

1              S. Batra

2          THE WITNESS:  Sure.

3          MS. GEYER:  Madam Court

4      Reporter, could you please read back

5      the last question?

6          (Whereupon, the requested

7      portion of the transcript was read

8      back by the reporter.)

9              THE WITNESS:  No.  I wish I      | Valve Corporation        Affirmative

10     could, but I can't.

11         Q.   When you say you can't or you

12     wish you could, is that because the reasons

13     are privileged?

14         A.   Correct.

15         Q.   Did PAM have a human resource

16     department?

17         A.   Not that I recall.

18         Q.   Are the things that you're

19     concerned about that make you not want to

20     recommend anyone work with Leigh Rothschild

21     things that you would have liked to take to

22     an HR Department?

23         MR. PALAVAN:  I would instruct

24     you to be careful on that.

25         THE WITNESS:  Could you

**Page  67**

```
 1                    S. Batra

 2         clarify, like what types of things?

 3         Q.   I don't know, because some of

 4    your concerns you can't tell me.  I am

 5    trying to understand at a high level -- I'm

 6    trying to understand around the edges in a

 7    way that isn't going to implicate

 8    privilege.

 9         A.   In an abundance of caution, I

10    won't answer that.

11              MR. ZITO:  I'm going to object

12         to this whole line of questions.  It

13         is completely irrelevant to this case

14         and inappropriate.

15              MS. GEYER:  We definitely

16         disagree on relevance there.  We're

17         allowed to inquire into the

18         credibility of a named defendant.

19              MR. ZITO:  That's not what

20         you're inquiring into.  We made our

21         objection.

22              MS. GEYER:  Agree to disagree.

23         Q.   When you worked for Patent

24    Asset Management, did you work remotely or

25    in an office?
```

Batra, Sugouri Deposition

September 5, 2025

**Page  68**

```
1              S. Batra

2       A.    At first, we worked remotely,

3   because I believe it was the height of the

4   pandemic when I started.  And then we did

5   go -- we had some in-person meetings, a few

6   meetings.  But overall, yes, it stayed

7   remote.

8       Q.    In those in-person meetings,

9   was Mr. Rothschild there personally or in

10  person?

11      A.    Yes.

12      Q.    Would you be in the same room

13  as Mr. Rothschild again today?

14           MR. ZITO:  Again, same

15       objection.  Inappropriate question

16       and irrelevance.  And I don't need to

17       discuss my objection with you.

18       That's not appropriate, Ms. Geyer.  I

19       made my objections.

20           MS. GEYER:  Then you can leave

21       out your narrative as well.

22           MR. ZITO:  No narrative there.

23       That's my objection.

24           THE WITNESS:  I will not be

25       hanging out with him voluntarily, be
```

Batra, Sugouri Deposition                                                    September 5, 2025

Page  69

1          S. Batra

2      in the same place with him.  I mean,

3      if I happen to run into him, I'll say

4      hello.  No hard feelings, but I will

5      not be calling him to see how he's

6      doing.

7      Q.   Earlier, I think you talked                    **Valve Corporation**          Affirmative

8  about old school versus new school patent

9  litigation.  Am I remembering that

10 correctly?

11     A.   Yes.

12     Q.   What is old school, or what did

13 you mean by old school patent litigation?

14     A.   Without revealing too much

15 specifics, old school basically is how

16 patent litigation was done around or

17 shortly after Alice.  And then new school

18 patent litigation is how patent litigation

19 is currently being handled for the most

20 part much after Alice and in light of all

21 of the recent case law that's come out that

22 has in some way, shape, or form cautioned

23 or otherwise created more precise contours

24 on the specific statutory limitations or

25 specific requirements of patent eligibility

Batra, Sugouri Deposition                                                                                    September 5, 2025

Page **70**

1              S. Batra

2    and patent ability, things like that.  So,

3    where the patent law was, you know, a

4    decade or two ago versus where it is now,

5    it's very different.  I would even go as

6    far as to say that currently it's kind of

7    a -- it's not as pro -- it's not pro

8    patent.  It's almost like anti patent

9    atmosphere that one really needs to

10   navigate.  So, those would be the

11   differences between old school and new

12   school.

**Valve Corporation**                                    Affirmative

13       Q.   And you consider the work that

14   PAM does to be in the old school camp while

15   you were there?

16       A.   Generally.  But then there were

17   also campaigns that I pride us, and PAM,

18   and the attorneys that were involved in

19   those campaigns, that were handled

20   differently in the new school way.  Very

21   proud of those.  So, generally, yeah, but

22   not always.

**Rothschild**                                            Counter
Untimely

23       Q.   Would you say that the Display

24   Technologies and SPIS cases against Valve

25   in September of 2022, would those be the

Kilpatrick Townsend & Stockton LLP

Batra, Sugouri Deposition

September 5, 2025

**Page 71**

```
 1              S. Batra
 2  old school way or new school way?
 3      A.   Hard to say.  I would have to
 4  look at the specific complaints and the
 5  case.  But, yeah, hard to say.  But then at
 6  that point, I feel like I shouldn't answer
 7  it, so...
 8      Q.   What would you be looking for
 9  in the complaint that would tell you
10  whether it fell into the old school or new
11  school bucket?
12      A.   Probably like the depth of
13  analysis, what's been positively pleaded in
14  the complaint, things like that.
15      Q.   Can you be any more specific?
16      A.   I can't.
17      Q.   So the record is clear:  You
18  can't because of privilege?
19      A.   Correct.  And also, it's kind
20  of hard to quantify as well, looking at
21  documents to equate like the depth of
22  analysis and things like that.
23          MS. GEYER:  I know I said this
24      last time when I asked for a
25      five-minute break, but I do think I'm
```

September 5, 2025

**Page 72**

```
 1              S. Batra

 2      actually really close to wrapping up

 3      this time.  So, if counsel agrees, we

 4      can go off the record for a quick

 5      break.

 6              THE VIDEOGRAPHER:  Going off

 7      the record at 1:26 p.m.

 8              (Whereupon, a short break was

 9      taken at this time.)

10              THE VIDEOGRAPHER:  This is

11      beginning of media number five.

12              We're back on the record at 1:36 p.m.

13  BY MS. GEYER:

14      Q.   I know I've asked you a number

15  of questions.  And we had some privilege

16  stuff, so I kind of want to close

17  everything out.

18              What, if anything else, can you

19  tell me about why you would not recommend

20  anyone working with Mr. Rothschild that is

21  not privileged?

22      A.   Nothing.

23      Q.   At the beginning of the

24  deposition, I asked you if you would have

25  been surprised to learn that Mr. Rothschild
```

Batra, Sugouri Deposition

September 5, 2025

**Page 73**

```
 1                 S. Batra

 2    had said that he fired you.

 3            Did Mr. Rothschild ever

 4    threaten to fire you or file a lawsuit

 5    against you?

 6         A.   Yes.

 7         Q.   When was that?

 8         A.   A few times.  I don't recall

 9    exactly.

10         Q.   Were those threats to fire you,

11    or were they threats to file a lawsuit, or

12    both?

13         A.   To fire me.

14         Q.   Is there anything

15    non-privileged you can tell me about the

16    reasons he made those threats to fire you?

17         A.   Monetary.  Basically, when I

18    finally decided to leave, he had told me

19    that he could no longer pay me what he's

20    paying me, and if I didn't agree to a

21    substantial pay cut, that I -- that I won't

22    be able to work there.

23            And in response, I said, thank

24    you, I will not be agreeing to that.  And I

25    decided to leave.
```

CONFIDENTIAL

Batra, Sugouri Deposition                                    September 5, 2025

Page 74

```
1                    S. Batra

2              To which he said, you're fired.

3              So, it went on something like

4    that.

5         Q.   Is there anything

6    non-privileged you can tell me about why he

7    wanted to make you take a substantial pay

8    cut?

9         A.   I'm sorry.  Could you repeat

10   that?

11        Q.    Is there anything

12   non-privileged you can tell me about why

13   Mr. Rothschild was demanding you take a

14   substantial pay cut?

15        A.    I don't know why he -- like he

16   was having monetary issues since I joined.

17   So, my job was, I guess, like always on the

18   line.

19        Q.    Do you know what those monetary

20   issues were?

21        A.    Yeah.  Just like, oh, we can't

22   afford this.

23        Q.    Not enough revenue to afford

24   your position?

25        A.    I don't know the specifics,
```

Batra, Sugouri Deposition                                    September 5, 2025

Page 75

```
1                   S. Batra

2   like who, what revenue.  I don't know.  But

3   yeah, that's all I can say right now.

4   Yeah.

5        Q.    How substantial was the pay

6   cut?

7        A.    Can I consult my calculator?

8        Q.    Absolutely.  I never heard that

9   one before.  That was good.

10        A.    I would say about one-third of

11   a cut.

12            MS. GEYER:  I pass the witness.

13            MR. ZITO:  I'm sorry.  Did you

14        say you pass the witness?

15            MS. GEYER:  Yes.

16            MR. ZITO:  I will defer to

17        Mr. Palavan, ask my questions when

18        he's done.

19            MR. PALAVAN:  Nothing for me as

20        well.

21            MR. ZITO:  I guess I would like

22        to explore a little bit about this

23        old school/new school.  I am not sure

24        I was following.

25                      XXXX
```

September 5, 2025

Page 76

```
 1                    S. Batra
 2    EXAMINATION
 3    BY MR. ZITO:
 4         Q.   Do you know what year Alice was
 5    decided, the Supreme Court version of
 6    Alice?
 7         A.   Yes.  In 2012, I want to say.
 8         Q.   It was 2014.
 9              I'm assuming you learned about
10    Alice in law school in a patent class?
11         A.   Correct.
12         Q.   Do you consider Alice good law,
13    bad law, or are you neutral?
14         A.   I think Alice did not age well.
15         Q.   What I take that as:  It was
16    not well-decided law as opposed to good or
17    bad?
18              MR. PALAVAN:  I'm going to
19         object to the extent -- I don't want
20         to be annoying, but if you're going
21         have her talk about, you know, her
22         opinions on case law, I don't think
23         that's really too relevant here.  If
24         you want to have more general
25         questions, that's fine.  I'm not
```

**Page 77**

```
 1              S. Batra

 2    trying to be annoying, but she's not

 3    a law professor or anything.

 4         MR. ZITO:  I agree.  Her

 5    opinions on old school, new school,

 6    bad law, aren't anything relevant at

 7    all to this case.  I agree 100

 8    percent.  But they have been let in,

 9    and I am going to need to clarify

10    them.  So, I am not trying to be

11    annoying either.

12         MS. GEYER:  Objection to

13    counsel testifying.

14         Joe, you said earlier that --

15    you'd asked me not to argue with

16    objections.  I would ask you to do

17    the same thing.

18         MR. ZITO:  Thank you.  I really

19    very much appreciate the advice from

20    you, Kate.  I think that's very

21    helpful.

22    BY MR. ZITO:

23      Q.    Now, when you say "old school,"

24    do you mean patents that were issued before

25    Alice?  And by new school, you mean patents
```

**Page 78**

```
 1              S. Batra
 2    that were issued after Alice?
 3         A.   No.  That's not what I mean.  I
 4    mean the general style of -- general style
 5    of enforcement.
 6         Q.   How is that related to Alice?
 7         A.   I was giving a rough timeframe
 8    in case you wanted to consult the type of
 9    cases that were being brought around that
10    time versus now.
11         Q.   Do you think that all cases
12    before Alice were put together better, and
13    all cases after Alice are not?
14         A.   I can't agree with either of
15    those statements.
16         Q.   Okay.  So, you were just using
17    Alice as a time reference to when you
18    perceive there was a change in how patent
19    law was conducted?
20         A.   Yes.
21         Q.   Okay.  All right.  Then that
22    answers my questions as to where old
23    school, new school, and Alice came
24    together.  You were not -- I am just trying
25    to make sure I got your answer.
```

Batra, Sugouri Deposition                                                                    September 5, 2025

Page 79

1                    S. Batra

2          You're not referring to patents

3    issued before or patents issued after

4    Alice, correct?

5        A.    Correct.

6        Q.    Are you referring to patents

7    that have 101 considerations as opposed to

8    patents that don't have 101 considerations?

9              MS. GEYER:  Object to form.

10             THE WITNESS:  What do you mean?

11       Q.    You understand Alice refers to

12   section 101, 35 USC, section 101 subject

13   matter?

14       A.    Yes.

15       Q.    Okay.  So, when you interjected

16   Alice into old school/new school, were you

17   referring to old school as patents that do

18   not have 101 issues and new school as

19   patents that do have 101 issues?

20       A.    Not specifically.  I am

21   referring to just a general style of

22   enforcement when I mean old school versus

23   new school.

24             MR. ZITO:  Thank you.  Those

25       are my clarifying questions.  Thank

Batra, Sugouri Deposition                                                                September 5, 2025

**Page 80**

```
 1              S. Batra

 2        you.  I pass the witness.

 3            MS. GEYER:  Give me 30 seconds.

 4        We don't need to go off the record

 5        but I am going to mute myself.

 6            (Whereupon, an off-the-record

 7        discussion was held.)

 8    EXAMINATION

 9    BY MS. GEYER:

10        Q.    What is the general style of

11    enforcement for old school as you've been

12    using that term?

13        A.    I'd rather not get into

14    specifics.

15        Q.    I was trying to keep it

16    general, using your phrase, general style

17    of enforcement.  At a level you're

18    comfortable explaining, can you please

19    explain what you mean by the old school

20    general style of enforcement?

21        A.    I think I'm better equipped to

22    give some insights on the newer style,

23    because I just wasn't practicing law when

24    the older was being done.  So, from the

25    newer style, the newer style of enforcement
```

Valve Corporation                                                          Affirmative

September 5, 2025

**Page 81**

1                      S. Batra

2      would entail much greater analysis.  It

3      would entail much greater evaluation.  It

4      would entail more thorough claim charts.

5      Things like that.

6            Q.    When you say greater analysis,

7      more thorough, that's in comparison to the

8      old school style; is that right?

9            A.    Correct.  Yes.

10              MS. GEYER:  I have no further

11       questions.

12              MR. ZITO:  Thank you,

13       Ms. Batra.

14                (Page break to accommodate

15       jurat.)

16     THE VIDEOGRAPHER:  Do you want to get the orders on
       record or off?

17     MR. ZITO:  Off record.

18     THE VIDEOGRAPHER: This concludes the deposition for today.
       We're now off the record at 1:49 p.m. Eastern Time.

19

20     (Whereupon, at 1:50 P.M., the Examination of this
        Witness was concluded.)

21

22

23

24

25

Valve Corporation                                    Affirmative

**Page 82**

```
 1               S. Batra

 2            E X H I B I T S

 3

 4    PLAINTIFF EXHIBITS

 5

 6    EXHIBIT   EXHIBIT                 PAGE

 7    NUMBER    DESCRIPTION

 8    (None)

 9

10

11               I N D E X

12

13    EXAMINATION BY               PAGE

14    MS. GEYER                    8

15    MR. ZITO                     76

16

17     INFORMATION AND/OR DOCUMENTS REQUESTED

18    INFORMATION AND/OR DOCUMENTS     PAGE

19    (None)

20

21       QUESTIONS MARKED FOR RULINGS

22    PAGE LINE QUESTION

23    (None)

24

25
```

Page 83

```
1                    S. Batra

2              C E R T I F I C A T E

3

4   STATE OF NEW YORK        )
                             :
5   COUNTY OF RICHMOND       )

6

7        I, MARINA DUBSON, a Notary Public for

8   and within the State of New York, do hereby

9   certify:

10        That the witness whose examination is

11   hereinbefore set forth was duly sworn and

12   that such examination is a true record of

13   the testimony given by that witness.

14        I further certify that I am not

15   related to any of the parties to this

16   action by blood or by marriage and that I

17   am in no way interested in the outcome of

18   this matter.

19        IN WITNESS WHEREOF, I have hereunto

20   set my hand this 5th day of September 2025.

21

22

23        ---------------------------
                 MARINA DUBSON
24

25
```

Page 84

1            DECLARATION UNDER PENALTY OF PERJURY

2    Case Name: Valve Corporation
              vs. Leigh Rothschild, et al.

3    Date of Deposition: 09/05/2025

4    Job No.: 10172200

5

6            I, SUGOURI BATRA, hereby certify

7    under penalty of perjury under the laws of the State of

8    _____ that the foregoing is true and correct.

9            Executed this _____ day of

10   _____, 2025, at _____.

11

12

13            _____

14            SUGOURI BATRA

15

16   NOTARIZATION (If Required)

17   State of _____

18   County of _____

19   Subscribed and sworn to (or affirmed) before me on

20   this _____ day of _____, 20__,

21   by_____,    proved to me on the

22   basis of satisfactory evidence to be the person

23   who appeared before me.

24   Signature: _____ (Seal)

25

Batra, Sugouri Deposition                                                                September 5, 2025

**Page 85**

```
 1    DEPOSITION ERRATA SHEET
      Case Name: Valve Corporation
 2           vs. Leigh Rothschild, et al.
      Name of Witness: Sugouri Batra
 3    Date of Deposition: 09/05/2025
      Job No.: 10172200
 4    Reason Codes:  1. To clarify the record.
                     2. To conform to the facts.
 5                   3. To correct transcription errors.

 6    Page _____ Line _____ Reason _____

 7    From _____ to _____

 8    Page _____ Line _____ Reason _____

 9    From _____ to _____

10    Page _____ Line _____ Reason _____

11    From _____ to _____

12    Page _____ Line _____ Reason _____

13    From _____ to _____

14    Page _____ Line _____ Reason _____

15    From _____ to _____

16    Page _____ Line _____ Reason _____

17    From _____ to _____

18    Page _____ Line _____ Reason _____

19    From _____ to _____

20    Page _____ Line _____ Reason _____

21    From _____ to _____

22    Page _____ Line _____ Reason _____

23    From _____ to _____

24    Page _____ Line _____ Reason _____

25    From _____ to _____
```

CONFIDENTIAL                                                     Kilpatrick Townsend & Stockton LLP

**Page 86**

```
1    DEPOSITION ERRATA SHEET

2    Page _____ Line _____ Reason _____

3    From _____ to _____

4    Page _____ Line _____ Reason _____

5    From _____ to _____

6    Page _____ Line _____ Reason _____

7    From _____ to _____

8    Page _____ Line _____ Reason _____

9    From _____ to _____

10   Page _____ Line _____ Reason _____

11   From _____ to _____

12   Page _____ Line _____ Reason _____

13   From _____ to _____

14   Page _____ Line _____ Reason _____

15   From _____ to _____

16   Page _____ Line _____ Reason _____

17   From _____ to _____

18   Page _____ Line _____ Reason _____

19   From _____ to _____

20   Page _____ Line _____ Reason _____

21   From _____ to _____

22   _____ Subject to the above changes, I certify that the
             transcript is true and correct
23   _____ No changes have been made. I certify that the
             transcript  is true and correct.

24           _____

25                    SUGOURI BATRA
```