# EXHIBIT 2
# SEALED

Patent Asset Management / Rothschild Broadcast

# Transcript Export

Deponent: Lafosse, Nicolle

April 22, 2025



everchron

The operating system for lawyers ®

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2          FOR THE WESTERN DISTRICT OF WASHINGTON

 3                     AT SEATTLE

 4    -----------------------------------------x
      VALVE CORPORATION,

 5                    Plaintiff,

 6          - versus -    Case No.:  2:23-cv-1016-JNW

 7
      LEIGH ROTHSCHILD, ROTHSCHILD
 8    BROADCAST DISTRIBUTION SYSTEMS,
      LLC, DISPLAY TECHNOLOGIES, LLC,
 9    PATENT ASSET MANAGEMENT, LLC,
      MEYLER LEGAL, PLLC, and SAMUEL
10    MEYLER,
                    Defendants.
11    -----------------------------------------x

12

13             VIDEOTAPED DEPOSITION OF:

14

15                   NICOLLE LAFOSSE

16

17              Tuesday, April 22, 2025

18           9:15 a.m. ET - 3:59 p.m. ET

19

20

21

22

23            REPORTED STENOGRAPHICALLY BY:

24           Stacey E. Raikes, RMR, CRR

25                Job No. 10162787
```

Lafosse, Nicolle Deposition

April 22, 2025

Page 2

1

2

3

4                         * * * * * * * * * * * *

5

6

7              VIDEOTAPED STENOGRAPHIC DEPOSITION of

8    NICOLLE LAFOSSE, taken in the above-entitled matter

9    before STACEY E. RAIKES, a stenographic machine

10   reporter, Registered Merit Reporter, Certified

11   Realtime Reporter, and Notary Public for the State of

12   Florida, taken on Tuesday, April 22, 2025, commencing

13   at 9:15 a.m. ET.

14

15

16

17                         * * * * * * * * * * * *

18

19

20

21

22

23

24

25

Lafosse, Nicolle Deposition                                                                                      April 22, 2025

Page 3

1    A P P E A R A N C E S :

2

3    KILPATRICK TOWNSEND & STOCKTON LLP

4    BY:  CHRISTOPHER P. DAMITIO, ESQ.

5                - and -

6    BY:  DARIO A. MACHLEIDT, ESQ.

7    1420 Fifth Avenue, Suite 3700

8    Seattle, Washington  98101

9    (206) 467.9600

10   cdamitio@kilpatricktownsend.com

11   dmachleidt@kilpatricktownsend.com

12   Attorneys for the Plaintiff

13

14

15   MERCHANT & GOULD, P.C.

16   BY:  ERIC R. CHAD, ESQ.

17   150 South Fifth Street, Suite 2200

18   Minneapolis, Minnesota  55402

19   (612) 336.4742

20   echad@MerchantGould.com

21   Attorneys for the Defendants

22

23

24

25

April 22, 2025

**Page 4**

```
 1     A P P E A R A N C E S:  (Continued)

 2

 3     DIAZ REUS & TARG LLP

 4     BY:  ISHMAEL GREEN, ESQ.

 5     Miami Tower at International Place

 6     100 Southeast Second Street, Suite 3400

 7     Miami, Florida  33131

 8     (305) 375.9220

 9     igreen@diazreus.com

10     Attorneys for the Deponent

11

12

13

14

15

16

17

18

19

20

21     ALSO PRESENT:

22

23     Paul Smith, Legal Video Specialist

24

25
```

Lafosse, Nicolle Deposition                                                    April 22, 2025

Page 5

```
 1                    I N D E X

 2                 NICOLLE LAFOSSE

 3    EXAMINATION BY                        PAGE

 4

 5    ATTORNEY DAMITIO                        8

 6

 7

 8                 E X H I B I T S

 9    NUMBER          DESCRIPTION           PAGE

10

11    EXHIBIT 1     Subpoena                 21

12    EXHIBIT 2     PAM Team screenshot      29

13    EXHIBIT 3     LinkedIn profile screenshot   31

14    EXHIBIT 4     Offer of Engagement
                    dated 10/1/2021          67

15

16    EXHIBIT 5     RBDS cases printout      77

17    EXHIBIT 6     Display Technologies

      cases printout                         78

18    EXHIBIT 7     Documents Bates stamped
                    ROTHSCHILD129 - 169      90

19

      EXHIBIT 8     Document Bates stamped

20                  VALVE_5202              100

21    EXHIBIT 9     Documents Bates stamped
                    VALVE_5397 - 5421       115

22

      EXHIBIT 10    Documents Bates stamped

23                  VALVE_4358 - 4360       149

24    EXHIBIT 11    Documents Bates stamped
                    VALVE_4655 - 4664       166

25
```

CONFIDENTIAL                                          Kilpatrick Townsend & Stockton LLP

April 22, 2025

Page 6

```
 1   ----------------------------------------------------
 2                   P R O C E E D I N G S
 3                      9:15 a.m. ET
 4   ----------------------------------------------------
 5           THE VIDEOGRAPHER:  We're now on the
 6   record.
 7           Today's date is April 22, 2025, and the
 8   time is 9:15 a.m.
 9           This is the video deposition of Nicolle
10   Lafosse taken in the matter of Valve
11   Corporation versus Leigh Rothschild, et al., on
12   behalf of the -- or pending in the court of the
13   United States District Court of the Western
14   District of Washington, case number
15   2:23-cv-1016-JMW.
16           The deposition is taking place at 100
17   Southeast Second Street, suite 3400, Miami,
18   Florida.
19           My name is Paul Smith appearing for Aptus
20   Court Reporting located at 401 West A Street,
21   suite 1680, San Diego, California.  I am the
22   official videographer, and this is the only
23   authorized video recording of the deposition.
24   The audio and video recording will continue to
25   take place at all times unless all counsel
```

Page 7

1  agree to go off the record.

2      Will counsel please identify yourselves

3  and state whom you represent, starting with the

4  noticing attorney?

5      ATTORNEY DAMITIO:  Chris Damitio with the

6  law firm Kilpatrick Townsend on behalf of Valve

7  Corporation.

8      With me this morning is Dario Machleidt,

9  also with Kilpatrick Townsend, and also on

10  behalf of the plaintiff, Valve Corporation.

11      ATTORNEY GREEN:  My name is Ishmael Green

12  from Diaz Reus & Targ LLP on behalf of the

13  deponent, Nicolle Lafosse.

14      ATTORNEY CHAD:  I am Eric Chad for

15  Merchant & Gould.  I am here on behalf of the

16  defendants.

17      THE VIDEOGRAPHER:  And the court reporter

18  today is Stacey Raikes, and she will now swear

19  in the deponent.

20      (Whereupon, the Stenographic Reporter

21      administered the oath to the witness.)

22          N I C O L L E  L A F O S S E,

23  having been first duly sworn or affirmed, was

24      examined and testified as follows:

25          (Time noted:  9:17 a.m.)

Lafosse, Nicolle Deposition                                                                April 22, 2025

Page 8

1    EXAMINATION BY ATTORNEY DAMITIO:

2    BY ATTORNEY DAMITIO:

3        Q.   Good morning, Ms. Lafosse.  My name is

4    Chris Damitio.  I represent Valve Corporation.

5            Are you ready to begin?

6        A.   I am ready.

7        Q.   Please tell us your full name.

8        A.   Nicolle Lafosse Pereda.

9        Q.   Do you understand that you're testifying

10   under oath today exactly the same as if you were

11   testifying in a courtroom?

12       A.   Yes, I understand.

13       Q.   Are you being represented by counsel

14   today?

15       A.   Yes.

16       Q.   Who is your lawyer?

17       A.   Ishmael Green.

18       Q.   Is anyone else in the room serving as your

19   lawyer here today?

20       A.   Only Ishmael Green.

21       Q.   I mentioned that I represent Valve

22   Corporation.  Are you familiar with that company?

23       A.   I remember it, yes.

24       Q.   What do you remember about Valve

25   Corporation?

**Valve Corporation**                                    Affirmative

**Valve Corporation**                                    Affirmative

CONFIDENTIAL                                          Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                    April 22, 2025

Page 9

1        A.   We dealt with it while I was working for

2    Leigh Rothschild, but I don't remember exactly what

3    matter I worked on for Valve.

4        Q.   Do you own any Valve products?

5        A.   No.

6        Q.   Do you have a steam online account?

7        A.   No.

8        Q.   Are you familiar with any of Valve's

9    products?

10       A.   Not anymore, no.

11       Q.   Were you at one time familiar with their

12   products?

13       A.   Briefly.  I knew about it because I was

14   copied on the emails and had to kind of skim through

15   the emails, but I never dealt with it personally.

16       Q.   Do you remember what products was at issue

17   in the -- your previous work on Valve?

18       A.   No.

19       Q.   Have you played any of Valve's video

20   games?

21       A.   No.

22       Q.   Any of your friends play Valve video

23   games?

24       A.   Nope.

25       Q.   One of the defendants in this case is

Valve Corporation                                    Affirmative

Lafosse, Nicolle Deposition                                                                April 22, 2025

Page 10

```
 1    Leigh Rothschild.  Are you familiar with
 2    Mr. Rothschild?
 3         A.   Yeah.
 4         Q.   Who is he?
 5         A.   He used to be my former boss and the owner
 6    of the company Patent --
 7         Q.   When you say -- sorry, please continue.
 8         A.   Patent Asset Management.
 9         Q.   What is Patent Asset Management?
10         A.   It's a company -- well, I don't know if
11    they're still doing the same thing, but back when I
12    was working for them, they acquired patents from
13    inventors and then litigated on behalf of the
14    inventors against infringers of the patents.
15         Q.   What did you think of Mr. Rothschild when
16    you worked for him?
17         A.   He -- he was ambitious.  He was trying to
18    always scale his company.  Fair, respectful.  Always
19    trying to find a new way of growing the business.
20    He's very creative, in a good way, in a businesslike
21    manner, trying to find new ways for approaching the
22    market and scaling.  Other than -- I met him on a
23    professional level; so that's pretty much just my
24    view.
25         Q.   What do you remember about him trying to
```

Rothschild                                                    Counter

403 as to 10:9-14, Untimely

CONFIDENTIAL                                           Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition

April 22, 2025

**Page 11**

1    scale his business?

2        A.    Well, we have someone -- we had -- when I

3    was there, he hired -- he hired someone to look for

4    attorneys who were barred in specific states so that

5    we can litigate on that specific state against

6    patent infringers.  So that was kind of one of --

7    one of the few things that I recall he did.  He had

8    someone who just precisely assigned to do that, to

9    look for attorneys who could represent us in

10   different states and then litigate on behalf of the

11   patents -- patent owners.

12       Q.    Do you remember the name of the individual

13   who was assigned to look for attorneys in different

14   states?

15       A.    Daniel -- I forgot his -- Falcucci,

16   Falcucci, something like that.  I don't remember his

17   last name.

18       Q.    And again, could you just describe his

19   role at the company when you were there?

20       A.    Daniel's --

21       Q.    Yeah.

22       A.    -- role?

23       Q.    Yes.

24       A.    That was pretty much it.  As far as I

25   know, he -- his only job was to look for attorneys

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                                                                    April 22, 2025

Page 12

1      who were barred in specific states where we

2      potentially would litigate the patent on behalf of

3      the inventors against infringers.

4                    (Discussion off the record.)

5          Q.   Was he looking for new employees for

6      Patent Asset Management or outside counsel?

7          A.   Outside counsel.

8          Q.   Without telling me anything you might have

9      discussed with your lawyer, how did you prepare for

10     your deposition today?

11         A.   I am -- by memory.  I have no files left

12     on me.  I don't have access to the emails.  So just

13     doing my best to recount.  You know, whatever I can

14     remember, I'll just, you know, offer it.

15         Q.   Did you meet with anyone to prepare for

16     your deposition?

17         A.   No.

18         Q.   Did you speak with any attorneys from the

19     law firm Merchant & Gould before your deposition?

20         A.   No.

21         Q.   Never spoken with Mr. Chad or any of his

22     colleagues?

23         A.   No.  I think --

24              THE WITNESS:  Did we email, maybe?

25              ATTORNEY CHAD:  Yeah.  To clarify.

CONFIDENTIAL                                                      Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                      April 22, 2025

**Page 13**

1          THE WITNESS:  Yeah.

2          ATTORNEY CHAD:  I had emailed

3     Ms. Lafosse --

4          THE WITNESS:  Yeah.

5          ATTORNEY CHAD:  -- to see if she was

6     represented.  And upon finding out she was --

7          THE WITNESS:  Right.

8          ATTORNEY CHAD:  -- I stopped communicating

9     with Ms. Lafosse.

10         A.   Yes.  He reached out to me, like, first --

11    the first communication was hey, Nicolle -- well, I

12    actually reached out to you first, because I

13    received the deposition and then I -- the deposition

14    had his name on it.  So I reach out to say hey, I

15    received the deposition.  And then trying to gauge,

16    like, the date, because I was out of town on the

17    date that it was initially scheduled.  So I did

18    reach out to him to ask him, you know, could we

19    reschedule?  I'm not in town at the date of the

20    deposition, the original date, and then we

21    rescheduled for today.

22         Oh.  And then, obviously, I told him that

23    I was going to be represented by Ishmael Green.

24              (Discussion off the record.)

25         Q.   Can you just go through everything that

Lafosse, Nicolle Deposition                                                April 22, 2025

Page 14

1    you remember discussing orally or via email with

2    Mr. Chad?

3        A.   Sure.  First communication was regarding

4    the deposition that I had been served.  Told him I

5    received it.  On the same email chain, I told him I

6    was not available, could we reschedule for a

7    different date.  He said yeah, sure.

8            Second communication was to tell him I was

9    being represented by Ishmael Green.  And then after

10   that, that was it.  He communicated with Ishmael

11   from there on.

12           ATTORNEY CHAD:  To clarify the record, I

13       don't believe I was the first recipient of that

14       call.

15           THE WITNESS:  Yeah, I don't remember.

16       Yeah.

17           ATTORNEY CHAD:  I don't know if it was one

18       of my colleagues or perhaps your office.

19           My first recollection, or that I have

20       record of, is that we had exchanged the

21       emails --

22           THE WITNESS:  Yeah.

23           ATTORNEY CHAD:  -- over the weekend and

24       yesterday.

25           THE WITNESS:  If I could look at my email,

Lafosse, Nicolle Deposition

April 22, 2025

**Page 15**

```
1          I could tell you exactly the person, but yeah.

2              ATTORNEY DAMITIO:  Okay.

3              Eric, she reached out to us and told us

4      that she was out of town and to speak with

5      Mr. Green going forward.

6              ATTORNEY CHAD:  Okay, okay.

7              THE WITNESS:  My bad.  Sorry.

8      BY ATTORNEY DAMITIO:

9          Q.   No problem.

10             Did you only exchange the one email with

11     Mr. Chad?

12         A.   Yeah, I think so.  I think so.

13         Q.   Besides Mr. Rothschild, do you know who

14     the other defendants are in this case that has led

15     to your deposition?

16         A.   No.

17         Q.   I'm going to list a few names.  If you

18     wouldn't mind waiting for me to end and then you

19     could tell me if there are any that you recognize.

20         A.   Yeah.

21         Q.   Rothschild Broadcast Distribution Systems;

22     Patent Asset Management; Display Technologies;

23     Samuel Meyler; and the law firm Meyler Legal PLLC.

24             Do you recognize any of those?

25         A.   The first three, I do.
```

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition

April 22, 2025

Page 16

```
1        Q.   That's Rothschild Broadcast Distribution

2    Systems, Patent Asset Management, and Display

3    Technologies?

4        A.   Correct.

5        Q.   As you mentioned, you previously worked

6    for Patent Asset Management; correct?

7        A.   Yes.

8        Q.   And to save time, are you okay if we refer

9    to that as PAM --

10       A.   Yeah.

11       Q.   -- going forward?

12            All right.  What is Rothschild Broadcast

13   Distribution Systems?

14       A.   I think he just kind of divided the

15   companies to approach different inventions.  That

16   was more in the, like, technology-based products,

17   softwares type of thing.  That's what I recall.

18       Q.   And when you say he, are you referring to

19   Mr. Rothschild?

20       A.   Yes, Mr. Rothschild.

21       Q.   So Mr. Rothschild created Rothschild

22   Broadcast Distribution Systems?

23       A.   I suppose.  I don't know.  When I started

24   working with him, the company was already put

25   together so.
```

**Valve Corporation**                    Affirmative

**Rothschild**                           Counter
Untimely

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition

April 22, 2025

**Page 17**

1      Q.    What about Display Technologies?

2      A.    Display Technologies was a division of

3  PAM, if I'm not mistaken, where he handled matters

4  that were, like, more like applications, things that

5  you use on your phone, things that are more like

6  display literally.  Like, screen display.

7      Q.    And when you say division, that it was a

8  part of PAM?

9      A.    It felt like it was, but structurally,

10  like, as an entity based, I don't know how it was --

11  if it was a subsidiary, if it was a parent.  You

12  know I don't know.  I just know he kept -- he kept

13  the products divided depending on the -- the company

14  dealt with different products, and that's kind of

15  how it was divided between PAM, Display

16  Technologies, and the other company.  I forgot the

17  name.  You just mentioned it.

18      Q.    Rothschild Broadcast Distribution Systems?

19      A.    That one, yes.

20      Q.    In your previous answer, when you said he

21  kept products divided depending on the company,

22  you're referring to Mr. Rothschild; correct?

23      A.    Yes.

24      Q.    All right.  Since you received the

25  subpoena from Valve, have you communicated in any

Page 18

1    way with any of the defendants in this case?

2         A.   No.

3         Q.   Any of the employees of the defendants?

4         A.   Nope.

5         Q.   Communications with Mr. Rothschild since

6    you received the subpoena?

7         A.   No.

8         Q.   All right.  Did you speak to anyone who's

9    not your attorney about the deposition?

10        A.   No.

11        Q.   Friends?

12        A.   Well, my husband.

13        Q.   General content of the conversation?

14        A.   He received the subpoena first and I was

15   not home.  He tried to, you know, receive it and

16   they wouldn't let it with him.  So he told me.

17        Q.   During what approximate time period did          Valve Corporation                    Affirmative

18   you work for PAM?

19        A.   That must have been, I think, 2020.

20   Around that time.

21        Q.   What was your title while you worked

22   there?

23        A.   Litigation manager, I think.  Can't recall

24   exactly, but I think it was litigation manager.

25        Q.   Did you sign an employee agreement with

Lafosse, Nicolle Deposition                                          April 22, 2025

Page 19

```
1    PAM?

2        A.   Yes.

3        Q.   Do you still have a copy of that

4    agreement?

5        A.   Yes, in my email.  My personal email.

6        Q.   Did you sign any confidentiality or

7    nondisclosure agreements with Mr. Rothschild or PAM?

8        A.   Don't remember, honestly.  I can check on

9    the same email.  Maybe it's in the same email chain

10   that I signed the agreement, the employment

11   agreement.

12       Q.   Do you still have access to that employee

13   agreement between you and PAM?

14       A.   Yeah, it's in my personal email.  That's

15   pretty much the only document that I have on me

16   regarding PAM.

17            (Discussion off the record.)

18            ATTORNEY DAMITIO:  Counsel, we may ask

19       later to collect that document.

20   BY ATTORNEY DAMITIO:

21       Q.   But, for now, Ms. Lafosse, do you remember

22   the general terms of your employee agreement with

23   PAM?

24       A.   As in compensation or duties or pretty

25   much anything?
```

Valve Corporation                                          Affirmative

Page 20

1      Q.   Anything you remember.

2      A.   Duties was assisting -- assisting

3   litigation matters on behalf of our clients who were

4   the inventor -- the inventors.  I worked under

5   our -- the attorney at the moment was Sugouri -- I

6   don't know her last name.  I don't remember.  But

7   she was the patent attorney.  So I worked alongside

8   with her on potential litigation matters.

9      Q.   Is Sugouri's last name possibly Batra?

10     A.   Yes.

11     Q.   Does that sound familiar?

12     A.   Yes.  That's her last name, yes.

13     Q.   And when you say she was the patent

14   attorney, what do you mean?

15     A.   She had a patent bar license and she was

16   also the one who kind of drafted the -- the

17   pleadings.  She taught me how to read the patents.

18   That was my first exposure to patents ever; so I was

19   learning about patents.

20     Q.   Was she your boss or direct report?

21     A.   Yeah, you could say so, yeah.

22     Q.   Did you also report directly to

23   Mr. Rothschild?

24     A.   Yes.

25                    (Pause.)

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                      April 22, 2025

Page 21

```
 1              ATTORNEY DAMITIO:  I'm marking Exhibit 1,

 2          which is Ms. Lafosse's document subpoena.

 3          (Subpoena is received and marked as Exhibit 1

 4                  for Identification.)

 5    BY ATTORNEY DAMITIO:

 6          Q.   Ms. Lafosse, go ahead and take a minute or

 7    two to leaf through the document, but do you

 8    recognize this as the document subpoena that you

 9    received from Valve Corporation?

10          A.   Yes, I do.

11          Q.   Is this subpoena requesting that you

12    produce documents to Valve?

13          A.   Yes.

14          Q.   And if you look at Page 2 through 4 on the

15    subpoena, do you recognize these as the specific

16    categories of documents being requested?

17          A.   Yes, I do.

18          Q.   What did you do to search for documents

19    called for by these requests?

20          A.   I looked into my computer, my current

21    computer, my old computer on all the files that I

22    could kind of control-find search on my database.  I

23    couldn't find any.

24          Q.   When you say database, is that --

25          A.   My personal database.  Sorry about that.
```

Lafosse, Nicolle Deposition

April 22, 2025

Page 22

1      Q.    About how long did you spend searching for

2   documents?

3      A.    A good 30, 40 minutes.

4      Q.    You mentioned you looked on two computers,

5   your current --

6      A.    Yeah.

7      Q.    -- computer and your old computer?

8      A.    Correct.

9      Q.    When did you stop using your old computer?

10      A.    I don't remember.  Two years, maybe.

11      Q.    Was that a personal computer that you

12   purchased?

13      A.    Yeah.

14      Q.    It wasn't a computer given to you by PAM?

15      A.    No.

16      Q.    Did you speak with anyone as part of

17   searching for documents responsive to Valve's

18   subpoena?

19      A.    No.

20      Q.    Do you have any documents responsive to

21   the requests in Valve's subpoena in your possession?

22      A.    I do not.

23      Q.    At some previous time, did you have access

24   to documents responsive to these requests in your

25   possession?

Lafosse, Nicolle Deposition                                                        April 22, 2025

**Page 23**

1      A.   During the time of my employment, I did,

2   through the company's email.

3      Q.   All right.  When was that time when you

4   had access to responsive documents?

5      A.   2020.  Just a wild guess that that's when

6   I was working for them so.

7      Q.   When did you lose access to these

8   responsive documents?

9      A.   When I stopped working for PAM.

10      Q.   Approximately when did you --                    Valve Corporation                    Affirmative

11      A.   Oh.

12      Q.   -- stop working for PAM?

13      A.   2021.

14      Q.   What, if anything, did Mr. Rothschild tell

15   you to do with the documents in your possession when

16   you left PAM?

17      A.   I didn't have any documents in my

18   possession.  Everything was through either the

19   cloud, internal cloud of the company, or the

20   company's email.  So it was a matter of just

21   deactivating my accounts and I wouldn't have access

22   to anything.

23      Q.   Did Mr. Rothschild instruct you to

24   deactivate your account?

25      A.   He didn't instruct me.  He just did it

Lafosse, Nicolle Deposition                                                                    April 22, 2025

**Page 24**

1    internally.  It was not up to me.  I couldn't

2    deactivate it myself.  The IT department or whoever

3    was handling the IT deactivated my account.

4         Q.   You don't know specifically who

5    deactivated your account?

6         A.   No.  No idea.

7         Q.   Did anyone tell you that they were going

8    to deactivate your account?

9         A.   Don't remember, to be honest.

10        Q.   Did the deactivation occur before you left

11   or after you had officially left PAM?

12        A.   I don't know.

13        Q.   When you worked at PAM, did you have in

14   your possession hard copy documents responsive to

15   the requests in Valve's document subpoena?

16        A.   No.

17        Q.   Just to make sure that I have everything

18   right, when was the last time you had access to any

19   of PAM's internal documents?

20        A.   If I had to make a wild guess, it would be

21   my last day of employment, which I don't know what

22   day exactly.  I know it's somewhere around the 2021.

23        Q.   And would that last day of employment be

24   when you lost access to PAM's internal documents?

25        A.   So I don't know if I lost access.  I just

Lafosse, Nicolle Deposition                                                                April 22, 2025

                                                                                      Page 25

1    simply stopped using it and assumed I had no more

2    access.  Also, I didn't have any interest on

3    accessing it.  So I assume that they deactivated.  I

4    don't know what the password is, completely forgot

5    so.

6          Q.   In searching for documents responsive to

7    this subpoena, did you attempt to regain access to

8    your cloud files from PAM?

9          A.   No.

10         Q.   Besides the employee agreement that you

11   mentioned earlier, sitting here today, do you have

12   any other PAM documents in your possession?

13         A.   No.

14         Q.   Do you have access to any other PAM

15   documents?

16         A.   No.

17              (Discussion off the record.)

18         Q.   How many email addresses did you use when

19   working for PAM on behalf of the company?

20         A.   Only one.

21         Q.   And what was that email address?

22         A.   It was nlafosse@patentassets.com.  I can

23   confirm that later by kind of looking into my

24   records, but I think somewhere around that line.

25         Q.   When you say you would be able to confirm

Lafosse, Nicolle Deposition

April 22, 2025

**Page 26**

1    it by looking into your records, what do you mean?

2        A.   Oh, because I had it on my -- I think it's

3    on one of my emails where they sent me the

4    credentials.  Like this is your email, blah, blah,

5    blah, set it up.

6        Q.   Got it.

7        A.   Like part of the enrollment documentation.

8        Q.   Your records would tell you the email

9    address, but not the emails that you have sent or

10   received using that address?

11       A.   Correct, yes.  Just the email address.

12              (Discussion off the record.)

13       Q.   Did you ever use your personal email

14   account for work related to PAM?

15       A.   No.

16       Q.   You only received the kind of initial

17   credentials and documents through your personal

18   account?

19       A.   Correct.

20       Q.   Did anyone leave PAM while you worked

21   there?

22       A.   No.

23       Q.   No one was fired or left the company?

24       A.   No.  Not that I recall, no.

25              (Discussion off the record.)

Kilpatrick Townsend & Stockton LLP

Page 27

| | | Valve Corporation | Affirmative |

1    Q.   Ms. Lafosse, do you have a law degree?

2    A.   Yes.

3    Q.   Where did you go to law school?

4    A.   University of Miami.

5    Q.   What year did you graduate?

6    A.   2018.

7    Q.   What is your undergraduate degree in?

8    A.   I didn't study in the U.S. undergrad.  So

9 I guess my undergrad is my law degree back home in

10 Honduras.

11    Q.   So you did your undergrad in Honduras?

12    A.   I can explain.

13         So I did law school in Honduras and then I

14 came into a master's degree at University of Miami.

15 From the master's degree, I did a joint degree into

16 a JD.

17    Q.   So you have both an LLM and a JD from the

18 University of Miami?

19    A.   Yes.  So I didn't do undergrad in the U.S.

20 or back home, just law school.

21    Q.   Got it.

22         Are you licensed to practice law in

23 Honduras?

24    A.   Yes.

25    Q.   Are you licensed to practice law in the

Lafosse, Nicolle Deposition                                                        April 22, 2025

**Page  28**

1    United States?

2        A.    Yes.

3        Q.    Were you licensed to practice law when you

4    were working at PAM?

5        A.    I should have been, yeah.

6        Q.    What jurisdictions were you barred in?

7        A.    D.C.  Washington, D.C.

8        Q.    Is that the only jurisdiction you're

9    licensed to practice law in?

10        A.    Yes.  In the U.S.

11        Q.    Where do you currently work?

12        A.    I got my own practice and I am also of

13    counsel at Diaz Reus & Targ LLP.

14        Q.    What is the name of your own practice?

15        A.    Law & Pixels.  That's the d/b/a so Lafosse

16    Law is the name.

17        Q.    And generally speaking, what type of law

18    do you practice in at Law & Pixels.  Or Lafosse Law?

19        A.    It's, as a general matter, technology law.

20    My expertise is blockchain, cryptocurrency, AI, Web3

21    matters.

22        Q.    Is that a solo practice?

23        A.    Yes.

24        Q.    Law & Pixels?

25        A.    Uh-huh.

Lafosse, Nicolle Deposition                                                  April 22, 2025

Page 29

1      Q.   And as you mentioned, you are also of

2    counsel at Diaz Reus?

3      A.   Yes.

4           ATTORNEY DAMITIO:   Introducing Exhibit 2.

5      (PAM Team screenshot is received and marked as

6           Exhibit 2 for Identification.)

7    BY ATTORNEY DAMITIO:

8      Q.   Ms. Lafosse, before we get to this

9    exhibit, just to close out the prior set of

10   questions --

11     A.   Uh-huh.

12     Q.   -- what type of law do you practice as

13   counsel at Diaz Reus?

14     A.   Technology law matters.

15     Q.   Similar to what you do at your own firm?

16     A.   Yeah.  Yes.

17     Q.   All right.  Turning to Exhibit 2, I'll

18   represent to you that this is a screenshot of the

19   website pam.shortcart.com/team.  This website shows

20   you as a current member of the PAM team.

21           Is this website correct?

22     A.   Current?  No, I'm not a current member.

23     Q.   So this website is not correct?

24     A.   No.

25     Q.   So you're not a current member?

                                    Kilpatrick Townsend & Stockton LLP

April 22, 2025

Page 30

1         A.   I actually was not even aware I was in

2    that website, which is not good.

3         Q.   Do you remember this website during your

4    time working at PAM?

5         A.   Yes.

6         Q.   When you were working at PAM, were you

7    represented as a current member?

8         A.   Yes.

9         Q.   But the website is no longer correct; you

10   are not a current member?

11        A.   For a while.  For many years it hasn't

12   been correct.  I don't know why my image is still

13   there.

14        Q.   Do you represent Mr. Rothschild in any

15   current matters as his attorney?

16        A.   No.

17        Q.   Do you represent PAM in any current

18   matters as Mr. Rothschild's attorney?

19        A.   No.

20        Q.   Do you represent any company that

21   Mr. Rothschild owns in any current matters as his

22   attorney?

23        A.   No.

24        Q.   Are you advising Mr. Rothschild in any

25   capacity with regards to his business or legal

Lafosse, Nicolle Deposition                                                                April 22, 2025

**Page 31**

```
 1    affairs?

 2         A.    No.

 3              ATTORNEY DAMITIO:   Marking Exhibit 3.

 4         (LinkedIn profile screenshot is received and

 5          marked as Exhibit 3 for Identification.)

 6    BY ATTORNEY DAMITIO:

 7         Q.    Ms. Lafosse, do you recognize this as your

 8    LinkedIn profile?

 9         A.    I do.

10         Q.    Everything on here appear to be accurate?

11         A.    No, not really.  And I just -- you just

12    brought it to my attention.  Patent litigation

13    manager should not be October 2021 to present,

14    because I no longer work there.

15         Q.    Anything else appear inaccurate?

16         A.    Let me just look.

17         Q.    Uh-huh.

18                   (Pause.)

19         A.    The rest is fine, I believe, at close

20    glance.

21         Q.    So, again, on your LinkedIn profile, you

22    are no longer a full-time member of Patent Asset

23    Management?

24         A.    In my LinkedIn profile, it shows as it's

25    still present, but that was an oversight on my end,
```

Lafosse, Nicolle Deposition

April 22, 2025

Page 32

1    because it shouldn't be present.  It should be done,

2    no longer working there.

3        Q.   Did you sign a termination agreement with

4    PAM when you left the company?

5        A.   I don't remember.

6        Q.   Do you remember filling out any paperwork

7    regarding you leaving the company?

8        A.   I know I sent him an email.  I was not

9    terminated, I left, so I sent him an email.  And I

10   don't remember if he sent me a final paperwork to

11   sign.

12       Q.   If he had sent you final paperwork, would

13   that be in your personal email address or your --

14       A.   The Patent.

15       Q.   -- patent Asset Management account?

16       A.   It should have been in the Patent Asset

17   Management, yeah.

18       Q.   If you turn to the second page of the

19   LinkedIn profile, the description of your work at

20   Patent Asset Management, did you write that

21   description?

22       A.   Yeah, yes.

23       Q.   Did anyone from PAM help you write it?

24       A.   No.

25       Q.   Did anyone from PAM advise you on how to

Page 33

1    write a description -- the description here?

2        A.    Nope.

3        Q.    Do you remember when you wrote this

4    description?

5        A.    Probably 2021.

6        Q.    All right.  Did you revise the description

7    after you wrote it at any time?

8        A.    Probably.  I don't recall.  It's been a

9    while, but most likely, yes.

10        Q.    You don't remember when you might have

11    revised it after you wrote it?

12        A.    No.  Like I said, I over -- I even

13    didn't -- I didn't even realize I had still present

14    in there.  So, yes, most likely haven't reviewed it

15    in, like, years.

16        Q.    You mentioned that you worked for PAM from

17    2020 to 2021, roughly.  How did you learn about the

18    job opening?

19        A.    Indeed.

20        Q.    Indeed the job --

21        A.    The --

22        Q.    -- website?

23        A.    Yes, the job website.

24        Q.    Did you apply for the job through Indeed?

25        A.    Yes.

Lafosse, Nicolle Deposition                                      April 22, 2025

Page 34

1       Q.   Did you interview for the position?

2       A.   Yes.

3       Q.   Who interviewed you?

4       A.   Sugouri.

5       Q.   Was that a remote or in-person interview?

6       A.   Remote.

7       Q.   During the time that you worked for PAM,

8  were you working in person in an office or remotely?

9       A.   Remote, always.

10      Q.   Does PAM have a physical office, that

11 you're aware of?

12      A.   I don't think so.

13      Q.   Did PAM have any physical offices at the

14 time you worked there?

15      A.   No.

16      Q.   Do you know if PAM received small business

17 or PPP loans from the government during the time you

18 worked there?

19      A.   No idea.

20      Q.   Do you know if PAM got any loans or

21 government assistance while you worked there?

22      A.   No, I don't know.

23      Q.   You also said that you were familiar with

24 defendant Leigh Rothschild.  Are you familiar with

25 him from your time working at PAM?

Lafosse, Nicolle Deposition                                                       April 22, 2025

Page 35

1      A.   Correct.

2      Q.   Had you met Mr. Rothschild prior to

3  working at PAM?

4      A.   No.

5      Q.   How well would you say you personally know

6  Leigh Rothschild?

7      A.   To a business level.  Every conversation

8  was related to work.  And outside that, we just

9  didn't talk about anything.

10     Q.   When did you first meet Mr. Rothschild?

11     A.   We had a one-time, like, team lunch at a

12 restaurant and that was the one time that I met him.

13     Q.   So you've met him in person just the one

14 time?

15     A.   Uh-huh, yes.

16     Q.   Do you remember when that in-person

17 meeting was?

18     A.   No.  Sometime during my employment.

19 That's -- that's best I can say.

20     Q.   How often did you interact with

21 Mr. Rothschild as part of your remote work for PAM?

22     A.   Let's see.  Out of five days of the week,

23 I spoke with him three times.

24     Q.   Three days out of the week or --

25     A.   No.

Lafosse, Nicolle Deposition                                                                April 22, 2025

**Page 36**

1      Q.   -- three times?

2      A.   Three times throughout the entire week.

3   Maybe three times in the same day or three times on

4   separate days, but it was not that much.  Like not

5   that much.

6      Q.   All right.  When you were speaking with

7   Mr. Rothschild for those three times, what were

8   those meetings about?

9      A.   Follow-ups, status of matters.  That was

10   pretty much it, because then the rest of the

11   communication was with Sugouri.  My communication at

12   least.  But, with him, it was just following up on

13   how the status of the matters were, any setbacks

14   that we might have had, asking if he could help

15   somehow.  That was the extent of it.

16      Q.   Were there other people on these meetings?

17      A.   Yes, Sugouri and sometimes Daniel,

18   sometimes the assistant.  I don't remember the

19   assistant's name, though, the office assistant.

20      Q.   Besides Sugouri, Daniel, the office

21   assistant, and Mr. Rothschild, were there any other

22   employees of PAM during the time that you worked

23   there?

24      A.   No, that was -- as far as I know, that was

25   the entire team.  At least the people that I

Lafosse, Nicolle Deposition                                                                April 22, 2025

Page 37

1    interacted with, that was it.

2        Q.   Going back to these meetings that you

3    would have, how long would they last?

4        A.   Varied a lot.  It could be a two-minute

5    call because -- it could be one-hour call.  I don't

6    think more than an hour.  An hour was tops.

7        Q.   Did the length of time of the calls depend

8    on the number of active cases that were ongoing?

9        A.   No, not necessarily.  I mean, it could

10   have been, but it also could be like a -- it could

11   have been a brainstorm session where we're trying to

12   see how to grow the company, just like business

13   planning, brainstorming with the team.  Like, he was

14   very inclusive when it came to growing the company,

15   included everybody in the team.  Like, give me

16   ideas, let's get creative, promotional materials,

17   things that we could do better, stuff like that.

18       Q.   What was Mr. Rothschild's reaction when

19   you left PAM?

20       A.   He was fine.  I told him I was leaving

21   because I was pursuing something bigger, better that

22   allowed me to grow more in my career and he was

23   happy for it.

24       Q.   Would you say that you left on good terms?

25       A.   Yes.

Rothschild                                                    Counter
402, 403, Untimely

**Page 38**

| | | Rothschild | Counter |
|---|---|---|---|

1    Q.    What was your impression of Mr. Rothschild

2    when you met him, either in person or during these

3    meetings?

4    A.    Overachiever.  Definitely eager to grow.

5    Businessman top to bottom.

*Rothschild* — 402, 403, Untimely

6              (Discussion off the record.)

7    Q.    When was the last time that you spoke to

8    Mr. Rothschild?

9    A.    Probably when I -- I called him before

10   sending the resignation letter.  That was probably

11   the last time.  And maybe like a farewell call with

12   the team.

13   Q.    Going back to these weekly calls that you

14   had with the team, were these phone calls, were they

15   over Zoom, what format were the calls in?

16             ATTORNEY CHAD:  Object to form.

17   Q.    You can answer the question.

18   A.    I don't recall.  I think Zoom, but I don't

19   recall, to be honest.

20   Q.    Were there agendas circulated prior to the

21   calls?

22   A.    Yes, Sugouri would put the agenda

23   together.

24   Q.    Sugouri would circulate an agenda prior to

25   each call?

Lafosse, Nicolle Deposition                                                                          April 22, 2025

Page 39

1        A.   Yes.  When it was like a team call, yes.

2   A casual call, no.

3        Q.   Were there minutes or notes taken of these

4   calls?

5        A.   Yes.

6        Q.   Who was responsible for recording meeting

7   minutes or taking notes?

8        A.   Sugouri.

9        Q.   Would Sugouri circulate the notes that she

10  had taken after the meeting?

11       A.   Yes.

12       Q.   Were those notes sent to everyone who was

13  on the meeting?

14       A.   Yes.

15            (Discussion off the record.)

16            ATTORNEY GREEN:  Really quick off the

17  record?

18       Is anyone else exceptionally warm?

19            (Discussion off the record.)

20            THE VIDEOGRAPHER:  You want to go off the

21  record?

22            ATTORNEY DAMITIO:  We've been going for --

23            ATTORNEY MACHLEIDT:  Yes, let's go off the

24  record.

25            ATTORNEY DAMITIO:  -- about an hour.  I

Lafosse, Nicolle Deposition                                                                April 22, 2025

**Page 40**

1          think now is a good time.  Yeah.

2                  THE VIDEOGRAPHER:  Going off record at

3          9:59 a.m.

4                          (Recess.)

5                  THE VIDEOGRAPHER:  We're going back on the

6          record.

7                  This is the beginning of media unit number

8          2, and the time is 10:13 a.m.

9                  ATTORNEY DAMITIO:  Can we go back off the

10         record?

11                 THE VIDEOGRAPHER:  I'll just delete that

12         file and we'll start over.

13                     (Discussion off the record.)

14                 THE VIDEOGRAPHER:  We're going back on the

15         record.

16                 This is the beginning of media unit number

17         2, and the time is 10:20 a.m.

18         BY ATTORNEY DAMITIO:

19             Q.   Ms. Lafosse, before the break, we were

20         talking about agendas and meeting minutes that were

21         circulated during your weekly meetings and I want to

22         ask about the form of those agendas and minutes.

23             A.   Uh-huh.

24             Q.   Tell me everything that you remember about

25         the form of the agendas and minutes without getting

Lafosse, Nicolle Deposition

April 22, 2025

Page 41

1    specifically into the content of the documents.

2        A.   The agenda consisted on things that were

3    successfully completed and things that were still

4    pending and I think it was a third category of

5    things that needed to be done that had been delayed

6    for too long already.  Kind of like a heat map of

7    priorities.

8        Q.   Were active cases listed out on the

9    agendas?

10       A.   Yeah.

11       Q.   All active cases at the time?

12       A.   Not all active.  Only the ones that we

13   were going to discuss during that meeting.

14       Q.   Were tasks arranged by specific case?

15       A.   Yes.

16       Q.   Were tasks arranged in order of

17   importance?

18       A.   I don't recall.

19       Q.   Was there an individual listed beside each

20   task to note who was assigned to each task?

21       A.   Certain tasks had names.  Like Nicolle did

22   X, Y, or Z pending X, Y, or Z.

23       Q.   Were these notes stored somewhere after

24   they were circulated?

25       A.   I don't know where Sugouri would have

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition

April 22, 2025

Page 42

1    stored them.  I stored them on my internal file of

2    the company.

3        Q.   And when you say internal file, what do

4    you mean?

5        A.   Like the cloud server where all the

6    documents were saved.

7        Q.   Did you have your own personal cloud

8    server or was it a shared cloud server for all of

9    PAM?

10       A.   A shared cloud server, yeah.  So we had

11   the email, the business emails, and then within that

12   business emails, you got your own file so.

13       Q.   All right.  You never kept hard copies of

14   the meeting notes or agendas?

15       A.   No.

16       Q.   Without telling me the context, just yes

17   or no, do you remember seeing Valve Corporation

18   listed in any of these agendas that were circulated?

19       A.   I don't remember.

20       Q.   Just yes or no:  Do you remember seeing

21   them in any of the meeting minutes that were

22   circulated after a meeting?

23       A.   I'm going to say yes, because the name

24   rings a bell.  I don't remember the subject matter

25   of it.

CONFIDENTIAL

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                    April 22, 2025

Page 43

1          Q.   As near as you can recall, what was the

2     date that the name appeared in the meeting minutes?

3          A.   Sometime during my employment.  Sorry,

4     that's the best I can do.

5          Q.   You also mentioned --

6               ATTORNEY DAMITIO:  Strike that.

7                    (Discussion off the record.)

8     BY ATTORNEY DAMITIO:

9          Q.   As near as you can recall, what was the

10    date that the name Valve Corporation appeared in the

11    meeting minutes?

12         A.   I do not recall.

13         Q.   Earlier, you mentioned that your

14    supervisor was Sugouri Batra?

15         A.   Yes.

16         Q.   What was Ms. Batra's role at the company?

17         A.   She was the one who drafted the motions;

18    she drafted the patents, the map of the patents; she

19    analyzed the patents, the infringements over it; she

20    did all the heavy lifting when it came to assessing

21    the patent and then potentially litigating against

22    infringers.

23         Q.   What was her title when she worked at PAM?

24         A.   I don't remember.

25         Q.   When you say she drafted motions, what

Lafosse, Nicolle Deposition                                                                     April 22, 2025

**Page 44**

1    motions did she draft?

2        A.   I don't recall, but must have been

3    literally every motion that we filed.  She -- it was

4    only her and me as an attorney; so I know I didn't

5    draft it so.

6                    (Discussion off the record.)

7        Q.   What role, if any, did outside counsel

8    have in drafting motions?

9        A.   They assisted Sugouri on drafting the

10   motions for sure.  Actually, I think they drafted --

11   now that I recall better, they drafted the motion

12   and then Sugouri looked over it and kind of like

13   polished in the patent side of the motion, the more

14   technical side.  But the of counsel would draft the

15   motion for sure, the person who would be filing on

16   behalf of PAM.

17       Q.   For active litigations, outside counsel

18   would draft the first draft of motions?

19       A.   Yes.

20       Q.   After drafting the first draft, outside

21   counsel would send the draft to --

22       A.   Sugouri.

23       Q.   -- Sugouri?

24       A.   Yes.

25       Q.   After outside counsel sent the first

Page 45

1    draft, Sugouri would review and suggest edits to the

2    motion?

3         A.   Correct.

4         Q.   Would Sugouri then send the draft of the

5    motion back to outside counsel?

6         A.   Yes.  He would --

7         Q.   Would Sugouri -- please.

8         A.   He would give the final approval.  He will

9    draft the final document and, you know -- all we did

10   was suggestions about the motion, but at the end of

11   the day, it was of counsel in the specific

12   jurisdiction who drafted, make sure everything was

13   accurate, and then sign off and filed it.

14              (Discussion off the record.)

15        Q.   How did you become aware that outside

16   counsel was drafting motions for litigation?

17        A.   I was copied in the emails.

18        Q.   Did you ever have meetings or discussions

19   with outside counsel?

20        A.   Yes.

21        Q.   Were those meetings about ongoing

22   litigations?

23        A.   Correct.  Ongoing or potential.  Sometimes

24   we didn't -- we had outside counsel draft them,

25   draft the motions, but we didn't end up filing for

**Page 46**

1    one reason or another.

2        Q.   What are some reasons for not filing a

3    motion?

4        A.   I don't remember, to be honest.

5        Q.   What role within PAM, if any, did

6    Mr. Rothschild have while you worked there?

7        A.   I don't know what -- I don't remember what

8    title he had, but he was just overseeing that things

9    got done.  He didn't get involved into the legal

10   side of things, he left that to Sugouri and myself,

11   but it was just pretty -- like, you could say he was

12   like the office oversight person, office manager

13   without having the title of office manager.  Company

14   manager.

15       Q.   Do you remember any specific

16   responsibilities that Mr. Rothschild took on at PAM

17   while you worked there?

18       A.   No, he didn't have any specific

19   responsibilities.  He just made sure everybody got

20   things done in time, nothing was, like, lingering

21   for too long.  Yeah.

22       Q.   How were you paid while you worked at PAM?

23       A.   Bank deposit or what do you mean?

24       Q.   Were you salary or hourly?

25       A.   Salary.

Rothschild                    Counter
Untimely

CONFIDENTIAL

Lafosse, Nicolle Deposition                                                                April 22, 2025

Page 47

1                    (Discussion off the record.)

2         Q.   Was Mr. Rothschild always, sometimes, or

3    never copied on correspondence with outside counsel?

4         A.   I don't recall, but if I would do a wild

5    guess, I would say he was in every communication.

6         Q.   Your best recollection is that he was

7    copied on every communication with outside counsel?

8         A.   Most likely.

9         Q.   Do you recognize the name Chris Medina in

10   association with your time at PAM?

11        A.   Yeah, it rings a bell, though, I don't

12   remember what his role was.  I know -- I know it

13   sounds -- it rings a bell for sure.

14        Q.   Tell me everything that you remember about

15   him.

16             ATTORNEY CHAD:  Object to form.

17        A.   Can you give me the title of his

18   employment maybe?  I know there was a Chris Medina.

19   I don't remember what his role was.

20        Q.   Does the name Catherine Delson ring a bell

21   with regards to your time at PAM?

22        A.   No, not her.

23        Q.   Does Mr. Rothschild own PAM?

24        A.   I don't know.  I know he ran it.

25        Q.   Do you know who owns PAM?

Lafosse, Nicolle Deposition

April 22, 2025

**Page 48**

1      A.   No.

2      Q.   Do you know if Mr. Rothschild owns any

3  companies?

4      A.   I know of PAM, but I don't know, like,

5  corporate wise, I don't know if his name is as --

6  listed as an owner.

7      Q.   Do you know if PAM owns any companies?

8           ATTORNEY DAMITIO:  Strike that.

9      Q.   When you worked at PAM, were you aware of

10  PAM owning any companies?

11     A.   I was not aware, but, if anything, I would

12  say PAM owned the technology one and the display

13  one.  Sorry, I don't recall the entire names so.

14     Q.   Would that be Rothschild Broadcast

15  Distribution Systems?

16     A.   Correct.  And then the other one, the

17  display one.  No, hold on.

18          That's the one, but there was a third one.

19     Q.   Display Technologies?

20     A.   Display Technologies, yes.

21     Q.   So you believe that PAM owned those two

22  companies?

23     A.   I believe so.  I believe so, but I don't

24  have any -- like, I never saw any documents that

25  said it did.  I just assumed they do because they

Page 49

1    work together in, you know, in unison, in a way.

2                (Discussion off the record.)

3        Q.   To the best of your knowledge and

4    recollection, when you worked at PAM, PAM owned

5    Rothschild Broadcast Distribution Systems and

6    Display Technologies?

7        A.   Yes.

8        Q.   Are there any other companies that you

9    believe PAM owned while you worked at PAM?

10       A.   Not that I know of.

11       Q.   Did you do work for Rothschild Broadcast          **Valve Corporation**          Affirmative

12   Distribution Systems while you worked at PAM?

13       A.   Yes.

14       Q.   All right.  Did you do work for Display

15   Technologies while you worked at PAM?

16       A.   Yes.

17       Q.   What was the nature of your work for            Rothschild                Counter

18   Rothschild Broadcast Distribution Systems?                403, Untimely

19       A.   I helped Sugouri structure the patents,

20   the patent map, and she was also teaching me about

21   how to -- how to integrate that map into the

22   motions, what to look for in the motion.  I was kind

23   of like her second hand.

24       Q.   When you say patent map, what do you mean?

25       A.   Well, I'm not sure -- I know it has a

Page 50

Rothschild                                                              Counter
403, Untimely

1   technical name, but you have -- when you have a

2   patent, you have to have the images of this is the

3   screen and there's an arrow for the code.  The code

4   does this.  That's another arrow for.  This is what

5   displays.  Then after this display, there's another

6   arrow.  Kind of like a map of the codes, the

7   algorithms, the screens, the buttons, the steps that

8   the software or the display has to show and how the

9   intention works.

10       Q.   You assisted Sugouri in creating these

11  patent maps?

12       A.   Yes.  I would do like the base draft and

13  then, of course, it was not -- it was not done

14  because I was just learning about how to, you know,

15  how to draft it, how to structure it.  And then

16  she'll look at it, tell me what was missing, what

17  was wrong, right, and then she'll finish it up.

18            (Discussion off the record.)

19       Q.   As PAM's litigation manager, how did you

20  keep track of ongoing cases?

21       A.   I think we have like -- we had like an

22  internal worksheet.  Yeah, we had an internal

23  worksheet that it kind of -- we old school literally

24  just typed in, like, cases that were pending, what

25  stage they were in, things that needed to be done.

Lafosse, Nicolle Deposition

April 22, 2025

Page 51

1   I mean, you can automate that now, but back in the

2   day, we did it on an Excel sheet.

3       Q.   As PAM's litigation manager, how were you

4   informed about ongoing cases?

5       A.   I took the meetings with Sugouri and she

6   would tell me about this new patent that we had

7   acquired and she would explain what the patent was

8   about, what the invention was about, what we were

9   looking to do with that invention at the moment we

10  acquired it.  And then we would have another meeting

11  with -- Daniel would then look in to an of counsel

12  of a jurisdiction where we would potentially file

13  the claim.  And then we would have another meeting

14  with the of counsel that Daniel found so that we

15  could explain to him the case, the matter and the

16  duties that he would have to do as an of counsel.

17      Q.   As PAM's litigation manager, what type of        Valve Corporation        Affirmative

18  information were you tasked with keeping track of?

19      A.   Everything.  Everything that related to

20  the litigation -- litigation or potential litigation

21  at hand.  From beginning to end.  Most of the time,

22  I don't think I ever -- I never got to see one that

23  was beginning to end.  I always, like, at the

24  beginning, but never saw any one -- any case being

25  closed.

Lafosse, Nicolle Deposition                                                                April 22, 2025

**Page 52**

1    Q.   Were you tasked with keeping track of case

2    deadlines?

3    A.   Yes.

4    Q.   Were you tasked with keeping track of

5    settlement negotiations and offers?

6    A.   Yes.

7    Q.   Were you tasked with keeping track of

8    orders from the Court that might have come out?

9    A.   No, I think that was of counsel.  I mean,

10   of counsel would take care of it and then he'll just

11   forward it to us.  In a way, I was copied in the

12   email.

13            (Discussion off the record.)

14   Q.   When you say of counsel, are you referring

15   to outside counsel?

16   A.   Yes.

17   Q.   From a law firm?

18   A.   Yes.

19   Q.   So if an order came out from the Court,

20   outside counsel would send it to PAM?

21   A.   Yes.

22   Q.   Who would be copied on emails where

23   outside counsel was sending an order of the Court to

24   PAM?

25   A.   Sugouri, the assistant, definitely Leigh,

Lafosse, Nicolle Deposition

April 22, 2025

**Page 53**

1   and me.

2        Q.   And when you say Leigh, that's referring

3   to --

4        A.   Rothschild.

5        Q.   -- Mr. Rothschild?

6        A.   Yes.

7        Q.   Was Mr. Falcucci copied on this

8   correspondence?

9        A.   Yes, he was.

10       Q.   When outside counsel sent a copy of an

11  order from a pending case, was Mr. Falcucci copied

12  on that correspondence?

13       A.   Yes, he was.

14            (Discussion off the record.)

15       Q.   Did PAM have a listserv or an email

16  distribution that it used?

17       A.   For distribution -- I'm not understanding

18  the question.

19       Q.   For example, if outside counsel was

20  sending an order of a court --

21       A.   Yeah.

22       Q.   -- did it send it to a group email that

23  you were all a part of or was it each individual

24  email address separately?

25       A.   Each individual email, he would put it

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                              April 22, 2025

**Page 54**

1    into the email, yeah.

2         Q.   As part of your role as PAM's litigation

3    manager, did you negotiate settlements with

4    companies?

5         A.   No, that would be Sugouri.

6         Q.   During your time at PAM, were you copied

7    on emails where Sugouri was negotiating with outside

8    counsel?

9         A.   Yes.

10             ATTORNEY DAMITIO:  I'm sorry, strike that.

11        Q.   During your time at PAM, were you copied

12   on emails where Sugouri was negotiating with

13   companies?

14        A.   Yes.

15        Q.   Did outside counsel for PAM ever negotiate

16   licenses or settlements on PAM's behalf?

17        A.   Yes.

18        Q.   Were you copied on emails where outside

19   counsel was negotiating licenses or settlements on

20   PAM's behalf?

21        A.   Yes.

22        Q.   Was Mr. Rothschild copied on

23   correspondence where outside counsel was negotiating

24   licenses or settlements on PAM's behalf?

25        A.   That I don't recall.  I know that

Page  55

1    everything that was internal to PAM, he was

2    definitely copied, but I don't recall communication

3    was outside counsel and then adverse parties.  I

4    don't remember.

5            (Discussion off the record.)

6        Q.   When you use the terms adverse parties,

7    infringers, and targets, do those all mean the same

8    thing to you?

9        A.   Yes.

10       Q.   What did --

11       A.   Hold on.  Take that back.

12            Infringers are definitely -- are not

13   necessarily the same as adverse parties.

14       Q.   What do you mean when you say adverse

15   party?

16       A.   I meant the attorney representing the

17   person who had potentially infringed on the patent.

18       Q.   When you say infringers, what do you mean?

19       A.   People who had potentially violated a

20   patent that was now acquired by PAM.

21       Q.   And when you use the term targets, what do

22   you mean?

23       A.   Potential infringers.

24       Q.   When a adverse party made an offer to

25   settle a case to PAM, was that offered conveyed to

Lafosse, Nicolle Deposition                                                     April 22, 2025

Page  56

```
 1    Mr. Rothschild?

 2         A.   Yes.

 3         Q.   Who conveyed that offer to Mr. Rothschild?

 4         A.   Sugouri.

 5         Q.   Was it conveyed over email?

 6         A.   Probably email and phone, both.

 7         Q.   Do you recall being copied on emails where

 8    a settlement offer was conveyed from Sugouri to

 9    Mr. Rothschild?

10         A.   Yes.

11         Q.   Roughly, how many times do you recall

12    being on correspondence where a settlement offer was

13    conveyed from Sugouri to Mr. Rothschild?

14         A.   Nine out of ten times.

15         Q.   Who at PAM had authority to decide whether

16    or not to accept a settlement offer?

17         A.   Leigh Rothschild.

18         Q.   Did anyone else at PAM have authority to

19    accept a settlement offer?

20         A.   Sugouri would make suggestions, but she

21    didn't have the last call.

22              (Discussion off the record.)

23         Q.   You said that you were copied on

24    correspondence where a settlement offer was conveyed

25    from Sugouri to Mr. Rothschild nine out of ten
```

Valve Corporation                                                    Affirmative

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                April 22, 2025

**Page 57**

1    times.

2            What would happen on that other one out of

3    ten times?

4        A.   I would not know.

5        Q.   You wouldn't know that a settlement offer

6    had been conveyed from --

7        A.   I would learn about it, but I wasn't

8    copied on the details so.

9        Q.   How would you learn about it?

10       A.   Sugouri would just comment in a casual

11   conversation like, you know, we're settling or

12   having conversations with settlement with so and so.

13       Q.   As part of your role as PAM's litigation

14   manager, did you receive licenses or settlement

15   agreements from outside counsel for Mr. Rothschild

16   to sign?

17       A.   I don't recall.

18       Q.   Do you recall ever sending signed licenses

19   to outside counsel?

20       A.   No, that would definitely not be me.  If

21   anything, it would have been Sugouri, not me.

22       Q.   Did you ever sign a license or settlement

23   agreement on behalf of PAM?

24       A.   No.

25       Q.   Did anyone other than Leigh Rothschild

April 22, 2025

Page 58

1    sign settlement licenses on behalf of PAM, that

2    you're aware of?

3        A.   Not aware of.

4        Q.   Did you confirm that settlement money was

5    properly paid by companies to Mr. Rothschild after a

6    license was executed?

7        A.   I was not aware.  I don't -- yeah, I was

8    not copied at that point.  It was like my -- I think

9    the end of my communications were up to the extent

10   of there's a settlement, this is the amount, and

11   then I just wasn't copied after that so I wouldn't

12   know.

13       Q.   As PAM's litigation manager, did you ever

14   track money coming in from infringers --

15       A.   No.

16       Q.   -- to PAM?

17            As part of your role as PAM's litigation

18   manager, did you ever move or transfer money between

19   Mr. Rothschild's companies?

20       A.   No.

21       Q.   As PAM's litigation manager, did you have

22   access to PAM's bank accounts?

23       A.   No.

24       Q.   Did you have visibility in to PAM's bank

25   accounts?

Page 59

1        A.   No.

2        Q.   Did you ever move money in to or out of

3    PAM's accounts as part of your role as PAM's

4    litigation manager?

5        A.   No.

6        Q.   Did you ever transfer money from PAM to

7    Mr. Rothschild as part of your role as PAM's

8    litigation manager?

9        A.   No.

10       Q.   Do you recall anyone at PAM transferring

11   money from PAM to Mr. Rothschild directly?

12       A.   I know there was someone.  I don't know

13   who.

14       Q.   How do you --

15       A.   If anything, it could have been the --

16   like, the office assistant, because she was wearing

17   many hats.  So, most likely, she also did that

18   payment transfer.

19       Q.   During your time at PAM, you were aware          | **Valve Corporation**    Affirmative

20   that there was money being transferred from PAM to

21   Mr. Rothschild?

22            ATTORNEY CHAD:  Object to form.

23       A.   Yeah.                                             | **Valve Corporation**    Affirmative

24       Q.   How were you aware during your time at PAM        | Rothschild    Counter

25   that there was money being transferred from PAM to          602, Untimely

Lafosse, Nicolle Deposition                                                                    April 22, 2025

Page 60

1    Mr. Rothschild?

2        A.   When there was a settlement that was a

3    successful settlement, there was a transfer of money

4    to the company from the settlement.

5        Q.   Would that money from the settlement be

6    deposited in PAM's bank accounts?

7        A.   I have no idea.  I don't know where it was

8    deposited.

**Rothschild**                                   Counter
602, Untimely

9            (Discussion off the record.)

10       Q.   Do you know if any settlement payments

11   went directly to Mr. Rothschild's accounts?

12       A.   I don't know.

**Rothschild**                                   Counter
602, Untimely

13       Q.   To the best of your knowledge, who would

14   have that information?

15       A.   I have no idea.  I don't know.

16       Q.   You don't recall the name of the office

17   manager at that time?

18       A.   I don't.  I don't.  I know she was a lady.

19           (Discussion off the record.)

20       Q.   While you worked at PAM, if you know, who

21   had access to PAM's bank accounts?

22       A.   I don't know, but a wild guess would be

23   just Leigh Rothschild.

24       Q.   What is your basis for that guess?

25       A.   He liked to keep management tight; so he

Page 61

1    most likely was the only one handling bank accounts.

2        Q.   When you say he liked to keep management

3    tight, what do you mean?

4        A.   He always wanted to be aware of the

5    things -- that everything was happening internally

6    and externally that related to the company.

7    Everything and anything that happened, he knew of,

8    and that's what I meant with keeping a tight, like,

9    he was always aware of everything happening.

Valve Corporation                                      Affirmative

10       Q.   Can you remind me, what is PAM's business

11   model?

12       A.   Acquire patents and litigate it on behalf

13   of the inventors against infringers.

14              (Discussion off the record.)

15       Q.   Other than acquiring patents and

16   litigating patent cases, did PAM make money from any

17   other sources?

18       A.   I would not know.

19       Q.   You don't know if there was an additional

20   source of revenue during your time --

21       A.   No.

22       Q.   -- at PAM?

23              Do you know if, during your time at PAM,

24   PAM filed lawsuits where PAM itself is named as the

25   plaintiff?

Lafosse, Nicolle Deposition                                                    April 22, 2025

Page 62

1      A.   I don't recall.

2      Q.   You don't recall if PAM filed lawsuits on

3  behalf of itself?

4      A.   No, I don't recall.

5      Q.   Does PAM own any other companies?

6      A.   I believe they own the display -- Display

7  Technologies company and the other one, the

8  technology other -- sorry, I'm going to have to

9  write down those two names, but the display company

10  and then the other one that was technology related.

11      Q.   Would that be Rothschild Broadcast

12  Distribution --

13      A.   Yes.

14      Q.   -- Systems.

15           And going forward, are you okay if I

16  shorten that to RBDS?

17      A.   Yes, perfect.

18      Q.   What role, if any, did Mr. Rothschild have          Valve Corporation                Affirmative

19  at RBDS and Display Technologies during the time you

20  worked at PAM?

21      A.   He would have the same role he had for

22  PAM, meaning he would oversee everything that

23  happened internally and externally.  He would make

24  sure that things follow through, that nothing was

25  lingering for too long, things got resolved.

Lafosse, Nicolle Deposition                                                                April 22, 2025

Page 63

1    Closing up any gaps that we had.

2        Q.   Did Mr. Rothschild own PAM?

3        A.   I don't know.

4        Q.   How many patents, if any, did PAM own

5    while you worked there?

6        A.   No idea.

7        Q.   Did RBDS own patents while you worked at

8    PAM?

9        A.   I don't know.  A wild guess, I would say

10   yes.

11       Q.   Do you know how many patents RBDS owned

12   while you worked at PAM?

13       A.   No.

14       Q.   Did Display Technologies own patents while

15   you worked at PAM?

16       A.   Wild guess?  Yes.

17            (Discussion off the record.)

18       Q.   Why do you assume that RBDS and Display

19   Technologies owned patents, but you don't know about

20   PAM?

21       A.   Because I helped draft the motions for

22   potential litigation.  So I'm just make -- I'm --

23   from what I remember, it just makes sense that if we

24   were drafting a motion to litigate a patent on

25   behalf of the inventor, that we had then acquired

Lafosse, Nicolle Deposition                                                                      April 22, 2025

**Page  64**

1    that patent.

2        Q.   So you never drafted motions for potential

3    litigation on behalf of PAM?

4        A.   I helped draft it.  I definitely was not

5    the last one to review and send.  If anything, I was

6    the one who did the first draft, which was not good

7    because I was just learning about it, and then

8    Sugouri and of counsel would just finish it up.

9        Q.   Did Display Technologies and RBDS file

10   patent lawsuits while you worked at PAM?

11       A.   Yes, they did.

12       Q.   Do you have personal knowledge of those

13   lawsuits?

14       A.   I do, to the extent that I know we had

15   some -- some litigation ongoing.  I don't recall the

16   matters, per se.  Like the names of the companies, I

17   don't recall.

18       Q.   What was your role with respect to the

19   lawsuits that Display Technologies and RBDS filed?

20       A.   Help Sugouri on picking up anything that

21   she was not able to handle.  Try to draft as many

22   legal documents as she needed in preparation for

23   litigation.  I helped her put together some of the

24   patent maps.  They were very, like, time consuming

25   because of the format of the images, the arrows, and

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition

April 22, 2025

**Page 65**

1    all that stuff, so would I help her with that.

2          I would also help her with follow-up

3    communications with of counsel.  Sometimes these of

4    counsels would just not be responsive and we need

5    to, like, follow up a lot with them, that type of

6    things.

7          Q.  Was it explained to you why you, as an

8    employee of PAM, were responsible for managing

9    litigation for other companies?

10         A.  I'm not following the question.

11         Q.  You were employed by PAM; correct?

12         A.  Right, yes.

13         Q.  You were not employed by RBDS?

14         A.  No.

15         Q.  You were not employed by Display

16   Technologies?

17         A.  Sorry, let me take that back.

18         I would have to look at my employment

19   contract to remember what company was, per se, but

20   if I recall, it would have been PAM and then I was

21   taking matters for RBDS and Display Technologies as

22   well.

23         ATTORNEY GREEN:  Well, we have the

24      agreement.

25         THE WITNESS:  Oh.  I don't have a copy of

Lafosse, Nicolle Deposition

April 22, 2025

**Page  66**

1          it, though.

2               ATTORNEY GREEN:  Maybe you want to.

3     BY ATTORNEY DAMITIO:

4          Q.   Why, when you were employed by PAM, were          | Valve Corporation                Affirmative

5     you handling litigation matters on behalf of Display

6     Technologies and RBDS?

7          A.   It looked like it was all the part of the

8     same company umbrella.

9               ATTORNEY MACHLEIDT:  Let's take a quick,

10         like, three-minute break, or however long you

11         guys need to, so Chris here can take a look the

12         agreement and then seems like a good time.

13              THE WITNESS:  Yeah.

14              ATTORNEY GREEN:  I was going to say this

15         is a great time to refresh memory, Chris.

16              THE VIDEOGRAPHER:  Going off record at

17         10:59 a.m.

18                   (Recess.)

19              THE VIDEOGRAPHER:  We are back on the

20         record.  This is beginning of media unit number

21         3, and the time is 11:22 a.m.

22    BY ATTORNEY DAMITIO:

23         Q.   Ms. Lafosse, I'd like to ask you a few

24    questions about your employment letter, which you

25    have in front of you.  Would you mind handing that

Lafosse, Nicolle Deposition                                                          April 22, 2025

Page 67

1      to the court reporter to mark this as Exhibit 4?

2             (Offer of Engagement dated 10/1/2021 is

3          received and marked as Exhibit 4 for

4                      Identification.)

5      BY ATTORNEY DAMITIO:

6          Q.   Have you had a chance to review this

7      agreement?

8          A.   I did.

9          Q.   In the first paragraph titled Start Date,

10     it states that your engagement will commence on

11     Monday, October 11, 2021.

12             Is that your start date with PAM?

13         A.   Yes.

14         Q.   Later in that same paragraph, it says --

15     the letter says, "You will be expected to work at

16     our office located in North Miami or another South

17     Florida location."

18             Did you ever work in person for PAM at an

19     office in North Miami?

20         A.   No.

21         Q.   Did you ever visit an office for PAM in

22     North Miami?

23         A.   No.

24         Q.   Are you aware of any other PAM employees

25     working at a PAM office in North Miami?

April 22, 2025

**Page 68**

```
 1        A.   No.

 2             (Discussion off the record.)

 3        Q.   What was your understanding of where

 4   Mr. Rothschild worked from when he was working for

 5   PAM?

 6        A.   His residence.

 7        Q.   Do you know where his residence was when

 8   you were working for PAM?

 9        A.   Miami.  Somewhere in Miami.  Don't know

10   exactly.

11             ATTORNEY CHAD:  Can we go off the record

12        for a second?

13             THE VIDEOGRAPHER:  Going off record at

14        11:24 a.m.

15                    (Recess.)

16             THE VIDEOGRAPHER:  Going back on the

17        record at 11:24 a.m.

18   BY ATTORNEY DAMITIO:

19        Q.   In the second paragraph of your employee

20   agreement titled Earnings, it says that you -- a

21   yearly salary of $60,000 per annum with performance

22   bonus to be negotiated.

23             Were you paid $60,000 or $65,000 while

24   employed at PAM?

25        A.   Oh, I don't remember.  Best guess, 65.
```

Valve Corporation                                    Affirmative

April 22, 2025

Page 69

1     Q.   Later in that paragraph, it says that

2   the -- your salary will be directly deposited or,

3   should you choose not to accept direct deposit, all

4   checks will be mailed by the service directly to

5   you.

6          Did you have checks mailed to you or did

7   you use direct deposit?

8     A.   Direct deposit.

9     Q.   When your salary was directly deposited

10  into your account, where did that money come from?

11    A.   I don't remember.

12    Q.   Was any part of your salary contingent on

13  the performance of PAM throughout the year?

14    A.   No, that was base salary.

15    Q.   Earlier, you said that PAM's business was

16  licensing patents on behalf of third-parties; right?

17    A.   Not licensing, litigating.

18    Q.   Litigating patents on behalf of

19  third-parties.  And from that litigation --

20          ATTORNEY DAMITIO:  Strike that.

21          (Discussion off the record.)

22    Q.   From litigating patents on behalf of

23  third-parties, PAM made money; correct?

24    A.   Correct.

25    Q.   If PAM didn't make any money from

Lafosse, Nicolle Deposition                                                    April 22, 2025

Page 70

1    litigating patents in a certain year, was it your

2    understanding that you would still be paid that

3    $65,000?

4         A.   Yes.

5         Q.   All right.  Were you ever paid less than

6    your agreed to salary because of the performance of

7    the company?

8         A.   No.

9         Q.   If you turn to Page 2 of the agreement, it

10   says that the agreement is subject to, in that

11   second bullet point, a confidentiality agreement.

12        A.   Uh-huh.

13        Q.   Do you remember signing a confidentiality

14   agreement before starting work at PAM?

15        A.   Yes, yes.  And I -- so, okay, so let me be

16   more clear.

17             I don't remember, but because of the fact

18   that it's here, I can say yes because, otherwise, I

19   would not have been able to start working with them

20   unless I signed a confidentiality agreement.

21        Q.   You don't specifically remember signing a

22   confidentiality agreement, but you believe that you

23   did sign one based on --

24        A.   Correct.

25        Q.   -- this document?

Lafosse, Nicolle Deposition                                                                           April 22, 2025

Page 71

1       A.   Correct.

2       Q.   Would a copy of that confidentiality

3   agreement be in your personal email?

4       A.   No.  I looked for it and no.  This was the

5   only document I had.

6       Q.   Earlier, you mentioned that PAM owned          **Valve Corporation**          Affirmative

7   companies, specifically Rothschild Broadcast

8   Distribution Systems and Display Technologies.

9            Did Rothschild Broadcast Distribution

10  Systems and Display Technologies have any employees?

11       A.   They were all operating under the same

12  team for PAM.

13       Q.   Did RBDS or Display Technologies have any

14  of their own operations?

15       A.   What do you mean?  I'm not following your

16  question.

17       Q.   Did RBDS or Display Technologies make any

18  products?

19       A.   No, they did not make products.  They also

20  litigated patent inventions on specific types of

21  technologies.

22       Q.   Did RBDS and Display Technologies sell any

23  products?

24       A.   Not that I know of.

25       Q.   When you worked at PAM, were you aware of

Page 72

1    RBDS or Display Technologies having a company

2    charter?

3         A.   I was not aware, no.

4         Q.   Did RBDS and Display Technologies pay

5    their own legal fees to outside counsel for

6    litigating patents?

7         A.   I am not aware of how that was paid for.

8         Q.   Are you aware of PAM ever paying legal

9    fees for litigating patents owned by RBDS or Display

10   Technologies?

11        A.   I never had that information.

12        Q.   During your time at PAM, was there ever a          Valve Corporation          Affirmative

13   period where there were zero anticipated lawsuits?

14        A.   No.

15        Q.   During your time at PAM, was there ever a

16   period where there were zero active litigations?

17        A.   No.

18        Q.   Earlier, you said that companies like RBDS

19   and Display Technologies litigate patents on behalf

20   of third-parties.

21             Which third-parties are those?

22        A.   The owners of the patents, meaning the

23   inventors of the patents.

24        Q.   Who was the inventor of the patents that

25   RBDS owned?

April 22, 2025

**Page 73**

1    A.   I do not recall.

2    Q.   Who was the owner of the patents that

3    Display Technologies owned?

4    A.   If I recall correct, the original patent

5    holder would transfer ownership to PAM and then PAM

6    would litigate on behalf of them.  I'm not sure how

7    Display Technologies' ownership when it came to the

8    patent side worked.  As far as I know, it went

9    through PAM and then somehow it kind of either

10   shifted to Display Technologies or RBDS, depending

11   on the type of technology.

12              (Discussion off the record.)

13   Q.   Who was the inventor of the patents that

14   Display Technologies owned?

15   A.   I don't remember.

16              (Discussion off the record.)

17   Q.   Do you know if Mr. Rothschild ever

18   invented any patents that PAM litigated?

19   A.   I believe he did had a couple of

20   inventions of himself.  I don't remember which ones,

21   but I know -- I know he definitely invented some --

22   something.

23   Q.   Was Mr. Rothschild a named inventor on any

24   patent owned by RBDS?

25   A.   I believe so.

CONFIDENTIAL

Lafosse, Nicolle Deposition                                                          April 22, 2025

Page 74

1       Q.   Was Mr. Rothschild a named inventor on any

2   patent owned by Display Technologies?

3       A.   I believe so.

4       Q.   Did --

5            ATTORNEY DAMITIO:  Strike that.

6               (Discussion off the record.)

7   BY ATTORNEY DAMITIO:

8       Q.   Did RBDS own patents where the named

9   inventor was not Mr. Rothschild?

10      A.   Yes.

11      Q.   Did Display Technologies own patents where

12  the named inventor was not Mr. Rothschild?

13      A.   I don't recall, but I'm leaning more

14  towards a yes.

15      Q.   Why are you leaning more towards a yes?

16      A.   Because they acquired several patents

17  while I was working there.  I just don't recall if,

18  particularly, RBDS or Display Technologies only

19  handled his inventions or we also had other

20  inventions that they had acquired.

21      Q.   Do you recall the inventor of the patents

22  that RBDS owned that was not Mr. Rothschild?

23      A.   No, I don't.  I don't recall.

24      Q.   Do you recall where RBDS obtained the

25  patents that were not named --

Lafosse, Nicolle Deposition                                                      April 22, 2025

Page 75

1           ATTORNEY DAMITIO:  Strike that.

2      Q.   For the patents where Mr. Rothschild was

3  not a named inventor, do you recall where RBDS

4  obtained the patents?

5      A.   No.  Never asked, to be honest.  It was

6  never brought to my attention either.  Just the

7  patent was already acquired by the time I got to

8  work on them.

9           (Discussion off the record.)

10      Q.   How were third-parties paid when their

11  patents were bought by PAM?

12      A.   I have no knowledge of that.

13      Q.   Were third-parties paid a lump sum amount

14  when their patents were purchased?

15      A.   I don't know.

16      Q.   Did Mr. Rothschild pay for the patents or

17  did PAM?

18      A.   I don't know and I was never made aware of

19  that side of the business.

20      Q.   Who was responsible for that side of the

21  business?

22      A.   Mr. Rothschild.  I don't know of anyone

23  else handling the acquisition of the patents.

24      Q.   When you worked for PAM, approximately how

25  many patents were owned by Mr. Rothschild or his

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                                April 22, 2025

Page 76

1    company?

2        A.   About eight.  And, you know, take that

3    number as best as I can recall.

4        Q.   While you worked at PAM, how many patent

5    infringement lawsuits were filed?

6        A.   I believe several.  Give it, in a month,

7    four, five filed.

8             (Discussion off the record.)

9        Q.   You said that in a month, there would be

10   four to five litigations filed.

11            During the course of your employment, how

12   many litigations were filed?

13       A.   Wow.  I do not recall, but let's just

14   calculate four or five times the months that I

15   worked there.  Just a safe number.

16       Q.   More than 20?

17       A.   Yeah.

18       Q.   Were these litigations filed on behalf of

19   RBDS and Display Technologies?

20       A.   Some of them.

21       Q.   Who -- what other companies were they

22   filed on behalf of?

23       A.   PAM.

24       Q.   Were they filed on behalf of any other

25   companies?

Lafosse, Nicolle Deposition

April 22, 2025

**Page 77**

1        A.    No.

2             ATTORNEY DAMITIO:   Marking Exhibit 5.

3        (RBDS cases printout is received and marked as

4             Exhibit 5 for Identification.)

5    BY ATTORNEY DAMITIO:

6        Q.    Go ahead and take a minute to skim this

7    document, Ms. Lafosse, but I'll represent to you

8    that these are cases filed by RBDS from January 1,

9    2021, to December 31, 2022.

10       A.    Okay.

11       Q.    All right.   Do you recall any of these

12   cases specifically?

13       A.    Their names ring a bell.   I don't remember

14   their facts specifically.   So, for instance, let me

15   see.

16             MOBI, I remember.   I mean, rings a bell.

17             Vidyo.   Coursera.   Showtime.   Those are

18   the ones that kind of ring a bell.

19       Q.    What do you remember from those cases that

20   ring a bell?

21       A.    Just knowing about it, acquiring the

22   patents, working on the patent map, taking the --

23   taking -- drafting down the facts for the motion,

24   drafting the motion, speaking with of counsel.   I

25   think Miku, also, I think I worked on that one.

CONFIDENTIAL

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                              April 22, 2025

                                                                              **Page 78**

1    Yes.

2         Q.   When you say drafting the motion, are you

3    referring to the complaint?

4         A.   Yes.

5         Q.   Or a different type of motion?

6         A.   No, the complaint.  I meant the complaint.

7         Q.   Do you recall being involved in the

8    pre-suit investigation analysis prior to any of

9    these cases?

10        A.   Yes.

11        Q.   Which ones specifically?

12        A.   The ones that I mentioned just now.  So

13   let me go back here.

14             So I think it was WizIQ, Vidyo, MOBI, or

15   MOBI.  And those are the ones that kind of ring a

16   bell.  Miku, maybe.

17        Q.   Do you recall how many of these cases

18   filed between 2021 and 2022 by RBDS settled?

19        A.   No, I don't recall.

20        Q.   Did any of these cases filed between 2021

21   and 2022 by RBDS settle for zero dollars?

22        A.   I do not recall.

23             ATTORNEY DAMITIO:  Marking Exhibit 6.

24          (Display Technologies cases printout is

25           received and marked as Exhibit 6 for

Lafosse, Nicolle Deposition

April 22, 2025

Page 79

1              Identification.)

2              (Discussion off the record.)

3      BY ATTORNEY DAMITIO:

4      Q.   Ms. Lafosse, take a second.

5              ATTORNEY DAMITIO:  For the record, these

6      are cases filed by Display Technologies between

7      January 1, 2021, and December 31, 2022.

8      Q.   Do you recognize specifically any of these

9      cases?

10     A.   Yes, I do.

11             So Valve Corporation, Nissan North

12     America, the Unified Patents v. Display

13     Technologies, BMW of North America, Trividia Health.

14     And I think I worked with several of these car ones

15     because of the display technology that they had on

16     the cars.  All right.  So Mercedes, Toyota, American

17     Honda Motors, yeah.

18     Q.   What do you remember about the Valve

19     Corporation case?

20     A.   Not much.

21             (Discussion off the record.)

22     Q.   Were you employed on September 27, 2022,

23     when the Valve case was filed?

24     A.   I don't remember.

25     Q.   Do you remember the Valve case being

Kilpatrick Townsend & Stockton LLP

**Page 80**

1    filed?

2         A.   I do remember it, yeah.  Being filed, yes.

3    I worked on it briefly.

4         Q.   When you say worked on it briefly, what do

5    you mean?

6         A.   As in like helping with the research, with

7    the analysis, with the patent, gathering documents,

8    evidence.

9         Q.   What types of documents did you gather?

10        A.   We did like a -- first, we did a -- so I

11   always liked to go for social media first.  See

12   where the patent was being used, how it was being

13   used, if it was promoted or whatnot.  And then we --

14   we try to research as to who was using it, how they

15   were using it.  As far as I recall, that's -- there

16   was more to it, but I can't remember.

17        Q.   So when you say gathering documents,

18   you're referring to publicly available documents?

19        A.   Correct, publicly available records that

20   we could find and then use as a support for the --

21   for the pleading.

22        Q.   When you say you helped with the research,

23   what do you mean?

24        A.   I went on Google and I started searching

25   doing a word search on the invention, depending on

Lafosse, Nicolle Deposition                                                                      April 22, 2025

Page 81

```
 1    what the invention was, see who was using it, how

 2    they were using it, what companies were using it,

 3    the extent they use.

 4              (Discussion off the record.)

 5        Q.   How did you determine what the invention

 6    was of the Display Technologies patent?

 7        A.   I did not make that determination.  I was

 8    already told what the invention was.  And then, from

 9    there, I did the search.

10        Q.   Who told you what the invention was?

11        A.   Sugouri.

12        Q.   What did they tell you the invention was?

13        A.   What did they tell me?  What do you mean?

14        Q.   How did Sugouri describe the invention?

15        A.   Ah.

16             ATTORNEY CHAD:  Hold on.

17        A.   She gave me --

18             ATTORNEY CHAD:  If we're going to get in

19    to specifics of what the invention was for

20    Display Technologies in the Valve case, I'm

21    going to object on the basis of privilege.

22             If it's generally sort of the she told me

23    what inventions were generally, I'm fine with

24    that, but that's the distinction that I would

25    draw.
```

Lafosse, Nicolle Deposition                                                                April 22, 2025

Page 82

1                THE WITNESS:  Okay.

2                ATTORNEY DAMITIO:  You're fine with asking

3        questions about the invention of the '221

4        patent being described.  If it were Valve

5        specific, that's where you're saying would be

6        the line?  I'm fine asking her --

7                ATTORNEY CHAD:  Understood.  I'm trying

8        to -- I'm just taking a minute to think.

9                Yes.  So if it's in the context of the

10       Valve case specifically, I would object.  If

11       it's generally what the invention of the '221

12       patent or other Display Technologies patents

13       are, I'm -- that's okay for now.

14               ATTORNEY DAMITIO:  Okay.

15                  (Discussion off the record.)

16   BY ATTORNEY DAMITIO:

17       Q.   How did Sugouri describe the invention of

18   the patent that DT asserted against Valve?

19               ATTORNEY CHAD:  Yeah, so just I will

20       object to that question, yeah.

21               ATTORNEY MACHLEIDT:  Object and instruct

22       not to answer?

23               ATTORNEY CHAD:  Yes.  I mean --

24               ATTORNEY MACHLEIDT:  No, understood.

25               ATTORNEY DAMITIO:  Well, so --

Lafosse, Nicolle Deposition

April 22, 2025

Page 83

```
1              ATTORNEY MACHLEIDT:  We got it.  No, no, I

2         think we can clean this up.

3                  (Discussion off the record.)

4    BY ATTORNEY DAMITIO:

5         Q.   Setting aside Valve or any Valve products,

6    how did Sugouri describe the intention of the DT

7    patent to you?

8         A.   We would first have a call.  She explained

9    to me what the patent was about.  And alongside we

10   would screen share the map of the patent and she

11   would explain the steps of how the patent worked.

12        Q.   Was Sugouri also involved in researching

13   public information to see how the Valve products

14   worked?

15        A.   Yes.

16        Q.   Did you assist in creating a patent map

17   for the Valve products?

18        A.   Yes, I did.

19        Q.   Did Sugouri assist in creating a patent

20   map for the Valve products?

21        A.   Yes.

22                  (Discussion off the record.)

23        Q.   Was anyone else involved in researching

24   the Valve products at PAM?

25        A.   No.  I mean, Leigh -- Leigh Rothschild
```

Lafosse, Nicolle Deposition                                                    April 22, 2025

Page  84

1    would do a very, like, very basic, over-the-top

2    research.  Nothing substantial, really.

3        Q.   Do you remember Leigh Rothschild

4    specifically researching the Valve products?

5        A.   I don't recall.

6        Q.   Who would you send the patent map to after

7    it was completed --

8        A.   Sugouri.

9        Q.   -- for the Valve products?

10       A.   Sugouri.

11       Q.   Do you know who Sugouri would send the

12   completed patent map to for the Valve products?

13       A.   The of counsel leading the case.

14       Q.   And when you say of counsel, do you mean

15   outside counsel?

16       A.   Outside counsel, yes.  Sorry.

17       Q.   Do you remember outside counsel --

18            ATTORNEY DAMITIO:  Strike that.

19       Q.   Do you remember who outside counsel was

20   for the Valve case?

21       A.   I don't.

22            (Discussion off the record.)

23       Q.   Were you working at PAM when Display

24   Technologies LLC v. Valve Corporation was filed?

25       A.   I don't recall.  I would lean on the yes

Page 85

1    to that answer, but I don't recall.  I'm saying yes

2    because I know I worked on it pre-litigation.  I

3    don't recall if we actually filed it while I was

4    still there.

5        Q.  Do you recall how the Display Technologies

6    v. Valve Corporation case resolved?

7        A.  No, I don't.

8        Q.  When you worked at PAM, how did the

9    company decide what patents to enforce?

10       A.   I never had knowledge of how the

11   determination was made.  I was just pretty much told

12   to work on X or Y patent.

13       Q.   Did someone at PAM give you a list of

14   companies to research?

15       A.   Not that I recall.  My best recollection

16   is Sugouri told me this company is potentially

17   infringing and we are researching on it.

18       Q.  Do you know if Sugouri identified                          **Valve Corporation**                Affirmative

19   companies as possibly infringing patents owned by

20   PAM?

21           ATTORNEY CHAD:  Objection.  Calls for

22       speculation.

23       A.  Most likely, yes.                                          **Valve Corporation**                Affirmative

24       Q.  Do you know if anyone else besides Sugouri

25   was involved in identifying companies as possibly

Lafosse, Nicolle Deposition                                                                April 22, 2025

Page 86

1    infringing patents owned by PAM?

2          A.   Leigh Rothschild, most likely.

3          Q.   Do you know what factors went in to

4    deciding what companies to target?

5          A.   No, I don't know.

6          Q.   Do you know if, while you worked at PAM,

7    outside counsel had any involvement in identifying

8    companies to target with patents?

9          A.   They did not.  They had no involvement in

10   that.

11               (Discussion off the record.)

12         Q.   Was anyone besides PAM employees involved

13   in choosing which companies to sue?

14         A.   No.

15         Q.   How was outside counsel selected by PAM?

16         A.   Daniel Falcucci -- I think that's his last

17   name.  He would reach out to them and he would

18   conduct the preliminary interview.

19               Then Sugouri would interview them and she

20   would assess whether this person is the right fit to

21   help us file for that lawsuit in a specific

22   jurisdiction.

23         Q.   At what point in a dispute did PAM engage

24   outside counsel?

25         A.   After Sugouri and I did the research, we

Page 87

1    had the patent map done, we had enough evidence to

2    support a claim, then we would start reaching out.

3            Actually, no.  I think it was since the --

4    since we -- since the moment we acquired the patent,

5    then it would start looking, because it took a time

6    for him to find someone.  So that was more or less

7    the same time it took us to do the research on our

8    side.

9            (Discussion off the record.)

10    Q.   After PAM acquired a patent, you and

11    Sugouri began doing research on potential targets?

12    A.   Yes.

13    Q.   Daniel began doing research on potential

14    outside counsel?

15    A.   Correct.

16    Q.   Which of those two things happened first?

17    In other words, did you identify companies and then

18    Daniel identified local counsel in those

19    jurisdictions?

20    A.   They both happened simultaneously from the

21    point where we acquired the patents.

22    Q.   So Daniel may have been identifying local

23    counsel before you had identified companies to

24    target?

25    A.   Correct, and local counsel would be put on

1    standby until we finalized our preliminary

2    investigation.  Sometimes we would file, sometimes

3    we won't because we didn't have enough of a basis

4    for an infringement.

5              (Discussion off the record.)

6         Q.   Do you understand local counsel to be the

7    same thing as outside counsel, of counsel,

8    independent law firms hired by PAM to assert

9    patents?

10        A.   Yes.

11        Q.   Okay.

12        A.   And on my previous statements that I've

13   referred as of counsel, I meant outside counsel,

14   whether independent practices.

15        Q.   I'm going to read off a list of law firms

16   and please feel free to interrupt me if you

17   recognize any of the firms as being ones that you

18   worked with during your time at PAM:

19              Kizzia Johnson.  Garteiser Honea.  SML

20   Avvocati.  Ni, Wang & Massond.  Gawthrop Greenwood.

21   Cunningham Swaim.  Stamoulis & Weinblatt.  The Chong

22   Law Firm.

23        A.   No.

24        Q.   Parker, Bunt & Ainsworth?

25        A.   No.  I probably recall better the name of

Lafosse, Nicolle Deposition

April 22, 2025

Page 89

1    the attorney leading than the law firm name.

2         Q.   Oh.  What attorneys do you remember

3    working with?

4         A.   I don't remember at the top of my head,

5    but, like, if you give me a list that's similar to

6    the cases that you printed, when I read them, it

7    kind of rings a bell and it helps my recollection.

8         Q.   Does the name Jay Johnson ring a bell?

9         A.   No, never worked with him.

10         Q.   Does the name Brad Kizzia ring a bell?

11         A.   No.

12         Q.   Stephen Lobbin ring a bell as an attorney

13    you worked with during your time at PAM?

14         A.   No.

15         Q.   Does the name Randall Garteiser ring a

16    bell as attorney you might have worked with during

17    your time at PAM?

18         A.   Uh-uh, no.

19         Q.   How, if at all, did a target's financial

20    situation come in to consideration when you were

21    investigating potential companies to target?

22         A.   Can you rephrase the question?

23         Q.   Sure.

24              If PAM believed a company infringed a

25    Rothschild patent but that company made very little

**Page 90**

1    revenue --

2        A.   Uh-huh.

3        Q.   -- would that impact the decision on

4    whether or not to sue them?

5        A.   I don't believe so.  It was more based on

6    the basis that we could have on our end to -- to be

7    able to justify it being an infringement, having

8    enough evidence and enough weight to file for a --

9    for a potential lawsuit.

10        I don't think the amount -- at least it

11    was never made aware to me that the amount had

12    anything to do with whether we filed or not.

13        ATTORNEY DAMITIO:  Marking Exhibit 7.

14    (Documents Bates stamped ROTHSCHILD129 - 169 is

15        received and marked as Exhibit 7 for

16            Identification.)

17    BY ATTORNEY DAMITIO:

18        Q.   Ms. Lafosse, please take a second to look

19    through the document, but when you're done, I'd ask

20    you to turn to the page ending in Rothschild 0000143

21    down at the bottom.

22        A.   Okay, I'm there.

23        Q.   And if you could flip through the next

24    couple pages of this infringement search report.

25        A.   Uh-huh.  Okay.

Lafosse, Nicolle Deposition                                                    April 22, 2025

Page 91

1                    (Discussion off the record.)

2        Q.   Do you recognize this document?

3        A.   Not this specific document.  I mean, I

4    potentially could have worked on it.  I don't recall

5    each one of them.  But this is sort of what I was

6    referring with the patent map, the ones like -- I

7    know we hired -- well, not we, but PAM hired someone

8    to work on this chart.  And then they would work

9    with Sugouri because she was the patent attorney.

10   And then would I help put these images together on

11   this chart.  So this is exactly what I meant with

12   the patent map.

13                   (Discussion off the record.)

14       Q.   If you turn to the first page of this

15   letter.

16       A.   The very first page.

17       Q.   I'm sorry, all the way to the first page

18   of the document.  It's dated June 21, 2023.

19       A.   Uh-huh.

20       Q.   Were you employed by PAM on that date?

21       A.   No.

22       Q.   And if you turn back to the page ending

23   the 143, you don't specifically remember creating

24   this claim chart or this patent map, do you?

25       A.   No, I honestly do not.  I do not.

Page 92

```
 1        Q.   Have you created --

 2             ATTORNEY DAMITIO:  Strike that.

 3                  (Discussion off the record.)

 4        Q.   Have you created patent maps like this

 5   before?

 6        A.   Not before I worked at PAM.

 7        Q.   During your time at PAM, did you create

 8   patent maps like this?

 9        A.   I assisted on creating them, yes.

10        Q.   Have you ever heard the term claim chart?

11        A.   Yes.

12        Q.   What is your definition or what is your

13   understanding of claim chart?

14        A.   Basically, a information sheet containing

15   the characteristics of the patents and the potential

16   infringements over it and it kind of helps put a

17   roadmap for potential litigation.  And then from

18   there, it becomes like a heat map as to whether we

19   litigate or not and the extent of the infringement.

20        Q.   To you, is a claim chart the same thing as

21   a patent map?

22        A.   I think -- no, they're not the same, but

23   they go side to side.  There's a claim chart and

24   then there's a patent map attached to the claim

25   chart.
```

Lafosse, Nicolle Deposition

April 22, 2025

**Page 93**

1      Q.    This document here --

2      A.    Uh-huh.

3      Q.    -- is this a patent map or a claim chart,

4   in your understanding?

5      A.    So, in my understanding, this -- the

6   first -- so let me use the number for record

7   purposes.

8           So pages ending on 00147 all the way to

9   00155 -- no, sorry.  00154, that would be the claim

10  chart.  And then the patent map would start where

11  the images start on 00156.  To my understanding.

12     Q.    On the top of Page 0000147, it lists Pitch

13  Scientific.

14     A.    Uh-huh.

15     Q.    Do you know what Pitch Scientific is?

16     A.    I think it was a company -- I don't know

17  if it was a company that we acquired the patent

18  from.  I know I worked on it.  It just rings a bell.

19     Q.    You don't know specifically -- do you know

20  specifically what patent --

21           ATTORNEY DAMITIO:  Strike that.

22     Q.    Do you know specifically what Pitch

23  Scientific does?

24     A.    No.  Don't recall.

25     Q.    Do you recall working with any specific

Lafosse, Nicolle Deposition

April 22, 2025

Page 94

1    individuals at Pitch Scientific?

2        A.   No, don't recall.

3        Q.   Did PAM use any third-parties to create

4    patent maps or claim charts?

5        A.   Yes.

6        Q.   What were the names of those companies?

7        A.   I don't know the name.  I know they were

8    outsourced from India.

Valve Corporation                                    Affirmative

9        Q.   Would PAM outsource all of its patent maps

10   and claim charts to companies in India?

11       A.   Yes.  And then Sugouri would over -- we

12   would have -- we would have them do the basic patent

13   charts and maps and then Sugouri would overlook at

14   them and then make sure that everything is -- that

15   everything needs to be there is there and that the

16   language is accurate and that the information that

17   we need is there.

18       Q.   The first draft of all patent maps and

19   claim charts came from third-party companies in

20   India?

21       A.   Yes.

22       Q.   Did PAM have any policies about companies

23   not to target?

24       A.   No.

25       Q.   Once PAM selected a company to target, how

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition

April 22, 2025

Page 95

1    would PAM reach out to that company to seek a

2    license?

3        A.   I think Sugouri would make the first

4    approach.  She would reach out to them, find the --

5    well, Daniel would find us the contact point and

6    then Sugouri would just follow up, schedule a

7    meeting.

8        Q.   Who would Sugouri schedule a meeting with?

9        A.   Whoever is a decision maker of the

10   company.

11       Q.   Were you ever involved in those meetings

12   with the company that had been targeted?

13       A.   Sometimes I was.

14       Q.   What would be discussed during those

15   meetings?

16       A.   Whether they knew that they were

17   infringing was the first thing.  Whether they were

18   looking to -- to pay.  How -- to the extent of how

19   they've been using the patent and just kind of, you

20   know, have a preliminary conversation of how can we

21   resolve this before -- without -- outside of

22   litigation avenues of resolving it.

23               (Discussion off the record.)

24       Q.   You said that sometimes you were involved

25   in those initial discussions with companies that

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                April 22, 2025

**Page  96**

1    were targeted by Rothschild.

2            Under what circumstances were you involved

3    in those conversations?

4        A.   It was mainly a time -- time-based

5    decision as to, like, if Sugouri was just too busy

6    to cc me on the email and make sure that I was

7    available, she'll just take the call herself.  The

8    decision was based on the agenda and how busy her

9    day and my day was.

10       Q.   During those calls, would Sugouri make a

11   initial settlement offer?

12       A.   Not on the first call.  We would have the

13   first call.  Then she'll probably meet with me or

14   with Leigh or both of us, discuss the content of the

15   call, and then determine a potential settlement and

16   then she'll reach back.

17       Q.   During the time that you worked at PAM,

18   did PAM have a standard opening offer that it

19   offered to settle potential litigation?

20       A.   Not a standard one.  I know Sugouri spoke

21   with Leigh before doing the first approach and

22   they'll internally discuss what was a fair

23   settlement proposal.  But I know -- I know the

24   first -- even if they had this number in their

25   minds, that information would not be disclosed on

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                     April 22, 2025

Page 97

1    the first call.

2                 (Discussion off the record.)

3        Q.   What factors went in to determining the

4    initial settlement offer?

5        A.   The extent to which the patent had been

6    used and the amount of income the company or the

7    person using the patent had made.  I think, also,

8    the value of the patent.  It kind of played a role

9    in it.  Like, for an invention that was more

10   extensive, settlement would be higher.  An invention

11   that is maybe smaller, not so extensive, would be a

12   smaller number.

13       Q.   How did PAM determine the extent to which

14   the patent had been used by a target company?

15       A.   Organic research via Google.  That would

16   be our initial call.  And if the company agreed,

17   they would show us how they had been using the

18   patents.  Those were two basic factors.

19       Q.   How did PAM determine the amount of income

20   the company made using the patent?

21       A.   I have no information of that.

22       Q.   Ms. Lafosse, are you familiar with what a

23   demand letter is?

24       A.   Yes.

25       Q.   What is a demand letter?

CONFIDENTIAL                                              Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                April 22, 2025

Page  98

1       A.   It's an initial communication demanding a

2  person or a company to do or cease doing something

3  and demanding something.  Demanding to do or not to

4  do something.  Or cease doing something.

5       Q.   During your time at PAM, did PAM ever send

6  demand letters to companies seeking royalties for

7  their patents?

8       A.   I don't recall royalties.  I know we did

9  send demand letters, but don't recall royalties.

10       Q.   What were the demand letters seeking?

11       A.   Damages.  X amount of damages based on the

12  use, based on the extent of the invention, the

13  patent, how well known it was in the industry, in

14  the market.

15       Q.   Did you draft demand letters for PAM that

16  were sent to companies?

17       A.   I assisted Sugouri on drafting them, yes.

18       Q.   Sugouri also drafted demand letters to

19  send to companies?

20       A.   Yes.

21       Q.   Did anyone else at PAM send demand letters

22  to send to companies?

23       A.   No, we were the only two attorneys.

24       Q.   Did Daniel Falcucci ever draft demand

25  letters to send to companies?

Lafosse, Nicolle Deposition                                                    April 22, 2025

Page 99

1      A.   No, not that I recall.  I think he's also

2  an attorney, if I'm not mistaken, but I don't -- he

3  was -- I don't recall him being involved in drafting

4  demand letters.

5      Q.   Was a demand letter always sent to a

6  company before it was sued for patent infringement

7  by PAM?

8      A.   I don't remember if always.  I know -- I

9  can for sure say it was customary, but I -- my

10  recollection is not good; so I don't know if every

11  single time that was done.

12      Q.   What reasons were there for not sending a

13  demand letter before filing a lawsuit?

14      A.   I wouldn't know, and that's kind of why my

15  answer was the way it was, because my understanding

16  is that we always sent one, but for some reason, at

17  some point, maybe on a given case, we didn't.  I

18  don't recall.

19      Q.   During your time at PAM, did you ever send

20  messages via email or LinkedIn to any company asking

21  them to take a license to a patent owned by PAM?

22      A.   Via email?  Probably.  Not via LinkedIn.

23  All the communications were directly from business

24  emails.

25           (Discussion off the record.)

Lafosse, Nicolle Deposition                                                    April 22, 2025

                                                                    **Page 100**

1        Q.   Ms. Lafosse, in my previous question, I

2    said patent owned by PAM.  I meant that to be

3    extended to patents owned directly or indirectly by

4    PAM.  In other words, patents that may have been

5    owned by RBDS or Display Technologies.

6        A.   Okay.

7        Q.   Does that definition work for you?

8        A.   Yes.

9            ATTORNEY MACHLEIDT:  By the way, would you

10   like me to check to see if anything's arrived

11   or will someone tell us?

12           ATTORNEY GREEN:  Usually, they're pretty

13   good about letting us know.

14           ATTORNEY MACHLEIDT:  Good.

15           ATTORNEY DAMITIO:  I was just going to

16   continue until lunch was my plan.

17           ATTORNEY GREEN:  Yup.

18           ATTORNEY DAMITIO:  Okay.  Marking Exhibit

19   8.

20       (Document Bates stamped VALVE_5202 is received

21       and marked as Exhibit 8 for Identification.)

22   BY ATTORNEY DAMITIO:

23       Q.   On Exhibit 7, Ms. Lafosse.

24       A.   Sorry, you meant 8?  Oh, 7.

25       Q.   Exhibit 7.

Lafosse, Nicolle Deposition                                                                April 22, 2025

**Page  101**

1          On the first page ending in 129, the

2    author of this letter is Samuel M. Meyler.

3          A.   Yeah.

4          Q.   Do you know Mr. Meyler?

5          A.   No.

6          Q.   Do you recognize Mr. Meyler's name at all

7    from when you worked at PAM?

8          A.   I do not.

9          Q.   Okay.  Turning to Exhibit 8, do you

10   recognize this document?

11         A.   Recognize it to the extent of this was the

12   content of Daniel's emails, yes.

13         Q.   Is this an example of an email to -- the

14   type of emails to companies that PAM would send?

15         A.   Yes.

16         Q.   How did PAM decide whether to send an

17   email or a demand letter to a company target?

18         A.   I have no information of that.  I don't

19   know.

20         Q.   The date of this email is April 19, 2022.

21              Were you employed at PAM during that time?

22         A.   Let me see.  One second.

23              I don't recall.  I mean, that was about --

24   I think that was around the date that I stopped

25   working for PAM.  So maybe.  Like, I know I was

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition

April 22, 2025

Page 102

1   working for PAM for about a year.  So, yeah, maybe.

2   Sorry about that.

3       Q.   Did PAM have a file on Valve?

4       A.   Yes.

5       Q.   What type of information of Valve would be

6   in that file?

7       A.   A claim chart, a patent map, a draft

8   demand letter, parties involved, evidence found on

9   organic Google search, that.

10      Q.   Would PAM have a file for every company --

11      A.   Yes.

12      Q.   -- that it targeted with a --

13      A.   Yes.

14      Q.   Do you know Mr. Falcucci's current role at

15  PAM?

16      A.   As of today?

17      Q.   Yes.

18      A.   No idea.

19      Q.   What was his role when you worked at the

20  company?

21      A.   He was solely in charge of reaching out to

22  outside counsel with the idea of that person filing

23  on behalf of PAM a potential matter for patent

24  infringement on a specific jurisdiction where that

25  attorney would be barred.

Valve Corporation                                    Affirmative

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                          April 22, 2025

**Page  103**

1       Q.   When you worked at PAM, Mr. Falcucci was

2   not reaching out to companies about their potential

3   infringement?

4       A.   I don't think so.  He was reaching

5   directly to the outside counsel, but communications

6   with the infringers were usually Sugouri and I

7   just -- I was joining the calls.

8          THE WITNESS:  I think we should ask Belkis

9       about --

10         ATTORNEY GREEN:  I texted her.

11         THE WITNESS:  Oh, okay.

12   BY ATTORNEY DAMITIO:

13      Q.   Do you know who at PAM, if anyone,

14   authorized Mr. Falcucci to send this email?

15      A.   No, it's a small team.  So it was --

16   Daniel was in charge of sending these type of

17   emails, reaching out.  And then Sugouri and I would

18   take care of the internal communications with

19   companies.

20      Q.   Do you recognize the recipient of this

21   email?

22      A.   No.

23      Q.   All right.

24      A.   Uh-uh, no.

25            (Discussion off the record.)

CONFIDENTIAL                                                 Kilpatrick Townsend & Stockton LLP

Page 104

1      Q.    Do you see that the email address for the

2  recipient of this email is valvesoftware?

Valve Corporation                    Affirmative

3      A.    Yes.

4      Q.    Valve was a company that PAM targeted;

5  correct?

6      A.    Correct.

7           (Discussion off the record.)

8      Q.    Would Mr. Falcucci need preapproval before

Valve Corporation                    Affirmative

9  contacting a target company like this?

10      A.    Yes.

11      Q.    Who would he need approval from?

12      A.    Sugouri.  And before Sugouri, Leigh

13  Rothschild.

14      Q.    Did Leigh Rothschild approve every contact

15  to a target company while you worked at PAM?

16      A.    Yes.

17           ATTORNEY GREEN:  That's lunch.

18           ATTORNEY DAMITIO:  Yup.  Let's go off the

19      record.

20           THE VIDEOGRAPHER:  Going off record at

21      12:28 p.m.

22           (Luncheon recess taken at 12:28 p.m.)

23              AFTERNOON SESSION

24           (Time noted:  1:11 p.m.)

25           THE VIDEOGRAPHER:  We're going back on the

Page 105

 1     record.

 2            This is the beginning of media unit 4, and

 3     the time is 1:11 p.m.

 4     BY ATTORNEY DAMITIO:

 5        Q.   Ms. Lafosse, I'd like to refer back to

 6     Exhibits 5 and 6, which are the cases filed by RBDS

 7     and Display Technologies between 2021 and 2022.

 8            How many of these cases settled during

 9     your time at PAM?

10        A.   I do not recall.

11        Q.   Do you have a rough approximation of how

12     many of these cases settled during your time at PAM?

13        A.   The cases that I worked on, maybe one.

14        Q.   You remember one settlement from your time

15     at PAM?

16        A.   I don't remember one settlement, but the

17     average, considering the number of cases that I

18     recall working on, it could have been one.  Like,

19     with -- to expand a little bit more, we didn't

20     settle that much.

21        Q.   What do you mean you didn't settle that

22     much?

23        A.   Most of the cases were going to

24     litigation.  At least during the time that I was

25     working there, I didn't get to see a case being

Page 106

1    settled or litigated enough to the point where a

2    settlement was discussed.

3                (Discussion off the record.)

4        Q.   Was there a financial settlement offer

5    given at the start of each of the cases listed in

6    Exhibits 5 and 6?

7        A.   I don't recall, but I could say that there

8    was an offer being made as a customary practice

9    before litigation ensued.

10       Q.   Would PAM ever file a lawsuit before          Valve Corporation              Affirmative

11   making a settlement offer?

12       A.   No, there was always an intent to settle.

13       Q.   How many of the cases --

14           ATTORNEY DAMITIO:  Strike that.

15       Q.   How many companies settled cases before a

16   lawsuit was filed?

17       A.   I don't recall.

18               (Discussion off the record.)

19       Q.   Why, when you worked at PAM, was there an     Valve Corporation              Affirmative

20   intent to settle cases?

21       A.   Litigation is expensive.  It's easier to

22   settle.  You get damages that you're seeking.

23   Timewise, it's more efficient.

24       Q.   During your time at PAM, did any case

25   reach summary judgment?

Lafosse, Nicolle Deposition                                                April 22, 2025

**Page 107**

1        A.   Not while I was there.  And I'm not aware

2   of -- of any.

3        Q.   You're not aware of any PAM case reaching

4   summary judgment?

5        A.   No, uh-uh.

6             (Discussion off the record.)

7        Q.   During your time at PAM, were you aware of

8   any Display Technologies or RBDS case reaching

9   summary judgment?

10       A.   Not to my knowledge, no.

11       Q.   During your time at PAM, were you aware of

12  any Display Technologies or RBDS case reaching

13  trial?

14       A.   Not to my knowledge.  I think I was only

15  on the stage of, like, pre-lit, pre-litigation.

16       Q.   During your time at PAM, was there a goal

17  to avoid summary judgment in cases filed by RBDS or

18  Display Technologies?

19       A.   I never got to that point.  So the

20  conversation never arose.

21       Q.   Did Display Technologies and RBDS have

22  bank accounts that were separate from PAM?

23       A.   I have no knowledge.

24             (Discussion off the record.)

25       Q.   Did Mr. Rothschild --

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition

April 22, 2025

Page 108

1            ATTORNEY DAMITIO:  Strike that.

2       Q.   Did Mr. Rothschild draw a salary from PAM,

3   RBDS, or Display Technologies?

4       A.   I have no knowledge of that.

5       Q.   If you wouldn't mind looking at Exhibit 7.

6       A.   Okay.

7       Q.   What happened when you worked at PAM if a

8   demand letter like this was ignored?

9       A.   Ignored to the addressee?  Like, the

10  person receiving --

11      Q.   In other words, if you sent a demand

12  letter to a company and they ignored it --

13      A.   Okay.

14      Q.   -- what happened next?

15      A.   I remember we were very persistent when we

16  had no response from the person that we were trying

17  to reach to the point where we always had an answer,

18  whether it took a couple of follow-ups or multiple

19  follow-ups.

20           I don't recall ever just saying oh, this

21  person didn't answer after three attempts of

22  following up and then just dropping.  Like, we would

23  always pursue it until we got a hold on someone.

24  Maybe a different person.  Maybe the person who we

25  were reaching was not the right person.

Lafosse, Nicolle Deposition                                                    April 22, 2025

Page 109

1      Q.   So PAM would continue following up with

2   the company until it reached someone at the company?

3      A.   Yes.

4           (Discussion off the record.)

5      Q.   When PAM identifies a company as a target

6   company, that company always settles or is sued by

7   PAM; correct?  Or Rothschild -- or RBDS or Display

8   Technologies?

9           ATTORNEY CHAD:  Object to form.

10          ATTORNEY DAMITIO:  I'll reask the

11      question.

12   BY ATTORNEY DAMITIO:

13      Q.   When PAM identifies a company as a target

14   company, that company always settles or is sued by

15   PAM or RBDS or Display Technologies?

16          ATTORNEY CHAD:  Same objection.

17      A.   The answer would be yes, either they

18   settle or they get sued.

19          (Discussion off the record.)

20      Q.   When PAM identified a company as a target

21   company, is it fair to say that that company had two

22   options, settle or be sued?

23      A.   Yes.

24      Q.   Do you know anything about the current

25   lawsuit between Valve and Mr. Rothschild?

Valve Corporation — Affirmative (lines 13–15)

Valve Corporation — Affirmative (lines 17–18)

Valve Corporation — Affirmative (lines 20–23)

Lafosse, Nicolle Deposition                                                        April 22, 2025

                                                              Page  110

1          A.   Nope.

2                      (Pause.)

3          Q.   If you could turn in Exhibit 7 to page

4    ending in 154.

5          A.   Okay, I'm there.

6          Q.   And just to refresh your memory, this is

7    the claim chart created by Pitch Scientific.

8               The first line says, "This report is based

9    on the information contained in files sent via

10   email."

11              What information would PAM send to

12   companies to help create claim charts?

13         A.   This was Sugouri who would send these

14   files and I would just be cc'd on, but from what I

15   recall, she would definitely put a patent map of

16   what the invention was and she would include links

17   of the websites of the company that was using that

18   patent and how the company was using the patent.

19         Q.   Earlier, you said that PAM had a file on

20   Valve.

21         A.   Yes.

22         Q.   If PAM wanted a claim chart created for a

23   Valve product, would it send the Valve file to the

24   claim chart creators?

25         A.   No, just specific documents.

Page 111

1        Q.    The second sentence begins with, "This

2   report is not to be used as a substitute for any

3   legal opinion that may be given by a patent

4   attorney."

5            Do you see that?

6        A.    Yes.

7        Q.    After PAM received claim charts back from

8   the third-party companies --

9        A.    Uh-huh.

10       Q.    -- they were reviewed by PAM; correct?

11       A.    Correct.

12       Q.    After they were reviewed, would either

13   Sugouri or yourself take this disclaimer language

14   out?

15       A.    I don't recall.  I don't recall, but the

16   thing that I do recall is that this was the main

17   document that we used to draft any type of demand --

18   either demand letter, a settlement letter, or a

19   pleading.  Like, this was pretty much the core

20   document that we used to draft the claims,

21   arguments.

22       Q.    Was a claim chart ever included in a

23   demand letter without being reviewed by Sugouri or

24   yourself?

25       A.    No.

Lafosse, Nicolle Deposition                                                                          April 22, 2025

Page  112

1        Q.    Do you remember Sugouri or yourself ever

2    removing this disclaimer language from a claim chart

3    before adding it to a demand letter?

4        A.    No, I don't recall.  And I don't know if

5    Sugouri did or did not.

6                (Discussion off the record.)

7        Q.    Is there anything in a patent map that

8    deals with a specifically --

9                ATTORNEY DAMITIO:  Strike that.

10       Q.    Is there anything in a patent map that

11   deals specifically with a product or is the patent

12   map only about the claims of the patent itself?

13       A.    Well, it has a combination of both, the

14   patent itself and the claims for the patent.

15       Q.    Does a patent map have information about a

16   specific product that PAM believed might be

17   infringing?

18       A.    Yes.

19       Q.    What type of specific information about

20   the product did the patent map contain?

21       A.    The way in which the invention was used

22   and the part of that invention that was protected by

23   the patent holder.

24                (Discussion off the record.)

25       Q.    Ms. Lafosse, I'd like you to review the

April 22, 2025

**Page 113**

1    pages in Exhibit 7 starting on page ending 143 and

2    continuing until page ending 155.

3        A.    Uh-huh.

4        Q.    And tell me what portion of these pages is

5    a patent map.

6        A.    You said until 145?

7        Q.    Beginning on 143.

8        A.    Uh-huh.

9        Q.    And ending on 155.

10       A.    Okay.

11            All right.  To my understanding, none of

12    these are patent maps.  Patent maps are starting as

13    of 00156 page number.

14       Q.    So, Ms. Lafosse, starting on Page 156,

15    that's a different patent than on pages -- the page

16    that I just asked you to review.

17       A.    Okay.

18       Q.    Correct?

19       A.    Yeah.  I'm just realizing that now, yup.

20       Q.    Is anything in pages --

21            ATTORNEY DAMITIO:  Strike that.

22                        (Pause.)

23       A.    Okay.

24       Q.    What, if anything, on Pages 143 to 155 is

25    a patent map?

Lafosse, Nicolle Deposition

April 22, 2025

Page  114

1    A.   To my understanding, the patent map should

2    be 15 -- Pages 15 -- wait.  Okay, hold on.  Say

3    that, again.

4    Q.   What, if anything, on Pages 143 to 155 is

5    a patent map?

6    A.   Okay.  To my understanding, none of these

7    is the patent map.

8    Q.   Is your understanding that everything on

9    Pages 143 to 155 is a claim chart?

10    A.   Yes.

11    Q.   What is the difference between a patent

12    map and a claim chart?

13    A.   The claim chart has more specific

14    information that will sustain any type of argument

15    that will or is about to be drafted on a complaint.

16         And then the patent map, it just gives you

17    details about the invention itself as to how it

18    works, the components that it has, what is it used

19    for, and it just provides an image like map of the

20    invention.

21         (Discussion off the record.)

22    Q.   Is there anything in a patent map that is

23    not in a claim chart?

24    A.   I don't recall.

25    Q.   Okay.  When, if ever, did PAM send a

Valve Corporation                                    Affirmative

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition

April 22, 2025

Page  115

1    demand letter and the goal was not to get money from

2    a target company?

3        A.   Never.  There's no way a demand letter is

4    sent unless the purpose is to receive some sort of

5    damages.

6        Q.   And by damages, you mean money?

7        A.   Money.

8            ATTORNEY DAMITIO:  Marking Exhibit 9.

9        (Documents Bates stamped VALVE_5397 - 5421 is

10        received and marked as Exhibit 9 for

11              Identification.)

12             (Discussion off the record.)

13   BY ATTORNEY DAMITIO:

14       Q.   In your experience as -- in your

15   experience as a PAM litigation manager --

16           ATTORNEY DAMITIO:  Strike that.

17       Q.   In your experience as a PAM litigation          Valve Corporation                    Affirmative

18   manager, when, if ever, did PAM, RBDS, or Display

19   Technologies send a demand letter and the goal was

20   not to get money from a target company?

21       A.   To my knowledge, never.

22       Q.   Do you see RBDS listed as a company in the

23   subject line of Exhibit 7?

24       A.   Yes.

25       Q.   Do you understand Exhibit 7 to be a demand

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition

April 22, 2025

Page  116

1    letter from at least RBDS?

2        A.   Yes.

3        Q.   Moving to Exhibit 9, which is the one

4    you've just been handed.

5        A.   Uh-huh.

6        Q.   Do you recognize Exhibit 9?

7        A.   Not really.  This -- no, I mean, I didn't.

8    I mean, it looks familiar, but I did not review it.

9    It was not part of what I did.

10       Q.   Have you seen presentations like this

11   before?

12       A.   Probably.  Sorry about the vague answer,

13   but, like, I don't recall exactly.  Most likely, I

14   did.  Or the meetings -- the meetings that we had,

15   we kind of went in to what each one of us had as a

16   duty within the company and Daniel probably was --

17   well, he was definitely in one of those meetings and

18   he had to do his own spiel about, like, where was --

19   what was he doing, how was he doing it, and the

20   documents that he was preparing in order to do his

21   duties.

22       Q.   Do you know if Daniel Falcucci was

23   responsible for drafting this presentation?

24       A.   I would believe so, yeah.

25       Q.   Was Daniel Falcucci responsible for

Page  117

1      drafting this presentation?

2          A.   I think so, yes.

3          Q.   Do you know what analysis or research was

4      conducted leading to the creation of this

5      presentation?

6          A.   I know he worked with the office assistant

7      to look in to the system of inventions that PAM

8      owned and that we could offer as a potential

9      licensor.  And then he would just go through the

10     internal office database to make sure that this list

11     is accurate and available to what we offered.

12         Q.   If you move to slide ending in 5407, it's

13     titled Featured Inventory.

14         A.   5407?

15         Q.   Uh-huh.

16         A.   Yeah.

17         Q.   How did Mr. Falcucci decide which patents

18     were part -- should be part of the featured

19     inventory --

20              ATTORNEY DAMITIO:  Strike that.

21                  (Discussion off the record.)

22         Q.   Do you know how Mr. Falcucci determined

23     which patents to list as featured inventory?

24         A.   I do not.

25         Q.   Do you know what, if anything, was done to

Page 118

1    ensure that the featured inventory were actually

2    relevant to a target's accused products?

3        A.   No, I had no involvement on that side of

4    the business.

5        Q.   If you turn to the slide ending in 5399.

6        A.   Okay.

7        Q.   It references a global settlement and

8    license agreement.  Do you see that?

9        A.   Yes.

10       Q.   Have you seen a global settlement and

11   license agreement between Valve and Display

12   Technologies?

13       A.   I have not.

14       Q.   Are you familiar with that agreement at

15   all from your time working at PAM?

16       A.   No, I'm not.

17       Q.   If a prior license had been executed                    Valve Corporation            Affirmative

18   between a company and Display Technologies, would

19   that prior license be in the company's file?

20       A.   Yes.

21       Q.   For example, this global settlement and

22   license agreement reached between Valve and Display

23   Technologies, you would expect that to be in the

24   Valve file; correct?

25       A.   Yes, uh-huh.

Lafosse, Nicolle Deposition

April 22, 2025

Page 119

1      Q.   You've never seen this agreement in the

2  Valve file when you reviewed the Valve file?

3      A.   No, never worked with it.

4           (Discussion off the record.)

5      Q.   As litigation manager, when you looked in

6  the file of a target company, were there sometimes

7  prior agreements?

8      A.   From time to time, I would find

9  communications, but not necessarily prior

10  agreements.

11      Q.   What type of communications would be in a

12  target company file?

13      A.   Point of contact, who's the right point of

14  contact, meaning the decision maker.  From time to

15  time, we found the contact of people who were no

16  longer working at that company.  So kind of bouncing

17  internally from one person to another until we found

18  the point of contact.  Then back and forth over a

19  time and date to meet, calendars conflicting.

20  Nothing substantial.  It's mainly logistics around

21  getting to the right person to speak to.

22      Q.   As litigation manager at PAM, you don't

23  recall ever looking in the file of a target company

24  and seeing a prior license agreement?

25      A.   I probably did.  Not in detail, but most

Lafosse, Nicolle Deposition                                                    April 22, 2025

Page  120

1    likely, if I'm looking into a company file, there is

2    a license agreement in there.  If there is one that

3    exists, it should be in there.

4              (Discussion off the record.)

5       Q.   As part of your research on a target

6    company, were your responsibility to review licenses

7    from the company files?

8       A.   Not necessarily within my

9    responsibilities.  We definitely needed to know if

10   we had a license in order to proceed an offer and

11   make an offer.  We wouldn't make an offer if we

12   didn't know we had the license to do that offer.

13      Q.   How did PAM determine if it already had a

14   license with the target company?

15      A.   I have no knowledge of that.  That would

16   be on Sugouri's purview.

17      Q.    In Exhibit 9, if you turn to the slide

18   ending in 5400, the second bullet point says, "The

19   following patents are completely new assets not

20   included in our original agreement."

21           Did PAM have a strategy to target

22   companies who had previously licensed Rothschild

23   patents to see if they would license additional

24   patents for more money?

25      A.   Yeah, they would do that from time to

Lafosse, Nicolle Deposition                                               April 22, 2025

Page **121**

1   time.

2        Q.   Was there an established strategy within

3   PAM to specifically target those companies that

4   already had a license?

5        A.   No, not a strategy, per se, it's more like

6   a reach out and see.

7             (Discussion off the record.)

8        Q.   Why, if a license already existed, would

9   PAM reach out to see if the target company wanted to

10  do a new license agreement?

11       A.   I don't recall exactly, but from what I do

12  recall is, most likely, they wanted to do a new

13  agreement where you could either offer additional

14  licenses that are kind of correlated to the existing

15  one.  I don't -- I don't know if the licensing was

16  for a term also.  So, like, if the term was about to

17  end, renegotiated, that type of conversation would

18  happen.

19            (Discussion off the record.)

20       Q.   Are you aware of any target company taking

21  a license to all patents owned by PAM or any of its

22  companies for all eternity?

23       A.   No.

24       Q.   While you worked at PAM, are you aware of

25  any instances where a patent license was offered to

Kilpatrick Townsend & Stockton LLP

**Page  122**

1    a company but the company already had a license to

2    the patent that was offered?

3        A.   I have no knowledge of that.

4        Q.   You said that PAM had a strategy of

5    reaching out to companies that had previously taken

6    a license to see if they wanted to do a new license;

7    right?

8        A.   Either renew --

9            ATTORNEY CHAD:  Objection.  Misstates

10       prior testimony.

11       Q.   Did PAM had have a strategy to target

12   companies who had previously licensed Rothschild

13   patents to see if they would license additional

14   patents for more money?

15       A.   Yes.

Valve Corporation                                      Affirmative

16       Q.   How did PAM ensure that it wasn't offering

17   a license to patents that the target company had

18   already previously licensed?

19       A.   Sorry.  Can you repeat that question?

20       Q.   How did PAM ensure that it wasn't offering

21   a license to patents that the target company had

22   already previously license?

23       A.   We had it on the internal company database

24   who had which license and for what invention, for

25   what patent.

Valve Corporation                                      Affirmative

Lafosse, Nicolle Deposition                                                                April 22, 2025

Page 123

1      Q.   When you say you had it on the internal

2   company database, what do you mean?

3      A.   The cloud storage service of the company,

4   we would have the files of each company that had

5   license and it -- we just, you know, go to the

6   database and see what companies already had a

7   license, which ones had about to expire license.

8   And the new patents that had license acquired, the

9   assistant would just kind of go through them and see

10  which companies aligned with the new patents

11  acquired and kind of offer the license to them.

12          I'm not sure if that was too tangled,

13  but --

14      Q.   Who at PAM was responsible for going

15  through the old licenses and seeing what new patents

16  the company might want to license?

17      A.   The office assistant.

18      Q.   Who at PAM was responsible for confirming

19  that a target company did not already have a license

20  to a patent before a demand letter was sent?

21      A.   Sugouri, along with Leigh Rothschild.

22      Q.   As part of signing off on a demand letter,

23  Leigh Rothschild personally confirmed that the

24  target company did not have a license to the patent?

25      A.   Correct.

Page 124

1          ATTORNEY CHAD:  Objection.  Calls for

2      speculation.

3      Q.   How do you know that to be the case?

4      A.   I was in the conversations.

5      Q.   Who at PAM had authority to agree to a

6  final dollar figure for licenses with the target

7  company?

8      A.   Leigh Rothschild.

9              (Discussion off the record.)

10     Q.   Who at PAM had authority to choose the

11 opening offer that would be made to a target

12 company?

13     A.   Leigh Rothschild would direct Sugouri to

14 draft that offer after having a previous phone call

15 conversation.

16     Q.   Previous phone call conversation between

17 Sugouri and Mr. Rothschild?

18     A.   Correct.

19     Q.   In your experience, what was the average

20 dollar figure for a license with a Rothschild

21 company?

22     A.   I do not recall.

23     Q.   During your time at PAM, what was the

24 highest dollar figure for a license?

25     A.   Do not recall.  Sorry.

Valve Corporation                    Affirmative

Valve Corporation                    Affirmative

Lafosse, Nicolle Deposition                                                    April 22, 2025

**Page 125**

1          Q.   During your time at PAM, what was the

2    lowest dollar figure for a license?

3          A.   Do not recall.

4          Q.   Do you recall any licenses being executed

5    to any RBDS or Display Technologies for zero

6    dollars?

7          A.   No.

8               (Discussion off the record.)

9          Q.   Do you recall any licenses resolving

10   litigation with PAM, Display Technologies, or RBDS

11   at all?

12         A.   Can you repeat the question?

13              (Discussion off the record.)

14         Q.   Do you recall any licenses resolving

15   active litigation or potential litigation with PAM,

16   Display Technologies, or RBDS at all?

17         A.   What do you mean licenses resolving?

18         Q.   Display Technologies and RBDS would file

19   lawsuits against target companies; correct?

20         A.   Correct.

21         Q.   To resolve that litigation --

22         A.   Uh-huh.

23         Q.   -- target companies would take a license

24   to patents owned by Display Technologies or RBDS;

25   correct?

Page 126

1      A.   Okay.  Yes; correct.

2                (Discussion off the record.)

3      Q.   Would settlement agreement be a better

4    term to use for license to settle active litigation?

5      A.   Not necessarily.

6      Q.   Is there a difference between a settlement

7    agreement and a license agreement?

8      A.   Yes.  Settlement means there is already an

9    intention to file a lawsuit.  Most likely, a draft

10   pleading has been sent.  Versus, a license, there is

11   no intention of filing a suit.  Rather, there's an

12   intention of providing a license and then either

13   agreeing or not agreeing to acquire -- to have the

14   license and then negotiations about the price of the

15   license would also be part of it.

16                (Discussion off the record.)

17     Q.   During your time at PAM, do you recall

18   hearing about or seeing settlement agreements or

19   licenses to resolve active or contemplated

20   litigation with PAM, RBDS, or Display Technologies?

21     A.   Yes.

22     Q.   How many licenses or settlement agreements

23   do you recall hearing about or seeing?

24     A.   I don't recall number.  I recall it being

25   part of a daily conversation.

Page 127

1        Q.   More than one?

2        A.   Yes.

3        Q.   More than ten?

4        A.   No.

5        Q.   Somewhere between one and ten during your

6   time at PAM?

7        A.   Let's say, tops, six.  One to six.

8        Q.   What was the most money paid as part of a

9   license or settlement agreement?

10        A.   I don't recall.

11        Q.   Were any of the six settlement or license

12   agreements that you do remember for zero dollars?

13        A.   No.

14        Q.   Ms. Lafosse, I'd like to go back to

15   Exhibit 3, which is your LinkedIn.

16        A.   Okay.

17        Q.   And on Page 2, you list your job titles as

18   part of Patent Asset Management; correct?

19        A.   Correct.

20        Q.   These duties are identical to the duties

21   in your employment agreement, Exhibit 4; right?

22        A.   Let me go to Exhibit 4.

23                    (Pause.)

24        A.   They're not identical, but they definitely

25   reflect the duties that are in my offer letter.

Lafosse, Nicolle Deposition                                                      April 22, 2025

Page 128

1      Q.   It says on your LinkedIn page that you

2   manage litigation cycle from start to finish when

3   you worked at PAM.

4      A.   Correct.

5      Q.   What do you mean that at PAM you managed

6   the litigation cycle from start to finish?

7      A.   So start would be pre-lit investigating,

8   redoing research about the use of the patent, the

9   invention, who owned it, who was infringing on it.

10        Then we started either potential

11   settlement agreement before litigation.  If that

12   didn't work, we would -- I would help file the

13   motion, a pleading.

14        And I guess the finish for me when I was

15   working there would be reaching to a settlement

16   before we -- like we would reach to a settlement

17   after we had already filed a lawsuit, and that would

18   be the end of it.

19        So if I want to be a little bit more clear

20   is the first step would be pre-litigation, which

21   includes researching the patent, who used it, who

22   infringed it, how they infringed it, to what extent.

23   Then a conversation about settlement.  If settlement

24   didn't work, then I'll help draft the pleading.  The

25   pleading was filed.  Then a potential settlement was

Page 129

1    offered by the party that we were being -- that we

2    were suing at the moment.  And if we agreed on a

3    number that worked for both parties, that would be

4    the end of it.

5         Q.  At what part of a litigation cycle did you

6    check to see if a potential target company already

7    has a license?

8         A.  Pre-litigation.

9         Q.  Were there any other finish points to a

10   litigation cycle besides a settlement agreement?

11        A.  Not that I recall.

12        Q.  Litigation always finished in a

13   settlement?

14        A.  No, not always.  Sometimes litigation was

15   ongoing and I didn't get to see the finish, but what

16   I mean, based off what my offer letter and the

17   description on LinkedIn, my finish, quote/unquote

18   finish, would be reaching a settlement and then that

19   would be the end of the matter for PAM.

20        Q.  Did PAM, RBDS, or Display Technologies

21   ever voluntarily dismiss a lawsuit without signing a

22   license agreement or receiving any money?

23        A.  Not to my knowledge.

24        Q.  You also write on your LinkedIn page that

25   you conducted legal and factual research for patent

Page 130

1     infringement claims.

2            We talked about the factual investigation

3     that you did looking on public sources about

4     companies.  What legal research did you do?

5     A.   I analyzed the patent itself.  And then

6     with Sugouri, we would kind of go through the use --

7     well, not necessarily a legal document, but the

8     exhibit -- the claim chart and the patent map, we

9     would -- we would analyze that claim chart alongside

10    with the patent map and the patent that was filed in

11    the USPTO database and we -- I think it was Sugouri

12    who would kind of draft the argument about she would

13    find the case law for the arguments that she was

14    drafting.  And then we would just go from there.

15           So I helped her to the point where she

16    would do the legal research.  She would know -- she

17    would already know like by heart what cases were

18    relevant precedent wise for the arguments at hand

19    and then we would just draft the motion together.

20    Q.   Did Leigh Rothschild assist in any of your

21    factual or legal research pre-litigation?

22    A.   No.

23    Q.   Did you have access to Westlaw or

24    LexisNexis while you worked at PAM?

25    A.   I think Westlaw.  I believe so.

Lafosse, Nicolle Deposition                                                April 22, 2025

Page 131

1       Q.   What factual research did you do into

2   Valve Corporation during your time at PAM?

3       A.   What legal research?

4       Q.   Legal or factual research.

5       A.   Legal research would be precedent, case

6   law.

7            Factual research would be how the patent

8   was being used, how was it potentially infringed,

9   the amount of money that the company -- that the

10  infringer was making out of the use of the patents.

11      Q.   During your time at PAM, did you do any

12  legal or factual research into any Washington State

13  companies?

14      A.   I don't recall.

15      Q.   Who did you share the results of your

16  legal and factual research with?

17      A.   Sugouri.  And we would very briefly

18  discuss it with Leigh Rothschild, but, like, it was

19  just to keep him informed now because he had a

20  saying over our legal research.

21            (Discussion off the record.)

22      Q.   During the factual research you conducted,

23  how would you determine the amount of money a target

24  company was making out of the use of the Rothschild

25  patent?

Lafosse, Nicolle Deposition                                                                    April 22, 2025

Page 132

1        A.   I wouldn't.  It would be -- I think Leigh

2    Rothschild alongside with Sugouri would discuss that

3    internally.  I'll just show them how it's being

4    used, to what extent, and I wasn't aware of the

5    content of the conversations that they would have as

6    to making that determination.

7              (Discussion off the record.)

8        Q.   Was there ever a time that the results of

9    your factual and legal research led Sugouri and

10   Mr. Rothschild to determine that there was no

11   infringement of the Rothschild patent?

12       A.   I think there was a few times.

13       Q.   Roughly, how many times did your factual

14   and legal research lead to a determination that

15   there was no infringement?

16       A.   Maybe two times.

17             (Discussion off the record.)

18       Q.   How many times did, based on your legal

19   and factual research, did Mr. Rothschild and Sugouri

20   determine that there was infringement of the

21   Rothschild patent?

22       A.   Four out of six.

23       Q.   So you conducted six total research

24   projects on target companies?

25       A.   No, I use that number as a reference.  I

Lafosse, Nicolle Deposition                                                      April 22, 2025

Page 133

1    don't remember the total number exact.

2         Q.   Four out of six times based on your

3    research Mr. Rothschild and Sugouri would determine

4    there was infringement?

5         A.   Correct.  So majority of the times, there

6    was an infringement.

7         Q.   And only two total times, based on your

8    research, they determined there was no infringement?

9         A.   The number that I used was as a reference

10   to the percentage of times that there was an

11   infringement versus not an infringement, but not

12   reflective over the numbers of cases that I reviewed

13   and that they either determined or not that there

14   was an infringement.

15            ATTORNEY MACHLEIDT:  You guys good?

16       Anybody water, break, anything?

17            THE WITNESS:  Like, let's say ten minutes

18       more.

19            ATTORNEY DAMITIO:  That should be --

20            THE WITNESS:  You can finish with that one

21       and then we'll take a break, yeah.

22   BY ATTORNEY DAMITIO:

23       Q.   During your time as litigation manager,

24   how common was it for Sugouri and Mr. Rothschild to

25   determine that there was no infringement of a

Lafosse, Nicolle Deposition                                                    April 22, 2025

Page 134

1    Rothschild patent?

2        A.    Rare.

3        Q.    All right.  Going back to your LinkedIn

4    page, you write that you conducted legal and factual

5    research for patent infringement claims leading to a

6    strategic litigation plan.

7              What does a strategic litigation plan

8    mean?

9        A.    Means -- so we would map out the

10   potential -- after we had drafted the pleading, we

11   would map out the options of how the case could

12   resolve, the results that we may or may not have,

13   counterarguments to it, potential of settlement, the

14   number to be negotiated on a potential settlement.

15   So kind of like, you know, foreshadowing what could

16   happen now that we have filed the lawsuit and then

17   assess our next step and or the legal strategy to be

18   had after a response was filed.

19       Q.    Was this strategic litigation plan

20   contained in a document?

21       A.    Yes, yes.

22       Q.    Where was the strategic litigation plan

23   stored?

24       A.    Sugouri's files within the company cloud.

25       Q.    Not within your files?

Lafosse, Nicolle Deposition                                                                    April 22, 2025

**Page 135**

1        A.   I probably downloaded whatever documents

2     she had for my own records so that I could follow up

3     with what she was doing.

4        Q.   Would the strategic litigation plan go in

5     the target company file?

6        A.   Yes.

7              (Discussion off the record.)

8        Q.   Do you recall discussing a Valve specific

9     strategic litigation plan?

10        A.   I do not recall exactly, no.

11              (Discussion off the record.)

12        Q.   Do you recall ever hearing about or did

13     any employees of PAM discuss a Valve specific

14     strategic litigation plan?

15        A.   Most likely, but I don't recall.  I'm

16     saying most likely because it was part of every

17     case's conversation.

18              (Discussion off the record.)

19        Q.   Was defending the validity of the

20     Rothschild patents part of the strategic litigation

21     plan?

22        A.   Yes.

23        Q.   Was winning at trial part of the strategic

24     litigation plan?

25        A.   Yes.

CONFIDENTIAL                                                                    Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition

April 22, 2025

Page **136**

1      Q.   Did the strategic litigation plan address

2   what to do if an accused infringer challenged the

3   validity of a Rothschild patent?

4      A.   Yes.

5      Q.   Did the strategic litigation plan address

6   what to do if an accused infringer accused a

7   Rothschild company of bad faith litigation?

8      A.   Yes.

9      Q.   Did the strategic litigation plan address

10   what to do if an accused infringer accused a

11   Rothschild company of violating Rule 11?

12      A.   Can you refresh what Rule 11 is?

13      Q.   Signing --

14           (Discussion off the record.)

15      Q.   Did any strategic litigation plan address

16   what to do if an accused infringer accused a

17   Rothschild company of violating Rule 11 of the

18   Federal Rules of Civil Procedure, i.e., ethical

19   rules, any prefiling requirements?

20      A.   It was never addressed in the sense of,

21   you know, what happens if Rule 11 is raised, but of

22   course, it was part of the strategic litigation

23   process as to, like, okay, what happens if we're

24   challenged.  Not necessarily for ethical reasons,

25   just a challenge.  It could have been for ethical

Kilpatrick Townsend & Stockton LLP

Page  137

1    reasons, but we didn't actually plan it out for a

2    specific ethical reason.

3        Q.   Was the strategic plan for what to do if

4    the Rothschild patent was challenged written down in

5    the strategic litigation plan?

6        A.   I don't recall.

7        Q.   Did each case have its own strategic

8    litigation plan document?

9        A.   Yes.

10           (Discussion off the record.)

11       Q.   Were those strategic litigation plans per

12   company or per case?

13       A.   Per case.

14           ATTORNEY DAMITIO:  I think now would be a

15       good time to take a short break.

16           THE WITNESS:  All right.

17           ATTORNEY DAMITIO:  If that's okay.

18           ATTORNEY GREEN:  All right.

19           THE VIDEOGRAPHER:  Going off record at

20       2:13 p.m.

21                   (Recess.)

22           THE VIDEOGRAPHER:  Going back on record.

23       This is the beginning of media unit number

24       5.  The time is 2:37 p.m.

25   BY ATTORNEY DAMITIO:

Lafosse, Nicolle Deposition

April 22, 2025

Page 138

```
 1        Q.   Ms. Lafosse, other than conversations

 2   about Miami or idle chitchat, have you spoken with

 3   Eric Chad during this deposition?

 4        A.   Via email.  Hold on.

 5        Q.   Today.

 6        A.   Today?  No.

 7        Q.   Going back to Exhibit 7.

 8        A.   Okay.

 9        Q.   We've talked about RBDS.  Do you recognize

10   the other two companies listed in the subject line

11   there, Social Positioning Input Systems LLC and

12   Quantum Technology Innovations LLC?

13        A.   No.  No.

14        Q.   You don't know anything about --

15        A.   No, it doesn't ring a bell.

16        Q.   On Exhibit 9, page ending in 5398.

17        A.   One second.  Page ending 9?

18        Q.   5398.

19        A.   Okay.  Yes?

20        Q.   The last bullet there, "Leigh Rothschild

21   has generated millions in revenue for patent

22   owners," was that something you were generally aware

23   of during your time at PAM?

24        A.   Aware of?  Yes.

25        Q.   Do you know how those millions in revenue
```

Lafosse, Nicolle Deposition

April 22, 2025

Page 139

1    were generated?

2        A.   Nope, I don't -- I can't even testify to

3    the accuracy of it being millions generated.  I was

4    aware of it.  Whether that information was accurate

5    or not, I don't know.

6                    (Discussion off the record.)

7        Q.   You were aware of the allegations that

8    Mr. Rothschild had made millions, but no facts

9    specific to that?

10       A.   Correct.  He mentioned it.  I took -- I

11   took it for what he said was worth and never had a

12   need to confirm whether it was accurate or not.

13       Q.   Were all of the patents that you filed

14   lawsuits on during your time at PAM owned by

15   Mr. Rothschild or one of his companies?

16       A.   I'm sorry, can you repeat the question?

17       Q.   During your time at PAM, you filed

18   lawsuits on behalf of RBDS?

19       A.   Uh-huh.

20       Q.   Display Technologies?

21       A.   Yes.

22       Q.   Those lawsuits were for patent

23   infringement?

24       A.   Correct.

25       Q.   Were all of the patents involved in those

Page 140

1    cases owned by Mr. Rothschild?

2        A.   Not all of them.

3            (Discussion off the record.)

4        Q.   Were all of the patents asserted by RBDS

5    or Display Technologies owned by Mr. Rothschild or

6    Display Technologies or RBDS?

7        A.   Yes.

8        Q.   Before the break, we were talking about

9    strategic litigation plans.

10            What do you recall about the strategic

11   litigation plan for Valve?

12       A.   Probably doing some research around the

13   infringement, the extent of infringement.  I think,

14   if I recall correctly, I only got to the stage of

15   pre-lit.  So, like, barebones of what the company

16   was doing with the patent, how were they infringing

17   them, organic research on Google.  I don't even

18   think I got to the point where I was able to review

19   the claims chart or the patent map.  It was like

20   very -- the very, very beginning of it.

21            (Discussion off the record.)

22       Q.   Were you told by someone at PAM that Valve

23   infringed or did you do independent research to

24   confirm that Valve infringed Display Technologies'

25   patent?

Lafosse, Nicolle Deposition

April 22, 2025

**Page  141**

1        A.   I was told by Sugouri that there was a

2   potential claim to be made and that we needed to do

3   more research about it.

4        Q.   Did you ever personally conclude that

5   Valve infringed a Display Technologies patent?

6        A.   No, didn't get to that point.

7        Q.   Going back to your LinkedIn profile,

8   Exhibit 3.

9        A.   Okay.

10        Q.   One of the things you mention there as

11   your responsibilities is attended weekly litigation

12   calls with primary counsel.

13        A.   Uh-huh.

14        Q.   What do you mean by primary counsel?

15        A.   Outside counsel.

16        Q.   Did anyone else from PAM attend these

17   weekly calls with outside counsel?

18        A.   Sugouri and sometimes the office

19   assistant.  Sometimes maybe Daniel, but rarely.

20        Q.   Did Mr. Rothschild ever attend the calls

21   with outside counsel?

22        A.   Rarely.  It was not -- no, he didn't -- he

23   really never interfered when it came to the

24   litigation side of our jobs.  He was -- he was very

25   aware of him letting us do, you know, the attorney

Lafosse, Nicolle Deposition                                                    April 22, 2025

Page 142

1    job.  He would like to be informed about what we

2    were doing, but he wouldn't have any direct

3    involvement in the sense of to make a substantial

4    involvement.

5         Q.  What was the general purpose of the weekly

6    litigation calls?

7         A.  To discuss the facts of the matter,

8    potential claims, potential counterclaims,

9    settlement opportunity -- settlement -- whether a

10   settlement was feasible or not feasible depending on

11   the party that we were dealing with.  Strategic,

12   pretty much, as to the upcoming litigation.

13        Q.  What outside law firms do you recall

14   having these weekly litigation calls with?

15        A.  I do not recall the names.

16        Q.  How long would these calls last?

17        A.  Sometimes they were as short as I'll thank

18   you for letting me know the facts, I will send you a

19   draft soon to we would have to go through each one

20   of the facts and discuss and explain how we came

21   about this specific facts, how to build the claim,

22   what were our objectives on filing the claim.  The

23   outside counsel would give us their view about how

24   he goes about filing claims, and that could take up

25   to an hour.

Lafosse, Nicolle Deposition                                          April 22, 2025

**Page 143**

1      Q.   Was there one call per case or were all

2    pending cases handled on one call?

3      A.   No, one call per case.

4      Q.   So --

5      A.   One call per case unless the same attorney

6    was handling several cases.  So, say, an attorney

7    from New Jersey was handling five cases, we would

8    address the cases that he was filing for.

9      Q.   On average, how many calls with outside

10   counsel would you have during your time at PAM?

11     A.   Per week, per day?

12     Q.   Per week.

13     A.   As many as necessary.  Sometimes it could

14   be one every day.  Sometimes it could be one per the

15   entire week.  It depends on what stage of the

16   litigation we were, whether it was still in

17   pre-litigation, the day before filing, the day of

18   filing.  It depended on what stage of litigation we

19   were in.

20     Q.   Were there agendas circulated before the

21   calls?

22     A.   Yes, yes.

23     Q.   Who circulated those agendas?

24     A.   Sugouri.

25     Q.   Were there notes taken during the calls?

Lafosse, Nicolle Deposition

April 22, 2025

**Page 144**

```
 1        A.   Yes.  There was always -- that was

 2   religiously, there was always an agenda before every

 3   call.

 4        Q.   Did Sugouri always circulate the agenda

 5   before any call with outside counsel?

 6        A.   Yes.

 7        Q.   Where was -- where did you save the

 8   agendas for calls with outside counsel?

 9        A.   On the company's cloud base.

10        Q.   Did you ever have calls that discussed

11   lawsuits that were being considered but had not yet

12   been filed?

13        A.   Can you rephrase, please?  Or just repeat

14   the question.

15        Q.   Did you ever have calls with outside

16   counsel about lawsuits that were being considered

17   but had not yet been filed?

18        A.   Yes.

19        Q.   On the last point on LinkedIn, it says

20   that you assisted in preparation of litigation

21   distribution and reporting on litigation.

22        A.   Okay, yes.

23        Q.   What does that mean?

24        A.   The entire -- hold on.  It says draft the

25   motions.  Okay.
```

Lafosse, Nicolle Deposition                                                                    April 22, 2025

**Page 145**

1              Okay.  So preparation of litigation would

2      be pre-lit.  So research before that.

3              Distribution would be making sure that

4      each matter that we had a potential claim was

5      partnered with a local counsel from a specific

6      jurisdiction.  That's what distribution meant.

7              And then reporting on litigation is just

8      we had internal reports as to the stage of the

9      litigation.  We would let Leigh Rothschild know

10     where we were standing, things that had happened,

11     things that were pending, and potential outcomes.

12         Q.   How often did you send reports to

13     Mr. Rothschild?

14         A.   As often as needed.  Whenever there was

15     a -- something to be reported, we would do so.  But

16     I guess we could say twice a week.  I believe so.  I

17     think it was like two -- two weeks per -- two

18     reports per week kind of to keep things very -- just

19     up to date.

20         Q.   Did you ever send a report involving

21     litigation against Valve?

22         A.   No.  Not that I recall, at least.

23         Q.   What format were these reports in?

24         A.   Word documents.  Is that what you meant?

25         Q.   Were they emailed to Mr. Rothschild?

Lafosse, Nicolle Deposition                                                                      April 22, 2025

**Page 146**

1        A.   Yes, they were emailed.

2        Q.   Were these reports also saved in the

3    cloud?

4        A.   Yes.

5             (Discussion off the record.)

6        Q.   When in the pre-litigation stage was the

7    strategic litigation plan created?

8        A.   That was step one.

9        Q.   If a company was sued by PAM or RBDS or

10   Display Technologies and challenged invalidity and

11   infringement, did PAM create a strategic litigation

12   plan for how to handle that?

13       A.   Yes.

14       Q.   What went in to that strategic litigation

15   plan?

16       A.   Evidence that supported our position

17   towards an infringement claim.

18       Q.   Did you collect evidence about the

19   validity of the patent?

20       A.   Yes.

21       Q.   And that also went in the strategic

22   litigation plan?

23       A.   It did.  What I don't recall is whether

24   that was disclosed immediately during pre-lit to the

25   party that we were about to file suit for.

Page 147

1        Q.    Was settlement strategy included in the

2    strategic litigation plan?

3        A.    Sometimes, not always.

4        Q.    Did settlement strategy change if a target

5    company challenged infringement or invalidity?

6        A.    Not substantially.  A couple tweaks here

7    and there depending on how much -- depending on how

8    much information we had versus the amount of

9    information that we needed to sustain our position.

10            Like, do you want me to rephrase that?

11    That was a little --

12        Q.    I can ask a different question.

13            If a target company challenged the

14    validity of a patent or infringement of a patent

15    owned by PAM, RBDS, or Display Technologies, that

16    might cause PAM to tweak their settlement offer?

17            ATTORNEY CHAD:  Object to form.

18        A.    Correct.

19        Q.    What do you mean by tweaked the settlement

20    offer?

21        A.    Maybe add more evidence, add more

22    substance to our position, reinforce our argument.

23        Q.    Would the dollar amount that PAM or

24    Display Technologies or RBDS would be willing to

25    settle for change if a target company challenged

Page 148

```
 1   infringement or invalidity?

 2        A.   It wouldn't change based off of challenge.

 3   It would change based off a counterproposal.

 4        Q.   Earlier, you mentioned that PAM kept a

 5   file on Valve.

 6        A.   Yes.

 7        Q.   Was that file ever sent to any

 8   third-parties besides Indian companies who created

 9   claim charts, that you know of?

10        A.   Not that I know of.  And the information

11   that I do know of we would never send an entire file

12   because it had privileged information.  We would

13   sent explicitly files that were pertaining to the

14   person being addressed.

15        Q.   What other third-parties would PAM send

16   target company files to?

17        A.   No one other than outside counsel,

18   internal employees, and the third-party who drafted

19   the claim chart and the patent maps.

20        Q.   When you reported on litigation progress,

21   you said that you drafted reports twice a week.

22        A.   Uh-huh.  Yes.

23        Q.   Did those reports contain updates on all

24   pending litigation?

25        A.   Yes.  Yes.
```

**Page 149**

1      Q.   Those reports were sent to Mr. Rothschild

2   via email?

3      A.   Correct.

4      Q.   What is Mr. Rothschild's email address

5   that he used while you were at PAM?

6      A.   I do not remember.

7      Q.   Do you recall the specific cloud server

8   that you used to store documents?

9      A.   No.  Most likely, it was Windows.  365

10   Windows.

11         ATTORNEY DAMITIO:  Marking Exhibit 10.

12      (Documents Bates stamped VALVE_4358 - 4360 is

13       received and marked as Exhibit 10 for

14               Identification.)

15   BY ATTORNEY DAMITIO:

16      Q.   Ms. Lafosse, if you want to take a second

17   and read through this order.

18               (Pause.)

19         ATTORNEY CHAD:  I'm just going to note for

20       the record that the date of this order is filed

21       as August 5, 2021, which I believe is before

22       Ms. Lafosse joined PAM.

23         ATTORNEY MACHLEIDT:  And we object to that

24       coaching of the witness.  That was unnecessary.

25   BY ATTORNEY DAMITIO:

Page 150

1       Q.   Do you recognize this order, Ms. Lafosse?

2       A.   Nope.

3       Q.   Have you ever seen it before?

4       A.   Not that I recall.  I don't -- yeah, no, I

5   never dealt with Aston Martin.

6       Q.   Do you understand this, though, to be an

7   order of the Court in the case Display Technologies

8   v. Aston Martin LLC?

9       A.   Yes.  According to the document, yes.

10      Q.   On Page 2 in the fourth paragraph, the

11  last line references walk-away agreements.

12      A.   You said the last paragraph?

13      Q.   Fourth paragraph, last line.

14           Are you familiar with what a walk-away

15  agreement is?

16      A.   I'm familiar to the extent that I can

17  correlate what it is, not that I have dealt with

18  them.

19      Q.   What do you mean you can correlate to

20  them?

21      A.   Based on my professional experience, a

22  walk-away agreement would be an agreement that you

23  just settle a number so that you make the matter go

24  away and stop any type of procedure.

25      Q.   Would you characterize any of the

Lafosse, Nicolle Deposition                                                      April 22, 2025

**Page 151**

1    settlements or license agreements that PAM, RBDS, or

2    Display Technologies entered into as walk-away

3    agreements?

4        A.   To the knowledge that I had at the moment

5    I was working with PAM, I would not.

6        Q.   Why not?

7        A.   I just didn't have enough experience to

8    determine that was a walk-away agreement.

9             (Discussion off the record.)

10       Q.   Did you have a company email address when

11   you worked at PAM?

12       A.   Yes.

13       Q.   What was your company email address?

14       A.   I don't recall, but I think I can find it.

15   It must have been my name at whatever else was the

16   company's email.  I think we can find it on one of

17   the exhibits from Daniel's email here.

18             ATTORNEY CHAD:  Counsel, if she's not able

19        to find it, I have something I could provide as

20        well.

21             ATTORNEY DAMITIO:  Okay.

22   BY ATTORNEY DAMITIO:

23       Q.   That's okay, Ms. Lafosse.

24             When you left the company, did you keep

25   access to that email account?

Lafosse, Nicolle Deposition                                                                April 22, 2025

Page 152

1        A.   No.

2        Q.   To your knowledge, did Mr. Rothschild or

3   any other PAM employees keep access to your email

4   account after you left the company?

5        A.   I have no knowledge of that.

6        Q.   Did PAM give you a company computer when

7   you started at the company?

8        A.   No.

9        Q.   Was there someone at PAM or any other

10  company that you worked with at PAM who was

11  responsible for IT?

12       A.   I believe they had someone, but I don't

13  know their name.  Don't recall.

14       Q.   Was that individual specifically

15  responsible for IT at PAM?

16       A.   I don't -- I don't know who -- what the

17  position of that person was.  I don't know if it was

18  an IT person of the company or just a point of

19  contact that could occasionally help with IT

20  matters.

21       Q.   Do you know if that person worked for PAM

22  or if it was an independent third-party individual?

23       A.   I have no knowledge.

24       Q.   Was someone responsible for document

25  management at PAM?

Lafosse, Nicolle Deposition

April 22, 2025

**Page  153**

1       A.   The office assistant.

2       Q.   And you don't remember the name of the

3    office assistant; correct?

4       A.   No.  I know it was a lady.

5       Q.   What did the office assistant do to manage

6    documents?

7       A.   She kept the files clean in the server, in

8    the cloud server, in the sense of making sure that

9    no -- like, say, for example, that Valve files were

10   all within the Valve folder rather than one document

11   in a different matter by accidentally stored in a

12   different file.  Just keep coherence within the

13   database.

14      Q.   Was the office assistant responsible for

15   managing emails?

16      A.   No.

17      Q.   Who at PAM was responsible --

18           ATTORNEY DAMITIO:  Strike that.

19              (Discussion off the record.)

20      Q.   Earlier, Ms. Lafosse, you mentioned that

21   PAM doesn't send entire target company files to

22   third-parties because they may contain privileged

23   information; right?

24      A.   Correct.

25      Q.   By describing either through title or

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                    April 22, 2025

Page 154

1    category without going in to the contents of the

2    documents, what privileged information was in the

3    Valve file?

4        A.   Litigation strategy, internal

5    communications between company employees, potential

6    settlement agreements, and anything that related to

7    strategic matters for either a potential litigation

8    or a license agreement.

9                (Discussion off the record.)

10   BY ATTORNEY DAMITIO:

11       Q.   What, if anything, was not privileged in

12   the Valve file?

13       A.   Meetings that were calendarized.  That was

14   pretty much it.  Everything else was internal

15   communication and every communication had Sugouri or

16   me or both of us, which made it privileged.  Other

17   types of communication were relating to strategy, to

18   patent infringements, so all of that.  There was

19   barely anything that was not privileged.

20           Maybe the fact -- the patent map, but even

21   that, because Sugouri worked on it, so she put

22   her -- her legal analysis as side notes to it, too,

23   so that would fall in to privilege.

24           Maybe the claim chart and the patent map

25   that was sent from the third-party outsource from

Page 155

```
 1    India, when they sent it back, that was not

 2    privileged before we put our work in to it.  Other

 3    than that, I -- that's all I can recall.

 4                (Discussion off the record.)

 5         Q.   What format would you receive the claim

 6    charts from the Indian companies in?

 7         A.   The exact format on one of the exhibits

 8    that you gave me.  This one.

 9         Q.   Would they be --

10         A.   Oh, not this one, but --

11         Q.   -- PDFs, Word documents?

12         A.   Word documents.

13         Q.   Who at PAM was responsible for collecting

14    and producing documents during active litigations?

15         A.   Sugouri and outside counsel.

16         Q.   What was the procedure for collecting and

17    producing relevant documents during litigations?

18         A.   I don't recall.

19         Q.   But the responsibility was Sugouri through

20    outside counsel?

21         A.   Correct.

22         Q.   Who determined what documents would be

23    produced during litigations?

24         A.   Sugouri.

25         Q.   Were document management procedures
```

Page 156

1    discussed at all among PAM employees?

2         A.   Yes.

3         Q.   What were those discussions?

4         A.   So between Sugouri and I, we would discuss

5    the extent of the production.  Office assistant

6    would help us either organize them in tabs for

7    potential exhibit files.  Daniel would just kind of

8    listen in.  He wouldn't have an active role in

9    there.  But we all kind of put our little puzzle

10   piece together.

11        Q.   Would the puzzle pieces that you put

12   together then be sent to outside counsel?

13        A.   Yes.

14        Q.   And those would be the documents that

15   would be produced to defendant in active

16   litigations?

17        A.   Correct.

18        Q.   Did PAM ever restrict you from deleting

19   documents or emails?

20        A.   No.

21        Q.   Who had access to your cloud storage files

22   while you were at PAM?

23        A.   Leigh, Sugouri, office assistant.

24        Q.   Were documents ever stored electronically

25   anywhere but the cloud storage files?

**Page  157**

1        A.    No.  Not to my knowledge, at least.

2        Q.    Did PAM use any workplace organization

3    platforms while you worked there?

4        A.    You mean like Windows 365?

5        Q.    Windows 365, Asana, Slack.

6        A.    Oh, we used -- did we?  We started using

7    Asana, but not substantially.  We started, tried it

8    out, and didn't like it.  But yeah, that Windows 365

9    would be the main one.

10        Q.    Did you ever store documents on an Asana

11    platform during your time at PAM?

12        A.    No, only the cloud, Windows.

13        Q.    Did PAM maintain any paper records while

14    you worked there?

15        A.    Paper records.  You mean printed?

16        Q.    Hard copy document records.

17        A.    I'm not aware of.  I don't know.

18        Q.    If PAM received documents, court filings

19    or information from outside counsel, was that

20    information also stored in the cloud?

21        A.    Yes.

22        Q.    Who was responsible for storing documents

23    or correspondence from outside counsel for PAM?

24        A.    Sugouri would receive them firsthand and

25    then she will cc me and office assistant.  The

Lafosse, Nicolle Deposition

April 22, 2025

Page 158

```
 1    office assistant would file it accordingly on the

 2    files.

 3         Q.   Did PAM have a separate file for each

 4    case?

 5         A.   Yes.

 6         Q.   Did PAM have a written document retention

 7    policy while you worked there?

 8         A.   I was not aware of one.  I don't know if

 9    they did or not have one.

10         Q.   Was there ever a document retention policy

11    that was conveyed to you orally?

12         A.   No.

13         Q.   Were there specific document retention

14    policies for emails and documents related to

15    litigation the Rothschild companies were involved

16    in?

17         A.   Not that I'm aware of.

18         Q.   Are you familiar with what a litigation

19    hold is?

20         A.   Yes.

21         Q.   What is a litigation hold?

22         A.   You cannot delete any ESI information from

23    the database while litigation is either pending or

24    ongoing.

25         Q.   During your time at PAM, were you ever
```

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition

April 22, 2025

**Page 159**

1    notified you were being placed on a litigation hold?

2        A.   Not that I recall.

3        Q.   Were you ever instructed to preserve

4    documents or emails in a certain way?

5        A.   In a certain way to the extent of we

6    wanted to keep coherence on the names of the files?

7    Yes.

8        Q.   Were you ever instructed not to delete

9    certain documents or emails?

10       A.   No.

11       Q.   Were you aware of any other individuals

12   from PAM being placed on a litigation hold during

13   your time at PAM?

14       A.   Not that I was aware of.

15       Q.   Are you aware of any litigation holds at

16   all that were put in place during your time at PAM?

17       A.   No.

18       Q.   Besides the methods that we've talked

19   about about making sure that files were accurately

20   named, are you aware of any other document

21   preservation efforts at PAM?

22       A.   No.

23           ATTORNEY DAMITIO:  I think, at this point,

24       if we could take a quick, five-minute break.

25       Let me take a look at my outline.

CONFIDENTIAL

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition                                                                    April 22, 2025

Page  160

1            We can go off the record.

2            THE VIDEOGRAPHER:  Going off record at

3       3:15 p.m.

4                     (Recess.)

5            THE VIDEOGRAPHER:  Going back on the video

6       record.

7            This is the beginning of media unit 6, and

8       the time is 3:41 p.m.

9  BY ATTORNEY DAMITIO:

10       Q.   Ms. Lafosse, earlier you said that

11  litigation costs money; right?

12       A.   Yes.

13       Q.   Litigations can be expensive?

14       A.   Yes.

15       Q.   When you were at PAM, was there a formal

16  or informal policy that when a target company fought

17  back, the Rothschild plaintiff would drop the

18  lawsuit?

19       A.   Not to my knowledge.

20       Q.   All right.  When you were at PAM, was a

21  decision ever made to drop a lawsuit because it was

22  too expensive to continue litigating?

23       A.   Not to my knowledge.

24       Q.   When you were at PAM, was a lawsuit ever

25  dropped because the cost of litigation would be more

Page 161

1     than a possible license amount?

2         A.   Not that I was aware of.

3         Q.   What percentage of your communications

4     that you sent or received while you were at PAM

5     were, in your opinion, not privileged?

6         A.   I can't recall.  I could answer that if I

7     had the documents to look at, but I do not recall.

8         Q.   Less than 50 percent?

9         A.   Yes.

10        Q.   Less than 25 percent?

11        A.   I would say 20 percent was not privileged.

12        Q.   Tell me all the categories of documents or

13    communications that you would characterize as not

14    privileged that you sent or received while you were

15    at PAM.

16        A.   Meeting calendar, communications regarding

17    availability, communications regarding point of

18    contact, communications regarding credentials for

19    outside counsel.  That would be it at the top of my

20    head.

21             ATTORNEY DAMITIO:  Off the record just one

22        second.

23             THE VIDEOGRAPHER:  Going off record at

24        3:43 p.m.

25                      (Recess.)

Lafosse, Nicolle Deposition                                                April 22, 2025

Page 162

1              THE VIDEOGRAPHER:  Going back on record at

2       3:44 p.m.

3    BY ATTORNEY DAMITIO:

4       Q.   Do you believe the meeting agendas that

5    were circulated by Sugouri before your internal

6    calls were privileged?

7       A.   Yes.

8       Q.   Do you believe that the meeting minutes

9    from your internal calls that were circulated by

10   Sugouri after the meetings were privileged?

11      A.   Yes.

12      Q.   Do you believe that the litigation reports

13   that you created and sent to Mr. Rothschild were

14   privileged?

15      A.   Yes.

16      Q.   Do you believe that the strategic

17   litigation plans that you and Sugouri created were

18   privileged?

19      A.   Yes.

20      Q.   When you said that communications

21   regarding point of contact were not privileged,

22   could you explain what point of contact means?

23      A.   Some person -- the person who had a

24   decision power over the company that we were

25   potentially trying to -- not potentially.  Over the

Page 163

1    company that we were trying to reach out to with

2    regards to a potential litigation for a patent

3    infringement matter.

4        Q.   And communications regarding credentials

5    for outside counsel that you said were not

6    privileged, what are those?

7        A.   Yeah, so experience of the attorneys,

8    cases that they've dealt with before.  I guess years

9    of experience, too.  Areas of expertise.

10       Q.   Were you aware of any allegations of

11   sanctionable conduct against Rothschild companies?

12       A.   I believe there was a sanction, but I'm

13   not sure if it was a sanction or just they called

14   him a patent troll.  He had bad PR regarding that

15   because he just pretty much chased someone who had a

16   patent infringement and acquired the patent and

17   litigated.  People understood that as being a patent

18   troll.  But not a formal sanction from an entity,

19   per se.

20       Q.   Are you aware of any court orders issuing

21   sanctions against a Rothschild company?

22       A.   No, I was not aware.

23       Q.   Were you aware of any allegations made

24   that a Rothschild company's infringement series were

25   frivolous?

Lafosse, Nicolle Deposition                                                    April 22, 2025

Page 164

1        A.   No, I was not aware.

2        Q.   Were you aware of any allegations that a

3    Rothschild company should have to pay attorney's

4    fees and expenses of the target companies it sued?

5        A.   No, I was not aware of that.

6             (Discussion off the record.)

7        Q.   If there had been an allegation of

8    sanctionable conduct against Rothschild companies,

9    would you be expected to know that and report that

10   as part of your role as a litigation manager?

11       A.   I don't think it would be part of my role.

12   It would be part of my ethical duty as an attorney.

13       Q.   Did PAM require outside counsel to notify

14   them of any allegations of sanctionable conduct?

15       A.   Not that I know of.

16       Q.   Did PAM require outside counsel to notify

17   them if there were any allegations that a Rothschild

18   company's infringement theories were frivolous?

19       A.   Yes.  Let me expand on that.

20            Yes, to the extent that this was something

21   that was expected, not necessarily said as a direct

22   instruction.  Meaning it was part of the outside

23   counsel to say -- to inform and to let us know

24   everything and anything that happened that affected

25   the company, PAM, or the litigation at hand.

Lafosse, Nicolle Deposition

April 22, 2025

Page 165

1     Q.   Did you ever instruct outside counsel that

2    they were to notify PAM if there were any

3    allegations that a Rothschild company's infringement

4    theories were frivolous?

5         A.   No.

6         Q.   Do you know if anyone at PAM --

7              ATTORNEY DAMITIO:  Strike that.

8         Q.   Did anyone at PAM require outside counsel

9    to notify --

10             ATTORNEY DAMITIO:  Strike that.

11        Q.   Did anyone at PAM require outside counsel

12   to notify PAM if there were allegations that a

13   Rothschild company's infringement theories were

14   frivolous?

15        A.   Not that I'm aware of.

16        Q.   Are you familiar with Section 285 of the

17   United States Patent Act?

18        A.   I would like a refresher.

19        Q.   Are you aware of a provision in patent law

20   that requires companies to pay legal fees if they've

21   engaged in frivolous actions?

22        A.   Yes.

23        Q.   Are you aware of any allegations that PAM

24   should be subject to payment of a target company's

25   attorney's fees because they engaged in frivolous

CONFIDENTIAL

April 22, 2025

**Page 166**

1      allegations?

2          A.   Not aware of.

3               (Discussion off the record.)

4          Q.   Are you aware of any allegation that

5      Display Technologies or RBDS should be subject to

6      payment of a target company's attorney's fees for

7      frivolous allegations?

8          A.   Not aware of.

9               ATTORNEY DAMITIO:  Marking Exhibit 11.

10         (Documents Bates stamped VALVE_4655 - 4664 is

11           received and marked as Exhibit 11 for

12                   Identification.)

13     BY ATTORNEY DAMITIO:

14         Q.   Ms. Lafosse, Exhibit 11 is a court order

15     in the case Rothschild Digital Confirmation LLC v.

16     CompanyCam.

17              Do you recognize the company Rothschild

18     Digital Confirmation LLC?

19         A.   Rings a bell.  I know of its existence.  I

20     never dealt with it while I was working for PAM.

21         Q.   Did you ever perform any factual or legal

22     investigations on behalf of Rothschild Digital

23     Confirmation?

24         A.   No.

25         Q.   Did any of your work as a litigation

Lafosse, Nicolle Deposition

April 22, 2025

Page  167

1    manager for PAM involve patents or cases on behalf

2    of Rothschild Digital Confirmation?

3        A.   I don't recall, but I'm leaning more

4    towards a no.  If I ever did, it might have been

5    slightly.

6        Q.   Are you familiar with this order?

7        A.   No.  First time seeing it.

8        Q.   All right.  Ms. Lafosse, if you could turn

9    to the last page, page ending in 4664, the

10   conclusion.

11           "Defendant's motion to declare this case

12   exceptional and for award of fees is granted."

13           Do you see that?

14       A.   Yes.

15       Q.   Would this be the type of order that PAM

16   would expect its outside counsel to send to PAM and

17   its employees?

18       A.   Yes.

19       Q.   In your time at PAM, did you ever receive

20   a letter from a target company stating that your --

21   that a PAM, RBDS, or Display Technologies patent

22   allegations were frivolous?

23       A.   I did not receive any.

24       Q.   Are you aware of anyone -- did anyone at

25   PAM receive a letter from a target company stating

Page 168

1    that the infringement allegations of PAM, RBDS, or

2    Display Technologies were frivolous?

3        A.   Not that I'm aware of.

4        Q.   On Page 6 of this order, in the middle of

5    the second paragraph, the order states, "Plaintiff

6    indicated that it intended to produce its initial

7    infringement contentions, that defendants'

8    invalidity contentions remain due, and that

9    plaintiff intends to amend the complaints filed in

10   the remaining cases here pursuant to Rule 15."

11           Would that strategy decision being

12   referred to by the Court have come from PAM or

13   outside counsel?

14       A.   I wouldn't know.  Yeah, I don't -- I don't

15   know.  It could have been either one.

16       Q.   Why do you say it could have been either

17   one?

18       A.   So Sugouri would also help draft the

19   motions alongside outside counsel.  So could have

20   been a motion that was a pleading document that

21   could have been worked on by both outside counsel

22   and Sugouri.  It's hard to determine which part of

23   it was Sugouri's, which part was outside counsel's.

24   I mean, it would have been is what I meant.

25       Q.   During your time at PAM, litigation

Lafosse, Nicolle Deposition

April 22, 2025

Page  169

1    strategy decisions could have come from Sugouri or

2    could have come from outside counsel?

3        A.   Or both.

4        Q.   Were there any litigation strategy

5    decisions that came exclusively from Mr. Rothschild

6    or PAM?

7        A.   Not from Mr. Rothschild.  He would never

8    draft any -- anything that related to legal

9    pleadings.

10            From PAM, if it was from PAM, it would be

11   Sugouri.  I would help on drafting it, but signature

12   would be Sugouri's.

13       Q.   Would Mr. Rothschild ever dictate to

14   Sugouri what legal strategy to take in a case?

15       A.   No.  He'll give his, like, personal

16   opinion of what he thinks, but at the end of the

17   day, it was not -- he wouldn't instruct on

18   litigation strategy at all.  He was very -- which I

19   liked a lot from him -- he was very sure of what his

20   role was within the company.  He would not attempt

21   to even try to tell us how to manage a case.

22       Q.   If there was a dispute over strategy

23   between Sugouri and outside counsel, who had the

24   final say?

25       A.   Sugouri.

CONFIDENTIAL

Kilpatrick Townsend & Stockton LLP

Lafosse, Nicolle Deposition

Page  170

1    Q.   Sugouri could dictate case strategy even

2  if outside counsel disagreed?

3    A.   There was like a push -- a pull and push

4  type of thing until they got into an agreement of

5  what the best strategy was.  At the end of the day,

6  it was not that Sugouri's opinion was superior or

7  better than outside counsel.  Sometimes both of them

8  had really good points.  Both of them had flaws on

9  their position.  But, you know, you -- it's pretty

10  much working with a team.  You know, work together

11  to get the best approach.

12    Q.   Are you familiar with Rule 11 of the

13  Federal Rules of Civil Procedure?

14    A.   Can I have a refresher?  Ethical duty?

15    Q.   In essence, Rule 11 is --

16       ATTORNEY MACHLEIDT:  Hold on.

17       ATTORNEY DAMITIO:  Strike that.

18       ATTORNEY GREEN:  Yeah, I was going to

19  actually object for the first time.

20         (Discussion off the record.)

21       ATTORNEY DAMITIO:  I pass the witness.

22       ATTORNEY CHAD:  One second.  We don't need

23  to go off the record.

24              (Pause.)

25       ATTORNEY CHAD:  I have no questions.

Page **171**

1          ATTORNEY MACHLEIDT:  Thank you for your

2     time.

3          Thank you, everybody.

4          ATTORNEY GREEN:  Our pleasure.

5          ATTORNEY MACHLEIDT:  We can go off the

6     record.

7          THE VIDEOGRAPHER:  I am supposed to get

8     orders on the record before.

9          ATTORNEY DAMITIO:  Fine.

10         Standard seven-day would be fine for --

11         THE VIDEOGRAPHER:  You guys have a

12    standing order for sync, I think; right?

13         ATTORNEY MACHLEIDT:  Yes.

14         And the rough ASAP.

15         ATTORNEY GREEN:  Do you want to read?

16         ATTORNEY CHAD:  Same is fine.  You don't

17    need to hurry on my account.

18         ATTORNEY GREEN:  You have the option to

19    read.

20         THE WITNESS:  No.

21         THE VIDEOGRAPHER:  This concludes the

22    deposition for today.

23         We're going off record at 3:59 p.m.

24         (Proceedings were concluded at 3:59 p.m.)

25              * * * * * * * * * *

Lafosse, Nicolle Deposition

April 22, 2025

Page 172

1               C E R T I F I C A T E

2

3

4           I, Stacey E. Raikes, NCRA Registered

5    Merit Reporter and NCRA Certified Realtime Reporter,

6    do hereby certify:

7

8           That NICOLLE LAFOSSE, the witness whose

9    deposition is hereinbefore set forth, having been

10   duly sworn, and that such deposition is a true

11   record of the testimony of said witness.

12

13          I further certify that I am not related

14   to any of the parties to this action by blood or

15   marriage, and that I am in no way interested in the

16   outcome of this matter.

17

18          IN WITNESS WHEREOF, I have hereunto set

19   my hand this 24th day of April 2025.

20

21

22

23   ----------------------------------------

24   Stacey E. Raikes, RMR, CRR
     Certified Machine Stenographer

25   Notary Public for the State of Florida