UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF WASHINGTON

_____

| | |
|---|---|
| VALVE CORPORATION, ) | |
| ) | |
| Plaintiff, ) | No. 2:23-cv-1016-JNW |
| ) | |
| vs. ) | Seattle, WA |
| ) | |
| LEIGH ROTHSCHILD, ) | |
| ROTHSCHILD BROADCAST ) | |
| DISTRIBUTION SYSTEMS, LLC, ) | |
| DISPLAY TECHNOLOGIES, LLC, ) | |
| PATENT ASSET MANAGEMENT, ) | |
| LLC, MEYLER LEGAL, PLLC, AND ) | |
| SAMUEL MEYLER, ) | |
| ) | Pretrial Conference |
| Defendants. ) | January 29, 2026 |
| ) | 1:30 p.m. |

_____

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE JAMAL N. WHITEHEAD
UNITED STATES DISTRICT JUDGE

_____

APPEARANCES:

FOR THE Plaintiff :   Dario A. Machleidt
                      Kathleen Geyer
                      Christopher P. Damitio
                      Kilpatrick Townsend & Stockton LLP
                      1420 Fifth Avenue, Suite 3700
                      Seattle, WA 98101
                      dmachleidt@kilpatricktownsend.com
                      kgeyer@ktslaw.com
                      cdamitio@kilpatricktownsend.com

                      Marianthi Marcella Karas
                      Kilpatrick Townsend & Stockton LLP
                      1801 Century Park East, Suite 2300
                      Los Angeles, CA 90067
                      mkaras@ktslaw.com

For the Defendants:    Joseph J. Zito
                       DNL Zito
                       1250 Connecticut Avenue NW, Suite 700
                       Washington, DC 20036
                       jzito@dnlzito.com

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Valve v. Rothschild et al., 1/29/26

P R O C E E D I N G S

*   *   *

THE CLERK:  This is the matter of Valve Corporation vs. Rothschild et al., Cause Number C23-1016 assigned to this Court.

Counsel, please rise and make your appearances for the record.

ATTY. MACHLEIDT:  Good afternoon, Your Honor.  Dario Machleidt on behalf of Valve Corporation.  And with me today we have Kate Geyer.  Also, next to her we have Chris Schenck, who is with Valve Corporation.  Next to Mr. Schenck we have Nita Gray, who is our trial technology specialist in terms of exhibits and things like that.  And then behind me we have Marianthi Karas and Chris Damitio, all here for Valve.

THE COURT:  Good afternoon all.  Thank you for bringing the whole team.

ATTY. MACHLEIDT:  You're welcome, Your Honor.

ATTY. ZITO:  Good afternoon, Your Honor.  I'm Joseph Zito, here as lead counsel for the defendants.  With me is one of the defendants, Mr. Sam Meyler.

And also with me is our new local counsel.  We learned this week that our local counsel, Matt Cunanan, cannot make it for trial.  And so our new local counsel -- I'll let him introduce himself.  He's going to make his appearance today as local counsel for our case.

Valve v. Rothschild et al., 1/29/26

ATTY. HOLMQUIST: Imants Holmquist.

THE COURT: All right. Good afternoon.

Well, I'm sure you all saw the Court's rulings yesterday. There were some dispositive motions that were pending for a little bit, and we issued rulings on those yesterday. So, hopefully, that has brought some clarity to at least some of the shape of trial and how things might proceed.

I will say that in reviewing all the materials -- thank you for the time and attention that you all have put into the pretrial statements. I've looked at the trial briefs. I've reviewed the pretrial order closely. I've looked at the exhibit list, of course, the motions in limine. I know there's a *Daubert* motion and sanctions motions that are pending also. But it's given me, I think, a pretty clear picture of what the issues are and the case theories are that you all are advancing.

So I will tell you, at the outset, I understand the trial estimate for this to be four days. I'm concerned about whether or not we can fit all of this in in four days. I count 13 lay witnesses, a number of expert witnesses, 600 exhibits. And the invalidity issues, I think, are somewhat complex.

So I am a little preoccupied with how we're going to fit all this in in four days. So I want to hear from the parties about their thoughts of whether or not a four-day trial estimate is feasible.

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Valve v. Rothschild et al., 1/29/26

And before you rise, Mr. Machleidt, I need to give you a little more context about trial days and how I run trial.

So you may have seen online, but I start trial promptly at 9:00 a.m. I'll take a 15-minute recess in the morning at 10:30. I do an hour-and-a-half-long lunch, which is a little bit long, but I think it's necessary, given that coming in and out of the building can be a hassle for jurors. And, frankly, I think they're more attentive in the afternoon when they come back having had a full lunch break and an opportunity to walk around. I take an afternoon recess at 2:30, and then we adjourn at 4:15.

So the way the math breaks down is that's about five hours for each trial day. Five times four gives us 20 hours in which to conduct this trial.

I'm going to put you all on a clock. I'll divide it right in half. That's ten hours to each of the parties. Beyond giving you that clock, I don't put time limits on openings or closings, any of that. I leave it to you all as professionals to manage your time.

So is ten hours, Mr. Machleidt, enough for Valve to put on its case?

ATTY. MACHLEIDT: Your Honor, would you like me to address from the podium?

THE COURT: Please.

ATTY. MACHLEIDT: Dario Machleidt on behalf of Valve

Valve v. Rothschild et al., 1/29/26

Corporation.

Your Honor, I'm happy to say I believe the answer is yes. You mentioned ten hours per side.  When we, on Valve's side, have been divvying up the time for the many witnesses, depo designations, the live witnesses, based on kind of our back-of-the-envelope calculations, we had us at ten and a half hours.  So in terms of our preparations thus far, we've been assuming we have ten and a half hours to try our case.

It's very helpful to know that it's a 50/50 split.  At some point today, it's probably helpful to discuss the fact that the witnesses tend to weigh in favor of Valve.  We will bring more.  We have more people.  I think we're the only ones that have any experts.  Not all of our experts will testify, but most will.

But my answer is yes.  We've been calculating kind of the trial time on ten and a half hours to try our case.  We'll shave off 30 minutes, and we can do it.

And may I add, Your Honor?

THE COURT:  Yes.

ATTY. MACHLEIDT:  You mentioned the invalidity issues.  Completely agree.  They are complex.

To -- as part of streamlining the trial, thinking about the time, for the jury, we will only present invalidity based on prior art of Claim 7.  Claim 7 is sort of the claim that's been tossed around and asserted in most of the RBDS cases,

Valve v. Rothschild et al., 1/29/26

asserted against Valve.  We're only going to try a prior art case on Claim 7 for the jury.  Afterwards, in terms of the legal issues, we will do 101 on all claims, but that's not a jury issue.

So the invalidity case has gotten much more streamlined because of the tightness of the timing.

THE COURT:  All right.  No.  Thank you.  That's a whole section of my outline here, is just sort of my concerns about the invalidity claim and just how that would be presented to the jury.

I saw the stipulation between the parties as to the construction of Claim 7.  But then in looking at, I believe it's Dr. Sorini's expert report, I think there are 13 different claims that are being discussed.

So I just want to be clear, then.  It would be Claim 7, solely?

ATTY. MACHLEIDT:  Correct.

THE COURT:  And are there any disputes as to the construction of Claim 7, or is the stipulation that the parties had entered previously still good?

ATTY. MACHLEIDT:  It's still good, Your Honor. There's been no discussion of going back on it or modifying it.

THE COURT:  And then how does that case look for Valve?  I mean, is it Dr. Sorini, then, testifying?  It rises and falls on his testimony?

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Valve v. Rothschild et al., 1/29/26

ATTY. MACHLEIDT:  Yes and no.  Part of the invalidity case is -- a lot of it is, of course, with Dr. Sorini.  But it is part of our bad faith case as well.

One of the factors we have in our proposed jury instructions for bad faith is willful ignorance of the prior art.  We will have Dr. Sorini explain to the jury how art that Mr. Rothschild and his companies and his lawyers have known for years -- how that art -- it's primarily two patents, two prior art patents -- that they invalidate Claim 7 of the '221 patent.

So there will be fact testimony in terms of the prior art references that comes in, whether it's from Mr. Rothschild, some of the other lawyers who have represented him who will be testifying in trial.  They will also touch on the prior art, knowledge of the art.  But in terms of kind of putting it all together and saying these two references, alone or combined, invalidate Claim 7, that is Dr. Sorini.

THE COURT:  All right.  And then from a claim construction standpoint, I mean, is it enough that I have the stipulation of the parties as to the meaning of Claim 7, or is there more that is required of the Court, claim construction, of course, being a matter of law for the Court?

ATTY. MACHLEIDT:  I believe there's nothing else required.  Kind of refreshing on *O2Micro*, in terms of the disputes, the fact that there was a minor dispute and the parties reached agreement, that's all the Court needs to do,

Valve v. Rothschild et al., 1/29/26

knowing that there are no more sort of construction issues that have arisen that, under *O2Micro*, would require essentially something between now and trial.  That not being the case, I do believe the stipulation addresses any legal disputes over the meaning of any of the terms.

THE COURT:  All right.  Thank you.

ATTY. MACHLEIDT:  You're welcome, Your Honor.

THE COURT:  Mr. Zito, I'll give you an opportunity to respond.

I mean, obviously, the overarching question is whether or not we can squeeze all of this in in four days.  And I had specific questions to Mr. Machleidt as it related to the invalidity case.  I have a feeling that I know some of what you might say.

But, please, if you could address the Court from the lectern.

ATTY. ZITO:  Certainly, Your Honor.  Thank you.

We think ten hours is perfectly fine to present this case. Again, as we've said in our pretrial brief, we think this is a much simpler case than plaintiff does.

THE COURT:  All right.  And on the invalidity issue as it relates to Claim 7, the stipulation at Docket 74, I believe it is, is that still a good stipulation?

ATTY. ZITO:  Yes, that's correct.  There's nothing further for the Court to do on claim construction.

Valve v. Rothschild et al., 1/29/26

THE COURT: All right. Well, thank you.

I mean, I think there's -- you may be seated. Actually, as a matter of fact, I appreciate and like the decorum of federal court. And here in the Western District, obviously, we are famous for addressing the Court from the lectern. But for purposes of this pretrial hearing and us going back and forth, it's all right for counsel to remain seated.

So I need to look a little bit closer into this issue of the claim construction. Thank you for citing the *O2Micro* case. I mean, I'm not a -- was not a patent practitioner by law -- by trade, excuse me -- and, certainly, there have been -- you know, the invalidity claim has been stated loudly and clearly from the outset of the case. But in terms of how this case has unfolded, it hasn't been on the usual track that the Court might see in a case where infringement and invalidity claims are front and center. So I just want to make sure I do my due diligence here and avoid reversible error.

So with that, if the parties are confident that you can get this case in in four days, then I'm willing to do it. But please know that the Court will be strict about the time limits. I am very concerned with just not wasting the time of our jurors.

And we'll get to this later, but we will do jury selection before the first day of trial. I think you all have probably read on my chambers procedures that I like to do jury selection

Valve v. Rothschild et al., 1/29/26

by Zoom, so we will do that remotely.  But we won't lose any trial hours with jury selection.

And, of course, I mean, if you are both taking ten hours to put on your cases, I mean, that puts us at the end of the day on Friday.  So, you know, I'm also mindful of what time we would get this case to our jury.  I don't want to have this hanging over them over the weekend.  That's the way it goes sometimes, but that is something I'm thinking about.  So to the extent we can get this case to the jury end of the day Thursday or the start of the day on Friday, I think that would lend itself to our jurors making a decision within the four-day estimate.

All right.  I guess there's something else I should mention for the parties.  And I wish I could give you more specific guidance on this.  But there is the prospect of a government shutdown.  Your guess is as good as mine as to whether or not that is something that is, in fact, going to happen.  But as you know, there's a lapse in appropriation that will take place at the end of this month.

The judiciary -- I don't know what the fund's called -- but is able to work its magic to keep the doors open for a certain amount of time, but there is a point at which the money runs out.  We call that Phase 2.  It's got a very ominous name.  But right now, given that we are fresh off the heels of a previous government shutdown, there isn't a lot of money there.

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Valve v. Rothschild et al., 1/29/26

So the expectation -- or the projection, anyway, that I've received is that we would reach Phase 2 Wednesday or Thursday of next week.  So I will tell you that if we do hit Phase 2, I'm of the mind to continue this trial.

So this is, I guess, one of those things that we will play by ear.  I will certainly hear the parties out if there's any reaction to that.  I don't know if anyone here has practiced in King County.  This is maybe akin to trial on standby.  But I just wanted to address perhaps the elephant in the room as it relates to this government shutdown.

So, Mr. Machleidt, anything to say on that?

ATTY. MACHLEIDT:  No, Your Honor, other than this would be the second time I had a trial impacted by a government shutdown.  Last time was in DC.  And I think you said it well.  It's sort of a wait and see, very much out of our control.

THE COURT:  All right.  Thank you.

Mr. Zito?

ATTY. ZITO:  We're perfectly understanding of the situation, Your Honor.

THE COURT:  All right.  Outstanding motions.  There are a few.  I've got the *Daubert* motions.  There are the motions in limine.  And then there's the sanctions motion.

I think -- I've looked at the *Daubert* motions.  I'm inclined to deny the *Daubert* motion.  But I want to think a little bit more about -- I don't know if it's Dr. or Mr. --

Valve v. Rothschild et al., 1/29/26

Gugliuzza, the professor from University of Texas, I believe. I want to think a little bit more about appropriate guardrails for that testimony.

I don't think that outright exclusion is warranted, but the defendants make some good points about how testimony about bad practices and whether or not violations of best practices, standard practices, industry practices, are one and the same as violations of the law that the Court will instruct the jury as to.

So that is not a ruling, but that's where my head's at on the *Daubert* motion.

As to the motions in limine, I've reviewed them. I appreciate the time and effort that you all have put into them. For the most part, they're going to be denied. Some are going to be reserved. To the extent a motion in limine is denied, that is not to say that the motion can't be renewed. It's just, oftentimes, I just lack the context of the back and flow, ebb and flow of trial testimony in order to rule on a motion.

Motions that are, more or less, sort of just reminders to the Court to follow the rules, again, those are just -- those are denied. But there are a couple that I think are going to be reserved.

I also want to look at the Court's rulings as to the *Daubert* and sanctions motions as those will inform the ruling on the motions in limine, which brings us to the sanctions

Valve v. Rothschild et al., 1/29/26

motions.  There are two that are currently pending.

These are questions for Valve.  I think you raise good and valid points in the motions.  But the remedy that is proposed, can you speak to, I guess, what it is that you're seeking.  I mean, I look at some of the proposals for the adverse inferences, and they are more or less establishing your alter ego theory as a matter of law.

So I am wondering whether there is a more tailored approach to the sanctions that matches the possibility of any adverse inference with the specific discovery violation that is at issue.

ATTY. MACHLEIDT:  Your Honor, the answer is there might be, but I don't know what it is.  And in terms of the -- whether you call them adverse inferences or findings to be, you know, instructed to the jury under Rule 37, we believe that what we have proposed is tailored to the discovery violation.  Going from the first unopposed motion for sanctions, the request there, as you said, is a finding of alter ego, that Mr. Rothschild is the alter ego of all of his companies and sort of a little bit of a mix and match, same with PAM.

They did not oppose that motion.  But the discovery that we raised that had not been responded to or responded to far too late for us to take depositions, ask questions, ask follow-up, it goes to the heart of alter ego status.  And they -- to this day, they continue to withhold.

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Valve v. Rothschild et al., 1/29/26

To be fair, in the very recent days, we have gotten some of that information that we requested long ago. But that kind of goes into the second motion for sanctions where I'd say we kind of took a step further from simply alter ego.

And, you know, I'll summarize it. You know, we asked for the Court to find that Display Technologies and RBDS are undercapitalized shell companies used to shield Mr. Rothschild from personal liability. When you take a look at the discovery that we asked -- I'll just call it the financial discovery -- that gets to the very heart of that question.

And we have much of it now. Now, they've labeled it as confidential. I'll be mindful of, you know, not going into details. But the arguments that we made in our briefing, in our sanctions briefing, about what information we were expecting, what we were going to do with it, what we should have been allowed to do with it, it supports exactly those requests, that the companies are very intentionally underfunded, that they are used solely for the purpose of patent assertion.

Much of that is actually undisputed; right? And I know you touched on this in the order on the discovery motions. You know, the question becomes is that used to shield Mr. Rothschild; right? The answer is yes. That's what the evidence points to.

And the reality is, if they wanted to make a

counterargument, they should have given us the information long ago, and we could have had a fight about that on the merits; right?  They gave it to us far too late, even to the point where they didn't comply with your order; right?  They say that by December 30, they gave us what they thought was called for by your order.  That wasn't true; right?  And still now, we don't have the financials for Rothschild.

So when it comes to trial, whatever happens in the future, right, he can say anything he wants.  They ask us to take the representation that all the money in and out of PAM, that allows us to tell, you know, what's happening with Mr. Rothschild.  We've explained in our briefing that's not true.

THE COURT:  So, I mean, taking that one, for example. I mean, I seem to recall there was a proposed finding or inference, you know -- I hope this is a correct quote here.  I mean, I've got just sort of loose chicken scratch.  But, I mean, it was along the lines of Mr. Rothschild dominates and controls PAM.  But then there was a second clause such that, you know, he's the alter ego of the company; right?

Would it be enough to make a finding of a fact or to tell the jury to infer, you know, that -- I guess just enter a finding of fact from which the parties or the plaintiff, Valve, could argue about what it means?  Would that be sufficient?

ATTY. MACHLEIDT:  I apologize, Your Honor.  I'm not

Valve v. Rothschild et al., 1/29/26

sure --

THE COURT:  It was a little convoluted.

I mean, I guess what I'm trying to look at is a distinction between inserting facts, meaning that there's a finding of fact that the jury is to accept as true, versus more of a thumb on the scale that the alter ego theory has been proven.  I mean, it's, you know, in some ways, sort of like a directed verdict against Rothschild, Mr. Rothschild, if I was to enter inferences, findings, in that way into the record.

ATTY. MACHLEIDT:  I dispute, respectfully, that it would be a directed verdict against Mr. Rothschild because the reality is we have to win -- we have to win across the board because they are all commingled; right?

Even -- I mean, when we deposed their lawyers and said, who's your client, they couldn't tell us, is it Mr. Rothschild, DT, RBDS, PAM; right?  It is a complicated web.  And we were prevented from getting the information that would have allowed us to either win or lose this issue on the merits; right?

And the fact that the information is entirely within their control and they chose to withhold it, right, and, speaking limited to this alter ego issue, the fact that they did not even oppose that motion -- Your Honor, if there is a compromise, we will, of course, hear it out.  But I think this is a situation where they have done so little to help their case on the merits, I don't think you need to temper what we've

Valve v. Rothschild et al., 1/29/26

asked for.  We do request and we think that their conduct warrants a finding that he is the alter ego.

The reality is, if we take a step -- you know, if we kind of make it a more neutral finding, there's so much that Mr. Rothschild could say at trial that we know nothing about because the information that, frankly, he would need to use to try to fight that, it's all been produced nearly a year after we deposed him, at least six months after we deposed him, and we're going in the dark.

THE COURT:  So what remains outstanding?  I mean, the financial records for PAM, RBDS, DT, do you have those?

ATTY. MACHLEIDT:  Yes.  We have PAM, RBDS, and Display Technologies financials.

THE COURT:  Not Mr. Rothschild.

ATTY. MACHLEIDT:  Not Mr. Rothschild's.  We don't have all of the financials for -- I believe it's Display Technologies.  There are -- and Ms. Geyer explained -- it's RBDS.  So we don't have all of the financials for RBDS.

But today we certainly have much more.  Once we indicated to the defendants that we were going to move for sanctions, they did start producing that information.  So we have the financials.  I'm going to say most of them, I assume.

But if I may add to that, the more we look into the recently produced financials, it's sort of the same thing with the 33,000 documents that were dropped on our heads not long

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Valve v. Rothschild et al., 1/29/26

ago.  We learn more and more that there's a lot of information we do not yet know, to the point of Mr. Rothschild's account numbers.

They have never represented what his personal accounts are, even though they say that we can kind of, you know, compare the dots.  We have a financial expert.  We have spent a tremendous amount of time scouring what they've given us.  And as of today, we believe that there are other RBDS accounts for which we do not have information.

But, again, it's -- all I can say is I think there's more, and they haven't given it to us.

THE COURT:  So, I mean, short -- is there anything, short of giving you -- giving Valve all of the relief that it's requested, that the Court can do to address the alleged prejudice in a proportionate way without this heavy-handed touch to the scale here?

ATTY. MACHLEIDT:  Yes, Your Honor.  Starting from the back and kind of going back in time, sort of the most recently, we ask that the actual adverse inference, that sort of part of -- you and I haven't spoken about it yet -- but the adverse inference where you would instruct the jury that the defendants, however we choose to -- however you choose to phrase it -- you know, they have failed to comply with their discovery obligations.  The jury can assume that there is withheld information.  Had they produced it, it would have been

Valve v. Rothschild et al., 1/29/26

bad.  We believe that that is completely appropriate in light of now three motions to compel and two motions for sanctions and still being where we are, so much in the dark.

In terms of the -- kind of the shell company and the alter ego scenario, I think, for the alter ego, I stand by -- I do think it's not heavy handed and too much of a thumb on the scale to say that Mr. Rothschild has to ride the trial together with the companies with which he is the sole owner, manager, controlling entity of.  If he wanted to dispute that he is the alter ego of, for example, Display Technologies and RBDS, he could have given us the information to do so.  He chose not to.  So I would say, still give us that relief from the unopposed motion for sanctions.

For the second motion, for the requests we have about these are shell companies, so on and so forth, I think there, there's certainly room to compromise.  I appreciate your concerns that that's a lot to tell the jury in terms of -- it's still just a factor among many when you consider the Patent Troll Prevention Act.

But I think there, we would be -- Valve would be more than willing to sort of walk back and be content with something less than what it has currently requested but kind of -- I'll call that the middle.  But on the two ends, I think -- I don't see much compromise for those two issues, the alter ego and adverse inference on discovery.

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Valve v. Rothschild et al., 1/29/26

THE COURT:  All right.  Thank you, Mr. Machleidt.

ATTY. MACHLEIDT:  You're welcome, Your Honor.

THE COURT:  Mr. Zito?

ATTY. ZITO:  Yes.  I think the alter ego goes too far.  Let me first explain.

The records that have not been produced are Mr. Rothschild's personal records, okay, his money from other endeavors, his personal bank accounts, his personal life, okay.  They've asked many questions that go into his personal life that have nothing to do with this case.  Those banking records, those accounting records, which, again, have nothing to do with this case, have not been produced.

What's been produced is -- and I believe -- maybe there are some that are left out.  Because our client has been gathering what they can, but their records are not as good as they could be.

But I believe all the records, the financial records from all of the various defendants, have been produced.  And they indicate how much money has gone to Mr. Rothschild from any and all of the entities, including many of the entities that are not even in this case.  There are a number of PAM and PAM subsidiaries.  Only three of them are in this case.  And there are many others, and we've produced records from all the others.  And the totality of the records shows how much money is left in each of these companies and how much money has gone

Valve v. Rothschild et al., 1/29/26

to Mr. Rothschild.  So they have all the information.

The adverse inference that these companies are underfunded -- they're minimally funded.  I don't know where the underfunded comes in.  But I believe that's in -- one of their experts is going to say this much funding is underfunded.  But that information has been produced.  And the adverse inference that -- because of the reluctance or the delay in producing it, that the companies are underfunded would be the appropriate compromise from what Your Honor has said.

Telling the jury that these are bad people because they did not produce records, and they should hold them as being bad people because they didn't cooperate in discovery, I don't think that's warranted.  That's on the one hand that opposing counsel has proposed.

And the other one, that because companies are or are not underfunded, that automatically makes Mr. Rothschild the alter ego, I think that's going too far.  That's not an appropriate sanction for delays in producing economic data that shows how much money is left and how much money goes to Mr. Rothschild.

So I think the one in the middle that opposing counsel is avoiding is the appropriate compromise for the Court, not the "Let's tell the jury how bad they are."  I think that's just a prejudicial instruction he'd like to have, nor coming to the ultimate conclusion is the alter ego -- the jury should determine whether or not by -- you know, by the totality of

Valve v. Rothschild et al., 1/29/26

what he does, by the totality of the cases he files, the way his companies operate, the funding that's in the companies -- they need to make that determination whether that becomes his alter ego or just proper business practices.  I think that's for the jury to determine.  I don't think that's appropriate ultimate decision based upon discovery disputes.

THE COURT:  I think I track what you're saying, but I think I also disagree.

I mean, the fact that we're talking about remedy here gives you my take on the merits of the sanctions motion.  I mean, of course, on the first one, there was no opposition that was filed.  There was no response, actually, on the motion to compel as well.

So really what I'm looking at right now is a situation where -- I mean, I can't come to any conclusion other than willful, willfulness, for purposes of ruling on the sanctions motion.  But what I'm trying to do is make sure I come to a place in which I am giving Valve relief from the wrong that it has suffered without putting too much of a thumb on the scale.

So on the part of what remains outstanding, yes or no, I mean, have the records for RBDS been produced to Valve?

ATTY. ZITO:  To my understanding, they have been fully produced.

(Court reporter interruption.)

ATTY. ZITO:  Yes.  To my understanding, they have

Valve v. Rothschild et al., 1/29/26

been fully produced.

THE COURT:  All right.  Well, I have Mr. Machleidt and co-counsel saying that is not the case.

As to Mr. Rothschild, of course, he is the defendant in the case.  The Court's prior order did not distinguish among defendants.

So what is the basis for not producing the financial records for Mr. Rothschild that were requested in discovery and ordered by the Court?

ATTY. ZITO:  Our understanding is that that's the financial records for Mr. Rothschild relating to the activities of the many entities and Mr. Rothschild in asserting the patents.  Those have been produced.  Because all the money disbursements, all the payments to Mr. Rothschild from all of that activity for the last decade have been produced.

He has other personal financial interests that have nothing to do with this case.  And it was never our understanding that -- there's a Rothschild foundation.  He donates money to a Rothschild foundation.  The Rothschild foundation does things in Miami.  We didn't produce any of those records.  Those would also be his -- part of his personal records.

There's many other things that Mr. Rothschild does that aren't related to patents at all.  And so that's -- that's what has not been produced, Your Honor.

Valve v. Rothschild et al., 1/29/26

THE COURT:  And, again, I mean, you know, we're talking about remedies.

What do you think is the appropriate remedy here?

ATTY. ZITO:  That what Valve is insisting is that those records show that these are all shell companies that are underfunded in order to -- I believe to shield Mr. Rothschild personally from liability.  That's what the records show.  That's what the records would show.  That's what the records potentially show.  That's what they want for the delay in producing those records.

The bank records don't show that Mr. Rothschild is the alter ego of or has dominance and control over or anything like that.  That's in the testimony that they took of his former employees and other people and his counsel and things like that.  That's a different issue.  Nothing was ever withheld.  There's not any argument that anything was withheld that would show whether or not Mr. Rothschild exercised his dominance and control and is the alter ego of the companies.

What they're arguing has been withheld shows the funding or lack of funding, the fact that there are, quote, shell companies, whether or not they are underfunded intentionally so that if any adverse ruling occurs, they can go bankrupt.  They can disappear, whatever it is.  That's what those records would show that they -- if those records had that, that's what they're alleging those records would show, and that should be

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Valve v. Rothschild et al., 1/29/26

what they get from the delay as an -- appropriate sanctions.

We didn't delay any testimony from any of the prior employees about what Mr. Rothschild does to dominate, control, alter ego.  We never objected, and they've got nothing they've argued that shows that.  It's just financial.

And so at most, what they should have is the -- that they're undercapitalized shell companies for the purpose of avoiding liability, which is different than the ultimate finding of alter ego and control.

THE COURT:  Thank you, Mr. Zito.

Mr. Machleidt, I'll give you the last word on this.

ATTY. MACHLEIDT:  Your Honor, there was a lot there.  But one thing I want to point out -- there's a big difference between admissibility and discoverability.

Mr. Zito, even now, is saying things that I don't know if he's seen documents to stand behind those representations because we just don't know; right?  We haven't asked for accounts of, you know, Mr. Rothschild's charitable institutions or whatever.

But the point is, we should be allowed -- as you mentioned, Mr. Rothschild is a named defendant.  We should be allowed to have the financials.  They are relevant that that ship is long sailed; right?  As you said, we're talking about a remedy.  We should all be allowed to look at them and decide whether Valve can make the argument -- you know, could have

Valve v. Rothschild et al., 1/29/26

made it at summary judgment, can make it at trial, right, on the merits.  They just ask you to trust them.

And the reality is, going back to that 33,000-document sort of data dump that happened recently, right, that -- that covers the waterfront of discovery.  And it's in our briefing, but I'll be -- I'll be brief on this point.  There is evidence from that production that they told us -- that the defendants told us they would give us certain information.  There were no privilege objections.  There were no relevance objections. They would give us that information.  And we found in those documents, which I don't believe they intended to give us the way they did -- we found in those documents incredibly relevant information -- we've referenced it in the briefing -- that we thought, if it existed, we were going to have it.

So knowing that the more they talk about discovery, the more they try to dig themselves out of the -- kind of the hole that they've, you know, dug for themselves, the worse it gets; right?  I don't think we, Valve, on the, you know, doorstep of trial should take -- should be forced to take any representation from them about what is or isn't in Mr. Rothschild's accounts; right?  That -- again, that's too late.

And the remedy here -- they really don't want to give us that information.  Fine.  You know, they -- it is sanctionable. But the remedy has to be something that actually addresses the

Valve v. Rothschild et al., 1/29/26

harm.

And here, it is as I've said.  All the information that they choose not to give us would be directly relevant to being able to decide these issues on the merits.  They prevented us, they prevented you, Your Honor, from having that ability.  And they simply say -- again, it kind of goes back to Mr. Rothschild at his deposition.  He thinks he can decide what's relevant and, therefore, what's, you know, discoverable.  That's not how the rules go.

And, again, Valve is more than willing to find a compromise kind of in that middle ground about the shell companies; right?  I appreciate your concern.

I will point out, though, that the shell company issue, that's still -- again, in our kind of proposed jury instructions, that's just, you know, one or one and a half of, you know, give or take, ten nonexclusive bad faith factors.  So even if you cut that in our favor, it doesn't mean that bad faith is established right then and there.  There's still more that we have to do.

THE COURT:  All right.

ATTY. MACHLEIDT:  May I have ten seconds, Your Honor?

THE COURT:  Of course.

ATTY. MACHLEIDT:  Your Honor, if I may just take twenty seconds on the record.

Mr. Zito sort of characterized my argument as Valve wants

Valve v. Rothschild et al., 1/29/26

to be able to tell the jury that the defendants and their witnesses are bad people. That is not what I've requested. That's not what Valve wants.

The reality is that there are rules, discovery rules, federal rules, your rules. And when the parties repeatedly fail to comply with them, it becomes willful. And there is a remedy for that willful violation, repeat violation of the rules. One of the very sort of known remedies is an adverse inference. If you have the information, and you didn't give it up, and you were supposed to, that's going to hurt you.

THE COURT: No, that's right. And, I mean, I understand the points that you were making right now and the point made in the brief. I think, in terms of how I've approached this part of the hearing, letting it be known that I am approaching this from the place of what the appropriate remedy is, I think, tips my hand as to how I'm viewing the issues.

My concern, Mr. Machleidt, is that cases should be decided on the merits. And an adverse inference is not the most severe sanction. Obviously, a terminating-type sanction is the most severe. But, you know, adverse inferences, inserting findings into the record, aren't too far from that.

So I want to approach that in a thoughtful way. And you all have given us a pretty big record to review on this, so I just want to put all the pieces together and make sure that

Valve v. Rothschild et al., 1/29/26

everything lines up as the parties have alleged, and then I will fashion a remedy.

So as it relates to -- you may be seated.

As it relates to the *Daubert* motions, the motions in limine, the sanctions motions, you will have a written order on those issues. I suspect early next week is the timing on that. So I know that is something that you will need for your case.

Preparation, I've tried to be as transparent as I can with where my current thoughts are on those issues, but a written order will follow.

I do, actually, want to circle back to one issue that I didn't address that is on my outline.

Mr. Zito, I believe, in reviewing the briefing, there's been some contention that it is improper for Valve to carry forward with its invalidity case absent an infringement case by the defendants.

Am I characterizing that argument correctly?

ATTY. ZITO: Their invalidity case, as far as it is a declaratory judgment action, would lose that -- has lost that basis because of our withdrawal with prejudice.

But I understand from the Court's earlier ruling, and I understand from the positions that Valve makes, that they want to say that invalidity is a factor in bad faith. And if the Court finds that invalidity can be a factor in bad faith, then it would stay in.

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Valve v. Rothschild et al., 1/29/26

However, we would add that it would have to be known invalidity for it to be bad faith. And there's been no ruling by a prior court -- so you can't -- you can't rule invalidity in this court and then say, aha, back in 2023, when the letter was written, the patent was invalid. Therefore, it's bad faith.

So there's no real reason for the Court to rule on validity or invalidity, even on Claim Number 7. But we concede that there could be some relevance as in a bad faith if their expert wants to say Mr. Rothschild or whoever should have known about this patent and should have known that that patent made this invalid, and, therefore, he was somehow acting in bad faith because of what he should have known or should have surmised or should have concluded. I would concede that that could be relevant information. But that doesn't support the jury or the Court coming up with a finding of invalidity, because that's years too late for that to have any relevance on bad faith and good faith.

The other issue -- not to jump from invalidity -- it's very much similar to the issue of infringement. Saying that they are isolated from infringement because they have a license is different than finding noninfringement of the claim. Noninfringement of the claim means that the accused device doesn't match. That hasn't been conceded. No one's conceded the accused device doesn't match the claims. What has been

Valve v. Rothschild et al., 1/29/26

agreed to is that because of the previous license, they don't infringe.

And so that was also somewhere else.  But I just wanted to bring that up because we were talking about invalidity versus, you know -- holding that versus that being bad faith.  And the same goes for noninfringement.  And a finding of noninfringement, not actual correspondence between the claim and the -- would be far too late for the 2023 letter.  And, also, that's not what's been agreed to.  What's been agreed to is that the license isolates them from infringement.

THE COURT:  All right.

ATTY. MACHLEIDT:  Your Honor?

THE COURT:  Mr. Machleidt?

ATTY. MACHLEIDT:  May Ms. Geyer handle the response?

THE COURT:  Yes, please.

ATTY. GEYER:  Good morning, Your Honor.  Kate Geyer on behalf of Valve.

I believe, to your first question, it was more of a jurisdiction question about whether or not the invalidity claim would remain in the case.

There's two cases -- there's one case I'd point you to.  It's the *Cardinal Chemicals* case I believe we cited on the briefing on the motion to dismiss, which confirms that just because an infringement claim is decided on the merits or goes away, it does not strip jurisdiction automatically as to an

Valve v. Rothschild et al., 1/29/26

invalidity claim.  There is still discretion for the Court to keep jurisdiction over that claim.  And, specifically, here, as to declaratory judgment jurisdiction and apprehension of fear, in this very case, in, I believe, the first answer, defendants asserted a counterclaim of infringement of a patent that they previously dismissed with prejudice against Valve.

So a dismissal with prejudice isn't any more helpful than a license was.  Both of them should have given us comfort that we were never going to get sued again -- and not just the '221 patent, but that was the '195 patent, in the original answer -- is there is a pattern of just ignoring the fact that they can't keep coming after us.

So, yes, we agree, and we appreciate that defendants agree, that defendants' willful ignorance of invalidity is relevant to bad faith.  But there is still also jurisdiction as to declaratory judgment on the merits of invalidity.

THE COURT:  All right.  That's consistent with the Court's understanding.  But I want to come back to something -- you know, just in terms of what it is that you are asking the jury to find.

I mean, on the verdict form, are we looking for the jury to invalidate the '221 patent?  Or is this a sort of -- I don't want to call it atmospheric, but is it speaking to the elements of bad faith as to the other claims?

ATTY. GEYER:  It's both, Your Honor.

Valve v. Rothschild et al., 1/29/26

So on the verdict form, there is a question, do you find Claim 7 -- I don't think it says Claim 7 yet, but we'll limit it to Claim 7 -- of the '221 patent invalid?  Yes or no?

We also proposed in our jury instruction -- I believe it's Factor 10 in our disputed -- in the Valve version of the disputed ones -- a bad faith factor, that is, whether defendants were willfully ignorant of the prior art to the '221 patent.  And we have cited a Federal Circuit case supporting that evidence being relevant to bad faith, which is the *Rothschild Connected Devices Innovations v. Guardian Protection Services* case, 858 F.3d 1383.

So it will be discussed as part of the various factors of bad faith under the Washington PTPA, but we do also intend to have an actual question to the jury on invalidating that claim.

THE COURT:  All right.  Thank you for clarifying.

All right.  Mr. Machleidt?

ATTY. MACHLEIDT:  I didn't want to jump the gun, Your Honor.  Dario Machleidt, on behalf of Valve.

I know you mentioned that the MIL rulings are coming our way.  If I may ask, we have some junior lawyers here who are -- one, in particular, who is prepared to argue one of Valve's motions in limine.

Would you grant us even just a few minutes to kind of spar with her and give her that argument?

THE COURT:  You know, I certainly appreciate the

Valve v. Rothschild et al., 1/29/26

request.  As you know from my chambers procedures, I actually encourage that.  But I have another hearing this afternoon.  So in that way, I'm dialed in, listening to the parties, but I'm also watching this clock right now.

So I'm going to have to decline the request right now, but perhaps there will be an opportunity, in the course of trial, for argument on issues as they arise.

ATTY. MACHLEIDT:  Absolutely, Your Honor.  I'm sure there will be.

Thank you, Your Honor.

THE COURT:  All right.  So back to jury selection. Actually, I'll pick up jury instructions.

I give the jury the preliminary jury instructions that are typically housekeeping-type instructions, what they can expect as the trial unfolds.  I do not give substantive jury instructions at the outset of the case.

So there are issues here that we've touched upon that relate to the jury instructions and the verdict form.  Those likely will not be resolved before the first day of trial.

What I will say is that I will review the drafts submitted by the parties closely.  I will then issue a discussion draft of the final instructions in advance of plaintiffs resting their case so that we can discuss, as the parties and the Court, what the appropriate instructions should be and make sure that we get the appropriate charge for our jury.  So that

Valve v. Rothschild et al., 1/29/26

will be the time at which to argue the final jury instructions, is when the Court gives out the draft instructions of the final instructions.  I should say that's when we discuss the substantive elements of the claims.

So going back up to the top of my outline, jury selection, I'm being told that perhaps February 9 would be a good day for jury selection.  The jury selection would take place via Zoom.

You all have done, you know, the Zoom thing before.  We will bring jurors in in flights.  It's just too much to have, you know, 40, 50 jurors on the screen at once.  So we'll have flights of jurors that we question.

So you all have read the Courts' general voir dire.  It's on the website.  Those are just aimed at sussing out conflicts and hardship.  I'm not going to present, you know, case theories or ask anyone how they feel about certain industries or technologies, any of that.

I thought the questions that the parties submitted to the Court as proposed voir dire questions were all fine and appropriate for the parties to ask, but I will not be asking them; all right?  So I'm going to stick with just the general screening, sorting questions will come from the Court.

After that, we will launch into attorney-led voir dire. I'm going to give 20 minutes for each side for the attorney-led voir dire, starting with plaintiff first, of course.  Ask, you know -- I won't say whatever you like, but ask questions.  This

Valve v. Rothschild et al., 1/29/26

is your opportunity to question potential jurors, the venire, who might actually sit on the jury.

Do not argue your case, though.  I'll step in if people are just trying to argue case theories.  Questions, yes.  Argument, no.  So we will do 20 minutes per side for attorney-led voir dire.

We will hear hardship -- I'm sorry -- not hardship but cause challenges outside the presence of the jury.  I think Zoom really lends itself well to hearing cause challenges.  I do cause challenges, even for in-person jury selection, outside the presence of the jury.  But that's how we'll do it.  We will do a flight of jurors.  You all will answer your questions.  And then while it's all fresh in our minds, I'll hear cause challenges as to any juror, so, you know, getting at bias or whatever other reason it might be.

I will then hear from the parties on peremptory challenges.  There are three -- not challenges -- but peremptory strikes.  There are three per side.  I'm trying to remember how I did this last time, if I'll have you all email or just call out the numbers.  But we will hear the peremptory strikes from the parties at the very end.

And then from there, we will impanel our jury.  We will get them sworn in and then have them report for jury duty on the first day of trial.

So then on that first day of trial, we'll -- I will

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Valve v. Rothschild et al., 1/29/26

instruct the jury, and then we'll launch right into opening statements and the presentation of evidence.

Any questions about that?

ATTY. MACHLEIDT:  Yes, Your Honor, just a few from me, but I imagine my colleagues have a few more.

I have not done -- Dario Machleidt on behalf of Valve.  I have not done Zoom jury selection.

In terms of knowing kind of an individual who's worth questioning because they're close to being on the panel versus Juror Number 58, is it sort of -- is it similar -- being in person, if somebody's in the back, they're not going to make it all the way to, you know, the final 12?  Or would it may be such that when we ask our own questions, we can sort of focus on, if we choose to, the lower numbered jurors, as opposed to the higher numbered jurors?

THE COURT:  Yeah, I mean, I don't think we are going to have a huge excess of jurors.  So, I mean, I would say to question everyone.  But, yes, you've touched upon just the reality of jury selection.  I mean, Juror Number 68 probably won't make it in the box.

So we will do the jury selection in flights.  The jurors will be numbered.  They'll come in in sequential order.  So you'll see on your screen the jurors.  And, you know, Juror Number 57, if you want to question him or her at length or not at all, I mean, that will be your prerogative as the attorney

leading the questioning.

ATTY. MACHLEIDT:  Thank you, Your Honor.  If I may, one or two more questions.

Do we get information -- sort of the basic information about the jurors ahead of time and --

THE COURT:  Yes.  So questionnaires.  The Court sends out a survey to the jurors.  It's just basic demographic information, name, age, who resides in your household, level of education, just basic demographic-type questions.

We don't get it too far in advance.  So as soon as I have the questionnaires, we will send it out to you.  It will be just PDFs.

I think that's right.  Grant, is that right?  PDFs?

THE CLERK:  Correct.

THE COURT:  PDFs of the completed sheets.  I know some jurisdictions -- again, I'm thinking of King County -- they give you a spreadsheet.  We don't do that here.  You get a PDF.  And then you and your team can go about, you know, sorting through and figuring out any questions you might have for any particular juror.

This case doesn't involve any sensitive subject matter. So in that way, I'm not anticipating anyone -- any potential jurors requesting screening outside the presence of other jurors.  But, again, that's something that is easy to accommodate via Zoom if there are any jurors that, for whatever

Valve v. Rothschild et al., 1/29/26

reason, if any of these issues are hitting too close to home, would like a private screening. And I always use air quotes on private because it is still open court, but outside the presence of the other jurors. That is something that we can do just to make sure that we are getting the best, most accurate, most truthful answers from jurors about their feelings on views on the case.

I have looked at the jury instructions, but I may get back to you about a neutral statement of the case. Just to orient the jurors and let them know what the case is, I typically read a short statement to the jurors, just so they know what's going on.

So there's Model Instruction Number 2, I believe, is -- involves a neutral statement of the case. So I'll look at that and see if that's something that I can repurpose for use during voir dire. If it's too long or -- just don't like it, I might get back to you. Mr. Cogswell and Andrew might reach out to you about redrafting. And I want to make sure that we are all on the same page about any neutral statement that is read to the potential jurors at the outset.

Mr. Zito, any questions?

ATTY. ZITO:  Were you finished?

ATTY. MACHLEIDT:  I've done a lot of talking. After you.

THE COURT:  Which is why I went to Mr. Zito.

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Valve v. Rothschild et al., 1/29/26

ATTY. ZITO:  I just have a logistical question so I understand.

THE COURT:  Yeah.  Go ahead.

ATTY. ZITO:  The jurors will phone in on Zoom.  The Court will phone in on Zoom.  And the attorneys will phone in.

THE COURT:  Correct.  Yes.

ATTY. ZITO:  We're not going to be here with the jurors on Zoom or vice versa.

THE COURT:  Thank you.  That's an important point of clarification.

Yes.  You can be at your office for Zoom.  Mr. Cogswell will circulate a Zoom link, and then we will all patch in remotely.

ATTY. ZITO:  And that's on the 9th.

THE COURT:  Yes.  I'll -- we'll confirm it in a minute order following the hearing.  I need to confer with Mr. Cogswell to make sure that we've got everything all lined up.  We need to check with jury admin, of course.

But based on the message that I just received, it's looking like February 9.

ATTY. ZITO:  Okay.  I had one issue regarding the order that you had.  I don't know if I should bring it up now or --

THE COURT:  Sure.  If it's something -- a different subject, let's go back to Mr. Machleidt about jury selection,

Valve v. Rothschild et al., 1/29/26

though.

ATTY. MACHLEIDT:  Your Honor, you mentioned flights and then also 20 minutes.

How many potential jurors are in the flights?

And then the 20 minutes, is it 20 minutes per flight of jurors?  Or, I guess, how does that go?

THE COURT:  Yeah, twenty minutes per flight.  I'm guessing two, maybe three here.  We'll see how it plays out. I'm guessing that we're going to expect probably about 40, 45 to answer the juror summons.

I should tell you.  I'm going to impanel eight jurors here.  We need six to return a verdict in a civil case.  I think eight is a good number.  If we lose someone, we will still be able to do our thing.  If we lose two people, we can still reach a verdict.  But this will be a jury of eight.

All right.  Mr. Zito, you had another question?

ATTY. ZITO:  It's easier for me to stand up here and talk into the microphone.

On Page 21 --

THE COURT:  I'm sorry.  What are you looking at right now?

ATTY. ZITO:  I'm looking at your decision, the order that came out.

THE COURT:  Give me a docket number, please.

ATTY. ZITO:  Oh, I'm sorry.  Docket Number 218.

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Valve v. Rothschild et al., 1/29/26

And on --

THE COURT:  This is the order on the cross-motions for summary judgment.  All right.

ATTY. ZITO:  And on Page 20, you're talking about the Meyler defendants' immunity under Noerr-Pennington doctrine.

THE COURT:  Yes.

ATTY. ZITO:  Okay.  On Page 21, the last paragraph, you refer to defendants' behavior reflects a strategy of seeking.

THE COURT:  Yes.

ATTY. ZITO:  Okay.  And it goes on to the next page and lists five cases and some other cases.

THE COURT:  All right.

ATTY. ZITO:  I just wanted to make it clear to the Court that all of that behavior is the other defendants.  None of that is the Meyler -- the attorney that was sanctioned in Texas was not the Meyler defendants.  None of those cases were filed by or participated in by the Meyler defendants.

I just wanted -- it was not clear from the way it was written that the Court understood that, that Mr. Meyler is not -- has only been counsel in one case in this court for the other defendants.  He's not -- he's not their regular counsel, wasn't involved in the other things.  That's all.

THE COURT:  All right.  No.  Thank you for the clarification.  I appreciate that.

Valve v. Rothschild et al., 1/29/26

Mr. Machleidt?

ATTY. MACHLEIDT:  Very briefly, in response to what Mr. Zito said.

I believe, in that Pages 21 to 22 of your order, you reference Washington cases and Texas cases.  The Washington cases referenced here, it was Mr. Meyler who represented the Rothschild plaintiffs in those cases.

THE COURT:  And, of course, I mean, on Page 21, looking at that last paragraph, it says defendants' behavior.  It doesn't call our Mr. Meyler in particular.

So I appreciate you making your record, Mr. Zito, but the order is what the order says.

ATTY. ZITO:  I'm sorry?

THE COURT:  I said the order is what the order says.

ATTY. ZITO:  Yes.  Okay.  Thank you.

THE COURT:  All right.  Let's move it along here.

All right.  So we've covered jury selection.

Remote versus in-person testimony.  It looks like mostly in person.  To the extent you are requesting leave to present any witnesses remotely, I need you to at least pay a little lip service to Rule 43.

I mean, it is 2026, so I don't have any aversion to people testifying remotely in a civil case.  But I do need you to speak to the standard a little bit about Rule 43.  So that can be addressed before any witness is called to appear remotely.

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Valve v. Rothschild et al., 1/29/26

So just work with each other.  Work with Mr. Cogswell. And just let us know in advance to the extent there is anyone that is being presented remotely.

On the part of the deposition designations, are we looking at video, or do we have written transcripts?

ATTY. MACHLEIDT:  Video, Your Honor.

THE COURT:  Very good.  So that takes care of the issue.

To the extent there are written transcripts, it's important to have a reader.  But if we've got video, that isn't an issue.

Again, please work with Mr. Cogswell.  Work with the courtroom IT to make sure that your equipment works properly and that we don't have any problem with feedback.  I hate losing jury time to technical issues.  So if your video is not working, I might ask you to call a live witness.

Talked about the outstanding ruling on the *Daubert* motions.  I sort of previewed the ruling there.

Rule 615, witness exclusion rule.  Witnesses should not be -- witnesses that you anticipate will testify should not be in the courtroom until the time of their testimony.  After they testify, then they're free to observe the rest of the proceedings.  Of course, that doesn't apply to parties or, in the case of a corporation, a corporate designee.

So if there is a corporate designee for Valve that you'd

Valve v. Rothschild et al., 1/29/26

like to designate, please just make sure that person is known.

ATTY. MACHLEIDT:  Your Honor, would you like us to make it known now?

THE COURT:  Sure, if you know.

ATTY. MACHLEIDT:  It will be -- Chris Schenck will be our corporate designee, who will also testify in the trial.

THE COURT:  All right.  Mr. Schenck.

As to evidence, take a look at your exhibit list.  In a four-day trial, I find it hard to believe that we're going to get to 600 exhibits.  So take a look.  Cull it down as best you can.

I was looking at it, not Mr. Schenck but Mr. Shneck -- I might be getting the name wrong.

ATTY. MACHLEIDT:  Ms. Schenk?

THE COURT:  Ms. Schenk.  Thank you.  My apologies.

But it looked to be a little bit of duplication there on the exhibit list.

To defense, please remember to put the "A" prefix before your exhibits.  And to the extent you haven't already, I guess it's probably not time yet, but electronic copies to the Court, please.

I know that there was a stipulation reached as to notifying each other about the next day's witnesses and exhibits.  I'll take a look at the pretrial order again.  That didn't seem to be a problem to me, but I'll take a closer look

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507

Valve v. Rothschild et al., 1/29/26

at the language that you all have there.

But setting that aside, the Court encourages parties -- orders parties to disclose the next day's witnesses. This is a civil case. There shouldn't be any surprises. You all know who the witnesses are. You know what the arguments are. You could probably guess what exhibits go with which witnesses. So it's no secret sauce being given up to disclose the next day's witnesses and exhibits.

And the reason why I ask that, it's not just because it's, I think, a professional courtesy, but it's also to flag any potential areas of disagreement or dispute.

I really don't like sidebars. I think it's just rude to go in the corner and whisper outside the presence of the jury. So really what I like to do is address any evidentiary issues at the start of the day, meaning 8:30. So I ask the parties to be ready to go at 8:30. It might not be that there's anything for us to discuss. But if something pops up overnight, I want to address it outside the presence of the jury so that we don't lose any jury time arguing about evidence.

To the extent any exhibits are stipulated as to authenticity and admissibility, do not consider them preadmitted. I still need a witness to offer them up. I'll be a little more lax foundationally, but I still need you to offer the exhibit into the record. Don't consider anything preadmitted.

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206) 370-8507

Valve v. Rothschild et al., 1/29/26

ATTY. MACHLEIDT:  May I ask a question about that, Your Honor?

THE COURT:  Of course.

ATTY. MACHLEIDT:  We, of course, saw that in your rules.

In terms of offering, you know, an exhibit into the record, do you want it done sort of then and there, when the exhibit has been presented, you know, to the witness with knowledge?  Or, for example, I think at least one or two witnesses will probably have 10 or 30 or -- you know, a lot of exhibits.

Do you want us to kind of save the offers for sort of undisputed exhibits, if you will, to the tail end of the examination or even potentially later?

THE COURT:  However you'd like to do it.  And I guess that's what I was alluding to with perhaps a little bit more lax with the foundation; right?  I mean, if there are exhibits where there isn't any dispute about the exhibit -- I mean, if you don't have the author of that email as the witness through which you're trying to offer the exhibit, you know, we'll see how that goes.  But, generally speaking, I need you to offer it.

So whether you want to do a wholesale sweep at the end of someone's testimony or right then and there, as you are, you know, showing the document to the witness, that's just going to

Valve v. Rothschild et al., 1/29/26

be your call as the examining attorney.

ATTY. MACHLEIDT:  Thank you, Your Honor.

THE COURT:  As far as objections go, please no speaking objections.  Just state the basis concisely, and I will rule.

Let me know if you or any of your witnesses need any sort of accommodations.  That's something certainly that we will work with you all on.

We'll put out a minute order so that you can bring food and drink into the courthouse.  That's something that will go out.

Thank you, Valve, for the offer of the binders for the juries, but we'll take care of that.  So that's something that's probably a change that you'll see.  I'll strike that out on the pretrial order.

As to the patent tutorial, I think it's a good idea to show that, so I'll work with jury admin to make that happen.

All right.  That's all I have on my outline.

Any questions from the parties?

ATTY. MACHLEIDT:  One question in terms of exhibits, Your Honor.

For exhibits to be used in an opening statement, do you have any rules or regulations about that process?

THE COURT:  No, that's a great question.

Please use stipulated exhibits for your opening

Valve v. Rothschild et al., 1/29/26

statements.  I don't want anyone to get derailed with a bunch of objections, so stick with stipulated objections -- I'm sorry -- exhibits for your openings.

I don't require the parties to exchange PowerPoint decks beforehand.  I just don't like that.  I won't get on my soapbox talking about why.  But there is no requirement to exchange PowerPoints beforehand.

But it is very difficult, in a PowerPoint presentation, to remove an exhibit if there is a sustained objection.  So be judicious with what you include in any opening deck.

ATTY. MACHLEIDT:  Thank you, Your Honor.

If I may -- and it's potentially a bigger issue -- we have, at the end of the pretrial order, the proposed pretrial order, an issue that has arisen about Mr. Meyler, who is, of course, here, and privilege, his appearance on the privilege log with Texas counsel.

I think Mr. Zito even -- when he came and talked about your -- yesterday's order, he drew the distinction between Texas counsel and Mr. Meyler.  When we look at the privilege log, there's maybe not as big of a divide between the two as we were led to believe.

If I may, Your Honor, either -- you know, of course, the ultimate thing is we think that we should see what the documents are.  We don't believe that the privilege actually applies there.

Valve v. Rothschild et al., 1/29/26

But at the very least, we ask for an in camera review from somebody who is not counsel for the defendants to see whether their claim of privilege specific to when Mr. Meyler is on an email communication with Texas counsel -- whether that is actually legitimate. Based on everything we've discussed today, the motions to compel and sanctions, we have our very serious concerns about the representations of the recent privilege logs.

THE COURT: Understood.

Mr. Zito, I'll give you an opportunity to speak on that, but before you do, I will tell you -- this is written in handwriting, which is maybe why I didn't read it off when I was looking at my outline.

On that particular issue, I mean, I read what was written in the pretrial order, and it was maybe a little less than a page, about a page, from Valve, a hot paragraph from the defendants.

What I would say to that issue is I am not in a position to give you any sort of ruling today. You all work together. Try and work the issue out. To the extent you can't, give me an LCR 37 submission. Let's say no longer than ten pages. And I'm not being to -- that should be plenty to present this issue to the Court. You don't have to use all ten. Maybe I should have said eight.

But present it to me in writing so that I can take a look

Valve v. Rothschild et al., 1/29/26

at what your arguments are.  If you all agree that an in camera review is appropriate, then attach whatever the documents are to the submission.  Get it to me by, say, end of the day on Tuesday.

ATTY. MACHLEIDT:  Understood, Your Honor.  Thank you.

THE COURT:  All right.  With that understanding, Mr. Zito, is there anything that you want to add in the moment or just save it for the brief?

ATTY. ZITO:  We'll save it for the brief, Your Honor.

THE COURT:  All right.  Very good.

Anything else?

ATTY. MACHLEIDT:  Not from Valve at the moment, Your Honor.

THE COURT:  Mr. Zito?

ATTY. ZITO:  No, Your Honor.

I'm sorry.  I do have a question.

On the local Rule 37 brief, do you want the parties to file a joint brief or --

THE COURT:  Joint brief.  Yeah, I'm sorry.  I was speaking in shorthand there.

Work with your local counsel.  But, yeah, LCR 37 is a joint procedure primarily used for discovery disputes, which is basically what this is.  But it's a joint submission.  And it's all just in one brief, so it's a complete package that's submitted to the Court.

Valve v. Rothschild et al., 1/29/26

ATTY. ZITO:  Thank you, Your Honor.

THE COURT:  Okay.  So the last thing that I will say is that if you all are going to settle the case, settle the case.  There's a lot that goes into putting on a trial.  I enjoy trials, so it's not any sort of reservation or apprehension to presiding over a trial.  But what I don't want to see is all of the work that goes into a jury trial on behalf of the lower bench and then, of course, our jurors to have the parties settle on day one of the trial or on the eve the trial.

So at this point, with the rulings on the dispositive motions, those are big data points that perhaps you needed.  We will get the other rulings out.  But if you're going to settle, settle.  Don't play a game of chicken.

All right.  With that, court is adjourned.

(Adjourned.)


C E R T I F I C A T E


I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.


/s/ *Andrea Ramirez*

ANDREA RAMIREZ
OFFICIAL COURT REPORTER

Andrea Ramirez, CRR, RPR, Official Court Reporter
USDC WAWD, 700 Stewart Street, Seattle, WA 98101
andrea_ramirez@wawd.uscourts.gov, (206)370-8507